1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW JERSEY

3

4    STEVEN FODER,              :        Civil No.
                                          14-cv-3935 -MCA
5              Plaintiff,        :
                                         TRANSCRIPT OF
6         v.                     :       TRIAL PROCEEDINGS

7    PORT AUTHORITY TRANS HUDSON  :          VOLUME 3
     CORPORATION,
8                                :
              Defendant.
9    -------------------------------x

10

11                                   Newark, New Jersey
                                     November 16, 2016

12

13

14

     BEFORE:
15
            THE HON. MADELINE COX ARLEO, U.S.D.J.
16

17

18                                   Reported by:
                                     CHARLES P. McGUIRE, C.C.R.
19                                   Official Court Reporter

20

21

            Pursuant to Section 753, Title 28, United States
22     Code, the following transcript is certified to be
       an accurate record as taken stenographically in
23     the above entitled proceedings.

24
                              s/CHARLES P. McGUIRE, C.C.R.
25                            _____



                  CHARLES P. McGUIRE, C.C.R.

369

```
1      APPEARANCES:

2           BARISH ROSENTHAL
            1717 Arch Street
3           Philadelphia, PA 19067
            BY: SAMUEL J. ROSENTHAL, ESQ., and
4               ANTHONY M. DiGIULIO, ESQ.
            Attorneys for Plaintiff
5
            NICHOLAS MINO, ESQUIRE
6           150 Greenwich Street
            New York, New York 10007
7           Attorney for Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           (Jury out)

2               THE COURT CLERK:  All rise.

3               THE COURT:  Okay.  Good morning, everyone.

4               Good morning, Chuck.

5               So tell me.  We have an issue.  Houston, there's a

6     problem?

7           (Laughter)

8               MR. ROSENTHAL:  Yes, Houston, or, yes, wherever,

9     Cape Canaveral, there is a problem.

10          (Laughter)

11              THE COURT:  Okay.

12              MR. ROSENTHAL:  Our expert -- who is not

13    testifying right now; we're still on Mr. Foder's

14    testimony -- has a demonstrative exhibit that he built to

15    show the exact dimensions that were required for the --

16              THE COURT:  Wow.  That's quite an exhibit.

17              MR. ROSENTHAL:  And it's solely to show the

18    dimensions, and that these are the dimensions.

19              And I think defense counsel is objecting to him

20    using that at trial.

21              THE COURT:  It's not being admitted for evidence.

22    He's an expert.  He's using a demonstrative.  What's your

23    objection?

24              MR. MINO:  The objection is that, one, we never

25    even got notice about this until about 10 minutes ago.

1          Two, it doesn't -- I think it's prejudicial to

2    PATH.  It does not give an accurate representation of what

3    the entire train looked like.  We have photographs that are

4    in evidence that show the exact train makeup, they show the

5    climb system, and there's really no reason for this.

6          If they think that the jurors really need to get a

7    sense of it, we'll gladly take them over to Harrison so they

8    can see the actual train.  But this, just a couple portions

9    of the train, is not accurate.  It's -- quite frankly, you

10   can't even ask for a demonstration on how to climb it

11   because I think the pipes would break.

12         THE COURT:  I don't understand.  We've talked.

13   It's not that complicated of a fact scenario.  We've been

14   using the picture on the big screen and we've been using

15   this blowup to demonstrate with every witness the process or

16   the way in which Mr. Foder claims he was injured, and it's

17   simply how to get on and off the train, right?  That's what

18   we were talking about.

19         And actually, when he was testifying, he talked

20   about -- you talked about the steps, the handlebar, and the

21   height, and the whole anti-climber, and there was a lot of

22   testimony about whether the anti-climber was the whole

23   diamond area or was just the two-inch edge and how the

24   anti-climber already goes from the edge all the way down to

25   the bottom of the area.

1          So I look at this exhibit, and it's a bunch of

2     pipes.  And I'm concerned, frankly.  Although my inclination

3     is always to let experts use demonstratives, it's not even

4     drawn to scale in terms of what the whole -- the whole case

5     is about this anti-climber.  We've called it the

6     anti-climber.  There is another phrase for --

7          MR. MINO:  The vestibule.

8          THE COURT:  The vestibule.  There's the picture up

9     on the screen.  And now I have something that doesn't even

10    show that part.

11         So I'm confused what probative value -- I mean,

12    it's really probative versus prejudice, and I'm concerned

13    that, given the way it's designed, it's not a prototype of

14    what we've seen in the pictures, it's something very

15    different.

16         MR. ROSENTHAL:  Well, can I respond?

17         THE COURT:  Sure.

18         MR. ROSENTHAL:  Your Honor, there is a -- what we

19    have here in front, I don't know if you can see it, is the

20    step, the -- what we have here is the step up, and then this

21    is the anti-climber.  This is the handhold.  This is the

22    handhold, and this is how people are -- I mean, these are

23    the actual dimensions.

24         THE COURT:  Here's the problem.  You didn't give

25    any notice of this.  I told counsel at the beginning of the

1    trial, any demonstrative, I said a week ago, share it with

2    each other.

3            And now I'm going to ask the Defendant -- he

4    doesn't know if this is the actual amount.

5            MR. MINO:  I do not.

6            THE COURT:  We can't measure it.  If you had given

7    him notice, he could have looked at your scale.

8            You have this resting on top of the witness stand.

9    I don't know if this is up or down two or three inches.  And

10   it certainly doesn't demonstrate the anti-climber, it just

11   demonstrates height.  And I'm not sure today, there's been

12   no testimony about what the actual true height is in that

13   picture, and now you're putting two tubes and wooden pieces

14   on top of -- it just so happens that the top of the witness

15   box is the same exact height as the anti-climber?

16           MR. ROSENTHAL:  No, actually, the anti-climber is

17   higher than this.  This is --

18           THE COURT:  Well, maybe it is, maybe it isn't.

19   But do you have dimensions?

20           MR. ROSENTHAL:  We do.

21           MR. DiGIULIO:  It's on his report, Your Honor.

22           MR. ROSENTHAL:  All the dimensions are on his

23   report.  He's going to testify about all this.

24           THE COURT:  Well, the dimensions are one thing.

25   Anyone can testify about dimensions, and certainly Mr. Foder

1    was able to really actually demonstrate how he tried to get

2    up in front of that picture.

3             But this is misleading.  The height is exactly the

4    same?  The Defendant is now put in a awkward position and an

5    unfair position to try to even cross-examine when he doesn't

6    even know, you know, whether this is the same height as what

7    happened.

8             And even if it was the same height, it doesn't

9    demonstrative the anti-climber.  It doesn't show the whole

10   area where he slipped.

11            It's a bunch of pipes.  It's not even a prototype.

12   I don't know what it is.  It looks like an amateur

13   reconstruction of something with like Sharpie ink on it and

14   tubes.  It looks like a plumbing job.  It looks like a

15   science fair project.  It doesn't even closely resemble.

16   And if what you're trying to show is height --

17            MR. ROSENTHAL:  Dimensions, right.

18            THE COURT:  -- dimensions, you could do that in a

19   much less prejudicial way, which would be mark the tape --

20   have a piece of paper and just mark where the tape is.  But

21   this gives a very unfair -- this prototype bears no

22   resemblance to reality, and if what you're trying to

23   demonstrate is purely height, there are a lot of fair ways

24   to demonstrate height.  You can just show this; you can mark

25   it here, you can mark it here.  You can have him mark it.

CHARLES P. McGUIRE, C.C.R.

1          But to have this prototype, I'm not inclined to

2     let you have it.  I think it's very prejudicial at this late

3     hour.

4          MR. ROSENTHAL:  Okay.  I understand.  The

5     distances are difficult to just have us demonstrate fairly

6     to the jury are distances such as the distance from the foot

7     -- whatever that is, step, to the grab bar and --

8          THE COURT:  But you just went to touch the grab

9     bar, you used your hand to pull it, and it's wobbly; it's

10    going to fall off.  It's going to give a false impression to

11    the jury that the grab bar is of that strength.  I could

12    knock this over with my hand.  It's wobbly.

13         It creates an impression that is not consistent

14    with what's in his expert report, what the pictures show,

15    and reality, and it creates a false impression before the

16    jury.

17         And to spring this on the Defendant to show height

18    and the relation of the grab bar in this prototype that

19    bears absolutely no relation to reality, there's no pipes,

20    there's no Sharpie ink, it's not this flimsy and fragile,

21    runs the risk of creating a false impression with the jury

22    as to exactly what happened.

23         There's plenty of pictures.  You could have brought

24    in an anti-climber.  But I'm not going to allow this.  I

25    think the prejudice far outweighs its probative value.

CHARLES P. McGUIRE, C.C.R.

1          And your witness can testify without reference to

2     this thing.  He could take a ruler, he could show height, he

3     could show -- but to say it shows proportion; I don't know

4     where the proportion is.  The grab bar is affixed to the

5     car.  This isn't affixed to anything.  This is a pipe nailed

6     into a piece of two-by-four.

7          It's just not reality, so I'm not going to allow

8     it.

9          MR. MINO:  Thank you.

10         THE COURT:  Okay.  We have to finish with

11    Mr. Foder.

12         MR. ROSENTHAL:  I know, but can the expert come

13    and take this out?

14         THE COURT:  Sure.

15         Let's get the jury.

16         THE COURT CLERK:  All rise.

17      (The jury enters)

18         THE COURT:  Welcome back, everyone.  Good morning.

19         Okay.  Let's see if everyone's happy.  You look

20    still happy.  The rain is gone.  It's a good day to be

21    alive.

22         So, we're here in Federal Court.  Thanks for

23    coming back, and we're going to continue with the testimony

24    of Mr. Foder.

25         Mr. Foder, you remain under oath.  If you want to

CHARLES P. McGUIRE, C.C.R.

1    take the stand.

2    S T E V E N   F O D E R, called as a witness on his own

3    behalf, and having been previously sworn, testified as

4    follows:

5            MR. ROSENTHAL:  May I begin, Your Honor?

6            THE COURT:  Yes.

7            MR. ROSENTHAL:  Thank you.

8                    DIRECT EXAMINATION (CONTINUED)

9    BY MR. ROSENTHAL:

10   Q.    Steve, I think we left off after your second surgery.

11   A.    Correct.

12   Q.    Tell the jury about your recovery from the second

13   surgery.

14   A.    My recovery after the second surgery was similar to

15   the first in a way, just the pain was a little different.  I

16   had more pain in the second one.  But it was a similar

17   process.  I was, you know, bedridden, home-ridden, off my

18   foot for eight weeks.

19            THE COURT:  Could we just stop for one second?

20            Counsel, could I just see everyone at sidebar for

21   one second?

22            I'm sorry, Mr. Foder.

23            One second, just one quick follow-up issue.

24        (The following takes place at sidebar)

25            THE COURT:  I'm sorry to interrupt your direct.

1          To preserve the record, I think we need to mark

2     that as a Court Exhibit, because if there is ever an

3     appellate issue about not allowing that in, we don't have

4     it.  We don't have a picture of it.

5              MR. ROSENTHAL:  Okay.  Of the demonstrative.

6              THE COURT:  I just didn't want the expert to throw

7     it out or something.

8              MR. ROSENTHAL:  We'll mark that as Court Exhibit

9     3.

10             THE COURT:  Mark it Court Exhibit 3 at the end of

11    the day, and we'll put it in the jury room.  I just don't

12    want it thrown in the garbage.

13             Thank you.

14          (The following takes place in open court)

15             THE COURT:  Again, I apologize.

16             THE WITNESS:  No problem.

17    BY MR. ROSENTHAL:

18    Q.    I think you were saying about, the pain was different?

19    A.    Yeah.  My pain level was a little bit more on the

20    second surgery because it was a more massive surgery.  But

21    the process was similar to the first one.  I was bedridden

22    or, you know, home-ridden to crutches I guess eight, 10

23    weeks, began therapy as soon as the cast came off.  Then I

24    got put into the boot again, the special boot, and then

25    another two months, three months go by, and then transition

1    into a sneaker again.

2    Q.    Now, you had mentioned bedridden before with the first

3    surgery swell.  Are you referring to --

4    A.    Well, just really not mobile.  I couldn't be that

5    mobile.  You know, I was off my feet without the use of

6    crutches, I mean, and it's tough, you know.  You only use

7    the crutches like if I really had to go somewhere, you know,

8    like the bathroom or if there was an emergency to go

9    somewhere or I had an appointment.  But other than that, I

10   was, you know, on the couch or watching TV or something of

11   that nature while I was injured, yeah.

12   Q.    And as you were transitioning into the boot and then

13   into your sneaker, how was the pain level through all that?

14   A.    It was tough.  Again, it's nothing quite like right

15   after surgery, you know, the pain does subside.  I was still

16   in pain, so -- it was -- it was tough.

17         Therapy was the hardest part for me most of the

18   time, because, you know, moving -- moving something that's

19   been immobilized for so long brought a lot of pain, so I

20   remember having to take my painkillers those days.  Those

21   were really bad days.

22   Q.    And how was your back through -- at this point?

23   A.    My back is still bad.  I see a chiropractor weekly.

24   The last time I saw him, I had a scan, like a body scan, and

25   he told me that my hips were off alignment because of the

1    injury and, you know, the way that I also compensate for the

2    way I walk now from the pain, so part of my body has

3    shifted, so like my hip's kind of out of place in a sense,

4    you know?

5    Q.    But you didn't miss any time from work for your back

6    specifically?

7    A.    No.  No.

8    Q.    And other than your back and your ankle, do you have

9    any other pain or pains?  And I'm talking now about by the

10   time that you were recovering from the second surgery, is

11   there anything else that's in pain other than your ankle and

12   your back?

13   A.    No.  I mean, unless you want to cover my new medical

14   discoveries, but besides that, no.

15   Q.    No, relating to this case.

16   A.    No.

17   Q.    Now, I want to digress for a moment and have you talk

18   about, outside of the pain that you're feeling specifically

19   in your ankle, by the time of the second surgery, you

20   recovered from the second surgery, had there been any

21   changes in your life that were caused by your ankle

22   problems?

23   A.    All right.  I'm sorry.  Can you repeat that one more

24   time?

25   Q.    After your second surgery, --

1    A.      Right.

2    Q.      -- other than the pain that you're feeling and the

3    surgeries that you had, the medical stuff, has there been

4    any other changes in your life that you attribute to the

5    injury that you had at PATH on July 22nd, 2011?

6    A.      Yeah.   My whole life has changed.

7            Should I just -- can I tell like everything, like

8    the whole?

9    Q.      Well, how was your -- tell the jury how your life was

10   changed.

11   A.      Before my accident, I had a house.  I lived with my

12   fiancee and my daughter.  After my first accident, my first

13   -- my first accident -- after my first surgery, I was out of

14   work for six months, and I didn't have the funds in my bank

15   account to -- to keep my house, so I wound up selling some

16   of my stuff just to pay rent, and, you know, mortgage, rent,

17   put food on the table.  And push came to shove, I lost it,

18   and I had to ask for help.

19           So I called my family, and, you know, originally,

20   before that, of course, I came from my mother's house like

21   everybody else.  And I called for help, but they didn't

22   really have the room for me and my new family, so they made

23   -- you know, they said that they'll clean out their garage,

24   which was like -- it was an attached garage with a door to

25   go into the house.  So we stayed there in a semifinished

1    garage, me, my fiancee, my daughter, and we stayed there for

2    a while.

3              Winter came, and it was getting -- it's really

4    cold in there because the door is like paper-thin, it's a

5    garage door, so -- it was cold.  My daughter was a newborn,

6    barely a year old.  So I bought a heater, and it helped.  I

7    bought an electric heater, but the problem is it just took

8    like two to three hours to heat up the garage, so it was

9    just unsuitable for my daughter.

10             So she wound up contacting her family, and she --

11   they didn't have the room for me, so they went back there.

12   But it was like --

13   Q.    Your fiancee, you're talking about?

14   A.    My fiancee and my daughter, yeah.  It was about an

15   hour, hour ride.  And that's -- with my injury, it was hard

16   to, you know, see them all the time.  And we ran into some,

17   you know, financial issues, you know, between us, and it

18   created some distance, you know, even further than the

19   actual distance that was between us.

20             She wound up moving, you know, moving on

21   eventually or seeing somebody else, and, you know, it was --

22   it was tough, because I didn't really have a -- like the

23   whole father thing growing up, so that's something I really

24   wanted to do for my daughter, and it affected me in a lot of

25   ways.  And, you know, imagine, like I wasn't even able to

CHARLES P. McGUIRE, C.C.R.

1    carry my daughter from the kitchen with a bottle back to the

2    garage because at any given time, even in a boot, or in my

3    sneaker, my leg could give out and I'd drop my daughter.  So

4    I missed a lot of -- a lot of her newborn -- newborn life, I

5    guess, in a sense.

6         And even after that now, it's -- it's tough

7    because like I can't run after her and -- you know, I had a

8    father, you know, like everybody else, and he had drinking

9    problems, and we never did anything together ever.  So I

10   always wanted to do stuff for my daughter.  You know, now,

11   like, that she's older -- remember, this isn't just a thing,

12   this has been years for me, so I'm talking throughout the

13   whole process, going like when she's running in the park

14   with her friends or her cousins, and she's trying to tag me

15   to play, and I can't chase her, I just hope that one day she

16   does understand that there are reasons why that I couldn't

17   do it because of my -- I can't.  You know, I still think

18   about it for me in my sense when I was a kid, where was my

19   father?  So I just don't want her to have the same feelings

20   that I have towards my father towards me.  So, yeah, that --

21   that's something that's big for me.

22        I can't do a lot of other stuff I do, you know.  I

23   gained like 50 pounds.  I went from like 215 to 286 after my

24   surgery.  My friends, my boys, ridicule me all the time.

25        You know, guys at my job called me the weatherman

CHARLES P. McGUIRE, C.C.R.

1    because a couple days before it rains, my limp gets bad, and

2    they're like, oh, it's going to rain, ha-ha-ha, just tease

3    me and stuff.  But -- I mean, it's been really difficult,

4    really hard.

5    Q.    Let's bring it back to, we were -- first of all,

6    yesterday, there was a lot of questions about union members.

7    Are you in a union?

8    A.    Yes, I'm in a union.

9    Q.    And what union are you in?

10   A.    I'm in the BLE.

11   Q.    Okay.  That's part of the Teamsters?

12   A.    Yes, Brotherhood of Locomotive Engineers.

13   Q.    And you've been a union member since you started on

14   the railroad?

15   A.    Yes.

16   Q.    Now, your recovery from the second surgery, as you

17   were recovering, take us to your recovery into the period of

18   time that you decided that you could go back to work from

19   that second surgery.

20   A.    From the second surgery to when I went back?

21   Q.    When you went back, the second surgery was in October

22   --

23   A.    Right.

24   Q.    -- of 2013; is that correct?

25   A.    I believe so.

1    Q.    Halloween?

2    A.    I believe so, yeah.

3    Q.    And I believe -- did you go back to work in April of

4    2014?

5    A.    Yes.

6    Q.    How was it that you went back to work at that time?

7    A.    I went back to work -- some of my pain, again, has

8    subsided.  I'm still in pain.  Again, the doctor told me a

9    long road to recovery, approximately another year --

10   Q.    This is Dr. Greisberg?

11   A.    Yes -- you know, before you really like notice, you

12   know, a difference.  So I stuck it out, went through the

13   whole thing, and that was that.

14   Q.    And did he -- who suggested that you go back to work

15   by April 2014?

16   A.    I did, and my doctors, I guess, cleared me, yeah.  I

17   felt that, you know, my pain wasn't going to get magically

18   better, and I couldn't stay home anymore, and I needed to

19   try to go on with my life, so I, you know, said, hey, am I

20   cleared?  Yeah, you should be cleared, continue with therapy

21   while you're at work, you've got to do home exercises and

22   all these other things, so --

23   Q.    Did you do that, the home exercises?

24   A.    Yes.  I still do them today.  I have to, probably

25   forever.

1    Q.    By the time you're going back to work in April of

2    2014, where are you living?  With your parents?

3    A.    Yeah.

4    Q.    Has your girlfriend and daughter left by then?

5    A.    Yes.  Yes.  This is after the second surgery.  Yes,

6    they're gone.

7    Q.    Okay.  How often are you seeing your daughter at that

8    point?

9    A.    I was trying to see her as much as I could, but still

10   -- I was still, you know -- I had no financial, I had no

11   finances, they were far away, so it was tough to see her as

12   much as I could at that given time 'cause I wasn't getting

13   paid, so I didn't have anything.  I barely had insurance on

14   my car.  I remember I lost it, and then I got it back

15   eventually, so I couldn't drive for a while.  I had to get

16   her whenever she would bring her around at that given point,

17   yeah.

18   Q.    So by the time you -- tell us about how it was when

19   you went back to work in April of 2014.

20   A.    I went back to work, still in pain, still doing my

21   therapy, just trying to get everything that I lost, which --

22   try to build it back up, you know, back to what I had.  I

23   had a lot that I lost, but just something.  Insurance on the

24   car was the best start, you know, money in my pocket, that

25   was great to start with.

1   Q.    But in terms of the work itself and the pain.

2   A.    I was in a lot of pain, but like I said, I was focused

3   on getting better and being more active with my daughter.   I

4   wanted my daughter.

5   Q.    And what happened next?

6   A.    So I'm working.  I can't tell you for how long.   I

7   think it's probably over a year, again.   And my pain level

8   was always, you know, at a certain set point.   And then one

9   day, I started feeling -- I woke up and I just started

10  feeling like excruciating pain again, but this time it

11  wasn't from the same spot in my ankle.   It was still in my

12  ankle, just a different location.   And I was like, what's

13  going on?

14          So, you know, I went to work and then went to the

15  doctor.

16  Q.    Dr. Greisberg?

17  A.    Yes.

18  Q.    Now, I have you being out from November 25th, 2014,

19  which is, I guess, about seven months after you came back to

20  work.  Does that sound about right?

21  A.    Yeah, I guess.  A year, seven months, I guess.

22  Q.    No, just seven months, not a year and seven months.

23  A.    No.  Yeah, seven months to a year.  I wasn't exactly

24  sure of the exact number, but --

25  Q.    Oh, okay.  So what happens when you go back to

1    Dr. Greisberg?

2    A.    They ordered me for an MRI.

3    Q.    Okay, but they can't do an MRI at that point; right?

4    A.    No.  No.

5    Q.    What do they do?  If you remember.

6    A.    I'd like to say it was a CAT scan, but I could be

7    wrong.  I don't remember exactly.

8    Q.    Okay.  And so whatever testing was done, what does

9    Dr. Greisberg say?  Or what is your understanding as to what

10   it is that Dr. Greisberg is recommending to you at that

11   point?

12   A.    Well, what he told me was that all the hardware that

13   was in my bone -- my bone started growing out, and it pushed

14   the hardware out of the bones, and it was starting to slice

15   my ligaments, and I almost lost one of my ligaments in my

16   ankle at that point.

17   Q.    What did he recommend?

18   A.    Surgery again.

19   Q.    Did you do that?

20   A.    Yeah.  At that point, I had to.  He said that if I

21   didn't do this now, I was going to be in big trouble.  So...

22   Q.    And what is your understanding as to what happened

23   during the surgery, what the surgery was?

24   A.    They went back into my ankle and removed pins and

25   screws and a rod or whatever was in there, yeah.

389

1    Q.    Now, that was your third surgery?

2    A.    Yeah.

3    Q.    Take us through your -- how were you after the

4    surgery?

5    A.    Immediately after?

6    Q.    Immediately after.

7    A.    Immediately after, I was in pain again, just like

8    anything after major surgery, I was in horrible pain.

9    Q.    Are you taking medication through these periods of

10   time when you're out?

11   A.    Yeah.  I was taking Vicodin again at that time.

12   Q.    Are you taking Vicodin after each of your surgeries?

13   A.    Yeah, because the OxyContin, I had allergic reactions

14   to it and gave me like -- I was scratching everywhere.

15   Q.    Okay.  So take us through your recovery from the third

16   surgery.

17   A.    So I had the hardware removed, and I had to do therapy

18   once again, the same way as before.  Therapy, boot, sneaker,

19   same project all over again.

20   Q.    And how was it that you went back to work after the

21   third surgery?

22   A.    I went back.  The pain was nowhere near what it was

23   when it was slicing my ligaments, but it was still bad, you

24   know, and my doctor just told me, you know, it's a long road

25   to recovery and keep it -- keep it up, and he says, you

CHARLES P. McGUIRE, C.C.R.

1    know, it will never be the same, so just expect it, and feel

2    it.

3    Q.    Now, I have you going back to work in April of 2015.

4    Does that sound about right?

5    A.    Sounds about right, sure.

6    Q.    And just for the record, I just want to make sure that

7    I have the dates correct.

8          From the date of the accident, you did not work,

9    until February 17th, 2012?

10   A.    I believe so.

11   Q.    And that was your recovery from the first surgery?

12   A.    Yeah, I believe so.

13   Q.    And from the second surgery, you were out from October

14   28th, 2013 to April 7th, 2014?  Does that sound right?

15   A.    Sounds about right, yeah.

16   Q.    And for the third surgery, you were out from November

17   25th, 2014 to April 17th, 2015?

18   A.    Yeah, it sounds about right, too.  I don't know the

19   exact dates.  I don't want to lie.

20   Q.    But does that sound about right to you?

21   A.    Yeah, it sounds about right.

22   Q.    Now, during your period of time when you were able to

23   work, were you able to work overtime?

24   A.    Yes.

25   Q.    And about how much overtime would you work?  Per week?

1    A.    It all depends, because we were on a roster for

2    overtime, so some weeks I'd get more, some weeks I'd get

3    less.  So it all depends.  I'd say one to two days a month

4    at that time.

5    Q.    Okay.  So one to two days a month.  Let's assume one

6    day a month.  That would be about two hours a week?

7    A.    Yeah.

8    Q.    Okay.

9    A.    Two hours a week.

10   Q.    And when you were working overtime, are you getting

11   paid time and a half?

12   A.    Yes.

13   Q.    Do you know what your rate, overtime rate was at the

14   time?

15   A.    Exactly down to the cent amount, no.  Somewhere around

16   $55 an hour overtime.

17   Q.    Okay.  And you worked out what your -- for the 17

18   months, you were not able to work overtime; is that correct?

19   A.    Correct.

20   Q.    And you worked out what you lost in overtime pay for

21   those 17 months the net figure after taxes; correct?

22   A.    Yes.

23   Q.    And the number you came to was $5,627, approximately?

24   A.    Approximately, yeah.

25   Q.    Now, when you went back to work after the third

1    surgery, tell us about how that was.

2    A.    Well, that was it for me at that point with surgery,

3    but I went to work.

4    Q.    Were you fully recovered?

5    A.    No.  No.  My doctor said, like I mentioned earlier,

6    that it was going to be a long process, it could take a

7    while, a year, maybe more, depending on how my body heals.

8    But I had pain, and I'll always have pain, probably, you

9    know.

10   Q.    And now I want you to talk -- I want to ask you

11   questions about and I want you to answer about now, okay,

12   how you're feeling now.

13            After you went back to work in April 2015 until

14   today, has there been any change in your pain level in your

15   ankle?

16   A.    No.  No.  Not -- not really.

17   Q.    Tell the jury how you're feeling now.

18   A.    I'm still in pain.  I still walk with a limp.  I still

19   have to kind of -- how do I say -- like compensate the way I

20   walk for my right leg.

21            I still -- you know, it's -- it's so hard to

22   describe, it's --

23   Q.    Try your best.  This is -- this is it.

24   A.    It's just -- my ankle locks occasionally, you know,

25   and then it will like crack out.  Just walking, like --

1    like, I can't do a full day of walking like you.  You know,

2    you go to Six Flags or a museum or a water park, like, I

3    can't do that, because by the end of the day, my ankle will

4    be twice the size that my left one is and I won't be able to

5    get my shoe off, or, you know, it's just, depending on how

6    high it is, my ankle just blows up in a lot of pain, and

7    it's rough.  It hurts the whole time, especially two days

8    before it rains is the worst.

9    Q.    But you're able to work?

10   A.    Yeah, I -- I have to go to work, yes.  I want to.

11   Q.    Now, we saw -- the job that you have, the jobs that

12   you've had since you came back to work, have they been

13   switching jobs or running jobs?

14   A.    No, I -- I have the option to pick either/or.  I try

15   to stay away from the yard jobs because it's just too much

16   walking and up and down, up and down.  The passenger service

17   job for me is a lot easier.  I only have to do it once, and

18   then I'm on the train and it's all flat ground, I don't have

19   to worry about, you know, constantly all day long being

20   through it, so...

21   Q.    Are you able to get up the PA-5 trains at track level?

22   A.    Yeah, I have no problem.

23   Q.    Now, is there any part of your job that you can't do

24   now?

25   A.    No, I can do it all.  I just tend to prefer to stay

CHARLES P. McGUIRE, C.C.R.

1    away from the other one, but I can do it all.

2    Q.    Now, I want to ask you about outside of work.  What

3    are the things that you can't do that you were able to do

4    or that you were doing before you got hurt in July 22nd,

5    2011?

6    A.    Well, even right before my incident, I was in a

7    football league.  I played football.  I went on a lot of

8    trips.  I did a lot of them like city challenges, like

9    benefits, you know, like obstacle courses.

10   Q.    Explain what that is to the jury.

11   A.    Like, they do the charity runs, like the charity

12   obstacle course, this time it's for breast cancer, this time

13   it could be for anything else, so --

14   Q.    Is it a race, a running race?

15   A.    Yeah.  I never really treated it as a race.  I just

16   did it for fun, like, did the obstacles courses and all that

17   stuff.

18            I can't do that.

19            Us, me and my fellow employees at work, the cops

20   and everybody, we all went paintballing all the time, bus

21   trips.  And I was good.  I used to play my whole life,

22   almost.  So, believe it or not, the Port Authority cops made

23   me their team captain.  So I was always playing.

24            I can't do that anymore.

25            I boxed since I was like 11 years old on and off.

CHARLES P. McGUIRE, C.C.R.

1    Around the time I had my daughter, I stopped for a little

2    while, but I did that.

3              That, I can no longer do.  That was something that

4    I really always loved.

5              Just anything that involves -- like anything on my

6    ankle that's physically challenging is just tough to do.

7    Like I said before, even Six Flags is tough because a long

8    day of walking is -- is -- it's tough for my leg.

9    Q.    As we sit here right now, do you have pain in your

10   ankle?

11   A.    Yeah.  I'm always going to have pain.

12   Q.    Now, are you able to run?

13   A.    No, not run.  I mean, if I'm -- if I had to, I could

14   probably do a light jog, if I had to, for a very short

15   distance.  But like I said, I'll -- I'll be in pain worse,

16   so I don't do it unless it's like absolutely necessary.

17   Like if my daughter's bolting towards the street and I have

18   to run to get her, I'll grab her, you know?  But that --

19   besides that, no, you know.

20   Q.    Did you have any other hobbies that were affected by

21   your ankle?

22   A.    So -- it's so hard being up here and trying to tell

23   you and thinking on the fly everything that I've done.

24   Q.    Try the best you can.

25   A.    Football, boxing...

Case 2:14-cv-03935-MCA-LDW  Document 75  Filed 04/18/17  Page 29 of 252 PageID: 1029

396

1   Q.    Did you ride your bike?

2   A.    That's -- yeah, but I can't do that anymore either,

3   really.  That's something I did, like you heard earlier, I

4   had an accident in 2009.  I enjoyed riding here and there.

5   But I can't really do that anymore either because I can't

6   support the weight of the bike on my leg, you know.  So when

7   you come to the red -- red light, I can't really put my feet

8   down and support that.  Even if I lean to my left, you know,

9   if I had to lean into my right for some reason on my right

10  leg, I'd be in -- I don't know what could happen.  If my

11  ankle gave out, I -- the bike would come crashing down.  So

12  no, I don't ride anymore, really, either.

13  Q.    And when you're talking about a bike, you're talking

14  about a motorcycle?

15  A.    Yeah, motorcycle, yeah.

16  Q.    Now, have you had occasion to be on the motorcycle in

17  the last five years?

18  A.    Once, maybe, maybe once, and that was it.  I never

19  rode it again, and that was it.  It's sitting.

20  Q.    And are there -- other than what you've testified

21  about, is there anything else with regard to your daughter

22  that you can no longer do?

23  A.    That little girl's my world, so I'll do anything I

24  can.  But it does -- it just sucks not being able to really

25  play with her in -- in the fashion that she wants to play

CHARLES P. McGUIRE, C.C.R.

1      in, or when she was a kid, it was bad, you know, I couldn't

2      carry her around.  It's just tough.  But a lot -- that's --

3      that's main -- you know, a lot of it with her.  It's just

4      not being able to fully be there and participate in her life

5      like the other fathers do that are around, like my friends

6      who have kids and who we go to the park and they'll go

7      chasing them on the jungle gym or jump down the slide with

8      them or something.  I just can't do it, and it's just tough.

9      It's just tough.

10               MR. ROSENTHAL:  Nothing further, Your Honor.

11               THE COURT:  Thank you.

12               Okay.  Cross-examine.

13               MR. MINO:  Your Honor, can I be heard at sidebar

14      briefly?

15               THE COURT:  Sure.

16           (The following takes place at sidebar)

17               THE COURT:  Okay.

18               MR. MINO:  Judge, during testimony, Plaintiff put

19      his financial status directly at issue.  He said he lost his

20      house because he was not getting a paycheck.

21               At this point, he's allowed to be impeached with

22      the Railroad Retirement Board benefits that he received.

23               Cases that say this --

24               THE COURT:  I agree.

25               MR. ROSENTHAL:  If you want to impeach him, I have

CHARLES P. McGUIRE, C.C.R.

```
 1      no objection.

 2                  THE COURT:  Yes.

 3                  MR. MINO:  Just a clarification.  If I impeach him

 4      with the stuff PATH paid, that opens up the door to the

 5      whole lien thing, right?  Or no?

 6                  THE COURT:  Let's think it through.

 7                  If you just impeach him on the amount -- what are

 8      you going to impeach him on; what he got paid?

 9                  MR. MINO:  With respect to the Railroad Retirement

10      Board's benefits, yes, that he got paid and he received the

11      amount.

12                  THE COURT:  He didn't get the whole amount.

13                  MR. MINO:  The Railroad Retirement Board is

14      separate from PATH.

15                  THE COURT:  Okay.

16                  MR. MINO:  The Railroad Retirement Board is a --

17      they pay into a full pension -- it's a third party, but they

18      also get sickness disability when they are out sick or when

19      they're out hurt, and he received benefits from them.  For

20      the time that he got half and no pay from PATH, he was

21      receiving some money from them.

22                  THE COURT:  Did he get full money?

23                  MR. MINO:  Not a full paycheck, no.

24                  THE COURT:  Okay.  But i thought we agreed -- what

25      is the stipulation, that that whole amount would be put back
```

1    in?

2              MR. ROSENTHAL:  We're not talking about that.

3    We're talking -- in addition -- what PATH paid aside, for

4    the period of time that PATH wasn't paying him, he was

5    entitled to certain benefits from the Railroad Retirement

6    Board --

7              THE COURT:  Money.

8              MR. ROSENTHAL:  Money -- of whatever it is,

9    like --

10             THE COURT:  They have a lien on that money.

11             MR. ROSENTHAL:  No, no, the Railroad Board does.

12             THE COURT:  That's what I mean.

13             MR. DiGIULIO:  That's separate and apart.

14             MR. ROSENTHAL:  Right.  So what counsel is saying

15   is that when Mr. Foder said that he couldn't afford

16   something, he opened the door for them asking him, well,

17   isn't it true that you got railroad retirement sick

18   benefits.

19             THE COURT:  Right.

20             MR. ROSENTHAL:  And he opened the door.  So --

21             THE COURT:  But do you want to bring out the lien?

22   Because I don't know if the lien is relevant.  The

23   lien is only relevant if he gets an award, right?

24             MR. ROSENTHAL:  Right.  We're not talking about

25   the -- the lien that we're talking about.  We're just

1     talking about the Railroad Retirement benefits.

2                THE COURT:  Did the Railroad Retirement Board have

3     a lien on this?

4                MR. MINO:  Yes.

5                MR. ROSENTHAL:  Yes.

6                THE COURT:  But that's not relevant because

7     they're only going to assert that lien if he gets a

8     judgment.

9                MR. MINO:  Yes.

10               MR. DiGIULIO:  Right.

11               MR. ROSENTHAL:  Yes.

12               THE COURT:  So in other words, it's not like he

13    had to -- if he had to pay it back no matter what, you would

14    argue the lien, but he only has to pay it back if you get a

15    judgment, so it's not relevant.  What's relevant is that he

16    said, I lost my house, I didn't have enough money, and gave

17    the impression to the jury that he wasn't getting paid.  You

18    can impeach him with the fact that he got extra money, just

19    as you could impeach him if his mother was giving him cash.

20               MR. DiGIULIO:  I don't think anyone says --

21               MR. MINO:  So I'm clear, if I try to impeach him

22    with the amount that PATH paid, right, because PATH did pay

23    him some wages, that then opens up the door to the lien

24    issue, or it does not?

25               THE COURT:  I don't think it opens up the door to

CHARLES P. McGUIRE, C.C.R.

1    the lien issue at all.  I'm not inclined to allow you to

2    open up the door to the lien issue because I don't think the

3    lien issue is relevant.  What's relevant is that he had

4    money coming in, and he can argue that he had enough money

5    to pay the mortgage.  He can ask what the mortgage is and

6    say, you essentially got 80 percent of your salary, so if

7    you got -- the equivalent of 80 percent of your salary.

8              MR. DiGIULIO:  If he starts talking about that he

9    was paid by PATH, the jury may consider that in rendering a

10   verdict.

11             THE COURT:  But that's why we'll have an

12   instruction.  That's why there's jury instructions, which

13   will say you can only consider pain and suffering and not

14   consider wages.  That's what we talked about.  Because

15   there's a lien.

16             So he can impeach him, and I'll give them

17   instructions on impeachment on this issue.  They can

18   consider that for the narrow issue of any pain and suffering

19   he suffered because he lost his house.  I mean, that was his

20   testimony:  I had to sleep in the garage, I didn't have a

21   heater.  That's a compensable harm.  But what isn't

22   compensable is the loss of salary, and we're going to

23   instruct them specifically on that.  That's the fair balance

24   that I would like to strike.

25             MR. ROSENTHAL:  Well, if he's impeached with the

1    fact that he was getting certain wages from PATH -- the

2    Railroad Retirement Board is something else, but from the

3    PATH wages, then he should be able to testify that he --

4    just as with the Railroad Retirement Board that he has to

5    pay that back from any verdict that he gets.

6            THE COURT:  But that's the whole point.  It would

7    only be relevant, the lien, if he had to pay it back no

8    matter what.  If the lien existed -- if they were going to

9    come after him for that money even if he got a no cause,

10   that would be very relevant that he really didn't get the

11   money, to put it aside to pay it back.  But we know he's

12   getting paid all of the money and there's a lien.  So you'd

13   only confuse the jury and allow them to give a double

14   recovery because he's going to -- we'll read about this

15   extensively.  If there is a verdict, all the wages get put

16   in, and then the lien comes out again.

17           MR. ROSENTHAL:  I understand.

18           THE COURT:  I'm not opening the door to the lien.

19   It's going to be way too confusing for the jury.  It's

20   impeachment on a narrow issue, and it's going to be dealt

21   with by an instruction not to consider lost -- not to

22   consider wages.  It's not part of your consideration in this

23   case.

24           MR. ROSENTHAL:  And also, I would ask for an

25   instruction that he's not getting Workers Compensation, so

CHARLES P. McGUIRE, C.C.R.

1    there's no confusion about that.

2              THE COURT:  We'll talk about that.  That's a

3    separate issue.  But I'm not going to decide that now.  I'm

4    just making the decision today that he can cross-examine him

5    on the money he got, and you can't open up the issue of the

6    lien.

7              MR. DiGIULIO:  One last issue.

8              When we checked -- we called the RRB -- when you

9    call the RRB --

10             THE COURT:  R --

11             MR. DiGIULIO:  RRB, the Railroad Retirement Board.

12             THE COURT:  RRB?

13             MR. DiGIULIO:  RRB.

14             THE COURT:  Okay.

15             MR. DiGIULIO:  They send you a fax printout of

16   what the lien is.  So when we did this, it was just north of

17   $5,000.  Mr. Mino has information that it may be more.  We

18   called again.  They confirmed --

19             MR. MINO:  Okay.

20             MR. DiGIULIO:  No problem there?

21             MR. MINO:  Yes, because we had it at 19, and they

22   called again, and they said it's back down to five.

23             MR. DiGIULIO:  Okay.  That's all.

24             THE COURT:  So the only money he got this whole

25   time out was $5,000?

404

1          MR. DiGIULIO:  Correct.

2          MR. MINO:  My understanding of it.

3          THE COURT:  Okay.  I mean, I thought it was a lot

4     of money; and it's not a lot of money.

5          MR. MINO:  No, but --

6          MR. ROSENTHAL:  No, but he's talking about the

7     wages as well.  The wages are like 23,000.

8          THE COURT:  Okay.

9          All right.  Thank you.

10         (The following takes place in open court)

11         THE COURT:  All right.  Your witness.

12                    CROSS-EXAMINATION

13    BY MR. MINO:

14    Q.    Good morning, Mr. Foder.  How are you?

15    A.    Good morning.  How are you?

16    Q.    I'm doing all right.

17         Now, you were here yesterday when Mr. Avril

18    testified; right?

19    A.    Correct.

20    Q.    And you heard what he said?

21    A.    Yes.

22    Q.    But if I understand your testimony correctly, you

23    think he lied.

24    A.    Lied, or just kind of covered himself, maybe, in a

25    sense.

1    Q.    Okay.  So you think his testimony was not true.  And

2    I'm talking specifically about the training that you

3    received when you started as an engineer.

4    A.    In what regard exactly?

5    Q.    If you remember, Mr. Avril testified that you,

6    specifically, you, because he trained you, were trained to

7    put your entire foot on the diamond plate.

8    A.    Yeah, that's not true, and he didn't train me.

9    Q.    Okay.  Oh, so he lied about all of that.

10   A.    Well, there was two other operations examiners who

11   trained me.

12   Q.    So it's your testimony that he lied not only about

13   where he told you to put your foot, but he just made the

14   whole thing up about training you in particular.

15   A.    He didn't train me.  He even said it yesterday.

16   Q.    I believe his testimony was that he showed you right

17   in the beginning --

18   A.    He said there was an orientation.

19   Q.    Right.  Did he make up the orientation that you were

20   in?

21   A.    Everybody has an orientation.  He seen me climb the

22   train.  That was it.

23   Q.    That's not my question.  Were you in the orientation

24   where he specifically instructed you to put your entire foot

25   on the diamond plate?

CHARLES P. McGUIRE, C.C.R.

1   A.      There was never any such orientation that -- the way

2   you're saying occurred.

3   Q.      So he made that up as well.

4   A.      Yes.

5   Q.      Was there any part of Mr. Avril's testimony that you

6   didn't think he was lying, or did you think he lied the

7   whole time?

8   A.      No, he told the truth in some circumstances as far as

9   the examiners who trained me, and, you know, his operations

10  examiners are rule enforcers, which is all true.

11  Q.      Now, you also, if I understand your testimony

12  correctly, you also think that he lied about the gloves?

13  A.      Nobody wears gloves unless, like I said -- yesterday.

14  Q.      So then it's your testimony that he made up the whole

15  portion of his testimony where people have been reinstructed

16  to wear the gloves.

17  A.      I believe so.

18  Q.      Okay.  And then also the portion where he said that

19  some would even be disciplined for not wearing the gloves.

20  A.      Never heard of it.

21  Q.      Okay.  Now, by the time we get to July 22nd, 2011,

22  give me an estimate of how many times you had climbed up

23  from track level onto a train.

24  A.      An estimate?

25  Q.      Yes.  It's going to be a rough estimate, I know that,

1    but --

2    A.    I was there a year.  I was there a year, training six

3    months, classroom six months, in the yard, so -- in the

4    yard, I could have been up and down 10 times a day, so, I

5    don't know, do the math:  A couple hundred, maybe?

6    Q.    All right.  Couple hundred times.

7    A.    I'm assuming, though.

8    Q.    No, I understand.  We'll -- give or take a little bit

9    on each end.

10   A.    Sure.

11   Q.    That's fine.

12         Now, the training that you're talking about; how

13   long was the training from when you started as an engineer

14   until you were certified as an engineer?

15   A.    From the very beginning, first day of class?

16   Q.    Yes.

17   A.    I'm going to say it was approximately a year.

18   Q.    Approximately a year.

19   A.    I would say so.

20   Q.    Okay.

21   A.    Between class, on the field, light train, passenger

22   service, approximately.

23   Q.    And you mentioned class.  So they don't just toss you

24   onto a train and tell you to drive it, right?  There's a

25   portion where you're only in the classroom, learning stuff?

1    A.    Yeah, in the beginning.

2    Q.    Okay.  How long does that take?

3    A.    I believe that's approximately six months as well.

4    Q.    So that's the first six months; right?

5    A.    I could be wrong, it was a long time ago, but these

6    are approximate, yes.

7    Q.    That's fine, and it's fine to approximate like that.

8          So for about the first six months, all you're

9    doing is learning stuff in the classroom; right?

10   A.    Yeah.

11   Q.    Then the last six months, what goes on there?

12   A.    You're in the yard, training.  You're putting all the

13   stuff you learned in the classroom to use, like your

14   breakdowns.  That was probably one of the biggest things

15   that you learn there, because you're not really learning --

16   when you're in the yard, you're not really learning how to

17   drive trains at that point, you're really learning how to do

18   all your switching moves, which is uncoupling, coupling

19   trains, that, and the breakdown part of it.  That's the main

20   focus of that part.

21   Q.    Now, when you say the yard, what yard are you in?

22   A.    You're in Harrison yard.

23   Q.    In Harrison?

24   A.    And other yards, but the majority.

25   Q.    During that training period, are you ever in Journal

CHARLES P. McGUIRE, C.C.R.

1     Square?

2     A.    That's towards the end.  It's -- the bulk of it is in

3     Harrison.

4     Q.    Okay.  But towards the end, you're in Journal Square?

5     A.    I think it's for maybe two weeks, yeah.

6     Q.    Okay.  And Journal Square is where your accident

7     happened.

8     A.    Yes.

9     Q.    Now, at some point, either during the classroom

10    training or the training when you're in the field learning

11    how to drive the trains or fix the breakdowns, mainly, as

12    you're saying, are you given the PATH book of rules?

13    A.    I was given the PATH book of rules on date of hire.

14    Q.    Okay.

15    A.    So it was before that.

16    Q.    All right.  So by the time you became an engineer, you

17    had the PATH book of rules.

18    A.    Yes, sir.

19    Q.    So then fair to say by July 22nd, 2011, you still had

20    the PATH book of rules; right?

21    A.    Yes, sir.  We were required to have it on us at all

22    times, or in your locker.

23    Q.    Okay.  So it's either physically on your person or in

24    your locker at all times?

25    A.    In your carry bag or in your locker, yes.

1    Q.    Okay.  And not only do you have to carry it; you also

2    have to be familiar with it, right?

3    A.    Sure.

4    Q.    Okay.  And one of those rules says that you have to

5    report all unsafe conditions as soon as you see them; right?

6    A.    Correct.

7    Q.    Okay.  All right.  And do you consider reporting an

8    unsafe condition telling your conductor?

9    A.    Telling my conductor what?

10   Q.    That there's something unsafe.

11   A.    You got to be a little bit more specific in what

12   you're saying.

13   Q.    Sure.  So when you report an unsafe condition,

14   right, --

15   A.    Sure.

16   Q.    -- you report it to a supervisor, right?  You don't

17   you report it to someone that's at the same level as you.

18   A.    Yeah, if you're reporting something unsafe that they

19   don't know about, you know.  There's a difference between

20   reporting something unsafe and complaining.

21   Q.    What's the difference?

22   A.    Well, there's a difference as far as there's something

23   there every day that everyone knows is unsafe that doesn't

24   change, that, you know, people already know about, your

25   immediate supervisors, and then just complaining about it

1    with your fellow employees.  So there's a difference.

2    Q.    Okay.  So when you see something that you think is

3    unsafe, you go through the process in your mind of

4    determining whether or not you think a supervisor already

5    knows about it, and then based on that, you report it or

6    not.

7    A.    Absolutely not.  I always -- I always talk to my

8    supervisors if I find an immediate problem.  But if my

9    supervisor walks on the same thing or sees the same problem

10   as me, if we both just stepped in grease, I'm not going to

11   say, hey, buddy; I know, like, he just did it.  That's what

12   I'm saying.

13   Q.    Okay.  So let's go to July 22nd, 2011.

14   A.    Okay.

15   Q.    I believe your testimony was that you walked down onto

16   track level from the dispatcher's booth; right?

17   A.    Correct.

18   Q.    And in order -- what track -- do you have to cross a

19   track before you get to S track?

20   A.    You have to cross 1 track.

21   Q.    Okay, and when you cross 1 track, there's wood planks

22   there; right?

23   A.    Yes, sir.

24   Q.    Okay.  On July 22nd, 2011, tell the jury where exactly

25   on those wood planks there was grease.

CHARLES P. McGUIRE, C.C.R.

1    A.    You want me to remember exactly like what spot from

2    five years ago today?

3    Q.    Well, yes.  You testified to the jury grease was

4    there, so one would think --

5    A.    Well, there's a --

6    Q.    Let me finish -- one would think that you would know

7    exactly where it was.

8    A.    Well, there's a grease -- automatic greaser that

9    greases the switch which is not very far away.  So when

10   trains come through, they drag, splatter spots of grease

11   everywhere.  If you want, I can't sit here with a ruler and

12   say, oh, there's grease here and there's grease there.

13   Q.    I understand that your testimony is at some point, you

14   may have seen grease.  I'm talking about July 22nd, 2011.

15   Tell me where the grease was.

16   A.    There was grease on the floor at some point.

17   Q.    Where?

18   A.    On the side of the rail, the side of the ballast, I'm

19   sure.  I can't say specifically.

20   Q.    Okay.  So you do not actually know that there was

21   grease there; you're just giving general testimony of what

22   you may think had been there.

23   A.    I guess so, if that's what you're saying.

24   Q.    Okay.  Great.  Tell me where the water was on the

25   planks.

CHARLES P. McGUIRE, C.C.R.

1    A.    Water?

2    Q.    Yes.  Was there water on the planks?

3    A.    Not that I recall completely, not like soaking wet.

4    Q.    Okay.  Great.  Now, you gave testimony about having a

5    conversation with Darren -- his last name started with a Z?

6    A.    Zebarowski.

7    Q.    Zebarowski.

8    A.    Yes.

9    Q.    About, that he had talked to you about the condition

10   of the area could possibly be unsafe if the water level rose

11   high enough; right?

12   A.    Yeah.

13   Q.    How high was the water level on the day you fell?

14   A.    Oh, it was nowhere near our conversation, if that's

15   what you're saying.

16   Q.    No, I'm asking, on July 22nd, 2011 was there any

17   standing water on the ground to make the area dangerous?

18   A.    It didn't rain that day, sir.

19   Q.    So the answer's no?

20   A.    The answer is no.

21   Q.    Okay.  So that whole conversation with Mr. Zebarowski

22   is irrelevant because there was no water there that day.

23   A.    If you want to consider it irrelevant, sure.

24   Q.    I mean, it wasn't a concern of yours because there was

25   no standing water to touch the third rail.

1    A.    No, not on the specific day, but it's still a hazard,

2    yes.

3    Q.    All right.  So once you walked across the planks that

4    -- you don't even remember whether or not there's grease

5    there, you take a left, right, and walk towards the train?

6    A.    Yes, sir.

7    Q.    All right.  And from when you take the left to when

8    you get to the train is about how far?

9    A.    Approximately?  Oh, from right when I take a left.

10    Q.    Yes.

11    A.    Maybe 10, 15 feet.

12    Q.    Ten, 15 feet.

13    A.    Approximately.

14    Q.    Okay.  Now, tell me where within that 10 to 15 feet

15    exactly there was grease.

16    A.    Again, it's going to be the same as before.

17    Q.    You can't do it.

18    A.    I can't specifically tell you.

19    Q.    Okay.  So then it's entirely possible that there is no

20    grease there.

21    A.    I would definitely not say that, 'cause I definitely

22    saw grease there, but --

23    Q.    Do you have a specific memory on July 22nd, 2011

24    seeing grease there?

25    A.    I told you, yes, but I can't tell you exactly where --

CHARLES P. McGUIRE, C.C.R.

1    Q.    Okay.

2    A.    -- on what rock, what piece of ballast.  I don't know

3    how to answer that question exactly.

4    Q.    You can't give me any specifics besides, it was there,

5    but you don't know where:  Close to the train, far from the

6    train, anywhere.  You just want the jury to believe that it

7    was there without giving any specifics; correct?

8    A.    There's an automatic greaser right there that the

9    trains drag through.  It's kind of common sense, in a sense.

10   Q.    Okay.  So you're making an assumption it was there,

11   but you have no specific memory of it, do you?

12   A.    I guess you're right, sure.

13         MR. ROSENTHAL:  Objection.

14         THE COURT:  I'll allow it.

15   Q.    Now, at this point, you get to the train; right?

16   A.    Yes, sir.

17   Q.    And the conductor's already gone up.

18   A.    Yes.

19   Q.    So when you get to the train, do you pause for a

20   second, or do you just kind of go right up?

21   A.    No, I mean, I pause for a second.

22   Q.    Well, actually, let me ask you this.  Are you carrying

23   anything when you walk to the train?

24   A.    On this day?

25   Q.    Yes.

1    A.     No, because my stuff was at Hoboken, so I had my vest

2    on, that was it.

3    Q.     When you say your stuff, what do you mean?

4    A.     Like my extra stuff, my gas mask all that stuff.  So I

5    had it in my locker in Hoboken that day, I believe.

6    Q.     Okay.  So you get to the train, and then, I'm sorry,

7    did you or didn't you pause for a second, or did you just go

8    right up?

9    A.     No, I paused for a second.

10   Q.     Why did you pause for a second?

11   A.     Well, I always pause to look around, you know, get

12   everything situated before I go up.  You just don't take a

13   running start onto the train.

14   Q.     Okay.  Fair enough.

15          During that pause, did you ever wipe your hands?

16   A.     I don't remember.

17   Q.     I mean, your hands were sweaty, right?

18   A.     After the fact, I remember that, but I can't tell you

19   before if I did that or not 'cause if I did, I'd be lying to

20   you.

21   Q.     I mean, because if you just kind of went like that,

22   your hands wouldn't have been sweaty anymore; right?

23   A.     I guess in the sense, if that's what your saying.

24   Q.     Okay.  And your hands were sweaty, which you knew, but

25   you decided not to put the gloves on.

CHARLES P. McGUIRE, C.C.R.

1    A.    My hands were sweaty after.  Could have been from

2    anything.  That's what I remember.  That's, you know --

3    Q.    So you only remember your hands being sweaty after.

4    That's your testimony today.

5    A.    I can't tell you like before the accident, you know,

6    what you're trying to get to, so --

7    Q.    Really, I'm just asking you if your hands were sweaty

8    before the accident.

9    A.    I don't remember at that point.  Right before, I don't

10   remember, no.

11   Q.    Okay.  But you made the decision not to put your

12   gloves on.

13   A.    Like I said, nobody wears their gloves.

14   Q.    Okay.  Yes, Mr. Avril lied about that, I remember.

15   A.    Um-h'm.

16         MR. ROSENTHAL:  Objection.

17         THE COURT:  I'll allow it.

18   Q.    Then you put your right foot in the foot hole; right?

19   A.    Yes, sir.

20   Q.    Okay.  And then both hands on the grab bar?

21   A.    Yes.

22   Q.    Again, without the gloves?

23   A.    Um-h'm.  Again.

24   Q.    And you pull yourself up?

25   A.    Yes, sir.

1   Q.    All right.  Now, I wasn't quite clear from your

2   testimony yesterday.

3   A.    Okay.

4   Q.    Explain to me what happens when you place your left

5   foot on the anti-climber.

6   A.    I placed my left foot and --

7   Q.    How do you place your left foot?

8   A.    Into the -- on the diamond plate, on the edge,

9   partially.

10  Q.    Okay.  Do you place it flat?

11  A.    Yeah.  Yeah.  As flat as you're going to be able to

12  fully get it until you transfer your weight.  You can't have

13  a flat foot at that height.

14  Q.    Okay.  Let me go back.

15        I'm asking specifically, that day, how did you

16  place your foot?

17  A.    The way I place it every other time.

18  Q.    Okay.  And you're sure about that.

19  A.    I'm positive.

20  Q.    Or are you just giving a general answer based on what

21  you generally do?

22  A.    No, I'm absolutely positive.

23  Q.    Okay.  So you place your foot flat.

24  A.    Um-h'm.

25  Q.    Right?  How much of it's on the diamond plate?

CHARLES P. McGUIRE, C.C.R.

419

1    A.    Most of it, probably.

2    Q.    I don't want a probably.  I want how much of it is on

3    the diamond plate.

4    A.    Most of my foot was on the diamond plate.

5    Q.    Okay, and how do you know most of your foot was on the

6    diamond plate?

7    A.    Because that's the way it's done.  I've done it

8    hundreds of times, by now thousands.

9    Q.    We'll do it this way.  It might be a little bit

10   easier.

11         You put your foot in the foothold, you grab onto

12   the grab bars, you pull yourself up.  At what point did you

13   look down at your left foot?

14   A.    What.

15   Q.    At what point did you look down at your left foot?

16   A.    You don't look down as you're climbing up exactly.

17   Q.    Okay.  If you did not look down at your left foot, how

18   can you tell me that most of your left foot was on the

19   diamond plate or some of it -- let me finish -- or some of

20   it was on the smooth edge?

21   A.    First of all, that would be looking over, not down.

22   You're -- the way you just described that instance would be

23   if I looked down when my foot is on the floor.  You're

24   saying, how do I know if my foot was on the diamond plating,

25   right?  Be more specific in your question, please.

CHARLES P. McGUIRE, C.C.R.

1    Q.    My question to you was, at what point in the process

2    do you look down at your left foot and see where it's

3    placed?

4    A.    So now I'm already up with both feet, you're saying,

5    right, before I lifted my leg.

6    Q.    I'm talking about at any time in the process.

7    A.    Okay.  So when my right foot is in that foot step, I'm

8    not looking down when my foot is on the floor.

9    Q.    Sure.

10   A.    Of course, when I look over, when I switch my -- move

11   my body, I'm going to see my foot because I have to look in

12   that direction anyway to see where I'm going, yes.

13   Q.    So on that day, you saw your foot; right?

14   A.    Of course.

15   Q.    Most of it's on the diamond plate.

16   A.    Yes.

17   Q.    How much of it isn't on the diamond plate?

18   A.    My heel.

19   Q.    Your heel.

20   A.    Yeah.  About my heel.

21   Q.    That's it.

22   A.    Yeah.

23   Q.    Okay.  And when you pull yourself up, even though your

24   foot is flat, you say most of your weight is in the heel?

25   A.    Well, at that point, yeah.  Remember, I'm coming from

CHARLES P. McGUIRE, C.C.R.

1    down, so I can't step over and be on my toes.  It's almost

2    impossible.  It's a high, high thing.  So of course, most of

3    my weight is going to be in the center back of my foot, and

4    as soon as I transferred it, I slid.

5    Q.    But the center of your foot's on the diamond plate.

6    A.    From more or less, yes.

7    Q.    And I wasn't quite sure from your testimony.  On July

8    22nd, 2011, before you climbed up the train, did you see the

9    smooth metal edge?

10   A.    No.

11   Q.    You didn't look.

12   A.    No.

13   Q.    Okay.  And then it's your testimony you planted your

14   left foot, and you slide.

15   A.    Correct.

16   Q.    Okay.  I believe -- and actually, your testimony then

17   was, after the accident, while you were on the ground, is

18   when you saw that there was no anti-slip tape?

19   A.    Actually more probably noticed it when I was getting

20   carried out on a stretcher more or less that I noticed

21   something, because I was looking around, like what happened.

22   I noticed it's shiny.  I didn't say that I noticed there was

23   no anti-slip tape there.  I just noticed that there was a

24   shiny edge.  I couldn't tell for what reason it was shiny at

25   that time.

CHARLES P. McGUIRE, C.C.R.

1    Q.    Okay.  When you're on the stretcher, are you laying

2    down or is it --

3    A.    Yes, but I was -- remember, I'm on track -- they

4    walked me out on track level onto an elevated ground where I

5    was level with the train.  I was actually above it at that

6    time, so I was able to see all of it.

7    Q.    Where was the train in relation to you when it was on

8    the -- when you got up on the platform, or when you were

9    above it, as you just put it?

10   A.    So if this is the platform, this is where the train

11   was, so when I fell off the train, I fell to the ground

12   track level.

13   Q.    Sure.

14   A.    They took me on a stretcher, carried me across the

15   same way I walked, back up the stairs, so now I'm exactly

16   parallel with the train.

17   Q.    Okay.  There was a track in between you from the

18   platform; right?

19   A.    Correct.

20   Q.    And you were actually in a neck brace; right?

21   A.    Yeah, I was in a neck brace, sure.

22   Q.    So that distance away, in a neck brace, you're able to

23   turn your head and say, ah, look at that, it's shiny.

24   A.    It's only 10 feet.

25   Q.    Okay.  But you could still turn your head in the neck

1    brace; it's not a problem?

2    A.    Sure, and I wasn't turning my head.  I didn't have to.

3    It was right in front of me, in a sense.

4    Q.    Now, when you get back -- and you can refer to

5    Defendant's Exhibit A that's in evidence.

6    A.    Um-h'm.

7    Q.    You filled out this 360 report?

8    A.    Yes.

9    Q.    I ask that you -- I think it's still up there -- that

10   you take a look at it, because we're going to go through it.

11   A.    No problem.

12         I think this is it right here.  Yes.

13         Okay.

14   Q.    All right.  You got it in front of you?

15   A.    Yes, sir.

16   Q.    All righty.  So July 22nd, 2011, that wasn't your

17   first time filling out one of these reports; right?

18   A.    No, sir.

19   Q.    So you were, at least generally, even though it might

20   have been only one or two other times, familiar with what

21   this form looked like.

22   A.    Yes.

23   Q.    So you weren't --

24   A.    In a sense.

25   Q.    You weren't particularly caught off guard by any of

424

1    the questions or anything like that.

2    A.    No.

3    Q.    So you knew what you were going to have to fill out.

4    A.    Yes.

5    Q.    Okay.  So when they ask you to describe the injury,

6    you write, "As I was climbing onto the train on S-1, I put

7    my right foot into the right foot step and grabbed hold of

8    the climbing rail.  As I lifted my body up my right ankle

9    slipped and rolled over on me.  I tried to hold on but due

10   to my hands being sweaty I couldn't hold on."

11   A.    Correct.

12   Q.    Now, if you want the jury to believe your testimony,

13   you left out the most important part of the accident on that

14   form.

15   A.    I was also in a lot of pain, that I just got dragged

16   back from the hospital, so I filled out as quick as I could

17   so I could get out of there.

18   Q.    So you filled it out and left out the part that caused

19   you to slip.  That's what you want the jury to believe.

20   A.    I also left out all of the conditions that are on

21   there that also could have happened.

22   Q.    Oh, I understand.  We'll get to that.  But as far as

23   your left foot slipping, if people look at this form, no one

24   would understand your left foot slipped because you never

25   mentioned it; correct?

1    A.    I guess so.  Remember, I put to where I was in pain, I

2    wrote that generally, what happened, it was the leg I was

3    hurting on.  I wanted to go home.  I just got back from the

4    hospital at that point.

5    Q.    Well, actually, if you want to go to "Describe

6    Injury," which is right above, it says, "open parentheses,

7    R, close parentheses, ankle sprained or torn ligament," next

8    line, "lower back pain."

9         So the pain didn't really prevent you from

10   accurately writing down which body parts were injured;

11   right?

12   A.    I put a R with parentheses.  I didn't write "right."

13   I just wanted to leave.  And I'm no physician, so I couldn't

14   tell you exactly, I just gave a guess.

15   Q.    Does R not stand for right?

16   A.    It does.  It's a shorthand verse for right.

17   Q.    So you were able to identify that your right ankle got

18   hurt and your back, but the pain prevented you from writing,

19   right foot slipped?

20   A.    Well, I didn't really write in a lot of things is what

21   I keep telling you.  I was in pain.  I left a lot of details

22   out on the form.

23   Q.    Okay.  Including the first thing that happened in

24   order to cause your accident.

25   A.    But it wasn't causing -- that wasn't where my pain

1    was, so I left it out.

2    Q.    But in your description of the accident, that doesn't

3    ask for, describe for me your pain in relation to how the

4    accident happened; it just says, describe how the injury

5    occurred.  Right?

6    A.    Correct.

7    Q.    And so you left out the first step.

8    A.    Along with a lot of other things.

9    Q.    That's what you want the jury to believe, that you

10    left out the first step.

11    A.    It's true, though.

12    Q.    So the first document -- the first chance that you

13    have to tell someone at PATH what went on, you totally leave

14    out one foot slipping.

15    A.    The first chance I had is just coming home from the

16    hospital two hours after my injury.

17    Q.    When did your injury occur?  What time?

18    A.    I don't know.  Two, three hours, now, you're going to

19    -- I don't know.  However long it was, two hours, three

20    hours.

21    Q.    Okay.

22    A.    Whatever it is.

23    Q.    So two, three hours after the injury, the first chance

24    to tell PATH, you decide not to tell them about the left

25    foot.

1      A.    Like I said, I've been in pain.  I wanted to leave at

2      that point.  I wanted to go home.

3      Q.    Okay.  Now, you testified yesterday about, when it

4      came to the condition of the track level, your testimony

5      was, well, I was kind of inspecting, but it's not really my

6      job; I was looking around, but not really my job.  Right?

7      A.    I always look where I'm walking.

8      Q.    Okay.  But you did say that you inspected the train

9      before you went up.

10     A.    Sure, visually.

11     Q.    Okay.  Go to the second page of this.

12     A.    Okay.

13     Q.    It asks:  "Did you inspect the tool or equipment prior

14     to use?"  And then there's boxes for Yes, No, or N/A, which

15     is not applicable.

16     A.    Correct.

17     Q.    And you checked off N/A.

18     A.    It is not applicable.  It's kind of, like I said

19     before, it's common sense.  If there's no foot step or grab

20     rail, that is my only equipment, so obviously if it's

21     missing -- it's there, but it's kind of nonapplicable

22     because all trains have that.  And if for some reason it was

23     missing, I would report that, yes.

24     Q.    Okay.  So is it not applicable, or did you do an

25     inspection?

CHARLES P. McGUIRE, C.C.R.

1    A.    It's kind of like on -- you're playing on a thin line

2    there.  That's -- it's not really equipment in a sense, but

3    I use it to climb, so yes, I visually looked at it.

4    Otherwise I wouldn't have been able to use it.

5    Q.    Right.  How about the next question:  "Did you inspect

6    the work site prior to beginning work?"  Again, you check

7    off N/A.

8    A.    Sorry, where is that?

9    Q.    It's right below number one.  It's number two.

10   A.    Okay.  Yeah.  Yeah, I see it.

11   Q.    Okay.

12   A.    It's the same question as one, almost.

13   Q.    Yes, and again, you check off N/A.  You don't say,

14   yes, I inspected it and it was fine, or, there's something

15   wrong with it.

16   A.    It's not like I'm inspecting a hammer before I'm using

17   it.  It's the step and the handrail is the main thing you're

18   inspecting.

19   Q.    Well, this question doesn't ask about tools, it asks

20   about the work site.

21   A.    Right.  Well, it's the same, the same exact thing.

22   Q.    Okay.  All right.  And then when you go to number

23   four, where it asks you to identify the extenuating

24   circumstances, --

25   A.    Correct.

CHARLES P. McGUIRE, C.C.R.

1    Q.    -- and then it actually provides examples of what they

2    might be, weather, temperature, lighting, noise, or coworker

3    activities, all you write in is that "Temperature was 110

4    degrees, possibly if it wasn't that hot my hands," quote,

5    "'might not have,'" close quote, "been that sweaty and might

6    have had better grip."

7    A.    Correct.

8    Q.    Right?

9    A.    Um-h'm.

10   Q.    So there was some testimony from you that it was --

11   the lighting was an issue and it was very dark.

12   A.    Sure.  There's a lot of things.

13   Q.    You didn't write lighting in here even though you're

14   prompted in the question, an example is lighting; correct?

15   A.    Correct.

16   Q.    You also don't identify grip tape as a cause; right?

17   A.    Correct.

18   Q.    You don't identify grease as a cause?

19   A.    Correct.

20   Q.    You don't identify oil as a cause?

21   A.    Correct.

22   Q.    Right?  So on the date of the injury, the only cause

23   that you identify, the only cause that you identify to PATH

24   is that your hands were sweaty; right?

25   A.    Correct.

1    Q.    All right.

2          MR. MINO:  May I approach?

3          THE COURT:  Yes.

4    Q.    Mr. Foder, I'm going to hand you what's been marked

5    Defendant's Exhibit B.  Take a look at it and let me know

6    when you're ready for some questions.

7    A.    I already know.  That's no problem.  I see it.

8    Q.    Are you ready?

9    A.    I'm ready.

10   Q.    All righty.

11         What is this document?

12   A.    It's an Unusual Occurrence Report, basically the same

13   thing as the other one.

14   Q.    Is that your handwriting on the document?

15   A.    It is.

16   Q.    Okay.  Is that your signature at the bottom?

17   A.    It is.

18   Q.    Okay.  And when did you fill that out?

19   A.    The same time as the other report.

20   Q.    Okay.

21         MR. MINO:  Your Honor, at this time, PATH would

22   like to move Defendant's Exhibit E -- or B into evidence.

23         THE COURT:  Any objection?

24         Okay.  It's in.

25         (Defendant's Exhibit B marked in evidence)

CHARLES P. McGUIRE, C.C.R.

1    Q.    And are you asked to describe the incident on that

2    form?

3    A.    Yeah, in a sense, sure.

4    Q.    Okay.  Read for the jury what you wrote in.

5    A.    "As I was climbing onto the train on S-1 I put my

6    right foot in the right foot step, grabbed the handrail.  As

7    I lifted my body up my right ankle slipped and rolled.  I

8    tried to hold on but due to my hands being sweaty I slipped

9    and fell."

10   Q.    Okay.  Once again, no mention of the left foot; right?

11   A.    And once again, I was in pain.  Same time.

12   Q.    So this is now the second opportunity you had to tell

13   PATH, and once again, you decide to not tell them about your

14   left foot slipping.

15   A.    Correct.

16   Q.    Okay.

17   A.    Or anything else.

18   Q.    Okay, great.  So this is also the second opportunity

19   you have to identify that the edge of the anti-climber

20   didn't have grip tape, and once again, you declined to do

21   that.

22   A.    Well, at that time, grip tape wasn't an issue until

23   now.  They're slowly adding it.

24   Q.    All right.  You also don't identify in either of the

25   documents, either A or B, the alignment as being a problem,

CHARLES P. McGUIRE, C.C.R.

1    right, the alignment of the grab bar and the end step?

2    A.    Like I said, I could have wrote for hours.  I was in

3    pain.  I wanted to go home.

4    Q.    So on the day of your injury, you decided the most

5    important thing to write as far as a cause of your injury

6    was sweaty hands.

7    A.    I wrote that because when I was sitting there with the

8    operations examiner who picked me up from the hospital says

9    you have to put something in every box, I saw weather in the

10   thing, and it was hot, so I wrote it.

11   Q.    Okay.  But you also saw lighting in the thing and

12   decided not to write lighting.

13   A.    Like I said, I wanted to go home.

14   Q.    Okay.  Now, to the extent based on your two reports

15   that you made to PATH the date of your injury that sweaty

16   hands were a problem, that would have just been cured by

17   putting the gloves on.

18   A.    I just said it because that's what I remember, my

19   hands were sweaty after, so --

20   Q.    That wasn't my question.  That problem would have been

21   remedied by you putting your gloves on; correct?

22   A.    It wouldn't have helped.

23   Q.    Oh, so sweaty hands and gloves:  Same exact thing.

24   A.    My ankle was already rolled.  No matter what, even if

25   I was glued to them bars, I was going to fall no matter

CHARLES P. McGUIRE, C.C.R.

433

1     what.

2     Q.    So if you were going to fall no matter what, why did

3     you write that your hands were sweaty as the cause of your

4     accident?

5     A.    Because I had to put something in every box.

6     Q.    And that was the --

7     A.    The first thing that came to my mind, yes.

8     Q.    -- most important thing -- okay.

9           Now, after your accident, right, you went up

10    eventually to Dr. Whitley?

11    A.    Yeah.  Yes.

12    Q.    And that's the PATH Doctor?

13    A.    Yes, sir.

14    Q.    How long after your accident did you see Dr. Whitley?

15    A.    I can't give you exactly.

16    Q.    And by that, I mean when was the first time you saw

17    her after your accident?

18    A.    Approximately, about five days, I believe.

19    Q.    Okay.  Couple days after your accident, about five,

20    you end up at the PATH doctor.

21    A.    Yes, sir.

22    Q.    And when you went to the PATH doctor, Dr. Whitley took

23    a history from you, didn't she?  She asked you what

24    happened?

25    A.    No.  Not that I remember.

1    Q.    Okay.

2    A.    She just asked me what's wrong.  She didn't ask me

3    incidents that I could recall.

4    Q.    Okay.  Do you recall telling Dr. Whitley that you

5    thought that you had grease on the bottom of your shoe which

6    possibly caused this fall?

7    A.    I don't recall, but I could have said that, and that

8    could have been very well possible as well.

9              MR. MINO:  May I approach?

10             THE COURT:  What document are you showing him?

11             MR. MINO:  This is Defendant's Exhibit H.  It's

12   just to refresh recollection.

13             THE COURT:  Okay.

14   Q.    Actually, let me give you the marked copy.

15             I show you what's been marked as Defendant's

16   Exhibit H.  Specifically, I'll draw your attention to what's

17   written under "Physician Note."

18   A.    Okay.  No problem.

19             Okay.

20   Q.    Okay.  In looking at this document, does this refresh

21   your recollection as to whether or not you told Dr. Whitley

22   that you thought that you had grease on the bottom of your

23   shoe which possibly caused your fall?

24   A.    No.  I -- like I said, I said that, sure, here, now

25   that you refresh my memory, and it's very possible.  There's

1      grease all over that area.

2      Q.    Now, you said after your accident -- actually, in the

3      two weeks after, immediately after your accident, how was

4      your ankle feeling?

5      A.    I was still in pain.

6      Q.    Okay.  You were in a lot -- I believe your testimony

7      was that there was throbbing pain?

8      A.    Sure, I had throbbing pain.

9      Q.    Sure.

10     A.    On and off.  Pain, yes.

11     Q.    Okay.  Do you recall telling Dr. Whitley on July 28th,

12     2011, which would be less than a week after your accident,

13     that your right ankle was feeling better with pain only in

14     certain movements?

15     A.    I told -- if it's on this paper, yes, that's what I

16     told her.  But I was still in pain.  It was just not as bad

17     as the exact moment I fell, sure.

18     Q.    Okay.  So you do remember telling her that you were

19     feeling better, pain only with certain movements.

20     A.    Partially.

21     Q.    It's not on that form.

22            MR. MINO:  Your Honor, may I approach?

23            THE COURT:  Yes.

24            MR. MINO:  This is part of Plaintiff's Exhibit 9.

25     A.    Like I told her, at rest, might have been a little bit

1    -- at rest, I would have less pain, obviously, than walking

2    on it or moving it, sure.

3    Q.    Take a look again under "Physician's Note."

4    A.    All right.

5    Q.    And I'll ask you a question in a second.

6    A.    All right.

7          Okay.

8    Q.    Okay.  In looking at that document, does that refresh

9    your recollection about what you told Dr. Whitley?

10   A.    Perfectly.

11   Q.    Okay.  Now, on the note where you tell Dr. Whitley

12   about grease on your shoe, you don't -- again, you don't

13   identify any other problem; correct?

14   A.    She was nobody to tell.  She's there to treat me.

15   Q.    All right.  So at some point -- or actually, how long

16   after your injury did you end up in physical therapy?  When

17   was the first time you went?

18   A.    I don't remember exactly.

19   Q.    Was it six months later, or was it only a couple weeks

20   after?

21   A.    It was probably a few weeks.  I don't remember

22   exactly.  You I guess know better than I would right now.

23   Q.    Did you go to Kessler Rehab?

24   A.    I did.

25   Q.    Okay.  And during your August 1st, 2011 visit, which I

1    guess was your initial visit, did you identify the severity

2    of pain in your ankle as one out of 10?

3    A.    I don't recall.

4    Q.    Okay.

5              MR. MINO:  May I approach?

6              THE COURT:  Yes.

7              MR. MINO:  This is part of Plaintiff's Exhibit 17.

8              THE COURT:  Okay.

9    Q.    Okay.  I'm going to direct your attention to just

10   under "Chief Complaint."

11   A.    Um-h'm.

12             THE COURT:  What document is that again?

13             MR. MINO:  It is an August 1st, 2011 note from

14   Kessler Rehab.  It's part of Exhibit --

15             THE COURT:  D-4?

16             MR. MINO:  No, it's Plaintiff's Exhibit 17.

17             THE COURT:  Oh, 17.  Okay.

18             MR. MINO:  Yes.

19   Q.    Are you ready?

20   A.    I'm ready.

21   Q.    Okay.  So in looking at that note, does that refresh

22   your recollection that by August 1st, when you went to

23   Kessler Rehab, that your pain in your ankle was one out of

24   10?

25   A.    Sure.

1   Q.    And also during that first visit, isn't it true that

2   you told the individuals at Kessler Rehab that you fell

3   because of grease on the track?

4   A.    I might have mentioned that, yes.

5   Q.    Can I see the document back just so I can show you at

6   a point?

7         If you look at what's written in under "History of

8   Injury."  Take a look at that.

9   A.    Sure.

10  Q.    Okay.

11  A.    I see it.

12  Q.    Does that refresh your recollection that you told the

13  physical therapist at Kessler Rehab that you fell because of

14  grease on the track?

15  A.    I gave everybody a general idea of what happened.  I

16  didn't go into every single detail of the whole accident.

17        I was also in a cam walker boot, so it made things

18  a little bit less painful for me because it took a lot of

19  stuff off my ankle.

20  Q.    Okay.  So you gave them a general idea, but again, you

21  leave out any mention of the anti-climber or the grab bar or

22  the in step.

23  A.    Or the lights or anything else.  I could go on and on

24  and on and on and on, but why tell strangers these things.

25  Q.    Okay.  You didn't find it important to be as open and

1    forthright with your doctors as possible?

2    A.    Why would I?  My left foot was not injured.  My right

3    foot was injured.

4    Q.    All right.  Now, your first surgery, your surgery with

5    Dr. Berberian, --

6    A.    Correct.

7    Q.    -- when did that take place?

8    A.    I can't give you a date.  I don't remember.

9    Q.    Sometime in September of 2011 sound about right?

10   A.    I guess.  I don't know.  You have it right there.  You

11   know better than I do.

12   Q.    Now, sometime -- within a month of your first surgery,

13   you actually fell on that ankle again, didn't you?

14   A.    Not that I recall falling, no.  Not a full, like,

15   fall.

16   Q.    Okay.

17            MR. MINO:  May I approach?

18            THE COURT:  Yes.  Tell me the number.

19            MR. MINO:  This is part of Plaintiff's Exhibit 12.

20            THE COURT:  Okay.

21   Q.    Do you recall telling Dr. Berberian on August 25th,

22   2011, that you fell on the ankle once?

23   A.    Yeah, I think I was in my boot or cam walker, I was on

24   my crutch.  I think I placed it down a little bit too hard

25   or something like that.  But I was already -- I was in a

CHARLES P. McGUIRE, C.C.R.

1   cast.  I was mobilized, I believe, at that time.  Yeah, I

2   believe so.

3   Q.   So you do remember telling him that you fell --

4   A.   A little bit, vaguely, very vaguely.  I don't remember

5   the whole thing.  This is five years ago.

6   Q.   All right.  Well, here, take a look at this note.

7           Mr. Foder, based on that note, does that refresh

8   your recollection about whether or not you told

9   Dr. Berberian that you fell on your ankle after the surgery?

10  A.   Yeah.

11  Q.   And then, by November --

12  A.   Hold on one second.

13  Q.   Yes.

14  A.   Yeah, I was in a cast.

15  Q.   Okay.  By November of 2011 --

16  A.   Okay.

17  Q.   -- at this point, you're still seeing Dr. Berberian?

18  A.   Yeah, I believe so.  Sure.  My surgery was just a

19  little prior, right?

20  Q.   Yes.

21  A.   Okay.  Yeah.  I was still seeing him.

22  Q.   And so by November 2011, you actually tell

23  Dr. Berberian that you're doing well.

24  A.   Sure.  I was -- as well as I could be at post-op.

25  Q.   Okay.  So six weeks from surgery, you're doing well.

1    A.    I guess so.  In pain, painkillers, but I'm doing well

2    for my situation, sure.

3    Q.    Okay.  Now, when did you -- after the first surgery,

4    when did you stop seeing Dr. Berberian?

5    A.    I don't recall exactly dates.  I don't recall.

6    Q.    But at some point after the first surgery, when you

7    returned to work with PATH the first time --

8    A.    Right.

9    Q.    -- you weren't treating with Dr. Berberian throughout

10   that period; correct?

11   A.    No, I was in therapy or something on and off, and then

12   I wound up going back to Dr. Berberian.

13   Q.    Right, and when did you go back to Dr. Berberian?

14   A.    I can't tell you exactly dates and --

15   Q.    Can you tell me the year?

16   A.    Yeah.  I think it was a year later from that surgery.

17   Q.    So in 2012 or 2013?

18   A.    I don't know.  '12, I guess.

19   Q.    And why did you go back to Dr. Berberian in 2012?

20   A.    Pain.

21   Q.    And was that when you then sought out -- is that when

22   he told you to have another surgery?

23   A.    I believe so.  I can't -- I don't know -- I can't

24   remember every single detail.  I've seen so many doctors.

25   Q.    Okay.  So at some point, you end up with

442

1    Dr. Greisberg.

2    A.    Correct.

3    Q.    Right?  And that would have been in October 2013;

4    correct?

5    A.    I believe so.

6    Q.    Do you remember in October 2013 telling Dr. Greisberg

7    that you exercise regularly?

8    A.    Yeah, my therapy, I do a lot of therapy, sure, yeah.

9    Q.    Not that you do therapy regularly, that you exercise

10   regularly.

11   A.    I think he was talking about my home exercises is what

12   I believe he was talking about, but this is a long time ago.

13   I don't remember exactly the conversation we held.

14   Q.    Okay.  And your second surgery with Dr. Greisberg is

15   on Halloween 2013?

16   A.    I believe that was it, yes.

17   Q.    Okay.  And then again, six weeks after the surgery, do

18   you recall telling Dr. Greisberg that, again, you're not in

19   much pain and that you're doing well?

20   A.    Again, I was mobilized in a cast on painkillers, so at

21   that time, that's what the answer is.

22   Q.    Okay.  So, again, six weeks after the injury, not in

23   much pain.

24   A.    I was in pain, but on painkillers and immobilized, not

25   using my ankle whatsoever.

CHARLES P. McGUIRE, C.C.R.

1   Q.     And then you testified before that you were only

2   really able to run if like your daughter's running out into

3   the street or something like that.

4   A.     Yeah, I can't fully sprint now, no.

5   Q.     Okay.  Only when you really need to.  Right?

6   A.     I guess.

7   Q.     Okay.

8   A.     I mean -- I mean, I might have had once or twice where

9   I've attempted to do it, but no, I don't do it regularly.

10  Q.     Okay.  And you said you could barely jog for even that

11  long, right?

12  A.     Not for a long time, no.

13  Q.     Okay.  Do you recall in January 2014 telling

14  Dr. Greisberg that you are doing a tiny bit of jogging

15  or using the elliptical machine?

16  A.     This is what they recommended me to try to do, sure.

17  This is what Dr. Greisberg told me to do.

18  Q.     So by 2014, that's what you're doing.

19  A.     This is what he told me to do, but when I tried it and

20  when I went back to tell him that I couldn't do it, I was in

21  pain, and I only tried to do it in moderation here and there

22  because he wanted me to try to build some fluid into my

23  ankle.

24  Q.     So how often are you jogging and using the elliptical

25  machine?

1    A.    I tried it a couple times.  I don't remember exactly.

2    Q.    Okay.  Now, eventually, there's a third surgery with

3    Dr. Greisberg; right?

4    A.    Yes, sir.

5    Q.    And that is November 2014.

6    A.    I believe so.

7    Q.    Okay.  Now, that third surgery, they're not going in

8    and cutting the bone again; right?

9    A.    I'm not a physician.  I don't know.  I know they took

10   the hardware out.  I was in pain.  That's all I remember.

11   They was cutting into my ligaments.

12   Q.    Okay.  So do you recall telling Dr. Greisberg less

13   than two weeks after that surgery that you're feeling pretty

14   good and you can weight-bear on it?

15   A.    I don't recall, but if I was, I think I was in a cam

16   walker and on painkillers, so...

17              MR. MINO:  This is part of Plaintiff's Exhibit 11.

18         May I approach?

19              THE COURT:  Yes.

20   Q.    Okay.  I'm going to show you this note.  Take a second

21   to read it, under "History."

22   A.    No problem.  No problem.

23         Okay.

24   Q.    And does that refresh your recollection that less than

25   two weeks after the surgery, you told Dr. Greisberg that

CHARLES P. McGUIRE, C.C.R.

445

1    you're doing --

2    A.    Sure.  Do you want me to read it for everybody?

3    Q.    No, I just asked if it refreshed your recollection.

4    A.    It refreshes my recollection, sure.

5    Q.    Now, you haven't seen Dr. Greisberg since March of

6    2015; right?

7    A.    I believe so.  Again, the dates --

8    Q.    Okay.  So it's been more than a year since you've saw

9    him.

10   A.    Sure.

11   Q.    Did you see any other orthopaedic doctor since then?

12   A.    Not that I recall.

13   Q.    Did you see anyone -- or not anyone.  Did you see any

14   doctor in relation to your right ankle since March of 2015?

15   A.    Not that I recall, unless therapists count.  I don't

16   think they do.

17   Q.    Okay.  Are you currently wearing a foot orthotic?

18   A.    Me?

19   Q.    Yes.

20   A.    I have to wear an ankle brace probably forever.

21   Q.    Okay.  Are you wearing it now?

22   A.    Yes.

23   Q.    Do you always wear it?

24   A.    Depends on the situation.  But not like if I'm -- not

25   just -- if any time I'm leaving the house for a good amount

446

1    of time, sure, I'd wear it.

2    Q.    Okay, but there's certain times during the day where

3    you do not wear it; correct?

4    A.    Yeah.

5    Q.    Okay.  Now, I want to talk to you about some of the

6    stuff you said with respect to your home.

7    A.    Okay.

8    Q.    Okay?

9          If you said you lost your home, it's fair to say,

10   then, that you didn't own it?

11   A.    Yeah, I didn't own it.  It was a rent with option to

12   buy.

13   Q.    Okay.  How much was your rent per month?

14   A.    Per month, it was $1,650, 1,700.

15   Q.    Okay.

16   A.    Plus everything else.

17   Q.    Okay.  And by "everything else," you mean what?

18   A.    All your other utilities, electric, cable, gas, water,

19   sewer, whatever.

20   Q.    So can you give me an estimate of how much the rent

21   plus utilities would be per month?

22   A.    I don't know.  Somewhere over 2,000, 22, 2,300.  Plus

23   I had car payment, I had to buy all stuff for my daughter,

24   she was a newborn.  So everything added up.

25   Q.    Okay.

CHARLES P. McGUIRE, C.C.R.

1    A.    I don't know total what it could have been I was

2    spending at the time.

3    Q.    I was just asking in relation to the house.

4    A.    Yeah.  I don't know.  I don't know exactly.  I didn't

5    have any figures that I wrote down prior to coming here,

6    so...

7    Q.    Okay.  Was your fiancee working at the time?

8    A.    She was.

9    Q.    Okay.  How did you guys -- or did you guys divvy up

10   the rent?  You pay half, she pays half, or what happened

11   there?

12   A.    I made more money than she did, so I paid as much as I

13   could for everything.  She just kind of makes minimum wage

14   at the time, she wasn't making that much money.

15   Q.    Okay.  So --

16   A.    And at that time, I'm not even sure if she was back to

17   work yet.

18   Q.    Okay.

19   A.    I'm not sure.

20   Q.    Why was she out of work?

21   A.    Well, she had a child.

22   Q.    Okay.  When was your daughter born?

23   A.    January 29th.

24   Q.    Of?

25   A.    2011.

CHARLES P. McGUIRE, C.C.R.

1    Q.    2011.  Okay.  So your testimony was before that this

2    injury put a lot of financial stress on you and you ended up

3    losing the house.

4    A.    Yeah.

5    Q.    Okay.  And did you end losing the house because you

6    stopped paying rent?

7    A.    Correct.

8    Q.    Okay.

9    A.    Well, I left him with my security deposit.  I didn't

10   leave him high and dry.  So the money that he had, I just

11   said, listen, I'm going to leave early, take this, and we

12   separated ways, because I didn't want to just leave him

13   stranded like, you know.  But, yeah, I had to.  I had no

14   other choice.  I didn't have enough income at the time.

15   Q.    Were there any months before you left that you just

16   didn't pay rent?

17   A.    Not that I recall, no.

18   Q.    Okay.  So just so I'm clear, you paid the landlord in

19   full, but you ended up leaving early?

20   A.    From my recollection, yeah, I remember that I couldn't

21   afford it with all my other bills.

22   Q.    Okay.  And when did you leave that house?

23   A.    I don't remember the month.

24   Q.    Can you give me a year?

25   A.    It was after the surgery.

1    Q.     Which surgery?

2    A.     After my first surgery, so six months, seven months

3    after, something like that.  I don't -- I don't recall

4    exactly.

5    Q.     So by 2012.

6    A.     I believe so.

7    Q.     Okay.  Now, isn't it true, though, that during your --

8    initially after the injury, right, when you were not

9    working, --

10   A.     Initially after the injury, correct.

11   Q.     Right, you were not working, PATH paid you your entire

12   paycheck?

13   A.     Initially after the injury.

14          Yeah.  For four weeks, I believe, I got paid.

15   Q.     So for four weeks where you were not working at all,

16   you received your entire paycheck.

17   A.     Only for the first surgery, though.

18   Q.     I understand.  So for the first surgery, we're talking

19   about for the first four weeks after the first surgery --

20   A.     Yes, I got paid for a month, yes.

21   Q.     Yes.

22   A.     One month.

23   Q.     And how much was that?

24   A.     Whatever my paycheck was times four, so -- maybe it

25   was 900 times four, something along those lines.  I can't

CHARLES P. McGUIRE, C.C.R.

450

1     give you exact dollar amount because then I'd be lying,

2     so...

3     Q.     And then after those first four weeks, PATH paid --

4     where you're still not working, PATH paid you half your

5     paycheck; right?

6     A.     Yes, for a couple of remainder, some weeks, sure.

7     Q.     So with respect to the financial hardship, for a while

8     there, you were collecting a paycheck without working.

9     A.     For a little while.

10    Q.     Okay.  Did you save that money?

11    A.     As much as I could to put into my bills.  Remember, I

12    had a newborn, too, so, and they're not exactly the cheapest

13    thing, either.

14    Q.     Now, isn't it also true that you were collecting money

15    from the Railroad Retirement Board while you were out and

16    not working?

17    A.     Yes, but that's the difference.  My check, what

18    happens is is that every day after the first week that I'm

19    out, they take $60 out of my check.  They sent it to

20    Railroad Retirement.  So I'm not really getting two, I'm

21    getting the same initial dollar amount, just from two

22    separate places because my money's being sent.

23    Q.     Okay.

24    A.     Yeah.

25    Q.     So you are, though, collecting money from the Railroad

CHARLES P. McGUIRE, C.C.R.

1      Retirement Board.

2      A.      Sure.

3      Q.      Okay.  Now, how about after the second surgery?

4      A.      Yeah.

5      Q.      PATH paid you then as well, didn't they?

6      A.      Yeah, but it's a different circumstance.

7      Q.      Okay.  And were you also collecting from the Railroad

8      Retirement Board then?

9      A.      Yeah, it would be the -- it would be similar to the

10     first time except for one -- I couldn't claim the IOD,

11     which, you know, you can't be out of work injured for the

12     same reason and collect the same way.  The way they do their

13     paychecking is weird, but...

14     Q.      Okay.  But fair to say, then, after the second

15     surgery, for a period of time, you were also collecting

16     money from two sources.

17     A.      Yeah, but it's still my regular check only for X

18     amount of time.  It's a short period.

19     Q.      And after your third surgery --

20     A.      Correct.

21     Q.      -- PATH pays you again, don't they?

22     A.      Yes, for the first four weeks.

23     Q.      After the second and third surgery, PATH pays you

24     again, you're not working and you're collecting money from

25     PATH; right?

1   A.   Correct.

2   Q.   And again, after the third surgery, did you get money

3   from the Railroad Retirement Board?

4   A.   The same way as before.  It's the same exact money

5   just coming from two different places.

6   Q.   Okay, so again, after each surgery, you were able to

7   collect money from two different sources while not working;

8   correct?

9   A.   Technically, two different sources, yes.

10   Q.   So you're back at full duty now; right?

11   A.   Yes, sir.

12   Q.   Okay.  You don't have any work restrictions; correct?

13   A.   No, sir.

14   Q.   All right.  There's nothing that they say, you know,

15   Mr. Foder can't do this, he can only do that?

16   A.   No.  I can do it all.

17   Q.   Okay.  Did you ever go to PATH and say, I can't work

18   this?

19   A.   No.

20   Q.   Did you ever go to PATH and say, don't put me on a

21   switching job, I can't physically do it?

22   A.   I can't do that because they would just take me out of

23   my craft.  They won't allow me to work.  If I can't work one

24   particular part of that job, I can't work any of it.  So, in

25   my seniority, I have the option to pick a running or a

CHARLES P. McGUIRE, C.C.R.

1    switching job, and I choose to pick something that is less

2    strenuous on my ankle.

3    Q.    At the time of the injury, which one were you working?

4    A.    I was working a running job.

5    Q.    Okay.  How long had you been working a running job

6    prior to July 22nd, 2011?

7    A.    I don't remember.  Not that long.  I don't think I --

8    I think I was switching prior to that.  I can't tell you

9    exactly.  We changed jobs so much, every three months, I

10   couldn't tell you.

11   Q.    So at least a couple of months before July 22nd, 2011,

12   you had started working a running job?

13   A.    Yeah, I'm sure I had a switching job in there

14   somewhere, yeah.

15   Q.    Okay.  Now, there was a little bit of testimony about

16   overtime.

17   A.    Okay.

18   Q.    And you said that you averaged about two hours a week?

19   A.    I said I worked maybe one to two days a month.

20   Q.    And then when Mr. Rosenthal asked you, he averaged it

21   out, saying about two hours a week?

22         MR. ROSENTHAL:  Objection.

23   A.    I guess that's what he came to his conclusion, maybe.

24         THE COURT:  What's the objection?

25         MR. ROSENTHAL:  A mischaracterization of what I

CHARLES P. McGUIRE, C.C.R.

1   said.

2              THE COURT:  I'll allow it.

3   Q.   So it ends up averaging out to about two hours a week?

4   A.   Yeah.

5   Q.   About?

6        Mr. Avril said that overtime was a speculative

7   thing, it wasn't guaranteed.  Was that true or not?

8   A.   That's true.

9   Q.   Okay, so that -- told the truth on that one.

10       So there were plenty of weeks where you didn't

11  work overtime; right?

12  A.   Yeah, there was a lot of times I didn't get called or

13  offered it, either.

14  Q.   For the periods of time you were out, how was overtime

15  assigned to you?

16  A.   When I'm out like of work?

17  Q.   Would overtime be assigned to you when you're out of

18  work?

19  A.   No.

20  Q.   No.  I understand that.

21       So in 2011, for the periods of time you were

22  there, how would overtime be assigned?

23  A.   Well, there is a roster of names, and then it goes by

24  tours.  Everybody's job finishes at different minutes, so,

25  like -- it's very complicated, but they go down the roster,

CHARLES P. McGUIRE, C.C.R.

1    per tour, either you're a.m., p.m., midnight.  The guys on

2    the a.m. would get the preferred a.m. overtime jobs, p.m.,

3    you know, and so on and so forth, but then it gets down to

4    the minute.  It's really complicated how they do it

5    upstairs.  All I know is generally it's on a rotating roster

6    is the best that I can describe it.

7    Q.    When you say on a rotating roster, what do you mean?

8    Do they try and keep everyone within that roster relatively

9    even as far as the amount of overtime?

10   A.    No, it starts at the top and then it goes down.

11   Q.    So it's a seniority thing.

12   A.    Basically, yes.

13   Q.    So in 2011, since you had only been an engineer for a

14   couple of months, is it fair to say you would have been

15   relatively low on the seniority list?

16   A.    Yeah, that's absolutely right.

17   Q.    So you would have gotten offered less overtime than

18   someone who was much higher up on the seniority list.

19   A.    Absolutely.

20   Q.    Now, when you're offered overtime-- the reason I say

21   offered, you're not required to work it; right?

22   A.    No, sir.

23   Q.    They can't say to you, Steven, you have to stay and

24   work this overtime.

25   A.    Well, they can force you on certain, whenever -- if

456

1    they need you.  But no, on most cases, you're right.

2    Q.    Okay.  And prior to this injury, there were instances

3    where you were offered overtime and you declined to work it.

4    A.    Absolutely.

5    Q.    And what would some of those reasons be?

6    A.    Some of them reasons could be either I just wanted to

7    be with my daughter or family, or I had a family birthday

8    party, or I had something going on that, you know, was more

9    prevalent to me being there for overtime.  You know, I like

10    to be around my family a lot, too, so a lot of that could be

11    it.

12    Q.    Okay.

13    A.    I worked when I could.

14    Q.    Well, you're able to be back and work overtime now.

15    A.    Yes, sir.

16    Q.    At any point prior to July 22nd, 2011, did you ever

17    make a written report to a PATH supervisor regarding the

18    alignment of the grab bars on the PATH train?

19    A.    No, sir.

20    Q.    Okay.  Even though you climb them every day.

21    A.    Yes, sir.

22    Q.    And even though you're required to report all unsafe

23    conditions.

24    A.    Yes.

25    Q.    Prior to 22nd, 2011, did you ever report in writing to

1    a supervisor anything about the edge of the anti-climber?

2    A.    No, sir.

3    Q.    Even though you're required to report all unsafe

4    conditions.

5    A.    Yes, sir, that was -- I wasn't aware.

6    Q.    Even though you're required to -- you climbed that

7    hundreds of times prior to July 22nd, 2011.

8    A.    Yes, sir.

9    Q.    Okay.  And despite -- actually, did you ever make a

10   written report prior to July 22nd, 2011 about there being

11   grease in the track area by S track?

12   A.    Not to my recollection, no.

13   Q.    Even though you're required to report all unsafe

14   conditions?

15   A.    Yes.

16   Q.    Okay?

17          MR. MINO:  I have nothing else.

18          THE COURT:  Okay.  You know what?  It is quarter

19   to 12.  Why don't we take our morning break?  I know you

20   have been very patient, the jury has been.  I appreciate it,

21   and I know they probably need a quick break to use the

22   restrooms and get something to drink or eat, so why don't we

23   -- it's a quarter of.  Why don't we resume at 12 o'clock?

24   Then we'll see if we can finish with the witness.  Okay?

25          All rise.


                   CHARLES P. McGUIRE, C.C.R.

1             THE COURT CLERK:  All rise.

2        (The jury exits)

3             THE COURT:  Okay, guys.  Take a break.  See you

4     soon.

5             Thank you, Mr. Foder.  You'll be back.  You're not

6     done yet.

7             THE WITNESS:  Thank you.  I know.

8        (Recess taken)

9        (Jury out)

10            THE COURT CLERK:  All rise.

11            THE COURT:  Bring in the jury.

12            How much do you think you'll have with Mr. Foder?

13            MR. ROSENTHAL:  I'm only going to have a couple of

14    questions.

15            THE COURT:  Okay, good, and then we're going to go

16    right into your expert, correct?

17            MR. ROSENTHAL:  We have our expert here, ready to

18    go.

19            THE COURT:  Excellent.

20            How long is the video?

21            MR. MINO:  It's an hour and 19 minutes, although

22    actually slightly shorter because we're cutting it down, but

23    only by like a minute or two.

24            MR. ROSENTHAL:  Yes, but I would say an hour and

25    20 minutes.

1           THE COURT CLERK:  All rise.

2           (The jury enters)

3           (The witness resumed the stand.)

4           THE COURT:  All right.  Welcome back, everyone.

5           Mr. Foder, you can have a seat.  You remain under

6    oath.

7           Mr. Rosenthal?

8           MR. ROSENTHAL:  Thank you, Your Honor.

9                    REDIRECT EXAMINATION

10   BY MR. ROSENTHAL:

11   Q.    Steve, I just have a couple of questions for you.

12   A.    Sure.

13   Q.    You were asked questions about sums that you received

14   while you were out the three times.

15   A.    Sure.

16   Q.    Each time that you were out -- I guess there was three

17   times; right?

18   A.    Yes.

19   Q.    You got -- you testified, I think -- you got how much

20   full pay and for how long?

21   A.    I got one month worth of full pay.

22   Q.    And how much was that?

23   A.    I don't know.  In four weeks?

24   Q.    No, per week, at the time.

25   A.    Around eight-something, $900.

460

1    Q.    And then after that, you got -- you still got paid,

2    but a lesser amount?

3    A.    I got half of that for the following eight weeks after

4    that.

5    Q.    And then after that?

6    A.    Nothing.

7    Q.    So at the time that you were losing your house, was

8    there any money coming in from PATH?

9    A.    No.

10   Q.    Now, you also testified about something called

11   Railroad Retirement benefits.

12   A.    Yeah, in my pension fund.

13   Q.    And how much was that bringing in to you?

14   A.    It was approximately $598 every two weeks, I believe,

15   or 596.

16   Q.    Okay.  So about 200 and something dollars a week?

17   A.    About that, yeah, two and change, yeah.

18   Q.    That's what you were getting at the time that you --

19   that's all that was coming in for you at the time that you

20   lost your house?

21   A.    That's it.

22   Q.    And for each time that you were out for the four

23   months till you went back to work, that was the only money

24   that you had?

25   A.    That was it, yeah.

1          MR. ROSENTHAL:  No other questions, Your Honor.

2          THE COURT:  Are we done?

3          MR. MINO:  Just one question.

4                    RECROSS EXAMINATION

5   BY MR. MINO:

6   Q.    The last time -- isn't it true that the last time you

7   went out, you actually never went no pay, you were full and

8   half pay the entire time?

9   A.    I don't recall.

10  Q.    So it's your testimony that you went into no pay.

11  A.    I don't recall exactly the dates.

12  Q.    You don't know one way or another.

13  A.    No, I'm not sure.  I'm pretty sure no, but...

14          MR. MINO:  I have nothing else.

15          THE COURT:  Okay.  Thank you, Mr. Foder.

16          THE WITNESS:  Okay.

17      (Witness excused)

18          THE COURT:  Your next witness.

19          MR. ROSENTHAL:  Plaintiff calls George Widas.

20          THE COURT:  Mr. Widas?

21          Mr. Widas, do you swear or affirm?

22          THE WITNESS:  Swear.

23          THE COURT:  Okay.

24          THE COURT CLERK:  Sir, if you can raise your right

25  hand, place your left hand on the bible, please.


                    CHARLES P. McGUIRE, C.C.R.

1    G E O R G E    W I D A S, called as a witness on behalf of

2    the Plaintiff, and having been duly sworn, testified as

3    follows:

4            THE COURT CLERK:  Please state your full name for

5    the record and spell it, please.

6            THE WITNESS:  George P. Widas, W-i-d-a-s.

7                    DIRECT EXAMINATION

8    BY MR. ROSENTHAL:

9    Q.    Mr. Widas, can you tell the jury what your occupation

10   is?

11   A.    I'm a professional engineer, and I practice as an

12   independent consulting forensic engineer.

13   Q.    And what does it mean to be an independent consulting

14   forensic engineer?

15   A.    I'm hired on a case-by-case basis.  I'm not employed

16   by anybody.

17   Q.    And what is forensic engineering?

18   A.    Forensic engineering is the use of physical sciences,

19   engineering sciences to figure out what happened and why in

20   different events.  For the sake of analysis, in other words,

21   it's the same sciences and engineering that you use to build

22   things.  You use the same stuff to take it apart.

23   Q.    And how long have you been working in consulting

24   engineering?

25   A.    Since 1967.  Forty-nine years.

                    CHARLES P. McGUIRE, C.C.R.

1    Q.    And what about your professional training as it

2    related to the engineering you did in this case?

3    A.    I have a Bachelor of Science cum laude Tau Beta Pi

4    from Syracuse University in civil engineering, which

5    included courses related to the work I did in this case,

6    physics, mechanics, vector analysis, engineering materials,

7    biology, photogrammetry, climatology, surveying.  After I

8    graduated from college, I've taken continuing engineering

9    education courses for credit for the last 40 or more years

10   in the fields of scientific event reconstruction, safety

11   engineering, safety engineering techniques, safety sciences,

12   human factors in ergonomics, biomechanics, cognitive

13   neuroscience, hazard analysis, risk assessment, safety

14   systems, safety system management, safety program

15   techniques, various different code compliances, including

16   the American Disabilities Act code compliance, OSHA

17   compliance, general safety regulations for OSHA,

18   OSHA-certified, fall protection, OSHA-certified, and I have

19   taken many programs in slips and fall events.

20   Q.    What is safety engineering?

21   A.    Safety engineering is a science which is the procedure

22   that should be followed to make systems safe for people to

23   use.

24   Q.    And what does the word "safety" mean to professionals

25   in your field?

CHARLES P. McGUIRE, C.C.R.

1    A.    The sciences of safety engineering reduce the risk of

2    harm to acceptable levels.  That's what safety is defined as

3    scientifically.

4    Q.    Is there a simple way for you to explain to us the

5    science of safety engineering?

6    A.    It's basically a four-step process.

7          The first step is hazard analysis, where you make

8    a list of what can go wrong that might hurt people or damage

9    property.

10         The second step is to do a risk assessment, where

11   you take that list of potential methods of harm and you

12   prioritize it and figure out what you actually have to do

13   something about, or whether your list included items that

14   just don't need your attention because they're unlikely to

15   occur and the consequences of them occurring are remote.

16         Once you've done the hazard analysis, make your

17   list, do the risk assessment, and prioritize the list, you

18   identify hazards of significant risk, if there are any.

19   Once you've done that, you mitigate or do something to make

20   those dangerous conditions safe, and there's a procedure to

21   be followed when you do that, and it is to eliminate the

22   hazard if you can; if you can't do it, can't eliminate it,

23   you protect the user or separate the user from the hazard.

24   If you can't do either of those two things, then you warn

25   about it.

1          And the fourth level of hazard mitigation is to

2     train and rely upon the user to protect themselves in the

3     system.

4     Q.    How does the science of physics relate to the work you

5     did in this case?

6     A.    Physics talks about forces, vector analysis, friction,

7     and materials science that would relate to a climb system,

8     the forces that are exerted on the climb system and on the

9     people using the climb system, and the traction demands at

10    the points of contact while using the climb system.

11    Q.    What is the science of biomechanics?

12    A.    Biomechanics is the science where a human body is

13    studied as a machine or a mechanical device.  Your bones are

14    the beams or structure, your muscles are the motors, your

15    tendons and ligaments are the connectors, and your brain is

16    the computer.  Cognitive neuroscience specifically studies

17    the part of that program where it relates to your function

18    of your brain.

19    Q.    How does the science of biomechanics relate to the

20    work that you did in this case?

21    A.    It tells us how people will fit and function in the

22    climb system on the railroad car.

23    Q.    What is the science of human factors?

24    A.    Human factors provides data for the performance of

25    humans in the built environment.  In other words, once you

466

1    create something, a building or a railroad car, and people

2    are going to use it, human factors gives you the data to fit

3    people in that system.

4    Q.    How does the science of human factors relate to the

5    work you did in this case?

6    A.    Tells us how big people's feet are, what the range of

7    motions of their joints are as they're climbing, and factors

8    like that.

9    Q.    What is the science of ergonomics?

10   A.    Ergonomics is the study -- the application of human

11   factors to the work environment.

12   Q.    How does the science of ergonomics relate to the work

13   you did in this case?

14   A.    This is a workplace safety issue.  The railroad

15   workers are using the railroad car and they're climbing the

16   railroad car, so this is an ergonomic issue.

17   Q.    What is professional scientific event reconstruction?

18   A.    That is the application of science to facts available

19   in a particular case to make a determination of what

20   happened and why.

21   Q.    Have you done any engineering work related to

22   workplace safety?

23   A.    I have.

24   Q.    And what have you done?

25   A.    First starting with design work in 1967, and I ended

467

1    my design work in 1994, through all of that time, all of the

2    systems that I designed had to be safe for the user.

3              In addition to that, starting in 1980, I devoted a

4    portion of my forensic -- of my consulting engineering

5    practice to forensic engineering, 1994, all forensics since

6    then, and started focusing on the actual safety of workplace

7    safety.

8              And to do that, I sit on safety committees and

9    write safety standards for the world at the American Society

10   For Testing and Materials, and in addition to that, I've

11   analyzed many different fall -- or workplace safety events,

12   several hundred over the last 36 years, 37 years.

13   Q.    Have you done any engineering work directly related to

14   the safety of climbing systems in the workplace?

15   A.    Yes.  I would estimate about a hundred of the events

16   that I've looked at through the years would involve climb

17   systems in the workplace.

18   Q.    Have you done any engineering work where people were

19   injured in a workplace in the railroad world?

20   A.    I would -- yes, I have.  I would say I've done maybe a

21   hundred railroad injury event investigations over the years.

22   Q.    Now, are the sciences you rely upon to do your

23   analysis different when the workplace is a railroad or some

24   other workplace?

25   A.    No.  As a safety professional, safety is safety,

1       physics is physics, human factors is human factors, whether

2       it's a railroad or an industrial plant where there is a

3       punchpress making parts for a transmission in a car.

4       Q.      How many times in the last 37 years have you studied

5       and rendered opinions in workplace safety in general?

6       A.      A few hundred times.

7       Q.      And how many times in the last 37 years have you

8       studied and rendered opinions on workplace safety in the

9       railroad world?

10      A.      Somewhere between 50 and 100 times, I would say.

11      Q.      What professional affiliations have you established

12      during your career?

13      A.      I'm a member of the American Society of Safety

14      Engineers, the American Society of Civil Engineers, the

15      Society of Automotive Engineers, the Human Factors and

16      Ergonomics Society, the American Society For Testing and

17      Materials, the National Safety Council, the International

18      Code Council, the American Meteorological Society, and other

19      organizations.

20      Q.      How does your membership in those professional

21      organizations help the jury to understand your

22      qualifications as a professional engineer, safety

23      professional, and human factors professional?

24      A.      The different professional societies offer grades of

25      membership based on your training and experience.  You

1    submit applications, and they review that and award a grade

2    of membership.  I'm recognized as a professional in each of

3    those fields.

4    Q.    Have you held any positions of responsibility in any

5    of those organizations?

6    A.    Yes.  I've been chairperson for different task groups

7    that write safety standards about footwear, with respect to

8    the structure and safety of footwear, walkway surface

9    safety, slip resistance measurement, workplace safety.

10   Those are committees and standards that I've been involved

11   in actually writing.

12   Q.    And did you hold any positions in particular that you

13   can tell the jury about?

14   A.    I'm just chairperson of the groups that wrote the

15   standards.  I have several standards that -- the words in

16   the standards are my words.

17   Q.    Do you have any board certifications or any similar

18   registrations during your career?

19   A.    I have been a professional engineer, a certified

20   safety professional, and a certified tribometrist.

21   Q.    What does it mean to be a professional engineer?

22   A.    You have to complete a minimum four-year accredited

23   engineering program, take a comprehensive examination to

24   qualify as an engineer in training, work for a minimum of

25   four years in responsible charge of engineering projects,

1    and then take another board examination.

2    Q.    Where have you been board certified as a professional

3    engineer?

4    A.    New York, New Jersey, Pennsylvania, South Carolina,

5    and Delaware.

6    Q.    What does it mean to be a certified safety

7    professional?

8    A.    Basically the same program.  You need a minimum

9    four-year accredited college program, you take a

10   comprehensive board examination, you must work a minimum of

11   four years in responsible safety science applications, and

12   then take another board examination.

13   Q.    Where have you been board certified as a certified

14   safety professional?

15   A.    The Board of Certified Safety Professionals is not

16   limited to states, it is international, so my certification

17   is international.

18   Q.    Now, you mentioned ASTM standards and the writing that

19   you did, but other than that, have you been involved in any

20   other similar work?

21   A.    Yes.  The United States Department of Labor

22   Occupational Safety and Health Administration, OSHA, hired

23   me to participate in making new laws, and I testified in

24   Washington, reviewing interested or concerned parties'

25   position papers and scientific research, and those laws were

471

1    related to workplace safety, specifically related to safety

2    in the steel erection industry, and it had a principal focus

3    of slip resistance on steel surfaces in the workplace.

4    Q.    Is it part of your work to testify in court, like

5    today?

6    A.    Yes, about one out of 10 cases that I analyze and

7    write reports on ends up in court.

8    Q.    Have you been qualified by courts as an expert in

9    professional engineering, workplace safety and the sciences

10   you have listed in any of those prior appearances?

11   A.    Yes.

12                 MR. ROSENTHAL:  At this time, Your Honor, we offer

13   Mr. George Widas as an expert in the field of engineering

14   and safety, specifically in the fields of workplace safety

15   and human factors.

16                 MR. MINO:  No objection.

17                 THE COURT:  He's so qualified.

18                 You can proceed.

19                 MR. ROSENTHAL:  Thank you, Your Honor.

20                 Just for the record, can I approach the witness?

21                 THE COURT:  Yes, you may.  Tell me what you're

22   showing him.

23                 MR. ROSENTHAL:  It's his CV.

24                 MR. MINO:  Yes.

25                 THE COURT:  Okay.

CHARLES P. McGUIRE, C.C.R.

1    Q.    I'm going to ask you to take a look at this document,

2    Plaintiff's Exhibit 6.

3              Do you recognize that?

4    A.    Yes.

5    Q.    What is it?

6    A.    It's a year-old curriculum vitae and fee schedule.

7    Q.    Do you have -- are there additions that are not on

8    there?

9    A.    The only thing that's not on there was a Federal

10   Railroad Administration training and qualification as a

11   contract roadway worker on track protection program that I

12   took and was certified by the Railroad.

13   Q.    What was your assignment in this case?

14   A.    To figure out what happened and why, using forensic

15   engineering techniques and the sciences that we've talked

16   about.

17   Q.    How did you go about performing your engineering in

18   this case?

19   A.    I was given factual sources of information by

20   Mr. Rosenthal or his office.  I did independent

21   data-gathering by examining the railroad car and the

22   location of the event, and other independent data-gathering

23   by putting together regulations, codes, standards,

24   authoritative reference books, textbooks, peer-reviewed

25   published papers and other documents, and then I analyzed

473

1    and reviewed those documents and rendered a report.

2    Q.    Now, what materials did you receive from my office?

3    A.    I received different legal proceedings documents, I

4    grouped them all together, complaints and other things that

5    don't provide facts to me, so I don't use them or rely upon

6    them.  But factual sources of information included the PATH

7    reports and investigations documents that were related to

8    the injury event to Mr. Foder, as well as answers to

9    interrogatories and answers to notices to produce answered

10   by Steven Foder and answered by PATH, and I reviewed

11   transcripts of depositions of Mr. Foder, Sandra Bou, Gregory

12   Reich, Dennis Velez, Astagne Avril, and Ken Wallace.  I also

13   was provided recently with a report of Augustine Ubaldi,

14   dated February 24, 2016.

15   Q.    What independent gathering did you perform?

16   Independent data gathering.

17   A.    Okay.  I put together the weather data for -- to

18   establish the environmental conditions at the time and place

19   of the event, and I put together references, standards,

20   codes, regulations, and authoritative papers that are

21   related to safety in general, human factors, and

22   specifically related to climb systems.

23   Q.    Before we go any further, I would like to instruct you

24   that all of your answers from here on out be opinions, and

25   can you give the basis of those opinions.

474

1    A.    Yes.

2               MR. MINO:  Objection.  To instruct him that they

3    have to be opinions?

4               THE COURT:  I'm not going to -- that's a strange

5    question.  You can ask the question, what is your opinion to

6    a degree of scientific certainty, but --

7               MR. ROSENTHAL:  I understand.

8               THE COURT:  -- but you have to ask him a fact

9    question.  It's not his opinion.

10              MR. ROSENTHAL:  Inartfully asked.  Thank you, Your

11   Honor.

12              THE COURT:  All right.  Good.  We're on track

13   again.

14   BY MR. ROSENTHAL:

15   Q.    Now, I do want to ask that your answers be to a

16   reasonable degree of engineering probability unless you

17   indicate to us otherwise.  Okay?

18   A.    Yes.

19   Q.    Now, what significant facts and information did you

20   extract from the materials that you reviewed about the

21   details of the event in which Mr. Foder was injured?

22   A.    Most of it -- I've been here the last two days, so

23   most of it you've already heard a lot of.  The event

24   occurred on July 22, 2011 in the Journal Square Station on

25   track S.  It occurred at about 4:30 p.m., involving car --

CHARLES P. McGUIRE, C.C.R.

1    PATH railroad car number 5678; that at the time of the

2    event, Engineer Foder was going to his work assignment.  He

3    left the control location, the dispatcher location, walked

4    through the station, went down to track level, approached

5    the railroad car and climbed onto the car as he's described

6    for you many times.

7              The -- beyond that, you've heard it all, and I

8    don't need to repeat it.

9    Q.    Okay, and where did the injury event take place?

10   A.    In Journal Square Station, track S, which is the

11   bottom level of the station.

12   Q.    Now, based on the information you reviewed and the

13   materials you described and your examination of the

14   location, was there anything significant about the walking

15   environment for railroad workers approaching the location

16   where Steven Foder climbed up the railroad car?

17   A.    Yes.  My examination in October of 2015, more than

18   four years after the event, when I was there, it was a

19   greasy, grimy, trash-strewn area at that location.  That was

20   more than four years after the event.

21             You've also heard what you've heard about the

22   condition of the location at the time of the event, which

23   was consistent with what I observed when I was there.

24             I also heard testimony here in the courtroom over

25   the last two days about the automatic greaser that is in the

CHARLES P. McGUIRE, C.C.R.

476

1    location of this area, which would provide a probable source

2    of contamination with grease on a regular basis.

3            That's what my factual review told me about the

4    location.

5    Q.    Now, you said you did an inspection of the railroad

6    car and location --

7    A.    Yes.

8    Q.    -- of the injury event?

9    A.    Yes.

10   Q.    Can you describe the location for us?

11   A.    I took photographs.  If we could look at a photograph,

12   you could see.

13   Q.    Sure.

14           I'm going to show you 55 photographs that have

15   been marked as Exhibit -- as part of Exhibit 5 -- they're a

16   part of Exhibit 5, Your Honor -- and ask you to identify

17   them.  And please keep them in two different piles if you

18   can.

19           THE COURT:  Okay.  Are these the exhibits attached

20   to the expert report?

21           MR. ROSENTHAL:  Yes.

22   A.    These appear to be the photographs I took on October

23   6, 2015.

24   Q.    Okay.  And you took of the railroad car and the

25   location?

CHARLES P. McGUIRE, C.C.R.

1    A.    What's that?

2    Q.    You took of the railroad car at issue and the

3    location?

4    A.    This pile is location, and this pile -- I see my hand.

5    This pile would be my examination of those -- railroad car.

6    Q.    Okay.

7         MR. ROSENTHAL:  And we would like to offer those

8    photographs as Exhibit 5, Your Honor.

9         THE COURT:  Which ones?

10        MR. MINO:  PATH objects to the introduction of

11   some of them.

12        MR. ROSENTHAL:  Yes, there's -- can we see --

13        THE COURT:  Sure.  Bring the pictures.

14        (The following takes place at sidebar)

15        THE COURT:  There are a ton of pictures here.

16   Which one?

17        First of all, in the future, something that you're

18   going -- you have big books of exhibits.  This is I think

19   the first ones you're entering into evidence.  These

20   pictures are important.  In the future, have them premarked

21   individually.  What's the point of having all these big

22   books and showing them to the witnesses and the key exhibits

23   you have lumped in as Plaintiff's Exhibit 5 and they're not

24   premarked.  The purpose of premarking is so we don't have to

25   do this in the middle after trial.

478

1                Just a little best practices tip.  This is not the

2       way to do it.

3                So you probably have 20 pictures attached to his

4       expert report.

5                MR. ROSENTHAL:  There is 55 pictures.

6                THE COURT:  Fifty-five.  They each should be

7       marked separately.  We have three books.  Have you entered

8       anything into evidence yet?

9                MR. DiGIULIO:  A few things, I think two or three.

10               THE COURT:  It's ridiculous.

11               Go ahead.  Have you showed these to your

12      adversary?

13               MR. DiGIULIO:  Yes.

14               MR. MINO:  Yes.

15               MR. ROSENTHAL:  And we made two piles, one of

16      which there's no objection to, one of which he has

17      objections to.  That's why I split them up.

18               THE COURT:  Okay.  So we have to premark them.

19      This is 5, it will be P-5-1 and go all the way through, so

20      we have a record for the Court's official report.

21               MR. MINO:  And just so we're clear, the ones that

22      are being objected to are ones that depict the grip tape on

23      the train, the subsequent remedial repair issue.

24               MR. ROSENTHAL:  We're keeping them out.

25               THE COURT:  Okay.  So you're going to have to take

1     a minute with Amy and you're going to have to mark them.

2     You're going to have to go through them one by one.  In

3     other words, we need to have each one of those marked.

4     Okay.  So you have to give them to Amy, and I don't know

5     which ones they are.

6              This should have been done at the break and should

7     have been raised with me while the jury was not here.

8              She's going to mark the Court's official

9     documents.  We have no way of knowing which ones, right,

10    because they've all shoved in here together, right, all 55

11    of them?

12             MR. MINO:  Yes, kind of.  I mean, yes, it's going

13    to be difficult.

14             THE COURT:  Okay.  It's going to be difficult.  In

15    the future, you have to have every single document

16    premarked.

17             Let's go back, and we'll wait for Amy to do it.

18    It's going to take a few minutes.

19        (The following takes place in open court)

20             THE COURT:  The jury will just have to bear with

21    us for a few minutes as we mark some documents.  Okay?

22             Just for the record, I'm just reviewing exhibits.

23    There is only one other exhibit in evidence, P-24A, a

24    picture.

25             MR. ROSENTHAL:  Right, 24A.

CHARLES P. McGUIRE, C.C.R.

1              THE COURT:  24A.  That's it.

2              MR. ROSENTHAL:  Right.  And actually, Your Honor,

3     23A --

4              THE COURT:  Was that moved in yet?  I don't think

5     so.

6              MR. MINO:  No.

7              MR. ROSENTHAL:  No, but it's going to be moved.

8     We can move it in right now.

9              THE COURT:  Is there any objection to 23A going

10    in?

11             MR. MINO:  No, there's no objection to that.

12             THE COURT:  Okay.  23A is in evidence.

13        (Plaintiff's Exhibit 23A marked in evidence)

14        (Plaintiff's Exhibits 5A through 5UU marked for

15    identification

16             THE COURT:  Amy, can you start with some of them?

17             THE COURT CLERK:  Sure.

18    BY MR. ROSENTHAL:

19    Q.   Mr. Widas, I'm going to show you some of these

20    photographs.

21             These are the photographs that you took?

22    A.   Yes.

23             MR. ROSENTHAL:  Your Honor, I'd like to move for

24    the admission of the photographs listed as 5A through 5TT.

25             THE COURT:  Any objection?

481

1        MR. MINO:  The other ones are taken out?

2        MR. ROSENTHAL:  Yes, they're all taken out.

3        MR. MINO:  So no objection to what's been marked.

4        (Plaintiff's Exhibits 5A through 5UU marked in

5    evidence)

6        THE COURT:  Okay.  You can proceed.

7    Q.    Okay.  Mr. Widas, what did you do when you examined

8    the railroad car and location?

9    A.    I took photographs and made observations and took

10   measurements.

11   Q.    Okay.  And based on your review of the materials and

12   the testimony and your inspection of the railroad car, what

13   did you determine about any physical characteristics of the

14   railroad car that were related to what happened to Steven

15   Foder?

16   A.    The best way to answer that would be to demonstrate

17   the relative dimensions and locations of the component of

18   the climb system, and I could do that if I could just point

19   to this witness box from that side with my tape measure.

20       MR. ROSENTHAL:  Your Honor?

21       THE COURT:  Any objection?

22       MR. MINO:  I would assume that there would be a

23   foundation laid giving the relative height of the witness

24   stand and all of that.

25       THE COURT:  Yes.  Will he explain what he's doing?

CHARLES P. McGUIRE, C.C.R.

1          MR. ROSENTHAL:  Sure.

2  Q.    Why don't you do that, and explain to the jury exactly

3  what you're doing?

4          THE COURT:  Yes, you may.

5          THE WITNESS:  Thank you.

6          (The witness stepped down.)

7  A.    If we were to use this structure (indicating the

8  witness stand) to represent the back of the railroad car, I

9  took a measurement of the railroad car itself and measured

10  from the ballast or track surface -- not the rail itself,

11  but the bottom where Mr. Foder was standing, and from there

12  to the deck of the railroad car was 49 inches -- 49 and

13  three-quarters inches.

14          This is 47 inches.  So if we were to take one of

15  these cups and add two and three-quarters inches to it, to

16  this line, we would have the height to the deck of the

17  railroad car (drawing a line on a paper cup) from the floor

18  of the courtroom to that line on that cup.

19          If I could use that photograph, too, if that could

20  be --

21          MR. ROSENTHAL:  Your Honor?

22          THE COURT:  Sure.

23          THE WITNESS:  Can I bring it over here?

24          THE COURT:  Sure.

25  A.    In the photograph 23A, from the right corner of the

1    car over to the doorway opening into the vestibule is 33 and

2    a half inches.  I measured that.  So if we were to measure

3    from this point, and we're going to call this the right

4    corner of the end of the railroad car, if we run over 33 and

5    a half inches, we put our cup there, that's where the

6    opening is into the doorway.

7              I measured from track level, the ballast, where

8    Mr. Foder was standing, to the step.  It is 27 inches, 27

9    and a quarter inches.  And if I were --

10             THE WITNESS:  Could I put painter's tape on the --

11             THE COURT:  Yes.

12             THE WITNESS:  Just be careful.  It's the

13   Government's property.

14        (Laughter)

15             THE WITNESS:  Painter's tape leaves no damage.

16   A.    So if I come up 27 and a quarter inches -- I see that

17   scratch - I didn't do that -- and I'm just going to...

18             Okay.  The step starts five and a half inches in

19   from the edge of the car.

20             I'm going to get a better marker.

21             So if I come in -- first I go up 27 and a half --

22   27 and a quarter inches -- it's right there -- and I come in

23   five and a half from our corner and start my step right

24   there.  And the step is 11 inches long, so I'm going to come

25   over 11 inches to this point right here, and that's our

1    step, right there.  Okay.

2              Now, we have grabs.  First we have an L-shaped

3    grab that starts four inches over from the opening of the

4    doorway.  So if we were to come over four inches from the

5    doorway, we have a grab that is oriented at that location

6    along the back of the car.

7              Remember, this is our doorway opening.  We go over

8    four inches, and we're going to go to this grab.

9              The bottom of that grab is eight and three quarter

10   inches above the deck of the railroad car, so eight and

11   three quarter, we're going to start that grab bar right

12   about there.  We're going to imagine that.

13             Eight and three-quarters -- we have somewhat of a

14   reference.  We're going to be right about there.

15             And that vertical piece goes up to 34 and a

16   quarter inches above the deck, so if we start at the deck

17   and go up 34 and a quarter inches, that's the bottom of that

18   rail, that grab rail, the bottom -- I'm sorry -- I've got to

19   do this -- up eight and three quarters to the bottom of that

20   vertical part of the grab rail.  The horizontal part of the

21   grab rail is 34 -- 35 and a quarter inches above the deck,

22   so the rail goes from here to the top of my tape measure

23   right now, and then from there, we go across 12 inches --

24   hang on -- the horizontal portion is 12 inches.

25             So that's, if you can imagine, we have a bar right

CHARLES P. McGUIRE, C.C.R.

1      there.  That's the rail that Mr. Foder grabbed.  If we can

2      imagine seeing that, so this is the step, that's the bar,

3      and he's -- he describes he had his right foot on the step

4      and he's going to put his left foot up here, this is the

5      doorway opening, the dimensions that I measured along the

6      top of the deck of the rear -- of the end of the railroad

7      car, it starts three inches wide over here above the step

8      right here, it's three inches wide.  By the time we get to

9      the door, it's seven inches, of which the front edge is one

10     and a half inches of smooth steel.

11             Could we have that photograph up?

12             (Plaintiff's Exhibit 24A was displayed.)

13     A.    You've seen the photograph a million times.

14             So we have the inch and a half of smooth steel all

15     across a rounded edge.  The rounded edge permits the

16     railroad cars to go around curves.  And then we have diamond

17     plate inside of the one and a half inch wide smooth steel

18     rib of the anti-climber.

19             There are three ribs on the anti-climber, and

20     we're talking about the top of the three ribs.

21             The height of the anti-climber face is seven and a

22     half inches, in other words, from here to here, seven and a

23     half inches.  This -- from the step to the bottom of the

24     anti-climber is 15 inches, so I could draw, you know, 15

25     inches up.  That's the -- that's where our step is, right

1    here, that U would be our step.

2              And our grab rail is up there that Mr. Foder

3    grabbed.

4    Q.     And there's the exhibit.

5    A.     You can see the curved inch and a half smooth steel

6    edge of the anti-climber.

7    Q.     Which is Exhibit 24A.

8    A.     You can also see the diamond plate that's there.  The

9    generic name for it is called raised lug metal decking, and

10   we can talk more about that later.  But those are the two

11   materials that are on the deck that extends into the

12   vestibule of the end of the car.

13   Q.     And they were the available -- that was the available

14   climb system?

15   A.     There is another grab, this one.  I just want to show

16   you where that is relative to what we're talking about.  The

17   bottom is 48 inches above this, above the deck, so it starts

18   there, okay, and then goes up 17 inches, all right?

19             So imagine that we have a grab above the end of

20   the ruler, up 17 inches, and we have another grab that's

21   over here that we saw before that's about there.

22             All right.  Those are the critical dimensions of

23   the railroad car that I measured when I examined the

24   railroad car.

25   Q.     Were any climbing aids provided beyond the fixtures

CHARLES P. McGUIRE, C.C.R.

1    that were part of the railroad car?

2              THE COURT:  Let me stop you.

3              Are you finished with the demonstration.  Should

4    the witness go back to his --

5    Q.    Are you finished with the demonstration, or are you

6    going to go back to the photograph?

7    A.    I think I'm done.

8              THE COURT:  Okay.  Good.

9         (The witness resumed the stand.)

10             MR. ROSENTHAL:  And for the record, Your Honor, it

11   goes up to 5UU.

12             THE COURT:  Okay.  So it's P-5 --

13             MR. ROSENTHAL:  P-5A through P-5UU.

14             MR. MINO:  Could you move that photograph, please?

15             Thank you.

16             THE COURT:  Okay.

17   BY MR. ROSENTHAL:

18   Q.    So were there any -- and, Mr. Widas, if you -- you

19   took the photographs, and they're in front of you.  If you

20   need to reference any of them, please do, but please tell us

21   what photograph that you're referencing by exhibit number,

22   and then we'll pass it around so that everybody can see what

23   it is.

24   A.    Okay.  When you took these from me originally, we were

25   talking about the condition of the track area where the

1    event occurred, and that would be 5A, B, C and D.

2              THE COURT:  There's no question pending.

3              THE WITNESS:  Oh.

4              THE COURT:  So the way it works here is, he asks a

5    question, you answer it.  There's no question pending.  So

6    let Mr. Rosenthal ask the question.

7    Q.    Were any climbing aids provided beyond the fixtures

8    that were part of the railroad car?

9    A.    No.

10   Q.    What role did your review of the reference materials

11   play in the analysis you performed and conclusions that you

12   reached in this case?

13   A.    There are many regulations, codes, and standards and

14   published articles and sections of textbooks that relate to

15   climb systems.  They establish the human factors aspects of

16   the use of climb systems and the desirable features of climb

17   systems.  There's also textbooks about the physics that

18   would be experienced during -- using a climb system.  So I

19   list those materials in my report to establish criteria for

20   a safe climb system.

21   Q.    Can you tell the jury just what you mean when you say

22   climb system?

23   A.    To get from one level to another.  It could be a

24   ladder, it could be a stairway.  I mean, it could be a

25   portable ladder, a fixed industrial ladder, a stairway, or

1    the climbing system that we're looking at here.  Any time

2    that you want to get workers from one level to another

3    level, there are standards that apply to that.

4    Q.    Now, are the references that you referred to generally

5    recognized and accepted as authoritative by professionals --

6              THE COURT:  I'm going to stop you.

7              You need to ask him the specific things he relied

8    on, not just what's in the report.  The jury is not getting

9    his report.  So he has to recite what you relied on, and

10   then you can ask him a follow-up question.  You can't just

11   ask him, is everything in your report reliable.

12   BY MR. ROSENTHAL:

13   Q.    What did you rely upon?

14   A.    I started out with the regulations that govern climb

15   systems in the railroad world, and that included the

16   United States Department of Transportation, Federal Railroad

17   Administration, C.F.R. 49, volume 4, section 231.13 and .14.

18             I used the criteria that is recommended for safe

19   railroad environments of the American Public Transportation

20   Association.

21             I used the criteria for safe climb systems from

22   OSHA.

23             I used the criteria for safe climb systems from

24   the Society of Automotive Engineers, who tell us how to make

25   safe climb systems for heavy trucks or offroad equipment

1    like bulldozers or cranes or other things like that that

2    people climb into, the operator climbs into.

3              I used all of those to establish the basic

4    criteria.  They all agree that as a person climbs that the

5    forces and loading on the person and the climb system should

6    be symmetrical and concentric, and we can define what that

7    means in a minute.  Or should we do it now?

8    Q.    Why don't you do it now?

9    A.    Okay.

10             THE WITNESS:  Can I have a stick?  May I use my

11   stick?

12             THE COURT:  Sure.

13             THE WITNESS:  Okay.

14   A.    This is actually another question, but we'll do it

15   now.

16             Force analysis.  Physics and vector analysis

17   analyze forces.

18             When we climb a system, we want all the forces to

19   be straight up and down, because, as soon -- what happens in

20   vector analysis is a resultant vector, or a force.  If I

21   push with this on you, I'm exerting a vector on you.

22             Right now, this vector is 90 degrees to the

23   support surface, and no matter how hard I push, it does not

24   move with respect to this surface.

25             As soon as I introduce eccentricity of the force,

1    meaning moving it away from the center, making it

2    asymmetrical and eccentric and I push down, I have produced

3    a horizontal component of this vector.  Instead of just

4    being straight down against the surface, as soon as I

5    introduce an offset and push down, I now have a force that

6    I'm pushing down with, and as I push down with that force,

7    it exerts a component along the surface which requires

8    resistance to that motion if we don't want it to move.

9             So the criteria of the climb systems wants us to

10   keep everything centered and concentric.  As soon as you

11   start to get away from the center, when you push down or try

12   to climb, you're going to introduce lateral forces that

13   require resistance in the system.

14   Q.   Now, did you review -- did you use any other

15   references in coming to your conclusions in this case?

16   A.   Physics, biomechanics, anthropometric data in the

17   human factors authorities and textbooks.  Anthropometric

18   data tells us what the shoe size is of a person, what the

19   width of footwear is, what the length of footwear is.  Body

20   mass index, stature, dimensions of arms, legs, shoulders,

21   hips, all of those things, that's anthropometric data.

22   That's all in there, too.

23   Q.   Now, how did you get and find your references?

24   A.   They are generally available at a library or online.

25   If you're interested in the subject, you could just look up

492

1    the subject of safe climb systems, human factors, forces,

2    friction, and other things, and it's readily available.

3    Q.    Now, can you please explain -- and you might have

4    already begun this, but please explain specifically how you

5    applied the science of physics to reconstruct the event in

6    which Mr. Foder was injured.

7    A.    Well, first, we use the science of vector analysis or

8    force analysis, which is physics, and we just demonstrated

9    that if you get eccentric or asymmetrical with your system,

10   meaning take a step over there, and you got to land over

11   here and you put a railing to grab up here, as soon as that

12   person steps on that step and reaches for that rail that far

13   up, if they can reach it, otherwise they're just going to

14   try to use the deck, but as soon as they start to reach up,

15   then we go asymmetrical and eccentric, and we start

16   requiring horizontal -- we produce horizontal forces, which

17   is traction demand, which means we have to have available

18   traction to resist that horizontal force.

19        To compound that, in this case, by then having to

20   move that foot up over four feet -- I'm sorry, the trailing

21   foot, lift it more than four feet from that level up to this

22   level and land on something that's -- the first inch and a

23   half is smooth steel, and then we have some raised-lug metal

24   diamond plate.  So again, we're eccentric, because the grab

25   -- here's -- our grab goes from here over to here up there,

CHARLES P. McGUIRE, C.C.R.

493

1    which is eccentric and asymmetrical with respect to our

2    landing point.

3             So our takeoff and our landing and our grab are

4    all not symmetrical, they're all eccentric and asymmetrical.

5             The simplest example that demonstrates it is a

6    ladder, a conventional ladder.  When you climb a ladder, you

7    put your foot down, straight down, and without having to

8    deviate from putting any weight straight down, you have

9    grabs readily available on both sides, and all of the

10   standards, the C.F.R.'s, the SAE's, the ASTM's, the ANSI's,

11   all the standards, they all say that the grabs must be

12   aligned so that forces are straight up and down on the

13   steps.

14   Q.    Are the standards that you just referenced, are they

15   recognized and accepted as authoritative by professionals in

16   the fields of engineering, human factors, and workplace

17   safety?

18   A.    Yes.

19   Q.    Now, how does the science of physics explain friction?

20   A.    Okay.  Friction comes from adhesion, and the most

21   predominant form of adhesion that creates friction is

22   mechanical adhesion.  The best example of that is, if you

23   could picture in your mind microscopically a hairbrush that

24   is the floor that sticks up with bristles, and the bottom of

25   your footwear also has bristles, and when you exert weight

1      on the two surfaces, they engage each other and they won't

2      slide with respect to each other because they have

3      mechanically interlocked.

4              Slip-resistant materials, if you notice, have

5      things that stick up.  They're called asperities.  The

6      sharper the asperities, the more you get mechanical adhesion

7      and you create friction.  If it's a smooth surface, you

8      don't get mechanical interlocking of the footwear bottom and

9      the walkway surface.  So we're always looking for two

10     brushes with bristles pointing at each other.  You want a

11     walkway with sharp things sticking up -- now, caught by

12     grit, which is like sand size, works perfectly, okay?  You

13     don't need to have bristles.  But on that microscopic level,

14     it's bristles and bristles.  That's mechanical interaction.

15     If you have smooth, you don't get the mechanical

16     interaction, you don't have friction.  Smooth, hard surfaces

17     are slippery, and they're particularly slippery when they're

18     contaminated.

19     Q.    Now, when you examined the subject railroad car, did

20     you measure the friction?

21     A.    I did not.

22     Q.    Can you explain why you didn't?

23     A.    The conditions were different.

24            MR. MINO:  Objection.

25     Q.    Okay.  Just the conditions were different.

CHARLES P. McGUIRE, C.C.R.

1    A.     The conditions were different.  I was there more than

2    four years later, and the conditions were different.

3            THE COURT:  Okay.

4    Q.     Now, have you measured smooth steel surfaces before?

5    A.     Hundreds of times.

6    Q.     And how have you done that?

7    A.     With a tribometer.  I mentioned before that I'm a

8    certified tribometrist, and I also write safety --

9    scientific standards for the calibration and validation of

10   walkway tribometers, which are slip-resistance-measuring

11   devices.  I measured slip resistance of walkway surfaces and

12   walkway surface materials thousands of times over the last

13   more than 30 years.  I use a tribometer that is validated,

14   calibrated, and certified as accurate, repeatable, and there

15   are peer-reviewed papers that validate its accuracy and its

16   meaning with respect to the risk for human slip-and-fall

17   injury events.

18           So I've measured smooth, hard surfaces thousands

19   of times, I've measured smooth, hard metal hundreds of

20   times, and no, the value, for instance, of --

21           MR. MINO:  Objection.  If he's going to testify to

22   some general standard for smooth, hard metal that he may

23   have measured but isn't in his report, PATH objects to that.

24   There is no listing of previous time that he's measured any

25   smooth, hard metal in his report.

1          THE COURT:  Mr. Rosenthal, he's limited to the

2     four corners of his report.

3               This is all new testimony.

4          MR. ROSENTHAL:  Okay.

5          THE COURT:  Why don't you move to another topic?

6     BY MR. ROSENTHAL:

7     Q.    Now, there's been a lot of mention in this trial by

8     PATH about the diamond plate on the deck of the vestibule.

9     A.    Yes.

10    Q.    Now, that extends out to the edge of the anti-climber,

11    is slip-resistant because of its projections?

12    A.    I've heard that.

13    Q.    And have you measured the slip resistance of the metal

14    diamond plate?

15    A.    I have.

16    Q.    And how much friction is available from that diamond

17    plate?

18          MR. MINO:  Objection.  He did not measure the slip

19    resistance of this diamond plate.  It's not in his report.

20          THE COURT:  Let's look at the report.

21               I don't see any discussion of friction on the

22    diamond plate anywhere in his report.

23          MR. ROSENTHAL:  No, but there was testimony about

24    that.

25          THE COURT:  Testimony where?

1             MR. ROSENTHAL:  From Mr. Avril.

2             THE COURT:  That doesn't mean he can testify about

3      it if it's not in his expert report.

4             MR. ROSENTHAL:  Well, he can testify --

5             THE COURT:  About what?  He can testify to the

6      four corners of his report.

7             I read this report earlier.  This is all new,

8      about the friction resistance of the diamond plate.  It's

9      not in here.

10             Show me where it's in here and I'll give you some

11     latitude.  But I'm going to hold him to his report.  His

12     conclusions are short.

13             MR. ROSENTHAL:  Okay.

14             THE COURT:  Nothing about friction resistance that

15     I can see, unless I'm missing something.  If you want to

16     point it out to me.

17             His conclusions are on pages 33 to 36, 37.

18             MR. ROSENTHAL:  No, he was just going to respond

19     to some of the testimony.

20             THE COURT:  He can't respond.

21             It's your case.  You called the witnesses.  He's

22     your witness.  He's limited to this report.  He's not a

23     rebuttal witness.  We're still on the Plaintiff's case.  So

24     this is -- query whether I will allow a rebuttal expert

25     under the circumstances, but the other gentleman was a fact

1      witness.

2            I'm going to hold every expert in this case to the

3      conclusions in their report.

4            MR. ROSENTHAL:   Okay.

5      BY MR. ROSENTHAL:

6      Q.    Other than the scientific references we discussed, how

7      did you utilize the regulations and safety standards you

8      reviewed in your analysis of this event?

9      A.    I used the regulations, codes, standards, textbooks,

10     and peer-reviewed articles to give criteria and to define

11     what's accepted safe practice; in other words, how to safely

12     engineer the system according to the principles of safety

13     and the science of safety that we discussed before, the

14     four-step process.

15           I'm not an FRA, Federal Railroad Administration

16     enforcement officer.  I don't write citations on railroad

17     cars.  I'm a safety professional.  So I just used those

18     references to establish what's safe and what's not safe.

19     Q.    And what does accepted safe practice mean?

20     A.    That when you follow the scientific method for

21     determining safety, in other words, safety engineering

22     science, you reduce the risk of harm to a reasonable level.

23     You define a potential hazard, you rate the hazards, and

24     those that are severe you want to do something about, and

25     then you do something about it.

1    Q.    Now, what in those regulations and authoritative

2    references was related to your analysis in this case?

3    A.    As we've discussed, that as you -- when you create a

4    climb system, you want the forces exerted during use of the

5    climb system to be concentric and symmetrical, so the

6    components have to be lined up that when you're gripping to

7    lift and step up when your foot is on this step that there

8    should be a grab here, and then as you step over to here,

9    there should be a grab here so that you can always have

10   straight up and down alignments of the exertion of force as

11   you use a climb system.  You don't reach from one point at

12   an angle over to another.  As soon as you do that and you

13   exert that force -- you have a force already on the step.

14   Now you're going to increase that force because it's shared

15   with the foot on the ground.  As soon as you lift the foot

16   off the ground and reach for a grab that's asymmetrical and

17   offset across your body, which even induces a twist, which

18   complicates things even further, you've introduced the need

19   for more slip resistance.  And then as you try to put that

20   foot down over here, hanging on here, you again have an

21   angle.  You're not symmetrical or concentric.

22   Q.    Now, what regulations or standards did you review that

23   were related to establishing accepted safe practices in this

24   case?

25   A.    The ones we listed.  We already listed those.

500

1    Q.    Okay.  Were any of the regulations directly

2    enforceable to the climb system on the end of the subject

3    railroad car?

4    A.    There were -- the way PATH -- or the designer or

5    manufacturer of the car -- in the PATH system, they don't

6    use conventional climb systems on the side of the car.  They

7    put it on the end of the car.  None of the regulations apply

8    to -- none of the Federal regulations in a regulatory sense

9    address that issue.  There are sill stirrups -- there are

10   stirrup -- stirrup sill steps and door entry steps, but they

11   are not associated with climbing in and out of the railroad

12   car.  They are the standards that are the closest to

13   defining what we have here, but they're not directly

14   applicable.

15   Q.    Now, comparing it with the recommended dimensions in

16   the safety references you've detailed for climb systems, how

17   do the grab bars, handholds on the railroad card available

18   to Mr. Foder compare to accepted safe practices?

19   A.    They do not conform.  They are offset, they are

20   eccentric, and they are asymmetrical.  In other words,

21   there's not pairs for you to hold onto as you go.

22   Q.    What is the significance of the locations of the

23   handholds with respect to physics, biomechanics and

24   ergonomics?

25   A.    You saw how high that grab was that we're talking

501

1    about.  That's -- the bigger the lever arm, the more the

2    force, that all of the dimensions make this system

3    foreseeably dangerous and foreseeably generating slips.

4    Q.    What does excessively offset and asymmetrical mean?

5          MR. MINO:  Objection.  He does not define

6    excessively offset and asymmetrical in his report.

7          THE COURT:  He's already testified about it.  He's

8    testified to it all morning, so I'm going to let him answer

9    it.

10          MR. ROSENTHAL:  I'll withdraw it.

11   Q.    What is the significance of the fact that the

12   handholds are offset and asymmetrical?

13   A.    The more they're offset, the more the forces are

14   generated.  They're not supposed to be offset at all

15   according to those criteria that are in the references that

16   we cited.  There is always symmetrical, concentric support

17   as you climb a step in the references and standards and

18   regulations.  So any asymmetrical or eccentric components of

19   a system that make you reach and push to the side as you're

20   lifting up, any of that is excessive.  It should always

21   allow you to exert your weight straight up and down.

22   Q.    What about the landing surface?  How far was that from

23   the stirrup step?

24   A.    We got about -- about two feet.  The inside of the

25   door is about two feet.

CHARLES P. McGUIRE, C.C.R.

502

1    Q.    Comparing the distance from the stirrup step to the

2    car deck with the recommended dimensions in the safety

3    references you've detailed for climb systems, how does that

4    condition on the railroad car available to Steven Foder

5    compare to accepted safety practices?

6    A.    You have to step up more than two feet to the first

7    step and more than two feet to the next step.  Ladder rungs

8    are supposed to be displaced 12 inches on center for regular

9    use in industrial climb systems.

10   Q.    Does the horizontal distance from the stirrup step to

11   the car deck have any implications with respect to the

12   landing surface?

13   A.    The more angle and height -- first of all, you can't

14   land your foot straight on the deck if you're hitting your

15   foot up that high.  If you use biomechanics -- I don't need

16   to explain that.  It's obvious.

17              And that means that you need to have a lot of

18   traction where that foot is landing.

19   Q.    Okay.  Now, comparing the smooth steel landing surface

20   with known -- with other similar steel, how does the

21   condition of the railroad car available to Steven Foder

22   compare to accepted safe practices?

23   A.    We need improved slip resistance or more traction than

24   smooth steel offers us on the edge that you're going to

25   contact when you're contorting to lift up over four feet

1       from one level to another level.

2       Q.    Does the climb system on the end of the railroad car

3       require anything that was not there at the time of the

4       injury event to make it safe for railroad workers to use as

5       a means to climb into the railroad car?

6       A.    Improved slip resistance on the smooth metal,

7       symmetrical grabs so that you always have a support straight

8       up above where you're pushing off or landing with your feet,

9       and -- that was it.  Because you said without a climb aid,

10      right?

11      Q.    Yes.

12      A.    Okay.  That's it.

13              THE COURT:  Mr. Rosenthal, how much more time do

14      you have?

15              MR. DiGIULIO:  Probably about 10 or 15 minutes.

16              THE COURT:  Maybe this is a good time to take a

17      break.  It's already 1:30.  I want to give them a half hour

18      lunch break, and we'll resume at two o'clock.

19              Ladies and gentlemen, we're going to try to finish

20      up this witness, and then there's a videotaped witness

21      that's a little over an hour.  I'd like to see if we can get

22      that all in today to get you out by Friday.  So we'll see

23      how far we can go with the video.

24              But it's 1:25 now.  Let's take a break until about

25      two, and then we'll resume and finish up with this witness.

CHARLES P. McGUIRE, C.C.R.

1      Okay?

2              THE COURT CLERK:  All rise.

3          (The jury exits)

4              THE COURT:  Okay, guys.  Enjoy your lunch.  I'll

5      see you in a half hour.

6              Yes.

7              MR. MINO:  Just quickly, my witness is here.  Do

8      you want me to send her home?

9              THE COURT:  No.

10             Thank you.

11         (Luncheon recess taken)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **A F T E R N O O N    S E S S I O N**

2          (Jury out)

3               THE COURT CLERK:  All rise.

4               MR. MINO:  Your Honor, before we bring the jury

5     in:  Would it be possible to go a little bit later today?

6     My witness has just informed me now that she is unavailable

7     tomorrow because she is on vacation.

8               THE COURT:  Well, she's going to be under the

9     power that she's been ordered by this Court to be here

10    tomorrow.

11              MR. MINO:  Okay.

12              THE COURT:  So unless you tell me there's some

13    kind of -- we can take her out of order, maybe.

14              MR. MINO:  I suggested that and counsel --

15              MR. ROSENTHAL:  We have a videographer who cannot

16    make it any time other than now.

17              THE COURT:  Okay.

18              So why don't you ask the jury before we can bring

19    them out, could they stay a little later today to get rid of

20    two witnesses.

21              The video is going to take how long?

22          (Off the record discussion)

23              MR. ROSENTHAL:  Probably an hour and a half.

24              THE COURT:  Okay, and how much longer do you have

25    with your expert?


                    CHARLES P. McGUIRE, C.C.R.

1                    MR. ROSENTHAL:  I have about 10 or 15 minutes.

2                    THE COURT:  And cross?

3                    MR. MINO:  Half hour to 45.

4                    THE COURT:  So that will about put us at three.

5      Four.  If we can go to --

6           (Off the record discussion)

7                    THE COURT:  If they'll stay to six, we should be

8      able to get everything done.

9                    MR. MINO:  And I apologize to everyone for the

10     trouble.

11          (The witness resumed the stand.)

12                   THE COURT:  Have a seat.

13                   Tomorrow, you have two witnesses?

14                   MR. MINO:  Yes, we will have my liability expert

15     and my doctor.

16                   THE COURT:  The doctor is another hour.  Have you

17     looked at their tape?

18                   MR. MINO:  At their tape?  Yes, I watched their

19     tape last night.

20                   THE COURT:  Have they looked at yours?

21                   MR. MINO:  We just discussed it, and --

22                   MR. ROSENTHAL:  Yes, there's only, I think, one

23     objection, and it covers a lot of stuff, and I told counsel

24     I'd be willing to just withdraw the objection.

25                   THE COURT:  Okay.  So then how long is your tape?

1    An hour?

2              MR. MINO:  Yeah, about an hour.

3              THE COURT:  And how long will your liability

4    witness take, like the morning?

5              MR. MINO:  Yes, might not even take the whole

6    morning.

7              THE COURT:  Okay.  So we have the jury charge too

8    that we're pulling together, and after we break tonight, the

9    lawyers will stay and start looking at this charge, because

10   I want to charge the jury before closing statements.

11             MR. MINO:  Okay.

12         (Off the record discussion)

13             THE COURT:  Five at the latest.  So, I mean, I'm

14   not adjourning it.  So you do it at your own risk.  You knew

15   that the trial was coming.  That means you may not be able

16   to call your witness, unless we can get it done quickly.  Or

17   if she can come tomorrow.  This trial was scheduled months

18   and months ago.  And the expectation was she would be

19   testifying Thursday or Friday.  So I'm not going to carry

20   this case until next week if she's on vacation.  When is she

21   on vacation through?

22             MR. MINO:  Thursday, Friday, Saturday, Sunday.

23             THE COURT:  I'm not carrying it till Monday

24   because I promised this jury five days, and the Port

25   Authority had ample notice of the length of the trial, and

CHARLES P. McGUIRE, C.C.R.

1    we picked the jury.  All along, Plaintiff's counsel had said

2    I think my case will take two days, roughly two days to put

3    in.  That's exactly what it is, and you should have expected

4    Thursday and Friday.

5              So you can talk to her, but I'm not going to carry

6    it.  You can put her at the end of your case tomorrow or

7    Friday morning, but I'm not going to be -- it looks like

8    this case can get to the jury before the weekend, and that's

9    what I'd like to do.  Okay?

10             MR. MINO:  Understood.

11             THE COURT:  We'll go as quickly as we can.  We'll

12   take a very brief afternoon break.

13             Let's bring out the jury and get it rolling.

14             THE COURT CLERK:  All rise.

15        (The jury enters)

16             THE COURT:  Welcome back, everyone.

17             Okay.  Let's proceed.

18             We're trying to get as many witnesses done as

19   possible today, and I understand you guys have to break at

20   five, so we'll take a short afternoon break, and we'll

21   hopefully get the case to you as quickly as possible.

22             Continue.

23   BY MR. ROSENTHAL:

24   Q.   Mr. Widas, the last question I asked you was, you gave

25   an opinion.  Can you -- it was about the -- I'm going to

509

1    read the question:  Does the climb system on the end of the

2    railroad car require anything that was not there at the time

3    of this injury event to make it safe for railroad workers to

4    use as a means to climb into the railroad car?

5    A.    Yes, it needed more slip resistance on the smooth

6    metal edge, and grabs that lined up with the steps.

7    Q.    What is that opinion based on?

8    A.    That's based on the sciences of physics that we talked

9    about and biomechanics, and the requirements in the FRA

10   regulations related to similar devices, and the regulations

11   in the Society of Automotive Engineers' articles that are

12   cited in my report, the OSHA climb requirements, and the

13   American National Standards Institute's or ASTM climb

14   requirements that are listed in my report, all of which say

15   that climb systems have to have three points of contact that

16   are centered and symmetrical with respect to where you step

17   and push to lift yourself up.

18   Q.    Under the circumstances of the climb system in this

19   case, was the steel of the anti-climber safe?

20   A.    No.

21   Q.    Now, what does the climb system on the end of a

22   railroad car require that was not there to make it safe for

23   railroad workers to use as a means to climb into the

24   railroad car?

25   A.    A grit-impregnated treatment on the smooth metal, and

CHARLES P. McGUIRE, C.C.R.

1    grab bars that are lined up with the steps.

2    Q.    From an engineering science point of view.  What does

3    all of that have to do with what Steven Foder described

4    happened when he was hurt?

5    A.    The way he describes the event is exactly what would

6    happen according to what physics will tell us would happen.

7    In other words, he has to reach over and step up over four

8    feet high while standing on a rung that's more than two feet

9    high and step laterally about two feet with a support in the

10   middle.  So there's a lot of angles, and because of the

11   contortions and the height of the step up, he can't get his

12   foot all the way onto the deck, he's going to contact the

13   portion of the edge, which is the smooth metal.  So he could

14   either use a climbing aid, like a stool or a ladder, to help

15   him, or he would need the improved slip resistance on the

16   edge, or grabs that line up with the steps.

17   Q.    Are you criticizing the design of the railroad car?

18   A.    No.

19   Q.    Then what is your focus?

20   A.    Using the railroad car the way that it was used, in

21   other words, you shouldn't have people going -- climbing in

22   and out of the cars without the slip resistance, without

23   addressing the safety issues or the dangerous parts of the

24   climb system that were there.

25   Q.    Now, what significant facts and information did you

1    extract from the materials you reviewed in this case about

2    the workplace safety practices of PATH as related to the

3    injury event?

4    A.    Okay.  We talked about the principles of safety, the

5    science of safety, hazard analysis, risk assessment, hazard

6    mitigation.  There was no indication in anything I reviewed

7    from PATH that they considered that method of achieving

8    safety.  All they did from what I could tell was talk about

9    the rules and regulations of the Federal Railroad

10   Administration and the book of rules of PATH, without

11   looking at the system that was involved in injuring

12   somebody.

13   Q.    Now, based on the sciences you have explained and

14   based on your application of the facts presented in this

15   case to those scientists, is it foreseeable that someone

16   could be injured in the manner that Mr. Foder was injured

17   when attempting to gain access to the railroad car at that

18   location and in the manner he described?

19   A.    Yes.

20   Q.    And based on the sciences you've explained and based

21   on your application of the facts presented in this case to

22   those sciences, did you formulate an opinion with regard to

23   how the actions of Steven Foder compared to accepted safe

24   practices as related to the happening of this injury event?

25   A.    I did.

1    Q.    And could you explain that opinion?

2    A.    He was doing his job the way he understood it to be

3    done.  He was not a safety inspector from the railroad who

4    was supposed to go out and evaluate the safety of climb

5    systems.  It wasn't part of his job duty to assess the

6    safety of the railroad station as he approached the railroad

7    car.  He's a locomotive engineer.  It would be unreasonable

8    from a safety perspective to expect him to evaluate the

9    safety of the universe and protect himself in that way.

10   That's why -- that is the fourth level of safety, you know,

11   if you have a defined hazard or significant risk, get rid of

12   it, guard against it, warn about it, and then rely on the

13   user to protect himself.  It wasn't his job to evaluate the

14   safety of the track, the grease, the automatic greaser that

15   was in the area of where the event occurred, and it wasn't

16   his job to evaluate the safety of the climb system.  He just

17   used it the way that he was -- that it was his practice and

18   he understood to be the right way.

19   Q.    Was there any evidence whatsoever that he did anything

20   wrong that day?

21   A.    No.

22   Q.    Now, based on the sciences you have explained and

23   based on your application of the facts presented in this

24   case to those sciences, what was the relevant accepted safe

25   practice or standard of care for PATH as far as workplace

1    safety is concerned relating to the happening of this injury

2    event?

3    A.    That they should have properly evaluated the climb

4    system and identified the dangerous characteristics of the

5    climb system and mitigated the dangerous conditions of the

6    climb system, which means that because of its configuration

7    that you need more slip resistance where the foot lands

8    because of the eccentricity and asymmetrical aspects of the

9    forces and the location of the grabs with respect to the

10   steps.

11   Q.    Now, based on your knowledge of the methodologies at

12   PATH when PATH investigated and addressed the safety aspect

13   of the subject injury event, did PATH follow accepted safety

14   procedures as defined in the sciences and principles you

15   have cited?

16          MR. MINO:  Objection.  If he could just lay some

17   foundation as to the understanding he has about what PATH

18   does.  There was no basis or foundation laid for that.

19          MR. ROSENTHAL:  Okay.  I'll ask it.

20          THE COURT:  Do you want to rephrase it?  Want to

21   lay a foundation?

22          MR. ROSENTHAL:  Sure.

23   Q.    Do you have any knowledge of the methodology that PATH

24   used when investigating and addressing the safety aspects of

25   the subject injury event?

514

1    A.    Yes.

2    Q.    And where does that information come from?

3    A.    The discovery in this case.  In other words, the

4    testimony of the witnesses and the documents I was provided

5    talk about what PATH does when somebody gets injured in an

6    event.

7    Q.    And what did you extract from those materials

8    regarding that issue?

9    A.    That their response was not to look at the system but

10   to say that the user, Mr. Foder, didn't follow the book of

11   rules, that he was supposed to go out and evaluate the

12   safety of the climb system before he used it, and that it

13   was his fault because he didn't assure that the system was

14   safe before he used it.

15   Q.    Now, based on your knowledge of the methodologies of

16   PATH when PATH investigated and addressed the safety aspects

17   of the subject injury event, did PATH follow accepted safety

18   procedures as defined in the sciences and principles you

19   have cited?

20   A.    They did not.  In other words, they didn't do a hazard

21   analysis to figure out if there was something wrong with the

22   system.  They just said he should have been more careful.

23   Q.    And based on the sciences you've explained and based

24   on your application of the facts presented in this case, did

25   you formulate an opinion with regard to how the actions of

1       PATH compared to accepted safe practices as related to the

2       happening of this injury event?

3       A.      I did.

4       Q.      And please explain that opinion.

5       A.      The principles of safety say that you have to evaluate

6       systems using the sciences of safety to identify hazards of

7       significant risk and mitigate them.

8               They didn't do that, so that accepted safe

9       practice would have had them properly evaluate the climb

10      system and identify the dangerous conditions and fix the

11      dangerous conditions.

12      Q.      If PATH had non-slip tape on the edge of the

13      anti-climber, would that have solved the problem?

14      A.      Yes.  According to the event as it's been explained,

15      the initiation of loss of control was a slip of the foot,

16      and if there was anti-slip material, then to a reasonable

17      degree of certainty, he wouldn't have initially slipped and

18      then he wouldn't have subsequently slipped off the system.

19      Q.      Now, other than putting non-slip tape on the

20      anti-climber, what could PATH have done to eliminate or

21      minimize the hazards that we're talking about?

22      A.      If you weren't going to fix the climb system by

23      designing it properly or posting warnings on it not to use

24      it without inspecting all of the surfaces and your footwear

25      and everything else before you climb on it, you could

1    instruct the workers not to use it unless it's absolutely

2    necessary, and then under -- only with a climbing aid.

3    Q.    Okay.  Now, what would have happened to Steven Foder

4    if the climb system on the end of the railroad car he used

5    to enter the car was made safe at the time of his injury

6    event as you have described?

7    A.    It wouldn't have happened.

8    Q.    And according to the safety sciences and principles

9    you have described, did PATH violate the applicable standard

10   of care with respect to safety of the subject climb system?

11   A.    Based on safety science, yes.

12              MR. ROSENTHAL:  Thank you.

13              THE COURT:  Okay.  Your witness.

14                        CROSS-EXAMINATION

15   BY MR. MINO:

16   Q.    Mr. Widas, you never worked for a railroad; correct?

17   A.    Not as an employee, no.

18   Q.    Okay, and you've never been a train engineer?

19   A.    No.

20   Q.    No.  Okay.  And so you haven't had to do the

21   day-to-day duties of a switchman?

22   A.    Correct.

23   Q.    Okay.  You've never had to inspect trains to determine

24   whether or not they comply with FRA standards and then

25   report that to the FRA?

                    CHARLES P. McGUIRE, C.C.R.

1  A.    Not as a regulatory person, no.

2  Q.    Okay.  Now, and just so I'm clear, all of your

3  testimony with respect to FRA guidelines, you are not

4  testifying in a regulatory sense; correct?

5  A.    Correct.

6  Q.    So you are not testifying that PATH is out of

7  compliance with FRA regulations; correct?

8  A.    I would consider that a legal question and beyond

9  safety engineering.

10  Q.    Okay.  Now, this isn't the first time you've testified

11  in a courtroom today; right?

12          This isn't the first time you've ever testified in

13  a courtroom, is it?

14  A.    Correct.

15  Q.    And this actually isn't the first time that you've

16  been hired by Plaintiff's attorneys to testify in a case, is

17  it?

18  A.    That's correct.

19  Q.    How many times has Plaintiff's attorney hired you?

20  A.    I would estimate between 15 and 25 times over 30

21  years.

22  Q.    Okay.  And you're being paid today; right?

23  A.    Correct.

24  Q.    How much are you being paid?

25  A.    My rate is $395 per hour as the income for my firm.

1   Q.    Okay.  And you were also paid to write a report in the

2   matter; right?

3   A.    Correct.

4   Q.    How much were you paid to write the report?

5   A.    I don't remember off the top of my head, but I would

6   estimate in the neighborhood of six or $7,000.

7   Q.    And have you ever been asked to evaluate PATH before?

8   A.    Yes.

9   Q.    How many times?

10  A.    I don't know specifically.  I would estimate four

11  times.

12  Q.    Four times.

13  A.    More or less.

14  Q.    Okay, and of those four times, you always found that

15  PATH did something wrong, didn't you?

16  A.    Yes.

17  Q.    Okay.  So not once did you find they were safe.

18  A.    Correct.

19  Q.    Okay.  Now, you didn't review -- or you can tell me if

20  I'm wrong, in looking at your list of documents reviewed,

21  you didn't review any of the daily inspection reports in

22  this case, did you?

23  A.    Correct.

24  Q.    Okay.  And you didn't review the blue sheet that

25  Mr. Wallace brought with him yesterday?

CHARLES P. McGUIRE, C.C.R.

519

1    A.    Correct.

2    Q.    Okay.  And did you hear Mr. Wallace testify?

3    A.    Yes.

4    Q.    Okay.  Do you remember generally his testimony?

5    A.    Yes.

6    Q.    Okay.  So when Mr. Wallace testified that the C.F.R.

7    regulations with respect to sill steps, PATH had been

8    exempted from, you didn't know that when you wrote your

9    report, did you?

10   A.    Correct.

11   Q.    Okay.  So, even understanding that PATH is exempt from

12   it, you still think it applies.

13   A.    Oh, to the extent that it discusses the issues that

14   we're talking about, which is the concentric and symmetrical

15   grabs with respect to steps, yes, it's a safety reference.

16   Q.    Well, I believe it discusses it with respect to sill

17   steps, which this is not.

18   A.    Correct.  There is no standard for this.

19   Q.    Right.

20   A.    It's most like a sill step because there's no door

21   over the step.  Even though it's not a sill step, it's the

22   closest thing that there is in the FARs.

23   Q.    So you just made your own arbitrary decision that this

24   is the closest.

25   A.    No.  I used the words in the regulation.

520

1    Q.    So how did you determine that this was the closest and

2    not some other regulation?

3    A.    Okay.  You've got me confused now.

4    Q.    Fine.  Then I'll withdraw it and we can go back.

5          You understood even when you wrote the report we

6    were not dealing with a sill step.

7    A.    Correct.

8    Q.    But you decided that, I'm going to look at sill step

9    regulations anyway.

10   A.    Of course.  They are a step.  They are a climb system

11   on a railroad car.

12   Q.    So any climb system on a railway car would do for you?

13   A.    I can't hear your last words.

14   Q.    Any climb system on a railway car would work for you.

15   A.    Sure.

16   Q.    Okay.

17   A.    As a reference.

18   Q.    All right.  Now, did you also hear the testimony of

19   Ken Wallace that the FRA came and looked at the cars when

20   they were initially delivered to PATH?

21   A.    Yes.

22   Q.    So is it your testimony that the FRA failed?

23   A.    Yes.

24   Q.    Okay.  So you would disagree with the Federal Railroad

25   Administration that these cars didn't violate any standards.

1    A.    If, in fact, they said that, correct.

2    Q.    But again, you're not an FRA inspector.

3    A.    Correct.

4    Q.    Now, you said that PATH could mitigate this by placing

5    some sort of anti-slip material on the edge of the

6    anti-climber; correct?

7    A.    Correct.

8    Q.    Okay.  Is there any regulation that you can point to

9    that specifically says PATH must have grip tape on the edge

10   of the anti-climber?

11   A.    No.

12   Q.    Now, let's talk about some of the assumptions you made

13   in your report.

14         You reviewed the -- you call it a TH 350, but it's

15   actually the TH 360, the accident report that Mr. Foder

16   filled out.  It's Exhibit A in evidence.

17   A.    Okay.

18   Q.    Okay.  You reviewed that?

19   A.    I reviewed it if it says so in my report.  Yes, I

20   recall that.

21   Q.    Okay.  Now, you also then chose to ignore the

22   description of the accident provided in that; correct?

23   A.    No, that's not correct.

24   Q.    Okay.  So based on the description provided in that

25   report, how did the anti-climber come into play?

522

1    A.    Just based on that report?

2    Q.    Yes.

3    A.    It didn't.

4    Q.    Okay.

5    A.    Except that it was more than four feet above the track

6    level from which he was stepping.

7    Q.    So that report does not mention the anti-climber at

8    all, does it?

9    A.    Correct.

10   Q.    So we'll go back to my question.  You ignored that

11   portion of it.  You said, you know what, I'm not going to

12   pay attention to that; this report never mentions the

13   anti-climber.

14   A.    Incorrect.

15   Q.    Okay.  Explain it, then.

16   A.    Well, that was a piece of information among a whole

17   lot more information, and when Mr. Foder testified in his

18   deposition and gave the complete version of the event with

19   all of the facts, that's what I relied upon.

20   Q.    Well, so within that statement, you're making the

21   assumption that it's the complete version and not just a new

22   version.

23   A.    It is factual.  In other words, his -- when I read a

24   deposition, the words that people say are the words that

25   people say.  It's not for me to say whether they're lying or

CHARLES P. McGUIRE, C.C.R.

1    not.  I make a determination as to whether or not it's

2    consistent with physical science, and as we've already

3    discussed, his version is perfect with respect to physics.

4    Q.    So the version written on the 360 report where his

5    hands just slip and he falls backward:  Not consistent with

6    science.

7    A.    Sure it is.

8    Q.    Okay.

9    A.    As an element of the overall story as we knew it once

10    we heard the whole story.

11    Q.    This is -- again, you're assuming that's the whole

12    story as opposed to just a new story he decided to tell;

13    correct?

14    A.    Oh, yes, I don't -- I don't -- it's up for these

15    people to decide whether Mr. Foder is telling the truth or

16    not.

17    Q.    I'm talking about your report, the assumptions that

18    you made that went into your report.

19    A.    I made no assumptions.  I used the words that he

20    testified to in his deposition.

21    Q.    Now, do you have your report in front of you?

22    A.    Yes.

23    Q.    Okay.  That diamond plate, on the edge, right, you

24    said that you did some work with OSHA; correct?

25    A.    Yes.

524

1    Q.    That diamond plate is OSHA-recognized as

2    slip-resistant; correct?

3    A.    Not all diamond plate, no.  That's a mistake.

4    Q.    Okay.  How about that diamond plate?

5    A.    I'm going to just advise that based on the -- the

6    explanation of where friction comes from that we talked

7    about before, if the bearing surfaces of that raised lug

8    metal plate are smooth and flat, it's slippery.

9    Q.    Okay.  But you didn't measure the friction surfaces on

10   that diamond plate.

11   A.    Correct.

12   Q.    In fact, you measured no friction surfaces anywhere on

13   that train.

14   A.    Correct.

15   Q.    Okay.  But you're fine with saying that friction

16   surfaces are slippery without measuring them.

17   A.    Absolutely.  I measured thousands of surfaces.

18   Q.    Okay.  If you go to page 33 of your report, on page

19   33, you conclude that the grab bars are excessively offset

20   with respect to the forces necessary to climb the train.

21   A.    Keep going.  I can't hear you.  I'm mostly deaf.

22   Q.    My apologies.

23         So is it the fourth paragraph on page 33.  All

24   right?

25   A.    Correct.

1    Q.    "The available grab bars were excessively offset and

2    asymmetrical with respect to the forces necessary for a

3    person using the climb system..."

4    A.    Correct.

5    Q.    At what point did you measure the forces necessary for

6    Mr. Foder to use the climb system?

7    A.    I didn't have to.

8    Q.    Oh, okay.  So you don't have to do any measurements to

9    decide what the forces necessary are.

10   A.    No.

11   Q.    No.  So you're just -- right.  You've done enough; you

12   just go with your gut?

13   A.    No, the laws of physics and our vector analysis will

14   tell us what we need to know without measuring anything.

15   Q.    Where in your report did you do the vector analysis?

16   A.    Right there in that paragraph.

17   Q.    Oh I'm sorry, I misunderstood.  I thought a vector

18   analysis would have numbers.

19   A.    Okay.  Well, then, let's -- what's the question?  I'm

20   sorry.

21   Q.    I said, I understood from your testimony a vector

22   analysis would have numbers.  There's no numbers involved?

23   A.    Correct.  It's principles.

24   Q.    Principles.  Okay.

25          So you give in your report a couple different

1    physics formulas.  Did you ever actually plug any numbers

2    into those physics formulas?

3    A.    No, not necessary.

4    Q.    Again, numbers are not necessary for you.

5    A.    No numbers are necessary.

6    Q.    Okay.

7          Now, in the next paragraph, you say that "The grab

8    bars were of smooth hard metal, which substantially reduced

9    the available grip-slide-resistance."

10          What is the actual grip-slide-resistance of those

11    grab bars?

12    A.    I didn't measure it.

13    Q.    Okay.

14    A.    It's a smooth metal.

15    Q.    Okay.

16    A.    No asperities.

17    Q.    Again, no numbers necessary.

18    A.    No numbers necessary.

19    Q.    All right.  And then you say, in foreseeable

20    contaminated/lubricated conditions.

21    A.    Yes.

22    Q.    Okay.  Now, did you hear the testimony of Dennis

23    Velez, or were you not here for that yet?

24    A.    I heard a lot of it.  I didn't hear it all.

25    Q.    Okay.  Mr. Velez was the car inspector that came out

1    and looked at the car immediately after the accident.

2    A.    Yes.

3    Q.    Now, are you aware that he found no grease on the car?

4    A.    I don't recall him -- I think I was here for that.  I

5    don't recall him saying that he looked for any.

6    Q.    No, he testified there was no grease on the car.

7    A.    Okay.

8    Q.    Okay.  So that would be one contaminant that isn't

9    there.

10   A.    Okay.

11   Q.    All right?

12   A.    Sure.

13   Q.    And he testified there was no oil on the end step or

14   the grab bar or the anti-climber.

15   A.    If that's what he said.

16   Q.    Okay.  So that's another contaminant that we don't

17   have to worry about.

18         And he testified that there was no water on the

19   end step, anti-climber, or grab bar; right?

20   A.    If you say so.

21   Q.    Okay.  So that's another contaminant.

22         So what contaminant are you talking about here?

23   A.    He said he didn't see any.

24   Q.    Oh, okay.

25   A.    No, he said if he saw large grease or oil or on -- on

CHARLES P. McGUIRE, C.C.R.

1    the walkway, he would report it.

2    Q.    There was also testimony about the end step, the

3    anti-climber, and the grab bar.  You may not have caught it

4    or it may have either been before, or you weren't paying

5    attention, that's fine.

6    A.    Okay.  Sure.

7    Q.    And if he testified to that -- and I just need these

8    photos.  If he testified to that, what other contaminants

9    would you be talking about?

10   A.    No, none.

11   Q.    None.  Okay.  So then actually, there is no

12   contaminated condition on that day.

13   A.    Oh, that's for these people to decide.

14   Q.    But you've made that assumption in your report that

15   there was a contamination that day, despite the testimony of

16   Dennis Velez.

17   A.    No, that is not what the words say that you just read.

18   Q.    Okay.

19   A.    It's foreseeable, and Mr. Avril said it over and over

20   again, that contaminant -- contamination from the surfaces

21   is highly foreseeable.

22   Q.    All right.  So you said on the day you did your site

23   visit that there was grease everywhere; right?

24   A.    I didn't say that.

25   Q.    No?  Did you see any grease in the track area when you

CHARLES P. McGUIRE, C.C.R.

1    went to go look at it?

2    A.    I saw discoloration of the surface -- the materials on

3    the walkway surfaces.  I did not analyze them.

4    Q.    Oh, okay.

5    A.    And I was there over four years later, so I didn't

6    analyze them because it wouldn't be relevant.

7    Q.    So did you see any oil in the walkway area?

8    A.    I saw discoloration and other materials.  I didn't do

9    any chemical analyses or other detailed analyses more than

10   four years after the event.

11   Q.    Okay.  So you have no idea what that dark

12   discoloration or however you would like to term it was, do

13   you?

14   A.    Correct.

15   Q.    Okay.  So then you actually have no personal knowledge

16   of oil being in that track, do you?

17   A.    Correct.

18   Q.    No personal knowledge of grease being in that track?

19   A.    Correct.

20   Q.    Did you see the track greasy that day when you were

21   there?

22   A.    No.

23   Q.    Okay.

24   A.    Didn't look for it.

25   Q.    Did you take any measurements with respect to the slip

1       resistance anywhere on this PATH train?

2       A.     You keep asking me that, and I'm not supposed to

3       answer that, so -- no, I didn't, because --

4               MR. ROSENTHAL:  Your Honor, could we have a

5       sidebar?

6               THE COURT:  Sure.

7          (The following takes place at sidebar)

8               MR. ROSENTHAL:  He keeps on asking the same

9       question, and the answer that Mr. Widas can't give us is, he

10      couldn't measure it because there was slip tape on there,

11      and if he keeps asking that question, that's going to be the

12      answer, he's going to open the door.

13              THE COURT:  All right.  So be forewarned.  If

14      that's the answer, you know, I couldn't measure it because,

15      be careful.

16              MR. MINO:  Well, he answered that question, he

17      said I couldn't measure it because the conditions were

18      different.

19              THE COURT:  Right.

20              MR. ROSENTHAL:  That's what --

21              THE COURT:  But you're pushing it.  You made the

22      point, number one.

23              MR. MINO:  Then I'll withdraw the question.

24              THE COURT:  Here's another point.  You keep going

25      back to the report.  You should ask him about his testimony.

1    They don't have the report, they're not going to get the

2    report.

3              Was his deposition taken

4              MR. MINO:  No.

5              THE COURT:  You know, I don't want to say anything

6    and stop you, but he never testified about -- it's not even

7    proper cross because he never testified about his report,

8    ever.  He alluded to it, but his conclusions were not

9    verbatim out of the report, and you keep going through the

10   report point by point.  You know, it's really beyond what he

11   testified.  You have a report, and he testified to part of

12   it at trial, and that's what the cross should be.

13             So, you know, think about that instead of telling

14   the jury, Didn't you write this in your report.  They're

15   going to go back and say -- they're not going to get the

16   report.

17             I'm not going to tell you how to do your job, but

18   it may be more effective to limit the cross-examination to

19   the direct testimony, which is what he said his conclusions

20   are.

21             But I'll leave it to you if there's no objection to

22   it.

23             MR. ROSENTHAL:  Well, I object to this question.

24             MR. MINO:  I'll withdraw this question.

25             THE COURT:  Let's move on.  I think they got the

532

1      point about nothing being measured, okay?

2            (The following takes place in open court)

3      BY MR. MINO:

4      Q.      During your site visit, did you ever climb up the

5      train the way Mr. Foder did?

6      A.      No.

7      Q.      Did you use the same climb system?

8      A.      No.

9      Q.      No.   Okay.

10            Now, you testified about PATH's lack of a hazard

11     analysis.

12     A.      Correct.

13     Q.      Okay.   Are you aware if that was ever asked for?

14     A.      As far as I know, they don't do that, so I don't know

15     who would ask for it, but...

16     Q.      And you testified that Mr. Foder, he's a locomotive

17     engineer, so he doesn't need to -- or it's not his job to

18     inspect certain areas.

19     A.      Correct.

20     Q.      Okay.

21     A.      From a safety perspective.   In other words, you don't

22     rely on a locomotive engineer walking to his train to

23     inspect the whole facility before he gets to the controls in

24     the locomotive.

25     Q.      Would you rely on Mr. Foder to look in the area where

533

1    he's walking?

2    A.    Yes.

3    Q.    Okay.  And in looking in the area where he's walking,

4    you would rely on Mr. Foder to avoid any grease or oil in

5    the track; right?

6    A.    Yes, if it's perceptible.

7    Q.    Okay.  So Mr. Foder does have a role to play in his

8    own safety; correct?

9    A.    Of course.

10   Q.    So it's not as if you're saying that PATH has to -- or

11   that it's all on PATH, and Mr. Foder can just kind of do

12   whatever he wants.

13   A.    Correct.

14         MR. MINO:  I have nothing else.

15         MR. ROSENTHAL:  Just very briefly, Your Honor.

16                  REDIRECT EXAMINATION

17   BY MR. ROSENTHAL:

18   Q.    Counsel asked you questions about vector analyses and

19   forces necessary to do things, and you said that you didn't

20   need numbers to do that.  Why not?

21   A.    Because we know from our demonstration and our

22   understanding of vector analysis that as soon as we become

23   asymmetrical or eccentric, we generate forces along the

24   surface that require a traction demand.  An absolute number

25   is not necessary.  We just know that now we must protect

                    CHARLES P. McGUIRE, C.C.R.

534

1     against slipping.  So we have to do something to protect

2     against slipping.

3     Q.     Does the steel protect against slipping?

4     A.     Smooth bare metal does not have protection against

5     slipping.

6     Q.     What would have protection against slipping?

7     A.     Grit-impregnated material on the smooth metal.

8     Q.     So like a non-slip tape type of thing?

9     A.     Plasma coating, non-slip tape, yes.

10    Q.     And actually, on the sill step, they had that?

11    A.     Correct.

12            MR. ROSENTHAL:  Thank you.

13            THE COURT:  I have one question for the witness.

14            Sir, you testified about asymmetrical hand bars;

15    right?

16            In that picture, where do you believe that the

17    hand bar should have been?

18            THE WITNESS:  Over the step.

19            THE COURT:  Well, can you demonstrate on the

20    picture?

21            THE WITNESS:  Yes.  (Referring to P-23A)

22         (The witness points)

23            THE COURT:  Let counsel see.

24            THE WITNESS:  Now, there are other devices

25    associated with the operation of the railroad car in that

CHARLES P. McGUIRE, C.C.R.

535

1    vicinity.  You might be able to design one that's a little

2    lower here, but it certainly can't interfere with this

3    device, so it would have to be above that.

4              THE COURT:  And wouldn't that be a lot higher than

5    the lower hand bar is there?  Because you're all the way

6    down below on the track.

7              THE WITNESS:  Correct.

8              THE COURT:  How could you possibly grab something

9    that high up?

10             THE WITNESS:  It's an unsafe climb system, so you

11   have to make sure that -- the slip resistance is the number

12   one solution.

13             THE COURT:  Okay.

14             THE WITNESS:  Okay?  I would have to design --

15   start from scratch with the car to answer your question,

16   Your Honor.  So the quick fix is the anti-slip.

17             THE COURT:  Okay.

18             Additional questions?

19             MR. MINO:  Yes.

20             THE COURT:  Go ahead.

21                     RECROSS EXAMINATION

22   BY MR. MINO:

23   Q.    The traction demand that you just testified about; the

24   diamond plate would provide the increased traction demand,

25   correct?

536

```
1    A.    Not necessarily.  It has to have sharp asperities on

2    the raised lugs.  If the raised lugs are smooth, you don't

3    get anything.

4    Q.    If it had the sharp asperities --

5    A.    Asperities.

6    Q.    -- asperities, it would provide the traction demand;

7    correct?

8    A.    Correct.

9    Q.    Okay.

10         And if it had the asperities, it would be safe to

11   use the climb system if the employees were instructed to

12   place their entire foot on the diamond plate; correct?

13   A.    No.  You can't make an unsafe system safe by telling

14   the people, do something unnatural, because if you do

15   something unnatural, there will be times when they won't do,

16   it for a number of different reasons.

17   Q.    How do you know it's unnatural?  How do you know it's

18   unnatural?

19   A.    Biomechanics, ergonomics, human factors tell us if

20   we're going to step from that floor to something this high,

21   one foot, one move, you're not going to get it flat.

22   Q.    Now, I understand that you never did it.  Did you ever

23   watch anyone do it?

24   A.    The fact that a contortionist could do something

25   doesn't make the system safe for the people who are going to
```

537

1    use it.

2    Q.    I didn't ask if you saw a contortionist do it.  Did

3    you ever see anyone from PATH do it?

4    A.    I don't recall.  I've seen people walk on -- climb

5    onto trains, and I've climbed onto trains.  It can be done.

6    That doesn't make it safe.

7    Q.    So you would move this out?  Just so I'm

8    understanding, you would move the grab bar out to make it

9    safe?

10   A.    I would make a grab bar over the step by either moving

11   the step, changing the whole system.  We'd have to start

12   from the beginning to get a system that meets the safety

13   requirements.

14   Q.    Okay.  But I'm a little confused.  Your testimony

15   originally was, you're not saying the design was bad.  You

16   said that initially when Mr. Rosenthal questioned you.

17   A.    Correct.  I'm not arguing the design defect case here.

18   What I'm arguing is it's an unsafe workplace.  You can make

19   it safe by making the landing area on the edge of the upper

20   level slip-resistant.

21            MR. ROSENTHAL:  Objection, Your Honor, just to

22   beyond the scope.

23            THE COURT:  I'm going to allow it.

24   Q.    So then actually, you don't need to move the grab bars

25   and the end step at all.

CHARLES P. McGUIRE, C.C.R.

1    A.    You would have if you wanted to make it a safer,

2    safest system.

3    Q.    Okay.  But your testimony is, what they really should

4    have done is done something to the steel edge?

5    A.    Correct.

6    Q.    Okay.  Something beyond instruction, instructing

7    employees to put their entire foot on the diamond plate?

8    A.    Correct, because that's not practical.

9              MR. MINO:  Nothing further.

10             THE COURT:  Thank you.

11             THE WITNESS:  You're welcome.

12             THE COURT:  Have a good day.

13             THE WITNESS:  Thank you.

14             THE COURT:  You're excused.

15             You can leave the pictures there.  Okay?

16             THE WITNESS:  I'm leaving everything.

17             THE COURT:  Excellent.

18         (Witness excused)

19             THE COURT:  Shall we put the witness on first, the

20    live witness, at this time?

21             MR. ROSENTHAL:  As long as we can get the whole

22    doctor's tape in.

23             MR. MINO:  I do not plan on being very long with

24    her, but -- so I would appreciate the courtesy, but, you

25    know, it's --

1          MR. ROSENTHAL:  I have no problem with the

2     courtesy.  It's a matter of, this is it, and if we have to

3     leave by five, I'd prefer to make sure that my case was in.

4          THE COURT:  Let me call the lawyers to sidebar for

5     one minute.

6          (Side bar conference held off the record)

7          THE COURT:  Ladies and gentlemen, it's movie time.

8          I'm going to give you an instruction, it's called

9     Videotape Deposition.  I'm going to instruct you as follows.

10          A deposition is the sworn testimony of a witness

11     taken before trial.  The witness is placed under oath and

12     swears to the truth, and lawyers for each party may ask

13     questions.  A Court Reporter is present and records the

14     questions and answers.

15          The deposition of Dr. Justin Greisberg was taken

16     on October 31, 2016, and is about to be presented to you by

17     a video.

18          Deposition testimony is entitled to the same

19     considerations and is to be judged, insofar as possible, in

20     the same way as if the witness here had been present to

21     testify.  Do not place any significance on the behavior or

22     tone of voice of any person reading the questions or

23     answers.

24          Okay?  And with that instruction, we're going to

25     proceed with the deposition.

CHARLES P. McGUIRE, C.C.R.

1          We'll take a very brief break after the video, and

2     then we'll have a final witness for the afternoon, and then

3     we'll break for the day.   Okay?

4          All right.

5          MR. MINO:   Your Honor, I just want to put these

6     back up.   I accidentally took them back.

7          THE COURT:   Okay.   If the witness is done, why

8     don't you give them to Amy?

9          MR. MINO:   Sure.

10         Thank you.

11     (The videotaped deposition of Dr. Justin Greisberg was

12     played.)

13         THE COURT:   Would you rather have the lights

14     dimmed?

15         Want to dim the lights?

16         MR. ROSENTHAL:   Is that loud enough?

17         THE COURT:   It's good.

18         Can you hear it?

19         MR. ROSENTHAL:   Stop.   Stop it.   The jury can't

20     hear it.

21         THE COURT:   Can everyone hear over there?

22         A JUROR:   It can be a little louder.

23         THE COURT:   Okay.   Louder.   Let's make it a little

24     louder.

25     (The videotaped deposition of Dr. Justin Greisberg was

541

1      played.)

2              (Playback ends)

3                  MR. ROSENTHAL:  Your Honor, may we come to

4      sidebar?

5              (The following takes place at sidebar)

6                  MR. ROSENTHAL:  The only issue that was off the

7      video is, counsel -- we had authenticated the records and

8      asked him about all of his records and what were his

9      records.  I showed him all the exhibits, and I asked counsel

10     whether he would stipulate to that so we don't have to bore

11     the jury with that.

12              I think he wants me to read it.

13                  THE COURT:  Read what?

14                  MR. ROSENTHAL:  "Doctor, I showed you a number of

15     exhibits.  Is this a true and correct copy of your report?

16              "Yes."

17              That sort of thing.

18                  THE COURT:  I'm not sure what you're asking me.

19                  MR. ROSENTHAL:  There's more to -- that we might

20     have to read to the jury.

21                  THE COURT:  For what purpose?

22                  MR. ROSENTHAL:  I suspect to authenticate the

23     documents, is this a true and correct copy --

24                  THE COURT:  But we're not admitting the documents

25     into evidence.

542

1                    MR. ROSENTHAL:  His records?

2                    THE COURT:  Why would they?  I'm asking you.

3                    MR. ROSENTHAL:  They're his medical -- they're the

4        medical records, operative report.

5                    THE COURT:  Is there opposition to the medical

6        records?

7                    MR. MINO:  The correct questions one asks to get

8        the medical records in as far as, is it -- is it in the

9        usual course of business to do it, were the records made at

10       or about the time, things like that.  It's a borderline

11       thing --

12                   THE COURT:  Look, here's the problem.

13                   MR. MINO:  But --

14                   THE COURT:  Here's the problem.  It's 4:20.  We

15       can table this and come in early tomorrow, stay late

16       tomorrow night.  I'm not adjourning this trial.  You did it

17       at your own risk with your witness.  I don't know why we're

18       fighting about this now if you have a witness that has to be

19       out of here, and the jury wants to leave at five, and I have

20       to give them a bathroom break.

21                   So are we finished the video dep that we need to

22       show the jury at this moment with the videographer?

23                   MR. MINO:  We're fine with the records coming in.

24                   THE COURT:  Okay.  So do you agree that all his

25       medical records can come in that the doctor reviewed?

CHARLES P. McGUIRE, C.C.R.

543

1          MR. MINO:  Yes.

2          THE COURT:  Any objection to them?

3          MR. MINO:  The records that he relied on in his

4    treatment, his medical files can come in, yes.

5          THE COURT:  Is there anything that can't come in

6    that you object to?

7          MR. MINO:  Are you trying to get the records of

8    Dr. Berberian in?

9          MR. ROSENTHAL:  No.  Just his records.

10         MR. DiGIULIO:  No, just the stuff we showed him.

11         THE COURT:  Okay.  That's fine.  So we don't have

12   to read that.  That's stipulated.   They'll come in.

13         And then we can take a quick break, and you can

14   put your witness on in 10 minutes.

15         MR. ROSENTHAL:  Right, and I'll offer the exhibits

16   tomorrow.

17         THE COURT:  Tomorrow.  Perfect.  You can just move

18   them in outside the presence of the jury and then they get

19   them.

20         MR. ROSENTHAL:  Great.

21         THE COURT:  Perfect.

22         All right.  10-minute break.

23       (The following takes place in open court)

24         THE COURT:  All right.  Ladies and gentlemen of

25   the jury, we'll have a quick, 10-minute break, go to the

CHARLES P. McGUIRE, C.C.R.

544

```
 1        bathroom, have something to drink, we'll send in some

 2        cookies, and then we'll come back in.

 3                 I promise we'll break at five today.

 4                 Thank you.

 5                 THE COURT CLERK:  All rise.

 6            (The jury exits)

 7            (Recess taken)

 8            (Jury out)

 9                 THE COURT CLERK:  All rise.

10            (The jury enters)

11                 THE COURT:  Okay, everyone.  Thank you for coming

12        back.  We'll try to get you out of here by five.  We'll

13        proceed.

14                 Any motions that need to be made?

15                 MR. MINO:  Yes.

16                 THE COURT:  Why don't we preserve them until

17        later, in the interests of efficiency.  Let's proceed with

18        Defendant's witnesses.

19                 MR. MINO:  Yes.

20                 Defendant calls Sandra Bou.

21                 THE COURT:  Ms. Bou, come forward.

22                 Do you swear or affirm?

23                 THE WITNESS:  Yes.

24                 THE COURT:  Which one?

25                 THE WITNESS:  I swear.
```

545

1              THE COURT CLERK:  Raise your right hand, place

2     your left hand on the bible, please.

3     S A N D R A   B O U, called as a witness on behalf of the

4     Defendant, and having been duly sworn, testified as follows:

5              THE COURT CLERK:  Please state your full name for

6     the record and spell it, please.

7              THE WITNESS:  My name is Sandra Bou, S-a-n-d-r-a,

8     B-o-u.

9              THE COURT:  You can have a seat.

10             THE WITNESS:  Thank you.

11                     DIRECT EXAMINATION

12    BY MR. MINO:

13    Q.   Good afternoon, Ms. Bou.

14             Are you currently employed?

15    A.   Yes.

16    Q.   And by who?

17    A.   PATH.

18    Q.   Okay.  And what's your current position within PATH?

19    A.   I'm a conductor.

20    Q.   How long have you been a conductor?

21    A.   About six years.

22    Q.   On July 22nd, 2011, what was your position with PATH?

23    A.   A conductor.

24    Q.   Okay.  And were you working on July 22nd, 2011?

25    A.   Yes.

1    Q.    Okay.  Were you working with Steven Foder?

2    A.    Yes.

3    Q.    And what was your job assignment that day?

4    A.    We were taking the light train from S-1 to World Trade

5    Center.

6    Q.    And S-1, is that Journal Square?

7    A.    Yes.

8    Q.    Had you worked with Mr. Foder before July 22nd, 2011?

9    A.    Yes.

10    Q.    About how many times?

11    A.    A few weeks.  I can't remember.

12          THE COURT:  You can use the microphone so we can

13    all hear.  Okay?

14          THE WITNESS:  Oh, okay.

15          THE COURT:  Thank you.

16    Q.    Now, in order to get to the train that you were

17    picking up, did you have to walk on track level?

18    A.    Yes.

19    Q.    Okay.  Now, on July 22nd, 2011, when you were walking

20    on track level, do you recall seeing any grease in the

21    ballast?

22    A.    I don't remember.

23    Q.    Okay.  Do you recall, when you had to get over to

24    S track, did you have to walk across 1 track?

25    A.    Yes, you do.

1    Q.    And walk across wooden planks?

2    A.    Yes.

3    Q.    Do you recall seeing any grease on the wooden planks?

4    A.    I don't remember.

5    Q.    Do you recall seeing any oil on the planks?

6    A.    I can't remember.

7    Q.    How about any water?

8    A.    I can't remember.

9    Q.    Okay.  Now, at some point, you get to the PATH train

10   car?

11   A.    Yes.

12   Q.    Okay.  And did you begin to climb up the PATH train

13   car?

14   A.    Climb up on the train?

15   Q.    Yes.

16   A.    Yes.

17   Q.    Okay.  And on July 22nd, 2011, describe for me how you

18   climbed up on the PATH train car.

19   A.    You climb up from the back --

20   Q.    Okay.

21   A.    -- of the train.

22   Q.    Okay.  Take me through the process, though.

23   A.    Oh.  Okay.  So you put two hands on the handrail, a

24   foot in the foot rail, and your other foot goes on the

25   anti-climber.

CHARLES P. McGUIRE, C.C.R.

548

1    Q.    Okay.  That day, which foot went into the foothold?

2    A.    Climb on the right side because you can't climb on the

3    left side, you'll get hit by a train.  So if I'm climbing on

4    the right side, looking at the train, I would have to put my

5    right foot in the foot rail, left foot would go on the

6    anti-climber.

7    Q.    Okay.  And on that day, were you able to put your left

8    foot on the anti-climber?

9    A.    Yeah, I got on the train, yes.

10   Q.    Okay.  So on that date, did you have any problems

11   getting on the train?

12   A.    Not that I can remember.

13   Q.    Okay.  Do you remember seeing any oil or grease on the

14   anti-climber?

15   A.    I can't remember.

16   Q.    Okay.  As a conductor, did you receive any training on

17   how to get up on the -- how to use that system to climb up

18   the train?

19   A.    Yes, we do.  We received training.

20   Q.    And when you climbed up that day, did you climb up as

21   you were trained?

22   A.    That's the only way you can get on a train, honestly,

23   on that side.

24   Q.    And how tall are you, Ms. Bou?

25   A.    Five-one.

1    Q.    And after you got on the train, at some point, did you

2    become aware that Mr. Foder fell?

3    A.    Yeah, but I was already on the train.  I didn't see

4    him fall if that's what you're --

5    Q.    Well, that was going to be my next question.

6    A.    Okay.

7    Q.    Did you specifically see him fall?

8    A.    No.

9    Q.    Okay.  So when you first saw Mr. Foder, where was he?

10   A.    When I came out of the train?

11   Q.    Yes.

12   A.    He was on the floor.

13   Q.    Okay.  And did he say anything to you?

14   A.    I don't really remember, that was so long ago, but

15   obviously he was in pain.  He was on the floor.

16   Q.    Okay.  At any point did he tell you how he fell?

17   A.    I think we were just in the middle of getting him

18   help.

19   Q.    Okay.

20   A.    If I can remember.  I'm not -- he was hurt, get him

21   help, you know.

22   Q.    Okay.  So then you're not really sure one way or

23   another how he fell.

24   A.    I didn't see him fall.

25              MR. MINO:  I have nothing else.

1              THE COURT:  Okay.

2              MR. ROSENTHAL:  I'm sorry, Your Honor, we're going

3     to be here all night with this.

4          (Laughter)

5              MR. ROSENTHAL:  I'm sorry, that was a bad joke.

6              THE COURT:  It's late-in-the-day humor for

7     lawyers.

8          (Laughter)

9              THE COURT:  Lawyers are not -- don't give up your

10    day jobs.

11         (Laughter)

12             THE COURT:  None of us should.

13                       CROSS-EXAMINATION

14    BY MR. ROSENTHAL:

15    Q.    Ms. Bou, you worked with Mr. Foder for a couple of

16    weeks?

17    A.    I think so, yes.

18    Q.    Did you ever see him do anything unsafe?

19    A.    No.

20    Q.    Now, you got on that train that day the way that they

21    taught you to get on the train?

22    A.    Yeah.

23    Q.    Do you remember who taught you how to climb?

24    A.    I do.  It was Avril, our chief OE.

25    Q.    And this is Plaintiff's Exhibit 23A.

1              You had both your hand on the rail?

2      A.    Yes.

3      Q.    And where on the rail did you have both your hands?

4      A.    What do you mean?  I'm holding the -- if I can see the

5      picture, I'll show you.

6      Q.    Sure.

7              MR. ROSENTHAL:  Your Honor?

8              THE COURT:  Would you mind going around and

9      pointing to it?

10             THE WITNESS:  Sure.

11             THE COURT:  Put it back on the easel.

12             Mr. Rosenthal, why don't you put it back on the

13     easel and, let her come up and show the jury.

14         (The witness stepped down.)

15     Q.    Yes, just tell the jury where your hands were.

16     A.    Okay.

17             THE COURT:  You have to speak up so our Court

18     Reporter can hear you.

19     A.    I would put my hands on the -- the handrail should be

20     here.  Yeah, that is the handrail.  Okay.  My hands would be

21     here.  If you can see the handrail, you put two hands here.

22     Your foot has to go here.  Has to be your right foot.  Left

23     foot has to reach over here if you're climbing up on this

24     way.  If you put your left foot in here, you would be going

25     that way.  So, yeah, that's how you climb in.


                    CHARLES P. McGUIRE, C.C.R.

552

1    Q.    So just to be clear --

2    A.    Two hands.  I can't really see if that's the handrail.

3    Q.    Right.  There's a handrail that goes like that?

4    A.    Yes, the two hands are here.

5    Q.    But on the vertical part of the handrail?

6    A.    Yes.

7    Q.    Okay.

8    A.    And the foot is there, and your left foot goes on the

9    anti-climber.

10   Q.    Okay, and the anti-climber is this piece of steel?

11   A.    It is the doorway frame in the doorway, yes.

12   Q.    We see it up there?

13   A.    Yes.

14         THE WITNESS:  Do you want me to go back?

15         THE COURT:  Yes.

16   Q.    Yes, you can go back.

17         Now, the area -- I'll wait until you get on.

18         (The witness resumed the stand.)

19   Q.    Now, the area where you walk in order to get to the

20   trains on S track, --

21   A.    Yeah.

22   Q.    -- there can be oil and grease and debris in that

23   area?

24   A.    Yeah, and ballast.

25   Q.    It's a railroad environment; right?

1      A.     Definitely, yeah.

2      Q.     And so there's always grease and oil and debris in

3      that area?

4      A.     You can expect it, yes.

5      Q.     Okay.  And is there a greaser that goes by as well?

6      A.     At various times, yeah, we have like a grease train

7      that goes out, yes.

8      Q.     What does that do?

9      A.     I'm not sure, but I know it greases the rails, I

10     think.  I'm not sure.

11     Q.     But that also can --

12     A.     Yes, it affects the trains.  It affects the brakes.

13     That's why, you know, we have to make sure we do brake tests

14     everywhere we go.  Every terminal, we have to make sure the

15     brakes are working properly.

16     Q.     Does the greaser affect the walking conditions as

17     well?  Spreading the grease?

18     A.     I mean, common sense, it would, you know.

19            MR. ROSENTHAL:  Okay.  That's all I have.  Thank

20     you.

21            THE WITNESS:  I don't know.

22                        REDIRECT EXAMINATION

23     BY MR. MINO:

24     Q.     Just, do you actually know whether or not the greaser

25     gets grease anywhere besides the tracks?

CHARLES P. McGUIRE, C.C.R.

1      A.     That's not --

2      Q.     Besides the actual rails?

3      A.     It's not my job.  I don't know where the grease train

4      is -- what their actually their job is to do.  I know it

5      greases the rails.

6      Q.     And you have no memory one way or another whether or

7      not there was grease in the area where you walked on July

8      22nd, 2011.

9      A.     I don't remember.

10            MR. MINO:  I have nothing else.

11                      RECROSS EXAMINATION

12     BY MR. ROSENTHAL:

13     Q.     I want to just --

14            THE COURT:  It's limited to the redirect.

15            MR. ROSENTHAL:  Right, it's just about the

16     greaser.

17     Q.     Do you remember testifying on August 28th, 2015?

18     A.     What is that?

19     Q.     In a deposition?

20     A.     Was that the deposition?  Okay.  Yes, I did.

21     Q.     And do you remember being asked about whether there

22     was oil on the walkway?

23     A.     I don't remember that question, but I've been asked

24     that, yes.

25     Q.     And do you remember giving, as part of your --

1              THE COURT:  No, let me stop.  Let's stop.

2              You're not going to paraphrase.  You can read her

3      the question and the answer, and the next question is, was

4      this your question and that's the answer, and that's it.

5      Okay?  And it has to be inconsistent with what she said.  If

6      it's not inconsistent, I don't want you to read it to her.

7              MR. ROSENTHAL:  It's essentially -- there's a --

8      yes.  Do you want to read it first?

9              THE COURT:  Yes, I do.  Let's go to sidebar.

10          (The following takes place at sidebar)

11              THE COURT:  It's not inconsistent.

12              "But was there oil on the walkway at that time?

13              "I wouldn't remember that.  I'm just saying in

14      general, it is a railroad.  There is going to be grease and

15      oil, you know, there is going to be -- there is going to be

16      a lot of things, you know.

17              "Sure.

18              "so if I said no there is no oil or no grease,

19      that would be lying.  There is.  We have trains that go by

20      and put grease on the rails so of course it is going to get

21      in other places.  It is going to get on our shoes, it is

22      going to get everywhere.

23              "That is what I'm asking is you.  Was there oil

24      and grease?

25              "I can't remember."

1          MR. ROSENTHAL:  Right.  It was just that.

2          THE COURT:  If you want it.  I think it's a close

3    call.  I mean, she said she doesn't really know what the

4    greaser does.

5          MR. MINO:  She said she doesn't know, and it's not

6    her job to know.

7          THE COURT:  Here's what you're going to do.

8    You're going to read the question and read the answer, and

9    the jury is going to say it's consistent, but I'll let you

10   do it.

11         MR. MINO:  The question starts there?

12         THE COURT:  You're going to read the whole thing.

13   You're not going to argue with her.  You're going to say, is

14   this your question and was that your answer on August 28th,

15   and then we're done.

16         MR. ROSENTHAL:  Well, I'm going to read through

17   these two with the shoe in there.

18         THE COURT:  Right, and read through "I can't

19   remember."  Read the whole thing.  I want context.  Okay?

20         MR. DiGIULIO:  Why don't you just ask, did it get

21   on her shoes?

22         THE COURT:  No, you're not asking that.  This is

23   redirect, guys.  We're not going to kill this.  You don't

24   get it:  It's overkill.  If you want to read it, you have

25   one question.  You're going to read from here to line 15,

CHARLES P. McGUIRE, C.C.R.

557

1       and then you're going to be done.

2                       MR. ROSENTHAL:  Okay.

3                       THE COURT:  Okay.

4              (The following takes place in open court)

5       BY MR. ROSENTHAL:

6       Q.      I'm going to read for you questions and answers and

7       ask you if you remember --

8       A.      Okay.

9       Q.      -- giving the testimony.

10      A.      Okay.

11      Q.      "QUESTION:  But was there oil on the walkway at that

12      time?

13                      "ANSWER:  I wouldn't remember that.  I'm just

14      saying in general, it is a railroad.  There is going to be

15      grease and oil, you know, there is going to be -- there is

16      going to be a lot of things, you know.

17                      "QUESTION:  Sure.

18                      "ANSWER:  So if I said no there is no oil or no

19      grease, that would be lying.  There is.  We have trains that

20      go by and put grease on the rails so of course it is going

21      to get in other places.  It is going to get on our shoes, it

22      is going to get everywhere.

23                      "QUESTION:  That is what I'm asking is you.  Was

24      there oil and grease?

25                      "ANSWER:  I can't remember."

CHARLES P. McGUIRE, C.C.R.

558

1          Do you remember that questioning?

2    A.    Yes, I do.

3          MR. ROSENTHAL:  Okay.  No further questions.

4          THE COURT:  Okay.  We're finished with this

5    witness?

6          MR. MINO:  Yes.

7          THE COURT:  Okay.  You're excused.  Thank you.

8      (Witness excused)

9          THE COURT:  Any other witnesses for today?

10         MR. MINO:  No.

11         THE COURT:  Okay.  Excellent.

12         So we're done a little bit early, ladies and

13   gentlemen of the jury.  We're winding up.  I think that

14   we'll get you out today at 20 of.

15         We have two witnesses tomorrow.  One, you get to

16   watch another movie, and we get to have a live witness, and

17   hopefully, after that, the next step would be to give you a

18   charge and then hear closing statements.

19         If we can get the charge, we'll work on it

20   tomorrow, we'll charge you, and then -- or, if not, we'll do

21   it Friday morning, but I'm hoping we can give you the charge

22   tomorrow, and then we'll hear closing statements either late

23   tomorrow or early Friday morning.

24         So I think for sure we'll be done by Friday.  So

25   you can count on tomorrow and Friday, but tomorrow for sure.

CHARLES P. McGUIRE, C.C.R.

1          So we'll start tomorrow at 9:30.

2          I will reiterate a couple things.  I want to thank

3  you for your attention.  I'm not just saying this to flatter

4  a particular jury, but you've been very attentive and you've

5  been prompt and you've been a pleasure to have, and I

6  appreciate your service.  I know I speak on behalf of the

7  lawyers in the room.  This is important to both sides.  So

8  attention is very much appreciated.

9          Your service is appreciated.  I know it interferes

10  with your own personal schedules, and I am very grateful for

11  your service.

12          We are nearing the end, probably at the halfway

13  point.

14          And so please remember my initial instructions.

15  Don't talk about the case, don't do any research.

16          Have a good night's sleep.  I think it's "Modern

17  Family" tonight, unless it's a rerun, and --

18      (Laughter)

19          THE COURT:  And so that's safe.  You can watch

20  "Modern Family."  And then we will see everyone tomorrow at

21  9:30.

22          And thank you very much again.  Okay?

23          THE COURT CLERK:  All rise.

24      (The jury exits)

25          THE COURT:  Okay, guys, so what's the story?  Is

CHARLES P. McGUIRE, C.C.R.

560

1       there a motion that you wanted to make?

2               MR. MINO:   Yes.

3               At this time, PATH would like to make a motion for

4       directed verdict in this case.

5               I think Plaintiff has failed to make out a prima

6       facie case.   I think what the evidence has shown here is

7       that the train was designed and at all times complied with

8       the FRA, the C.F.R. FRA regulations with respect to the end

9       step.   The ones cited do not apply to PATH, that would be 49

10      C.F.R. 231.14, that PATH was specifically exempted from

11      that.

12              In addition, I believe the evidence also showed

13      that Mr. Foder was trained to place his entire foot on the

14      diamond plate of the anti-climber.   If his foot went on the

15      smooth steel edge, that was improper, and therefore he is

16      responsible for the accident, and PATH has not done anything

17      wrong in this matter.

18              So for those reasons, PATH would move for a

19      directed verdict in this case.

20              THE COURT:   Okay.

21              I'm not granting that directed verdict.   I'm going

22      to table it and adjourn it until after the verdict comes in.

23      But I'm not inclined -- there's certainly evidence here of

24      negligence, and both sides have certainly cross-examined on

25      it, but there's certainly enough to go to the jury.   But in

CHARLES P. McGUIRE, C.C.R.

1    any event, I'm going to deny the motion without prejudice

2    and it can be renewed at the end of the case, after the jury

3    verdict comes in.  I'm not granting the motion now.

4              MR. MINO:  Thank you, Your Honor.

5              THE COURT:  But so noted.

6              And so with that, we have a couple housekeeping

7    matters.

8              One is the exhibits.  I know that Mr. Rosenthal

9    wanted to move a number of Plaintiff's Exhibits in.

10             MR. ROSENTHAL:  Yes, Your Honor.

11             THE COURT:  And I think I noted them.  I think we

12   moved them.  P-5A to P-5UU is in evidence already.  Did we

13   move them already?

14             MR. ROSENTHAL:  Yes, in evidence.

15             THE COURT:  I have them marked in my book as in

16   evidence earlier.  They're in.

17             Okay.  Then we have the doctors' notes.

18             MR. ROSENTHAL:  We have the exhibits from the

19   doctor's depositions, which were --

20             THE COURT:  I can't move in things from

21   depositions.  I can only move them in from exhibit books.

22             MR. ROSENTHAL:  Okay.  In the exhibit books, there

23   is P-11A, P-11B.  They're all separately marked in the

24   exhibit book under Exhibit 11.  P-11A, P-11B, P-11C.  Do you

25   want me to list what --

CHARLES P. McGUIRE, C.C.R.

1          THE COURT:  P-11 is medical records of Justin

2      Greisberg?

3          MR. ROSENTHAL:  Yes, they're all from that.

4          THE COURT:  So it's only 11.

5          MR. ROSENTHAL:  So, yes, it is all from 11.

6          THE COURT:  That's it.  So it's P-11, so all the

7      records that Dr. Greisberg reviewed.

8          MR. ROSENTHAL:  Yes.

9          THE COURT:  And that's all you're moving; correct?

10         MR. ROSENTHAL:  That's all, yes.

11         THE COURT:  Any objection to P-11?

12         MR. MINO:  To the Dr. Greisberg records, no.  They

13     were all part of his medical files.

14         THE COURT:  Okay.  So P-11 is in evidence.

15         (Plaintiff's Exhibit 11 marked in evidence)

16         MR. ROSENTHAL:  And I'm not sure in terms of the

17     doctor's deposition whether that should be placed in

18     evidence or not.

19         THE COURT:  No, it won't be.  If they want a

20     readback, just like the trial transcript is not given, nor

21     would a tape.  If they want a readback, we'll play it, and I

22     don't think they will, but you never know.  We'll deal with

23     it if it happens.

24         MR. ROSENTHAL:  Just trying to be safe.

25         Thank you.

563

1                    THE COURT:  I hear you.

2                    Okay.  Anything else?

3                    MR. MINO:  No.  As far as tomorrow goes, we have

4       my liability expert, we have the doctor on tape.

5                    Dr. Whitley, we may be able to -- I was really

6       just going to bring her in so she could authenticate her

7       medical records and that's it.

8                    THE COURT:  Dr. Whitley is your medical expert?

9                    MR. MINO:  No, Dr. Whitley is just the PATH

10      Medical doctor that Mr. Foder went to periodically

11      throughout, and she has medical records.

12                   THE COURT:  Can there be a stipulation to those?

13                   MR. ROSENTHAL:  From the Plaintiff, there can be,

14      Your Honor.

15                   THE COURT:  Right.

16                   MR. MINO:  I just want to make sure that my office

17      is fine with me stipulating to it and doesn't want to bring

18      her in.

19                   THE COURT:  Well, tell them that I'm fine with it.

20      I'm not going to have unnecessary witnesses for the jury

21      mand I'm not going to allow it if there's a stipulation.  So

22      that answers the question.

23                   MR. MINO:  Okay.

24                   THE COURT:  I mean, if there's a strong reason, I

25      want to know why, but I'm not in the habit of wasting time

CHARLES P. McGUIRE, C.C.R.

1     of the Court and the jurors if there's a stipulation.  The

2     only purpose of putting her on would be to authenticate, and

3     there's a stipulation.  That would be very silly to waste

4     everybody's time.

5               MR. MINO:  I agree, and I will communicate -- I

6     can't imagine why they would, but I don't want to definitely

7     tell you no and then you hear tomorrow.  That would be bad.

8               THE COURT:  So who else do you have tomorrow?

9               MR. MINO:  Gus Ubaldi is the liability expert.

10              THE COURT:  And how long do you think his direct

11    will be?

12              MR. MINO:  His direct will be, I don't know, an

13    hour, maybe a little bit less.

14              THE COURT:  Okay.

15              MR. MINO:  And then Dr. Dennis, the doctor on

16    videotape.  His entire deposition is slightly over an hour.

17              THE COURT:  Okay.  So I think we should be

18    prepared to do summations tomorrow, and if we start promptly

19    at 9:30, and there's no issue on medical records.

20              So what we need to do, you've got the deposition

21    of Defendant's expert, and there's no objection to it coming

22    in, the video?

23              MR. ROSENTHAL:  If it's just that one objection, I

24    have no objection to that.

25              MR. MINO:  Yes, that was it.


                    CHARLES P. McGUIRE, C.C.R.

1          THE COURT:  Okay.  So here's what we're going to

2     do, guys.  I'm working on the jury instructions.  Why don't

3     you take a break?  Alex will get you -- the way I see it --

4     he's been doing research with me the last couple days.

5     There's really just a one-count complaint, right?

6          MR. ROSENTHAL:  Just the FELA.

7          THE COURT:  It's just the one charge.  We've used

8     model from -- what circuit, Alex?

9          LAW CLERK SILAGI:  Fifth Circuit, Eighth, and

10    Seventh.

11         THE COURT:  Fifth, Eighth, and Seventh have model

12    instructions, so we took some of the language from those,

13    and we crafted a verdict sheet, and everything else is just

14    standard Federal, you know, weighing of the evidence, the

15    standard stuff.

16         So we'll give you a whole set.  Since it's only

17    4:30, why don't you take a look at it and see if it's good.

18    We can get that out of the way, and then you can worry about

19    your closings tonight and we don't have to worry about

20    anything else.

21         Ideally, I'd love to get everything to the jury by

22    tomorrow, but if I don't think we can do it by tomorrow --

23    if we can't get everything done, then my sense is we'll just

24    do the closings Friday morning, we'll come at like 10 and do

25    closings.

CHARLES P. McGUIRE, C.C.R.

1          But let's get the -- in the event that we can get

2     the jury charge done, I want to charge the jury before

3     closing statements.  Okay?

4          So why don't we take a few minutes, and then as

5     soon as we have them ready, we'll bring them out.

6          MR. ROSENTHAL:  Thank you, Your Honor.

7          MR. MINO:  Thank you.

8          THE COURT CLERK:  All rise.

9       (Recess taken)

10      (Jury out)

11          THE COURT:  Gentlemen.  Okay.  Did you get a copy

12    of the jury instructions?

13          MR. ROSENTHAL:  Yes, we did.

14          THE COURT:  I'm going to mark them the first one

15    as Court Exhibit 4, which is the jury instructions, and then

16    the verdict sheet will be Court Exhibit 5.

17        (Court Exhibits 4 and 5 marked for identification)

18          THE COURT:  Okay.  Comments, objections?  From the

19    Plaintiff?

20          MR. MINO:  I'll let you start.

21          MR. ROSENTHAL:  Okay.  Plaintiff would ask that a

22    number of Plaintiff's proposed points be reconsidered and

23    placed into the --

24          THE COURT:  Okay.  Tell me which ones.

25          MR. ROSENTHAL:  Number 11, which --

1          THE COURT:  Do you have an extra copy?

2          MR. DiGIULIO:  We have a copy right in here.

3          THE COURT:  Are they in my books?

4          MR. DiGIULIO:  Yes.

5          THE COURT:  Tell me which number.

6          MR. DiGIULIO:  The first book, they should be

7     inside the front cover.  If you don't have it, there is a

8     copy right here.

9          THE COURT:  I don't believe I have them.  If you

10    want to hand them up, that will be great.

11         MR. DiGIULIO:  May I approach?

12         THE COURT:  Thank you.

13         MR. DiGIULIO:  You're welcome.

14         THE COURT:  Okay.  So which ones would you like to

15    have added?

16         MR. ROSENTHAL:  The first one is number 11, which

17    deals with the issue of foreseeability.

18         THE COURT:  Any objection to the foreseeability

19    one?

20         MR. MINO:  Yes.  I would object to this particular

21    jury instruction, yes.  It seems to just kind of go through

22    what type of evidence you can consider and things like that.

23    If there's a more general foreseeability charge, I am fine

24    with that.  I'm not okay -- PATH is not okay with number 11.

25    If there is a model foreseeability charge that the Court has

1      ...

2                    THE COURT:  I don't know.  I'll take a look at it

3      and let you know tomorrow.

4                    MR. ROSENTHAL:  And this one is a model.

5                    THE COURT:  Right, and what is it that you object

6      about in this one?

7                    MR. ROSENTHAL:  Are you --

8                    THE COURT:  No, Defendant.  You're fine with it.

9      They say they object, they want a different one.

10                   What is objectionable on this one?

11                   MR. MINO:  I just don't think that it needs to be

12     as explicit as it does about what evidence to consider

13     versus what evidence to not consider.

14                   In Defendant's proposed jury instructions, there

15     is also a foreseeability.

16                   THE COURT:  Do you have that?  I'm sorry, I don't

17     have it with me.  Do you have a copy of yours?

18                   MR. MINO:  I should.  It's in the same packet, in

19     the back.

20                   MR. ROSENTHAL:  It's their instruction number

21     four, it looks like.

22                   THE COURT:  Okay.  I'll take a look and let you

23     know.  I'll look through these cases and I'll see.

24                   MR. ROSENTHAL:  Just for the record, I'm

25     specifically objecting to that since I think it's crafted in

                        CHARLES P. McGUIRE, C.C.R.

1      a way -- it's not a model charge, and it's crafted in a way

2      that's improper.

3                  THE COURT:  Okay.  I get it.  I'm going to take a

4      look at this tonight, and I'll let you know tomorrow, okay?

5                  MR. ROSENTHAL:  Do you want me just to read the

6      numbers --

7                  THE COURT:  Sure.

8                  MR. ROSENTHAL:  -- as opposed to going through

9      each one?

10                 THE COURT:  Tell me how you want to do it.  We

11     just crafted this one from the model, the model that we had

12     on file.  So you can tell me if there's any that you object

13     to in mine, or you could tell me, as we started to, they're

14     okay, but I want to add additional ones in, like number 11.

15                 MR. ROSENTHAL:  Yes.  I think from Plaintiff's

16     perspective I have no objection to what is in yours.  I do

17     have --

18                 THE COURT:  Additional ones you want.

19                 MR. ROSENTHAL:  -- additional ones that I want.

20                 THE COURT:  Okay.

21                 MR. ROSENTHAL:  And I do object to -- some of the

22     language in the verdict sheet, I think, should be a

23     little --

24                 THE COURT:  Let's talk about that in a minute.

25     Let's go through these first.

CHARLES P. McGUIRE, C.C.R.

1           So you want 11 in, and what else do you want in?

2           MR. ROSENTHAL:  Seventeen.

3           THE COURT:  Hold on.  Is that a model charge?

4           MR. ROSENTHAL:  No, it is not.

5           THE COURT:  Okay.

6           MR. ROSENTHAL:  And the only thing I'm looking for

7    is the issue of the nondelegable duty of the FELA.  I think

8    the jury should be apprised of that since the issue of

9    Kawasaki came up, and --

10          THE COURT:  Kawasaki?

11          MR. ROSENTHAL:  Yes, being the -- Kawasaki was the

12   one that designed the car.

13          THE COURT:  I don't think it came up here that it

14   was someone else's duty.

15          MR. MINO:  Yes.  In fact, I don't think that was

16   elicited on my --

17          THE COURT:  No, there's no evidence of, it was the

18   railroad or Amtrak's duty or something.

19          MR. ROSENTHAL:  Yes, I think -- I mean, my reading

20   of Mr. Wallace's testimony --

21          THE COURT:  Who's Wallace?

22          MR. ROSENTHAL:  He was the person for --

23          THE COURT:  One of the earlier ones?

24          MR. ROSENTHAL:  Yes.

25          THE COURT:  Okay.

CHARLES P. McGUIRE, C.C.R.

1          MR. ROSENTHAL:  -- was that he was trying to say

2     that some of the issues regarding how the car came and their

3     acceptance wasn't really -- we didn't really -- we weren't

4     involved in that at all, it was Kawasaki, how the cars came

5     to us and what was on there and what wasn't.

6          THE COURT:  That would be fine in a product defect

7     case, they agree to say, we didn't make it, somebody else

8     made it.

9          I'll think about this, but there was really no

10    evidence of -- your expert didn't say it was a design

11    defect.

12         MR. ROSENTHAL:  No, no, absolutely.

13         THE COURT:  So, you know, I get the Kawasaki

14    instruction when you're pointing the finger at someone else

15    on the chain, but here, I don't know if there's -- I'll

16    think about whether I give it, but I don't think there's any

17    harm in giving it because there was no evidence of anyone

18    else that -- no one pointed a finger at anyone else.

19         MR. MINO:  I just think the harm is that just

20    lends to confusion because there was no evidence of it.  I

21    think that -- and quite frankly, it could cut against or for

22    PATH.  I think a jury is going to be confused --

23         THE COURT:  I don't see any confusion about it,

24    because it says "responsibility to inspect" -- it says,

25    "This nondelegable duty -- " -- we can just put, it should

CHARLES P. McGUIRE, C.C.R.

1    be a "nondelegable duty is continuing and imposes on a

2    railroad a responsibility to inspect, maintain, and/or

3    repair its property to insure that its equipment, tools,

4    machinery, and/or appliances and/or the surface conditions

5    of its yards, tracks, and roadbeds are reasonably safe."

6            I'll think about it.

7            Your only objection is it's confusing because

8    there was no evidence of a nondelegable duty.

9            MR. MINO:  Yes, there was no evidence presented

10   from any witness, much less a PATH witness, that PATH isn't

11   responsible for these train yards.  In fact, Mr. Wallace and

12   Mr. Velez all said they inspected them.

13           MR. ROSENTHAL:  The law is it's a nondelegable --

14           THE COURT:  I hear you.  Let me think about it.  I

15   wanted to hear what the scope of the objections are.

16           So you have 11, 17.  What else would you like in,

17   Mr. Rosenthal?

18           MR. ROSENTHAL:  Twenty-three and 24 are very

19   similar.  They involve the issue of PATH's failure to

20   enforce its rules.

21           THE COURT:  Any objection?

22           MR. MINO:  I'm sorry, I'm just reading it to make

23   sure I understand it.

24           Yes, I mean, PATH would object.  At a minimum, I'm

25   not sure that these cases stand for what it says.

573

1            THE COURT:  Well, the jury doesn't get the cite.

2      The jury just gets the proposition.

3            MR. MINO:  No, I understand that they don't get

4      the cite, but these are cited to in support of that, and I'm

5      not sure that's what they say.

6            And I guess enforcing the rules is that -- what

7      was the evidence that PATH didn't enforce the rules?

8            MR. ROSENTHAL:  Well, there's a lot of evidence

9      that they didn't, that there's this rule on how to get on

10     the car and nobody seems to be --

11           THE COURT:  There was a factual dispute about what

12     the training involved.  It was clearly a factual dispute.

13     There was a lot of -- there were two or three PATH witnesses

14     who said this is how they were instructed, and it's very

15     serious, and we instruct them, and you have to put your

16     whole foot on the diamond.

17           And Plaintiff said, I got instructed but it was

18     never that specific.

19           That's it, and that's really the defense in this

20     case:  He was properly instructed, and he didn't try to get

21     on the car the proper way.

22           So I would imagine that that's -- I'll take a look

23     at the case, but, you know, this one seems relevant for the

24     safe operation of its equipment, tools, machinery, and

25     appliances.

574

1          We may have to strike that.  The safe operation of

2     its rail cars would probably be better.

3          And you have to instruct on it.  I mean, that -- I

4     can't imagine that's not the law.  You have to have

5     regulations for the safe operation, and you have to instruct

6     them on the rules, procedures, and regulations.

7          But if the objection is Defendant isn't sure what

8     the law is, we'll take a look at the law, and if you have

9     other law overnight that you want to say that's not the law,

10    you can bring it to me in the morning.

11         MR. MINO:  Sure.

12         THE COURT:  But it looks to me like -- it sounds

13    sound.  It doesn't sound unreasonable.  And I'll take a look

14    at the cases.  Okay?

15         What's next?

16         MR. ROSENTHAL:  Number 38 is next.  And this is

17    only in response to PATH's repeated claims that they

18    satisfied their safety obligations simply by satisfying the

19    C.F.R.s.

20         THE COURT:  Right, because the standard isn't

21    whether they complied with the C.F.R.s.  the standard is

22    whether they were reasonably safe.

23         MR. ROSENTHAL:  Right.

24         THE COURT:  So this looks like it would be

25    appropriate, given the evidence in the case.

CHARLES P. McGUIRE, C.C.R.

1           Any objection?

2           MR. MINO:  No.

3           THE COURT:  Okay.

4           MR. MINO:  Much as I would like to.

5       (Laughter)

6           THE COURT:  I know.  Unfortunately, it's the law.

7           MR. ROSENTHAL:  The next two are 49 and 51, and

8   they are both not -- they are both --

9           THE COURT:  Forty-nine and 51.

10          MR. ROSENTHAL:  Yes, about the issue of assumption

11  of the risk.

12          THE COURT:  Let's talk about 49 first.

13          I understand the second part of it which says --

14  I'll read it for the record:  "Contributory negligence may

15  arise only from plaintiff's own acts or acts of negligence,

16  not from knowingly taking on a risk inherent in the work

17  environment or a risk created by defendant's negligence."

18          I understand not from a risk created by

19  Defendant's negligence, not from taking on a risk created.

20          I'm not sure what "a risk inherent in the work

21  environment" means.

22          MR. ROSENTHAL:  Well, assumption of the risk is

23  from any risk that the job requires that he undertake in the

24  performance of his duties.  It doesn't have to be

25  negligence.  It's -- if he's doing his -- just because he's

CHARLES P. McGUIRE, C.C.R.

1    doing his job and there is assumption of the risk, he's not

2    liable for assumption of the risk if the job happens to be

3    dangerous or if it happens to be --

4              THE COURT:  But here's the really narrow issue.

5    He works in the railroad.  There's risks, and if he acts

6    unreasonably in doing his job, then he's contributorily

7    negligent.  And so I don't want to use language that

8    suggests that -- if he does -- if he takes on a risk that's

9    inherent in his job, you know, that can never be the basis

10   for negligence, because the issue is whether he was

11   reasonable in how he took on that risk.

12             In other words, there's going to be -- I assume

13   that the testimony's going to be he didn't have gloves on,

14   his hands were sweaty, and he grabbed the pole and he

15   slipped off it.  Okay?  Is that an inherent risk in the work

16   environment, so that can't contribute to contributory

17   negligence?  Because I think Defendant is going to argue he

18   was negligent in not having his gloves on, and if he had his

19   gloves on he wouldn't have had -- it wouldn't have happened.

20             MR. ROSENTHAL:  And I understand their argument.

21   I'm not suggesting that they can't make it.  I'm just always

22   worried in a situation like this where there's -- the

23   interplay between assumption of the risk and contributory

24   negligence is so important, but --

25             THE COURT:  Let me ask you this question.  Let me

CHARLES P. McGUIRE, C.C.R.

1        stop and ask the Defendant if they have any objection to 49.

2                MR. MINO:  Yes.  PATH would object to 49, and I

3        think that you were right to highlight the problematic

4        phrase in that.  PATH actually would like a little bit more

5        of an expansive contributory negligence instruction, but the

6        "not from knowingly taking on a risk inherent in the work

7        environment," just --

8                THE COURT:  I don't what that means.

9                MR. MINO:  Yes, it's not clear what it means, and

10       I think that it would --

11               (Off the record discussion)

12               THE COURT:  Give me one second to look at

13       something.

14               Okay.  Let me just read you something from the

15       model instruction on the assumption of the risk.  These are

16       the pattern instructions what the 7th Circuit, and they're

17       not addressed by any other circuit.

18               this is on assumption of the risk.  This is what

19       the instructions say, quote:

20               "Although there is some overlap between assumption

21       of risk and contributory negligence, the two are not

22       interchangeable.  An assumption of risk is an employee's

23       voluntary knowledge and acceptance of a dangerous condition

24       that is necessary for him to perform his duty.  Contributory

25       negligence is a careless act or omission on the plaintiff's

1    part tending to add new danger to a condition that the

2    employer negligently created or permitted to exist.  The

3    committee recommends against giving the assumption of a risk

4    instruction unless it is necessary to create a

5    misimpression.  If the Court chooses to instruct on this

6    topic in a case in which the issue has been injected, the

7    committee recommends the addition of the following sentence,

8    quote:  'It is not a defense that an employee may have

9    assumed the risk of his employment.'"

10              That's the law.

11              So there is an issue here of assumption of the

12   risk.  I mean, this is the issue:  Did he assume the risk by

13   -- was he required to do this dangerous work, or climb up

14   the way he was forced to climb it?  Or did he act carelessly

15   by not climbing on it right and not having a glove on?

16              That's the case as I see it.  Right?

17              They're saying he had to do it this way, and they

18   didn't instruct him, and he had to get on the train, so he

19   just did it, and he wasn't told how to do it any way

20   differently, and that's how the injury occurred.  They

21   didn't have the rubber, the handrail wasn't in the right

22   place, and he had to get on and off the train, and he didn't

23   get instructed, and he had to get on and off the train in

24   order to perform his duties, and that whole situation was

25   dangerous.

1              Defendants say, on the other hand, it is just what

2      negligence is, that he acted carelessly in not listening to

3      -- not properly getting on and off the train by not wearing

4      his gloves, and that is a careless act tending to create new

5      dangers that -- a condition that the employer negligently

6      created or permitted to exist.

7              So I'd be inclined to give that instruction, with

8      the caveat that it is not a defense that an employee may

9      have assumed the risk of his employment.

10             MR. ROSENTHAL:  I have no objection.

11             MR. MINO:  I have no objection to that either.

12             THE COURT:  Okay.  So we'll change it to that

13     language.

14             I'm making the prediction.  I wanted to be careful

15     because I think if there's any area where they're going to

16     come back with a question, it's going to be this topic.  The

17     ones I worry about the most are the ones I get a question

18     on.

19             So I want to use the model language and think it

20     through, and before you leave, I want to give you a copy of

21     this so you can both read it and read the case, because I

22     think it 's an important point.  Okay?

23             MR. ROSENTHAL:  Okay.

24             THE COURT:  That's 49.  I'm going to produce the

25     model.

1           And what about 51?

2           MR. ROSENTHAL:  Fifty-one is covered by the same

3     thing.  It's another assumption of the risk charge.

4           THE COURT:  Okay.  So we'll use that one instead.

5           What's next?

6           MR. ROSENTHAL:  The last one would be number 76.

7           THE COURT:  Okay.  Let me read it.

8           I didn't know that there was -- any objection to

9     that?

10          I didn't know there was an issue with him before.

11          MR. ROSENTHAL:  It will be.

12          MR. MINO:  Yes, it will be with my doctor that

13    some of it was pre-existing.

14          THE COURT:  Okay.  I didn't think anyone had

15    anything pre-existing when they're only 25.  That makes me

16    feel old.  Everything I have is -- I guess I have no lawsuit

17    that I'm old.

18          THE PLAINTIFF:  Thank you.

19        (Laughter)

20          THE COURT:  So far, there's really been no

21    testimony about pre-existing.

22          MR. MINO:  Right.

23          THE COURT:  If you put this in, I have to give the

24    charge.

25          MR. MINO:  No, no, I understand.

CHARLES P. McGUIRE, C.C.R.

1          THE COURT:  Okay.  And what do you have?

2          MR. MINO:  Sure.

3          So I have -- if we go to mine --

4          THE COURT:  I'm there.

5          MR. MINO:  All right.  PATH would ask that its

6   instruction number four on foreseeability be the

7   foreseeability one that was used.

8          THE COURT:  Okay.  We talked about that earlier,

9   right?

10          MR. MINO:  Right.

11          Then we have instruction number nine, and that's

12   regarding PATH not being required to furnish the best or

13   most perfect equipment, just ones that are reasonably safe.

14          THE COURT:  And the objection?

15          I would take out, I'd strike the second sentence

16   says -- I'll read it for the record:  "The Defendant was not

17   required to furnish Plaintiff with the latest, best, or most

18   perfect appliances with which to work..."  I'll leave

19   that. But then I would strike, "nor to discard standard

20   appliances already in use upon discovery of later

21   improvements...," because I don't think there's been any

22   evidence of that.

23          MR. ROSENTHAL:  I would object to this charge.  I

24   think even the last sentence isn't a proper recitation of

25   the law, "If you find that Defendant had no reason to

CHARLES P. McGUIRE, C.C.R.

582

1    believe that the means in question was not reasonably

2    safe..."  It's not about whether they believe it or not;

3    it's whether -- it is reasonably safe.  That's the issue.

4    It's not -- they're not being judged --

5              THE COURT:  So it should be if you find that the

6    Defendant -- that the conditions were reasonably safe.

7              MR. MINO:  Yes.

8              THE COURT:  If you find that the conditions were

9    reasonably safe -- if I allow that one, I'll modify it.  If

10   you find that the conditions were reasonably safe, you must

11   find in favor of Defendant, or if you find that Plaintiff's

12   working conditions were reasonably safe.  Right?

13             MR. ROSENTHAL:  That would -- that would address

14   that last sentence, yes.

15             THE COURT:  I'll see if it's redundant, if it's

16   already in there, because I'm not going to say it twice.

17             MR. ROSENTHAL:  I do object to the charge in

18   general, but that's --

19             THE COURT:  That will clean it up a little bit.

20             All right.  Next?

21             MR. MINO:  And then instruction number 11, the

22   employee contributory negligence.  I think they should be

23   added in.  The instruction provided touched on contributory

24   negligence slightly, but I think that this particular 11

25   should actually be put in after the explanation of what

CHARLES P. McGUIRE, C.C.R.

1    negligence is, because they are claiming negligence.  PATH

2    is saying, well, he was contributorily negligent.  And I

3    think there needs to be a more full explanation of what that

4    means.

5              THE COURT:  Okay.  I'll take a look at it.

6              Is there any objection to it?

7              MR. ROSENTHAL:  I think you cover in your

8    negligence area -- I mean, contributory negligence is

9    negligence.  I mean, it's just negligence of the Plaintiff

10   versus the --

11             THE COURT:  I'll take a look at it.  There's

12   nothing -- if it's not clear, I'll add it, because there are

13   two forces here:  There's negligence on the part of the

14   Defendant, and there's negligence on the part of the

15   Plaintiff.

16             MR. ROSENTHAL:  Right.  I think I've seen in some

17   of the model charges they use the same language for both,

18   and in that way, you're protecting yourself.

19             THE COURT:  Okay.  I'm going to take a look at it,

20   and I'll let you know tomorrow.  All right?

21             MR. MINO:  All right.  And that was all that PATH

22   would add.

23             THE COURT:  Okay.  Do we have enough copies of

24   this?  I'm going to mark this one that I marked, I'll mark

25   it as Court Exhibit 6, okay, so we have Court Exhibits, so

584

1      we have a list of what your objections were and there's a

2      record of them.   Okay?   And we'll get back to you on that

3      tomorrow.

4              (Court Exhibit 6 marked for identification)

5                   THE COURT:   Let's talk about the verdict sheet.

6                   MR. ROSENTHAL:   I believe that you have -- under

7      the FELA, for both Plaintiff and Defendant, it has to be

8      "caused or contributed, in whole or in part," which is the

9      statutory language.   I would ask for even more stringent

10     language of --

11                  THE COURT:   Let's talk about a question and tell

12     me what you're asking.

13                  MR. ROSENTHAL:   I'm looking at question number one

14     and question number three.

15                  THE COURT:   Okay.

16                  MR. MINO:   Mr. Rosenthal is correct.   FELA

17     45 U.S.C. -- and I'm blanking on the rest, does say, in

18     whole or in part.   I agree that it should match what the

19     statute is.

20                  THE COURT:   So what do you propose?

21                  MR. ROSENTHAL:   Maybe the easiest way to do it

22     would be, Do you find that Defendant PATH was negligent and

23     Defendant PATH's negligence caused and contributed, comma,

24     in whole or in part, comma, to Steven Foder's injury.

25                  And in number three, Do you find that the

CHARLES P. McGUIRE, C.C.R.

1      Plaintiff was also negligent and Plaintiff's negligence

2      caused or contributed, comma, in whole or in part, to his

3      own injuries?

4               THE COURT:  That works for me.  Okay?

5               Anything else?

6               MR. ROSENTHAL:  That's my only objection to the

7      verdict sheet.

8               MR. MINO:  Yes, with respect to the verdict sheet,

9      I would prefer to order it, was PATH negligent, was

10     Plaintiff negligent, then award damages, so sort of flip two

11     and three.

12              THE COURT:  I agree.  Negligence should come

13     first.

14              MR. MINO:  Right.  And then damages.

15              THE COURT:  And then three.

16              MR. MINO:  And quite frankly, I would prefer to

17     break up, was PATH negligent, question two, did that

18     negligence cause or contribute, in whole or in part, and

19     then do the same thing with the Plaintiff's negligence.  So

20     essentially there's six questions.

21              THE COURT:  Say that again.

22              MR. MINO:  So question number one would be, Do you

23     find that Defendant PATH was negligent?  Yes or no.

24     Question two would be, did Defendant PATH's negligence cause

25     or contribute in whole or in part --

1          THE COURT:  Let me just stop you for a minute.

2          The way I have it, then, is done for a reason.  If

3     they say that PATH was not negligent, if the answer to

4     question one is no, PATH was not negligent, the case is

5     over; right?

6          MR. MINO:  Yes.

7          THE COURT:  Okay.  So if you answer no, do not

8     answer questions.

9          Question two.  If they say yes, Do you find that

10    Plaintiff was also negligent and that Plaintiff's negligence

11    caused or contributed, in whole or in part, to his own

12    injuries, then they would say yes.

13         Then question three would become --

14         MR. MINO:  I guess what I'm saying is, there's a

15    scenario at least why they could find, either PATH or

16    Plaintiff, was negligent, did something wrong, didn't pay

17    enough attention, was careless, but also that that

18    carelessness didn't cause or contribute to the injury, which

19    is why I would break up the two sections.

20         THE COURT:  The reason why I didn't do it is

21    because this was taken from a model from one of the

22    circuits, the 7th Circuit model, because I discussed this

23    with Alex about whether we should break up negligence and

24    causation.  It's broken up in the instructions, and if you

25    can find me a model where they break it up, I'll be happy to

```
1    consider it tomorrow.  But the model that I found put it all
2    in one question.
3              MR. MINO:  Sure.
4              THE COURT:  That's the only reason why I did it.
5    I had the same issue.
6              And then I'm not sure we should have that first
7    phrase.  Three would then come without taking into
8    consideration any possible negligence by Plaintiff.
9              MR. ROSENTHAL:  No.
10             THE COURT:  I think that's confusing.
11             MR. ROSENTHAL:  The other issue that I actually,
12   looking at it, ask for is that we break up the -- the lost
13   overtime is clear, but the pain and suffering, his past pain
14   and suffering versus his future pain and suffering, I just
15   want to make sure that --
16             THE COURT:  Let's make sure that's in -- we're not
17   going to break it up into past and future because I don't
18   think there was a clear demarcation line.  In other words,
19   the future is everything after today, right?  So we can say
20   in the charge, and I've got to look back in the charge, do
21   we say in evaluating pain and suffering you should take into
22   consideration everything he has suffered to date as well as
23   what you think he will be reasonably expected to suffer in
24   the future.
25             MR. ROSENTHAL:  If that's dealt with --
```

CHARLES P. McGUIRE, C.C.R.

1            THE COURT:  If that's in there.  You have to tell

2    me.

3            MR. MINO:  It is not.

4            THE COURT:  Okay.

5            MR. MINO:  Or at least it's not under the damage

6    section.

7            "The damage a party suffers means the amount of

8    money that will fairly compensate him for any injuries

9    sustained and is reasonably certain to sustain in the

10   future."

11           MR. ROSENTHAL:  It's in brackets, right.  Are you

12   talking about pain and suffering?

13           THE COURT:  What page are you on?

14           MR. ROSENTHAL:  Twelve?  Is that where you are?

15           THE COURT:  On the Court's instructions?

16           MR. MINO:  Yes.  So if you look right under the

17   third point, damage, the second sentence talks about the

18   parties suffering --

19           THE COURT:  And is reasonably expected to

20   experience in the future.

21           MR. MINO:  Right.

22           MR. ROSENTHAL:  Okay.

23           THE COURT:  So it's in there.

24           So let's go back to the verdict sheet.  So I'll

25   have one and two.

CHARLES P. McGUIRE, C.C.R.

1           Maybe it makes sense to have three, the

2    apportionment, before we get to damages?

3           MR. MINO:  Yes.

4           MR. ROSENTHAL:  Okay.

5           THE COURT:  What percentage of Plaintiff's -- but

6    then I don't know because then we talk about damages caused

7    by the negligence of the expected parties.  If they find

8    that both were negligent, then they have to give the damages

9    -- we may have to apportion it first and then have them go

10   to damages.

11          MR. ROSENTHAL:  Oh, I think apportioning it first.

12          MR. MINO:  Yes, I think we can reword the

13   phrasing.

14          THE COURT:  I'll move the apportionment to three,

15   and then the damage question.  Okay?

16          You know what I think we should do tomorrow?  I'm

17   thinking about it.  We're going to be here on Friday.  We're

18   not going to get a verdict tomorrow.  We have two witnesses.

19   We have to go over these again.  We have summations, and we

20   have to have the jury deliberate.  So maybe to give you guys

21   a little bit of time -- I know Mr. Rosenthal and company are

22   traveling -- why don't we just tomorrow do the two witnesses

23   and break, and send the jury home early?

24          MR. MINO:  Okay.

25          THE COURT:  And then we can have the charge

1    conference after the jury leaves and get them in shape, you

2    guys leave a little bit earlier tomorrow, and then Friday

3    morning, I'll charge, we'll have closing statements, and

4    give it to the jury.

5              MR. MINO:  Okay.

6              MR. ROSENTHAL:  No objection.

7              THE COURT:  Does that make sense?

8              MR. MINO:  Just with respect to Dr. Whitley, what

9    PATH is willing to do is stipulate that her notes will come

10   in, but the PATH Medical file includes stuff that she

11   doesn't -- that's not hers.

12             MR. ROSENTHAL:  What's the exhibit?

13             MR. DiGIULIO:  I know what he means.  The 360

14   report and stuff was in there.

15             MR. MINO:  The 360 report, but also medical

16   records.

17             MR. ROSENTHAL:  He's talking about other medical

18   records.  Yes, I have no objection to that.

19             THE COURT:  So you have a stipulation.

20             MR. MINO:  So, yes, so what PATH will stipulate to

21   is the introduction into evidence of all of Dr. Whitley's

22   notes.

23             MR. ROSENTHAL:  Relating to this incident.

24             MR. MINO:  Relating to this incident, perfect,

25   from the PATH Medical file.

CHARLES P. McGUIRE, C.C.R.

1            THE COURT:  From the PATH Medical file.

2            MR. MINO:  Yes.

3            THE COURT:  So all I need you to do tomorrow is

4    move them into evidence.

5            MR. MINO:  Yes.

6            THE COURT:  If there's no objection, you just move

7    them into evidence.  You don't need a stipulation.  I mean,

8    you say, there's no objection to moving them into evidence.

9            MR. MINO:  Okay.  That's fine.

10           THE COURT:  And then the jury gets them.

11           MR. MINO:  Right.

12           THE COURT:  So I just need to know exactly what

13   documents.  Are they all in one exhibit?

14           MR. MINO:  No, they're not.

15           MR. ROSENTHAL:  He's going to have to fold hem.

16           MR. MINO:  I'll fold them and bring them all

17   tomorrow, copies for everyone.

18           THE COURT:  We'll make it a new exhibit.

19           MR. MINO:  Yes.

20           THE COURT:  And that will be what goes in to the

21   jury.  Okay?

22           So here's the plan.  You do that tomorrow.  We'll

23   come at 9:30.  I would have done 10 if I had known we were

24   going to have a shorter day.  But we'll do both witnesses,

25   we'll have a final charge conference, send you home early,

CHARLES P. McGUIRE, C.C.R.

592

1    and then we'll charge, close, and give it to the jury on

2    Friday.

3                    MR. MINO:  Perfect.

4                    THE COURT:  Okay?

5                    MR. DiGIULIO:  Your Honor, as a matter of

6    housekeeping, we have the --

7                    THE COURT:  Yes, I'll save that forever.

8           (Laughter)

9                    MR. DiGIULIO:  The science project.

10                   THE COURT:  When I retire someday, I'll save it

11   for my retirement party.

12                   MR. DiGIULIO:  I didn't know whether you wanted to

13   mark it in evidence.

14                   THE COURT:  We will.  I'll give it to Amy

15   tomorrow.

16                   Have a safe night.  We'll see you tomorrow at

17   9:30.

18                   Thank you.

19                   MR. MINO:  Thank you, Your Honor.

20                   MR. ROSENTHAL:  Thank you, Your Honor.

21          (Matter adjourned until Thursday, November 17, 2016,

22   commencing at 9:30 a.m.)

23

24

25


                        CHARLES P. McGUIRE, C.C.R.

593

## INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **WITNESSES FOR THE PLAINTIFF:** | | | | | |
| STEVEN FODER | 377 | 404 | 459 | 461 | |
| GEORGE P. WIDAS | 462 | 516 | 533 | 535 | |
| JUSTIN GREISBERG (via videotaped deposition) | 540 | | | | |
| **WITNESSES FOR THE DEFENDANT:** | | | | | |
| SANDRA BOU | 545 | 550 | 553 | 554 | |

| EXHIBITS: | Marked | Received: |
|---|---|---|
| D-B | | 430 |
| P-23A | | 480 |
| P-5A through P-5UU | 480 | 481 |
| P-11 | | 562 |
| Court Exhibits 4 and 5 | 566 | |
| Court Exhibit 6 | 584 | |

594

**$**

**$1,650** [1] - 446:14
**$395** [1] - 517:25
**$5,000** [2] - 403:17, 403:25
**$5,627** [1] - 391:23
**$55** [1] - 391:16
**$598** [1] - 460:14
**$60** [1] - 450:19
**$7,000** [1] - 518:6
**$900** [1] - 459:25

**'**

**'12** [1] - 441:18
**'it** [1] - 578:8
**'might** [1] - 429:5

**1**

**1** [3] - 411:20, 411:21, 546:24
**1,700** [1] - 446:14
**10** [13] - 378:22, 407:4, 414:11, 414:14, 422:24, 437:2, 437:24, 471:6, 503:15, 506:1, 543:14, 565:24, 591:23
**10-minute** [2] - 543:22, 543:25
**100** [1] - 468:10
**11** [16] - 394:25, 444:17, 483:24, 483:25, 561:24, 562:4, 562:5, 562:15, 566:25, 567:16, 567:24, 569:14, 570:1, 572:16, 582:21, 582:24
**110** [1] - 429:3
**12** [6] - 439:19, 457:19, 457:23, 484:23, 484:24, 502:8
**14** [1] - 489:17
**15** [9] - 414:11, 414:12, 414:14, 485:24, 503:15, 506:1, 517:20, 556:25
**17** [9] - 391:17, 391:21, 437:7, 437:16, 437:17, 486:18, 486:20, 572:16, 592:21
**17th** [2] - 390:9, 390:17
**19** [2] - 403:21, 458:21
**1967** [2] - 462:25, 466:25
**1980** [1] - 467:3

**1994** [2] - 467:1, 467:5
**1:25** [1] - 503:24
**1:30** [1] - 503:17
**1st** [3] - 436:25, 437:13, 437:22

**2**

**2,000** [1] - 446:22
**2,300** [1] - 446:22
**20** [3] - 458:25, 478:3, 558:14
**200** [1] - 460:16
**2009** [1] - 396:4
**2011** [35] - 381:5, 394:5, 406:21, 409:19, 411:13, 411:24, 412:14, 413:16, 414:23, 421:8, 423:16, 435:12, 436:25, 437:13, 439:9, 439:22, 440:15, 440:22, 447:25, 448:1, 453:6, 453:11, 454:21, 455:13, 456:16, 456:25, 457:7, 457:10, 474:24, 545:22, 545:24, 546:8, 546:19, 547:17, 554:8
**2012** [4] - 390:9, 441:17, 441:19, 449:5
**2013** [6] - 384:24, 390:14, 441:17, 442:3, 442:6, 442:15
**2014** [10] - 385:4, 385:15, 386:2, 386:19, 387:18, 390:14, 390:17, 443:13, 443:18, 444:5
**2015** [8] - 390:3, 390:17, 392:13, 445:6, 445:14, 475:17, 476:23, 554:17
**2016** [3] - 473:14, 539:16, 592:21
**215** [1] - 383:23
**22** [2] - 446:22, 474:24
**22nd** [23] - 381:5, 394:4, 406:21, 409:19, 411:13, 411:24, 412:14, 413:16, 414:23, 421:8, 423:16, 453:6, 453:11, 456:16, 456:25, 457:7, 457:10, 545:22, 545:24, 546:8, 546:19, 547:17, 554:8
**23,000** [1] - 404:7
**231.13** [1] - 489:17
**231.14** [1] - 560:10
**23A** [6] - 480:3, 480:9,

480:12, 480:13, 482:25, 550:25
**24** [2] - 473:14, 572:18
**24A** [4] - 479:25, 480:1, 485:12, 486:7
**25** [2] - 517:20, 580:15
**25th** [3] - 387:18, 390:17, 439:21
**27** [5] - 483:8, 483:16, 483:21, 483:22
**286** [1] - 383:23
**28th** [4] - 390:14, 435:11, 554:17, 556:14
**29th** [1] - 447:23

**3**

**3** [2] - 378:9, 378:10
**30** [2] - 495:13, 517:20
**31** [1] - 539:16
**33** [6] - 483:1, 483:4, 497:17, 524:18, 524:19, 524:23
**34** [3] - 484:15, 484:17, 484:21
**35** [1] - 484:21
**350** [1] - 521:14
**36** [2] - 467:12, 497:17
**360** [5] - 423:7, 521:15, 523:4, 590:13, 590:15
**37** [4] - 467:12, 468:4, 468:7, 497:17
**38** [1] - 574:16

**4**

**4** [3] - 489:17, 566:15, 566:17
**40** [1] - 463:9
**45** [2] - 506:3, 584:17
**47** [1] - 482:14
**48** [1] - 486:17
**49** [9] - 482:12, 489:17, 560:9, 575:7, 575:12, 577:1, 577:2, 579:24
**4:20** [1] - 542:14
**4:30** [2] - 474:25, 565:17

**5**

**5** [7] - 476:15, 476:16,

477:8, 477:23, 478:19, 566:16, 566:17
**50** [2] - 383:23, 468:10
**51** [1] - 575:7, 575:9, 580:1
**55** [3] - 476:14, 478:5, 479:10
**5678** [1] - 475:1
**596** [1] - 460:15
**5A** [4] - 480:14, 480:24, 481:4, 488:1
**5TT** [1] - 480:24
**5UU** [3] - 480:14, 481:4, 487:11

**6**

**6** [4] - 472:2, 476:23, 583:25, 584:4

**7**

**76** [1] - 580:6
**7th** [3] - 390:14, 577:16, 586:22

**8**

**80** [2] - 401:6, 401:7

**9**

**9** [1] - 435:24
**90** [1] - 490:22
**900** [1] - 449:25
**9:30** [6] - 559:1, 559:21, 564:19, 591:23, 592:17, 592:22

**A**

**a.m** [4] - 455:1, 455:2, 592:22
**able** [26] - 374:1, 382:25, 390:22, 390:23, 391:18, 393:4, 393:9, 393:21, 394:3, 395:12, 396:24, 397:4, 402:3, 418:11, 422:6, 422:22, 425:17, 428:4, 443:2, 452:6, 456:14, 506:8, 507:15, 535:1, 548:7, 563:5
**absolute** [1] - 533:24
**absolutely** [10] - 375:19, 395:16, 411:7,

**418**:22, 455:16, 455:19, 456:4, 516:1, 524:17, 571:12
**acceptable** [1] - 464:2
**acceptance** [2] - 571:3, 577:23
**accepted** [14] - 489:5, 493:15, 498:11, 498:19, 499:23, 500:18, 502:5, 502:22, 511:23, 512:24, 513:13, 514:17, 515:1, 515:8
**access** [1] - 511:17
**accident** [26] - 381:11, 381:12, 381:13, 390:8, 396:4, 409:6, 417:5, 417:8, 421:17, 424:13, 425:24, 426:2, 426:4, 433:4, 433:9, 433:14, 433:17, 433:19, 435:2, 435:3, 435:12, 438:16, 521:15, 521:22, 527:1, 560:16
**accidentally** [1] - 540:6
**according** [5] - 498:12, 501:15, 510:6, 515:14, 516:8
**account** [1] - 381:15
**accredited** [2] - 469:22, 470:9
**accuracy** [1] - 495:15
**accurate** [3] - 371:2, 371:9, 495:14
**accurately** [1] - 425:10
**achieving** [1] - 511:7
**Act** [1] - 463:16
**act** [3] - 577:25, 578:14, 579:4
**acted** [1] - 579:2
**actions** [2] - 511:23, 514:25
**active** [1] - 387:3
**activities** [1] - 429:3
**acts** [3] - 575:15, 576:5
**actual** [8] - 371:8, 372:23, 373:4, 373:12, 382:19, 467:6, 526:10, 554:2
**add** [5] - 482:15, 569:14, 578:1, 583:12, 583:22
**added** [3] - 446:24, 567:15, 582:23
**adding** [1] - 431:23
**addition** [5] - 399:3, 467:3, 467:10, 560:12,

578:7
   **additional** [4] - 535:18, 569:14, 569:18, 569:19
   **additions** [1] - 472:7
   **address** [2] - 500:9, 582:13
   **addressed** [3] - 513:12, 514:16, 577:17
   **addressing** [2] - 510:23, 513:24
   **adhesion** [4] - 493:20, 493:21, 493:22, 494:6
   **adjourn** [1] - 560:22
   **adjourned** [1] - 592:21
   **adjourning** [2] - 507:14, 542:16
   **Administration** [6] - 470:22, 472:10, 489:17, 498:15, 511:10, 520:25
   **admission** [1] - 480:24
   **admitting** [1] - 541:24
   **adversary** [1] - 478:12
   **advise** [1] - 524:5
   **affect** [1] - 553:16
   **affected** [2] - 382:24, 395:20
   **affects** [2] - 553:12
   **affiliations** [1] - 468:11
   **affirm** [2] - 461:21, 544:22
   **affixed** [2] - 376:4, 376:5
   **afford** [2] - 399:15, 448:21
   **afternoon** [4] - 508:12, 508:20, 540:2, 545:13
   **ago** [7] - 373:1, 408:5, 412:2, 440:5, 442:12, 507:18, 549:14
   **agree** [7] - 397:24, 490:4, 542:24, 564:5, 571:7, 584:18, 585:12
   **agreed** [1] - 398:24
   **ahead** [2] - 478:11, 535:20
   **aid** [3] - 503:9, 510:14, 516:2
   **aids** [2] - 486:25, 488:7
   **Alex** [3] - 565:3, 565:8, 586:23
   **aligned** [1] - 493:12
   **alignment** [4] -

379:25, 431:25, 432:1, 456:18
   **alignments** [1] - 499:10
   **alive** [1] - 376:21
   **allergic** [1] - 389:13
   **allow** [13] - 375:24, 376:7, 401:1, 402:13, 415:14, 417:17, 452:23, 454:2, 497:24, 501:21, 537:23, 563:21, 582:9
   **allowed** [1] - 397:21
   **allowing** [1] - 378:3
   **alluded** [1] - 531:8
   **almost** [4] - 388:15, 394:22, 421:1, 428:12
   **amateur** [1] - 374:12
   **American** [8] - 463:16, 467:9, 468:13, 468:14, 468:16, 468:18, 489:19, 509:13
   **amount** [14] - 373:4, 391:15, 398:7, 398:11, 398:12, 398:25, 400:22, 445:25, 450:1, 450:21, 451:18, 455:9, 460:2, 588:7
   **ample** [1] - 507:25
   **Amtrak's** [1] - 570:18
   **Amy** [6] - 479:1, 479:4, 479:17, 480:16, 540:8, 592:14
   **analyses** [3] - 529:9, 533:18
   **analysis** [23] - 462:20, 463:6, 463:13, 464:7, 464:16, 465:6, 467:23, 488:11, 490:16, 490:20, 492:7, 492:8, 498:8, 499:2, 511:5, 514:21, 525:13, 525:15, 525:18, 525:22, 532:11, 533:22
   **analyze** [4] - 471:6, 490:17, 529:3, 529:6
   **analyzed** [2] - 467:11, 472:25
   **angle** [3] - 499:12, 499:21, 502:13
   **angles** [1] - 510:10
   **ankle** [34] - 380:8, 380:11, 380:19, 380:21, 387:11, 387:12, 388:16, 388:24, 392:15, 392:24, 393:3, 393:6, 395:6, 395:10, 395:21, 396:11, 424:8, 425:7, 425:17, 431:7, 432:24, 435:4, 435:13, 437:2, 437:23, 438:19, 439:13, 439:22,

440:9, 442:25, 443:23, 445:14, 445:20, 453:2
   **ANSI's** [1] - 493:10
   **ANSWER** [3] - 557:13, 557:18, 557:25
   **answer** [20] - 392:11, 413:20, 415:3, 418:20, 442:21, 481:16, 488:5, 501:8, 530:3, 530:9, 530:12, 530:14, 535:15, 555:3, 555:4, 556:8, 556:14, 586:3, 586:7, 586:8
   **answer's** [1] - 413:19
   **answered** [3] - 473:9, 473:10, 530:16
   **answers** [8] - 473:8, 473:9, 473:24, 474:15, 539:14, 539:23, 557:6, 563:22
   **anthropometric** [3] - 491:16, 491:17, 491:21
   **anti** [44] - 371:21, 371:22, 371:24, 372:5, 372:6, 372:21, 373:10, 373:15, 373:16, 374:9, 375:24, 418:5, 421:18, 421:23, 431:19, 438:21, 457:1, 485:18, 485:19, 485:21, 485:24, 486:6, 496:10, 509:19, 515:13, 515:16, 515:20, 521:5, 521:6, 521:10, 521:25, 522:7, 522:13, 527:14, 527:19, 528:3, 535:16, 547:25, 548:6, 548:8, 548:14, 552:9, 552:10, 560:14
   **anti-climber** [39] - 371:21, 371:22, 371:24, 372:5, 372:6, 372:21, 373:10, 373:15, 373:16, 374:9, 375:24, 418:5, 431:19, 438:21, 457:1, 485:18, 485:19, 485:21, 485:24, 486:6, 496:10, 509:19, 515:13, 515:20, 521:6, 521:10, 521:25, 522:7, 522:13, 527:14, 527:19, 528:3, 547:25, 548:6, 548:8, 548:14, 552:9, 552:10, 560:14
   **anti-slip** [5] - 421:18, 421:23, 515:16, 521:5, 535:16
   **anyway** [2] - 420:12, 520:9
   **apart** [2] - 399:13, 462:22
   **apologies** [1] -

524:22
   **apologize** [2] - 378:15, 506:9
   **appear** [1] - 476:22
   **appearances** [1] - 471:10
   **appellate** [1] - 378:3
   **appliances** [4] - 572:4, 573:25, 581:18, 581:20
   **applicable** [5] - 427:15, 427:18, 427:24, 500:14, 516:9
   **application** [6] - 466:10, 466:18, 511:14, 511:21, 512:23, 514:24
   **applications** [2] - 469:1, 470:11
   **applied** [1] - 492:5
   **applies** [1] - 519:12
   **apply** [2] - 489:3, 500:7, 560:9
   **appointment** [1] - 379:9
   **apportion** [1] - 589:9
   **apportioning** [1] - 589:11
   **apportionment** [2] - 589:2, 589:14
   **appreciate** [3] - 457:20, 538:24, 559:6
   **appreciated** [2] - 559:8, 559:9
   **apprised** [1] - 570:8
   **approach** [8] - 430:2, 434:9, 435:22, 437:5, 439:17, 444:18, 471:20, 567:11
   **approached** [2] - 475:4, 512:6
   **approaching** [1] - 475:15
   **appropriate** [1] - 574:25
   **approximate** [2] - 408:6, 408:7
   **April** [8] - 385:3, 385:15, 386:1, 386:19, 390:3, 390:14, 390:17, 392:13
   **arbitrary** [1] - 519:23
   **area** [23] - 371:23, 371:25, 374:10, 413:10, 413:17, 435:1, 457:11, 475:19, 476:1, 487:25, 512:15, 528:25, 529:7, 532:25, 533:3, 537:19, 552:17, 552:19, 552:23, 553:3, 554:7, 579:15, 583:8

**areas** [1] - 532:18
   **argue** [4] - 400:14, 401:4, 556:13, 576:17
   **arguing** [2] - 537:17, 537:18
   **argument** [1] - 576:20
   **arise** [1] - 575:15
   **arm** [1] - 501:1
   **arms** [1] - 491:20
   **articles** [3] - 488:14, 498:10, 509:11
   **aside** [2] - 399:3, 402:11
   **aspect** [1] - 513:12
   **aspects** [4] - 488:15, 513:8, 513:24, 514:16
   **asperities** [8] - 494:5, 494:6, 526:16, 536:1, 536:4, 536:5, 536:6, 536:10
   **assert** [1] - 400:7
   **assess** [1] - 512:5
   **assessment** [4] - 463:13, 464:10, 464:17, 511:5
   **assigned** [3] - 454:15, 454:17, 454:22
   **assignment** [3] - 472:13, 475:2, 546:3
   **associated** [2] - 500:11, 534:25
   **Association** [1] - 489:20
   **assume** [4] - 391:5, 481:22, 576:12, 578:12
   **assumed** [2] - 578:9, 579:9
   **assuming** [2] - 407:7, 523:11
   **assumption** [15] - 415:10, 522:21, 528:14, 575:10, 575:22, 576:1, 576:2, 576:23, 577:15, 577:18, 577:20, 577:22, 578:3, 578:11, 580:3
   **assumptions** [3] - 521:12, 523:17, 523:19
   **assure** [1] - 514:13
   **Astagne** [1] - 473:12
   **ASTM** [2] - 470:18, 509:13
   **ASTM's** [1] - 493:10
   **asymmetrical** [15] - 491:2, 492:9, 492:15, 493:1, 493:4, 499:16, 500:20, 501:4, 501:6, 501:12, 501:18, 513:8, 525:2, 533:23, 534:14
   **attached** [3] - 381:24, 476:19, 478:3

**attempted** [1] - 443:9
**attempting** [1] - 511:17
**attention** [8] - 434:16, 437:9, 464:14, 522:12, 528:5, 559:3, 559:8, 586:17
**attentive** [1] - 559:4
**attorney** [1] - 517:19
**attorneys** [1] - 517:16
**attribute** [1] - 381:4
**August** [6] - 436:25, 437:13, 437:22, 439:21, 554:17, 556:14
**Augustine** [1] - 473:13
**authenticate** [3] - 541:22, 563:6, 564:2
**authenticated** [1] - 541:7
**authoritative** [5] - 472:24, 473:20, 489:5, 493:15, 499:1
**authorities** [1] - 491:17
**Authority** [2] - 394:22, 507:25
**automatic** [4] - 412:8, 415:8, 475:25, 512:14
**Automotive** [3] - 468:15, 489:24, 509:11
**available** [13] - 466:18, 486:13, 491:24, 492:2, 492:17, 493:9, 496:16, 500:17, 502:4, 502:21, 525:1, 526:9
**averaged** [2] - 453:18, 453:20
**averaging** [1] - 454:3
**avoid** [1] - 533:4
**Avril** [8] - 404:17, 405:5, 417:14, 454:6, 473:12, 497:1, 528:19, 550:24
**Avril's** [1] - 406:5
**award** [3] - 399:23, 469:1, 585:10
**aware** [4] - 457:5, 527:3, 532:13, 549:2
**awkward** [1] - 374:4

## B

**B-o-u** [1] - 545:8
**Bachelor** [1] - 463:3
**backward** [1] - 523:5
**bad** [5] - 379:21, 379:23, 384:1, 389:23, 397:1, 435:16, 537:15,

550:5, 564:7
**bag** [1] - 409:25
**balance** [1] - 401:23
**ballast** [6] - 412:18, 415:2, 482:10, 483:7, 546:21, 552:24
**bank** [1] - 381:14
**bar** [19] - 375:7, 375:9, 375:11, 375:18, 376:4, 417:20, 432:1, 438:21, 484:11, 484:25, 485:2, 527:14, 527:19, 528:3, 534:17, 535:5, 537:8, 537:10, 539:6
**bare** [1] - 534:4
**barely** [2] - 382:6, 386:13, 443:10
**bars** [11] - 419:12, 432:25, 456:18, 500:17, 510:1, 524:19, 525:1, 526:8, 526:11, 534:14, 537:24
**based** [23] - 411:5, 418:20, 432:14, 440:7, 468:25, 475:12, 481:11, 509:7, 509:8, 511:13, 511:14, 511:20, 512:22, 512:23, 513:11, 514:15, 514:23, 516:11, 521:24, 522:1, 524:5
**basic** [1] - 490:3
**basis** [5] - 462:15, 473:25, 476:2, 513:18, 576:9
**bathroom** [3] - 379:8, 542:20, 544:1
**beams** [1] - 465:14
**bear** [2] - 444:14, 479:20
**bearing** [1] - 524:7
**bears** [2] - 374:21, 375:19
**became** [1] - 409:16
**become** [3] - 533:22, 549:2, 586:13
**bedridden** [3] - 377:17, 378:21, 379:2
**began** [1] - 378:23
**begin** [2] - 377:5, 547:12
**beginning** [6] - 372:25, 405:17, 407:15, 408:1, 428:6, 537:12
**begun** [1] - 492:4
**behalf** [3] - 377:3, 462:1, 545:3, 559:6
**behavior** [1] - 539:21
**below** [2] - 428:9, 535:6
**benefits** [8] - 394:9,

397:22, 398:10, 398:19, 399:5, 399:18, 400:1, 460:11
**Berberian** [11] - 439:5, 439:21, 440:9, 440:17, 440:23, 441:4, 441:9, 441:12, 441:13, 441:19, 543:8
**best** [9] - 386:24, 392:23, 395:24, 455:6, 478:1, 481:16, 493:22, 581:12, 581:17
**Beta** [1] - 463:3
**better** [9] - 385:18, 387:3, 429:6, 435:13, 435:19, 436:22, 439:11, 483:20, 574:2
**between** [9] - 382:17, 382:19, 407:21, 410:19, 422:17, 468:10, 517:20, 576:23, 577:20
**beyond** [7] - 475:7, 486:25, 488:7, 517:8, 531:10, 537:22, 538:6
**bible** [2] - 461:25, 545:2
**big** [6] - 371:14, 383:21, 388:21, 466:6, 477:18, 477:21
**bigger** [1] - 501:1
**biggest** [1] - 408:14
**bike** [4] - 396:1, 396:6, 396:11, 396:13
**bills** [2] - 448:21, 450:11
**biology** [1] - 463:7
**biomechanics** [9] - 463:12, 465:11, 465:12, 465:19, 491:16, 500:23, 502:15, 509:9, 536:19
**birthday** [1] - 456:7
**bit** [17] - 378:19, 407:8, 410:11, 419:9, 435:25, 438:18, 439:24, 440:4, 443:14, 453:15, 505:5, 558:12, 564:13, 577:4, 582:19, 589:21, 590:2
**blanking** [1] - 584:17
**BLE** [1] - 384:10
**blows** [1] - 393:6
**blowup** [1] - 371:15
**blue** [1] - 518:24
**board** [6] - 469:17, 470:1, 470:2, 470:10, 470:12, 470:13
**Board** [14] - 397:22, 398:13, 398:16, 399:6, 399:11, 400:2, 402:2, 402:4, 403:11, 450:15,

451:1, 451:8, 452:3, 470:15
**Board's** [1] - 398:10
**body** [10] - 379:24, 380:2, 392:7, 420:11, 424:8, 425:10, 431:7, 465:12, 491:19, 499:17
**bolting** [1] - 395:17
**bone** [3] - 388:13, 444:8
**bones** [2] - 388:14, 465:13
**book** [9] - 409:12, 409:13, 409:17, 409:20, 511:10, 514:10, 561:15, 561:24, 567:6
**books** [7] - 472:24, 477:18, 477:22, 478:7, 561:21, 561:22, 567:3
**boot** [7] - 378:24, 379:12, 383:2, 389:18, 438:17, 439:23
**booth** [1] - 411:16
**borderline** [1] - 542:10
**bore** [1] - 541:10
**born** [1] - 447:22
**bottle** [1] - 383:1
**bottom** [14] - 371:25, 430:16, 434:5, 434:22, 475:11, 482:11, 484:9, 484:17, 484:18, 484:19, 485:23, 486:17, 493:24, 494:8
**Bou** [7] - 473:11, 544:20, 544:21, 545:7, 545:13, 548:24, 550:15
**bought** [2] - 382:6, 382:7
**box** [4] - 373:15, 432:9, 433:5, 481:19
**boxed** [1] - 394:25
**boxes** [1] - 427:14
**boxing..** [1] - 395:25
**boys** [1] - 383:24
**brace** [5] - 422:20, 422:21, 422:22, 423:1, 445:20
**brackets** [1] - 588:11
**brain** [2] - 465:15, 465:18
**brake** [1] - 553:13
**brakes** [2] - 553:12, 553:15
**break** [27] - 371:11, 457:19, 457:21, 458:3, 479:6, 503:17, 503:18, 503:24, 507:8, 508:12, 508:19, 508:20, 540:1, 540:3, 542:20, 543:13,

543:22, 543:25, 544:3, 565:3, 585:17, 586:19, 586:23, 586:25, 587:12, 587:17, 589:23
**breakdown** [1] - 408:19
**breakdowns** [2] - 408:14, 409:11
**breast** [1] - 394:12
**brief** [2] - 508:12, 540:1
**briefly** [2] - 397:14, 533:15
**bring** [14] - 384:5, 386:16, 399:21, 458:11, 477:13, 482:23, 505:4, 505:18, 508:13, 563:6, 563:17, 566:5, 574:10, 591:16
**bringing** [1] - 460:13
**bristles** [2] - 493:24, 493:25, 494:10, 494:13, 494:14
**broken** [1] - 586:24
**Brotherhood** [1] - 384:12
**brought** [3] - 375:23, 379:19, 518:25
**brushes** [1] - 494:10
**buddy** [1] - 411:11
**build** [3] - 386:22, 443:22, 462:21
**building** [1] - 466:1
**built** [1] - 465:25
**bulk** [1] - 409:2
**bulldozers** [1] - 490:1
**bunch** [2] - 372:1, 374:11
**bus** [1] - 394:20
**business** [1] - 542:9
**but..** [2] - 451:13, 461:13, 532:15
**buy** [2] - 446:12, 446:23
**BY** [22] - 377:9, 378:17, 404:13, 459:10, 461:5, 462:8, 474:14, 480:18, 487:17, 489:12, 496:6, 498:5, 508:23, 516:15, 532:3, 533:17, 535:22, 545:12, 550:14, 553:23, 554:12, 557:5

## C

**C.F.R** [4] - 489:17, 519:6, 560:8, 560:10
**C.F.R.'s** [1] - 493:10
**C.F.R.s** [2] - 574:19,

574:21
   **cable** [1] - 446:18
   **calibrated** [1] - 495:14
   **calibration** [1] - 495:9
   **cam** [3] - 438:17, 439:23, 444:15
   **cancer** [1] - 394:12
   **cannot** [1] - 505:15
   **captain** [1] - 394:23
   **car** [75] - 376:5, 386:14, 386:24, 446:23, 465:22, 466:1, 466:15, 466:16, 468:3, 472:21, 474:25, 475:1, 475:5, 475:16, 476:6, 476:24, 477:2, 477:5, 481:8, 481:12, 481:14, 482:8, 482:9, 482:12, 482:17, 483:1, 483:4, 483:19, 484:6, 484:10, 485:7, 486:12, 486:23, 486:24, 487:1, 488:8, 494:19, 500:3, 500:5, 500:6, 500:7, 500:12, 502:2, 502:4, 502:11, 502:21, 503:2, 503:5, 509:2, 509:4, 509:22, 509:24, 510:17, 510:20, 511:17, 512:7, 516:4, 516:5, 520:11, 520:12, 520:14, 526:25, 527:1, 527:3, 527:6, 534:25, 535:15, 547:10, 547:13, 547:18, 570:12, 571:2, 573:10, 573:21
   **card** [1] - 500:17
   **care** [2] - 512:25, 516:10
   **career** [2] - 468:12, 469:18
   **careful** [4] - 483:12, 514:22, 530:15, 579:14
   **careless** [3] - 577:25, 579:4, 586:17
   **carelessly** [2] - 578:14, 579:2
   **carelessness** [1] - 586:18
   **Carolina** [1] - 470:4
   **carried** [2] - 421:20, 422:14
   **carry** [6] - 383:1, 397:2, 409:25, 410:1, 507:19, 508:5
   **carrying** [2] - 415:22, 507:23
   **cars** [7] - 485:16, 498:17, 510:22, 520:19, 520:25, 571:4, 574:2

**case** [51] - 372:4, 380:15, 402:23, 462:15, 463:2, 463:5, 465:5, 465:20, 466:5, 466:13, 466:19, 472:13, 472:18, 488:12, 491:15, 492:19, 497:21, 497:23, 498:2, 499:2, 499:24, 507:20, 508:2, 508:6, 508:8, 508:21, 509:19, 511:1, 511:15, 511:21, 512:24, 514:3, 514:24, 517:16, 518:22, 537:17, 539:3, 559:15, 560:4, 560:6, 560:19, 561:2, 571:7, 573:20, 573:23, 574:25, 578:6, 578:16, 579:21, 586:4
   **case-by-case** [1] - 462:15
   **cases** [6] - 397:23, 456:1, 471:6, 568:23, 572:25, 574:14
   **cash** [1] - 400:19
   **cast** [4] - 378:23, 440:1, 440:14, 442:20
   **CAT** [1] - 388:6
   **caught** [3] - 423:25, 494:11, 528:3
   **causation** [1] - 586:24
   **caused** [9] - 380:21, 424:18, 434:6, 434:23, 584:8, 584:23, 585:2, 586:11, 589:6
   **causing** [1] - 425:25
   **caveat** [1] - 579:8
   **cent** [1] - 391:15
   **Center** [1] - 546:5
   **center** [5] - 421:3, 421:5, 491:1, 491:11, 502:8
   **centered** [2] - 491:10, 509:16
   **certain** [9] - 387:8, 399:5, 402:1, 435:14, 435:19, 446:2, 455:25, 532:18, 588:9
   **certainly** [6] - 373:10, 373:25, 535:2, 560:23, 560:24, 560:25
   **certainty** [2] - 474:6, 515:17
   **certification** [1] - 470:16
   **certifications** [1] - 469:17
   **certified** [12] - 407:14, 463:18, 469:19, 469:20, 470:2, 470:6, 470:13,

472:12, 495:8, 495:14
   **Certified** [1] - 470:15
   **chain** [1] - 571:15
   **chairperson** [2] - 469:6, 469:14
   **challenges** [1] - 394:8
   **challenging** [1] - 395:6
   **chance** [3] - 426:12, 426:15, 426:23
   **change** [4] - 392:14, 410:24, 460:17, 579:12
   **changed** [2] - 381:6, 381:10, 453:9
   **changes** [2] - 380:21, 381:4
   **changing** [1] - 537:11
   **characteristics** [2] - 481:13, 513:4
   **charge** [25] - 469:25, 507:7, 507:9, 507:10, 558:18, 558:19, 558:20, 558:21, 565:7, 566:2, 567:23, 567:25, 569:1, 570:3, 580:3, 580:24, 581:23, 582:17, 587:20, 589:25, 590:3, 591:25, 592:1
   **charges** [1] - 583:17
   **charity** [2] - 394:11
   **chase** [1] - 383:15
   **chasing** [1] - 397:7
   **cheapest** [1] - 450:12
   **check** [5] - 428:6, 428:13, 450:17, 450:19, 451:17
   **checked** [2] - 403:8, 427:17
   **chemical** [1] - 529:9
   **chief** [2] - 437:10, 550:24
   **child** [1] - 447:21
   **chiropractor** [1] - 379:23
   **choice** [1] - 448:14
   **choose** [1] - 453:1
   **chooses** [1] - 578:5
   **chose** [1] - 521:21
   **circuit** [2] - 565:8, 577:17
   **Circuit** [3] - 565:9, 577:16, 586:22
   **circuits** [1] - 586:22
   **circumstance** [1] - 451:6
   **circumstances** [4] - 406:8, 428:24, 497:25, 509:18
   **citations** [1] - 498:16

**cite** [2] - 573:1, 573:4
   **cited** [6] - 501:16, 509:12, 513:15, 514:19, 560:9, 573:4
   **city** [1] - 394:8
   **Civil** [1] - 468:14
   **civil** [1] - 463:4
   **claim** [1] - 451:10
   **claiming** [1] - 583:1
   **claims** [2] - 371:16, 574:17
   **clarification** [1] - 398:3
   **class** [3] - 407:15, 407:21, 407:23
   **classroom** [5] - 407:3, 407:25, 408:9, 408:13, 409:9
   **clean** [2] - 381:23, 582:19
   **clear** [10] - 400:21, 418:1, 448:18, 478:21, 517:2, 552:1, 577:9, 583:12, 587:13, 587:18
   **cleared** [2] - 385:16, 385:20
   **clearly** [1] - 573:12
   **CLERK** [17] - 376:16, 458:1, 458:10, 459:1, 461:24, 462:4, 480:17, 504:2, 505:3, 508:14, 544:5, 544:9, 545:1, 545:5, 559:23, 565:9, 566:8
   **climatology** [1] - 463:7
   **climb** [85] - 371:5, 371:10, 405:21, 428:3, 456:20, 465:7, 465:8, 465:9, 465:10, 465:22, 467:16, 473:22, 481:18, 486:14, 488:15, 488:16, 488:18, 488:20, 488:22, 489:14, 489:21, 489:23, 489:25, 490:2, 490:5, 490:18, 491:9, 491:12, 492:1, 493:6, 499:4, 499:5, 499:11, 500:2, 500:6, 500:16, 501:17, 502:3, 502:9, 503:2, 503:5, 503:9, 509:1, 509:4, 509:12, 509:13, 509:15, 509:18, 509:21, 509:23, 510:24, 512:4, 512:16, 513:3, 513:5, 513:6, 514:12, 515:9, 515:22, 515:25, 516:4, 516:10, 520:10, 520:12, 520:14, 524:20, 525:3, 525:6, 532:4, 532:7,

535:10, 536:11, 537:4, 547:12, 547:14, 547:19, 548:2, 548:17, 548:20, 550:23, 551:25, 578:13, 578:14
   **climbed** [8] - 406:22, 421:8, 457:6, 475:5, 475:16, 537:5, 547:18, 548:20
   **climber** [39] - 371:21, 371:22, 371:24, 372:5, 372:6, 372:21, 373:10, 373:15, 373:16, 374:9, 375:24, 418:5, 431:19, 438:21, 457:1, 485:18, 485:19, 485:21, 485:24, 486:6, 496:10, 509:19, 515:13, 515:20, 521:6, 521:10, 521:25, 522:7, 522:13, 527:14, 527:19, 528:3, 547:25, 548:6, 548:8, 548:14, 552:9, 552:10, 560:14
   **climbing** [17] - 419:16, 424:6, 424:8, 431:5, 466:7, 466:15, 467:14, 486:25, 488:7, 489:1, 500:11, 510:14, 510:21, 516:2, 548:3, 551:23, 578:15
   **climbs** [2] - 490:2, 490:4
   **close** [2] - 415:5, 425:7, 429:5, 556:2, 592:1
   **closely** [1] - 374:15
   **closest** [4] - 500:12, 519:22, 519:24, 520:1
   **closing** [5] - 507:10, 558:18, 558:22, 566:3, 590:3
   **closings** [3] - 565:19, 565:24, 565:25
   **coating** [1] - 534:9
   **code** [2] - 463:15, 463:16
   **Code** [1] - 468:18
   **codes** [4] - 472:23, 473:20, 488:13, 498:9
   **cognitive** [2] - 463:12, 465:16
   **cold** [2] - 382:4, 382:5
   **collect** [2] - 451:12, 452:7
   **collecting** [6] - 450:8, 450:14, 450:25, 451:7, 451:15, 451:24
   **college** [2] - 463:8, 470:9
   **coming** [13] - 376:23,

598

401:4, 420:25, 426:15, 447:5, 452:5, 460:8, 460:19, 491:15, 507:15, 542:23, 544:11, 564:21

**comma** [3] - 584:23, 584:24, 585:2

**commencing** [1] - 592:22

**comments** [1] - 566:18

**committee** [2] - 578:3, 578:7

**committees** [2] - 467:8, 469:10

**common** [3] - 415:9, 427:19, 553:18

**communicate** [1] - 564:5

**company** [1] - 589:21

**compare** [3] - 500:18, 502:5, 502:22

**compared** [2] - 511:23, 515:1

**comparing** [3] - 500:15, 502:1, 502:19

**compensable** [2] - 401:21, 401:22

**compensate** [3] - 380:1, 392:19, 588:8

**Compensation** [1] - 402:25

**complaining** [2] - 410:20, 410:25

**complaint** [2] - 437:10, 565:5

**complaints** [1] - 473:4

**complete** [3] - 469:22, 522:18, 522:21

**completely** [1] - 413:3

**compliance** [3] - 463:16, 463:17, 517:7

**compliances** [1] - 463:15

**complicated** [3] - 371:13, 454:25, 455:4

**complicates** [1] - 499:18

**complied** [2] - 560:7, 574:21

**comply** [1] - 516:24

**component** [3] - 481:17, 491:3, 491:7

**components** [2] - 499:6, 501:18

**compound** [1] - 492:19

**comprehensive** [2] - 469:23, 470:10

**computer** [1] - 465:16

**concentric** [6] - 490:6, 491:10, 499:5, 499:21, 501:16, 519:14

**concern** [1] - 413:24

**concerned** [4] - 372:2, 372:12, 470:24, 513:1

**conclude** [1] - 524:19

**conclusion** [1] - 453:23

**conclusions** [7] - 488:11, 491:15, 497:12, 497:17, 498:3, 531:8, 531:19

**condition** [12] - 410:8, 410:13, 413:9, 427:4, 475:22, 487:25, 502:4, 502:21, 528:12, 577:23, 578:1, 579:5

**conditions** [22] - 410:5, 424:20, 456:23, 457:4, 457:14, 464:20, 473:18, 494:23, 494:25, 495:1, 495:2, 513:5, 515:10, 515:11, 526:20, 530:17, 553:16, 572:4, 582:6, 582:8, 582:10, 582:12

**conductor** [6] - 410:8, 410:9, 545:19, 545:20, 545:23, 548:16

**conductor's** [1] - 415:17

**conference** [3] - 539:6, 590:1, 591:25

**configuration** [1] - 513:6

**confirmed** [1] - 403:18

**conform** [1] - 500:19

**confuse** [1] - 402:13

**confused** [4] - 372:11, 520:3, 537:14, 571:22

**confusing** [3] - 402:19, 572:7, 587:10

**confusion** [3] - 403:1, 571:20, 571:23

**connectors** [1] - 465:15

**consequences** [1] - 464:15

**consider** [13] - 401:9, 401:13, 401:14, 401:18, 402:21, 402:22, 410:7, 413:23, 517:8, 567:22, 568:12, 568:13, 587:1

**consideration** [3] - 402:22, 587:8, 587:22

**considerations** [1] - 539:19

**considered** [1] - 511:7

**consistent** [5] - 375:13, 475:23, 523:2, 523:5, 556:9

**constantly** [1] - 393:19

**consulting** [4] - 462:12, 462:13, 462:23, 467:4

**contact** [4] - 465:10, 502:25, 509:15, 510:12

**contacting** [1] - 382:10

**contaminant** [5] - 527:8, 527:16, 527:21, 527:22, 528:20

**contaminants** [1] - 528:8

**contaminated** [2] - 494:18, 528:12

**contaminated/ lubricated** [1] - 526:20

**contamination** [3] - 476:2, 528:15, 528:20

**context** [1] - 556:19

**continue** [2] - 376:23, 385:20, 508:22

**CONTINUED** [1] - 377:8

**continuing** [2] - 463:8, 572:1

**contorting** [1] - 502:25

**contortionist** [2] - 536:24, 537:2

**contortions** [1] - 510:11

**contract** [1] - 472:11

**contribute** [4] - 576:16, 585:18, 585:25, 586:18

**contributed** [4] - 584:8, 584:23, 585:2, 586:11

**contributorily** [2] - 576:6, 583:2

**contributory** [9] - 575:14, 576:16, 576:23, 577:5, 577:21, 577:24, 582:22, 582:23, 583:8

**control** [2] - 475:3, 515:15

**controls** [1] - 532:23

**conventional** [2] - 493:6, 500:6

**conversation** [4] - 413:5, 413:14, 413:21,

442:13

**cookies** [1] - 544:2

**copies** [2] - 583:23, 591:17

**cops** [2] - 394:19, 394:22

**copy** [4] - 434:14, 541:15, 541:23, 566:11, 567:1, 567:2, 567:8, 568:17, 579:20

**corner** [3] - 482:25, 483:4, 483:23

**corners** [2] - 496:2, 497:6

**correct** [91] - 377:11, 384:24, 390:7, 391:18, 391:19, 391:21, 404:1, 404:19, 410:6, 411:17, 415:7, 421:15, 422:19, 424:11, 424:25, 426:6, 427:16, 428:25, 429:7, 429:14, 429:15, 429:17, 429:19, 429:21, 429:25, 431:15, 432:21, 436:13, 439:6, 441:10, 442:2, 442:4, 446:3, 448:7, 449:10, 451:20, 452:1, 452:8, 452:12, 458:16, 516:16, 516:22, 517:4, 517:5, 517:7, 517:14, 517:18, 517:23, 518:3, 518:18, 518:23, 519:1, 519:10, 519:18, 520:7, 521:1, 521:3, 521:6, 521:7, 521:22, 521:23, 522:9, 523:13, 523:24, 524:2, 524:11, 524:14, 524:25, 525:4, 525:23, 529:14, 529:17, 529:19, 532:12, 532:19, 533:8, 533:13, 534:11, 535:7, 535:25, 536:7, 536:8, 536:12, 537:17, 538:5, 538:8, 541:15, 541:23, 542:7, 562:9, 584:16

**correctly** [2] - 404:22, 406:12

**couch** [1] - 379:10

**Council** [2] - 468:17, 468:18

**counsel** [10] - 372:25, 377:20, 399:14, 505:14, 506:23, 508:1, 533:18, 534:23, 541:7, 541:9

**count** [3] - 445:15, 558:25, 565:5

**couple** [17] - 371:8, 384:1, 407:5, 407:6, 433:19, 436:19, 444:1, 450:6, 453:11, 455:14,

458:13, 459:11, 525:25, 550:15, 559:2, 561:6, 565:4

**coupling** [1] - 408:18

**course** [10] - 381:20, 394:12, 420:10, 420:14, 421:2, 520:10, 533:9, 542:9, 555:20, 557:20

**courses** [2] - 394:9, 394:16, 463:5, 463:9

**court** [8] - 378:14, 404:10, 471:4, 471:7, 479:19, 532:2, 543:23, 557:4

**COURT** [364] - 371:12, 372:8, 372:17, 372:24, 373:6, 373:18, 373:24, 374:18, 375:8, 376:10, 376:14, 376:16, 376:18, 377:6, 377:19, 377:25, 378:6, 378:10, 378:15, 397:11, 397:15, 397:17, 397:24, 398:2, 398:6, 398:12, 398:15, 398:22, 398:24, 399:7, 399:10, 399:12, 399:19, 399:21, 400:2, 400:6, 400:12, 400:25, 401:11, 402:6, 402:18, 403:2, 403:10, 403:12, 403:14, 403:24, 404:3, 404:8, 404:11, 415:14, 417:17, 430:3, 430:23, 434:10, 434:13, 435:23, 437:6, 437:8, 437:12, 437:15, 437:17, 439:18, 439:20, 444:19, 453:24, 454:2, 457:18, 458:1, 458:3, 458:10, 458:11, 458:15, 458:19, 459:1, 459:4, 461:2, 461:15, 461:18, 461:20, 461:23, 461:24, 462:4, 471:17, 471:21, 471:25, 474:4, 474:8, 474:12, 476:19, 477:9, 477:13, 477:15, 478:6, 478:10, 478:18, 478:25, 479:14, 479:20, 480:1, 480:4, 480:9, 480:12, 480:16, 480:17, 480:25, 481:6, 481:16, 481:21, 481:25, 482:4, 482:22, 482:24, 483:11, 487:2, 487:8, 487:12, 487:16, 488:2, 488:4, 489:6, 490:12, 495:3, 496:1, 496:5, 496:20, 496:25, 497:2, 497:5, 497:14, 497:20, 501:7, 503:13, 503:16, 504:2, 504:4, 504:9,

505:3, 505:8, 505:12,
505:17, 505:24, 506:2,
506:4, 506:7, 506:12,
506:16, 506:20, 506:25,
507:3, 507:7, 507:13,
507:23, 508:11, 508:14,
508:16, 513:20, 516:13,
530:6, 530:13, 530:19,
530:21, 530:24, 531:5,
531:25, 534:13, 534:19,
534:23, 535:4, 535:8,
535:13, 535:17, 535:20,
537:23, 538:10, 538:12,
538:14, 538:17, 538:19,
539:4, 539:7, 540:7,
540:13, 540:17, 540:21,
540:23, 541:13, 541:18,
541:21, 541:24, 542:2,
542:5, 542:12, 542:14,
542:24, 543:2, 543:5,
543:11, 543:17, 543:21,
543:24, 544:5, 544:9,
544:11, 544:16, 544:21,
544:24, 545:1, 545:5,
545:9, 546:12, 546:15,
550:1, 550:6, 550:9,
550:12, 551:8, 551:11,
551:17, 552:15, 554:14,
555:1, 555:9, 555:11,
556:2, 556:7, 556:12,
556:18, 556:22, 557:3,
558:4, 558:7, 558:9,
558:11, 559:19, 559:23,
559:25, 560:20, 561:5,
561:11, 561:15, 561:20,
562:1, 562:4, 562:6,
562:9, 562:11, 562:14,
562:19, 563:1, 563:8,
563:12, 563:15, 563:19,
563:24, 564:8, 564:10,
564:14, 564:17, 565:1,
565:7, 565:11, 566:8,
566:11, 566:14, 566:18,
566:24, 567:1, 567:3,
567:5, 567:9, 567:12,
567:14, 567:18, 568:2,
568:5, 568:8, 568:16,
568:22, 569:3, 569:7,
569:10, 569:18, 569:20,
569:24, 570:3, 570:5,
570:10, 570:13, 570:17,
570:21, 570:23, 570:25,
571:6, 571:13, 571:23,
572:14, 572:21, 573:1,
573:11, 574:12, 574:20,
574:24, 575:3, 575:6,
575:9, 575:12, 576:4,
576:25, 577:8, 577:12,
579:12, 579:24, 580:4,
580:7, 580:14, 580:20,
580:23, 581:1, 581:4,

581:8, 581:14, 582:5,
582:8, 582:15, 582:19,
583:5, 583:11, 583:19,
583:23, 584:5, 584:11,
584:15, 584:20, 585:4,
585:12, 585:15, 585:21,
586:1, 586:7, 586:20,
587:4, 587:10, 587:16,
588:1, 588:4, 588:13,
588:15, 588:19, 588:23,
589:5, 589:14, 589:25,
590:7, 590:19, 591:1,
591:3, 591:6, 591:10,
591:12, 591:18, 591:20,
592:4, 592:7, 592:10,
592:14
   **Court** [16] - 376:22,
378:2, 378:8, 378:10,
505:9, 539:13, 551:17,
564:1, 566:15, 566:16,
566:17, 567:25, 578:5,
583:25, 584:4
   **Court's** [3] - 478:20,
479:8, 588:15
   **courtesy** [2] - 538:24,
539:2
   **courtroom** [4] -
475:24, 482:18, 517:11,
517:13
   **courts** [1] - 471:8
   **cousins** [1] - 383:14
   **cover** [3] - 380:13,
567:7, 583:7
   **covered** [2] - 404:24,
580:2
   **covers** [1] - 506:23
   **coworker** [1] - 429:2
   **crack** [1] - 392:25
   **craft** [1] - 452:23
   **crafted** [4] - 565:13,
568:25, 569:1, 569:11
   **cranes** [1] - 490:1
   **crashing** [1] - 396:11
   **create** [5] - 466:1,
494:7, 499:3, 578:4,
579:4
   **created** [6] - 382:18,
575:17, 575:18, 575:19,
578:2, 579:6
   **creates** [3] - 375:13,
375:15, 493:21
   **creating** [1] - 375:21
   **credit** [1] - 463:9
   **criteria** [8] - 488:19,
489:18, 489:21, 489:23,
490:4, 491:9, 498:10,
501:15
   **critical** [1] - 486:22
   **criticizing** [1] -
510:17

   **CROSS** [3] - 404:12,
516:14, 550:13
   **cross** [11] - 374:5,
397:12, 403:4, 411:18,
411:20, 411:21, 506:2,
531:7, 531:12, 531:18,
560:24
   **cross-examination**
[1] - 531:18
   **CROSS-
EXAMINATION** [3] -
404:12, 516:14, 550:13
   **cross-examine** [3] -
374:5, 397:12, 403:4
   **cross-examined** [1] -
560:24
   **crutch** [1] - 439:24
   **crutches** [3] - 378:22,
379:6, 379:7
   **cum** [1] - 463:3
   **cup** [3] - 482:17,
482:18, 483:5
   **cups** [1] - 482:15
   **cured** [1] - 432:16
   **current** [1] - 545:18
   **curriculum** [1] -
472:6
   **curved** [1] - 486:5
   **curves** [1] - 485:16
   **cut** [1] - 571:21
   **cutting** [3] - 444:8,
444:11, 458:22
   **CV** [1] - 471:23

# D

   **D-4** [1] - 437:15
   **daily** [1] - 518:21
   **damage** [6] - 464:8,
483:15, 588:5, 588:7,
588:17, 589:15
   **damages** [6] -
585:10, 585:14, 589:2,
589:6, 589:8, 589:10
   **danger** [1] - 578:1
   **dangerous** [12] -
413:17, 464:20, 501:3,
510:23, 513:4, 513:5,
515:10, 515:11, 576:3,
577:23, 578:13, 578:25
   **dangers** [1] - 579:5
   **dark** [2] - 429:11,
529:11
   **Darren** [1] - 413:5
   **data** [9] - 465:24,
466:2, 472:21, 472:22,
473:16, 473:17, 491:16,
491:18, 491:21
   **data-gathering** [2] -

472:21, 472:22
   **date** [7] - 390:8,
409:13, 429:22, 432:15,
439:8, 548:10, 587:22
   **dated** [1] - 473:14
   **dates** [6] - 390:7,
390:19, 441:5, 441:14,
445:7, 461:11
   **daughter** [18] -
381:12, 382:1, 382:5,
382:9, 382:14, 382:24,
383:1, 383:3, 383:10,
386:4, 386:7, 387:3,
387:4, 395:1, 396:21,
446:23, 447:22, 456:7
   **daughter's** [2] -
395:17, 443:2
   **day-to-day** [1] -
516:21
   **days** [15] - 379:20,
379:21, 384:1, 391:3,
391:5, 393:7, 433:18,
433:19, 453:19, 474:22,
475:25, 507:24, 508:2,
565:4
   **deaf** [1] - 524:21
   **deal** [1] - 562:22
   **dealing** [1] - 520:6
   **deals** [1] - 567:17
   **dealt** [2] - 402:20,
587:25
   **debris** [2] - 552:22,
553:2
   **decide** [6] - 403:3,
426:24, 431:13, 523:15,
525:9, 528:13
   **decided** [6] - 384:18,
416:25, 432:4, 432:12,
520:8, 523:12
   **decision** [3] - 403:4,
417:11, 519:23
   **deck** [15] - 482:12,
482:16, 484:10, 484:16,
484:21, 485:6, 486:11,
486:17, 492:14, 496:8,
502:2, 502:11, 502:14,
510:12
   **decking** [1] - 486:9
   **declined** [2] - 431:20,
456:3
   **defect** [3] - 537:17,
571:6, 571:11
   **Defendant** [19] -
373:3, 374:4, 375:17,
544:20, 545:4, 568:8,
574:7, 576:17, 577:1,
581:16, 581:25, 582:6,
582:11, 583:14, 584:7,
584:22, 584:23, 585:23,
585:24

   **defendant's** [1] -
575:17
   **Defendant's** [10] -
423:5, 430:5, 430:22,
430:25, 434:11, 434:15,
544:18, 564:21, 568:14,
575:19
   **Defendants** [1] -
579:1
   **defense** [3] - 573:19,
578:8, 579:8
   **define** [4] - 490:6,
498:10, 498:23, 501:5
   **defined** [4] - 464:2,
512:11, 513:14, 514:18
   **defining** [1] - 500:13
   **definitely** [4] -
414:21, 553:1, 564:6
   **degree** [2] - 474:6,
474:16, 515:17
   **degrees** [2] - 429:4,
490:22
   **Delaware** [1] - 470:5
   **deliberate** [1] -
589:20
   **delivered** [1] - 520:20
   **demand** [5] - 492:17,
533:24, 535:23, 535:24,
536:6
   **demands** [1] - 465:9
   **demarcation** [1] -
587:18
   **demonstrated** [8] -
371:15, 373:10, 374:1,
374:23, 374:24, 375:5,
481:16, 534:19
   **demonstrated** [1] -
492:8
   **demonstrates** [2] -
373:11, 493:5
   **demonstration** [4] -
371:10, 487:3, 487:5,
533:21
   **demonstrative** [3] -
373:1, 374:9, 378:5
   **demonstratives** [1] -
372:3
   **Dennis** [4] - 473:12,
526:22, 528:16, 564:15
   **deny** [1] - 561:1
   **dep** [1] - 542:21
   **Department** [2] -
470:21, 489:16
   **depict** [1] - 478:22
   **deposit** [1] - 448:9
   **deposition** [15] -
522:18, 522:24, 523:20,
531:3, 539:10, 539:15,
539:18, 539:25, 540:11,
540:25, 554:19, 554:20,

600

562:17, 564:16, 564:20
**Deposition** [1] - 539:9
**depositions** [3] - 473:11, 561:19, 561:21
**describe** [8] - 392:22, 424:5, 426:3, 426:4, 431:1, 455:6, 476:10, 547:17
**Describe** [1] - 425:5
**described** [7] - 419:22, 475:5, 475:13, 510:3, 511:18, 516:6, 516:9
**describes** [2] - 485:3, 510:5
**description** [3] - 426:2, 521:22, 521:24
**design** [8] - 466:25, 467:1, 510:17, 535:1, 535:14, 537:15, 537:17, 571:10
**designed** [4] - 372:13, 467:2, 560:7, 570:12
**designer** [1] - 500:4
**designing** [1] - 515:23
**desirable** [1] - 488:16
**despite** [2] - 457:9, 528:15
**detail** [2] - 438:16, 441:24
**detailed** [3] - 500:16, 502:3, 529:9
**details** [2] - 425:21, 474:21
**determination** [2] - 466:19, 523:1
**determine** [3] - 481:13, 516:23, 520:1
**determining** [2] - 411:4, 498:21
**deviate** [1] - 493:8
**device** [2] - 465:13, 535:3
**devices** [3] - 495:11, 509:10, 534:24
**devoted** [1] - 467:3
**diamond** [32] - 371:23, 405:7, 405:25, 418:8, 418:25, 419:3, 419:4, 419:6, 419:19, 419:24, 420:15, 420:17, 421:5, 485:16, 486:8, 492:24, 496:8, 496:14, 496:16, 496:19, 496:22, 497:8, 523:23, 524:1, 524:3, 524:4, 524:10, 535:24, 536:12, 538:7,

560:14, 573:16
**difference** [6] - 385:12, 410:19, 410:21, 410:22, 411:1, 450:17
**different** [25] - 372:15, 377:15, 378:18, 387:12, 451:6, 452:5, 452:7, 452:9, 454:24, 462:20, 463:15, 467:11, 467:23, 468:24, 469:6, 473:3, 476:17, 494:23, 494:25, 495:1, 495:2, 525:25, 530:18, 536:16, 568:9
**differently** [1] - 578:20
**difficult** [4] - 375:5, 384:3, 479:13, 479:14
**diGIULIO** [1] - 567:4
**DiGIULIO** [25] - 373:21, 399:13, 400:10, 400:20, 401:8, 403:7, 403:11, 403:13, 403:15, 403:20, 403:23, 404:1, 478:9, 478:13, 503:15, 543:10, 556:20, 567:2, 567:6, 567:11, 567:13, 590:13, 592:5, 592:9, 592:12
**digress** [1] - 380:17
**dim** [1] - 540:15
**dimensions** [14] - 372:23, 373:19, 373:22, 373:24, 373:25, 374:17, 374:18, 481:17, 485:5, 486:22, 491:20, 500:15, 501:2, 502:2
**dimmed** [1] - 540:14
**direct** [5] - 377:25, 437:9, 531:19, 564:10, 564:12
**DIRECT** [3] - 377:8, 462:7, 545:11
**directed** [3] - 560:4, 560:19, 560:21
**direction** [1] - 420:12
**directly** [4] - 397:19, 467:13, 500:1, 500:13
**Disabilities** [1] - 463:16
**disability** [1] - 398:18
**disagree** [1] - 520:24
**discard** [1] - 581:19
**disciplined** [1] - 406:19
**discoloration** [3] - 529:2, 529:8, 529:12
**discoveries** [1] - 380:14
**discovery** [2] - 514:3,

581:20
**discussed** [6] - 498:6, 498:13, 499:3, 506:21, 523:3, 586:22
**discusses** [2] - 519:13, 519:16
**discussion** [5] - 496:21, 505:22, 506:6, 507:12, 577:11
**dispatcher** [1] - 475:3
**dispatcher's** [1] - 411:16
**displaced** [1] - 502:8
**displayed** [1] - 485:12
**dispute** [2] - 573:11, 573:12
**distance** [7] - 375:6, 382:18, 382:19, 395:15, 422:22, 502:1, 502:10
**distances** [2] - 375:5, 375:6
**divvy** [1] - 447:9
**doctor** [16] - 385:8, 387:15, 389:24, 392:5, 433:20, 433:22, 445:11, 445:14, 506:15, 506:16, 541:14, 542:25, 563:4, 563:10, 564:15, 580:12
**Doctor** [1] - 433:12
**doctor's** [3] - 538:22, 561:19, 562:17
**doctors** [3] - 385:16, 439:1, 441:24
**doctors'** [1] - 561:17
**document** [10] - 426:12, 430:11, 430:14, 434:10, 434:20, 436:8, 437:12, 438:5, 472:1, 479:15
**documents** [12] - 431:25, 472:25, 473:1, 473:3, 473:7, 479:9, 479:21, 514:4, 518:20, 541:23, 541:24, 591:13
**dollar** [2] - 450:1, 450:21
**dollars** [1] - 460:16
**done** [35] - 388:8, 395:23, 419:7, 458:6, 461:2, 464:16, 464:19, 466:21, 466:24, 467:13, 467:18, 467:20, 479:6, 487:7, 495:6, 506:8, 507:16, 508:18, 512:3, 515:20, 525:11, 537:5, 538:4, 540:7, 556:15, 557:1, 558:12, 558:24, 560:16, 565:23, 566:2, 586:2, 591:23

**door** [15] - 381:24, 382:4, 382:5, 398:4, 399:16, 399:20, 400:23, 400:25, 401:2, 402:18, 485:9, 500:10, 501:25, 519:20, 530:12
**doorway** [8] - 483:1, 483:6, 484:4, 484:5, 484:7, 485:5, 552:11
**double** [1] - 402:13
**down** [46] - 371:24, 373:9, 391:15, 393:16, 396:8, 396:11, 397:7, 403:22, 407:4, 411:15, 419:13, 419:15, 419:16, 419:17, 419:21, 419:23, 420:2, 420:8, 421:1, 422:2, 425:10, 439:24, 447:5, 454:25, 455:3, 455:10, 458:22, 475:4, 482:6, 490:19, 491:2, 491:4, 491:5, 491:6, 491:11, 493:7, 493:8, 493:12, 499:10, 499:20, 501:21, 535:6, 551:14
**Dr** [45] - 385:10, 387:16, 388:1, 388:9, 388:10, 433:10, 433:14, 433:22, 434:4, 434:21, 435:11, 436:9, 436:11, 439:5, 439:21, 440:9, 440:17, 440:23, 441:4, 441:9, 441:12, 441:13, 441:19, 442:1, 442:6, 442:14, 442:18, 443:14, 443:17, 443:3, 444:12, 444:25, 445:5, 539:15, 540:11, 540:25, 543:8, 562:7, 562:12, 563:5, 563:8, 563:9, 564:15, 590:8, 590:21
**drag** [2] - 412:10, 415:9
**dragged** [1] - 424:15
**draw** [2] - 434:16, 485:24
**drawing** [1] - 482:17
**drawn** [1] - 372:4
**drink** [2] - 457:22, 544:1
**drinking** [1] - 383:8
**drive** [4] - 386:15, 407:24, 408:17, 409:11
**drop** [1] - 383:3
**dry** [1] - 448:10
**due** [2] - 424:9, 431:8
**duly** [2] - 462:2, 545:4
**during** [15] - 388:23, 390:22, 397:18, 408:25, 409:9, 416:15, 436:25,

438:1, 446:2, 449:7, 468:12, 469:18, 488:18, 499:4, 532:4
**duties** [3] - 516:21, 575:24, 578:24
**duty** [9] - 452:10, 512:5, 570:7, 570:14, 570:18, 571:25, 572:1, 572:8, 577:24

**E**

**early** [7] - 448:11, 448:19, 542:15, 558:12, 558:23, 589:23, 591:25
**easel** [2] - 551:11, 551:13
**easier** [1] - 393:17, 419:10
**easiest** [1] - 584:21
**eat** [1] - 457:22
**eccentric** [6] - 491:2, 492:9, 492:15, 492:24, 493:1, 493:4, 500:20, 501:18, 533:23
**eccentricity** [2] - 490:25, 513:8
**edge** [25] - 371:23, 371:24, 418:8, 419:20, 421:9, 421:24, 431:19, 457:1, 483:19, 485:9, 485:15, 486:6, 496:10, 502:24, 509:6, 510:13, 510:16, 515:12, 521:5, 521:9, 523:23, 537:19, 538:4, 560:15
**education** [1] - 463:9
**effective** [1] - 531:18
**efficiency** [1] - 544:17
**eight** [6] - 377:18, 378:22, 459:25, 460:3, 484:9, 484:10, 484:13, 484:19
**eight-something** [1] - 459:25
**Eighth** [2] - 565:9, 565:11
**either** [18] - 396:2, 396:5, 396:12, 409:9, 409:23, 431:24, 431:25, 450:13, 454:13, 455:1, 456:6, 464:24, 510:14, 528:4, 537:10, 558:22, 579:11, 586:15
**either/or** [1] - 393:14
**electric** [2] - 382:7, 446:18
**element** [1] - 523:9

**elevated** [1] - 422:4
**elicited** [1] - 570:16
**eliminate** [3] - 464:21, 464:22, 515:20
**elliptical** [2] - 443:15, 443:24
**emergency** [1] - 379:8
**employed** [2] - 462:15, 545:14
**employee** [4] - 516:17, 578:8, 579:8, 582:22
**employee's** [1] - 577:22
**employees** [4] - 394:19, 411:1, 536:11, 538:7
**employer** [2] - 578:2, 579:5
**employment** [2] - 578:9, 579:9
**end** [28] - 378:10, 393:3, 407:9, 409:2, 409:4, 432:1, 433:20, 436:16, 441:25, 448:5, 483:4, 485:6, 486:12, 486:19, 500:2, 500:7, 503:2, 508:6, 509:1, 509:21, 516:4, 527:13, 527:19, 528:2, 537:25, 559:12, 560:8, 561:2
**ended** [3] - 448:2, 448:19, 466:25
**ends** [3] - 454:3, 471:7, 541:2
**enforce** [2] - 572:20, 573:7
**enforceable** [1] - 500:2
**enforcement** [1] - 498:16
**enforcers** [1] - 406:10
**enforcing** [1] - 573:6
**engage** [1] - 494:1
**engineer** [19] - 405:3, 407:13, 407:14, 409:16, 455:13, 462:11, 462:12, 462:14, 468:22, 469:19, 469:21, 469:24, 470:3, 475:2, 498:12, 512:7, 516:18, 532:17, 532:22
**engineering** [31] - 462:17, 462:18, 462:19, 462:21, 462:24, 463:2, 463:4, 463:6, 463:8, 463:11, 463:20, 463:21, 464:1, 464:5, 466:21, 467:4, 467:5, 467:13, 467:18, 469:23, 469:25,

471:9, 471:13, 472:15, 472:17, 474:16, 493:16, 498:21, 510:2, 517:9
**Engineers** [5] - 384:12, 468:14, 468:15, 489:24
**Engineers'** [1] - 509:11
**enjoy** [1] - 504:4
**enjoyed** [1] - 396:4
**enter** [1] - 516:5
**entered** [1] - 478:7
**entering** [1] - 477:19
**enters** [4] - 376:17, 459:2, 508:15, 544:10
**entire** [10] - 371:3, 405:7, 405:24, 449:11, 449:16, 461:8, 536:12, 538:7, 560:13, 564:16
**entirely** [1] - 414:19
**entitled** [2] - 399:5, 539:18
**entry** [1] - 500:10
**environment** [8] - 465:25, 466:11, 475:15, 552:25, 575:17, 575:21, 576:16, 577:7
**environmental** [1] - 473:18
**environments** [1] - 489:19
**equipment** [7] - 427:13, 427:20, 428:2, 489:25, 572:3, 573:24, 581:13
**equivalent** [1] - 401:7
**erection** [1] - 471:2
**ergonomic** [1] - 466:16
**ergonomics** [6] - 463:12, 466:9, 466:10, 466:12, 500:24, 536:19
**Ergonomics** [1] - 468:16
**especially** [1] - 393:7
**essentially** [3] - 401:6, 555:7, 585:20
**establish** [5] - 473:18, 488:15, 488:19, 490:3, 498:18
**established** [1] - 468:11
**establishing** [1] - 499:23
**estimate** [8] - 406:22, 406:24, 406:25, 446:20, 467:15, 517:20, 518:6, 518:10
**evaluate** [8] - 512:4, 512:8, 512:13, 512:16,

514:11, 515:5, 515:9, 518:7
**evaluated** [1] - 513:3
**evaluating** [1] - 587:21
**event** [35] - 463:10, 466:17, 467:21, 472:22, 473:8, 473:19, 474:21, 474:23, 475:2, 475:9, 475:18, 475:20, 475:22, 476:8, 488:1, 492:5, 498:8, 503:4, 509:3, 510:5, 511:3, 511:24, 512:15, 513:2, 513:13, 513:25, 514:6, 514:17, 515:2, 515:14, 516:6, 522:18, 529:10, 561:1, 566:1
**events** [5] - 462:20, 463:19, 467:11, 467:15, 495:17
**eventually** [4] - 382:21, 386:15, 433:10, 444:2
**everywhere** [6] - 389:14, 412:11, 528:23, 553:14, 555:22, 557:22
**evidence** [41] - 371:4, 423:5, 430:22, 430:25, 477:19, 478:8, 479:23, 480:12, 480:13, 481:5, 512:19, 521:16, 541:25, 560:6, 560:12, 560:23, 561:12, 561:14, 561:16, 562:14, 562:15, 562:18, 565:14, 567:22, 568:12, 568:13, 570:17, 571:10, 571:17, 571:20, 572:8, 572:9, 573:7, 573:8, 574:25, 581:22, 590:21, 591:4, 591:7, 591:8, 592:13
**exact** [9] - 371:4, 373:15, 387:24, 390:19, 428:21, 432:23, 435:17, 450:1, 452:4
**exactly** [31] - 374:3, 375:22, 387:23, 388:7, 391:15, 405:4, 411:24, 412:1, 412:7, 414:15, 414:25, 415:3, 419:16, 422:15, 425:14, 433:15, 436:18, 436:22, 441:5, 441:14, 442:13, 444:1, 447:4, 449:4, 450:12, 453:9, 461:11, 482:2, 508:3, 510:5, 591:12
**EXAMINATION** [12] - 377:8, 404:12, 459:9, 461:4, 462:7, 516:14,

533:16, 535:21, 545:11, 550:13, 553:22, 554:11
**examination** [8] - 469:23, 470:1, 470:10, 470:12, 475:13, 475:17, 477:5, 531:18
**examine** [3] - 374:5, 397:12, 403:4
**examined** [4] - 481:7, 486:23, 494:19, 560:24
**examiner** [1] - 432:8
**examiners** [3] - 405:10, 406:9, 406:10
**examining** [1] - 472:21
**example** [3] - 429:14, 493:5, 493:22
**examples** [1] - 429:1
**excellent** [3] - 458:19, 538:17, 558:11
**except** [2] - 451:10, 522:5
**excessive** [1] - 501:20
**excessively** [4] - 501:4, 501:6, 524:19, 525:1
**excruciating** [1] - 387:10
**excused** [5] - 461:17, 538:14, 538:18, 558:7, 558:8
**exempt** [1] - 519:11
**exempted** [2] - 519:8, 560:10
**exercise** [2] - 442:7, 442:9
**exercises** [3] - 385:21, 385:23, 442:11
**exert** [3] - 493:25, 499:13, 501:21
**exerted** [2] - 465:8, 499:4
**exerting** [1] - 490:21
**exertion** [1] - 499:10
**exerts** [1] - 491:7
**exhibit** [10] - 372:1, 479:23, 486:4, 487:21, 561:21, 561:22, 561:24, 590:12, 591:13, 591:18
**Exhibit** [32] - 378:2, 378:8, 378:10, 423:5, 430:5, 430:22, 430:25, 434:11, 434:16, 435:24, 437:7, 437:14, 437:16, 439:19, 444:17, 472:2, 476:15, 476:16, 477:8, 477:23, 480:13, 485:12, 486:7, 521:16, 550:25, 561:24, 562:15, 566:15,

566:16, 583:25, 584:4
**exhibits** [9] - 476:19, 477:18, 477:22, 479:22, 541:9, 541:15, 543:15, 561:8, 561:18
**Exhibits** [5] - 480:14, 481:4, 561:9, 566:17, 583:25
**exist** [2] - 578:2, 579:6
**existed** [1] - 402:8
**existing** [3] - 580:13, 580:15, 580:21
**exits** [4] - 458:2, 504:3, 544:6, 559:24
**expansive** [1] - 577:5
**expect** [3] - 390:1, 512:8, 553:4
**expectation** [1] - 507:18
**expected** [4] - 508:3, 587:23, 588:19, 589:7
**experience** [2] - 468:25, 588:20
**experienced** [1] - 488:18
**expert** [19] - 375:14, 376:12, 378:6, 458:16, 458:17, 471:8, 471:13, 476:20, 478:4, 497:3, 497:24, 498:2, 505:25, 506:14, 563:4, 563:8, 564:9, 564:21, 571:10
**experts** [1] - 372:3
**explain** [13] - 394:10, 418:4, 464:4, 481:25, 482:2, 492:3, 492:4, 493:19, 494:22, 502:16, 512:1, 515:4, 522:15
**explained** [5] - 511:13, 511:20, 512:22, 514:23, 515:14
**explanation** [3] - 524:6, 582:25, 583:3
**explicit** [1] - 568:12
**extends** [2] - 486:11, 496:10
**extensively** [1] - 402:15
**extent** [2] - 432:14, 519:13
**extenuating** [1] - 428:23
**extra** [3] - 400:18, 416:4, 567:1
**extract** [3] - 474:20, 511:1, 514:7

# F

face [1] - 485:21
facie [1] - 560:6
facility [1] - 532:23
fact [12] - 371:13, 400:18, 402:1, 416:18, 474:8, 497:25, 501:11, 521:1, 524:12, 536:24, 570:15, 572:11
Factors [1] - 468:15
factors [17] - 463:12, 465:23, 465:24, 466:2, 466:4, 466:7, 466:11, 468:1, 468:23, 471:15, 473:21, 488:15, 491:17, 492:1, 493:16, 536:19
facts [9] - 466:18, 473:5, 474:19, 510:25, 511:14, 511:21, 512:23, 514:24, 522:19
factual [6] - 472:19, 473:6, 476:3, 522:23, 573:11, 573:12
failed [2] - 520:22, 560:5
failure [1] - 572:19
fair [8] - 374:15, 374:23, 401:23, 409:19, 416:14, 446:9, 451:14, 455:14
fairly [2] - 375:5, 588:8
fall [13] - 375:10, 432:25, 433:2, 434:6, 434:23, 439:15, 463:18, 463:19, 467:11, 495:16, 549:4, 549:7, 549:24
falling [1] - 439:14
falls [1] - 523:5
false [3] - 375:10, 375:15, 375:21
familiar [2] - 410:2, 423:20
family [6] - 381:19, 381:22, 382:10, 456:7, 456:10
Family [2] - 559:17, 559:20
far [18] - 375:25, 386:11, 406:8, 410:22, 412:9, 414:8, 415:5, 424:22, 432:5, 455:9, 492:12, 501:22, 503:23, 512:25, 532:14, 542:8, 563:3, 580:20
FARs [1] - 519:22
fashion [1] - 396:25
father [4] - 382:23,

383:8, 383:19, 383:20
fathers [1] - 397:5
fault [1] - 514:13
favor [1] - 582:11
fax [1] - 403:15
features [1] - 488:16
February [2] - 390:9, 473:14
Federal [8] - 376:22, 472:9, 489:16, 498:15, 500:8, 511:9, 520:24, 565:14
fee [1] - 472:6
feelings [1] - 383:19
feet [20] - 379:5, 396:7, 414:11, 414:12, 414:14, 420:4, 422:24, 466:6, 492:20, 492:21, 501:24, 501:25, 502:6, 502:7, 502:25, 503:8, 510:8, 510:9, 522:5
FELA [4] - 565:6, 570:7, 584:7, 584:16
fell [14] - 413:13, 422:11, 431:9, 435:17, 438:2, 438:13, 439:13, 439:22, 440:3, 440:9, 549:2, 549:16, 549:23
fellow [2] - 394:19, 411:1
felt [1] - 385:17
few [7] - 436:21, 468:6, 478:9, 479:18, 479:21, 546:11, 566:4
fiancee [5] - 381:12, 382:1, 382:13, 382:14, 447:7
field [4] - 407:21, 409:10, 463:25, 471:13
fields [4] - 463:10, 469:3, 471:14, 493:16
fifth [1] - 565:9
Fifth [1] - 565:11
fifty [2] - 478:6, 580:2
fifty-five [1] - 478:6
fifty-one [1] - 580:2
fighting [1] - 542:18
figure [5] - 391:21, 462:19, 464:12, 472:14, 514:21
figures [1] - 447:5
file [4] - 569:12, 590:10, 590:25, 591:1
files [2] - 543:4, 562:13
fill [2] - 424:3, 430:18
filled [4] - 423:7, 424:16, 424:18, 521:16
filling [1] - 423:17
final [2] - 540:2,

591:25
finances [1] - 386:11
financial [5] - 382:17, 386:10, 397:19, 448:2, 450:7
fine [15] - 407:11, 408:7, 428:14, 520:4, 524:15, 528:5, 542:23, 543:11, 563:17, 563:19, 567:23, 568:8, 571:6, 591:9
finger [2] - 571:14, 571:18
finish [6] - 376:10, 412:6, 419:19, 457:24, 503:19, 503:25
finished [4] - 487:3, 487:5, 542:21, 558:4
finishes [1] - 454:24
firm [1] - 517:25
First [1] - 477:17
first [63] - 377:15, 378:21, 379:2, 381:12, 381:13, 384:5, 390:11, 407:15, 408:4, 408:8, 419:21, 423:17, 425:23, 426:7, 426:10, 426:12, 426:15, 426:23, 433:7, 433:16, 436:17, 438:1, 439:4, 439:12, 441:3, 441:6, 441:7, 449:2, 449:17, 449:18, 449:19, 450:3, 450:18, 451:10, 451:22, 464:7, 466:25, 477:19, 483:21, 484:2, 492:7, 492:22, 502:6, 502:13, 517:10, 517:12, 517:15, 538:19, 549:9, 555:8, 566:14, 567:6, 567:16, 569:25, 575:12, 585:13, 587:6, 589:9, 589:11
fit [2] - 465:21, 466:2
five [17] - 396:17, 403:22, 412:2, 433:18, 433:19, 440:5, 478:6, 483:18, 483:23, 507:13, 507:24, 508:20, 539:3, 542:19, 544:3, 544:12, 548:25
five-one [1] - 548:25
fix [4] - 409:11, 515:10, 515:22, 535:16
fixed [1] - 488:25
fixtures [2] - 486:25, 488:7
Flags [2] - 393:2, 395:7
flat [8] - 393:18, 418:10, 418:11, 418:13,

418:23, 420:24, 524:8, 536:21
flatter [1] - 559:3
flimsy [1] - 375:20
flip [1] - 585:10
floor [8] - 412:16, 419:23, 420:8, 482:17, 493:24, 536:20, 549:12, 549:15
fluid [1] - 443:22
fly [1] - 395:23
focus [3] - 408:20, 471:2, 510:19
focused [1] - 387:2
focusing [1] - 467:6
Foder [52] - 371:16, 373:25, 376:11, 376:24, 376:25, 377:22, 399:15, 404:14, 430:4, 440:7, 452:15, 458:5, 458:12, 459:5, 461:15, 473:8, 473:10, 473:11, 474:21, 475:2, 475:16, 481:15, 482:11, 483:8, 485:1, 486:2, 492:6, 500:18, 502:4, 502:21, 510:3, 511:16, 511:23, 514:10, 516:3, 521:15, 522:17, 523:15, 525:6, 532:5, 532:16, 532:25, 533:4, 533:7, 533:11, 546:1, 546:8, 549:2, 549:9, 550:15, 560:13, 563:10
Foder's [1] - 584:24
fold [2] - 591:15, 591:16
follow [6] - 377:23, 489:10, 498:20, 513:13, 514:10, 514:17
follow-up [2] - 377:23, 489:10
followed [2] - 463:22, 464:21
following [14] - 377:24, 378:14, 397:16, 404:10, 460:3, 477:14, 479:19, 530:7, 532:2, 541:5, 543:23, 555:10, 557:4, 578:7
follows [4] - 377:4, 462:3, 539:9, 545:4
food [1] - 381:17
foot [81] - 375:6, 377:18, 405:7, 405:13, 405:24, 417:18, 418:5, 418:6, 418:7, 418:13, 418:16, 418:23, 419:4, 419:5, 419:11, 419:13, 419:15, 419:17, 419:18, 419:23, 419:24, 420:2,

420:7, 420:8, 420:11, 420:13, 420:24, 421:3, 421:14, 424:7, 424:23, 424:24, 425:19, 426:14, 426:25, 427:19, 431:6, 431:10, 431:14, 439:2, 439:3, 445:17, 485:3, 485:4, 492:20, 492:21, 493:7, 499:7, 499:15, 499:20, 502:14, 502:15, 502:18, 510:12, 513:7, 515:15, 536:12, 536:21, 538:7, 547:24, 548:1, 548:5, 548:8, 551:22, 551:23, 551:24, 552:8, 560:13, 560:14, 573:16
foot's [1] - 421:5
football [3] - 394:7, 395:25
foothold [2] - 419:11, 548:1
footwear [7] - 469:7, 469:8, 491:19, 493:25, 494:8, 515:24
force [13] - 455:25, 490:16, 490:20, 490:25, 491:5, 491:6, 492:8, 492:18, 499:10, 499:13, 499:14, 501:2
forced [1] - 578:14
forces [19] - 465:6, 465:8, 490:5, 490:17, 490:18, 491:12, 492:1, 492:16, 493:12, 499:4, 501:13, 513:9, 524:20, 525:2, 525:5, 525:9, 533:19, 533:23, 583:13
forensic [7] - 462:12, 462:14, 462:17, 462:18, 467:4, 467:5, 472:14
forensics [1] - 467:5
foreseeability [7] - 567:17, 567:18, 567:23, 567:25, 568:15, 581:6, 581:7
foreseeable [4] - 511:15, 526:19, 528:19, 528:21
foreseeably [2] - 501:3
forever [3] - 385:25, 445:20, 592:7
forewarned [1] - 530:13
form [7] - 423:21, 424:14, 424:23, 425:22, 431:2, 435:21, 493:21
formulas [1] - 526:1, 526:2
formulate [2] -

511:22, 514:25
**forth** [1] - 455:3
**forthright** [1] - 439:1
**forty** [2] - 462:25,
575:9
**forty-nine** [2] -
462:25, 575:9
**forward** [1] - 544:21
**foundation** [4] -
481:23, 513:17, 513:18,
513:21
**four** [38] - 376:6,
428:23, 449:14, 449:15,
449:19, 449:24, 449:25,
450:3, 451:22, 459:23,
460:22, 464:6, 469:22,
469:25, 470:9, 470:11,
475:18, 475:20, 484:3,
484:4, 484:8, 492:20,
492:21, 495:2, 496:2,
497:6, 498:14, 502:25,
506:5, 510:7, 518:10,
518:12, 518:14, 522:5,
529:5, 529:10, 568:21,
581:6
**four-step** [2] - 464:6,
498:14
**four-year** [2] -
469:22, 470:9
**fourth** [3] - 465:1,
512:10, 524:23
**FRA** [11] - 498:15,
509:9, 516:24, 516:25,
517:3, 517:7, 520:19,
520:22, 521:2, 560:8
**fragile** [1] - 375:20
**frame** [1] - 552:11
**frankly** [4] - 371:9,
372:2, 571:21, 585:16
**friction** [16] - 465:6,
492:2, 493:19, 493:20,
493:21, 494:7, 494:16,
494:20, 496:16, 496:21,
497:8, 497:14, 524:6,
524:9, 524:12, 524:15
**Friday** [13] - 503:22,
507:19, 507:22, 508:4,
508:7, 558:21, 558:23,
558:24, 558:25, 565:24,
589:17, 590:2, 592:2
**friends** [3] - 383:14,
383:24, 397:5
**front** [8] - 372:19,
374:2, 423:3, 423:14,
485:9, 487:19, 523:21,
567:7
**full** [13] - 393:1,
398:17, 398:22, 398:23,
439:14, 448:19, 452:10,
459:20, 459:21, 461:7,

462:4, 545:5, 583:3
**fully** [4] - 392:4,
397:4, 418:12, 443:4
**fun** [1] - 394:16
**function** [2] - 465:17,
465:21
**fund** [1] - 460:12
**funds** [1] - 381:14
**furnish** [2] - 581:12,
581:17
**future** [9] - 477:17,
477:20, 479:15, 587:14,
587:17, 587:19, 587:24,
588:10, 588:20

## G

**gain** [1] - 511:17
**gained** [1] - 383:23
**garage** [7] - 381:23,
381:24, 382:1, 382:5,
382:8, 383:2, 401:20
**garbage** [1] - 378:12
**gas** [2] - 416:4,
446:18
**gathering** [4] -
472:21, 472:22, 473:15,
473:16
**general** [12] - 412:21,
418:20, 438:15, 438:20,
463:17, 468:5, 473:21,
495:22, 555:14, 557:14,
567:23, 582:18
**generally** [7] -
418:21, 423:19, 425:2,
455:5, 489:4, 491:24,
519:4
**generate** [1] - 533:23
**generated** [1] -
501:14
**generating** [1] - 501:3
**generic** [1] - 486:9
**gentleman** [1] -
497:25
**gentlemen** [5] -
503:19, 539:7, 543:24,
558:13, 566:11
**George** [3] - 461:19,
462:6, 471:13
**girl's** [1] - 396:23
**girlfriend** [1] - 386:4
**given** [10] - 372:13,
373:6, 383:2, 386:12,
386:16, 409:12, 409:13,
472:19, 562:20, 574:25
**gladly** [1] - 371:7
**glove** [1] - 578:15
**gloves** [15] - 406:12,
406:13, 406:16, 406:19,

416:25, 417:12, 417:13,
417:22, 432:17, 432:21,
432:23, 576:13, 576:18,
576:19, 579:4
**glued** [1] - 432:25
**govern** [1] - 489:14
**Government's** [1] -
483:13
**grab** [46] - 375:7,
375:8, 375:11, 375:18,
376:4, 395:18, 417:20,
419:11, 419:12, 427:19,
432:1, 438:21, 456:18,
484:3, 484:5, 484:8,
484:9, 484:11, 484:18,
484:20, 484:21, 486:2,
486:15, 486:19, 486:20,
492:11, 492:24, 492:25,
493:3, 499:8, 499:9,
499:16, 500:17, 500:25,
510:1, 524:19, 525:1,
526:7, 526:11, 527:14,
527:19, 528:3, 535:8,
537:8, 537:10, 537:24
**grabbed** [5] - 424:7,
431:6, 485:1, 486:3,
576:14
**grabs** [8] - 484:2,
493:9, 493:11, 503:7,
509:6, 510:16, 513:9,
519:15
**grade** [1] - 469:1
**grades** [1] - 468:24
**graduated** [1] - 463:8
**granting** [1] - 560:21,
561:3
**grateful** [1] - 559:10
**grease** [51] - 411:10,
411:25, 412:3, 412:8,
412:10, 412:12, 412:14,
412:15, 412:16, 412:21,
414:4, 414:15, 414:20,
414:22, 414:24, 429:18,
434:5, 434:22, 435:1,
436:12, 438:3, 438:14,
457:11, 476:2, 512:14,
527:3, 527:6, 527:25,
528:25, 528:25, 529:18,
533:4, 546:20, 547:3,
548:13, 552:22, 553:2,
553:6, 553:17, 553:25,
554:3, 554:7, 555:14,
555:18, 555:20, 555:24,
557:15, 557:19, 557:20,
557:24
**greaser** [9] - 412:8,
415:8, 475:25, 512:14,
553:5, 553:16, 553:24,
554:16, 556:4
**greases** [3] - 412:9,

553:9, 554:5
**greasy** [2] - 475:19,
529:20
**great** [6] - 386:25,
412:24, 413:4, 431:18,
543:20, 567:10
**Gregory** [1] - 473:11
**Greisberg** [21] -
385:10, 387:16, 388:1,
388:9, 388:10, 442:1,
442:6, 442:14, 442:18,
443:14, 443:17, 444:3,
444:12, 444:25, 445:5,
539:15, 540:11, 540:25,
562:2, 562:7, 562:12
**grimy** [1] - 475:19
**grip** [8] - 429:6,
429:16, 431:20, 431:22,
478:22, 521:9, 526:9,
526:10
**grip-slide-
resistance** [2] - 526:9,
526:10
**gripping** [1] - 499:6
**grit** [3] - 494:12,
509:25, 534:7
**grit-impregnated** [2]
- 509:25, 534:7
**ground** [7] - 393:18,
413:17, 421:17, 422:4,
422:11, 499:15, 499:16
**grouped** [1] - 473:4
**groups** [2] - 469:6,
469:14
**growing** [2] - 382:23,
388:13
**guaranteed** [1] -
454:7
**guard** [2] - 423:25,
512:12
**guess** [22] - 378:22,
383:5, 385:16, 387:19,
387:21, 412:23, 415:12,
416:23, 425:1, 425:14,
436:22, 437:1, 439:10,
441:1, 441:18, 443:6,
453:23, 459:16, 573:6,
580:16, 586:14
**guidelines** [1] - 517:3
**Gus** [1] - 564:9
**gut** [1] - 525:12
**guys** [12] - 383:25,
447:9, 455:1, 458:3,
504:4, 508:19, 556:23,
559:25, 565:2, 589:20,
590:2
**gym** [1] - 397:7

## H

**h'm** [6] - 417:15,
417:23, 418:24, 423:6,
429:9, 437:11
**ha-ha-ha** [1] - 384:2
**habit** [1] - 563:25
**hairbrush** [1] -
493:23
**half** [23] - 391:11,
398:20, 447:10, 450:4,
460:3, 461:8, 483:2,
483:5, 483:18, 483:21,
483:23, 485:10, 485:14,
485:17, 485:22, 485:23,
486:5, 492:23, 503:17,
504:5, 505:23, 506:3
**halfway** [1] - 559:12
**Halloween** [2] -
385:1, 442:15
**hammer** [1] - 428:16
**hand** [14] - 375:9,
375:12, 430:4, 461:25,
477:4, 534:14, 534:17,
535:5, 545:1, 545:2,
551:1, 567:10, 579:1
**handhold** [2] -
372:21, 372:22
**handholds** [3] -
500:17, 500:23, 501:12
**handlebar** [1] -
371:20
**handrail** [10] - 428:17,
431:6, 547:23, 551:19,
551:20, 551:21, 552:2,
552:3, 552:5, 578:21
**hands** [27] - 416:15,
416:17, 416:22, 416:24,
417:1, 417:3, 417:7,
417:20, 424:10, 429:4,
429:24, 431:8, 432:6,
432:16, 432:19, 432:23,
433:3, 523:5, 547:23,
551:3, 551:15, 551:19,
551:20, 551:21, 552:2,
552:4, 576:14
**handwriting** [1] -
430:14
**hang** [1] - 484:24
**hanging** [1] - 499:20
**happy** [3] - 376:19,
376:20, 586:25
**hard** [12] - 382:15,
384:4, 392:21, 395:22,
439:24, 490:23, 494:16,
495:18, 495:19, 495:22,
495:25, 526:8
**hardest** [1] - 379:17
**hardship** [1] - 450:7

604

**hardware** [4] - 388:12, 388:14, 389:17, 444:10

**harm** [6] - 401:21, 464:2, 464:11, 498:22, 571:17, 571:19

**Harrison** [4] - 371:7, 408:22, 408:23, 409:3

**hazard** [13] - 414:1, 463:13, 464:7, 464:16, 464:22, 464:23, 465:1, 498:23, 511:5, 512:11, 514:20, 532:10

**hazards** [4] - 464:18, 498:23, 515:6, 515:21

**head** [4] - 422:23, 422:25, 423:2, 518:5

**heals** [1] - 392:7

**Health** [1] - 470:22

**hear** [17] - 519:2, 520:13, 520:18, 524:21, 526:22, 526:24, 540:18, 540:20, 540:21, 546:13, 551:18, 558:18, 558:22, 563:1, 564:7, 572:14, 572:15

**heard** [12] - 396:3, 397:13, 404:20, 406:20, 474:23, 475:7, 475:21, 475:24, 496:12, 523:10, 526:24

**heat** [1] - 382:8

**heater** [3] - 382:6, 382:7, 401:21

**heavy** [1] - 489:25

**heel** [4] - 420:18, 420:19, 420:20, 420:24

**height** [18] - 371:21, 373:11, 373:12, 373:15, 374:3, 374:6, 374:8, 374:16, 374:23, 374:24, 375:17, 376:2, 418:13, 481:23, 482:16, 485:21, 502:13, 510:11

**held** [3] - 442:13, 469:4, 539:6

**help** [6] - 381:18, 381:21, 468:21, 510:14, 549:18, 549:21

**helped** [2] - 382:6, 432:22

**hem** [1] - 591:15

**high** [12] - 393:6, 413:11, 413:13, 421:2, 448:10, 500:25, 502:15, 510:8, 510:9, 535:9, 536:20

**higher** [3] - 373:17, 455:18, 535:4

**highlight** [1] - 577:3

**highly** [1] - 528:21

**himself** [3] - 404:24, 512:9, 512:13

**hip's** [1] - 380:3

**hips** [2] - 379:25, 491:21

**hire** [1] - 409:13

**hired** [4] - 462:15, 470:22, 517:16, 517:19

**history** [3] - 433:23, 438:7, 444:21

**hit** [1] - 548:3

**hitting** [1] - 502:14

**hobbies** [1] - 395:20

**Hoboken** [2] - 416:1, 416:5

**hold** [10] - 424:7, 424:9, 424:10, 431:8, 440:12, 469:12, 497:11, 498:2, 500:21, 570:3

**holding** [1] - 551:4

**hole** [1] - 417:18

**home** [16] - 377:17, 378:22, 385:18, 385:21, 385:23, 425:3, 426:15, 427:2, 432:3, 432:13, 442:11, 446:6, 446:9, 504:8, 589:23, 591:25

**home-ridden** [2] - 377:17, 378:22

**honestly** [1] - 548:22

**Honor** [35] - 372:18, 373:21, 377:5, 397:10, 397:13, 430:21, 435:22, 459:8, 461:1, 471:12, 471:19, 474:11, 476:16, 477:8, 480:2, 480:23, 481:20, 482:21, 487:10, 505:4, 530:4, 533:15, 535:16, 537:21, 540:5, 541:3, 550:2, 551:7, 561:4, 561:10, 563:14, 566:6, 592:5, 592:19, 592:20

**hope** [1] - 383:15

**hopefully** [2] - 508:21, 558:17

**hoping** [1] - 558:21

**horizontal** [7] - 484:20, 484:24, 491:3, 492:16, 492:18, 502:10

**horrible** [1] - 389:8

**hospital** [4] - 424:16, 425:4, 426:16, 432:8

**hot** [2] - 429:4, 432:10

**hour** [17] - 375:3, 382:15, 391:16, 458:21, 458:24, 503:17, 503:21, 504:5, 505:23, 506:3,

506:16, 507:1, 507:2, 517:25, 564:13, 564:16

**hours** [12] - 382:8, 391:6, 391:9, 426:16, 426:18, 426:19, 426:20, 426:23, 432:2, 453:18, 453:21, 454:3

**house** [14] - 381:11, 381:15, 381:20, 381:25, 397:20, 400:16, 401:19, 445:25, 447:3, 448:3, 448:5, 448:22, 460:7, 460:20

**housekeeping** [2] - 561:6, 592:6

**human** [18] - 463:12, 465:12, 465:23, 465:24, 466:2, 466:4, 466:10, 468:1, 468:23, 471:15, 473:21, 488:15, 491:17, 492:1, 493:16, 495:16, 536:19

**Human** [1] - 468:15

**humans** [1] - 465:25

**humor** [1] - 550:6

**hundred** [6] - 407:5, 407:6, 467:12, 467:15, 467:21, 468:6

**hundreds** [4] - 419:8, 457:7, 495:5, 495:19

**hurt** [6] - 394:4, 398:19, 425:18, 464:8, 510:4, 549:20

**hurting** [1] - 425:3

**hurts** [1] - 393:7

# I

**idea** [3] - 438:15, 438:20, 529:11

**Ideally** [1] - 565:21

**identification** [3] - 480:15, 566:17, 584:4

**identified** [1] - 513:4

**identify** [15] - 425:17, 428:23, 429:16, 429:18, 429:20, 429:23, 431:19, 431:24, 436:13, 437:1, 464:18, 476:16, 515:6, 515:10

**ignore** [1] - 521:21

**ignored** [1] - 522:10

**imagine** [8] - 382:25, 484:12, 484:25, 485:2, 486:19, 564:6, 573:22, 574:4

**immediate** [2] - 410:25, 411:8

**immediately** [5] -

389:5, 389:6, 389:7, 435:3, 527:1

**immobilized** [2] - 379:19, 442:24

**impeach** [8] - 397:25, 398:3, 398:7, 398:8, 400:18, 400:19, 400:21, 401:16

**impeached** [2] - 397:21, 401:25

**impeachment** [2] - 401:17, 402:20

**implications** [1] - 502:11

**important** [8] - 424:13, 432:5, 433:8, 438:25, 477:20, 559:7, 576:24, 579:22

**imposes** [1] - 572:1

**impossible** [1] - 421:2

**impregnated** [2] - 509:25, 534:7

**impression** [5] - 375:10, 375:13, 375:15, 375:21, 400:17

**improper** [2] - 560:15, 569:2

**improved** [3] - 502:23, 503:6, 510:15

**improvements..** [1] - 581:21

**inartfully** [1] - 474:10

**inch** [5] - 371:23, 485:14, 485:17, 486:5, 492:22

**inches** [35] - 373:9, 482:12, 482:13, 482:14, 482:15, 483:2, 483:5, 483:8, 483:9, 483:16, 483:18, 483:22, 483:24, 483:25, 484:3, 484:4, 484:8, 484:10, 484:16, 484:17, 484:21, 484:23, 484:24, 485:7, 485:8, 485:9, 485:10, 485:22, 485:23, 485:24, 485:25, 486:17, 486:18, 486:20, 502:8

**incident** [4] - 394:6, 431:1, 590:23, 590:24

**incidents** [1] - 434:3

**inclination** [1] - 372:2

**inclined** [4] - 375:1, 401:1, 560:23, 579:7

**included** [4] - 463:5, 464:13, 473:6, 489:15

**includes** [1] - 590:10

**including** [2] - 425:23, 463:15

**income** [2] - 448:14, 517:25

**inconsistent** [3] - 555:5, 555:6, 555:11

**incorrect** [1] - 522:14

**increase** [1] - 499:14

**increased** [1] - 535:24

**independent** [6] - 462:12, 462:13, 472:20, 472:22, 473:15, 473:16

**index** [1] - 491:20

**indicate** [1] - 474:17

**indicating** [1] - 482:7

**indication** [1] - 511:6

**individually** [1] - 477:21

**individuals** [1] - 438:2

**induces** [1] - 499:17

**industrial** [3] - 468:2, 488:25, 502:9

**industry** [1] - 471:2

**information** [9] - 403:17, 472:19, 473:6, 474:19, 475:12, 510:25, 514:2, 522:16, 522:17

**informed** [1] - 505:6

**inherent** [5] - 575:16, 575:20, 576:9, 576:15, 577:6

**initial** [3] - 437:1, 450:21, 559:14

**initiation** [1] - 515:15

**injected** [1] - 578:6

**injured** [12] - 371:16, 379:11, 425:10, 439:2, 439:3, 451:11, 467:19, 474:21, 492:6, 511:16, 514:5

**injuries** [3] - 585:3, 586:12, 588:8

**injuring** [1] - 511:11

**injury** [39] - 380:1, 381:5, 382:15, 424:5, 426:4, 426:16, 426:17, 426:23, 429:22, 432:4, 432:5, 432:15, 436:16, 438:8, 442:22, 448:2, 449:8, 449:10, 449:13, 453:3, 456:2, 467:21, 473:8, 475:9, 476:8, 495:17, 503:4, 509:3, 511:3, 511:24, 513:1, 513:13, 513:25, 514:17, 515:2, 516:5, 578:20, 584:24, 586:18

**Injury** [1] - 425:6

**ink** [2] - 374:13, 375:20

605

**inside** [3] - 485:17, 501:24, 567:7

**insofar** [1] - 539:19

**inspect** [7] - 427:13, 428:5, 516:23, 532:18, 532:23, 571:24, 572:2

**inspected** [3] - 427:8, 428:14, 572:12

**inspecting** [4] - 427:5, 428:16, 428:18, 515:24

**inspection** [4] - 427:25, 476:5, 481:12, 518:21

**inspector** - 512:3, 521:2, 526:25

**instance** [2] - 419:22, 495:20

**instances** [1] - 456:2

**instead** [3] - 491:3, 531:13, 580:4

**Institute's** [1] - 509:13

**instruct** [10] - 401:23, 473:23, 474:2, 516:1, 539:9, 573:15, 574:3, 574:5, 578:5, 578:18

**instructed** [6] - 405:24, 536:11, 573:14, 573:17, 573:20, 578:23

**instructing** [1] - 538:6

**instruction** [17] - 401:12, 402:21, 402:25, 538:6, 539:8, 539:24, 567:21, 568:20, 571:14, 577:5, 577:15, 578:4, 579:7, 581:6, 581:11, 582:21, 582:23

**instructions** [12] - 401:12, 401:17, 559:14, 565:2, 565:12, 566:12, 566:15, 568:14, 577:16, 577:19, 586:24, 588:15

**insurance** [2] - 386:13, 386:23

**insure** [1] - 572:3

**interaction** [2] - 494:14, 494:16

**interchangeable** [1] - 577:22

**interested** [2] - 470:24, 491:25

**interests** [1] - 544:17

**interfere** [1] - 535:2

**interferes** [1] - 559:9

**interlocked** [1] - 494:3

**interlocking** [1] - 494:8

**International** [1] - 468:17

**international** [2] - 470:16, 470:17

**interplay** [1] - 576:23

**interrogatories** [1] - 473:9

**interrupt** [1] - 377:25

**introduce** [3] - 490:25, 491:5, 491:12

**introduced** [1] - 499:18

**introduction** [2] - 477:10, 590:21

**investigated** [2] - 513:12, 514:16

**investigating** [1] - 513:24

**investigations** [2] - 467:21, 473:7

**involve** [2] - 467:16, 572:19

**involved** [6] - 469:10, 470:19, 511:11, 525:22, 571:4, 573:12

**involves** [1] - 395:5

**involving** [1] - 474:25

**IOD** [1] - 451:10

**irrelevant** [2] - 413:22, 413:23

**issue** [37] - 377:23, 378:3, 397:19, 400:24, 401:1, 401:2, 401:3, 401:17, 401:18, 402:20, 403:3, 403:5, 403:7, 429:11, 431:22, 466:14, 466:16, 477:2, 478:23, 500:9, 514:8, 541:6, 564:19, 567:17, 570:7, 570:8, 572:19, 575:10, 576:4, 576:10, 578:6, 578:11, 578:12, 580:10, 582:3, 587:5, 587:11

**issues** [4] - 382:17, 510:23, 519:13, 571:2

**items** [1] - 464:13

**itself** [3] - 387:1, 482:9, 482:10


**J**

**January** [2] - 443:13, 447:23

**Jersey** [1] - 470:4

**job** [30] - 374:14, 383:25, 393:11, 393:17, 393:23, 427:6, 452:21, 452:24, 453:1, 453:4, 453:5, 453:12, 453:13,

**jobs** [7] - 393:11, 393:13, 393:15, 453:9, 455:2, 550:10

**jog** [2] - 395:14, 443:10

**jogging** [1] - 443:14, 443:24

**joints** [1] - 466:7

**joke** [1] - 550:5

**Journal** [6] - 408:25, 409:4, 409:6, 474:24, 475:10, 546:6

**Judge** [1] - 397:18

**judged** [2] - 539:19, 582:4

**judgment** [2] - 400:8, 400:15

**July** [24] - 381:5, 394:4, 406:21, 409:19, 411:13, 411:24, 412:14, 413:16, 414:23, 421:7, 423:16, 435:11, 453:6, 453:11, 456:16, 457:7, 457:10, 474:24, 545:22, 545:24, 546:8, 546:19, 547:17, 554:7

**jump** [1] - 397:7

**jungle** [1] - 397:7

**JUROR** [1] - 540:22

**jurors** [2] - 371:6, 564:1

**Jury** [1] - 505:2

**jury** [86] - 375:6, 375:11, 375:16, 375:21, 376:15, 376:17, 377:12, 378:11, 381:9, 392:17, 394:10, 400:17, 401:9, 401:12, 402:13, 402:19, 411:24, 412:3, 415:6, 424:12, 424:19, 426:9, 431:4, 457:20, 458:2, 458:9, 458:11, 459:2, 462:9, 468:21, 469:13, 479:7, 479:20, 482:2, 488:21, 489:8, 504:3, 505:4, 505:18, 507:7, 507:10, 507:24, 508:1, 508:8, 508:13, 508:15, 531:14, 540:19, 541:11, 541:20, 542:19, 542:22, 543:18, 543:25, 544:6, 544:8, 544:10, 551:13, 551:15, 556:9, 558:13, 559:4, 559:24, 560:25,

**561**:2, 563:20, 565:2, 565:21, 566:2, 566:10, 566:12, 566:15, 567:21, 568:14, 570:8, 571:22, 573:1, 573:2, 589:20, 589:23, 590:1, 590:4, 591:10, 591:21, 592:1

**Justin** [4] - 539:15, 540:11, 540:25, 562:1


**K**

**Kawasaki** [5] - 570:9, 570:10, 570:11, 571:4, 571:13

**keep** [11] - 381:15, 389:25, 425:21, 455:8, 476:17, 491:10, 524:21, 530:2, 530:24, 531:9

**keeping** [1] - 478:24

**keeps** [2] - 530:8, 530:11

**Ken** [2] - 473:12, 520:19

**Kessler** [5] - 436:23, 437:14, 437:23, 438:2, 438:13

**key** [1] - 477:22

**kid** [2] - 383:18, 397:1

**kids** [1] - 397:6

**kill** [1] - 556:23

**kind** [15] - 380:3, 392:19, 404:24, 415:9, 415:20, 416:21, 427:5, 427:18, 427:21, 428:1, 447:13, 479:12, 505:13, 533:11, 567:21

**kitchen** [1] - 383:1

**knock** [1] - 375:12

**knowing** [1] - 479:9

**knowingly** [2] - 575:16, 577:6

**knowledge** [6] - 513:11, 513:23, 514:15, 529:15, 529:18, 577:23

**known** [2] - 502:20, 591:23

**knows** [2] - 410:23, 411:5


**L**

**L-shaped** [1] - 484:2

**Labor** [1] - 470:21

**lack** [1] - 532:10

**ladder** [8] - 488:24, 488:25, 493:6, 502:7, 510:14

**ladies** [4] - 503:19,

**539**:7, 543:24, 558:12

**laid** [2] - 481:23, 513:18

**land** [3] - 492:10, 492:22, 502:14

**landing** [8] - 493:2, 493:3, 501:22, 502:12, 502:18, 502:19, 503:8, 537:19

**landlord** [1] - 448:18

**lands** [1] - 513:7

**language** [8] - 565:12, 569:22, 576:7, 579:13, 579:19, 583:17, 584:9, 584:10

**large** [1] - 527:25

**last** [21] - 379:24, 396:17, 403:7, 408:11, 413:5, 461:6, 463:9, 467:12, 468:4, 468:7, 474:22, 475:25, 495:12, 506:19, 508:24, 520:13, 565:4, 580:6, 581:24, 582:14

**late** [4] - 375:2, 542:15, 550:6, 558:22

**late-in-the-day** [1] - 550:6

**lateral** [1] - 491:12

**laterally** [1] - 510:9

**latest** [2] - 507:13, 581:17

**latitude** [1] - 497:11

**laude** [1] - 463:3

**Laughter** [5] - 483:14, 550:4, 550:8, 580:19, 592:8

**laughter** [3] - 550:11, 559:18, 575:5

**LAW** [1] - 565:9

**law** [9] - 572:13, 574:4, 574:8, 574:9, 575:6, 578:10, 581:25

**laws** [3] - 470:23, 470:25, 525:13

**lawsuit** [1] - 580:16

**lawyers** [6] - 507:9, 539:4, 539:12, 550:7, 550:9, 559:7

**lay** [2] - 513:16, 513:21

**laying** [1] - 422:1

**league** [1] - 394:7

**lean** [2] - 396:8, 396:9

**learn** [1] - 408:15

**learned** [1] - 408:13

**learning** [4] - 407:25, 408:9, 408:15, 408:16, 408:17, 409:10

**least** [4] - 423:19,

453:11, 586:15, 588:5
**leave** [15] - 425:13, 426:13, 427:1, 438:21, 448:10, 448:11, 448:12, 448:22, 531:21, 538:15, 539:3, 542:19, 579:20, 581:18, 590:2
**leaves** [2] - 483:15, 590:1
**leaving** [3] - 445:25, 448:19, 538:16
**left** [41] - 377:10, 386:4, 393:4, 396:8, 414:5, 414:7, 414:9, 418:4, 418:6, 418:7, 419:13, 419:15, 419:17, 419:18, 420:2, 421:14, 424:13, 424:18, 424:20, 424:23, 424:24, 425:21, 426:1, 426:7, 426:10, 426:24, 431:10, 431:14, 439:2, 448:9, 448:15, 461:25, 475:3, 485:4, 545:2, 548:3, 548:5, 548:7, 551:22, 551:24, 552:8
**leg** [7] - 383:3, 392:20, 395:8, 396:6, 396:10, 420:5, 425:2
**legal** [2] - 473:3, 517:8
**legs** [1] - 491:20
**lends** [1] - 571:20
**length** [2] - 491:19, 507:25
**less** [14] - 374:19, 391:3, 421:6, 421:20, 435:12, 436:1, 438:18, 444:12, 444:24, 453:1, 455:17, 518:13, 564:13, 572:10
**lesser** [1] - 460:2
**level** [32] - 378:19, 379:13, 387:7, 392:14, 393:21, 406:23, 410:17, 411:16, 413:10, 413:13, 422:4, 422:5, 422:12, 427:4, 465:1, 475:4, 475:11, 483:7, 488:23, 489:2, 489:3, 492:21, 492:22, 494:13, 498:22, 503:1, 512:10, 522:6, 537:20, 546:17, 546:20
**levels** [1] - 464:2
**lever** [1] - 501:1
**liability** [4] - 506:14, 507:3, 563:4, 564:9
**liable** [1] - 576:2
**library** [1] - 491:24
**lie** [1] - 390:19

**lied** [7] - 404:23, 404:24, 405:9, 405:12, 406:6, 406:12, 417:14
**lien** [21] - 398:5, 399:10, 399:21, 399:22, 399:23, 399:25, 400:3, 400:7, 400:14, 400:23, 401:1, 401:2, 401:3, 401:15, 402:7, 402:8, 402:12, 402:16, 402:18, 403:6, 403:16
**life** [8] - 380:21, 381:4, 381:6, 381:9, 383:4, 385:19, 394:21, 397:4
**lift** [5] - 492:21, 499:7, 499:15, 502:25, 509:17
**lifted** [3] - 420:5, 424:8, 431:7
**lifting** [1] - 501:20
**ligament** [1] - 425:7
**ligaments** [5] - 388:15, 389:23, 444:11, 465:15
**light** [4] - 395:14, 396:7, 407:21, 546:4
**lighting** [6] - 429:2, 429:11, 429:13, 429:14, 432:11, 432:12
**lights** [3] - 438:23, 540:13, 540:15
**limit** [1] - 531:18
**limited** [4] - 470:16, 496:1, 497:22, 554:14
**limp** [2] - 384:1, 392:18
**line** [8] - 425:8, 428:1, 482:16, 482:17, 482:18, 510:16, 556:25, 587:18
**lined** [3] - 499:6, 509:6, 510:1
**lines** [1] - 449:25
**list** [11] - 455:15, 455:18, 464:8, 464:11, 464:13, 464:17, 488:19, 518:20, 561:25, 584:1
**listed** [5] - 471:10, 480:24, 499:25, 509:14
**listen** [1] - 448:11
**listening** [1] - 579:2
**listing** [1] - 495:24
**live** [2] - 538:20, 558:16
**lived** [1] - 381:11
**living** [1] - 386:2
**loading** [1] - 490:5
**location** [19] - 387:12, 472:22, 475:3, 475:14, 475:15, 475:19, 475:22, 476:1, 476:4, 476:6,

476:10, 476:25, 477:3, 477:4, 481:8, 484:5, 511:18, 513:9
**locations** [2] - 481:17, 500:22
**locker** [4] - 409:22, 409:24, 409:25, 416:5
**locks** [1] - 392:24
**Locomotive** [1] - 384:12
**locomotive** [4] - 512:7, 532:16, 532:22, 532:24
**look** [44] - 372:1, 376:19, 416:11, 419:13, 419:15, 419:16, 419:17, 420:2, 420:10, 420:11, 421:11, 422:23, 423:10, 424:23, 427:7, 430:5, 436:3, 438:7, 438:8, 440:6, 472:1, 476:11, 491:25, 496:20, 514:9, 520:8, 529:1, 529:24, 532:25, 542:12, 565:17, 568:2, 568:22, 568:23, 569:4, 573:22, 574:8, 574:13, 577:12, 583:5, 583:11, 583:19, 587:20, 588:16
**looked** [11] - 371:3, 373:7, 419:23, 423:21, 428:3, 467:16, 506:17, 506:20, 520:19, 527:1, 527:5
**looking** [17] - 419:21, 420:8, 421:21, 427:6, 434:20, 436:8, 437:21, 489:1, 494:9, 507:9, 511:11, 518:20, 533:3, 548:4, 570:6, 584:13, 587:12
**looks** [7] - 374:12, 374:14, 508:7, 568:21, 574:12, 574:24
**losing** [3] - 448:3, 448:5, 460:7
**loss** [2] - 401:22, 515:15
**lost** [13] - 381:17, 386:14, 386:21, 386:23, 388:15, 391:20, 397:19, 400:16, 401:19, 402:21, 446:9, 460:20, 587:12
**loud** [1] - 540:16
**louder** [3] - 540:22, 540:23, 540:24
**love** [1] - 565:21
**loved** [1] - 455:9
**low** [1] - 455:15
**lower** [3] - 425:8,

535:2, 535:5
**lug** [3] - 486:9, 492:23, 524:7
**lugs** [2] - 536:2
**lumped** [1] - 477:23
**lunch** [2] - 503:18, 504:4
**luncheon** [1] - 504:11
**lying** [6] - 406:6, 416:19, 450:1, 522:25, 555:19, 557:19

# M

**machine** [3] - 443:15, 443:25, 465:13
**machinery** [2] - 572:4, 573:24
**magically** [1] - 385:17
**main** [3] - 397:3, 408:19, 428:17
**maintain** [1] - 572:2
**major** [1] - 389:8
**majority** [1] - 408:24
**makeup** [1] - 371:4
**management** [1] - 463:14
**mand** [1] - 563:21
**manner** [2] - 511:16, 511:18
**manufacturer** [1] - 500:5
**March** [2] - 445:5, 445:14
**mark** [15] - 374:19, 374:20, 374:24, 374:25, 378:1, 378:8, 378:10, 479:1, 479:8, 479:21, 566:14, 583:24, 592:13
**marked** [17] - 430:4, 430:25, 434:14, 434:15, 476:15, 478:7, 479:3, 480:13, 480:14, 481:3, 481:4, 561:15, 561:23, 562:15, 566:17, 583:24, 584:4
**marker** [1] - 483:20
**mask** [1] - 416:4
**mass** [1] - 491:20
**massive** [1] - 378:20
**match** [1] - 584:18
**material** [3] - 515:16, 521:5, 534:7
**materials** [11] - 463:6, 465:7, 473:2, 474:20, 475:13, 481:11, 486:11, 488:10, 488:19, 494:4, 495:12, 511:1, 514:7, 529:2, 529:8

**Materials** [2] - 467:10, 468:17
**math** [1] - 407:5
**matter** [11] - 400:13, 402:8, 432:24, 432:25, 433:2, 490:23, 518:2, 539:2, 560:17, 592:5, 592:21
**matters** [1] - 561:7
**mean** [41] - 372:11, 372:22, 379:6, 380:13, 384:3, 395:13, 399:12, 401:19, 404:3, 413:24, 415:21, 416:3, 416:17, 416:21, 433:16, 443:8, 446:17, 455:7, 462:13, 463:24, 469:21, 470:6, 479:12, 488:21, 488:24, 497:2, 498:19, 501:4, 507:13, 551:4, 553:18, 556:3, 563:24, 570:19, 572:24, 574:3, 578:12, 583:8, 583:9, 591:7
**meaning** [3] - 491:1, 492:10, 495:16
**means** [15] - 490:7, 492:17, 502:17, 503:5, 507:15, 509:4, 509:23, 513:6, 575:21, 577:8, 577:9, 582:1, 583:4, 588:7, 590:13
**measure** [12] - 373:6, 481:19, 483:2, 484:22, 494:20, 496:18, 524:9, 525:5, 526:12, 530:10, 530:14, 530:17
**measured** [15] - 482:9, 483:2, 483:7, 485:5, 486:23, 495:4, 495:11, 495:18, 495:19, 495:23, 495:24, 496:13, 524:12, 524:17, 532:1
**measurement** [2] - 469:9, 482:9
**measurements** [3] - 481:10, 525:8, 529:25
**measuring** [3] - 495:10, 524:16, 525:14
**mechanical** [6] - 465:13, 493:22, 494:6, 494:8, 494:14, 494:15
**mechanically** [1] - 494:3
**mechanics** [1] - 463:6
**Medical** [4] - 563:10, 590:10, 590:25, 591:1
**medical** [16] - 380:13, 381:3, 542:3, 542:4, 542:5, 542:8, 542:25,

607

543:4, 562:1, 562:13,
563:7, 563:8, 563:11,
564:19, 590:15, 590:17
  **medication** [1] -
389:9
  **meets** [1] - 537:12
  **member** [2] - 384:13,
468:13
  **members** [1] - 384:6
  **membership** [3] -
468:20, 468:25, 469:2
  **memory** [4] - 414:23,
415:11, 434:25, 554:6
  **mention** [4] - 431:10,
438:21, 496:7, 522:7
  **mentioned** [7] -
379:2, 392:5, 407:23,
424:25, 438:4, 470:18,
495:7
  **mentions** [1] - 522:12
  **metal** [16] - 421:9,
486:9, 492:23, 495:19,
495:22, 495:25, 496:13,
503:6, 509:6, 509:25,
510:13, 524:8, 526:8,
526:14, 534:4, 534:7
  **Meteorological** [1] -
468:18
  **method** [2] - 498:20,
511:7
  **methodologies** [2] -
513:11, 514:15
  **methodology** [1] -
513:23
  **methods** [1] - 464:11
  **microphone** [1] -
546:12
  **microscopic** [1] -
494:13
  **microscopically** [1] -
493:23
  **middle** [3] - 477:25,
510:10, 549:17
  **midnight** [1] - 455:1
  **might** [12] - 419:9,
423:19, 429:2, 429:5,
435:25, 438:4, 443:8,
464:8, 492:3, 507:5,
535:1, 541:19
  **million** [1] - 485:13
  **mind** [4] - 411:3,
433:7, 493:23, 551:8
  **mine** [2] - 569:13,
581:3
  **minimize** [1] - 515:21
  **minimum** [6] -
447:13, 469:22, 469:24,
470:8, 470:10, 572:24
  **Mino** [1] - 403:17
  **MINO** [164] - 372:7,

373:5, 376:9, 397:13,
397:18, 398:3, 398:9,
398:13, 398:16, 398:23,
400:4, 400:9, 400:21,
403:19, 403:21, 404:2,
404:5, 404:13, 430:2,
430:21, 434:9, 434:11,
435:22, 435:24, 437:5,
437:7, 437:13, 437:16,
437:18, 439:17, 439:19,
444:17, 457:17, 458:21,
461:3, 461:5, 461:14,
471:16, 471:24, 474:2,
477:10, 478:14, 478:21,
479:12, 480:6, 480:11,
481:1, 481:3, 481:22,
487:14, 494:24, 495:21,
496:18, 501:5, 504:7,
505:4, 505:11, 505:14,
506:3, 506:9, 506:14,
506:18, 506:21, 507:2,
507:5, 507:11, 507:22,
508:10, 513:16, 516:15,
530:16, 530:23, 531:4,
531:24, 532:3, 533:14,
535:19, 535:22, 538:9,
538:23, 540:5, 540:9,
542:7, 542:13, 542:23,
543:1, 543:3, 543:7,
544:15, 544:19, 545:12,
549:25, 553:23, 554:10,
556:5, 556:11, 558:6,
558:10, 560:2, 561:4,
562:12, 563:3, 563:9,
563:16, 563:23, 564:5,
564:9, 564:12, 564:15,
564:25, 566:7, 566:20,
567:20, 568:11, 568:18,
570:15, 571:19, 572:9,
572:22, 573:3, 574:11,
575:2, 575:4, 577:2,
577:9, 579:11, 580:12,
580:22, 580:25, 581:2,
581:5, 581:10, 582:7,
582:21, 583:21, 584:16,
585:8, 585:14, 585:16,
585:22, 586:6, 586:14,
587:3, 588:3, 588:5,
588:16, 588:21, 589:3,
589:12, 589:24, 590:5,
590:8, 590:15, 590:20,
590:24, 591:2, 591:5,
591:9, 591:11, 591:14,
591:16, 591:19, 592:3,
592:19
  **minute** [7] - 455:4,
458:23, 479:1, 490:7,
539:5, 569:24, 586:1
  **minutes** [9] - 454:24,
458:21, 458:25, 479:18,
479:21, 503:15, 506:1,

543:14, 566:4
  **mischaracterization**
[1] - 453:25
  **misimpression** [1] -
578:5
  **misleading** [1] -
374:3
  **miss** [1] - 380:5
  **missed** [1] - 383:4
  **missing** [3] - 427:21,
427:23, 497:15
  **mistake** [1] - 524:3
  **misunderstood** [1] -
525:17
  **mitigate** [3] - 464:19,
515:7, 521:4
  **mitigated** [1] - 513:5
  **mitigation** [2] - 465:1,
511:6
  **mobile** [2] - 379:4,
379:5
  **mobilized** [2] - 440:1,
442:20
  **model** [16] - 565:8,
565:11, 567:25, 568:4,
569:1, 569:11, 570:3,
577:15, 579:19, 579:25,
583:17, 586:21, 586:22,
586:25, 587:1
  **moderation** [1] -
443:21
  **Modern** [1] - 559:16,
559:20
  **modify** [1] - 582:9
  **moment** [3] - 380:17,
435:17, 542:22
  **Monday** [1] - 507:23
  **money** [31] - 386:24,
398:21, 398:22, 399:7,
399:8, 399:10, 400:16,
400:18, 401:4, 402:9,
402:11, 402:12, 403:5,
403:24, 404:4, 447:12,
447:14, 448:10, 450:10,
450:14, 450:25, 451:16,
451:24, 452:2, 452:4,
452:7, 460:8, 460:23,
588:8
  **money's** [1] - 450:22
  **month** [12] - 391:3,
391:5, 391:6, 439:12,
446:13, 446:14, 446:21,
448:23, 449:20, 449:22,
453:19, 459:21
  **months** [26] - 378:25,
381:14, 387:19, 387:21,
387:22, 387:23, 391:18,
391:21, 407:3, 408:3,
408:4, 408:8, 408:11,
436:19, 448:15, 449:2,

453:9, 453:11, 455:14,
460:23, 507:17, 507:18
  **morning** [13] -
376:18, 404:14, 404:15,
457:19, 501:8, 507:4,
507:6, 508:7, 558:21,
558:23, 565:24, 574:10,
590:3
  **mortgage** [3] -
381:16, 401:5
  **most** [10] - 379:17,
419:1, 419:4, 419:5,
419:18, 420:15, 420:24,
421:2, 424:13, 432:4,
433:8, 456:1, 474:22,
474:23, 493:20, 519:20,
579:17, 581:13, 581:17
  **mostly** [1] - 524:21
  **mother** [1] - 400:19
  **mother's** [1] - 381:20
  **motion** [5] - 491:8,
560:1, 560:3, 561:1,
561:3
  **motions** [2] - 466:7,
544:14
  **motorcycle** [3] -
396:14, 396:15, 396:16
  **motors** [1] - 465:14
  **move** [23] - 420:10,
430:22, 480:8, 480:23,
487:14, 490:24, 491:8,
492:20, 496:5, 531:25,
536:21, 537:7, 537:8,
537:24, 543:17, 560:18,
561:9, 561:13, 561:20,
561:21, 589:14, 591:4,
591:6
  **moved** [3] - 480:4,
480:7, 561:12
  **movements** [2] -
435:14, 435:19
  **moves** [1] - 408:18
  **movie** [2] - 539:7,
558:16
  **moving** [9] - 379:18,
382:20, 436:2, 491:1,
537:10, 562:9, 591:8
  **MR** [381] - 372:7,
372:16, 372:18, 373:5,
373:16, 373:20, 373:21,
373:22, 374:17, 375:4,
376:9, 376:12, 377:5,
377:7, 377:9, 378:5,
378:8, 378:17, 397:10,
397:13, 397:18, 397:25,
398:3, 398:9, 398:13,
398:16, 398:23, 399:2,
399:8, 399:11, 399:13,
399:14, 399:20, 399:24,
400:4, 400:5, 400:9,
400:10, 400:11, 400:20,
400:21, 401:8, 401:25,
402:17, 402:24, 403:7,
403:11, 403:13, 403:15,
403:19, 403:20, 403:21,
403:23, 404:1, 404:2,
404:5, 404:6, 404:13,
415:13, 417:16, 430:2,
430:21, 434:9, 434:11,
435:22, 435:24, 437:5,
437:7, 437:13, 437:16,
437:18, 439:17, 439:19,
444:17, 453:22, 453:25,
457:17, 458:13, 458:17,
458:21, 458:24, 459:8,
459:10, 461:1, 461:3,
461:5, 461:14, 461:19,
462:8, 471:12, 471:16,
471:19, 471:23, 471:24,
474:2, 474:7, 474:10,
474:14, 476:21, 477:7,
477:10, 477:12, 478:5,
478:9, 478:13, 478:14,
478:15, 478:21, 478:24,
479:12, 479:25, 480:2,
480:6, 480:7, 480:11,
480:18, 480:23, 481:1,
481:2, 481:3, 481:20,
481:22, 482:1, 482:21,
487:10, 487:13, 487:14,
487:17, 489:12, 494:24,
495:21, 496:4, 496:6,
496:18, 496:23, 497:1,
497:4, 497:13, 497:18,
498:4, 498:5, 501:5,
501:10, 503:15, 504:7,
505:4, 505:11, 505:14,
505:15, 505:23, 506:1,
506:3, 506:9, 506:14,
506:18, 506:21, 506:22,
507:2, 507:5, 507:11,
507:22, 508:10, 508:23,
513:16, 513:19, 513:22,
516:12, 516:15, 530:4,
530:8, 530:16, 530:20,
530:23, 531:4, 531:23,
531:24, 532:3, 533:14,
533:15, 533:17, 534:12,
535:19, 535:22, 537:21,
538:9, 538:21, 538:23,
539:1, 540:5, 540:9,
540:16, 540:19, 541:3,
541:6, 541:14, 541:19,
541:22, 542:1, 542:3,
542:7, 542:13, 542:23,
543:1, 543:3, 543:7,
543:9, 543:10, 543:15,
543:20, 544:15, 544:19,
545:12, 549:25, 550:2,
550:5, 550:14, 551:7,
553:19, 553:23, 554:10,

554:12, 554:15, 555:7, 556:1, 556:5, 556:11, 556:16, 556:20, 557:2, 557:5, 558:3, 558:6, 558:10, 560:2, 561:4, 561:10, 561:14, 561:18, 561:22, 562:3, 562:5, 562:8, 562:10, 562:12, 562:16, 562:24, 563:3, 563:9, 563:13, 563:16, 563:23, 564:5, 564:9, 564:12, 564:15, 564:23, 564:25, 565:6, 566:6, 566:7, 566:13, 566:20, 566:21, 566:25, 567:2, 567:4, 567:6, 567:11, 567:13, 567:16, 567:20, 568:4, 568:7, 568:11, 568:18, 568:20, 568:24, 569:5, 569:8, 569:15, 569:19, 569:21, 570:2, 570:4, 570:6, 570:11, 570:15, 570:19, 570:22, 570:24, 571:1, 571:12, 571:19, 572:9, 572:13, 572:18, 572:22, 573:3, 573:8, 574:11, 574:16, 574:23, 575:2, 575:4, 575:7, 575:10, 575:22, 576:20, 577:2, 577:9, 579:10, 579:11, 579:23, 580:2, 580:6, 580:11, 580:12, 580:22, 580:25, 581:2, 581:5, 581:10, 581:23, 582:7, 582:13, 582:17, 582:21, 583:7, 583:16, 583:21, 584:6, 584:13, 584:16, 584:21, 585:6, 585:8, 585:14, 585:16, 585:22, 586:6, 586:14, 587:3, 587:9, 587:11, 587:25, 588:3, 588:5, 588:11, 588:14, 588:16, 588:21, 588:22, 589:3, 589:4, 589:11, 589:12, 589:24, 590:5, 590:6, 590:8, 590:12, 590:13, 590:15, 590:17, 590:20, 590:23, 590:24, 591:2, 591:5, 591:9, 591:11, 591:14, 591:15, 591:16, 591:19, 592:3, 592:5, 592:9, 592:12, 592:19, 592:20

**MRI** [2] - 388:2, 388:3
**muscles** [1] - 465:14
**museum** [1] - 393:2
**must** [5] - 470:10, 493:11, 521:9, 533:25, 582:10

# N

**N/A** [4] - 427:14, 427:17, 428:7, 428:13
**nailed** [1] - 376:5
**name** [5] - 413:5, 462:4, 486:9, 545:5, 545:7
**names** [1] - 454:23
**narrow** [3] - 401:18, 402:20, 576:4
**National** [2] - 468:17, 509:13
**nature** [1] - 379:11
**near** [2] - 389:22, 413:14
**nearing** [1] - 559:12
**necessarily** [1] - 536:1
**necessary** [15] - 395:16, 516:2, 524:20, 525:2, 525:5, 525:9, 526:3, 526:4, 526:5, 526:17, 526:18, 533:19, 533:25, 577:24, 578:4
**neck** [4] - 422:20, 422:21, 422:22, 422:25
**need** [29] - 371:6, 378:1, 443:5, 456:1, 457:21, 464:14, 470:8, 475:8, 479:3, 487:20, 489:7, 494:13, 499:18, 502:15, 502:17, 502:23, 510:15, 513:7, 525:14, 528:7, 532:17, 533:20, 537:24, 542:21, 544:14, 564:20, 591:3, 591:7, 591:12
**needed** [2] - 385:18, 509:5
**needs** [2] - 568:11, 583:3
**negligence** [33] - 560:24, 575:14, 575:15, 575:17, 575:19, 575:25, 576:10, 576:17, 576:24, 577:5, 577:21, 577:25, 579:2, 582:22, 582:24, 583:1, 583:8, 583:9, 583:13, 583:14, 584:23, 585:1, 585:12, 585:18, 585:19, 585:24, 586:10, 586:23, 587:8, 589:7
**negligent** [14] - 576:7, 576:18, 583:2, 584:22, 585:1, 585:9, 585:10, 585:17, 585:23, 586:3, 586:4, 586:10, 586:16, 589:8

**negligently** [2] - 578:2, 579:5
**neighborhood** [1] - 518:6
**net** [1] - 391:21
**neuroscience** [2] - 463:13, 465:16
**never** [18] - 383:9, 390:1, 394:15, 396:18, 406:1, 406:20, 424:24, 461:7, 516:16, 516:18, 516:23, 522:12, 531:6, 531:7, 536:22, 562:22, 573:18, 576:9
**New** [2] - 470:4
**new** [10] - 380:13, 381:22, 470:23, 496:3, 497:7, 522:21, 523:12, 578:1, 579:4, 591:18
**newborn** [5] - 382:5, 383:4, 446:24, 450:12
**next** [15] - 387:5, 425:7, 428:5, 461:18, 502:7, 507:20, 526:7, 549:5, 555:3, 558:17, 574:15, 574:16, 575:7, 580:5, 582:20
**night** [4] - 506:19, 542:16, 550:3, 592:16
**night's** [1] - 559:16
**nine** [3] - 462:25, 575:9, 581:11
**nobody** [4] - 406:13, 417:13, 436:14, 573:10
**noise** [1] - 429:2
**non** [4] - 515:12, 515:19, 534:8, 534:9
**non-slip** [4] - 515:12, 515:19, 534:8, 534:9
**nonapplicable** [1] - 427:21
**nondelegable** [5] - 570:7, 571:25, 572:1, 572:8, 572:13
**none** [5] - 500:7, 500:8, 528:10, 528:11, 550:12
**north** [1] - 403:16
**Note** [2] - 434:17, 436:3
**note** [6] - 436:11, 437:13, 437:21, 440:6, 440:7, 444:20
**noted** [2] - 561:5, 561:11
**notes** [3] - 561:17, 590:9, 590:22
**nothing** [13] - 379:14, 397:10, 452:14, 457:17, 460:6, 461:14, 497:14,

532:1, 533:14, 538:9, 549:25, 554:10, 583:12
**notice** [7] - 372:25, 373:7, 385:11, 494:4, 507:25
**noticed** [5] - 421:19, 421:20, 421:22, 421:23
**notices** [1] - 473:9
**November** [7] - 387:18, 390:16, 440:11, 440:15, 440:22, 444:5, 592:21
**nowhere** [2] - 389:22, 413:14
**number** [30] - 387:24, 391:23, 428:9, 428:22, 439:18, 475:1, 487:21, 530:22, 533:24, 535:11, 536:16, 541:14, 561:9, 566:22, 566:25, 567:5, 567:16, 567:24, 568:20, 569:14, 574:16, 580:6, 581:6, 581:11, 582:21, 584:13, 584:14, 584:25, 585:22
**numbers** [10] - 525:18, 525:22, 526:1, 526:4, 526:5, 526:17, 526:18, 533:20, 569:6

# O

**o'clock** [2] - 457:23, 503:18
**oath** [3] - 376:25, 459:6, 539:11
**object** [11] - 531:23, 543:6, 567:20, 568:5, 568:9, 569:12, 569:21, 572:24, 577:2, 581:23, 582:17
**objected** [1] - 478:22
**objecting** [1] - 568:25
**objection** [45] - 398:1, 415:13, 417:16, 430:23, 453:22, 453:24, 471:16, 474:2, 478:16, 480:9, 480:11, 480:25, 481:3, 481:21, 494:24, 495:21, 496:18, 501:5, 506:23, 506:24, 513:16, 531:21, 537:21, 543:2, 562:11, 564:21, 564:23, 564:24, 567:18, 569:16, 572:7, 572:21, 574:7, 575:1, 577:1, 579:10, 579:11, 580:8, 581:14, 583:6, 585:6, 590:6, 590:18, 591:6, 591:8
**objectionable** [1] -

**568:10
objections** [4] - 478:17, 566:18, 572:15, 584:1
**objects** [2] - 477:10, 495:23
**obligations** [1] - 574:18
**observations** [1] - 481:9
**observed** [1] - 475:23
**obstacle** [2] - 394:9, 394:12
**obstacles** [1] - 394:16
**obvious** [1] - 502:16
**obviously** [3] - 427:20, 436:1, 549:15
**occasion** [1] - 396:16
**occasionally** [1] - 392:24
**occupation** [1] - 462:9
**Occupational** [1] - 470:22
**occur** [2] - 426:17, 464:15
**occurred** [7] - 406:2, 426:5, 474:24, 474:25, 488:1, 512:15, 578:20
**Occurrence** [1] - 430:12
**occurring** [1] - 464:15
**October** [7] - 384:21, 390:13, 442:3, 442:6, 475:17, 476:22, 539:16
**OE** [1] - 550:24
**offer** [4] - 468:24, 471:12, 477:7, 543:15
**offered** [5] - 454:13, 455:17, 455:20, 455:21, 456:3
**offers** [1] - 502:24
**office** [3] - 472:20, 473:2, 563:16
**officer** [1] - 498:16
**official** [2] - 478:20, 479:8
**offroad** [1] - 489:25
**offset** [2] - 497:5, 499:17, 500:19, 501:4, 501:6, 501:12, 501:13, 501:14, 524:19, 525:1
**often** [2] - 386:7, 443:24
**oil** [19] - 429:20, 527:13, 527:25, 529:7, 529:16, 533:4, 547:5, 548:13, 552:22, 553:2,

554:22, 555:12, 555:15, 555:18, 555:23, 557:11, 557:15, 557:18, 557:24

**old** [5] - 382:6, 394:25, 472:6, 580:16, 580:17

**older** [1] - 383:11

**omission** [1] - 577:25

**once** [16] - 389:18, 393:17, 396:18, 414:3, 431:10, 431:11, 431:13, 431:20, 439:22, 443:8, 464:16, 464:19, 465:25, 518:17, 523:9

**One** [1] - 377:23

**one** [102] - 373:24, 377:16, 377:19, 377:21, 377:23, 378:21, 380:23, 383:15, 387:8, 388:15, 391:3, 391:5, 393:4, 394:1, 403:7, 408:14, 410:4, 412:4, 412:6, 423:17, 423:20, 424:23, 426:14, 428:9, 428:12, 430:13, 437:2, 437:23, 440:12, 449:22, 451:10, 452:23, 453:3, 453:19, 454:9, 459:21, 461:3, 461:12, 471:6, 477:16, 478:15, 478:16, 479:2, 479:3, 479:23, 482:14, 485:9, 485:17, 486:15, 488:23, 489:2, 499:11, 503:1, 506:22, 527:8, 530:22, 534:13, 535:1, 535:12, 536:21, 539:5, 542:7, 544:24, 548:25, 549:22, 554:6, 556:25, 558:15, 561:8, 564:23, 565:5, 565:7, 566:14, 567:16, 567:19, 568:4, 568:6, 568:9, 568:10, 569:9, 569:11, 570:12, 570:23, 571:18, 573:23, 577:12, 580:2, 580:4, 580:6, 581:7, 582:9, 583:24, 584:13, 585:22, 586:4, 586:21, 587:2, 588:25, 591:13

**one-count** [1] - 565:5

**ones** [18] - 477:9, 477:19, 478:21, 478:22, 479:5, 479:9, 481:1, 499:25, 560:9, 566:24, 567:14, 569:14, 569:18, 569:19, 570:23, 579:17, 581:13

**online** [1] - 491:24

**op** [1] - 440:24

**open** [11] - 378:14,

401:2, 403:5, 404:10, 425:6, 438:25, 479:19, 530:12, 532:2, 543:23, 557:4

**opened** [2] - 399:16, 399:20

**opening** [6] - 402:18, 483:1, 483:6, 484:3, 484:7, 485:5

**opens** [3] - 398:4, 400:23, 400:25

**operation** [4] - 534:25, 573:24, 574:1, 574:5

**operations** [3] - 405:10, 406:9, 432:8

**operative** [1] - 542:4

**operator** [1] - 490:2

**opinion** [4] - 474:5, 474:9, 508:25, 509:7, 511:22, 512:1, 514:25, 515:4

**opinions** [6] - 468:5, 468:8, 473:24, 473:25, 474:3

**opportunity** [2] - 431:12, 431:18

**opposed** [2] - 523:12, 569:8

**opposition** [1] - 542:5

**option** [1] - 393:14, 446:11, 452:25

**order** [7] - 411:18, 425:24, 505:13, 546:16, 552:19, 578:24, 585:9

**ordered** [2] - 388:2, 505:9

**organizations** [3] - 468:19, 468:21, 469:5

**orientation** [5] - 405:18, 405:19, 405:21, 405:23, 406:1

**oriented** [1] - 484:5

**originally** [3] - 381:19, 487:24, 537:15

**orthopaedic** [1] - 445:11

**orthotic** [1] - 445:17

**OSHA** [9] - 463:16, 463:17, 463:18, 470:22, 489:22, 509:12, 523:24, 524:1

**OSHA-certified** [2] - 463:18

**OSHA-recognized** [1] - 524:1

**otherwise** [3] - 428:4, 474:17, 492:13

**outside** [3] - 380:18, 394:2, 543:18

**outweighs** [1] - 375:25

**overall** [1] - 523:9

**overkill** [1] - 556:24

**overlap** [1] - 577:20

**overnight** [1] - 574:9

**overtime** [23] - 390:23, 390:25, 391:2, 391:10, 391:13, 391:16, 391:18, 391:20, 453:16, 454:6, 454:11, 454:14, 454:17, 454:22, 455:2, 455:9, 455:17, 455:20, 455:24, 456:3, 456:9, 456:14, 587:13

**own** [11] - 377:2, 446:10, 446:11, 507:14, 519:23, 533:8, 542:17, 559:10, 575:15, 585:3, 586:11

**OxyContin** [1] - 389:13

# P

**P-11** [4] - 562:1, 562:6, 562:11, 562:14

**P-11A** [2] - 561:23, 561:24

**P-11B** [2] - 561:23, 561:24

**P-11C** [1] - 561:24

**P-23A** [1] - 534:21

**P-24A** [1] - 479:23

**P-5** [1] - 487:12

**P-5-1** [1] - 478:19

**P-5A** [2] - 487:13, 561:12

**P-5UU** [2] - 487:13, 561:12

**p.m** [3] - 455:1, 455:2, 474:25

**PA-5** [1] - 393:21

**packet** [1] - 568:18

**page** [5] - 427:11, 524:18, 524:23, 588:13

**pages** [1] - 497:17

**paid** [23] - 386:13, 391:11, 398:4, 398:8, 398:10, 399:3, 400:17, 400:22, 401:9, 402:12, 447:12, 448:18, 449:11, 449:14, 449:20, 450:3, 450:4, 451:5, 460:1, 517:22, 517:24, 518:1, 518:4

**pain** [68] - 377:15, 377:16, 378:18, 378:19, 379:13, 379:15, 379:16,

379:19, 380:2, 380:9, 380:11, 380:18, 381:2, 385:7, 385:8, 385:17, 386:20, 387:1, 387:2, 387:7, 387:10, 389:7, 389:8, 389:22, 392:8, 392:14, 392:18, 393:6, 395:9, 395:11, 395:15, 401:13, 401:18, 424:15, 425:1, 425:8, 425:9, 425:18, 425:21, 425:25, 426:3, 427:1, 431:11, 432:3, 435:5, 435:7, 435:8, 435:10, 435:13, 435:16, 435:19, 436:1, 437:2, 437:23, 441:1, 441:20, 442:19, 442:23, 442:24, 443:21, 444:10, 549:15, 587:13, 587:14, 587:21, 588:12

**painful** [1] - 438:18

**painkillers** [5] - 379:20, 441:1, 442:20, 442:24, 444:16

**pains** [1] - 380:9

**paintballing** [1] - 394:20

**painter's** [2] - 483:10, 483:15

**pairs** [1] - 500:21

**paper** [4] - 374:20, 382:4, 435:15, 482:17

**paper-thin** [1] - 382:4

**papers** [4] - 470:25, 472:25, 473:20, 495:15

**paragraph** [3] - 524:23, 525:16, 526:7

**parallel** [1] - 422:16

**paraphrase** [1] - 555:2

**parentheses** [3] - 425:6, 425:7, 425:12

**parents** [1] - 386:2

**park** [3] - 383:13, 393:2, 397:6

**part** [41] - 372:10, 379:17, 380:2, 384:11, 393:23, 402:22, 406:5, 408:19, 408:20, 424:13, 424:18, 435:24, 437:7, 437:14, 439:19, 444:17, 452:24, 465:17, 471:4, 476:15, 476:16, 484:20, 487:1, 488:8, 512:5, 531:11, 552:5, 554:25, 562:13, 575:13, 578:1, 583:13, 583:14, 584:8, 584:18, 584:24, 585:2, 585:18, 585:25, 586:11

**partially** [2] - 418:9,

435:20

**participate** [2] - 397:4, 470:23

**particular** [7] - 405:14, 452:24, 466:19, 469:12, 559:4, 567:20, 582:24

**particularly** [2] - 423:25, 494:17

**parties** [2] - 588:18, 589:7

**parties'** [1] - 470:24

**parts** [3] - 425:10, 468:3, 510:23

**party** [5] - 398:17, 456:8, 539:12, 588:7, 592:11

**pass** [1] - 487:22

**passenger** [2] - 393:16, 407:21

**past** [2] - 587:13, 587:17

**PATH** [112] - 371:2, 381:5, 398:4, 398:14, 398:20, 399:3, 399:4, 400:22, 401:9, 402:1, 402:3, 409:12, 409:13, 409:17, 409:20, 426:13, 426:24, 429:23, 430:21, 431:13, 432:15, 433:12, 433:20, 433:22, 441:7, 449:11, 450:3, 450:4, 451:5, 451:21, 451:23, 451:25, 452:17, 452:20, 456:17, 456:18, 460:8, 473:6, 473:10, 475:1, 477:10, 495:23, 496:8, 500:4, 500:5, 511:2, 511:7, 511:10, 512:25, 513:12, 513:13, 513:17, 513:23, 514:5, 514:16, 514:17, 515:1, 515:12, 515:20, 516:9, 517:6, 518:7, 518:15, 519:7, 519:11, 520:20, 521:4, 521:9, 530:1, 533:10, 533:11, 537:3, 545:17, 545:18, 545:22, 547:9, 547:12, 547:18, 560:3, 560:9, 560:10, 560:16, 560:18, 563:9, 567:24, 571:22, 572:10, 572:24, 573:7, 573:13, 577:2, 577:4, 581:5, 581:12, 583:1, 583:21, 584:22, 585:9, 585:17, 585:23, 586:3, 586:4, 586:15, 590:9, 590:10, 590:20, 590:25, 591:1

**PATH's** [5] - 532:10,

572:19, 574:17, 584:23, 585:24

**patient** [1] - 457:20
**pattern** [1] - 577:16
**pause** [6] - 415:19, 415:21, 416:7, 416:10, 416:11, 416:15
**paused** [1] - 416:9
**pay** [20] - 381:16, 391:20, 398:17, 398:20, 400:13, 400:14, 400:22, 401:5, 402:5, 402:7, 402:11, 447:10, 448:16, 459:20, 459:21, 461:7, 461:8, 461:10, 522:12, 586:16
**paycheck** [7] - 397:20, 398:23, 449:12, 449:16, 449:24, 450:5, 450:8
**paychecking** [1] - 451:13
**paying** [3] - 399:4, 448:6, 528:4
**payment** [1] - 446:23
**pays** [3] - 447:10, 451:21, 451:23
**peer** [3] - 472:24, 495:15, 498:10
**peer-reviewed** [3] - 472:24, 495:15, 498:10
**pending** [2] - 488:2, 488:5
**Pennsylvania** [1] - 470:4
**pension** [2] - 398:17, 460:12
**people** [20] - 372:22, 406:15, 410:24, 424:23, 463:22, 464:8, 465:9, 465:21, 466:1, 466:3, 467:18, 490:2, 510:21, 522:24, 522:25, 523:15, 528:13, 536:14, 536:25, 537:4
**people's** [1] - 466:6
**per** [7] - 390:25, 446:13, 446:14, 446:21, 455:1, 459:24, 517:25
**percent** [2] - 401:6, 401:7
**percentage** [1] - 589:5
**perceptible** [1] - 533:6
**perfect** [7] - 523:3, 543:17, 543:21, 581:13, 581:18, 590:24, 592:3
**perfectly** [2] - 436:10, 494:12

**perform** [3] - 473:15, 577:24, 578:24
**performance** [2] - 465:24, 575:24
**performed** [1] - 488:11
**performing** [1] - 472:17
**period** [7] - 384:17, 390:22, 399:4, 408:25, 441:10, 451:15, 451:18
**periodically** [1] - 563:10
**periods** [3] - 389:9, 454:14, 454:21
**permits** [1] - 485:15
**permitted** [2] - 578:2, 579:6
**person** [9] - 409:23, 490:4, 490:5, 491:18, 492:12, 517:1, 525:3, 539:22, 570:22
**personal** [2] - 529:15, 529:18, 559:10
**perspective** [3] - 512:8, 532:21, 569:16
**photogrammetry** [1] - 463:7
**photograph** [8] - 476:11, 482:19, 482:25, 485:11, 485:13, 487:6, 487:14, 487:21
**photographs** [10] - 371:3, 476:11, 476:14, 476:22, 477:8, 480:20, 480:21, 480:24, 481:9, 487:19
**photos** [1] - 528:8
**phrase** [3] - 372:6, 577:4, 587:7
**phrasing** [1] - 589:13
**physical** [5] - 436:16, 438:13, 462:18, 481:13, 523:2
**physically** [3] - 395:6, 409:23, 452:21
**physician** [2] - 425:13, 444:9
**Physician** [1] - 434:17
**Physician's** [1] - 436:3
**physics** [18] - 463:6, 465:4, 465:6, 468:1, 488:17, 490:16, 491:16, 492:5, 492:8, 493:19, 500:23, 509:8, 510:6, 523:3, 525:13, 526:1, 526:2
**Pi** [1] - 463:3

**pick** [3] - 393:14, 452:25, 453:1
**picked** [2] - 432:8, 508:1
**picking** [1] - 546:17
**picture** [10] - 371:14, 372:8, 373:13, 374:2, 378:4, 479:24, 493:23, 534:16, 534:20, 551:5
**pictures** [9] - 372:14, 375:14, 375:23, 477:13, 477:15, 477:20, 478:3, 478:5, 538:15
**piece** [6] - 374:20, 376:6, 415:2, 484:15, 522:16, 552:10
**pieces** [1] - 373:13
**pile** [3] - 477:4, 477:5
**piles** [2] - 476:17, 478:15
**pins** [1] - 388:24
**pipe** [1] - 376:5
**pipes** [4] - 371:11, 372:2, 374:11, 375:19
**place** [28] - 377:24, 378:14, 380:3, 397:16, 404:10, 418:4, 418:7, 418:10, 418:16, 418:17, 418:23, 439:7, 461:25, 473:18, 475:9, 477:14, 479:19, 530:7, 532:2, 536:12, 539:21, 541:5, 543:23, 545:1, 555:10, 557:4, 560:13, 578:22
**placed** [6] - 418:6, 420:3, 439:24, 539:11, 562:17, 566:23
**places** [4] - 450:22, 452:5, 555:21, 557:21
**placing** [1] - 521:4
**PLAINTIFF** [1] - 580:18
**Plaintiff** [17] - 397:18, 461:19, 462:2, 560:5, 563:13, 566:19, 566:21, 573:17, 581:17, 583:9, 583:15, 584:7, 585:1, 585:10, 586:10, 586:16, 587:8
**plaintiff's** [2] - 575:15, 577:25
**Plaintiff's** [25] - 435:24, 437:7, 437:16, 439:19, 444:17, 472:2, 477:23, 480:13, 480:14, 481:4, 485:12, 497:23, 508:1, 517:16, 517:19, 550:25, 561:9, 562:15, 566:22, 569:15, 582:11, 585:1, 585:19, 586:10,

589:5
**plan** [2] - 538:23, 591:22
**planks** [8] - 411:21, 411:25, 412:25, 413:2, 414:3, 547:1, 547:3, 547:5
**plant** [1] - 468:2
**planted** [1] - 421:13
**plasma** [1] - 534:9
**plate** [30] - 405:7, 405:25, 418:8, 418:25, 419:3, 419:4, 419:6, 419:19, 420:15, 420:17, 421:5, 485:17, 486:8, 492:24, 496:8, 496:14, 496:17, 496:19, 496:22, 497:8, 523:23, 524:1, 524:3, 524:4, 524:8, 524:10, 535:24, 536:12, 538:7, 560:14
**platform** [3] - 422:8, 422:10, 422:18
**plating** [1] - 419:24
**play** [8] - 383:15, 394:21, 396:25, 488:11, 521:25, 533:7, 562:21
**playback** [1] - 541:2
**played** [3] - 394:7, 540:12, 541:1
**playing** [2] - 394:23, 428:1
**pleasure** [1] - 559:5
**plenty** [3] - 375:23, 454:10
**plug** [1] - 526:1
**plumbing** [1] - 374:14
**plus** [3] - 446:16, 446:21, 446:22
**pocket** [1] - 386:24
**point** [50] - 379:22, 386:8, 386:16, 387:8, 388:3, 388:11, 388:16, 388:20, 392:2, 397:21, 402:6, 408:17, 409:9, 412:13, 412:16, 415:15, 417:9, 419:12, 419:15, 420:1, 420:25, 425:4, 427:2, 436:15, 438:6, 440:17, 441:6, 441:25, 456:16, 477:21, 481:18, 483:3, 483:25, 493:2, 497:16, 499:11, 510:2, 521:8, 525:5, 530:22, 530:24, 531:10, 532:1, 547:9, 549:1, 549:16, 559:13, 579:22, 588:17
**pointed** [1] - 571:18
**pointing** [3] - 494:10, 551:9, 571:14

**points** [4] - 465:10, 509:15, 534:22, 566:22
**pole** [1] - 576:14
**Port** [2] - 394:22, 507:24
**portable** [1] - 488:25
**portion** [7] - 406:15, 406:18, 407:25, 467:4, 484:24, 510:13, 522:11
**portions** [1] - 371:8
**position** [5] - 374:4, 374:5, 470:25, 545:18, 545:22
**positions** [2] - 469:4, 469:12
**positive** [2] - 418:19, 418:22
**possible** [9] - 414:19, 434:8, 434:25, 439:1, 505:5, 508:19, 508:21, 539:19, 587:8
**possibly** [5] - 413:10, 429:4, 434:6, 434:23, 535:8
**post** [1] - 440:24
**post-op** [1] - 440:24
**posting** [1] - 515:23
**potential** [2] - 464:11, 498:23
**pounds** [1] - 383:23
**power** [1] - 505:9
**practical** [2] - 538:8
**practice** [7] - 462:11, 467:5, 498:11, 498:19, 512:17, 512:25, 515:9
**practices** [8] - 478:1, 499:23, 500:18, 502:5, 502:22, 511:2, 511:24, 515:1
**pre** [3] - 580:13, 580:15, 580:21
**pre-existing** [3] - 580:13, 580:15, 580:21
**prediction** [1] - 579:14
**predominant** [1] - 493:21
**prefer** [4] - 393:25, 539:3, 585:9, 585:16
**preferred** [1] - 455:2
**prejudice** [3] - 372:12, 375:25, 561:1
**prejudicial** [3] - 371:1, 374:19, 375:2
**premark** [1] - 478:18
**premarked** [3] - 477:20, 477:24, 479:16
**premarking** [1] - 477:24
**prepared** [1] - 564:18

**presence** [1] - 543:18
**present** [2] - 539:13, 539:20
**presented** [6] - 511:14, 511:21, 512:23, 514:24, 539:16, 572:9
**preserve** [2] - 378:1, 544:16
**pretty** [2] - 444:13, 461:13
**prevalent** [1] - 456:9
**prevent** [1] - 425:9
**prevented** [1] - 425:18
**previous** [1] - 495:24
**previously** [1] - 377:3
**prima** [1] - 560:5
**principal** [1] - 471:2
**principles** [8] - 498:12, 511:4, 513:14, 514:18, 515:5, 516:8, 525:23, 525:24
**printout** [1] - 403:15
**prioritize** [2] - 464:12, 464:17
**probability** [1] - 474:16
**probable** [1] - 476:1
**probative** [3] - 372:11, 372:12, 375:25
**problem** [21] - 372:24, 378:16, 382:7, 393:22, 403:20, 411:8, 411:9, 423:1, 423:11, 430:7, 431:25, 432:16, 432:20, 434:18, 436:13, 444:22, 515:13, 539:1, 542:12, 542:14
**problematic** [1] - 577:3
**problems** [3] - 380:22, 383:9, 548:10
**procedure** [2] - 463:21, 464:20
**procedures** [3] - 513:14, 514:18, 574:6
**proceed** [6] - 471:18, 481:6, 508:17, 539:25, 544:13, 544:17
**proceedings** [1] - 473:3
**process** [11] - 371:15, 377:17, 378:21, 383:13, 392:6, 411:3, 420:1, 420:6, 464:6, 498:14, 547:22
**produce** [3] - 473:9, 492:16, 579:24
**produced** [1] - 491:2
**product** [1] - 571:6

**professional** [19] - 462:11, 463:1, 466:17, 467:25, 468:11, 468:20, 468:22, 468:23, 468:24, 469:2, 469:19, 469:20, 469:21, 470:2, 470:7, 470:14, 471:9, 498:17
**Professionals** [1] - 470:15
**professionals** [3] - 463:24, 489:5, 493:15
**program** [6] - 463:14, 465:17, 469:23, 470:8, 470:9, 472:11
**programs** [1] - 463:19
**project** [3] - 374:15, 389:19, 592:9
**projections** [1] - 496:11
**projects** [1] - 469:25
**promise** [1] - 544:3
**promised** [1] - 507:24
**prompt** [1] - 559:5
**prompted** [1] - 429:14
**promptly** [1] - 564:18
**proper** [2] - 531:7, 573:21, 581:24
**properly** [6] - 513:3, 515:9, 515:23, 553:15, 573:20, 579:3
**property** [2] - 464:9, 483:13, 572:3
**proportion** [2] - 376:3, 376:4
**propose** [1] - 584:20
**proposed** [2] - 566:22, 568:14
**proposition** [1] - 573:2
**protect** [7] - 464:23, 465:2, 512:9, 512:13, 533:25, 534:1, 534:3
**protecting** [1] - 583:18
**protection** [4] - 463:18, 472:11, 534:4, 534:6
**prototype** [5] - 372:13, 374:11, 374:21, 375:1, 375:18
**provide** [4] - 473:5, 476:1, 535:24, 536:6
**provided** [7] - 473:13, 486:25, 488:7, 514:4, 521:22, 521:24, 582:23
**provides** [2] - 429:1, 465:24
**Public** [1] - 489:19

**published** [2] - 472:25, 488:14
**pull** [4] - 375:9, 417:24, 419:12, 420:23
**pulling** [1] - 507:8
**punchpress** [1] - 468:3
**purely** [1] - 374:23
**purpose** [3] - 477:24, 541:21, 564:2
**push** [9] - 381:17, 490:21, 490:23, 491:2, 491:5, 491:6, 491:11, 501:19, 509:17
**pushed** [1] - 388:13
**pushing** [3] - 491:6, 503:8, 530:21
**put** [57] - 374:4, 378:11, 378:24, 381:17, 396:7, 397:18, 398:25, 402:11, 402:15, 405:7, 405:13, 405:24, 416:25, 417:11, 417:18, 419:11, 422:9, 424:6, 425:1, 425:12, 431:5, 432:9, 433:5, 448:2, 450:11, 452:20, 473:17, 473:19, 483:5, 483:10, 485:4, 492:11, 493:7, 499:19, 500:7, 506:4, 508:2, 508:6, 538:7, 538:19, 540:5, 543:14, 547:23, 548:4, 548:7, 551:11, 551:12, 551:19, 551:21, 551:24, 555:20, 557:20, 571:25, 573:15, 580:23, 582:25, 587:1
**putting** [8] - 373:13, 408:12, 432:17, 432:21, 472:23, 493:8, 515:19, 564:2

**Q**

**qualification** [1] - 472:10
**qualifications** [1] - 468:22
**qualified** [2] - 471:8, 471:17
**qualify** [1] - 469:24
**quarter** [10] - 457:18, 457:23, 483:9, 483:16, 483:22, 484:9, 484:11, 484:16, 484:17, 484:21
**quarters** [4] - 482:13, 482:15, 484:13, 484:19
**query** [1] - 497:24
**QUESTION** [3] -

557:11, 557:17, 557:23
**questioned** [1] - 537:16
**questioning** [1] - 558:1
**questions** [18] - 384:6, 392:11, 424:1, 430:6, 458:14, 459:11, 459:13, 461:1, 533:18, 535:18, 539:13, 539:14, 539:22, 542:7, 557:6, 558:3, 585:20, 586:8
**quick** [6] - 377:23, 424:16, 457:21, 535:16, 543:13, 543:25
**quickly** [4] - 504:7, 507:16, 508:11, 508:21
**quite** [6] - 371:9, 379:14, 418:1, 421:7, 571:21, 585:16
**quote** [4] - 429:4, 429:5, 577:19, 578:8

**R**

**race** [3] - 394:14, 394:15
**rail** [18] - 412:18, 413:25, 424:8, 427:20, 482:10, 484:18, 484:20, 484:21, 484:22, 485:1, 486:2, 492:12, 547:24, 548:5, 551:1, 551:3, 574:2
**railing** [1] - 492:11
**Railroad** [32] - 397:22, 398:9, 398:13, 398:16, 399:5, 399:11, 400:1, 400:2, 402:2, 402:4, 403:11, 450:15, 450:20, 450:25, 451:7, 452:3, 460:11, 472:10, 472:12, 489:16, 498:15, 511:9, 520:24
**railroad** [70] - 384:14, 399:17, 465:22, 466:1, 466:14, 466:15, 466:16, 467:19, 467:21, 467:23, 468:2, 468:9, 472:21, 475:1, 475:5, 475:15, 475:16, 476:5, 476:24, 477:2, 477:5, 481:8, 481:12, 481:14, 482:8, 482:9, 482:12, 482:17, 483:4, 484:10, 485:6, 485:16, 486:23, 486:24, 487:1, 488:8, 489:15, 489:19, 494:19, 498:16, 500:3, 500:11, 500:17, 502:4, 502:21, 503:2,

503:4, 503:5, 509:2, 509:3, 509:4, 509:22, 509:23, 509:24, 510:17, 510:20, 511:17, 512:3, 512:6, 516:4, 516:16, 520:11, 534:25, 552:25, 555:14, 557:14, 570:18, 572:2, 576:5
**rails** [1] - 553:9, 554:2, 554:5, 555:20, 557:20
**railway** [2] - 520:12, 520:14
**rain** [3] - 376:20, 384:2, 413:18
**rains** [2] - 384:1, 393:8
**raise** [2] - 461:24, 545:1
**raised** [6] - 479:7, 486:9, 492:23, 524:7, 536:2
**raised-lug** [1] - 492:23
**ran** [1] - 382:16
**range** [1] - 466:6
**rate** [4] - 391:13, 498:23, 517:25
**rather** [1] - 540:13
**reach** [7] - 492:13, 492:14, 499:11, 499:16, 501:19, 510:7, 551:23
**reached** [1] - 488:12
**reaches** [1] - 492:12
**reactions** [1] - 389:13
**read** [31] - 402:14, 431:4, 444:21, 445:2, 497:7, 509:1, 522:23, 528:17, 541:12, 541:13, 541:20, 543:12, 555:2, 555:6, 555:8, 556:8, 556:12, 556:16, 556:18, 556:19, 556:24, 556:25, 557:6, 569:5, 575:14, 577:14, 579:21, 580:7, 581:16
**readback** [2] - 562:20, 562:21
**readily** [2] - 492:2, 493:9
**reading** [3] - 539:22, 570:19, 572:22
**ready** [7] - 430:6, 430:8, 430:9, 437:19, 437:20, 458:17, 566:5
**reality** [4] - 374:22, 375:15, 375:19, 376:7
**really** [50] - 371:5, 371:6, 372:12, 374:1, 379:4, 379:7, 379:21,

381:22, 382:3, 382:22, 382:23, 384:3, 384:4, 385:11, 392:16, 394:15, 395:4, 396:3, 396:5, 396:7, 396:12, 396:24, 402:10, 408:15, 408:16, 408:17, 417:7, 425:9, 425:20, 427:5, 427:6, 428:2, 443:2, 443:5, 450:20, 455:4, 531:10, 538:3, 549:14, 549:22, 552:2, 556:3, 563:5, 565:5, 571:3, 571:9, 573:19, 576:4, 580:20

**rear** [1] - 485:6
**reason** [11] - 371:5, 396:9, 421:24, 427:22, 451:12, 455:20, 563:24, 581:25, 586:2, 586:20, 587:4
**reasonable** [4] - 474:16, 498:22, 515:16, 576:11
**reasonably** [12] - 572:5, 574:22, 581:13, 582:1, 582:3, 582:6, 582:9, 582:10, 582:12, 587:23, 588:9, 588:19
**reasons** [5] - 383:16, 456:5, 456:6, 536:16, 560:18
**rebuttal** [2] - 497:23, 497:24
**receive** [2] - 473:2, 548:16
**received** [8] - 397:22, 398:10, 398:19, 405:3, 449:16, 459:13, 473:3, 548:19
**receiving** [1] - 398:21
**recently** [1] - 473:13
**recess** [4] - 458:8, 504:11, 544:7, 566:9
**recitation** [1] - 581:24
**recite** [1] - 489:9
**recognize** [1] - 472:3
**recognized** [4] - 469:2, 489:5, 493:15, 524:1
**recollection** [11] - 434:12, 434:21, 436:9, 437:22, 438:12, 440:8, 444:24, 445:3, 445:4, 448:20, 457:12
**recommend** [1] - 388:17
**recommended** [4] - 443:16, 489:18, 500:15, 502:2
**recommending** [1] -

388:10
**recommends** [2] - 578:3, 578:7
**reconsidered** [1] - 566:22
**reconstruct** [1] - 492:5
**reconstruction** [3] - 374:13, 463:10, 466:17
**record** [17] - 378:1, 390:6, 462:5, 471:20, 478:20, 479:22, 487:10, 505:22, 506:6, 507:12, 539:6, 545:6, 568:24, 575:14, 577:11, 581:16, 584:2
**records** [22] - 539:13, 541:7, 541:8, 541:9, 542:1, 542:4, 542:6, 542:8, 542:9, 542:23, 542:25, 543:3, 543:7, 543:9, 562:1, 562:7, 562:12, 563:7, 563:11, 564:19, 590:16, 590:18
**recovered** [2] - 380:20, 392:4
**recovering** [2] - 380:10, 384:17
**recovery** [9] - 377:12, 377:14, 384:16, 384:17, 385:9, 389:15, 389:25, 390:11, 402:14
**RECROSS** [3] - 461:4, 535:21, 554:11
**red** [1] - 396:7
**redirect** [2] - 554:14, 556:23
**REDIRECT** [3] - 459:9, 533:16, 553:22
**reduce** [2] - 464:1, 498:22
**reduced** [1] - 526:8
**redundant** [1] - 582:15
**refer** [1] - 423:4
**reference** [7] - 376:1, 472:24, 484:14, 487:20, 488:10, 519:15, 520:17
**referenced** [1] - 493:14
**references** [11] - 473:19, 489:4, 491:15, 491:23, 498:6, 498:18, 499:2, 500:16, 501:15, 501:17, 502:3
**referencing** [1] - 487:21
**referred** [1] - 489:4
**referring** [2] - 379:3, 534:21

**refresh** [8] - 434:12, 434:20, 434:25, 436:8, 437:21, 438:12, 440:7, 444:24
**refreshed** [1] - 445:3
**refreshes** [1] - 445:4
**regard** [4] - 396:21, 405:4, 511:22, 514:25
**regarding** [4] - 456:17, 514:8, 571:2, 581:12
**registrations** [1] - 469:18
**regular** [3] - 451:17, 476:2, 502:8
**regularly** [4] - 442:7, 442:9, 442:10, 443:9
**regulation** [3] - 519:25, 520:2, 521:8
**regulations** [22] - 463:17, 472:23, 473:20, 488:13, 489:14, 498:7, 498:9, 499:1, 499:22, 500:1, 500:7, 500:8, 501:18, 509:10, 511:9, 517:7, 519:7, 520:9, 560:8, 574:5, 574:6
**regulatory** [3] - 500:8, 517:1, 517:4
**Rehab** [5] - 436:23, 437:14, 437:23, 438:2, 438:13
**Reich** [1] - 473:12
**reinstructed** [1] - 406:15
**reiterate** [1] - 559:2
**relate** [6] - 465:4, 465:7, 465:19, 466:4, 466:12, 488:14
**related** [16] - 463:2, 463:5, 466:21, 467:13, 471:1, 473:7, 473:21, 473:22, 481:14, 499:2, 499:23, 509:10, 511:2, 511:24, 515:1
**relates** [1] - 465:17
**relating** [4] - 380:15, 513:1, 590:23, 590:24
**relation** [6] - 375:18, 375:19, 422:7, 426:3, 445:14, 447:3
**relative** [3] - 481:17, 481:23, 486:16
**relatively** [2] - 455:8, 455:15
**relevant** [12] - 399:22, 399:23, 400:6, 400:15, 401:3, 402:7, 402:10, 512:24, 529:6, 573:23
**reliable** [1] - 489:11

**relied** [4] - 489:7, 489:9, 522:19, 543:3
**rely** [8] - 465:2, 467:22, 473:5, 489:13, 512:12, 532:22, 532:25, 533:4
**remain** [2] - 376:25, 459:5
**remainder** [1] - 450:6
**remedial** [1] - 478:23
**remedied** [1] - 432:21
**remember** [62] - 379:20, 383:11, 386:14, 388:5, 388:7, 405:5, 412:1, 414:4, 416:16, 416:18, 417:2, 417:3, 417:9, 417:10, 417:14, 420:25, 422:3, 425:1, 432:18, 433:25, 435:18, 436:18, 436:21, 439:8, 440:3, 440:4, 441:24, 442:6, 442:13, 444:1, 444:10, 448:20, 448:23, 450:11, 453:7, 484:7, 518:5, 519:4, 546:11, 546:22, 547:4, 547:6, 547:8, 548:12, 548:13, 548:15, 549:14, 549:20, 550:23, 554:9, 554:17, 554:21, 554:23, 554:25, 555:13, 555:25, 556:19, 557:7, 557:13, 557:25, 558:1, 559:14
**remote** [1] - 464:15
**removed** [2] - 388:24, 389:17
**rendered** [3] - 468:5, 468:8, 473:1
**rendering** [1] - 401:9
**renewed** [1] - 561:2
**rent** [8] - 381:16, 446:11, 446:13, 446:20, 447:10, 448:6, 448:16
**repair** [2] - 478:23, 572:3
**repeat** [2] - 380:23, 475:8
**repeatable** [1] - 495:14
**repeated** [1] - 574:17
**rephrase** [1] - 513:20
**Report** [1] - 430:12
**report** [75] - 373:21, 373:23, 375:14, 410:5, 410:13, 410:16, 410:17, 411:5, 423:7, 427:23, 430:19, 456:17, 456:22, 456:25, 457:3, 457:10, 457:13, 473:1, 473:13, 476:20, 478:4, 478:20,

488:19, 489:8, 489:9, 489:11, 495:23, 495:25, 496:2, 496:19, 496:20, 496:22, 497:3, 497:6, 497:7, 497:11, 497:22, 498:3, 501:6, 509:12, 509:14, 516:25, 518:1, 518:4, 519:9, 520:5, 521:13, 521:15, 521:19, 521:25, 522:1, 522:7, 522:12, 523:4, 523:17, 523:18, 523:21, 524:18, 525:15, 525:25, 528:1, 528:14, 530:25, 531:1, 531:2, 531:7, 531:9, 531:10, 531:11, 531:14, 531:16, 541:15, 542:4, 590:14, 590:15
**Reporter** [2] - 539:13, 551:18
**reporting** [3] - 410:7, 410:18, 410:20
**reports** [5] - 423:17, 432:14, 471:7, 473:7, 518:21
**represent** [1] - 482:8
**representation** [1] - 371:2
**require** [5] - 491:13, 503:3, 509:2, 509:22, 533:24
**required** [9] - 409:21, 455:21, 456:22, 457:3, 457:6, 457:13, 578:13, 581:12, 581:17
**requirements** [4] - 509:9, 509:12, 509:14, 537:13
**requires** [2] - 491:7, 575:23
**requiring** [1] - 492:16
**rerun** [1] - 559:17
**research** [3] - 470:25, 559:15, 565:4
**resemblance** [1] - 374:22
**resemble** [1] - 374:15
**resist** [1] - 492:18
**resistance** [21] - 469:9, 471:3, 491:8, 491:13, 495:10, 495:11, 496:13, 496:19, 497:8, 497:14, 499:19, 502:23, 503:6, 509:5, 510:15, 510:22, 513:7, 526:9, 526:10, 530:1, 535:11
**resistant** [4] - 494:4, 496:11, 524:2, 537:20
**respect** [24] - 398:9, 446:6, 450:7, 469:7,

**ride** [3] - 382:15, 396:1, 396:12
**ridicule** [1] - 383:24
**ridiculous** [1] - 478:10
**riding** [1] - 396:4
**righty** [2] - 423:16, 430:10
**rise** [12] - 376:16, 457:25, 458:1, 458:10, 459:1, 504:2, 505:3, 508:14, 544:5, 544:9, 559:23, 566:8
**risk** [38] - 375:21, 463:13, 464:1, 464:10, 464:17, 464:18, 495:16, 498:22, 507:14, 511:5, 512:11, 515:7, 542:17, 575:11, 575:16, 575:17, 575:18, 575:19, 575:20, 575:22, 575:23, 576:1, 576:2, 576:8, 576:11, 576:15, 576:23, 577:6, 577:15, 577:18, 577:21, 577:22, 578:3, 578:9, 578:12, 579:9, 580:3
**risks** [1] - 576:5
**road** [2] - 385:9, 389:24
**roadbeds** [1] - 572:5
**roadway** [1] - 472:11
**rock** [1] - 415:2
**rod** [1] - 388:25
**rode** [1] - 396:19
**role** [2] - 488:10, 533:7
**rolled** [3] - 424:9, 431:7, 432:24
**rolling** [1] - 508:13
**room** [4] - 378:11, 381:22, 382:11, 559:7
**rose** [1] - 413:10
**ROSENTHAL** [191] - 372:16, 372:18, 373:16, 373:20, 373:22, 374:17, 375:4, 376:12, 377:5, 377:7, 377:9, 378:5, 378:8, 378:17, 397:10, 397:25, 399:2, 399:8, 399:11, 399:14, 399:20, 399:24, 400:5, 400:11, 401:25, 402:17, 402:24, 404:6, 415:13, 417:16, 453:22, 453:25, 458:13, 458:17, 458:24, 459:8, 459:10, 461:1, 461:19, 462:8, 471:12, 471:19, 471:23, 474:7, 474:10, 474:14, 476:21, 477:7, 477:12, 478:5, 478:15,

478:24, 479:25, 480:2, 480:7, 480:18, 480:23, 481:2, 481:20, 482:1, 482:21, 487:10, 487:13, 487:17, 489:12, 496:4, 496:6, 496:23, 497:1, 497:4, 497:13, 497:18, 498:4, 498:5, 501:10, 505:15, 505:23, 506:1, 506:22, 508:23, 513:19, 513:22, 516:12, 530:4, 530:8, 530:20, 531:23, 533:15, 533:17, 534:12, 537:21, 538:21, 539:1, 540:16, 540:19, 541:3, 541:6, 541:14, 541:19, 541:22, 542:1, 542:3, 543:9, 543:15, 543:20, 550:2, 550:5, 550:14, 551:7, 553:19, 554:12, 554:15, 555:7, 556:1, 556:16, 557:2, 557:5, 558:3, 561:10, 561:14, 561:18, 561:22, 562:3, 562:5, 562:8, 562:10, 562:16, 562:24, 563:13, 564:23, 565:6, 566:6, 566:13, 566:21, 566:25, 567:16, 568:4, 568:7, 568:20, 568:24, 569:5, 569:8, 569:15, 569:19, 569:21, 570:2, 570:4, 570:6, 570:11, 570:19, 570:22, 570:24, 571:1, 571:12, 572:13, 572:18, 573:8, 574:16, 574:23, 575:7, 575:10, 575:22, 576:20, 579:10, 579:23, 580:2, 580:6, 580:11, 581:23, 582:13, 582:17, 583:7, 583:16, 584:6, 584:13, 584:21, 585:6, 587:9, 587:11, 587:25, 588:11, 588:14, 588:22, 589:4, 589:11, 590:6, 590:12, 590:17, 590:23, 591:15, 592:20
**Rosenthal** [12] - 453:20, 459:7, 472:20, 488:6, 496:1, 503:13, 537:16, 551:12, 561:8, 572:17, 584:16, 589:21
**roster** [6] - 391:1, 454:23, 454:25, 455:5, 455:7, 455:8
**rotating** [2] - 455:5, 455:7
**rough** [2] - 393:7, 406:25
**roughly** [1] - 508:2

**rounded** [2] - 485:15
**RRB** [5] - 403:8, 403:9, 403:11, 403:12, 403:13
**rubber** [1] - 578:21
**rule** [2] - 406:10, 573:9
**ruler** [2] - 376:2, 412:11, 486:20
**rules** [12] - 409:12, 409:13, 409:17, 409:20, 410:4, 511:9, 511:10, 514:11, 572:20, 573:6, 573:7, 574:6
**run** [6] - 383:7, 395:12, 395:13, 395:18, 443:2, 483:4
**rung** [1] - 510:8
**rungs** [1] - 502:7
**running** [9] - 383:13, 393:13, 394:14, 416:13, 443:2, 452:25, 453:4, 453:5, 453:12
**runs** [2] - 375:21, 394:11

## S

**S-1** [4] - 424:6, 431:5, 546:4, 546:6
**SAE's** [1] - 493:10
**safe** [47] - 463:22, 464:20, 467:2, 488:20, 489:18, 489:21, 489:23, 489:25, 492:1, 498:11, 498:18, 498:19, 499:23, 500:18, 502:22, 503:4, 509:3, 509:19, 509:22, 511:23, 512:24, 514:14, 515:1, 515:8, 516:5, 518:17, 536:10, 536:13, 536:25, 537:6, 537:9, 537:19, 559:19, 562:24, 572:5, 573:24, 574:1, 574:5, 574:22, 581:13, 582:3, 582:6, 582:9, 582:10, 582:12, 592:16
**safe..** [1] - 582:2
**safely** [1] - 498:11
**safer** [1] - 538:1
**safest** [1] - 538:2
**Safety** [4] - 468:13, 468:17, 470:15, 470:22
**safety** [83] - 463:10, 463:11, 463:13, 463:14, 463:17, 463:20, 463:21, 463:24, 464:1, 464:2, 464:5, 466:14, 466:22, 467:6, 467:7, 467:8,

467:9, 467:11, 467:14, 467:25, 468:5, 468:8, 468:22, 469:7, 469:8, 469:9, 469:20, 470:6, 470:11, 470:14, 471:1, 471:9, 471:14, 473:21, 493:17, 495:8, 498:7, 498:12, 498:13, 498:17, 498:21, 500:16, 502:2, 502:5, 510:23, 511:2, 511:4, 511:5, 511:8, 512:3, 512:4, 512:6, 512:8, 512:9, 512:10, 512:14, 512:16, 513:1, 513:12, 513:13, 513:24, 514:12, 514:16, 514:17, 515:5, 515:6, 516:8, 516:10, 516:11, 517:9, 519:15, 532:21, 533:8, 537:12, 574:18
**sake** [1] - 462:20
**salary** [3] - 401:6, 401:7, 401:22
**sand** [1] - 494:12
**SANDRA** [1] - 545:7
**Sandra** [3] - 473:11, 544:20, 545:7
**satisfied** [1] - 574:18
**satisfying** [1] - 574:18
**Saturday** [1] - 507:22
**save** [3] - 450:10, 592:7, 592:10
**saw** [3] - 379:24, 393:11, 414:22, 420:13, 421:18, 432:9, 432:11, 433:16, 445:8, 486:21, 500:25, 527:25, 529:2, 529:8, 537:2, 549:9
**scale** [2] - 372:4, 373:7
**scan** [3] - 379:24, 388:6
**scenario** [2] - 371:13, 586:15
**schedule** [1] - 472:6
**scheduled** [1] - 507:17
**schedules** [1] - 559:10
**Science** [1] - 463:3
**science** [25] - 374:15, 463:21, 464:5, 465:4, 465:7, 465:11, 465:12, 465:19, 465:23, 466:4, 466:9, 466:12, 466:18, 470:11, 492:5, 492:7, 493:19, 498:13, 498:22, 510:2, 511:5, 516:11, 523:2, 523:6, 592:9

**sciences** [19] - 462:18, 462:19, 462:21, 463:11, 464:1, 467:22, 471:9, 472:15, 509:8, 511:13, 511:20, 511:22, 512:22, 512:24, 513:14, 514:18, 514:23, 515:6, 516:8

**scientific** [7] - 463:10, 466:17, 470:25, 474:6, 495:9, 498:6, 498:20

**scientifically** [1] - 464:3

**scientists** [1] - 511:15

**scope** [2] - 537:22, 572:15

**scratch** [2] - 483:17, 535:15

**scratching** [1] - 389:14

**screen** [2] - 371:14, 372:9

**screws** [1] - 388:25

**seat** [3] - 459:5, 506:12, 545:9

**second** [38] - 377:10, 377:12, 377:14, 377:16, 377:19, 377:21, 377:23, 378:20, 380:10, 380:19, 380:20, 380:25, 384:16, 384:19, 384:20, 384:21, 386:5, 390:13, 415:20, 415:21, 416:7, 416:9, 416:10, 427:11, 431:12, 431:18, 436:5, 440:12, 442:14, 444:20, 451:3, 451:14, 451:23, 464:10, 575:13, 577:12, 581:15, 588:17

**section** [2] - 489:17, 588:6

**sections** [2] - 488:14, 586:19

**security** [1] - 448:9

**see** [59] - 371:8, 372:19, 376:19, 377:20, 379:23, 382:16, 386:9, 386:11, 410:5, 411:2, 420:2, 420:11, 420:12, 421:8, 422:6, 428:10, 430:7, 433:14, 438:5, 438:11, 445:11, 445:13, 457:24, 458:3, 476:12, 477:4, 477:12, 483:16, 486:5, 486:8, 487:22, 496:21, 497:15, 503:21, 503:22, 504:5, 527:23, 528:25, 529:7, 529:20,

534:23, 537:3, 549:3, 549:7, 549:24, 550:18, 551:4, 551:21, 552:2, 552:12, 559:20, 565:3, 565:17, 568:23, 571:23, 578:16, 582:15, 592:16

**seeing** [11] - 382:21, 386:7, 414:24, 440:17, 440:21, 441:4, 485:2, 546:20, 547:3, 547:5, 548:13

**sees** [1] - 411:9

**selling** [1] - 381:15

**semifinished** [1] - 381:25

**send** [5] - 403:15, 504:8, 544:1, 589:23, 591:25

**seniority** [4] - 452:25, 455:11, 455:15, 455:18

**sense** [7] - 371:7, 380:3, 383:5, 383:18, 404:25, 415:9, 416:23, 423:3, 423:24, 427:19, 428:2, 431:3, 500:8, 517:4, 553:18, 565:23, 589:1, 590:7

**sent** [2] - 450:19, 450:22

**sentence** [5] - 578:7, 581:15, 581:24, 582:14, 588:17

**separate** [5] - 398:14, 399:13, 403:3, 450:22, 464:23

**separated** [1] - 448:12

**separately** [2] - 478:7, 561:23

**September** [1] - 439:9

**serious** [1] - 573:15

**service** [5] - 393:16, 407:22, 559:6, 559:9, 559:11

**set** [2] - 387:8, 565:16

**seven** [9] - 387:19, 387:21, 387:22, 387:23, 449:2, 485:9, 485:21, 485:22

**seventeen** [1] - 570:2

**Seventh** [2] - 565:10, 565:11

**several** [2] - 467:12, 469:15

**severe** [1] - 498:24

**severity** [1] - 437:1

**sewer** [1] - 446:19

**shall** [1] - 538:19

**shape** [1] - 590:1

**shaped** [1] - 484:2

**share** [1] - 373:1

**shared** [1] - 499:14

**sharp** [3] - 494:11, 536:1, 536:4

**sharper** [1] - 494:6

**Sharpie** [2] - 374:13, 375:20

**sheet** [8] - 518:24, 565:13, 566:16, 569:22, 584:5, 585:7, 585:8, 588:24

**shifted** [1] - 380:3

**shiny** [4] - 421:22, 421:24, 422:23

**shoe** [6] - 393:5, 434:5, 434:23, 436:12, 491:18, 556:17

**shoes** [3] - 555:21, 556:21, 557:21

**short** [4] - 395:14, 451:18, 497:12, 508:20

**shorter** [2] - 458:22, 591:24

**shorthand** [1] - 425:16

**shoulders** [1] - 491:20

**shove** [1] - 381:17

**shoved** [1] - 479:10

**show** [20] - 371:4, 372:10, 374:9, 374:16, 374:24, 375:14, 375:17, 376:2, 376:3, 434:15, 438:5, 444:20, 476:14, 480:19, 486:15, 497:10, 542:22, 551:5, 551:13

**showed** [6] - 405:16, 478:11, 541:9, 541:14, 543:10, 560:12

**showing** [3] - 434:10, 471:22, 477:22

**shown** [1] - 560:6

**shows** [1] - 376:3

**sick** [2] - 398:18, 399:17

**sickness** [1] - 398:18

**side** [10] - 412:18, 481:19, 500:6, 501:19, 539:6, 548:2, 548:3, 548:4, 548:23

**sidebar** [12] - 377:20, 377:24, 397:13, 397:16, 477:14, 530:5, 530:7, 539:4, 541:4, 541:5, 555:9, 555:10

**sides** [3] - 493:9, 559:7, 560:24

**signature** [1] - 430:16

**significance** [3] -

500:22, 501:11, 539:21

**significant** [6] - 464:18, 474:19, 475:14, 510:25, 512:11, 515:7

**SILAGI** [1] - 565:9

**sill** [9] - 500:9, 500:10, 519:7, 519:16, 519:20, 519:21, 520:6, 520:8, 534:10

**silly** [1] - 564:3

**similar** [9] - 377:14, 377:16, 378:21, 451:9, 469:17, 470:20, 502:20, 509:10, 572:19

**simple** [1] - 464:4

**simplest** [1] - 493:5

**simply** [2] - 371:17, 574:18

**single** [3] - 438:16, 441:24, 479:15

**sit** [3] - 395:9, 412:11, 467:8

**site** [4] - 428:6, 428:20, 528:22, 532:4

**sitting** [2] - 396:19, 432:7

**situated** [1] - 416:12

**situation** [4] - 441:2, 445:24, 576:22, 578:24

**Six** [2] - 393:2, 395:7

**six** [16] - 381:14, 407:2, 407:3, 408:3, 408:4, 408:8, 408:11, 436:19, 440:25, 442:17, 442:22, 449:2, 506:7, 518:6, 545:21, 585:20

**size** [3] - 393:4, 491:18, 494:12

**sleep** [2] - 401:20, 559:16

**slice** [1] - 388:14

**slicing** [1] - 389:23

**slid** [1] - 421:4

**slide** [5] - 397:7, 421:14, 494:2, 526:9, 526:10

**slightly** [3] - 458:22, 564:16, 582:24

**slip** [33] - 421:18, 421:23, 424:19, 469:9, 471:3, 494:4, 495:10, 495:11, 495:16, 496:11, 496:13, 496:18, 499:19, 502:23, 503:6, 509:5, 510:15, 510:22, 513:7, 515:12, 515:15, 515:16, 515:19, 521:5, 523:5, 524:2, 529:25, 530:10, 534:8, 534:9, 535:11, 535:16, 537:20

**slip-and-fall** [1] - 495:16

**slip-resistance-measuring** [1] - 495:10

**slip-resistant** [4] - 494:4, 496:11, 524:2, 537:20

**slipped** [9] - 374:10, 424:9, 424:24, 425:19, 431:7, 431:8, 515:17, 515:18, 576:15

**slippery** [4] - 494:17, 524:8, 524:16

**slipping** [8] - 424:23, 426:14, 431:14, 534:1, 534:2, 534:3, 534:5, 534:6

**slips** [2] - 463:19, 501:3

**slowly** [1] - 431:23

**smooth** [28] - 419:20, 421:9, 485:10, 485:14, 485:17, 486:5, 492:23, 494:7, 494:15, 494:16, 495:4, 495:18, 495:19, 495:22, 495:25, 502:19, 502:24, 503:6, 509:5, 509:25, 510:13, 524:8, 526:8, 526:14, 534:4, 534:7, 536:2, 560:15

**sneaker** [4] - 379:1, 379:13, 383:3, 389:18

**so..** [5] - 388:21, 393:20, 444:16, 447:6, 450:2

**soaking** [1] - 413:3

**societies** [1] - 468:24

**Society** [9] - 467:9, 468:13, 468:14, 468:15, 468:16, 468:18, 489:24, 509:11

**solution** [1] - 535:12

**solved** [1] - 515:13

**someday** [1] - 592:10

**someone** [6] - 410:17, 426:13, 455:18, 511:15, 570:14, 571:14

**sometime** [2] - 439:9, 439:12

**somewhat** [1] - 484:13

**somewhere** [6] - 379:7, 379:9, 391:15, 446:22, 453:14, 468:10

**soon** [14] - 378:23, 410:5, 421:4, 458:4, 490:19, 490:25, 491:4, 491:10, 492:11, 492:14, 499:12, 499:15, 533:22, 566:5

**sorry** [13] - 377:22, 377:25, 380:23, 416:6, 428:8, 484:18, 492:20, 525:17, 525:20, 550:2, 550:5, 568:16, 572:22

**sort** [3] - 521:5, 541:17, 585:10

**sought** [1] - 441:21

**sound** [7] - 387:20, 390:4, 390:14, 390:20, 439:9, 574:13

**sounds** [5] - 390:5, 390:15, 390:18, 390:21, 574:12

**source** [1] - 476:1

**sources** [5] - 451:16, 452:7, 452:9, 472:19, 473:6

**South** [1] - 470:4

**special** [1] - 378:24

**specific** [7] - 410:11, 414:1, 414:23, 415:11, 419:25, 489:7, 573:18

**specifically** [20] - 380:6, 380:18, 401:23, 405:2, 405:6, 405:24, 412:19, 414:18, 418:15, 434:16, 465:16, 471:1, 471:14, 473:22, 492:4, 518:10, 521:9, 549:7, 560:10, 568:25

**specifics** [2] - 415:4, 415:7

**speculative** [1] - 454:6

**spell** [2] - 462:5, 545:6

**spending** [1] - 447:2

**splatter** [1] - 412:10

**split** [1] - 478:17

**spot** [2] - 387:11, 412:1

**spots** [1] - 412:10

**sprained** [1] - 425:7

**spreading** [1] - 553:17

**spring** [1] - 375:17

**sprint** [1] - 443:4

**Square** [6] - 409:1, 409:4, 409:6, 474:24, 475:10, 546:6

**stairs** [1] - 422:15

**stairway** [2] - 488:24, 488:25

**stand** [10] - 373:8, 377:1, 425:15, 459:3, 481:24, 482:8, 487:9, 506:11, 552:18, 572:25

**standard** [9] - 495:22, 512:25, 516:9, 519:18,

565:14, 565:15, 574:20, 574:21, 581:19

**standards** [22] - 467:9, 469:7, 469:10, 469:15, 469:16, 470:18, 472:23, 473:19, 488:13, 489:3, 493:10, 493:11, 493:14, 495:9, 498:7, 498:9, 499:22, 500:12, 501:17, 516:24, 520:25

**Standards** [1] - 509:13

**standing** [5] - 413:17, 413:25, 482:11, 483:8, 510:8

**start** [16] - 386:24, 386:25, 416:13, 480:16, 483:23, 484:11, 484:16, 491:11, 492:14, 492:15, 507:9, 535:15, 537:11, 559:1, 564:18, 566:20

**started** [11] - 384:13, 387:9, 388:13, 405:3, 407:13, 413:5, 453:12, 467:6, 489:14, 569:13

**starting** [3] - 388:14, 466:25, 467:3

**starts** [7] - 401:8, 455:10, 483:18, 484:3, 485:7, 486:17, 556:11

**state** [2] - 462:4, 545:5

**statement** [1] - 522:20

**statements** [5] - 507:10, 558:18, 558:22, 566:3, 590:3

**states** [1] - 470:16

**States** [2] - 470:21, 489:16

**Station** [2] - 474:24, 475:10

**station** [3] - 475:4, 475:11, 512:6

**stature** [1] - 491:20

**status** [1] - 397:19

**statute** [1] - 584:19

**statutory** [1] - 584:19

**stay** [8] - 385:18, 393:15, 393:25, 455:23, 505:19, 506:7, 507:9, 542:15

**stayed** [2] - 381:25, 382:1

**steel** [16] - 471:2, 471:3, 485:10, 485:14, 485:17, 486:5, 492:23, 495:4, 502:19, 502:20, 502:24, 509:19, 534:3, 538:4, 552:10, 560:15

**step** [62] - 372:20, 375:7, 420:7, 421:1, 424:7, 426:7, 426:10, 427:19, 428:17, 431:6, 432:1, 438:22, 464:6, 464:7, 464:10, 483:8, 483:18, 483:23, 483:24, 484:1, 485:2, 485:3, 485:7, 485:23, 485:25, 486:1, 492:10, 492:12, 498:14, 499:7, 499:8, 499:13, 501:17, 501:23, 502:1, 502:6, 502:10, 509:16, 510:7, 510:9, 510:11, 519:20, 519:21, 520:6, 520:8, 520:10, 527:13, 527:19, 528:2, 534:10, 534:18, 536:20, 537:10, 537:11, 537:25, 558:17, 560:9

**stepped** [3] - 411:10, 482:6, 551:14

**stepping** [1] - 522:6

**steps** [12] - 371:20, 492:12, 493:13, 500:10, 509:6, 510:1, 510:16, 513:10, 519:7, 519:15, 519:17

**Steve** [2] - 377:10, 459:11

**Steven** [11] - 455:23, 473:10, 475:16, 481:14, 502:4, 502:21, 510:3, 511:23, 516:3, 546:1, 584:24

**stick** [3] - 490:10, 490:11, 494:5

**sticking** [1] - 494:11

**sticks** [1] - 493:24

**still** [29] - 376:20, 379:15, 379:23, 383:17, 385:8, 385:24, 386:9, 386:10, 386:20, 387:11, 389:23, 392:18, 392:21, 409:19, 414:1, 422:25, 423:9, 435:5, 435:16, 440:17, 440:21, 450:4, 451:17, 460:1, 497:23, 519:12

**stipulate** [3] - 541:10, 590:9, 590:20

**stipulated** [1] - 543:12

**stipulating** [1] - 563:17

**stipulation** [7] - 398:25, 563:12, 563:21, 564:1, 564:3, 590:19, 591:7

**stirrup** [5] - 500:10,

501:23, 502:1, 502:10

**stirrups** [1] - 500:9

**stool** [1] - 510:14

**stop** [11] - 377:19, 441:4, 487:2, 489:6, 531:6, 540:19, 555:1, 577:1, 586:1

**stopped** [2] - 395:1, 448:6

**story** [5] - 523:9, 523:10, 523:12, 559:25, 561:2, 502:6, 502:7

**straight** [9] - 490:19, 491:4, 493:7, 493:8, 493:12, 499:10, 501:21, 502:14, 503:7

**stranded** [1] - 448:13

**strange** [1] - 474:4

**strangers** [1] - 438:24

**street** [2] - 395:17, 443:3

**strength** [1] - 375:11

**strenuous** [1] - 453:2

**stress** [1] - 448:2

**stretcher** [3] - 421:20, 422:1, 422:14

**strewn** [1] - 475:19

**strike** [4] - 401:24, 574:1, 581:15, 581:19

**stringent** [1] - 584:9

**strong** [1] - 563:24

**structure** [3] - 465:14, 469:8, 482:7

**stuck** [1] - 385:12

**studied** [3] - 465:13, 468:4, 468:8

**studies** [1] - 465:16

**study** [1] - 466:10

**stuff** [23] - 381:3, 381:16, 383:10, 383:22, 384:3, 394:17, 398:4, 407:25, 408:9, 408:13, 416:1, 416:3, 416:4, 438:19, 446:6, 446:23, 462:22, 506:23, 543:10, 565:15, 590:10, 590:14

**subject** [8] - 491:25, 492:1, 494:19, 500:2, 513:13, 513:25, 514:17, 516:10

**submit** [1] - 469:1

**subsequent** [1] - 478:23

**subsequently** [1] - 515:18

**subside** [1] - 379:15

**subsided** [1] - 385:8

**substantially** [1] - 526:8

**sucks** [1] - 396:24

**suffer** [1] - 587:23

501:23, 502:1, 502:10

**stirrups** [1] - 500:9

**suffered** [2] - 401:19, 587:22

**suffering** [8] - 401:13, 401:18, 587:13, 587:14, 587:21, 588:12, 588:18

**suffers** [1] - 588:7

**suggested** [2] - 385:14, 505:14

**suggesting** [1] - 576:21

**suggests** [1] - 576:8

**summations** [2] - 564:18, 589:19

**sums** [1] - 459:13

**Sunday** [1] - 507:22

**supervisor** [5] - 410:16, 411:4, 411:9, 456:17, 457:1

**supervisors** [2] - 410:25, 411:8

**support** [7] - 396:6, 396:8, 490:23, 501:16, 503:7, 510:9, 573:4

**supposed** [5] - 501:14, 502:8, 512:4, 514:11, 530:2

**surface** [15] - 469:8, 482:10, 490:23, 490:24, 491:4, 491:7, 494:7, 494:9, 495:12, 501:22, 502:12, 502:19, 529:2, 533:24, 572:4

**surfaces** [14] - 471:3, 494:1, 494:16, 495:4, 495:11, 495:18, 515:24, 524:7, 524:9, 524:12, 524:16, 524:17, 528:20, 529:3

**surgeries** [2] - 381:3, 389:12

**surgery** [59] - 377:10, 377:13, 377:14, 378:20, 379:3, 379:15, 380:10, 380:19, 380:20, 380:25, 381:13, 383:24, 384:16, 384:19, 384:20, 384:21, 386:5, 388:18, 388:23, 389:1, 389:4, 389:8, 389:16, 389:21, 390:11, 390:13, 390:16, 392:1, 392:2, 439:4, 439:12, 440:9, 440:18, 440:25, 441:3, 441:6, 441:16, 441:22, 442:14, 442:17, 444:2, 444:7, 444:13, 444:25, 448:25, 449:1, 449:2, 449:17, 449:18, 449:19, 451:3, 451:15, 451:19, 451:23, 452:2, 452:6

surveying [1] - 463:7
suspect [1] - 541:22
sustain [1] - 588:9
sustained [1] - 588:9
swear [4] - 461:21, 461:22, 544:22, 544:25
swears [1] - 539:12
sweaty [16] - 416:17, 416:22, 416:24, 417:1, 417:3, 417:7, 424:10, 429:5, 429:24, 431:8, 432:6, 432:15, 432:19, 432:23, 433:3, 576:14
swell [1] - 379:3
switch [2] - 412:9, 420:10
switching [6] - 393:13, 408:18, 452:21, 453:1, 453:8, 453:13
switchman [1] - 516:21
sworn [4] - 377:3, 462:2, 539:10, 545:4
symmetrical [8] - 490:6, 493:4, 499:5, 499:21, 501:16, 503:7, 509:16, 519:14
Syracuse [1] - 463:4
system [59] - 371:5, 463:14, 465:3, 465:7, 465:8, 465:9, 465:10, 465:22, 466:3, 481:18, 486:14, 488:18, 488:20, 488:22, 489:1, 490:5, 490:18, 491:13, 492:9, 498:12, 499:4, 499:5, 499:11, 500:2, 500:5, 501:2, 501:19, 503:2, 509:1, 509:18, 509:21, 510:24, 511:11, 512:16, 513:4, 513:5, 513:6, 514:9, 514:12, 514:13, 514:22, 515:10, 515:18, 515:22, 516:4, 516:10, 520:10, 520:12, 520:14, 525:6, 532:7, 535:10, 536:11, 536:13, 536:25, 537:11, 537:12, 538:2, 548:17
system.. [1] - 525:3
systems [22] - 463:14, 463:22, 467:2, 467:14, 467:17, 473:22, 488:15, 488:16, 488:17, 489:15, 489:21, 489:23, 489:25, 491:9, 492:1, 500:6, 500:16, 502:3, 502:9, 509:15, 512:5, 515:6

T

table [3] - 381:17, 542:15, 560:22
tag [1] - 383:14
takeoff [1] - 493:3
talks [2] - 465:6, 588:17
tall [1] - 548:24
tape [25] - 374:19, 374:20, 421:18, 421:23, 429:16, 431:20, 431:22, 478:22, 481:19, 483:10, 483:15, 484:22, 506:17, 506:18, 506:19, 506:25, 515:12, 515:19, 521:9, 530:10, 534:8, 534:9, 538:22, 562:21, 563:4
task [1] - 469:6
Tau [1] - 463:3
taught [2] - 550:21, 550:23
taxes [1] - 391:21
team [1] - 394:23
Teamsters [1] - 384:11
tease [1] - 384:2
technically [1] - 452:9
techniques [3] - 463:11, 463:15, 472:15
Temperature [1] - 429:3
temperature [1] - 429:2
ten [1] - 414:12
tend [1] - 393:25
tending [2] - 578:1, 579:4
tendons [1] - 465:15
term [1] - 529:12
terminal [1] - 553:14
terms [3] - 372:4, 387:1, 562:16
testified [32] - 377:3, 396:20, 404:18, 405:5, 412:3, 427:3, 443:1, 459:19, 460:10, 462:2, 470:23, 501:7, 501:8, 517:10, 517:12, 519:6, 522:17, 523:20, 527:6, 527:13, 527:18, 528:7, 528:8, 531:6, 531:7, 531:11, 532:10, 532:16, 534:14, 535:23, 545:4
testify [12] - 373:23, 373:25, 376:1, 402:3, 471:4, 495:21, 497:2, 497:4, 497:5, 517:16,

519:2, 539:21
testifying [5] - 371:19, 507:19, 517:4, 517:6, 554:17
testimony [53] - 371:22, 373:12, 376:23, 397:18, 401:20, 404:22, 405:1, 405:12, 405:16, 406:5, 406:11, 406:14, 406:15, 411:15, 412:13, 412:21, 413:4, 417:4, 418:2, 421:7, 421:13, 421:16, 424:12, 427:4, 429:10, 435:6, 448:1, 453:15, 461:10, 475:24, 481:12, 496:3, 496:23, 496:25, 497:19, 514:4, 517:3, 519:4, 520:18, 520:22, 525:21, 526:22, 528:2, 528:15, 530:25, 531:19, 537:14, 538:3, 539:10, 539:18, 557:9, 570:20, 580:21
testimony's [1] - 576:13
testing [1] - 388:8
Testing [2] - 467:10, 468:16
tests [1] - 553:13
textbooks [5] - 472:24, 488:14, 488:17, 491:17, 498:9
TH [2] - 521:14, 521:15
THE [395] - 371:12, 372:8, 372:17, 372:24, 373:6, 373:18, 373:24, 374:18, 375:8, 376:10, 376:14, 376:16, 376:18, 377:6, 377:19, 377:25, 378:6, 378:10, 378:15, 378:16, 397:11, 397:15, 397:17, 397:24, 398:2, 398:6, 398:12, 398:15, 398:22, 398:24, 399:7, 399:10, 399:12, 399:19, 399:21, 400:2, 400:6, 400:12, 400:25, 401:11, 402:6, 402:18, 403:2, 403:10, 403:12, 403:14, 403:24, 404:3, 404:8, 404:11, 415:14, 417:17, 430:3, 430:23, 434:10, 434:13, 435:23, 437:6, 437:8, 437:12, 437:15, 437:17, 439:18, 439:20, 444:19, 453:24, 454:2, 457:18, 458:1, 458:3, 458:7, 458:10, 458:11, 458:15, 458:19, 459:1,

459:4, 461:2, 461:15, 461:16, 461:18, 461:20, 461:22, 461:23, 461:24, 462:4, 462:6, 471:17, 471:21, 471:25, 474:4, 474:8, 474:12, 476:19, 477:9, 477:13, 477:15, 478:6, 478:10, 478:18, 478:25, 479:14, 479:20, 480:1, 480:4, 480:9, 480:12, 480:16, 480:17, 480:25, 481:6, 481:21, 481:25, 482:4, 482:5, 482:22, 482:23, 482:24, 483:10, 483:11, 483:12, 483:15, 487:2, 487:8, 487:12, 487:16, 488:2, 488:3, 488:4, 489:6, 490:10, 490:12, 490:13, 495:3, 496:1, 496:5, 496:20, 496:25, 497:2, 497:5, 497:14, 497:20, 501:7, 503:13, 503:16, 504:2, 504:4, 504:9, 505:3, 505:8, 505:12, 505:17, 505:24, 506:2, 506:4, 506:7, 506:12, 506:16, 506:20, 506:25, 507:3, 507:7, 507:13, 507:23, 508:11, 508:14, 508:16, 513:20, 516:13, 530:6, 530:13, 530:19, 530:21, 530:24, 531:5, 531:25, 534:13, 534:18, 534:19, 534:21, 534:23, 534:24, 535:4, 535:7, 535:8, 535:10, 535:13, 535:14, 535:17, 535:20, 537:23, 538:10, 538:11, 538:12, 538:13, 538:14, 538:16, 538:17, 538:19, 539:4, 539:7, 540:7, 540:13, 540:17, 540:21, 540:23, 541:13, 541:18, 541:21, 541:24, 542:2, 542:5, 542:12, 542:14, 542:24, 543:2, 543:5, 543:11, 543:17, 543:21, 543:24, 544:5, 544:9, 544:11, 544:16, 544:21, 544:23, 544:24, 544:25, 545:1, 545:5, 545:7, 545:9, 545:10, 546:12, 546:14, 546:15, 550:1, 550:6, 550:9, 550:12, 551:8, 551:10, 551:11, 551:17, 552:14, 552:15, 553:21, 554:14, 555:1, 555:9, 555:11, 556:2, 556:7, 556:12, 556:18, 556:22, 557:3, 558:4,

558:7, 558:9, 558:11, 559:19, 559:23, 559:25, 560:20, 561:5, 561:11, 561:15, 561:20, 562:1, 562:4, 562:6, 562:9, 562:11, 562:14, 562:19, 563:1, 563:8, 563:12, 563:15, 563:19, 563:24, 564:8, 564:10, 564:14, 564:17, 565:1, 565:7, 565:11, 566:8, 566:11, 566:14, 566:18, 566:24, 567:1, 567:3, 567:5, 567:9, 567:12, 567:14, 567:18, 568:2, 568:5, 568:8, 568:16, 568:22, 569:3, 569:7, 569:10, 569:18, 569:20, 569:24, 570:3, 570:5, 570:10, 570:13, 570:17, 570:21, 570:23, 570:25, 571:6, 571:13, 571:23, 572:14, 572:21, 573:1, 573:11, 574:12, 574:20, 574:24, 575:3, 575:6, 575:9, 575:12, 576:4, 576:25, 577:8, 577:12, 579:12, 579:24, 580:4, 580:7, 580:14, 580:18, 580:20, 580:23, 581:1, 581:4, 581:8, 581:14, 582:5, 582:8, 582:15, 582:19, 583:5, 583:11, 583:19, 583:23, 584:5, 584:11, 584:15, 584:20, 585:4, 585:12, 585:15, 585:21, 586:1, 586:7, 586:20, 587:4, 587:10, 587:16, 588:1, 588:4, 588:13, 588:15, 588:19, 588:23, 589:5, 589:14, 589:25, 590:7, 590:19, 591:1, 591:3, 591:6, 591:10, 591:12, 591:18, 591:20, 592:4, 592:7, 592:10, 592:14
themselves [1] - 465:2
therapist [1] - 438:13
therapists [1] - 445:15
therapy [1] - 378:23, 379:17, 385:20, 386:21, 389:17, 389:18, 436:16, 441:11, 442:8, 442:9
therefore [1] - 560:15
they've [1] - 479:10
thin [2] - 382:4, 428:1
thinking [2] - 395:23, 589:17

**third** [13] - 389:1, 389:15, 389:21, 390:16, 391:25, 398:17, 413:25, 444:2, 444:7, 451:19, 451:23, 452:2, 588:17
**thousands** [4] - 419:8, 495:12, 495:18, 524:17
**three** [33] - 373:9, 378:25, 382:8, 426:18, 426:19, 426:23, 453:9, 459:14, 459:16, 478:7, 478:9, 482:13, 482:15, 484:9, 484:11, 484:13, 484:19, 485:7, 485:8, 485:19, 485:20, 506:4, 509:15, 572:18, 573:13, 584:14, 584:25, 585:11, 585:15, 586:13, 587:7, 589:1, 589:14
**three-quarters** [3] - 482:13, 482:15, 484:13
**throbbing** [2] - 435:7, 435:8
**throughout** [3] - 383:12, 441:9, 563:11
**throw** [1] - 378:6
**thrown** [1] - 378:12
**Thursday** [4] - 507:19, 507:22, 508:4, 592:21
**tiny** [1] - 443:14
**tip** [1] - 478:1
**to..** [1] - 483:17
**today** [17] - 373:11, 385:24, 392:14, 403:4, 412:2, 417:4, 471:5, 503:22, 505:5, 505:19, 508:19, 517:11, 517:22, 544:3, 558:9, 558:14, 587:19
**toes** [1] - 421:1
**together** [7] - 383:9, 472:23, 473:4, 473:17, 473:19, 479:10, 507:8
**tomorrow** [37] - 505:7, 505:10, 506:13, 507:17, 508:6, 542:15, 542:16, 543:16, 543:17, 558:15, 558:20, 558:22, 558:23, 558:25, 559:1, 559:20, 563:3, 564:7, 564:8, 564:18, 565:22, 568:3, 569:4, 583:20, 584:3, 587:1, 589:16, 589:18, 589:22, 590:2, 591:3, 591:17, 591:22, 592:15, 592:16
**ton** [1] - 477:15
**tone** [1] - 539:22

**tonight** [4] - 507:8, 559:17, 565:19, 569:4
**took** [19] - 382:7, 422:14, 433:22, 438:18, 444:9, 472:12, 476:11, 476:22, 476:24, 477:2, 480:21, 481:9, 482:9, 487:19, 487:24, 540:6, 565:12, 576:11
**tool** [1] - 427:13
**tools** [3] - 428:19, 572:3, 573:24
**top** [8] - 373:8, 373:14, 455:10, 484:22, 485:6, 485:20, 518:5
**topic** [3] - 496:5, 578:6, 579:16
**torn** [1] - 425:7
**toss** [1] - 407:23
**total** [1] - 447:1
**totally** [1] - 426:13
**touch** [2] - 375:8, 413:25
**touched** [1] - 582:23
**tough** [12] - 379:6, 379:14, 379:16, 382:22, 383:6, 386:11, 395:6, 395:7, 395:8, 397:2, 397:8, 397:9
**tour** [1] - 455:1
**tours** [1] - 454:24
**towards** [6] - 383:20, 395:17, 409:2, 409:4, 414:5
**track** [38] - 393:21, 406:23, 411:16, 411:18, 411:19, 411:20, 411:21, 422:3, 422:4, 422:12, 422:17, 427:4, 438:3, 438:14, 457:11, 472:11, 474:12, 474:25, 475:4, 475:10, 482:10, 483:7, 487:25, 512:14, 522:5, 528:25, 529:16, 529:18, 529:20, 533:5, 535:6, 546:17, 546:20, 546:24, 552:20
**tracks** [2] - 553:25, 572:5
**traction** [9] - 465:9, 492:17, 492:18, 502:18, 502:23, 533:24, 535:23, 535:24, 536:6
**Trade** [1] - 546:4
**trailing** [1] - 492:20
**train** [65] - 371:3, 371:4, 371:8, 371:9, 371:17, 393:18, 405:8, 405:15, 405:22, 406:23, 407:21, 407:24, 414:5,

414:8, 415:5, 415:6, 415:15, 415:19, 415:23, 416:6, 416:13, 421:8, 422:5, 422:7, 422:10, 422:11, 422:16, 424:6, 427:8, 431:5, 456:18, 465:2, 478:23, 516:18, 524:13, 524:20, 530:1, 532:5, 532:22, 546:4, 546:16, 547:9, 547:12, 547:14, 547:18, 547:21, 548:3, 548:4, 548:9, 548:11, 548:18, 548:22, 549:1, 549:3, 549:10, 550:20, 550:21, 553:6, 554:3, 560:7, 572:11, 578:18, 578:22, 578:23, 579:3
**trained** [6] - 405:6, 405:11, 406:9, 548:21, 560:13
**training** [16] - 405:2, 405:14, 407:2, 407:12, 407:13, 408:12, 408:25, 409:10, 463:1, 468:25, 469:24, 472:10, 548:16, 548:19, 573:12
**trains** [14] - 393:21, 408:17, 408:19, 409:11, 412:10, 415:9, 427:22, 516:23, 537:5, 552:20, 553:12, 555:19, 557:19
**transcript** [1] - 562:20
**transcripts** [1] - 473:11
**transfer** [1] - 418:12
**transferred** [1] - 421:4
**transition** [1] - 378:25
**transitioning** [1] - 379:12
**transmission** [1] - 468:3
**Transportation** [2] - 489:16, 489:19
**trash** [1] - 475:19
**trash-strewn** [1] - 475:19
**traveling** [1] - 589:22
**treat** [1] - 436:14
**treated** [1] - 394:15
**treating** [1] - 441:9
**treatment** [2] - 509:25, 543:4
**trial** [10] - 373:1, 477:25, 496:7, 507:15, 507:17, 507:25, 531:12, 539:11, 542:16, 562:20
**tribometer** [2] -

495:7, 495:13
**tribometers** [1] - 495:10
**tribometrist** [2] - 469:20, 495:8
**tried** [6] - 374:1, 424:9, 431:8, 443:19, 443:21, 444:1
**trips** [2] - 394:8, 394:21
**trouble** [2] - 388:21, 506:10
**trucks** [1] - 489:25
**true** [14] - 373:12, 399:17, 405:1, 405:8, 406:10, 426:11, 438:1, 449:7, 450:14, 454:7, 454:8, 461:6, 541:15, 541:23
**truth** [4] - 406:8, 454:9, 523:15, 539:12
**try** [16] - 374:5, 385:19, 386:22, 392:23, 393:14, 395:24, 400:21, 443:16, 443:22, 455:8, 491:11, 492:14, 499:19, 503:19, 544:12, 573:20
**trying** [11] - 374:16, 374:22, 383:14, 386:9, 386:21, 395:22, 417:6, 508:18, 543:7, 562:24, 571:1
**tubes** [2] - 373:13, 374:14
**turn** [2] - 422:23, 422:25
**turning** [1] - 423:2
**TV** [1] - 379:10
**twelve** [1] - 588:14
**twenty** [1] - 572:18
**twenty-three** [1] - 572:18
**twice** [3] - 393:4, 443:8, 582:16
**twist** [1] - 499:17
**Two** [1] - 371:1
**two** [76] - 371:23, 373:9, 373:13, 376:6, 378:25, 382:8, 391:3, 391:5, 391:6, 391:9, 393:7, 405:10, 409:5, 423:20, 426:16, 426:18, 426:19, 426:23, 428:9, 432:14, 435:3, 444:13, 444:25, 450:20, 450:21, 451:16, 452:5, 452:7, 452:9, 453:18, 453:19, 453:21, 454:3, 458:23, 460:14, 460:17, 464:24, 472:22, 475:25, 476:17,

478:9, 478:15, 482:15, 486:10, 494:1, 494:9, 501:24, 501:25, 502:6, 502:7, 503:18, 503:25, 505:20, 506:13, 508:2, 510:8, 510:9, 547:23, 551:21, 552:2, 552:4, 556:17, 558:15, 573:13, 575:7, 577:21, 583:13, 585:10, 585:17, 585:24, 586:19, 588:25, 589:18, 589:22
**two-by-four** [1] - 376:6
**two-inch** [1] - 371:23
**type** [2] - 534:8, 567:22

## U

**U.S.C** [1] - 584:17
**Ubaldi** [2] - 473:13, 564:9
**um-h'm** [6] - 417:15, 417:23, 418:24, 423:6, 429:9, 437:11
**unavailable** [1] - 505:6
**uncoupling** [1] - 408:18
**under** [16] - 376:25, 434:17, 436:3, 437:10, 438:7, 444:21, 459:5, 497:25, 505:8, 509:18, 516:2, 539:11, 561:24, 584:6, 588:5, 588:16
**understood** [5] - 508:10, 512:2, 512:18, 520:5, 525:21
**undertake** [1] - 575:23
**unfair** [2] - 374:5, 374:21
**unfortunately** [1] - 575:6
**union** [5] - 384:6, 384:7, 384:8, 384:9, 384:13
**United** [2] - 470:21, 489:16
**universe** [1] - 512:9
**University** [1] - 463:4
**unless** [11] - 380:13, 395:16, 406:13, 445:15, 474:16, 497:15, 505:12, 507:16, 516:1, 559:17, 578:4
**unlikely** [1] - 464:14
**unnatural** [4] -

536:14, 536:15, 536:17, 536:18

**unnecessary** [1] - 563:20

**unreasonable** [2] - 512:7, 574:13

**unreasonably** [1] - 576:6

**unsafe** [16] - 410:5, 410:8, 410:10, 410:13, 410:18, 410:20, 410:23, 411:3, 413:10, 456:22, 457:3, 457:13, 535:10, 536:13, 537:18, 550:18

**unsuitable** [1] - 382:9

**Unusual** [1] - 430:12

**up** [133] - 372:8, 372:20, 373:9, 374:2, 377:23, 381:15, 382:8, 382:10, 382:20, 382:23, 386:22, 387:9, 389:25, 393:6, 393:16, 393:21, 395:22, 398:4, 400:23, 400:25, 401:2, 403:5, 405:14, 405:19, 406:3, 406:14, 406:22, 407:4, 415:17, 415:20, 416:8, 416:12, 417:24, 419:12, 419:16, 420:4, 420:23, 421:8, 422:8, 422:15, 423:9, 424:8, 427:9, 431:7, 432:8, 433:9, 433:20, 436:16, 441:12, 441:25, 446:24, 447:9, 448:2, 448:19, 454:3, 455:18, 471:7, 475:16, 478:17, 483:16, 483:21, 484:15, 484:17, 484:19, 485:4, 485:11, 485:25, 486:2, 486:18, 486:20, 487:11, 489:10, 490:19, 491:25, 492:11, 492:13, 492:14, 492:20, 492:21, 492:25, 493:12, 493:24, 494:5, 494:11, 496:9, 499:7, 499:10, 501:20, 501:21, 502:6, 502:15, 502:25, 503:8, 503:20, 503:25, 509:6, 509:17, 510:1, 510:7, 510:11, 510:16, 523:14, 532:4, 535:9, 540:6, 546:17, 547:12, 547:14, 547:18, 547:19, 548:17, 548:20, 550:9, 551:13, 551:17, 551:23, 552:12, 558:13, 567:10, 570:9, 570:13, 578:13, 582:19, 585:17, 586:19, 586:23, 586:24, 586:25, 587:12, 587:17

**upper** [1] - 537:19

**upstairs** [1] - 455:5

**user** [6] - 464:23, 465:2, 467:2, 512:13, 514:10

**usual** [1] - 542:9

**utilities** [2] - 446:18, 446:21

**utilize** [1] - 498:7

**V**

**vacation** [3] - 505:7, 507:20, 507:21

**vaguely** [2] - 440:4

**validate** [1] - 495:15

**validated** [1] - 495:13

**validation** [1] - 495:9

**value** [3] - 372:11, 375:25, 495:20

**various** [2] - 463:15, 553:6

**vector** [15] - 463:6, 465:6, 490:16, 490:20, 490:21, 490:22, 491:3, 492:7, 525:13, 525:15, 525:17, 525:21, 533:18, 533:22

**Velez** [5] - 473:12, 526:23, 526:25, 528:16, 572:12

**verbatim** [1] - 531:9

**verdict** [16] - 401:10, 402:5, 402:15, 560:4, 560:19, 560:21, 560:22, 561:3, 565:13, 566:16, 569:22, 584:5, 585:7, 585:8, 588:24, 589:18

**verse** [1] - 425:16

**version** [5] - 522:18, 522:21, 522:22, 523:3, 523:4

**versus** [4] - 372:12, 568:13, 583:10, 587:14

**vertical** [3] - 484:15, 484:20, 552:5

**vest** [1] - 416:1

**vestibule** [5] - 372:7, 372:8, 483:1, 486:12, 496:8

**vicinity** [1] - 535:1

**Vicodin** [2] - 389:11, 389:12

**video** [8] - 458:20, 503:23, 505:21, 539:17, 540:1, 541:7, 542:21, 564:22

**videographer** [2] - 505:15, 542:22

**videotape** [1] - 564:16

**Videotape** [1] - 539:9

**videotaped** [3] - 503:20, 540:11, 540:25

**view** [1] - 510:2

**violate** [2] - 516:9, 520:25

**visit** [5] - 436:25, 437:1, 438:1, 528:23, 532:4

**visually** [2] - 427:10, 428:3

**vitae** [1] - 472:6

**voice** [1] - 539:22

**volume** [1] - 489:17

**voluntary** [1] - 577:23

**W**

**W-i-d-a-s** [1] - 462:6

**wage** [1] - 447:13

**wages** [8] - 400:23, 401:14, 402:1, 402:3, 402:15, 402:22, 404:7

**wait** [2] - 479:17, 552:17

**walk** [10] - 380:2, 392:18, 392:20, 414:5, 415:23, 537:4, 546:17, 546:24, 547:1, 552:19

**walked** [4] - 411:15, 414:3, 422:4, 422:15, 475:3, 554:7

**walker** [3] - 438:17, 439:23, 444:16

**walking** [12] - 392:25, 393:1, 393:16, 395:8, 427:7, 436:1, 475:14, 532:22, 533:1, 533:3, 546:19, 553:16

**walks** [1] - 411:9

**walkway** [12] - 469:8, 494:9, 494:11, 495:10, 495:11, 495:12, 528:1, 529:3, 529:7, 554:22, 555:12, 557:11

**Wallace** [7] - 473:12, 518:25, 519:2, 519:6, 520:19, 570:21, 572:11

**Wallace's** [1] - 570:20

**wants** [5] - 396:25, 491:9, 533:12, 541:12, 542:19

**warn** [2] - 464:24, 512:12

**warnings** [1] - 515:23

**Washington** [1] - 470:24

**waste** [1] - 564:3

**wasting** [1] - 563:25

**watch** [3] - 536:23, 558:16, 559:19

**watched** [1] - 506:18

**watching** [1] - 379:10

**water** [12] - 393:2, 412:24, 413:1, 413:2, 413:10, 413:13, 413:17, 413:22, 413:25, 446:18, 527:18, 547:7

**ways** [3] - 374:23, 382:25, 448:12

**wear** [5] - 406:16, 445:20, 445:23, 446:1, 446:3

**wearing** [4] - 406:19, 445:17, 445:21, 579:3

**wears** [2] - 406:13, 417:13

**weather** [3] - 429:2, 432:9, 473:17

**weatherman** [1] - 383:25

**week** [12] - 373:1, 390:25, 391:6, 391:9, 435:12, 450:18, 453:18, 453:21, 454:3, 459:24, 460:16, 507:20

**weekend** [1] - 508:8

**weekly** [1] - 379:23

**weeks** [25] - 377:18, 378:23, 391:2, 409:5, 435:3, 436:19, 436:21, 440:25, 442:17, 442:22, 444:13, 444:25, 449:14, 449:15, 449:19, 450:3, 450:6, 451:22, 454:10, 459:23, 460:3, 460:14, 546:11, 550:16

**weighing** [1] - 565:14

**weight** [8] - 396:6, 418:12, 420:24, 421:3, 444:14, 493:8, 493:25, 501:21

**weight-bear** [1] - 444:14

**weird** [1] - 451:13

**welcome** [5] - 376:18, 459:4, 508:16, 538:11, 567:13

**wet** [1] - 413:3

**whatsoever** [2] - 442:25, 512:19

**Whitley** [11] - 433:10, 433:22, 434:4, 434:21, 435:11, 436:9, 436:11, 563:5, 563:8, 563:9, 590:8

**whitley** [1] - 433:14

**Whitley's** [1] - 590:21

**whole** [42] - 371:21, 371:22, 372:4, 374:9, 381:6, 381:8, 382:23, 383:13, 385:13, 393:7, 394:21, 398:5, 398:12, 398:25, 402:6, 403:24, 405:14, 406:7, 406:14, 413:21, 438:16, 440:5, 507:5, 522:16, 523:10, 523:11, 532:23, 537:11, 538:21, 556:12, 556:19, 565:16, 573:16, 578:24, 584:8, 584:18, 584:24, 585:2, 585:18, 585:25, 586:11

**Widas** [12] - 461:19, 461:20, 461:21, 462:6, 462:9, 471:13, 480:19, 481:7, 487:18, 508:24, 516:16, 530:9

**wide** [3] - 485:7, 485:8, 485:17

**width** [1] - 491:19

**willing** [2] - 506:24, 590:9

**winding** [1] - 558:13

**Winter** [1] - 382:3

**wipe** [1] - 416:15

**withdraw** [5] - 501:10, 506:24, 520:4, 530:23, 531:24

**witness** [51] - 371:15, 373:8, 373:14, 376:1, 377:2, 404:11, 457:24, 459:3, 461:17, 461:18, 462:1, 471:20, 481:19, 481:23, 482:6, 482:8, 487:4, 487:9, 497:22, 497:23, 498:1, 503:20, 503:25, 504:7, 505:6, 506:11, 507:4, 507:16, 516:13, 534:13, 534:22, 538:18, 538:19, 538:20, 539:10, 539:11, 539:20, 540:2, 540:7, 542:17, 542:18, 543:14, 545:3, 551:14, 552:18, 558:5, 558:8, 558:16, 572:10

**WITNESS** [30] - 378:16, 458:7, 461:16, 461:22, 462:6, 482:5, 482:23, 483:10, 483:12, 483:15, 488:3, 490:10, 490:13, 534:18, 534:21, 534:24, 535:7, 535:10, 535:14, 538:11, 538:13, 538:16, 544:23, 544:25, 545:7, 545:10, 546:14, 551:10, 552:14, 553:21

**witnesses** [14] - 477:22, 497:21, 505:20, 506:13, 508:18, 514:4, 544:18, 558:9, 558:15, 563:20, 573:13, 589:18, 589:22, 591:24

**wobbly** [2] - 375:9, 375:12

**woke** [1] - 387:9

**wood** [2] - 411:21, 411:25

**wooden** [3] - 373:13, 547:1, 547:3

**word** [1] - 463:24

**words** [24] - 400:12, 462:20, 465:25, 469:15, 469:16, 479:3, 485:22, 498:11, 498:21, 500:20, 510:7, 510:21, 514:3, 514:20, 519:25, 520:13, 522:23, 522:24, 523:19, 528:17, 532:21, 576:12, 587:18

**work..** [1] - 581:18

**worker** [1] - 472:11

**workers** [7] - 466:15, 475:15, 489:2, 503:4, 509:3, 509:23, 516:1

**Workers** [1] - 402:25

**workplace** [20] - 466:14, 466:22, 467:6, 467:11, 467:14, 467:17, 467:19, 467:23, 467:24, 468:5, 468:8, 469:9, 471:1, 471:3, 471:9, 471:14, 493:16, 511:2, 512:25, 537:18

**works** [4] - 488:4, 494:12, 576:5, 585:4

**World** [1] - 546:4

**world** [5] - 396:23, 467:9, 467:19, 468:9, 489:15

**worried** [1] - 576:22

**worry** [5] - 393:19, 527:17, 565:18, 565:19, 579:17

**worse** [1] - 395:15

**worst** [1] - 393:8

**worth** [1] - 459:21

**wound** [4] - 381:15, 382:10, 382:20, 441:12

**write** [16] - 424:6, 425:12, 425:20, 429:3, 429:13, 432:5, 432:12, 433:3, 467:9, 469:7, 471:7, 495:8, 498:16, 518:1, 518:4, 531:14

**writing** [5] - 425:10, 425:18, 456:25, 469:11, 470:18

**written** [5] - 434:17, 438:7, 456:17, 457:10, 523:4

**wrote** [9] - 425:2, 431:4, 432:2, 432:7, 432:10, 447:5, 469:14, 519:8, 520:5

## Y 

**yard** [8] - 393:15, 407:3, 407:4, 408:12, 408:16, 408:21, 408:22

**yards** [3] - 408:24, 572:5, 572:11

**year** [18] - 382:6, 385:9, 387:7, 387:21, 387:22, 387:23, 392:7, 407:2, 407:17, 407:18, 441:15, 441:16, 445:8, 448:24, 469:22, 470:9, 472:6

**year-old** [1] - 472:6

**years** [23] - 383:12, 394:25, 396:17, 412:2, 440:5, 462:25, 463:9, 467:12, 467:16, 467:21, 468:4, 468:7, 469:25, 470:11, 475:18, 475:20, 495:2, 495:13, 517:21, 529:5, 529:10, 545:21

**yesterday** [7] - 384:6, 404:17, 405:15, 406:13, 418:2, 427:3, 518:25

**York** [1] - 470:4

**yourself** [5] - 417:24, 419:12, 420:23, 509:17, 583:18

## Z

**Zebarowski** [3] - 413:6, 413:7, 413:21