1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW JERSEY

3

4    STEVEN FODER,                :        Civil No.
                                           14-cv-3935 -MCA
5                  Plaintiff,     :
                                           TRANSCRIPT OF
6            v.                   :        TRIAL PROCEEDINGS

7    PORT AUTHORITY TRANS HUDSON  :            VOLUME 1
     CORPORATION,
8                                 :
                   Defendant.
9    -------------------------------x

10
                                      Newark, New Jersey
11                                    November 14, 2016

12

13

14
     BEFORE:
15
            THE HON. MADELINE COX ARLEO, U.S.D.J.
16

17

18                                    Reported by:
                                      CHARLES P. McGUIRE, C.C.R.
19                                    Official Court Reporter

20

21
            Pursuant to Section 753, Title 28, United States
22   Code, the following transcript is certified to be
     an accurate record as taken stenographically in
23   the above entitled proceedings.

24
                            s/CHARLES P. McGUIRE, C.C.R.
25


                    CHARLES P. McGUIRE, C.C.R.

1    **APPEARANCES:**

2        **BARISH ROSENTHAL**
         **1717 Arch Street**
3        **Philadelphia, PA 19067**
         **BY: SAMUEL J. ROSENTHAL, ESQ., and**
4            **ANTHONY M. DiGIULIO, ESQ.**
         **Attorneys for Plaintiff**
5
         **NICHLOAS MINO, ESQUIRE**
6        **150 Greenwich Street**
         **New York, New York 10007**
7        **Attorney for Defendant**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               THE COURT CLERK:  All rise.

2               THE COURT:  Good morning, everybody.

3               We have a full house today.  Wow.

4               MR. ROSENTHAL:  Trying.

5               THE COURT:  Okay.  Who do we have here today?

6               We're here in Foder v. Port Authority.

7               MR. ROSENTHAL:  Yes, Your Honor.  This is Sam

8       Rosenthal --

9               THE COURT:  The famous Sam Rosenthal.

10              MR. ROSENTHAL:  I don't know about famous.

11              THE COURT:  I heard the name, I see your name on

12      the docket, but I like to put faces with names.

13              Nice to meet you, Mr. Rosenthal.

14              MR. ROSENTHAL:  Actually, Your Honor, I've been

15      before you many times.

16              THE COURT:  In my different life, right, in my

17      former life?

18              MR. ROSENTHAL:  In a different life, yes.

19              THE COURT:  All the same life, but it's breaking

20      up a little bit.

21          (Laughter)

22              MR. ROSENTHAL:  Yes.

23              THE COURT:  Okay.

24              MR. ROSENTHAL:  And this is Mr. DiGiulio, Tony

25      DiGiulio, who is with me as attorney.

1          THE COURT:  Yes.  He did a great job here last

2     week.

3          MR. DiGIULIO:  Thank you, Your Honor.

4          MR. ROSENTHAL:  This is OUR paralegal, Mr. Tom

5     Pazsik, who's with me, and this is Mr. Steven Foder, the

6     Plaintiff in the case.

7          THE COURT:  Okay.  Welcome.

8          THE PLAINTIFF:  Pleasure to meet you, Your Honor.

9          THE COURT:  Okay.  Who do we have for team

10    defense?

11         MR. MINO:  Good morning, Your Honor.

12         Nicholas Mino for PATH, and I have with me a law

13    intern, Ace Pawlikowski.

14         MR. PAWLIKOWSKI:  Good morning, Your Honor.

15         THE COURT:  You're outnumbered.  Are you okay with

16    that?

17       (Laughter)

18         MR. MINO:  I'm fine with that.

19         MR. ROSENTHAL:  Your Honor, Mr. Pazsik is just

20    going to be up here now for the jury selection, but for the

21    trial, he's not going to be sitting at counsel table.

22         THE COURT:  Your --

23         MR. ROSENTHAL:  Paralegal.

24         THE COURT:  He can.

25         MR. ROSENTHAL:  Well, I didn't want him to be back

1   there with the jury -- I figured the jury is going to be

2   back in the --

3           THE COURT:  Yes.

4           MR. ROSENTHAL:  So I didn't want him sitting back

5   there.  That's why I brought him up here.

6           THE COURT:  That's fine.  Okay.

7           So, gentlemen, you can have a seat, and we'll talk

8   about some preliminary issues.

9           So when we broke on Thursday, what I left

10  outstanding was this issue of the setoff, and what everyone

11  seemed to agree was that there were -- and I want to talk

12  about it this morning -- an agreed amount of medical bills

13  and lost wages that the parties agreed should be set off

14  from the verdict, and the narrow issue is whether they

15  should be set off from the entirety of the verdict, or just

16  that portion of the verdict that is awarded for pain and

17  suffering or for medical bills.

18          And I looked at the cases, and I looked at the

19  statute, and I actually went back and I looked at, as we

20  talked about, the language of the statute, which refers you

21  back to the agreement of the parties, and the agreement

22  makes clear that, like a third party lien, the lien goes

23  against the jury award.

24          So I don't see how I could consider the setoff any

25  other way but a setoff against the liens for the medical

1    bills and the wages would go against the whole verdict.  I

2    mean, I know we talked about this with Mr. DiGiulio.

3    There's no authority that said it somehow would only go

4    against that portion of the verdict that pertains to medical

5    bills or lost wages.

6          MR. DiGIULIO:  I agree, Your Honor.  I didn't find

7    anything that was on point, either, but I think the bigger

8    issue is, if we're going to have the setoff, which we say

9    that they are permitted to, we should be able to put on

10    evidence of the wage lien and the medical lien.

11          THE COURT:  Well, let me ask you this question.

12    If it's stipulated -- and I think it is, it's stipulated

13    that the medical bills are reasonable and necessary --

14    sometimes they're not, and so you put in all the medical

15    bills and you put in a doctor to explain that they're

16    reasonable and necessary.

17          I think I heard from counsel that there they will

18    stipulate to reasonable and necessary with respect to the

19    medical bills.  Is that true?

20          MR. MINO:  We're willing to stipulate to the

21    amount that we paid for the medical bills, yes.

22          THE COURT:  Well, if you don't stipulate to

23    reasonable and necessary, then you have to.  I mean, you

24    can't have it both ways.  You have to either say it's

25    reasonable and necessary -- because the jury is only going

1    to theoretically award reasonable and necessary.  That's

2    what the jury charge would say.  So if you don't agree to

3    stipulate that all his bills were reasonable and necessary,

4    he has to put on evidence through a doctor, go through each

5    bill painstakingly and say it was reasonable and necessary.

6           MR. MINO:  No, no.  Yes, then PATH would just

7    stipulate that the bills were reasonable and necessary.

8           THE COURT:  So if they accept that it's reasonable

9    and necessary, there's no basis to put it before the jury.

10          MR. DiGIULIO:  WelL, I think there is, because

11    that's money -- if he has a lost wage amount, right, and

12    they're saying, well --

13          THE COURT:  Let's talk about medical bills for a

14    second.

15          MR. DiGIULIO:  Okay.  Either way.  So if he says

16    -- if there's medical bills that are outstanding, and then

17    PATH is saying, well, he can't put on evidence of the

18    medical bills because we paid them, well, that's true to an

19    extent, but at the end of the case, they're going to be

20    taking them right back.  So it's something that should have

21    been put in front of the jury.

22          THE COURT:  But here's the thing.  We agree that

23    there's a lien.  We agree that there's a setoff based on the

24    medical bills.  The medical bills are -- if the jury's told

25    that -- just theoretically, if everyone agrees, and there's

1    a written stipulation or an oral stipulation that all the

2    medical bills are reasonable and necessary and there will be

3    a setoff to any jury verdict, there's no purpose to put them

4    before a jury as long as you instruct the jury carefully

5    that pain and suffering -- you should not include medical

6    bills or lost wages, and they're not part of your

7    consideration in this case.  That's the language that you

8    have to tell the jury, because you don't want the jury to

9    throw it in because they figure, well, it has to be part of

10   it.

11          On the other hand, you don't want them to have

12   that factor in.  You want them to say, you just consider the

13   medical bills.

14          MR. ROSENTHAL:  Your Honor, if I may.

15          THE COURT:  Yes.

16          MR. ROSENTHAL:  Under the law, Plaintiff is

17   entitled to all of his medical bills paid by --

18          THE COURT:  They have been paid, though.  You're

19   right, he is entitled to compensation for medical bills if

20   they aren't paid.  What he's not entitled to do -- there's

21   law out there that says there's no logical relationship

22   between amount of medical bills and pain and suffering.

23   People could have high medical bills and very little

24   suffering, and there's unfortunately in this world people

25   with huge pain and suffering and very few medical bills

1   because there's nothing you can do for the pain and

2   suffering.

3            So the only purpose of putting on evidence of

4   medical bills is if they're disputed, and they're not

5   disputed here.  They have no other relevance to the case if

6   everyone agrees that they're fixed, that they're reasonable

7   and necessary, and that there will be an offset.

8            MR. ROSENTHAL:  Except for the fact that if he's

9   entitled to his medical bills, and there is an offset, if he

10  gets a verdict of let's say -- and the medical bills are

11  $85,000, and he gets a verdict of $85,000, he would -- if

12  there's a takeout, a setoff, he would end up with a verdict

13  of zero.

14           THE COURT:  And that's the risk that we face every

15  day in courts in America.

16           MR. ROSENTHAL:  But the jury needs to understand

17  that he is responsible for paying his own medical bills.

18           THE COURT:  But here's what I propose:  That the

19  jury will not be told anything about -- medical bills are

20  not at issue in this case any longer based on what I just

21  heard from counsel.  They are just not at issue.  We're

22  going to explain the reasonable and necessary, that all the

23  bills have been paid, and there's going to be a setoff.  So

24  in other words, the only purpose of introducing evidence of

25  it is to adversely influence the jury to say, you know,

1    you've got to know there are some medical bills out there.

2    The medical bills are no longer at issue in this case.

3    They're just not relevant.  We can mold the verdict, and we

4    can instruct the jury that they're here to award damages for

5    pain and suffering, and specifically instruct them, you

6    should not include or assume there are any medical bills

7    that are outstanding.  They are not part of your

8    deliberative process.

9         MR. ROSENTHAL:  If that is the case, then there is

10    no setoff, because the jury's not awarding him money for his

11    medical.

12         THE COURT:  But it's a stipulation.  Of course

13    we're going -- this is why we're having -- we're trying to

14    do what's fair and not confuse the jury.  To say to the jury

15    that there are medical bills, to give them a -- if I were to

16    accept your argument, Mr. Rosenthal, it would be, let's just

17    tell the jury about the stipulation and how much the medical

18    bills are, and then we can put that line on the sheet, and

19    if the medical bills are 85,000, put 85,000, and then they

20    accept it, the pain and suffering, the only purpose of that

21    is to let the jury know how great the medical bills are, to

22    somehow influence their pain and suffering, because --

23         MR. ROSENTHAL:  No.

24         THE COURT:  What's the relevance, then?  I have a

25    lawyer here for the Defendant that has said they have been

1    fully paid by the PATH, no one disputes that -- let me

2    finish -- that, I will stipulate that they are reasonable

3    and necessary, I will agree that the Court can mold the

4    verdict, so if the jury only awards 50,000 for pain and

5    suffering, we have an $85,000 lien, you're not going to get

6    any money.

7              MR. ROSENTHAL:  But he's entitled to his medical

8    costs, that's the problem, so it has to be on the verdict

9    sheet.

10             THE COURT:  But, Mr. Rosenthal, he'll agree to

11   that.  He's going to agree that -- I would imagine, he has

12   to agree that part of the stipulation is whatever liability

13   that the jury apportions to the -- you know, awards in favor

14   of the Plaintiff, that that proportion will apply to the

15   medical bills and the lost wages.

16             MR. ROSENTHAL:  Oh, okay.  I understand now.

17             THE COURT:  Do you get it?  I want to make sure

18   you understand that.

19             In other words, let's use your hypothetical.

20             There's $85,000 in medical bills, and for

21   simplicity, let's take wages off the table.  Let's just say

22   we deal with medical bills.  Okay?

23             MR. MINO:  Sure.  Sure.

24             THE COURT:  So there's 85,000 in medical bills.

25   The jury comes back with -- let's make it 90,000 in medical

1    bills.

2            MR. MINO:  Okay.

3            THE COURT:  The jury comes back with a verdict of

4    $100,000.  We all agree that the Plaintiff gets 10,000.

5    Right?

6            MR. MINO:  Well, actually -- well, quite frankly,

7    under your scenario, it comes out better for PATH.  However,

8    I don't actually think -- well, to me --

9            THE COURT:  You can't have it both ways, though.

10           MR. MINO:  I think it depends on the contribution,

11   because --

12           THE COURT:  Well, let me stop you for a minute.

13           MR. MINO:  Sure.

14           THE COURT:  Let's say the Defendant is 100 percent

15   at fault under that scenario.

16           MR. MINO:  Okay.

17           THE COURT:  So you mold the verdict and say the

18   Plaintiff's 100 percent at fault.

19           MR. ROSENTHAL:  The Plaintiff, or the Defendant?

20           THE COURT:  I'm sorry.  The Defendant.  The

21   Defendant is 100 percent at fault, and we're going to award

22   the Plaintiff $100,000, and there's a $90,000 medical lien.

23   We'd all agree that after the verdict, if the jury only has

24   one line for pain and suffering, we mold the verdict and

25   say, okay, the Plaintiff gets $10,000.

1          MR. ROSENTHAL:  We don't, because it's 100 percent

2     for the Defendant.  So the medical bills, that 90,000 should

3     be 100 percent paid by the Defendant.  That's the problem.

4          THE COURT:  I'm sorry.  I'm sorry, you're correct.

5     It's 100 percent -- you're right.  I stand corrected.  Under

6     that scenario, you're right:  If there's $90,000 in medical

7     liens, and there's a hundred percent liability imposed on

8     the Defendant, and $90,000 worth of medical bills and

9     $100,000 awarded, he gets 100,000.

10          MR. MINO:  Walks with a hundred.

11          THE COURT:  He walks with a husband.

12          MR. MINO:  Yes.

13          THE COURT:  Now, if the jury says 50-50, right,

14     then we would have a scenario of, the medical lien would be

15     45, the verdict would be 50, right, and he would wind up

16     with 5,000.  Is that right?

17          MR. ROSENTHAL:  The pain and suffering would be

18     50, he would get 25 of that.

19          THE COURT:  Pain and suffering, if it was 90, all

20     right, so that would mean that we would agree that 50

21     percent of the medical bills get paid --

22          MR. ROSENTHAL:  Fifty percent of the medical.

23          THE COURT:  -- and that would leave another 45

24     unpaid.

25          MR. ROSENTHAL:  Oh, okay.  I understand what

1    you're saying.  So it would be, then, five, plus 45; 50

2    total, which would be 50 percent.

3                THE COURT:  So let's make sure we're clear on

4    this.  The same scenario:  The jury comes up with 100,000,

5    and if 90,000 in medical bills, and the jury apportions

6    liability 50-50.

7                MR. ROSENTHAL:  Yes.

8                THE COURT:  So out of that 100,000, if it's 50

9    percent, the Plaintiff would get 50.

10               MR. ROSENTHAL:  Yes.

11               THE COURT:  But it would be offset by a $45,000

12   unpaid medical lien.

13               MR. ROSENTHAL:  Well, I think what happened -- I

14   mean, my reading of that scenario is, there is $90,000 that

15   would be cut in half to $45,000 that he would be responsible

16   for and he would get back, that he -- for the -- he'd be

17   responsible for the 45, so that would go back to PATH.  They

18   wouldn't have to pay that 45, they'd have to pay the other

19   45 --

20               THE COURT:  Right.

21               MR. ROSENTHAL:  -- and the 10 would be split in

22   half, so he would end up with -- to five.

23               THE COURT:  He would end up with $5,000.

24               MR. ROSENTHAL:  $5,000 for the pain and suffering

25   and $45,000 for the half of the medical.

1          THE COURT:  No.  How would that be?  The way I see

2    it would be, the medical lien would be 90,000.

3          MR. ROSENTHAL:  Right.

4          THE COURT:  The medical bills are 90.  But PATH is

5    only half negligent, so -- you know, it's a 50-50 split, so

6    45 percent of the medical lien would be extinguished.  The

7    other 45 percent would be his responsibility.

8          MR. MINO:  Actually, Your Honor, we end up at the

9    same number, but the way --

10          THE COURT:  Which number is that?

11          MR. MINO:  5,000, under the scenario you just

12   proposed, $5,000.

13          THE COURT:  Right.

14          MR. MINO:  However, the way we get there in light

15   of the Clark case, which says that the amount of the setoff

16   is not diminished by liability, PATH has always come to it

17   differently.  So under your scenario --

18          THE COURT:  What's the Clark case?

19          MR. MINO:  Clark is -- I can give you the cite.

20   Just let me pull it up.

21          But in that, they were examining whether or not

22   wages could be set off.

23          It was cited in our motion in limine brief.  It's

24   Clark v. Northern Burlington Railroad.

25          THE COURT:  Where's it from?

1       MR. MINO:  It's from, if you will just give me a

2    second to pull it up -- it is from the 8th Circuit,

3    Nebraska.  It is 726 F.2d 448.

4       THE COURT:  And what do you say it stands for?

5    What proposition?

6       MR. MINO:  The proposition that the setoff is not

7    affected by the liability split.  So, for example, under

8    your scenario, if we had paid $90,000 in medical expenses,

9    but it's 50-50, you do not say, okay, you get $45,000 of it.

10    Let me just explain --

11       THE COURT:  I think I see.  Go ahead.

12       MR. MINO:  So what PATH has always done is said,

13    okay, the jury awards $100,000 pain and suffering.  Add in

14    the $90,000 of wages.  From that 190 --

15       THE COURT:  No, wait.  It's medical.

16       MR. MINO:  Medical bills, I'm sorry.

17       From that 190, you apportion liability there, so

18    50-50, and then that leaves you with $95,000, and then you

19    subtract the full amount of the lien, $90,000, and you're

20    left with five.

21       THE COURT:  I agree.  You're right.

22       MR. MINO:  You and I end up with the same five,

23    but we stay within the bounds of Clark, where we are

24    entitled to a dollar-for-dollar setoff.  Okay?

25       THE COURT:  I hear you.

CHARLES P. McGUIRE, C.C.R.

1              MR. MINO:  Okay.

2              THE COURT:  Mr. Rosenthal?

3              MR. ROSENTHAL:  Are we still talking about

4    medical?

5              THE COURT:  Just medical.  I mean, because,

6    medical, we all agree that everything is reasonable and

7    necessary, everything's been fully paid.

8              MR. ROSENTHAL:  Right.  I believe that <u>Clark</u> is

9    not applicable here in this circumstance where we're talking

10   about if my client is 50 percent negligent, he should not be

11   able to recover for 50 percent of his medical costs that are

12   -- that the setoff is requested for.  For example, if he's a

13   hundred percent -- the contract is that if he's a hundred

14   percent responsible, he doesn't have to pay anything back.

15   So it doesn't quite make sense to me.

16             THE COURT:  If the Defendant is 100 percent

17   liable, then they have to pay a hundred percent of the

18   medical bills, and no different than if we had put -- the

19   assumption is that the jury would give him a hundred percent

20   of his medical bills, so they would give him a hundred

21   percent and then they would exert the lien on that.  Right?

22   If we charged the jury -- if I said to the jury, there's

23   $90,000 in medical bills and you could assume that they were

24   fair and reasonable, if there's a hundred percent liability,

25   you would imagine in my scenario they're going to give

1    100,000 for pain and suffering, they're going to give 90,000

2    for medical bills, right?  So the Plaintiff doesn't get the

3    190 because then the PATH would say, we have a lien for

4    90,000 and that would extinguish the medical bills that he

5    was awarded.

6            I think what the defense is arguing is, if there's

7    a 50-50 split, okay, you still have that lien of 90,000,

8    although the 90,000 doesn't get cut in half because the jury

9    cut it in half, it just means you still have a lien, but you

10   exert the lien over the total amount and you apportion

11   fault.

12           It's no different than a third party.  If you had

13   a third-party medical provider in the case, right, and they

14   had a lien, the lien exists independent of what fault is

15   apportioned to the Plaintiff.  Right?

16           MR. DiGIULIO:  Correct, Your Honor, but in that

17   situation, the Plaintiff is allowed to put the evidence of

18   that medical lien in front of the jury.  They're allowed to

19   put that amount, not to prove anything but the fact that

20   they have this lien, it's a part of damages, they are going

21   to have to pay it back at the end of the day.

22           THE COURT:  But they're not permitted to unless

23   it's relevant.  In other words, you could deal with that

24   with an instruction.  There's no law that I've seen anywhere

25   that says, every time there's a lien, a plaintiff has a

CHARLES P. McGUIRE, C.C.R.

1     right to put on the damages -- the amount of the lien,

2     because the only relevance is to somehow suggest to the jury

3     that pain and suffering should be more because we have a lot

4     of medical bills.

5             MR. DiGIULIO:  I understand that point.  And in

6     these cases like Clark, the reason why the Court said they

7     were irrelevant was that they're not an issue in the case.

8     They were already paid in those cases.  The railroad is not

9     asserting the lien.  They're just saying, hey, we've already

10    paid this guy, he shouldn't be able to double dip and --

11            THE COURT:  It's not about double dipping.  It's

12    different.  The narrow issue that we seem to be fighting

13    over now is, everyone agrees on how the lien is going to

14    work.  It's, do you allow the jury to hear the amount of the

15    medical bill and the amount of the wages or not.  Because I

16    know what they are, and I can mold the verdict.  We all

17    agree how it should work, and if I'm wrong about how we mold

18    the verdict, we have a verdict, and it can go up to the

19    Circuit.  But the issue is, you want to put that before the

20    jury, and I say -- if we're in agreement; we haven't even

21    talked about wages yet, but if we're in agreement that they

22    have a lien, that they can attach it to the verdict, and

23    that the amount is fair and reasonable, I can mold the

24    verdict.  There's no point in giving it to the jury as long

25    as you tell the jury specifically you should not consider

1    medical bills and wages.

2           MR. ROSENTHAL:  But you're pulling it from the

3    pain and suffering award.

4           THE COURT:  I'm not pulling it.  The jury will be

5    instructed that they should not consider medical bills and

6    they should not consider wages, because we know outside the

7    presence of the jury that that has all been satisfied --

8           MR. ROSENTHAL:  Well, not all.  I mean, for the

9    wages, it's a different story.

10          THE COURT:  So tell me about the wages.  Let's

11   talk about the wages for a minute.

12          MR. MINO:  If I can jump in, what PATH is willing

13   to do with the wages is stipulate to past wage liens in the

14   amount actually paid to Mr. Foder and stipulate to the -- I

15   guess what I would call the regular lost wage amount that

16   would represent the amount that Mr. Foder was not paid on

17   half pay and was not paid on full pay.  So PATH will

18   stipulate to those two things.  They will not stipulate to

19   lost overtime, so I think evidence of that should go on.

20          But when it comes to the wages, we will stipulate

21   to the amount we actually paid to him as well as to the half

22   and no pay amount.  So that would reflect all of the regular

23   wages that he received or that he was entitled to, and our

24   lien -- in that scenario, then, the wages work the same as

25   the medical bills:  Outside the presence of the jury, we add

1   it in and then just subtract out our lien.  And in that

2   case, our lien does not match exactly the wage amount.

3            MR. ROSENTHAL:  Can we go back to the medical for

4   a moment?

5            Under the scenario -- and I just want to make sure

6   I understand this -- if he gets a verdict of $100,000 for

7   pain and suffering, because we're not getting a verdict for

8   the medical, and it's 100 percent on PATH, he ends up with

9   $100,000 under those circumstances, and there is no setoff.

10  There's nothing goes -- he gets that $100,000.  The verdict

11  is molded to 100.

12           THE COURT:  Agreed; correct?

13           MR. MINO:  Yes, I guess what PATH would say is,

14  they get the 90 back because we're adding 90 in,

15  apportioning, taking 90 out.  But under that scenario, it's

16  clean.  You're walking with -- if it's a hundred --

17           THE COURT:  The stipulation is not just it's

18  reasonable and necessary.  The stipulation has to be more

19  than that to address Mr. Rosenthal's point, which is that we

20  agree that the Plaintiff is entitled to an award for wages

21  and medical bills proportionate to the percentages of

22  liability.  Right?

23           Because I'm thinking, it may be -- I'm coming full

24  circle.  It may be easier just to tell the jury what they

25  are and stipulate to it, because you're not agreeing -- we

CHARLES P. McGUIRE, C.C.R.

1    have to have language to make sure -- and let me tell you

2    something, it's completely in my discretion whether I allow

3    it, and I'm starting to think it will be a better record to

4    just say there's a stipulation to medical bills, there's a

5    stipulation on, and you can fill it in, on reasonable and

6    necessary, because the issue is not just stipulating to

7    reasonable and necessary in the amount of the lien; the

8    issue becomes, how do we address -- like Mr. Rosenthal says,

9    his view is, you agree, really, then, to satisfy -- to pay

10   the medical bills, and then, you know, you're responsible

11   for the medical bills, and then your lien extinguishes them.

12   The stipulation gets very complicated because you have two

13   different ways of looking at how that lien works.  In the

14   case where there's a hundred percent liability --

15           MR. MINO:  He walks with a hundred thousand

16   dollars.

17           THE COURT:  But what's the stipulation, then, as

18   to how that happened?  You have to have a stipulation.  You

19   can't just say, we kind of talked about it.

20           MR. MINO:  No, I understand.

21           THE COURT:  Because you can say -- if we don't

22   have a stipulation, and the jury comes back and awards

23   $100,000, you can theoretically say, no, no, no, we have a

24   $90,000 lien and he's not protected.  You have to agree in

25   that stipulation that the lien is offset by the theoretical

CHARLES P. McGUIRE, C.C.R.

1    amount the jury would have awarded for medical bills, and

2    you're not agreeing to that.

3            In other words, if right now I say to you -- let's

4    assume the jury is going to come back and say a hundred

5    percent liability against the PATH, and the Defendant

6    stipulates that medical bills of $90,000 are reasonable and

7    necessary.

8            MR. MINO:  I agree about the stipulation --

9            THE COURT:  A verdict comes in for $100,000.  You

10   are going to say, I want to exert my $190,000 lien.

11           MR. MINO:  I agree we have to stipulate to more

12   than that.  It's just -- really just the wording.  If the

13   stipulation is awarded that it's a hundred percent on PATH,

14   they're entitled to no setoff, that's not really correct.

15   PATH is still entitled to a setoff.  It's just that when you

16   add in the $90,000 medical bills, and then apportion and put

17   100 percent on PATH, and then take the medical bills back

18   out, he's left with exactly what the jury awarded him.

19           THE COURT:  But those steps that you just left

20   out, if they're not part of the stipulation, they don't make

21   sense, because he's not protected.

22           MR. MINO:  I'm fine with adding them to the

23   stipulation.

24           THE COURT:  What we're really doing by stipulation

25   and by molding the verdict is, assuming that we agree that

CHARLES P. McGUIRE, C.C.R.

1      if they award pain and suffering, whatever proportion of

2      fault, it's the same for the other two components of

3      damages.  Otherwise, it doesn't make any sense.  We're like

4      adding in medical bills that the jury didn't add in.

5              So the more I think about it, I think it's better

6      for the record to have a stipulation.  That's what I'm

7      inclined to do, because I think the stipulation will be way

8      too complicated.  There's no real harm to say, the parties

9      stipulate the medical bills are X, the parties stipulate

10     that the wages paid to date are X, Plaintiff says he's

11     entitled to more wages, you can say he's not entitled to

12     overtime, whatever, and then let the jury decide it.

13             MR. MINO:  Is the jury then awarding medical

14     expenses?

15             THE COURT:  Yes.

16             MR. MINO:  I guess I don't understand why.

17             THE COURT:  Why not?  I mean, because, if they

18     don't award it -- they're entitled to ask for it, right?

19     They're entitled to say, I have three components of my

20     suffering:  Pain and suffering, medical bills, and lost

21     wages.  What makes it complicated if we don't give them a

22     line for each is, what happens when the jury comes back with

23     the verdict, depending on what the fault is, because you

24     look at it differently than they do, and if they come back,

25     which, you know, if the jury's instructed like in model

1    instructions, it's stipulated that the parties agree that

2    the medical bills are $90,000 and that they're reasonable

3    and necessary, and the jury comes back and puts 90,000 for

4    medical bills, 100,000 for pain and suffering, then it's

5    easy.  Then I say, okay, I mold the verdict, and I say,

6    they've given you $90,000 for medical bills, you can assert

7    your $90,000 lien.

8              MR. MINO:  So then what if they give $50,000 for

9    medical bills?  We're still entitled to our $90,000 lien.

10             THE COURT:  You are, and that's the risk that the

11   Plaintiffs take by agreeing to go this way.

12             MR. MINO:  What if they give $120,000 worth of

13   medical bills?

14             THE COURT:  Well, then, I would probably fix the

15   verdict.  You could make the motion that the verdict would

16   -- let me finish.  If there's a stipulation that the medical

17   bills are $90,000, and the jury comes back with $150,000 for

18   medical bills, I would grant the motion to conform the

19   verdict as against the weight of the evidence.  There would

20   be no evidence otherwise.

21             Conversely, if the jury came back with -- you

22   know, if it's below that, that's a whole other story, there

23   may be a reason, there may be -- I don't know; but if it was

24   above it, you would make a motion because there would be no

25   evidence.  It would be an unjust verdict.  What would be the

1       point?

2               MR. MINO:  That's exactly my -- why even invite

3       that possible error?  Why not --

4               THE COURT:  Because we can't agree to how the lien

5       works, because it's too complicated to have the language.

6       You're not proposing -- if you want to propose language,

7       propose language and agree to it; but I'm not going to be in

8       a position where there's a fight when the verdict comes in

9       over how the lien operates.  If the jury gives me a line for

10      medical bills and pain and suffering, and you have a lien

11      for medical bills, I can apply that and mold the verdict.

12              MR. MINO:  Sure.

13              THE COURT:  Absent a very comprehensive agreement

14      by the parties, it would create uncertainty how to apply the

15      lien when the verdict comes in.

16              MR. MINO:  Sure.  And I can propose language in

17      order to address this issue.

18              THE COURT:  Let me hear from the Plaintiff.

19              MR. ROSENTHAL:  Actually, in other cases, and

20      Mr. Mino and I had another case, and in that case, what we

21      did is, on the verdict sheet for the medical expenses, we

22      said medical expenses, with a line, and the parties

23      stipulate that the medical expenses were 86 or 90, whatever

24      it is, $90,000.

25              THE COURT:  That's what I'm suggesting.

1       MR. ROSENTHAL:  Right.

2       MR. MINO:  Exactly.  In that other case, you

3   didn't put medicals up there, you put wages, and I argued

4   against putting wages up.

5       MR. ROSENTHAL:  But we did -- but that's what the

6   Court did is, they put --

7       THE COURT:  They molded it.

8       MR. ROSENTHAL:  Right, they molded it, but it was

9   on the verdict sheet.

10      MR. MINO:  But the jury didn't award anything, and

11  there was no testimony about --

12      THE COURT:  This is a stipulation, so they can

13  hear it.  In other words, counsel, I'll give you -- I know

14  why you don't want the medical bills.  But you're not giving

15  me an easy answer to how we have an agreement.  You can't --

16  you have a lien.

17      MR. MINO:  Yes.

18      THE COURT:  They have a right to ask for medical

19  bills.  Unless you can come up with language that when a

20  verdict comes back, the Plaintiff is protected about how the

21  lien functions, then it would be problematic to go forward

22  without an agreement.  The only agreement you have is that

23  there is a lien and that the medical bills are reasonable

24  and necessary, number one.

25      Number two, I'm hearing that there is an issue

1    about wages.  You're not stipulating to all his wages.  They

2    think he's entitled to more wages than you say.

3              MR. MINO:  I think they think he's entitled to

4    lost overtime, not regular wages.  If we stipulate to

5    both --

6              MR. ROSENTHAL:  Well, with regard to the wages,

7    just to be fair, what happens is, and correct me if I'm

8    wrong, PATH pays him his full wages with no overtime for --

9    what is it, eight weeks, or four weeks?

10              MR. MINO:  A certain amount of time --

11              MR. ROSENTHAL:  Four weeks, and then eight weeks'

12    half pay without overtime, and then after that, he gets

13    nothing from PATH.  So we're making a --

14              THE COURT:  You didn't get full wages.  How long

15    was he out?

16              MR. ROSENTHAL:  He was out for 17 months, but

17    three different occasions.

18              MR. MINO:  And PATH is willing to stipulate to

19    that amount that wasn't paid in half and in full pay.  The

20    only amount of wages that we're not willing to stipulate to

21    is lost overtime.  So PATH is willing to stipulate to our

22    lien amount, which is the amount that Mr. Foder actually

23    received.

24              MR. ROSENTHAL:  What is the figure that PATH is

25    willing to stipulate to?

1        MR. MINO:  Well, we have for lost income, which is

2    the half and no pay amount, $65,165.44.  That's what we

3    paid.

4        MR. ROSENTHAL:  That's what you paid out, right?

5        MR. MINO:  No.  That's what he did not receive in

6    half and no pay.  What we paid out is $45,183.36.

7        MR. ROSENTHAL:  So essentially, the lost wages is

8    about $110,000?

9        MR. MINO:  $110,348.80, for which PATH has a just

10    over $45,000 lien.

11        MR. ROSENTHAL:  And you're saying that beyond

12    that, we're also -- Plaintiff is also making a claim for the

13    lost overtime, whatever it is --

14        MR. MINO:  That's my understanding.

15        MR. ROSENTHAL:  Yes.  Okay.  And what you want to

16    do with that is --

17        MR. MINO:  Is the same thing we did in the last

18    trial that we had in PATH, right?  We disagree whether or

19    not it should be on the verdict sheet, but how it works

20    would be the same thing, the same as the medical bills.

21        MR. ROSENTHAL:  But in that case, there was a full

22    -- there was no -- I don't remember --

23        MR. MINO:  She claimed lost overtime.

24        THE COURT:  Gentlemen, I want to look at this

25    Clark case.  Take 10 minutes and talk about this issue,

1    about the stipulation, and resolve it, and I'll come back

2    out.

3              MR. DiGIULIO:  Your Honor, may I say one thing?

4              THE COURT:  Yes.

5              MR. DiGIULIO:  When you were talking earlier about

6    us taking the risk, you know, say the lien, medical lien is

7    10,000, and the jury comes back 5,000 in medical expenses,

8    that's our -- that's our risk.  That is, quote-unquote,

9    "risk," but that is also the law.  It's a -- if they're

10   taking money back, that's the damage.  We need to be able to

11   put that on.

12             THE COURT:  Okay.

13             MR. DiGIULIO:  Clark doesn't address that.

14             THE COURT:  All right.  Let me take five or 10

15   minutes to look at everything and then I'll be back.

16             THE COURT CLERK:  All rise.

17        (Recess taken)

18             THE COURT CLERK:  All rise.

19             THE COURT:  All right.  Any resolution?

20             MR. DiGIULIO:  I don't think so.

21             THE COURT:  Okay.  I looked at the case, I thought

22   about everything we talked about earlier, and here's where I

23   think the complication arises from.

24             I think the Defendant was right in how the medical

25   bill -- how the lien and how the offset would work as a

1      practical matter with the jury verdict.

2                 And part of the stipulation can't just be

3      reasonable and necessary, but that Plaintiff is -- that

4      these amounts reflect damages that Plaintiff would be

5      entitled to.

6                 So, in other words, let's go back to

7      Mr. Rosenthal's hypothetical.

8                 We have $100,000 in pain and suffering, right, and

9      that's it, and it's a hundred percent liability, so

10     technically, the first thing you do is, you add back in the

11     medical bills, because if we have a stipulation, and the

12     jury gives $100,000 for pain and suffering, the stipulation

13     would require that the medical bills go back in as a

14     component of damages.  This is what we're stipulating to.

15     We're not going to ask the jury to decide what's reasonable

16     and necessary.  The lawyers have agreed that he had 90,000

17     in medical bills which should go back into the verdict.  So

18     the jury just comes with one line, $100,000 for pain and

19     suffering.  How do we mold the verdict?  At 100-percent

20     liability on PATH.  We say, okay, we have a hundred, and we

21     add in the 90, because that's your medical bills, and then

22     we subtract out the $90,000 lien, and then Plaintiff gets

23     $100,000.

24                 That's I think what Mr. Mino was articulating

25     earlier.  Right?

CHARLES P. McGUIRE, C.C.R.

1          So let's use the same hypothetical with a 50-50

2    split of liability.  It's $100,000, you add in the 90 in

3    medical bills, you still have 190.  But then you apportion

4    liability, right?  So if you apportion liability, you have

5    190, and half of that is 95, right, and then you subtract

6    out the lien, and the Plaintiff gets $5,000.

7          Because that's what we're doing, and this is --

8    it's my mistake, and I should have picked it up sooner.

9    What you're doing with the stipulation is, you're adding

10   back in the damages before you apportion fault.  You're

11   saying if the jury comes back with whatever the jury comes

12   back with, whether it's a no cause or whether it's 100

13   percent for Plaintiff, you're adding back in the medical

14   bills, and then you're apportioning fault, and then you're

15   applying the lien.

16          That's really what I think is -- rather than 50

17   percent of the medical bills, it's not.  We agree that he's

18   entitled to the medical bills and the lost wages, and they

19   go back into the -- they get added onto the verdict for pain

20   and suffering when I mold it, and then I apportion fault,

21   and then I apply the lien.

22          MR. ROSENTHAL:  If that's the case, then PATH

23   can't argue to the jury that they paid his medical bills, or

24   that --

25          THE COURT:  They can't.  They can't.

1          MR. ROSENTHAL:  -- or that they paid any of his

2    wages.

3          THE COURT:  They can't argue any of that because

4    it's no longer relevant.

5          MR. MINO:  Yes.  It doesn't come in.

6          THE COURT:  He can't say it.  And it cuts both

7    ways.  It's really fair, because I'm really struggling to do

8    what's fair, right?  If you have the lines in, you run the

9    risk that a jury is going to say, don't give him as much for

10   pain and suffering, he's getting all this money back for

11   medical bills.  Okay?

12         Conversely, if you don't have it in, you run the

13   risk that the jury is going to say, That's all he's getting?

14   We should give him more.

15         So what we're doing here is, they can't argue that

16   they paid the medical bills; clearly, that would be very

17   prejudicial.  On the other hand, you can't argue about the

18   amount of the medical bills.  You can't say, you know, he

19   must have a lot of pain and suffering, he had a half a

20   million dollars in medical bills.  You can't argue that.

21   And he can't say, But we paid the medical bills.  It's a

22   wash.  But you come to the jury and you say pain and

23   suffering.  And that's really what's fair, as long as we all

24   agree that the stipulation is -- PATH is stipulating he has

25   suffered -- the language would have to be, the parties agree

```
 1    that the amounts reflect the medical expenses and the lost

 2    wages, excluding overtime, that Plaintiff was either paid or

 3    entitled to.

 4              It's really the fairest way to do it, because you

 5    add them back in.  You get them automatically.  And then you

 6    add them back in, you apportion fault, and you apply the

 7    lien.

 8              MR. ROSENTHAL:  There is an issue about the wages

 9    that we wanted to address.

10              THE COURT:  Yes.  And so the issue should be --

11    let's talk about that, but let me just tell you the big

12    picture, and then we'll figure it out.

13              You should be able to argue for overtime, and you

14    should stipulate to what his hourly rate was, and I'll tell

15    the jury there has been a stipulation to his hourly rate,

16    and no one talks about that he was or wasn't paid.

17              Plaintiff has a claim in this case for overtime,

18    and he would have worked overtime that he wasn't allowed to

19    work.

20              I don't know how you argue for overtime to a jury

21    as a practical matter without saying that they paid all of

22    his regular wages.  And you're going to open the door

23    because you're going to say, it's not fair, he would have

24    worked more overtime, and they're going to say -- I don't

25    know how you argue it with -- so you're going to open that
```

 1    door.  If you open that door on your case-in-chief on

 2    overtime and say, Mr. Foder, how much, you know --

 3              MR. ROSENTHAL:  But he's entitled to that.

 4              THE COURT:  Entitled to what?

 5              MR. ROSENTHAL:  He's entitled to his lost

 6    overtime.

 7              THE COURT:  I know that.  But I'm telling you, be

 8    careful, if you open the door to say --

 9              MR. ROSENTHAL:  That's why I would ask that, at

10    least on wages --

11              THE COURT:  The wages don't need to be, but -- you

12    can ask for overtime.  You can do it very artfully and say,

13    had he been employed, he would have received -- he would

14    have done 20 hours of overtime a week because that's what he

15    did before he got injured, and you should award him

16    overtime.

17              MR. ROSENTHAL:  Or the jury should be told that

18    there's been a stipulation as to what his wages and medical

19    were that the jury need not --

20              THE COURT:  The medicals are irrelevant.

21              MR. ROSENTHAL:  Well, I mean, I think the jury

22    should know, because I think we're also running now into the

23    risk of the jury confusing what we're doing with Workers

24    Compensation, which would be error.  So we have to put this

25    in a scenario where the jury --

CHARLES P. McGUIRE, C.C.R.

1        THE COURT:  We can cure that with the jury

2    instruction.  I mean, the jury doesn't know what Workers

3    Compensation is.  We can instruct them, you are not to

4    consider medical bills, and we assume that -- my one

5    takeaway from the jurors in all these years is jurors follow

6    instructions very, very carefully, and they will do it.

7        Overtime is a little bit trickier because you're

8    going to argue overtime, and I think it would be very hard

9    to argue overtime without letting the jury know that he was

10   paid all his regular wages.  It cuts both ways.  Once the

11   jury hears that he's been paid all --

12       MR. ROSENTHAL:  Right.  He wasn't paid all of

13   his wages.  He was paid maybe 40 percent of what his wages

14   were, and they're willing to stipulate as to what the other

15   60 percent were, or was, I don't know which one is what.

16   But we're dealing now with the issue of overtime on top of

17   that, and you're putting us in a situation where, frankly, I

18   think, without laying it out on the verdict sheet, we run

19   the risk of -- I mean, we're in a position where you're

20   telling us that we have risk in even making a claim for

21   overtime, which is not fair.

22       THE COURT:  I'm saying to you it cuts both ways,

23   and that's why the medical bills -- the medical bills, the

24   jury is not going to hear about the medical bills.  But let

25   me tell you something.  You cannot get up there and say

CHARLES P. McGUIRE, C.C.R.

1    Mr. Foder has not been paid any wages without opening the

2    door -- let me finish -- to them saying there's a lien,

3    we've paid most of it, and we've agreed, we've stipulated

4    that we will pay his entire -- I'm just saying

5    hypothetically, before it's allowed to go forward.  You

6    can't have it both ways.  You can't say he hasn't been paid

7    when he has been paid.

8         MR. ROSENTHAL:  No, but it can be set off in the

9    body of the verdict sheet, for example, that the parties

10   stipulate that the Plaintiff's lost wages for everything but

11   overtime equals X, and Plaintiff -- and then a line for

12   overtime, so they know that there's an issue with that.

13        THE COURT:  Counsel?

14        MR. MINO:  I agree that there should be a line for

15   lost overtime, they can make a claim for lost overtime, and

16   PATH can argue against it.

17        If there's a stipulation as to the lost wages, to

18   me, you run into the same issue that you run into with the

19   medical bills:  Why are you putting it on the verdict sheet

20   if not to influence the jury's pain and suffering award?  To

21   me, the two lines on the verdict sheet should be the pain

22   and suffering --

23        THE COURT:  Well, it doesn't influence the

24   verdict.

25        MR. MINO:  -- and lost overtime.

CHARLES P. McGUIRE, C.C.R.

1             THE COURT:  Let me stop you for a minute.

2             The business of prejudicing the jury sheet with

3    medical bills is because you don't want the jury to assume

4    pain and suffering based on medical bills.  They're going to

5    hear that he's out of work.

6             MR. MINO:  Sure.

7             THE COURT:  And the issue becomes, they're going

8    to hear that he wasn't fully paid.  But they're also going

9    to hear that he was paid for a lot of it, and they're also

10   going to hear eventually --

11            MR. ROSENTHAL:  Not if there's --

12            THE COURT:  And I want you to think about this for

13   a minute.  If you open the door to say that he's entitled to

14   wages and he wasn't fully paid, you allow PATH to say, we

15   have stipulated that he will be fully paid for all of his

16   regular time, and we're paying it; he just isn't entitled to

17   overtime.

18            MR. ROSENTHAL:  But they're not paying it.

19   They're asking for a setoff.  So they're not really in a

20   position to say that anyway.

21            THE COURT:  Counsel?

22            MR. MINO:  I guess I didn't understand --

23            THE COURT:  He wants to be able to argue to the

24   jury on regular wages -- I think, Mr. Rosenthal -- that

25   they've only paid a portion of his wages, 25 or 50 percent,

1    depending on the time frame, and we need you to award the

2    additional wages.

3              MR. ROSENTHAL:  And that they're asking for a

4    setoff.  So, I mean, we're entitled to actually say, you

5    know, they didn't pay him anything, they gave him 40 percent

6    of what he would have earned in an advance, and when the

7    trial's over, they're looking for it all back.  I'm entitled

8    to say that.

9              THE COURT:  You're not entitled to say they want

10   it all back.

11             Go ahead.

12             MR. ROSENTHAL:  But they are.

13             MR. MINO:  Well no, if it's a no cause, we don't

14   come after Mr. Foder for the amount of money.

15             MR. ROSENTHAL:  And we can tell the jury that.

16             THE COURT:  Never happen.  It's not a setoff.

17   Medical bills theoretically exist whether or not there's a

18   jury verdict.  The lien doesn't get extinguished --

19             MR. ROSENTHAL:  Yes, I understand the medical

20   bills.

21             THE COURT:  And no one here is arguing that if you

22   don't give him the wages that they're going to take all the

23   wages back.  He's not arguing that the 40 percent --

24             What did you pay him; 40 percent or 50 percent?

25             -- that they're taking it back.

CHARLES P. McGUIRE, C.C.R.

1          MR. MINO:  We paid him 45,000 out of 110, give or

2     take.

3          THE COURT:  Right.  Because then you're arguing

4     double recovery.  You can't mislead the jury and say that

5     they haven't paid him, because they have paid him, and the

6     setoff is to give back what they've already paid him only.

7     And they've also agreed to say, if there's a jury verdict --

8          Is that what you're saying, that we'll agree to

9     pay the full wages?

10          MR. MINO:  Yes, but out of that comes our lien.

11     So the full amount, the amount paid and the amount not paid,

12     is about $110,000.

13          I can give you the exact number.

14          THE COURT:  Okay.

15          MR. MINO:  $110,348.80.

16          THE COURT:  Okay.

17          MR. MINO:  That's the full amount of, if Mr. Foder

18     had worked and never been injured, he would have received.

19          THE COURT:  Right.

20          MR. MINO:  PATH is willing to stipulate to that

21     amount.  PATH is also willing to stipulate --

22          THE COURT:  How much has he been paid?

23          MR. MINO:  The PATH wage lien is $45,183.

24          THE COURT:  All right.  Just roughly, 45,000.

25          MR. MINO:  Yes.

1          THE COURT:  Okay.

2          MR. MINO:  So, what PATH is -- yes, if there's a

3     verdict like the medical bills outside the presence of the

4     jury, we add in that amount.

5          THE COURT:  110 no matter what.

6          MR. MINO:  110 no matter what.  We add in the pain

7     and suffering, the medical bills and the lost overtime to

8     that lost wages.  You then apportion for liability, you back

9     out our medical lien or setoff and our wage setoff.

10          Now, the way that works is this.  If we get -- if

11     it's a no cause, he doesn't walk with the $65,000 that's

12     above our 45.  Mathematically, that's just, you know, there

13     would be zero --

14          THE COURT:  If there's a no cause, he gets

15     nothing, so it doesn't matter.

16          MR. MINO:  Right.  But if it's a hundred percent

17     on us, he'll walk with the pain and suffering, the lost

18     overtime, plus the $65,000 he was never paid that he would

19     have earned had he worked.

20          THE COURT:  Right.  And he'll get the 90 in

21     medical bills and the 45 in money he wasn't paid --

22          MR. MINO:  Because you add it in.

23          THE COURT:  We'll add it in no matter what.

24          MR. MINO:  No matter what.

25          THE COURT:  No matter what, he gets it added in

CHARLES P. McGUIRE, C.C.R.

1      again.  How much was he paid, 45?  He wasn't paid 65,000.

2              What they're suggesting is, in terms of regular

3      wages, he gets it added in no matter what.  The jury comes

4      back in my hypothetical with $100,000 pain and suffering and

5      100 percent liability.  We add in the 65, we add in the

6      medical bills of 90, and we add in the hundred, and he gets

7      all of it.  He gets that money added back in, all of his

8      regular full-time salary.  What he doesn't get added in is

9      -- he gets full regular wages in, and he gets full medical

10     bills paid, and then depending on the apportion of fault,

11     you apportion fault, and then you satisfy the liens.

12              MR. ROSENTHAL:  So in that scenario, he would end

13     up with one sixty-five.

14              MR. MINO:  It was 100 pain and suffering.

15              THE COURT:  Let's do the math.

16              MR. MINO:  Sure.

17              MR. ROSENTHAL:  One hundred pain and suffering,

18     100 percent liability.

19              THE COURT:  One hundred percent for medical.  What

20     did we say; the medical bills, hypothetically, are 90?

21              MR. MINO:  Yes, 90.

22              THE COURT:  And wages are 65, right?

23              MR. MINO:  One-ten, because you have to include

24     our lien in order to be fair to them.

25              THE COURT:  Right, being fair.  So it's 100,000

1    for pain and suffering, 90 for medical bills, and 110 for

2    wages; right?

3                    MR. MINO:  Yes.

4                    THE COURT:  So then you have $300,000.  Right?

5    And then the lien would be --

6                    MR. MINO:  You take out the 90 medical lien, and

7    then 45 for our wage lien.

8                    THE COURT:  And 45 for wage lien.

9                    MR. MINO:  And I'm not sure what that comes out

10   to.

11                   THE COURT:  90 plus 45, that's 135, 300 minus 135.

12                   MR. ROSENTHAL:  165.

13                   MR. MINO:  Yes.

14                   THE COURT:  165.

15                   MR. MINO:  So in that case, he gets all of the

16   pain and suffering they've awarded him, plus PATH is making

17   up for the amount that was not paid during half and no pay.

18                   MR. ROSENTHAL:  And if it's 99 percent liability

19   on PATH, then he would end up with approximately 99,000

20   plus --

21                   MR. MINO:  I need a calculator.

22                   THE COURT:  We have an calculator.  Anyone have an

23   iPhone?  In this whole crew, no one has an iPhone?

24                   MR. ROSENTHAL:  90 plus --

25                   THE COURT:  I think it works, because he's going

44

1    to add in the total amount.

2              MR. ROSENTHAL:  Okay.  So 90 plus 110 --

3              MR. MINO:  90 plus 110 plus 100.

4              THE COURT:  Plus 100 for pain and suffering.  But

5    you take out only a $45,000 lien, not a $110,000 lien.

6              MR. MINO:  Yes.

7              MR. ROSENTHAL:  Right.  Right.

8              THE COURT:  So he gets the money.  You see what

9    I'm saying?

10             MR. ROSENTHAL:  So it's 300,000 --

11             THE COURT:  Minus the 90 lien, and how much was --

12   90 and 45, minus 135.  Three hundred minus 135 is how much?

13             MR. ROSENTHAL:  One-sixty-five.  Is that when you

14   take the one percent off?

15             THE COURT:  No, the 165, you get the 100 percent

16   liability.

17             MR. ROSENTHAL:  Right.  Not the hundred percent

18   liability.  When do you take -- do you take the one percent

19   off --

20             THE COURT:  It's stage two.  You add in the money,

21   and then you apportion fault.  You take off one percent of

22   it at that point, and then you would apply the lien.

23             MR. ROSENTHAL:  So two -- whatever it is.

24             MR. MINO:  So 297 minus 45, minus 90.

25             MR. ROSENTHAL:  But shouldn't it be 90 percent --

CHARLES P. McGUIRE, C.C.R.

1        99 percent of the --

2                    THE COURT:  Let's say 90.  Ninety is easier than

3        99, okay?  So say they say that PATH is 90 percent -- PATH

4        is 90 percent, or PATH is 10 percent liable?

5                    MR. MINO:  Ninety.

6                    MR. ROSENTHAL:  Well, we could do 90, PATH.

7                    THE COURT:  Okay.  So let's do the math again.

8                    So you have 100,000 for pain and suffering, and

9        you have the stipulated 90,000 in medical bills, and you

10       have wages that he's entitled to of 110.  Right?  That's

11       300,000.

12                   Stage two, he's entitled to 90 percent of that, 90

13       percent of 300,000.

14                   MR. ROSENTHAL:  Okay.

15                   THE COURT:  So that would be what; 270?

16                   MR. ROSENTHAL:  Yes.

17                   THE COURT:  270, and then you take out the 135,

18       meaning that 100 -- the 90 in medical bills, you don't take

19       out the 110, you take out the 45, which is all that they

20       paid him in wages to date.

21                   MR. MINO:  He walks with 135.

22                   MR. ROSENTHAL:  But are they entitled to the full

23       amount, or just --

24                   THE COURT:  It's good for you.  Mr. Rosenthal, you

25       add in the 110, but you only take out the 45.

1          MR. ROSENTHAL:  But just on that, but in

2   general --

3          THE COURT:  And then he winds up with -- he'll end

4   up with 145.  So if there's a $100,000 verdict, he winds up

5   with 145,000 on 90 percent liability.

6          MR. ROSENTHAL:  So with a hundred percent

7   liability, he was getting 165, and with 90 percent

8   liability, he's getting 145, so $20,000 less.

9          THE COURT:  Because it's 30,000 minus 135 is 165.

10  Right?

11         MR. ROSENTHAL:  That's not 10 percent.

12         No, the difference between -- if he gets 90

13  percent as versus a hundred percent is $20,000, 165, 10

14  percent, is 16.5 thousand, so he's paying an extra 3. --

15  he's paying 3.5 thousand dollars more even though he's -- it

16  doesn't add up to 90 percent.

17         Do you understand my concern?

18         THE COURT:  Well, it's not a straight 90 percent

19  of the verdict, it's 90 percent -- because what's funky here

20  is that it's not a straight -- it's not like they paid him

21  110.  So it's not 90 percent -- when you take out the

22  proportion of fault, you don't take it out of -- you totally

23  include the 100 percent of the medical bills, but you don't

24  include a hundred percent of the wages because you're adding

25  in the 110 and you're only taking out 45.

CHARLES P. McGUIRE, C.C.R.

1              MR. ROSENTHAL:  No, no, I don't see where the -- I

2      don't see where the 90 percent is being taken out of what he

3      needs to pay, out of PATH's setoff figure.  PATH's getting a

4      hundred percent of their setoff figure versus 10 percent --

5      you know what I mean?

6              THE COURT:  No, I don't follow you.  Tell me what

7      you're trying to articulate, because what we're doing in

8      both scenarios is, we're adding in the full amount of

9      damages that he would be entitled to, which is -- we're

10     adding into the jury verdict, just like the jury would do,

11     assuming the jury would give him what you stipulated to, the

12     full amount of the wages and the full amount of the medical

13     bills, we're assuming a jury would give you that if they

14     gave him any amount of pain and suffering, because the jury

15     would be told he's entitled to $110,000 in lost wages, he's

16     entitled to $90,000 in medical bills.  What we're doing by

17     this is, we're adding that back in as if the jury had given

18     it to him.  And then after that, it's what I do.  It has

19     nothing to do with the jury.  The stipulation is very

20     narrow.  It's saying, we agree that -- we would have to

21     argue about wages or -- putting aside overtime, wages or

22     medical bills.  We're adding them in as if the jury had

23     given him the right and proper amount.  And under a scenario

24     of $100,000 in pain and suffering that the jury determines,

25     we don't determine, and we know he has $90,000 in medical

1    bills, we know that PATH would have paid him 110, and

2    they're going to pay him 110, we add that into the 300,000,

3    and then we take that -- that's his total -- that's the

4    total amount of what he's entitled to.  And then we take out

5    what the percentage of fault is.  We say, a regular $300,000

6    verdict over any PI case, you take -- what's 90 percent of

7    that?  270.  And then you apply the lien.  And you don't

8    apply the full $110,000 lien because they haven't paid him

9    the full 110.  You add in what they've paid him in medicals,

10   which is 90, and you add in what they paid him in wages,

11   which is 45, and take that out.

12              MR. ROSENTHAL:  So he doesn't get his lost wages,

13   then.

14              THE COURT:  He does, because we're only applying a

15   lien of $45,000, which is what he's been paid, but we're

16   giving him credit for 110.

17              MR. ROSENTHAL:  But he's paying back the 45.  He's

18   getting --

19              THE COURT:  Well, he should be.  Otherwise it

20   would be a double recovery.  Why should he get paid the 45

21   he's already been paid?

22              MR. ROSENTHAL:  But, I mean, I guess I don't see

23   in this scenario how he is getting his --

24              THE COURT:  Balance?  He's getting the balance of

25   it because he is getting in the jury verdict --

1     Mr. Rosenthal, if I did it your way, and you argued, he's

2     entitled to 110 in lost wages, the jury is going to put on

3     the line 110 for wages, it's going to put 90 for medical

4     bills.  That's what you stipulated to.  They're going to

5     give him $100,000 for pain and suffering, they're going to

6     give him a $300,000 verdict, and they're going to say, he is

7     90 percent at fault -- I mean, they're 90 percent at fault,

8     he's 10 percent at fault.  That's all they're going to do,

9     and they're going to say goodbye, and I'm going to thank

10    them for their service.

11          And then we're going to be left with the verdict

12    sheet, and here is what I will do.  I would do this in any

13    case no matter what.  I'm going to say, okay, what liens do

14    they have?  And counsel is going to say, we have the medical

15    lien of 90, and we have a -- which is exactly the amount of

16    bills we paid, but for lost wages, we only have a lien for

17    $45,000, Judge, because that's what we paid him.  We never

18    paid him anything else.  He got full credit in the jury

19    verdict for the 110.  Now we take out the 45 he's already

20    been paid.  He was paid that amount.  If we don't take out

21    that 45, he gets double recovery.  He gets the 45 he already

22    was paid when he was working, and he gets 110 the jury just

23    gave him.

24          You have to take out -- we have a $45,000 lien.

25    That's 135,000.  First, we say, the 300,000 has to be

CHARLES P. McGUIRE, C.C.R.

1    reduced by the proportion of liability, which brings it to

2    270.  Then we apply the lien and he gets 145.  It's very

3    simple, it's very logical, because that's what I would do no

4    matter what.

5         We're getting way ahead of ourselves with the

6    stipulation.  All we're doing is, we're stipulating to

7    undisputed damages, and we have undisputed damages here, 90

8    in medical bills, 110 in wages.

9         That's how we're going to do it.  And you can

10   argue any way you want about overtime.  The smart way to

11   look at overtime is, he worked overtime, and he's entitled

12   to it.  If you open the door and say that he wasn't paid all

13   his regular wages, I'm going to allow them to say, yes, but

14   we've agreed to pay them all.  This is a stipulation.  I'm

15   going to tell them about the stipulation then.  Because you

16   can't argue to the jury he did not get paid his regular

17   wages, because, under the stipulation, they're agreeing to

18   pay him all his wages.  And that would be very harmful to

19   the Port Authority to have to then come back and explain to

20   -- because you don't want the jury to give him more money

21   for the wages they already agreed to pay him.

22        That's what we're going to do.

23        Anything further?

24        MR. DiGIULIO:  Yes, to Mr. Mino:

25        So the 110, that is, which would be straight time

1      had he worked the entire 17 months?

2                  MR. MINO:  Yes.  I had my guys rerun the numbers.

3                  MR. DiGIULIO:  Straight time gross number.

4                  MR. MINO:  Straight time gross.  So, yes, I had my

5      guys rerun the numbers on Wednesday in preparation for

6      Thursday.  That was the most updated.

7                  THE COURT:  Is Mr. Foder back to work?

8                  MR. ROSENTHAL:  Yes.

9                  THE COURT:  Okay.

10                 MR. DiGIULIO:  Can you provide us with whatever

11     printout they made?

12                 MR. MINO:  I don't know that they made a printout,

13     but whatever they have --

14                 THE COURT:  And I will mold the verdict no matter

15     what it is.

16                 Mr. Rosenthal, are you with me?

17                 MR. ROSENTHAL:  Well, the other thing that I'm

18     concerned about, Your Honor, is, they paid him $45,000, and

19     he paid taxes on it.

20                 MR. MINO:  Actually, that is tax free.

21                 THE PLAINTIFF:  But that's only for the first

22     time, because the other two surgeries I had were not IOD.

23     You're not allowed to be out IOD for the last two.  Those

24     are sick time.

25                 THE COURT:  What is this issue?

1          MR. MINO:  IOD:  Injury on duty.  When they go

2   out, when Mr. Foder or any PATH employee goes out on an

3   injury, and they receive a paycheck from PATH, it's tax

4   free.  It's not -- the taxes aren't taken out.

5          THE COURT:  That's interesting.

6          MR. MINO:  He went out --

7          MR. ROSENTHAL:  He went out three times.

8          MR. MINO:  The second and third time, and -- it

9   was sick pay?

10          THE PLAINTIFF:  They're not allowed legally to go

11   out IOD for the same injury.  So when I had my second and

12   third surgeries, those were taxed monies.

13          THE COURT:  Can we figure that into the

14   stipulation and add that money in?  He paid taxes on it, so

15   he's going to have add that money into the stipulation to be

16   higher because he paid taxes on it.

17          MR. MINO:  Which -- I'm sorry.  Which part of --

18          THE COURT:  So in other words, the first part was

19   tax-free, right?  He was out three times.

20          MR. MINO:  Yes.

21          THE COURT:  The first part he didn't pay any taxes

22   on it, and the second time he did, and the third time he

23   did.

24          How much tax are we talking about?  Does anyone

25   know?

1              MR. ROSENTHAL:  Probably about 20 percent.

2              MR. DiGIULIO:  Probably about 20 percent, Your

3     Honor.

4              So that -- you're going to have to cut it,

5     whatever, the three times.

6              MR. ROSENTHAL:  Probably -- $6,000 is 20 percent

7     of $30,000, which is two-thirds of 45.

8              MR. MINO:  No, no.  The 45 represents the exact

9     amount that we paid.

10             I guess I'm confused.

11             MR. ROSENTHAL:  Yes, and of that --

12             MR. MINO:  Are you saying that --

13             MR. ROSENTHAL:  He paid taxes on $30,000 of it.

14             Now, this is all a rough, but he was out three

15    times.  I'm assuming 15, 15, 15, for simplicity purposes,

16    and at 20 percent taxes for the second and third time,

17    30,000, that's 6,000 that he already --

18             MR. MINO:  I understand what you're saying.

19             My understanding was that 45 amount is the amount

20    that was on his paycheck that he received, in which case it

21    would have already taken care of the tax amount.

22             MR. ROSENTHAL:  Are you saying that money was

23    taken out by PATH on the second and third time?

24             MR. MINO:  That's my -- when someone cuts you a

25    paycheck, I see the amount on my check, and then the

1      Government and stuff is paid on the side.  That doesn't get

2      paid to me.

3                THE COURT:  Was he paid 45 or was he paid less

4      than 45?  Was it gross or net?

5                MR. MINO:  My understanding is he was paid 45.

6                THE COURT:  That was net?

7                MR. MINO:  Yes, because the first time, there is

8      no taxes, and my understanding, though I'm more than happy

9      to go back and double and triple check it, is that the 45

10     amount represents the amount he actually received on his

11     paychecks.  That is my understanding.  I will before we mold

12     it at the end --

13               THE COURT:  Is that your understanding, too?

14               MR. ROSENTHAL:  I believe so, Your Honor.

15               THE COURT:  So then there's not an issue, then.

16               MR. MINO:  Right.

17               THE COURT:  All right.  So, gentlemen, it's 12:20.

18     The jury is getting antsy.  I think we should let them go to

19     lunch and come back in 45 minutes, at 1:15.

20               MR. MINO:  Your Honor, if we're done with the

21     setoff stuff, we have another issue.

22               THE COURT:  Okay.  So tell me what the issue is,

23     because I want to send them to lunch.

24               MR. MINO:  It has to do with photographs that are

25     going to be put up during the opening.

1          THE COURT:  Okay.  Let's talk about that now.

2          MR. ROSENTHAL:  The issue, I think, Your Honor,

3     is, I wanted to show the jury what we're dealing with here.

4          (Off the record discussion)

5          THE COURT:  Okay.  Mr. Rosenthal, what's the

6     issue?

7          MR. ROSENTHAL:  The issue is, I want to show the

8     jury what we're talking about in this case, and what we're

9     talking about is the difference between an anti-climber that

10    Mr. Foder came to that day, and the anti-climber that he

11    could have come to but he didn't because of happenstance.

12          So these were the two that were types that were

13    available.

14          He came to this.

15          A decision had been made earlier to make them all

16    that; but it was still like this at the time.

17          THE COURT:  I'm a little confused.  Tell me what

18    the picture is.

19          MR. ROSENTHAL:  It's a picture of two

20    anti-climbers.  Anti-climbers are the back ends of cars, and

21    they --

22          MR. DiGIULIO:  Your Honor, it's this, but that is

23    a close-up of this portion of it, just the edge of the top

24    there.

25          THE COURT:  Okay.  So why would I let you show a

1    subsequent remedial measure?

2            MR. ROSENTHAL:  Well, it's not a subsequent

3    remedial measure.  The issue is, prior to the incident,

4    there was a decision made at PATH to change these things.

5    And so some were changed and some weren't.  And this

6    shows --

7            THE COURT:  And at the time of the accident, they

8    left -- there was a decision made that some of them were

9    going to stay the old way and some of them were changed.

10           MR. ROSENTHAL:  No, no, at the time of the

11   accident, the decision was made, we're going to change these

12   things over in a certain fashion, and some were changed

13   over, some weren't.

14           THE COURT:  Well, we had in limines, and I said

15   that subsequent remedial measures are only relevant and

16   evidential for impeachment purposes.  Unless you tell me --

17           MR. ROSENTHAL:  But it's not -- I guess my issue,

18   Your Honor, is, I'm not talking about a subsequent review.

19   I'm not talking about this car.  I'm talking about the

20   decision to change over, from this to this, which was before

21   the incident.  It's pre.

22           THE COURT:  Well, that's a different issue.  It's

23   the first I'm hearing about it.

24           MR. MINO:  It's not pre.  The cars were not

25   retrofitted with them until after.

CHARLES P. McGUIRE, C.C.R.

1          Mr. Foder in his own deposition, page 82, said

2     that he did not look for it because they didn't have it on

3     cars yet.

4          That's a subsequent remedial repair.

5          THE COURT:  You guys should show me something from

6     the testimony.  It appears to me like a subsequent -- we had

7     in limines.  There was a time that came after the accident

8     where they changed all the cars.  And so your expert can say

9     this would have been a better design, that's fine, but you

10    -- and if they say this was the best design possible, you

11    can -- the PATH folks, you can impeach them on it.  But to

12    open on, here is what they should have done and what they

13    did afterwards, I'm not going to allow.

14         MR. ROSENTHAL:  No, no, what I wanted to open on

15    was, this is what -- the decision was made before he got

16    hurt, and he encountered this, which was not.

17         THE COURT:  But whether the decision was made, the

18    point is that it wasn't put into effect until afterward,

19    okay?

20         Do you have the cite to -- so -- I'm hearing --

21    how are you going to produce testimony about when the

22    decision was made?

23         MR. ROSENTHAL:  Well, if they had any of them at

24    the time --

25         THE COURT:  Tell me the line and the page of the

1    witness who is going to say the decision was made --

2    because, as I understand it, the decision was made to do it

3    later.  It wasn't, a decision was made, let's immediately

4    change everything, and then they just dropped the ball.

5              MR. ROSENTHAL:  On this car, it was done by --

6              MR. MINO:  I can cite the page.

7              THE COURT:  Go ahead.

8              MR. MINO:  Steven Foder deposition, page 82, lines

9    one to six:

10             "QUESTION:  Did you see the lack of grip tape on

11   the train prior to beginning to work?

12             "ANSWER:  That was not something that I was

13   looking for because the train at the time did not have it on

14   it yet."

15             THE COURT:  Okay.  So I'm asking you,

16   Mr. Rosenthal, a very narrow question.  If your argument is,

17   I want to show this because -- I'm going to put evidence on

18   at trial that a decision was made beforehand to change it

19   and then they never got around to change it, what are you

20   going to rely on?

21             MR. ROSENTHAL:  The testimony of the people who

22   were -- the guy who looked that day --

23             THE COURT:  Not the guy that looked that day.  I

24   want testimony from a PATH executive or employee that says,

25   We made the decision way before this accident, and then we

1    just never got around to doing it.

2            I'm not going to have some vague -- it's very

3    damaging testimony.  It's prejudicial to the PATH.  If

4    that's your theory, that they made the decision and they

5    failed to execute it, you need to show me.

6            Opening statement is a road map to the evidence at

7    trial.  That's the evidence.

8            MR. ROSENTHAL:  Right.

9            Prior to the incident, there were cars that had it

10    on there.

11            THE COURT:  I know that.  Listen, hear me loud and

12    clear.  We all know that there were some cars that had it

13    beforehand, and some were changed and some weren't.  That

14    doesn't give you the right -- and afterward, they changed

15    the car.  That's a subsequent remedial measure.  If your

16    theory is some vague stuff where they changed some cars and

17    here's how they should have changed it, that's a subsequent

18    remedial measure because after his accident, a decision was

19    made to change all the cars.  Before then, it wasn't.

20            So unless you have the testimony from someone at

21    PATH, saying, We made the decision to change all the cars

22    beforehand but we didn't get around to implementing it until

23    after the accident, I may consider that.  But I'm not going

24    to allow you to bootstrap this exhibit without testimony.

25            MR. ROSENTHAL:  Your Honor, the only reason that

1    there are cars beforehand with the tape on is because it's

2    part of that program to change them over.  There's no

3    other --

4              THE COURT:  I'm going to ask you again:  Give me

5    evidence.  You can't open on something without evidence to

6    support it.

7              MR. ROSENTHAL:  The evidence is that there were

8    cars that had it on there.

9              THE COURT:  Give me the evidence.  You can't say

10   that.  You need a witness.  Give me the evidence, if this

11   was a decision, it was to have all the cars changed over,

12   and they didn't get a chance to change this car over.  You

13   can't just say it.  I know why you want it in, but you have

14   to have a witness.  Mr. Foder just said it wasn't

15   implemented -- he said it wasn't implemented yet.  Wasn't

16   that language Mr. Foder?

17             MR. ROSENTHAL:  No, he didn't --

18             THE COURT:  He didn't have that knowledge.  He's

19   not a PATH employee.  You wanted to offer evidence --

20             MR. ROSENTHAL:  Mr. Foder is a PATH employee.

21             THE COURT:  I hear you.  I didn't mean to say

22   that.  But he didn't have knowledge of -- what is it that

23   you want to introduce that for?  Let's go back to it.  That

24   they had knowledge, and that they changed some cars but not

25   his car; right?

1          MR. ROSENTHAL:  They had knowledge, they changed

2     some cars before his car.  There were cars on the property

3     that had it, there were cars that didn't.  He had a car that

4     didn't.

5          THE COURT:  Okay.  And who is going to testify

6     about that?

7          MR. ROSENTHAL:  Everybody.  I don't think it's --

8          THE COURT:  But here's the thing.  And if they

9     still didn't have it, Mr. Rosenthal, if they never changed

10    the cars, right, you want to show that his car was

11    subsequently changed.

12         MR. ROSENTHAL:  No, I don't.  I don't care about

13    his car being changed afterwards.  I'm not getting into

14    that.  I'm not.  The fact that his car was changed

15    afterwards really is only going to come up maybe -- in the

16    event that one of his witnesses testifies a certain way

17    about something, you know, relating to that car.  I don't

18    care that there was a subsequent --

19         THE COURT:  So your argument is just there were

20    some cars that had it and some cars that didn't.  Who is

21    going to say that some cars had it and some cars didn't?

22         MR. ROSENTHAL:  My client.

23         THE COURT:  Okay.

24         Counsel?

25         It's not a scenario where there was an accident

1  and then they changed everything.  His argument is, part of

2  the negligence is, some of them were and some of them

3  weren't beforehand, and they all should have been.

4           MR. MINO:  If Mr. Foder testifies to that, then he

5  will just contradict his sworn deposition.

6           MR. ROSENTHAL:  Then -- then --

7           MR. MINO:  He is the only one who may testify to

8  that.  Every PATH employee that was deposed testified, no,

9  the other cars didn't have them.

10           MR. ROSENTHAL:  No, that's not true.

11           THE COURT:  Let him finish.  Let him finish.

12           MR. MINO:  The problem with the photograph in

13  general is that because it's two cars next to each other,

14  and it's two PATH cars, you see the subsequent remedial

15  repair.

16           THE COURT:  Well, let me stop you for one second.

17           I hear you about the subsequent remedial repair.

18  But if he's offering it for a different position, that there

19  were cars -- the classic subsequent remedial repair case is

20  that no cars in the PATH had this safety grip tape, none of

21  them did, and then afterward, they changed it.  That's a

22  classic subsequent remedial repair, and it's in response to

23  the fact that we changed everything to make it more safe,

24  and the policy behind that is, we want to encourage people

25  to make safer equipment, right?

1            He has a different argument.  He's saying,

2       beforehand, it was arbitrary; that's part of their

3       negligence.  They changed some cars and they didn't change

4       the other car.  Some of them had it, some of them didn't,

5       and they should have changed all of them.  It's not a

6       subsequent repair.  It's the state of what the cars were

7       like at the time of the accident.

8            But he needs a witness to say that.

9            MR. ROSENTHAL:  And even Mr. Foder says -- he was

10      asked:

11           "At the time in 2011, to the best of your memory,

12      did any PATH trains have grip tape along the anti-climber?

13           "Maybe a few."

14           THE COURT:  Okay.  Do you have any other evidence

15      than that?

16           MR. MINO:  No.

17           MR. ROSENTHAL:  Yes.

18           THE COURT:  Tell me.  This is important, because

19      this is your opening.  You have to have evidence.  For a

20      witness to say there may have been a few, unless Mr. Foder

21      can point to that evidence and say, and this is exactly what

22      I saw and was aware of --

23           MR. ROSENTHAL:  After the incident, he noticed

24      that there were numerous cars that had it on there.

25           MR. MINO:  After the incident.

CHARLES P. McGUIRE, C.C.R.

1          MR. ROSENTHAL:  After the incident.

2          THE COURT:  But not beforehand.

3          MR. ROSENTHAL:  No, but unless something

4   happens --

5          THE COURT:  Let me finish.

6          Unless there's evidence that before the

7   accident -- before, not after, not that he realizes it

8   after, before the accident, I was aware that certain cars

9   had the grip tape, I'm not allowing it.  You have to have a

10   witness that says before the accident, not after.

11          MR. ROSENTHAL:  The day or so after the incident,

12   he came upon numerous cars that had it.

13          MR. MINO:  How?  He wasn't working.  He was out

14   sick.

15          MR. ROSENTHAL:  Or whenever it was that he first

16   came back.

17          THE PLAINTIFF:  When I came back.

18          MR. MINO:  It's subsequent to the accident.

19          THE COURT:  It's subsequent, and it's when, and

20   it's how much time afterward, and which ones were there.

21          I'm not allowing it.  I'm not allowing you to open

22   on it unless you can show me in a good-faith basis to say, I

23   will have witnesses who will say, at the time of the

24   accident, I knew that this is how some of the cars looked

25   and this is how the other cars looked.

1           If you don't have a witness, it would be highly

2     improper to allow you to say, well, after the accident, they

3     started to change them all over, I noticed that some of them

4     had it.

5           I'm not allowing it.

6           MR. ROSENTHAL:  Well, Your Honor, can I call,

7     either in my case-in-chief or in rebuttal, a witness named

8     Tosha Maxwell, who will say that --

9           MR. MINO:  Absolutely not.  That would be --

10          THE COURT:  Stop, stop, stop.  One at a time.

11          Rebuttal is only if they introduce a point.  If

12     they don't introduce that point, if they don't come out and

13     say -- you can't have a rebuttal witness unless it's to

14     rebut something that the Defendant said.

15          MR. ROSENTHAL:  Right.  If the Defendant said that

16     they only did this afterwards --

17          THE COURT:  They're not going to say that.  They

18     are not touching that.  They are not going there.  You can't

19     bootstrap this impeachment by saying -- if they could

20     impeach on it, it doesn't go in as substantive evidence.

21     They can impeach on it and say -- you can, rather, you can

22     impeach it, but you can't bring in evidence of other

23     witnesses in rebuttal.  It's not a rebuttal.  That should

24     have been part of your case-in-chief.  It's not in the final

25     pretrial order, and we'll deal with that at the time.

1              But I'm not going to allow you to open on the

2      possibility of rebuttal evidence, and I'm not going to allow

3      you to use that picture.  If you develop a theory about this

4      during the trial through your witnesses, we'll talk about

5      whether you can use it as closing.  I'm not going to allow

6      you to use it in opening because you haven't made a good

7      faith-basis to me to demonstrate that it's part of the case.

8              Anything else about openings?

9              MR. MINO:  No.  It was to that photo, and then

10     there's another that showed the grip tape.  Both had the

11     same issue.

12             THE COURT:  Let's take a break.  It's 20 of.  The

13     jury is going to come back at one o'clock.  So I want you

14     back here at 1:15.

15             MR. MINO:  My three witnesses are supposed to be

16     here at one because we thought we would be a little farther

17     along.

18             THE COURT:  We'll see.  Keep them here.

19             Okay.  Thank you, guys.  See you soon.

20             THE COURT CLERK:  All rise.

21         (Luncheon recess taken)

22

23

24

25

1            **A F T E R N O O N    S E S S I O N**

2            THE COURT CLERK:  All rise.

3            THE COURT:  Hello, everyone.

4            Any questions, gentlemen, before we bring in the

5      jury?

6            MR. ROSENTHAL:  No, Your Honor.  Just for the

7      record, we presented a photograph just of the anti-climber

8      as it was on that day without tape, and counsel has no

9      objection.

10           THE COURT:  If there's no objection from counsel,

11     there's no objection from me.

12           MR. ROSENTHAL:  Thank you, Your Honor.

13           THE COURT:  I'd like to have everyone's names

14     right in front of me, so if you could just complete another

15     sign-in sheet.  I don't want to get your names wrong in

16     front of the jury.  It would be much appreciated.

17           So here's what we're going to do.  We're going to

18     call in the jury panel.

19           You have the questions, right?

20           I know the Plaintiff had asked for additional

21     questions.  I'm not inclined to add them.  I'm not going to

22     add anything, any conscientious objections to pain and

23     suffering.  I think it's subsumed by being fair, and I think

24     they all are subsumed with other questions, and I just think

25     that they don't add anything.  I'm not inclined to give

CHARLES P. McGUIRE, C.C.R.

1     them.  Okay?

2              MR. ROSENTHAL:  Okay.

3              THE COURT:  Just for the record, I'll read them

4     for the record:

5              "Do you have any conscientious objections to the

6     award of pain and suffering?"

7              "Do you agree with our system of justice that

8     stands for the proposition that if someone is injured

9     because of the acts or fault of someone else, it is the

10    entity who caused the injury that should pay for it?"

11             And, three, "Assuming the evidence shows that the

12    Plaintiff has suffered pain as a result of this injury, do

13    you know of any reason or consciousness which would prevent

14    you from awarding such a person a substantial sum for pain

15    and suffering?"

16             I think they're confusing, I think they're

17    subsumed with, can you be fair and follow the instructions

18    of the judge, and I'm not inclined to give them.  Okay?  I'm

19    going to stick with what I have.

20             We are going to ask general questions of the whole

21    venire.  I'm going to ask everyone to introduce themselves,

22    and I'm going to read the statement of the case that I think

23    Alex gave you this morning, and I'm going to ask you to

24    introduce yourselves and your client, and I'm going to ask

25    you to state all your witnesses, turn around and just tell

1        the jury, our witnesses are X, Y and Z and I am so-and-so.

2        And I'm going to ask if they know any of the parties, the

3        lawyers or the witnesses, do they know any of the jurors, do

4        they have any extraordinary personal reason that they can't

5        serve for -- the trial is expected to last one week, right?

6                  MR. ROSENTHAL:  Yes.

7                  THE COURT:  And then when we get rid of those

8        people, they will come up, they will have personal excuses,

9        then we'll put eight in the box, and each person well go

10       through the questions, they'll have the sheet, and I'll ask

11       them the questions.

12                  And then if there are any cause objections when

13       they're finished the questions, ask to be heard at sidebar,

14       and I'll excuse them.  If there are not, we'll wait till we

15       get all eight seated, and we'll exercise preemptories.

16                  Each have three.  If you both pass on a round, the

17       jury is satisfactory.  Got it?

18                  MR. ROSENTHAL:  How many jurors, Your Honor?

19                  THE COURT:  In the box?  There will be eight.

20                  MR. ROSENTHAL:  Okay.

21                  THE COURT:  Okay?

22                  MR. MINO:  And just, Your Honor, with the

23       statement of the case as your clerk gave it to us, he had

24       crossed out "lost overtime."

25                  THE COURT:  I will add it back in.

CHARLES P. McGUIRE, C.C.R.

1              MR. MINO:  Okay.

2              THE COURT:  "For pain and suffering and overtime."

3      Okay?

4              Is the joint statement in the case satisfactory to

5      everyone, other than with that change?

6              MR. MINO:  It's fine with PATH.

7              THE COURT:  Okay.

8              MR. ROSENTHAL:  Your Honor.

9              THE COURT:  Yes.

10             MR. ROSENTHAL:  And just for the record, we do

11     object to the rulings that you made this morning on the

12     issues that can come before the jury on lost wages and

13     medical expenses.

14             THE COURT:  And your objection is?  You want --

15             MR. ROSENTHAL:  We'd like the actual verdict sheet

16     to have lost wages and medical expenses on the verdict

17     sheet.

18             THE COURT:  But there's no objection to how I

19     would calculate the lien; correct?

20             MR. ROSENTHAL:  There is no objection to how you

21     would calculate the lien.

22             THE COURT:  Okay.  So noted, and for reasons I

23     stated earlier, in light of the stipulation of counsel that

24     whatever jury verdict is awarded, if anything, what will be

25     added to it will be the lost wages, the total amount,

1   including full overtime, which will be roughly 110,000;

2   right?

3               MR. MINO:  The 110 doesn't include overtime.

4               THE COURT:  I'm sorry.  Exclusive of overtime.

5   The regular wages will be added back in.  And also, the

6   medical -- do we have a rough estimate?  I know the full,

7   regular wages is about 110,000.  Do we know roughly what the

8   medical bills are?

9               MR. MINO:  Yes.  $86,696.31.

10              THE COURT:  Okay.

11              So, Mr. Rosenthal, I appreciate your objection,

12  and given the agreement by the parties that we will add in

13  the approximate amount of $110,000 for regular wages and the

14  $86,000 approximate amount of medical bills, and that

15  there's a stipulation to reasonableness and there's a

16  stipulation that they will be added back into any jury

17  verdict, and then the liens will be applied, there is no

18  relevance to allowing the jury to calculate amounts that are

19  stipulated, and I'm satisfied that it will just cause more

20  confusion, it doesn't add anything to the process, and that

21  for that reason, I am denying your request.  Okay?

22              Thank you.

23              MR. ROSENTHAL:  Thank you, Your Honor.

24              THE COURT:  All right.  So let's bring in the jury

25  pool.

1               (A jury was duly empaneled and sworn.)

2               (Jury in)

3                    THE COURT:   Okay.   I'd like to just go over with

4         you the schedule for the week.

5                    We're going to hopefully have, if we can do it,

6         have opening statements today, we'll take a break in a few

7         minutes, have opening statements, and tomorrow we'll begin

8         with the witnesses.

9                    Tomorrow, I'm going to need to break a little bit

10        earlier, probably around 3:30, because I have a night court

11        session tomorrow that I have to handle, and then the rest of

12        the week, we'll go full jury days.

13                   I think it makes sense to start at 9:30 and go

14        until 4:30 most days, but we'll try to make logical breaks

15        with the witnesses' schedules.   If you as a group say to

16        me -- you can tell Amy if you'd like to start a little bit

17        earlier or come a little bit later because of travel.   Your

18        schedule dictates how soon or early we'll go, within those

19        general areas.

20                   So we'll start around 9:30 and hopefully go to

21        4:30 every day, and with the exception of tomorrow, we'll

22        break a little bit earlier because I have the night court

23        obligation, and we'll go every day until completed.   The

24        lawyers have given me an estimate of about a week, and that

25        hopefully will take us to Friday, or no later than Monday

CHARLES P. McGUIRE, C.C.R.

1    and at the very latest Tuesday before the Thanksgiving

2    break.

3          So that's our schedule.  We can adjust it as we go

4    forward, you know, to get in as many witnesses as possible

5    and to get you home safely at an appropriate time.  All

6    right?

7          So at this point, I want to, again, and I mean it

8    with complete sincerity, express my gratitude, and the

9    gratitude of not just the Court, but of all the attorneys in

10    the room for your willingness to serve in this matter.  I

11    promise you that to the extent it is humanly possible, I

12    will try to give you a rewarding experience and will try to

13    make your accommodations here as pleasant as possible.

14          If you need anything at all, do not hesitate to

15    ask Amy Andersonn, my courtroom deputy.  Amy and I will do

16    our best to accommodate anything that you need in any way

17    possible.

18          Cell phones, smartphones, beepers and cameras --

19    does anyone still have beepers?  These are old instructions.

20    I don't think anyone has beepers anymore, right -- are

21    prohibited in the courtroom.  If you have them, turn them

22    off and leave them in your pockets or pocketbooks.  If you

23    do not silence them and they go off during the trial, it can

24    be disruptive.  If that happens, I'll ask Amy to hold your

25    phone until the end of the day.

1                   I'm now going to give you some preliminary

2          instructions.

3                   It is your duty to find the facts from the

4          evidence presented to you.  You and you alone will be the

5          judge of the facts.  You will then have to apply those facts

6          to the law as the Court gives it to you.  You must follow

7          the law whether you agree with it or not.

8                   Nothing the Court may say or do during the course

9          of trial is intended to indicate or should be taken by you

10         as indicating what your verdict will be.

11                  The evidence from which you will find the facts

12         will consist of the testimony of witnesses, documents, and

13         other things received into the record as exhibits, any facts

14         that the lawyers agree to stipulate, or what the Court

15         instructs you to find.

16                  Certain things are not evidence and must not be

17         considered by you.  I will list them for you.

18                  Statements, arguments, and questions by lawyers

19         are not evidence.  Objections to evidence are not evidence.

20         Lawyers have an obligation to their clients to make

21         objections when they believe evidence being offered is

22         improper under the Rules of Evidence.  You should not be

23         influenced by the objection or the Court's ruling on it.  If

24         the objection is sustained, ignore the question.  If it is

25         overruled, you treat it like any other answer.  If you're

                       CHARLES P. McGUIRE, C.C.R.

1    instructed that some item of evidence is received for a

2    limited purpose, follow that instruction.

3            Testimony that the Court has excluded or told you

4    to disregard shall not be considered.  Anything you may see

5    or hear outside the courtroom is not evidence and must be

6    disregarded.  You are to decide the case solely on the

7    evidence presented in the courtroom.

8            There are two types of evidence, direct and

9    circumstantial.  Direct evidence is the direct proof of a

10   fact, such as the testimony of an eyewitness.

11   Circumstantial evidence is proof of facts from which you may

12   infer or conclude that other facts exist.  I will give you

13   further information on these as well as other matters at the

14   end of the case, but keep in mind you may consider both

15   kinds of evidence.

16           It will be up to you to decide which witnesses to

17   believe, which witnesses not to believe, and how much of a

18   witness' testimony to accept or to reject.  I will give you

19   guidance in determining the credibility of witnesses at the

20   end of the case.

21           This is a civil case.  Plaintiff, Steven Foder, is

22   the person that brought the lawsuit.  Defendant Port

23   Authority is the Defendant against whom the lawsuit was

24   filed.  This is a personal injury lawsuit.

25           In determining whether any fact has been proved by

1      a preponderance of the evidence in the case, you may unless

2      otherwise instructed consider the testimony of all

3      witnesses, regardless of who may have called them, and all

4      exhibits received in evidence, regardless of who may have

5      produced them.

6              You may have heard the term, proof beyond a

7      reasonable doubt.  That is the strictest standard of proof

8      that applies only to criminal cases.  It doesn't apply to

9      civil cases such as this, so put that out of your mind.

10             Now, a few words about your conduct as jurors.

11             You as jurors must decide the case solely on the

12     evidence presented here within the four corners of this

13     courtroom.  That means that during the trial, you must not

14     conduct any independent research about the case, the matters

15     in the case, the individuals, the lawyers, the entities,

16     anything at all to do with the case.  You cannot do

17     independent research.  I cannot emphasize that enough in the

18     world we live in where we have information at our fingertips

19     with our phones.  So that includes Internet research.  Don't

20     look at dictionaries, reference materials, internet search

21     web sites, blogs, don't ask Siri on your iPhone, or use any

22     electronic device or hard copies of any books to obtain any

23     information about this case.  Please do not try to find any

24     information from any sources outside of this courtroom.

25             Until you retire to deliberate, you may not

CHARLES P. McGUIRE, C.C.R.

1    discuss the case with anyone, even your fellow jurors.  I

2    know this is hard, but it is a very important instruction to

3    follow.  After you retire to deliberate, you may begin

4    discussing the case with your fellow jurors, and I'll tell

5    you when that is, but you cannot discuss a case with anyone

6    else until you have returned your verdict and the case is at

7    an end.  Please don't talk about the case with anyone,

8    family members, friends, loved ones, anyone.

9         I know that many of you use cell phones, the

10   Internet, iPhones, smartphones, and other tools of

11   technology.  You must not talk to anyone at any time about

12   the case or use these tools to communicate electronically

13   with anyone about the case.  This includes your family and

14   friends.  You may not communicate with them about this case

15   on your cell phone through email, iPhone, text messaging,

16   Twitter, a blog, Facebook, Google, MySpace, LinkedIn, or

17   YouTube.  You may not use any similar technology or social

18   media, even if I have not specifically mentioned it here.

19        I expect that you will inform me if you become

20   aware of another juror's violation of those instructions.

21        Any questions, you'll put in writing to the Court,

22   or you can let Amy know that you have an issue.

23        A juror who violates these restrictions

24   jeopardizes the fairness of this trial, and a mistrial could

25   result, which would require the whole process to start all

1    over again.  It would be very unfair to the rest of the

2    jurors who are serving here, it would be unfair to the

3    Court, it would be unfair to the lawyers and to Mr. Foder

4    and the Port Authority.

5              Do not form any opinions until all the evidence is

6    in.  Keep an open mind until you start deliberating at the

7    end.

8              I hope that for all of you, this case is

9    interesting and noteworthy.

10             And I'm going to now give you a short break so you

11   can use the bathroom, you can get something to drink, and

12   when you come back, each side will make an opening

13   statement.

14             An opening statement is neither evidence nor

15   argument.  It is an outline of what the party intends to

16   prove, offered to help you follow the evidence.  Then the

17   Plaintiff will present his witnesses, and the defense may

18   cross-examine them.  Then the Defendant will present its

19   witnesses, and the Plaintiff may cross-examine them.

20             After all the evidence is in, the parties will

21   present their closing arguments to summarize and interpret

22   the evidence for you, and the Court will give you

23   instructions.  You will then retire to deliberate.

24             But until that time, welcome to Federal Court.

25   Thank you for your service.

1              It's 3:15.  We'll take a 15-minute break, then

2      we'll return, we'll have opening statements, and then we'll

3      be done for the day.

4              Thank you.

5              THE COURT CLERK:  All rise for the jury.

6          (The jury exits)

7              THE COURT:  Okay.  Gentlemen, anything else before

8      we begin?  We're good with the exhibits and the

9      demonstratives?

10             MR. MINO:  You showed me the one photo.  Is there

11     anything else you're going to be putting up on your opening?

12             MR. ROSENTHAL:  This photo.

13             MR. MINO:  Okay.  All right.  Just those two?

14             MR. ROSENTHAL:  Yes.

15             And can I just -- that's it.  I'm good.

16             THE COURT:  You're good, Mr. Rosenthal?  You need

17     a few minutes?  Okay.

18             So we'll take a few minutes' break, go get your

19     Diet Cokes or your coffee, and if you want to bring drinks

20     into the courtroom, it's perfectly fine, okay?

21             Yes?

22             MR. MINO:  What am I doing with the witnesses?

23     Are we going to take one today?  Send them home?

24             THE COURT:  I think we should let them go today,

25     don't you?

1           MR. MINO:  Yes.

2           THE COURT:  We're not going to get too far.  I'm

3     sorry about that.  We had a little bit of a delay today.

4     And we'll talk about the schedule for tomorrow.  We'll do

5     the openings, we should be done hopefully by four, so then

6     we'll talk about tomorrow then.  All right?

7           Take a few minutes, guys.  Thank you.

8     (Recess taken)

9     (Jury out)

10          THE COURT CLERK:  All rise.

11          THE COURT:  Are we good?

12          MR. ROSENTHAL:  Yes, Your Honor.

13          MR. MINO:  Yes, Your Honor.

14          MR. ROSENTHAL:  Actually, Your Honor, a question.

15    Are we tied to the podium, or can we move about?

16          THE COURT:  I don't restrict you from doing what

17    you want.  Just don't get too close to the jury, because

18    they tell me that:  They don't like people invading their

19    personal space.

20          MR. ROSENTHAL:  Is this too close?

21          THE COURT:  No.  Just don't lien over that rail.

22    You do it at your own risk.  But they do like personal

23    space.  But you guys are so nice, I'm sure they'll be fine.

24          Thank you.

25          This is my law clerk, Alex, and this is Cindy.

CHARLES P. McGUIRE, C.C.R.

1                        These are the lawyers.

2                        THE COURT CLERK:  All rise for the jury.

3                 (The jury enters)

4                        THE COURT:  Okay.  Welcome back, everyone.

5                        Ladies and gentlemen, we're going to begin with

6           the opening statements.

7                        And I will turn it over for opening statements to

8           Plaintiff's counsel.

9                        MR. ROSENTHAL:  Thank you, Your Honor.

10                       Good afternoon, ladies and gentlemen.  I hope it's

11          been a -- not a completely terrible day for you.

12                       July 22nd, 2011, more than five and a half years

13          ago, an incident occurred at the Journal Square Station

14          facility at PATH.  We're here today about that incident.

15                       In short, my client, Steven Foder, was attempting

16          to board a train from track level as he was supposed to do,

17          and he slipped and he fell, and he had a very serious injury

18          to his right ankle.

19                       Now, Steven Foder is a railroad engineer.  Just to

20          give you an idea of what the railroad is, engineers are the

21          people that operate train equipment.  They operate on cars

22          that are also locomotives.  There's a cab in the front of

23          these cars where the engineer, Mr. Foder, can operate an

24          entire train consist, which means an entire train made up of

25          connected cars, and there's also a conductor that works on

1    these trains.

2            Mr. Foder was going to work that day and

3    attempting to get on what you're going to hear talked about

4    as PA-5 PATH trains, MUs, meaning multiple units.  The PA-5

5    were fairly new to PATH at the time that this incident

6    occurred.  They started to be used on the property in about

7    2009, 2010.

8            Mr. Foder started to work or was hired to work at

9    PATH and began training as an engineer in approximately

10   2009, 2010, and finished his training in the beginning of

11   2011.  The incident occurred maybe five or six months after

12   he started working as a certified engineer.

13           Now, this, ladies and gentlemen, is a PA-5 train

14   car.  We're going to be talking a lot about this design and

15   how engineers such as Mr. Foder were trained to get on

16   trains from track level.  This is not where the incident

17   occurred.  This photograph was taken inside the facility.

18   So there's things here in this photograph, ladies and

19   gentlemen, that were not there at the time of the incident.

20           And I'm going to explain to you very briefly about

21   how Mr. Foder was trained to get onto this train.

22           As you can see, it's hard to tell perspective from

23   this photograph.

24           Right over here is a step.  This is the back of a

25   train.  The train -- there's more train on both sides.  This

1    is the back.  One can climb up on either side of the back of

2    the train.

3            Mr. Foder was trained to put his right foot on

4    this step.  His left foot would be in the track, on ballast,

5    which are the stones in the track underneath the rail.  A

6    rail sticks up about five or six inches above the ballast.

7    And you're going to see photographs of that as well.

8            In this photograph, you don't see any of that.

9    This set of steps over here is just for the photograph.

10   It's not relevant to our case.

11           So he put his right foot into this step.  He is

12   then supposed to take his dominant arm and then his other

13   arm and grab a rail, which is right here next to the

14   doorway.  There's a door over here in the middle of the

15   train car.

16           You're going to be hearing from a lot of

17   witnesses.  You're going to be hearing from people who work

18   for PATH.  You're going to be hearing from a professional

19   engineer who is going to tell you about how this works and

20   going through detail, and I just want to give you a idea of

21   what it is we're talking about, because this is what the

22   case is.

23           You're supposed to hold onto that rail.  Then,

24   with one foot in the stirrup, this handrail is going to be

25   to his left, he's holding on with both hands, he takes his

1    left foot and he's supposed to place it on what is called an

2    anti-climber.

3              Anti-climbers, ladies and gentlemen, are areas

4    between train cars that are sort of bumpers.

5              To give you an idea of what we're talking about,

6    this is what -- everybody can see?  This is what an

7    anti-climber looks like.

8              The edge of the anti-climber in this case was made

9    up of straight steel.  Beyond that, several inches beyond

10   that, you have diamond plate, and because of how the car is

11   set up, one has to put their foot into an area very much

12   near or at the doorway, because that's the only place where

13   your foot -- where your feet, because you're going to get

14   your other foot up there as well -- where your feet must

15   sit.

16             So you put one foot up there, you're grabbing on

17   over here, and then you have to lift your left leg -- from

18   the ballast level to the anti-climber is over four feet

19   high.  And so you lift your leg, you're supposed to lift

20   your leg onto the anti-climber, your entire foot down, using

21   whatever strength that you can in your upper body, and then

22   pull yourself, once you're able to get your foot -- your

23   foot down and secure, at that point, you pull up with your

24   right foot, which is now still in this step, which is all

25   the way to the right at the back of the train, and you have

1     to bring that foot up into this area as well.

2              Well, on July 22nd, 2011, Mr. Foder never got his

3     second foot up there, because, when he got his first foot

4     onto the steel, it slid, and it slid him into essentially a

5     split.  At that time, holding onto the grab rail with both

6     of his hands, he let go, as his foot here on the step

7     rolled, and he fell down, and at some point, either in the

8     rolling process or when he struck the rail with his right

9     leg on the ground, he injured his right ankle.

10             And I'm going to tell you about that injury in a

11    moment, because it's a complicated type of injury that he

12    had.

13             This case, ladies and gentlemen, is being brought

14    under a very special act of Congress.  Everything you think

15    you know about the relationship between workers and

16    employers, forget about it, it doesn't apply.  The Judge is

17    going to tell you at the end of this case, and she already

18    mentioned it to you, this case is governed by one law, and

19    under that law, if PATH is negligent, and that negligence

20    plays any part, even the slightest, in causing Mr. Foder's

21    injuries, he's entitled to recover for his damages.  Any

22    part, even the slightest.

23             These cars, you're going to hear -- and they came

24    to PATH in 2009, 2010, for whatever reason, it doesn't

25    appear that anybody ever thought about how one could safely

1    get onto the train car, because it looks more like a

2    perverse game of twister on a wall than it does, the way

3    this, which is just a regular ladder with handholds.

4    Because standards tell you that handholds have to be above

5    the steps to make it safe, particularly if there's one

6    handhold.

7            You're going to hear from our professional

8    engineer, who's an expert in these sorts of things, and he's

9    going to tell you about the fact that this whole climb

10   system didn't work, and, in fact, all you really needed to

11   do to make this safe would have been on that steel that you

12   see in the back is just to put some sort of anti-slip tape.

13   That would have made what happened to Mr. Foder not -- never

14   had to have happened.  It never would have happened if a

15   simple, a simple safety device had been thought of the year

16   before by PATH when they decided that they were going to use

17   these cars for this particular purpose.  PATH knew that they

18   used these cars for that purpose because it's the only way

19   you can get on at many of the PATH facilities PATH operates

20   between New Jersey and New York in tunnels and with coast

21   clearances, and you can only get on from track level safely,

22   if you can call it safe, in this area.  So they knew.  And

23   you're going to hear some actually interesting testimony

24   about exactly what PATH says that they taught people, and I

25   want you to listen carefully to what the people say the

1        training was.

2               Four feet for the left foot to get up, using all

3        your body strength.

4               Steven Foder was 24 years old at the time this

5        incident occurred.  He was a father.  He was in a very

6        serious relationship at the time.  His life was moving

7        forward the way that he wanted it.  He had worked at other

8        jobs before.  He had had a couple of other injuries before.

9        He had hurt his elbow.  He had surgery in his -- not his

10       elbow, I'm sorry, his wrist, his right wrist.  The year

11       before at PATH, he had twisted his ankle.  He never went to

12       a doctor, and he missed about seven days of work.

13              As a result of this, as a result of falling that

14       day, he went to PATH Medical.  Now, I want you to understand

15       that every doctor that Steven Foder saw, every single

16       doctor, he was referred to by PATH.  He either saw PATH's

17       doctors or doctors they referred him to.

18              He goes to see PATH's doctors, who then refer him

19       to orthopaedic doctors, who are the doctors who deal with

20       ankle injuries.  He goes to the hospital that night first,

21       and they do an x ray.  Doesn't look like he broke anything.

22       He goes to PATH a couple days later.  He's in pain.  They

23       send him to see an orthopaedic doctor, who, they do physical

24       therapy.  That doctor can't seem to get the pain under

25       control, sends him to another doctor in the same practice.

1    That doctor decides, hey, let's do an MRI, and they find

2    that he has a condition called osteochondral lesion of the

3    talus.

4              The talus is a bone in the ankle.  It is a bone

5    under where you would think the ankle was.  This is a

6    problem that some people have genetically, but in this case,

7    you're going to hear from one of the doctors who PATH

8    referred Mr. Foder to that his osteochondral lesion was

9    caused by this incident.

10             Now, what happened?

11             Mr. Foder was in pain.  He goes to the doctor, the

12   second doctor.  They say, you know what?  I'm looking now at

13   the MRI.  I see what the problem is.  You've got this

14   osteochondral lesion.

15             "Osteo" means bone; "chondral" is a word for

16   cartilage.  There's an issue.  Part of his cartilage has

17   detached itself; it is now dying in his leg.

18             So the doctor says, look, we can do surgery on

19   this and hopefully get you better; if not, we can do other

20   things, but let's see what we can do.

21             So he has a surgery.  They drill into his leg,

22   into his ankle.  He misses about six months of work, goes

23   back to work, but he's still in pain.

24             He works for about a year, maybe a year and a half

25   after that, and goes back to the doctor:  Doctor, I'm still

CHARLES P. McGUIRE, C.C.R.

1    in pain.  The doctor says, well, you know, I told you

2    originally we might have to do something else if this

3    doesn't work.  This is a complicated situation, so I think

4    we should do another surgery.  He goes back to PATH Medical.

5         PATH has a medical department.  And I heard Mr.

6    Mino tell you that he's going to bring in the PATH doctor.

7    Great.

8         He goes back to the PATH doctor, who says, go to

9    another doctor.

10        You know, Steven was concerned.  He didn't want to

11   get another surgery.  He was concerned because the doctor

12   said, I think you need another surgery.  The first thing

13   that goes through some people's minds is, I don't want to

14   get another surgery, so I'm going to get a second opinion.

15        So he goes for the second opinion, and PATH sends

16   him to see a doctor named Dr. Justin Greisberg at

17   Columbia-Presbyterian Hospital in Manhattan.  All he does is

18   foot and ankle surgery.  You're going to be seeing a video

19   from Dr. Greisberg.  Dr. Greisberg sees him, says, you do

20   need surgery.  Here's what you need, and it's not a simple

21   surgery, it's a very complex surgery.  What we have to do

22   is, we have to go into your ankle, we have to literally cut

23   a bone so that we can get to where the defect is.  Then

24   we're going to -- what we're going to do is, we're going to

25   put a graft in there, an embryonic graft into your ankle,

1    and hopefully that will grow and that will make things

2    better.

3              He has that surgery.  He misses, again, about six

4    months of work.  Goes back to work, still having problems.

5              Goes back to Dr. Greisberg:  Dr. Greisberg, I

6    still have pain.

7              Dr. Greisberg says, okay, let's do a third

8    surgery.

9              Three surgeries.  Three surgeries Steven Foder had

10   within three years or so of this incident, trying to somehow

11   get onto the train from track level at Journal Square.

12             He ultimately missed 17 months of work.

13             The third surgery was successful enough for him to

14   go back.  He's working at his old job.  He's trying to do

15   the best he can, but he still has some lingering issues, and

16   you're going to hear about what those issues are, and you're

17   going to hear about what he went through, why he went

18   through it, and what he's going to continue to go through

19   for the rest of his life, because one of the things that

20   Dr. Greisberg found that when he went in the third time is

21   that he's got arthritis there.  He was 26 years old at the

22   time.  He's got arthritis, bone-on-bone in his ankle.

23             Now, nobody saying that it's going to disable him.

24   That's not what this case is about.  This case is about a

25   guy who is working, and he's going to continue working for

1     the rest of his life in whatever circumstance he's in now.

2           But one thing that I did not mention is that the

3     day of this incident was the hottest day on record in

4     New Jersey in history.  It was over a hundred degrees.

5     Steven saw it in his car that day it was 118 degrees, but

6     the temperature was probably more like 108.  "Home Sweat

7     Home" was what they were talking about in the Herald-Tribune

8     -- not the Herald-Tribune, the Newark Star-Ledger.

9           There's an issue in the case about gloves.

10    Somebody from PATH is going to come in and say, oh,

11    engineers, they have to wear gloves at all times.

12          Well, if that's the case, that's not what they

13    were taught, and that's not what people did.

14          You're going to -- I'm sure the counsel is going

15    to show you what those gloves look like.

16          But you're going to hear from our expert, you're

17    going to hear from Mr. Foder, number one, that wasn't what

18    the rule was, number two, they never charged him with ever

19    violating that rule, and, number three, it wouldn't have

20    helped him anyway.

21          Ladies and gentlemen, this is a case about what

22    happens when safety is an afterthought.  This could have

23    been addressed a year before, when PATH knew what these cars

24    were going to be used for, when Kawasaki was delivering

25    them.  But they didn't.  And instead, a dangerous situation

CHARLES P. McGUIRE, C.C.R.

1    was allowed to exist, and Mr. Foder got hurt, and it wasn't

2    a minor injury.  It was a major injury that caused him to

3    have three surgeries and really changed his life in some

4    respects.  He's working, but it did, it changed his life,

5    and it was completely unnecessary.

6              Thank you.

7              THE COURT:  Thank you, Mr. Rosenthal.

8              Counsel?

9              MR. MINO:  Good afternoon, ladies and gentlemen of

10   the jury.

11             This case is about the mistakes that get made when

12   a person gets too comfortable in their routine, too

13   comfortable in their surroundings.  It's about the

14   inattentiveness or casual behavior that a person might have

15   when they're doing something that they have done hundreds of

16   times before, something that they do every day.  And it's

17   about the consequences that that type of lax behavior can

18   have.

19             Now, I just want to take a second, though, and

20   tell you what this case is not about.

21             This case is not about whether or not Mr. Foder

22   fell.  He did.  I'm not going to stand here and tell you

23   that he didn't fall.

24             But, ladies and gentlemen of the jury, in a

25   nutshell, this case is about whether or not Mr. Foder's own

1    carelessness and own inattentiveness in doing something that

2    he had done hundreds of times before actually caused him to

3    fall, and whether or not any of the injuries he claims

4    resulted from that fall.

5            Now, you heard Mr. Rosenthal say, and it's true,

6    we are here because on July 22nd, 2011, Mr. Foder was a PATH

7    engineer and was assigned to take an empty train and bring

8    it into service.  That's a train without any passengers.  He

9    was going to get on it and start bringing it into service,

10   meaning go to a station, pick up passengers, and then go

11   back and forth.  So this was something that Mr. Foder did

12   every day as an engineer.

13           So on that day, he arrives at the Journal Square

14   PATH station, and he was told where to go pick up his train

15   at Journal Square.  So Mr. Foder along with the conductor

16   goes down to track level to begin walking to the train.  And

17   as Mr. Rosenthal explained a little bit, track level doesn't

18   mean, I'm going down to the platform, and track one is on my

19   left, track two is on my right.  It doesn't mean that.  What

20   that means is that Mr. Foder and the conductor are down on

21   the ground, walking next to the rails.  And the train that

22   day was about 25 to 30 feet from where Mr. Foder and the

23   conductor got onto track level.  So they begin walking, and

24   eventually they make it to the train.

25           Now, they do have to get on the train, and since

1    there's no platform there, they can't enter through the side

2    doors the way I did when I got on the PATH train this

3    morning to Newark, right?  They have to climb up the face of

4    the train.

5            And that process, climbing up the face of the

6    train, you are going to hear that this was something that

7    Mr. Foder did every single day as an engineer, sometimes up

8    to 10 times a day, so that by July 22nd, 2011, he had done

9    this hundreds and hundreds of times.

10           You are also going to hear how PATH gives

11   extensive training to its employees, specifically,

12   engineers, on the proper way to climb up the front of the

13   train.

14           You will hear how PATH stresses the importance of

15   maintaining three points of contact with the train at all

16   times, and how PATH stresses properly placing your foot on

17   the anti-climber.

18           Now, this is the anti-climber here.  The photo may

19   be slightly misleading.  That top portion is less than two

20   inches wide.  The rest of it is diamond plate.

21           Now, you are going to hear that when PATH trains

22   their engineers to climb up the face of the train, they are

23   instructed to put their foot on the diamond plate.  They are

24   not supposed to put their foot on the edge of the

25   anti-climber, right?  And you will hear how before you can

CHARLES P. McGUIRE, C.C.R.

1    even enter the engineers' class, this is demonstrated for

2    Mr. Foder, and Mr. Foder himself had to do it to the

3    satisfaction of the supervisors.  Okay?  And you will hear

4    that during this practical portion, Mr. Foder was given

5    gloves to help him grip as he pulls himself up.  All right?

6           So here we are, July 22nd, 2011.  Mr. Foder,

7    having done this hundreds and hundreds of times, begins to

8    climb up the front of the train.  Now, as Mr. Rosenthal

9    said, Mr. Foder places his right foot in this end step, and

10   he doesn't put on the gloves, as hot as it may be, he

11   decides, I don't need the gloves, grabs both hands onto the

12   grab bar.

13          Now, Mr. Rosenthal was a little misleading.  You

14   don't then just swing your left leg up.  You pull yourself

15   up so that you are close to the top of the anti-climber, and

16   then in theory place your entire foot on the diamond plate.

17          On that day, Mr. Foder begins to pull himself up,

18   and he falls.

19          This is generally what Mr. Foder alleges, and the

20   reason I say generally is because, from the date of the

21   accident till today, Mr. Foder has told a couple different

22   versions of what happened and what caused him to fall, so I

23   can't even really give you a straight idea of what he is

24   going to say happened to him.  We may get something entirely

25   new.

CHARLES P. McGUIRE, C.C.R.

1          So at this point, it's important to say that

2     Mr. Foder as the Plaintiff bears the burden of proof here,

3     right?  It is his burden to prove that PATH was negligent

4     beyond -- or by a preponderance of the evidence, okay?  And

5     that means that it is more likely than not.  And just

6     because Mr. Foder fell, that alone does not make PATH

7     negligent.  And while Judge Arleo will give you in-depth

8     instructions as to what negligence means at the close of the

9     trial, for now, it suffices to say that it's a failure to

10    exercise reasonable care under the circumstances.

11         Now, you heard Mr. Rosenthal say that Mr. Foder is

12    claiming that PATH was negligent chiefly in two ways:

13    First, that on July 22nd, 2011, the edge of the anti-climber

14    didn't have some sort of anti-slip tape.  Right?  And then

15    the other is that, in their words, the perverse game of

16    twister due to the alignment of the end step and the grab

17    bar.

18         Well, with respect to the anti-slip tape, the

19    evidence is going to show there is no rule, there's no

20    regulation, there's no standard, there's no requirement that

21    mandates that PATH put anti-slip tape in the area identified

22    by Mr. Foder.  And as I explained before, Mr. Foder was

23    given ample training on how to climb up properly and how to

24    properly place his foot on the diamond plate of the

25    anti-climber, not on the edge.

1            So in addition to the lack of a rule or regulation

2    governing the placement of grip tape on the anti-climber,

3    the evidence will show that if Mr. Foder had followed the

4    training that he was given, his foot would have never

5    touched that area.  It would have ended up on the diamond

6    plate.

7            Now, with respect to the alignment of the grab bar

8    and the end step, Mr. Rosenthal talks about how the grab bar

9    should be over the end step, and there's regulations about

10   that.

11           The evidence will show that that regulation does

12   not apply to PATH and does not apply to these PATH cars.

13   The evidence will also show that it would not be possible to

14   move the end step in or the grab bar out and still have a

15   functional PATH train.  Okay?

16           And there's one other way that the evidence will

17   show -- or that will demonstrate that PATH wasn't negligent

18   here.

19           Remember that conductor I was saying that walked

20   with Mr. Foder to the train?  Well, that conductor was able

21   to climb up the train safely right before Mr. Foder, and

22   then right after Mr. Foder, a car inspector came out and was

23   also able to climb up the train properly, did not fall.

24           And so now we come to Mr. Foder's injury.

25           Mr. Rosenthal was correct.  The date of his fall,

1      Mr. Foder goes to Jersey City Medical Center, and

2      Mr. Rosenthal mentioned an x ray that was taken, showed no

3      break.  And that's true, there was no broken bone.

4              What it did show was the presence of

5      osteochondritis dissecans, or the osteochondral lesions, as

6      he put it.  They're essentially interchangeable terms.

7              Now, the evidence will show that osteochondritis

8      dissecans or the osteochondral lesions, these are

9      conditions that take a long time to develop, so long to

10     develop that Mr. Foder would have had it before his fall on

11     July 22nd, 2011.  And so the evidence will show that the

12     osteochondral lesion or the osteochondral dissecans was a

13     pre-existing condition and was not caused by Mr. Foder's

14     fall.

15             Now, again, true, Mr. Foder underwent three

16     surgeries.  PATH cannot deny that.  He had each of them.

17             However, you will hear testimony that after the

18     third surgery, Mr. Foder's right ankle is in relatively good

19     condition.  He did have the three surgeries, but by the last

20     surgery, the surgery was successful, and he is in relatively

21     good condition, and you will hear that he has returned to

22     work and is working full duty as an engineer for PATH.  All

23     right?

24             And so I want to thank you for the opportunity to

25     speak to you this afternoon, and I just want to say before I

1    end that you're going to spend a couple of days here,

2    hopefully we'll be out of here by Friday or no later than

3    Monday or Tuesday, but you'll have some time to get

4    comfortable being a juror.

5              However, I ask that you do not make the mistake

6    that Mr. Foder made:  Do not get so comfortable in your role

7    in doing your job as jurors that you become inattentive or

8    that you don't pay attention, all right?

9              Both Mr. Foder and PATH deserve your full

10   attention and focus.  Do not fall into that lax behavior

11   that sometimes comes with something that you are very

12   comfortable with.

13             And I think if you pay attention and focus, I'm

14   confident that you will come to a fair and just result for

15   the parties.

16             Thank you.

17             THE COURT:  Okay.  Thank you.

18             Okay.  Ladies and gentlemen of the jury, it is now

19   4:20, and I'm going to release you for the day.

20             We'll begin tomorrow at 9:30 here.  So if you can

21   get here by 9:15, shoot for 9:15, then we will start

22   promptly at 9:30.

23             My goal is to stay on time so you won't have to

24   leave the courthouse later than what's reasonable, which I

25   hope every day will be around 4:30.  If we have a logical

1    breaking point, we are moving quickly, we will stay a little

2    later or go a little earlier.  So if you have a little bit

3    of flexibility with me, I will certainly do my best to

4    accommodate your needs, which are paramount to everyone in

5    the room.

6            And so I will just leave you with parting words:

7    Don't talk about the case.  Don't do any research.  Don't

8    look on television.  You can watch your shows tonight and

9    enjoy them.  And have a good night's sleep, and again, thank

10   you, and I'll see you tomorrow at 9:30.  Okay?

11           THE COURT CLERK:  All rise.

12       (The jury exits)

13           THE COURT:  Okay, guys.  Good job, everyone.  So

14   9:30 is the plan tomorrow.

15           MR. ROSENTHAL:  Yes, Your Honor.

16           MR. MINO:  Yes.

17           THE COURT:  So, any other issues?  The order of

18   witnesses?

19           MR. MINO:  I let Plaintiff's counsel know -- I'm

20   going to have the three PATH witnesses here that were here

21   this afternoon.

22           THE COURT:  Give me their names again just so I

23   know.

24           MR. MINO:  Dennis Velez, Astagne Avril, and Ken

25   Wallace.

CHARLES P. McGUIRE, C.C.R.

1               THE COURT:  Okay.

2               MR. MINO:  Mr. Avril cannot get here until 11 a.m.

3               THE COURT:  Okay.

4               MR. MINO:  Plaintiff's counsel seemed okay with

5       it.

6               MR. ROSENTHAL:  Your Honor, we will have no

7       problem dealing around anybody's schedule.

8               THE COURT:  Perfect.  Thank you.  I appreciate it.

9               MR. MINO:  I just wanted to let them and the Court

10      know.

11              THE COURT:  Do you expect them to be long

12      witnesses?

13              MR. ROSENTHAL:  No.

14              THE COURT:  After that, we're going to hear from

15      Mr. Foder?

16              MR. ROSENTHAL:  I'm hopeful.  We thought that we

17      were going to have our expert come in, so he's coming in

18      tomorrow.

19              THE COURT:  Whatever works for your schedule.

20              MR. ROSENTHAL:  I'd rather have Mr. Foder go next.

21      We'll have somebody, though.

22              MR. MINO:  But it will either be Mr. Widas or

23      Mr. Foder.

24              MR. ROSENTHAL:  Yes.  It's going to be one or the

25      other.

1              THE COURT:  Do you have anyone after that?

2              MR. ROSENTHAL:  We have a doctor on tape.

3              THE COURT:  You have a doctor on tape, and was

4     that doctor taken for the purposes of trial?

5              MR. ROSENTHAL:  Yes.

6              MR. MINO:  Yes.

7              THE COURT:  Okay.  So all the objections have been

8     -- there are no issues that need to be resolved on that?

9              MR. MINO:  I have to read through the transcript

10    again.  I still haven't gotten the video.  I don't know what

11    happened, but --

12             THE COURT:  We need to know.

13             MR. MINO:  Yes.

14             THE COURT:  Because we have to deal with it

15    beforehand.

16             MR. MINO:  That's my plan when I get back to the

17    office.  But I will read through -- I have the transcript,

18    just not the physical video of it.

19             MR. ROSENTHAL:  And the transcript is in the

20    exhibits.

21             THE COURT:  Well, when we're going to show the

22    jury the actual video, we have to know anything that has to

23    be edited, and I need to know first thing in the morning.

24    Okay?

25             MR. ROSENTHAL:  Sure.  That should be Wednesday.

1        THE COURT:  Okay.  And then you'll begin your case

2   on Wednesday, right?

3        MR. MINO:  Yes.

4        THE COURT:  You know what?  We'll go to 9:30,

5   we'll take a morning break, we'll take a lunch break, and

6   we'll go as far as we can tomorrow until I can break for my

7   re-entry Thanksgiving party.  You're all welcome to stay and

8   meet my guys if you want to stay.

9        Okay, guys, have a great night.  Good job.  I'll

10  see you tomorrow at 9:30.

11        MR. ROSENTHAL:  Thank you, Your Honor.

12        THE COURT CLERK:  All rise.

13        (Matter adjourned until Tuesday, November 15, 2016,

14  commencing at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

CHARLES P. McGUIRE, C.C.R.

1                                    <u>INDEX</u>

2                                                          <u>**Page**</u>:

3        <u>**COURT'S REMARKS:**</u>                          **72**

4
         <u>**OPENING STATEMENTS:**</u>
5
         **MR. ROSENTHAL:**                                  **81**
6
         **MR. MINO:**                                       **92**
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# $

**$10,000** [1] - 12:25
**$100,000** [18] - 12:4, 12:22, 13:9, 16:13, 21:6, 21:9, 21:10, 22:23, 23:9, 31:8, 31:12, 31:18, 31:23, 32:2, 42:4, 46:4, 47:24, 49:5
**$110,000** [6] - 29:8, 40:12, 44:5, 47:15, 48:8, 71:13
**$110,348.80** [2] - 29:9, 40:15
**$120,000** [1] - 25:12
**$150,000** [1] - 25:17
**$190,000** [1] - 23:10
**$20,000** [2] - 46:8, 46:13
**$30,000** [2] - 53:7, 53:13
**$300,000** [3] - 43:4, 48:5, 49:6
**$45,000** [10] - 14:11, 14:15, 14:25, 16:9, 29:10, 44:5, 48:15, 49:17, 49:24, 51:18
**$45,183** [1] - 40:23
**$45,183.36** [1] - 29:6
**$5,000** [4] - 14:23, 14:24, 15:12, 32:6
**$50,000** [1] - 25:8
**$6,000** [1] - 53:6
**$65,000** [2] - 41:11, 41:18
**$65,165.44** [1] - 29:2
**$85,000** [4] - 9:11, 11:5, 11:20
**$86,000** [1] - 71:14
**$86,696.31** [1] - 71:9
**$90,000** [20] - 12:22, 13:6, 13:8, 14:14, 16:8, 16:14, 16:19, 17:23, 22:24, 23:6, 23:16, 25:2, 25:6, 25:7, 25:9, 25:17, 26:24, 31:22, 47:16, 47:25
**$95,000** [1] - 16:18

# 1

**10** [9] - 14:21, 29:25, 30:14, 45:4, 46:11, 46:13, 47:4, 49:8, 94:8
**10,000** [2] - 12:4, 30:7
**100** [19] - 12:14, 12:18, 12:21, 13:1,

13:3, 13:5, 17:16, 21:8, 21:11, 23:17, 32:12, 42:5, 42:14, 42:18, 44:3, 44:4, 44:15, 45:18, 46:23
**100,000** [7] - 13:9, 14:4, 14:8, 18:1, 25:4, 42:25, 45:8
**100-percent** [1] - 31:19
**108** [1] - 91:6
**11** [1] - 101:2
**110** [22] - 40:1, 41:5, 41:6, 43:1, 44:2, 44:3, 45:10, 45:19, 45:25, 46:21, 46:25, 48:1, 48:2, 48:9, 48:16, 49:2, 49:3, 49:19, 49:22, 50:8, 50:25, 71:3
**110,000** [2] - 71:1, 71:7
**118** [1] - 91:5
**12:20** [1] - 54:17
**135** [7] - 43:11, 44:12, 45:17, 45:21, 46:9
**135,000** [1] - 49:25
**145** [1] - 46:4, 46:8, 50:2
**145,000** [1] - 46:5
**15** [4] - 53:15, 103:13
**15-minute** [1] - 79:1
**16.5** [1] - 46:14
**165** [6] - 43:12, 43:14, 44:15, 46:7, 46:9, 46:13
**17** [3] - 28:16, 51:1, 90:12
**190** [5] - 16:14, 16:17, 18:3, 32:3, 32:5
**1:15** [2] - 54:19, 66:14

# 2

**20** [6] - 35:14, 53:1, 53:2, 53:6, 53:16, 66:12
**2009** [3] - 82:7, 82:10, 85:24
**2010** [3] - 82:7, 82:10, 85:24
**2011** [9] - 63:11, 81:12, 82:11, 85:2, 93:6, 94:8, 95:6, 96:13, 98:11
**2016** [1] - 103:13
**22nd** [7] - 81:12, 85:2, 93:6, 94:8, 95:6, 96:13, 98:11
**24** [1] - 87:4
**25** [3] - 13:18, 38:25, 93:22

**26** [1] - 90:21
**270** [4] - 45:15, 45:17, 48:7, 50:2
**297** [1] - 44:24

# 3

**3** [1] - 46:14
**3.5** [1] - 46:15
**30** [1] - 93:22
**30,000** [2] - 46:9, 53:17
**300** [1] - 43:11
**300,000** [5] - 44:10, 45:11, 45:13, 48:2, 49:25
**3:15** [1] - 79:1
**3:30** [1] - 72:10

# 4

**40** [4] - 36:13, 39:5, 39:23, 39:24
**448** [1] - 16:3
**45** [33] - 13:15, 13:23, 14:1, 14:17, 14:18, 14:19, 15:6, 15:7, 41:12, 41:21, 42:1, 43:7, 43:8, 43:11, 44:12, 44:24, 45:19, 45:25, 46:25, 48:11, 48:17, 48:20, 49:19, 49:21, 53:7, 53:8, 53:19, 54:3, 54:4, 54:5, 54:9, 54:19
**45,000** [2] - 40:1, 40:24
**4:20** [1] - 99:19
**4:30** [3] - 72:14, 72:21, 99:25

# 5

**5,000** [3] - 13:16, 15:11, 30:7
**50** [12] - 13:15, 13:18, 13:20, 14:1, 14:2, 14:8, 14:9, 17:10, 17:11, 32:16, 38:25, 39:24
**50,000** [1] - 11:4
**50-50** [7] - 13:13, 14:6, 15:5, 16:9, 16:18, 18:7, 32:1

# 6

**6,000** [1] - 53:17

**60** [1] - 36:15
**65** [2] - 42:5, 42:22
**65,000** [1] - 42:1

# 7

**726** [1] - 16:3

# 8

**82** [2] - 57:1, 58:8
**85,000** [3] - 10:19, 11:24
**86** [1] - 26:23
**8th** [1] - 16:2

# 9

**90** [44] - 13:19, 15:4, 21:14, 21:15, 26:23, 31:21, 32:2, 41:20, 42:6, 42:20, 42:21, 43:1, 43:6, 43:11, 43:24, 44:2, 44:3, 44:11, 44:12, 44:24, 44:25, 45:2, 45:3, 45:4, 45:6, 45:12, 45:18, 46:5, 46:7, 46:12, 46:16, 46:18, 46:19, 46:21, 47:2, 48:6, 48:10, 49:3, 49:7, 49:15, 50:7
**90,000** [11] - 11:25, 13:2, 14:5, 15:2, 18:1, 18:4, 18:7, 18:8, 25:3, 31:16, 45:9
**95** [1] - 32:5
**99** [3] - 43:18, 45:1, 45:3
**99,000** [1] - 43:19
**9:15** [2] - 99:21
**9:30** [2] - 72:13, 72:20, 99:20, 99:22, 100:10, 100:14, 103:4, 103:10, 103:14

# A

**a.m** [2] - 101:2, 103:14
**able** [9] - 6:9, 17:11, 19:10, 30:10, 34:13, 38:23, 84:22, 97:20, 97:23
**absent** [1] - 26:13
**absolutely** [1] - 65:9
**accept** [4] - 7:8,

10:16, 10:20, 75:18
**accident** [15] - 56:7, 56:11, 57:7, 58:25, 59:18, 59:23, 61:25, 63:7, 64:7, 64:8, 64:10, 64:18, 64:24, 65:2, 95:21
**accommodate** [2] - 73:16, 100:4
**accommodations** [1] - 73:13
**Ace** [1] - 4:13
**act** [1] - 85:14
**acts** [1] - 68:9
**actual** [2] - 70:15, 102:22
**add** [31] - 16:13, 20:25, 23:16, 24:4, 31:10, 31:21, 32:2, 34:5, 34:6, 41:4, 41:6, 41:22, 41:23, 42:5, 42:6, 44:1, 44:20, 45:25, 46:16, 48:2, 48:9, 48:10, 52:14, 52:15, 67:21, 67:22, 67:25, 69:25, 71:12, 71:20
**added** [8] - 32:19, 41:25, 42:3, 42:7, 42:8, 70:25, 71:5, 71:16
**adding** [10] - 21:14, 23:22, 24:4, 32:9, 32:13, 46:24, 47:8, 47:10, 47:17, 47:22
**addition** [1] - 97:1
**additional** [2] - 39:2, 67:20
**address** [5] - 21:19, 22:8, 26:17, 30:13, 34:9
**addressed** [1] - 91:23
**adjourned** [1] - 103:13
**adjust** [1] - 73:3
**advance** [1] - 39:6
**adversely** [1] - 9:25
**affected** [1] - 16:7
**afternoon** [4] - 81:10, 92:9, 98:25, 100:21
**afterthought** [1] - 91:22
**afterwards** [4] - 57:13, 61:13, 61:15, 65:16
**ago** [1] - 81:13
**agree** [33] - 5:11, 6:6, 7:2, 7:22, 7:23, 11:3, 11:10, 11:11, 11:12, 12:4, 12:23, 13:20, 16:21, 17:6, 19:17, 21:20, 22:9, 22:24,

23:8, 23:11, 23:25, 25:1, 26:4, 26:7, 32:17, 33:24, 33:25, 37:14, 40:8, 47:20, 68:7, 74:7, 74:14
**agreed** [8] - 5:12, 5:13, 21:12, 31:16, 37:3, 40:7, 50:14, 50:21
**agreeing** [4] - 21:25, 23:2, 25:11, 50:17
**agreement** [9] - 5:21, 19:20, 19:21, 26:13, 27:15, 27:22, 71:12
**agrees** [3] - 7:25, 9:6, 19:13
**ahead** [4] - 16:11, 39:11, 50:5, 58:7
**Alex** [2] - 68:23, 80:25
**alignment** [2] - 96:16, 97:7
**alleges** [1] - 95:19
**allow** [10] - 19:14, 22:2, 38:14, 50:13, 57:13, 59:24, 65:2, 66:1, 66:2, 66:5
**allowed** [7] - 18:17, 18:18, 34:18, 37:5, 51:23, 52:10, 92:1
**allowing** [5] - 64:9, 64:21, 65:5, 71:18
**alone** [2] - 74:4, 96:6
**America** [1] - 9:15
**amount** [55] - 5:12, 6:21, 7:11, 8:22, 15:15, 16:19, 18:10, 18:19, 19:1, 19:14, 19:15, 19:23, 20:14, 20:15, 20:16, 20:21, 20:22, 21:2, 22:7, 23:1, 28:10, 28:19, 28:20, 28:22, 29:2, 33:18, 39:14, 40:11, 40:17, 40:21, 41:4, 43:17, 44:1, 45:23, 47:8, 47:12, 47:14, 47:23, 48:4, 49:15, 49:20, 53:9, 53:19, 53:21, 53:25, 54:10, 70:25, 71:13, 71:14
**amounts** [3] - 31:4, 34:1, 71:18
**ample** [1] - 96:23
**Amy** [5] - 72:16, 73:15, 73:24, 77:22
**Andersonn** [1] - 73:15
**ankle** [12] - 81:18, 85:9, 87:11, 87:20, 88:4, 88:5, 88:22, 89:18, 89:22, 89:25,

90:22, 98:18
**ANSWER** [1] - 58:12
**answer** [2] - 27:15, 74:25
**Anti** [1] - 84:3
**anti** [22] - 55:9, 55:10, 55:20, 63:12, 67:7, 84:2, 84:7, 84:8, 84:18, 84:20, 86:12, 94:17, 94:18, 94:25, 95:15, 96:13, 96:14, 96:18, 96:21, 96:25, 97:2
**anti-climber** [16] - 55:9, 55:10, 63:12, 67:7, 84:2, 84:7, 84:8, 84:18, 84:20, 94:17, 94:18, 94:25, 95:15, 96:13, 96:25, 97:2
**Anti-climbers** [1] - 84:3
**anti-climbers** [2] - 55:20
**anti-slip** [4] - 86:12, 96:14, 96:18, 96:21
**antsy** [1] - 54:18
**anyway** [2] - 38:20, 91:20
**appear** [1] - 85:25
**applicable** [1] - 17:9
**applied** [1] - 71:17
**applies** [1] - 76:8
**apply** [14] - 11:14, 26:11, 26:14, 32:21, 34:6, 44:22, 48:7, 48:8, 50:2, 74:5, 76:8, 85:16, 97:12
**applying** [2] - 32:15, 48:14
**apportion** [12] - 16:17, 18:10, 23:16, 32:3, 32:4, 32:10, 32:20, 34:6, 41:8, 42:10, 42:11, 44:21
**apportioned** [1] - 18:15
**apportioning** [2] - 21:15, 32:14
**apportions** [2] - 11:13, 14:5
**appreciate** [2] - 71:11, 101:8
**appreciated** [1] - 67:16
**appropriate** [1] - 73:5
**approximate** [2] - 71:13, 71:14
**arbitrary** [1] - 63:2
**area** [5] - 84:11, 85:1, 86:22, 96:21, 97:5
**areas** [2] - 72:19, 84:3

**argue** [15] - 32:23, 33:3, 33:15, 33:17, 33:20, 34:13, 34:20, 34:25, 36:8, 36:9, 37:16, 38:23, 47:21, 50:10, 50:16
**argued** [2] - 27:3, 49:1
**arguing** [4] - 18:6, 39:21, 39:23, 40:3
**argument** [6] - 10:16, 58:16, 61:19, 62:1, 63:1, 78:15
**arguments** [2] - 74:18, 78:21
**arises** [1] - 30:23
**Arleo** [1] - 96:7
**arm** [2] - 83:12, 83:13
**arrives** [1] - 93:13
**artfully** [1] - 35:12
**arthritis** [2] - 90:21, 90:22
**articulate** [1] - 47:7
**articulating** [1] - 31:24
**aside** [1] - 47:21
**assert** [1] - 25:6
**asserting** [1] - 19:9
**assigned** [1] - 93:7
**assume** [5] - 10:6, 17:23, 23:4, 36:4, 38:3
**Assuming** [1] - 68:11
**assuming** [4] - 23:25, 47:11, 47:13, 53:15
**assumption** [1] - 17:19
**Astagne** [1] - 100:24
**attach** [1] - 19:22
**attempting** [2] - 81:15, 82:3
**attention** [3] - 99:8, 99:10, 99:13
**attorneys** [1] - 73:9
**Authority** [3] - 50:19, 75:23, 78:4
**authority** [1] - 6:3
**automatically** [1] - 34:5
**available** [1] - 55:13
**Avril** [2] - 100:24, 101:2
**award** [13] - 5:23, 7:1, 10:4, 12:21, 20:3, 21:20, 24:1, 24:18, 27:10, 35:15, 37:20, 39:1, 68:6
**awarded** [8] - 5:16, 13:9, 18:5, 23:1, 23:13, 23:18, 43:16, 70:24
**awarding** [3] - 10:10,

24:13, 68:14
**awards** [4] - 11:4, 11:13, 16:13, 22:22
**aware** [2] - 63:22, 64:8, 77:20

**B**

**balance** [2] - 48:24
**ball** [1] - 58:4
**ballast** [3] - 83:4, 83:6, 84:18
**bar** [5] - 95:12, 96:17, 97:7, 97:8, 97:14
**based** [3] - 7:23, 9:20, 38:4
**basis** [3] - 7:9, 64:22, 66:7
**bathroom** [1] - 78:11
**bears** [1] - 96:2
**become** [2] - 77:19, 99:7
**becomes** [2] - 22:8, 38:7
**beepers** [3] - 73:18, 73:19, 73:20
**beforehand** [8] - 58:18, 59:13, 59:22, 60:1, 62:3, 63:2, 64:2, 102:15
**began** [1] - 82:9
**begin** [8] - 72:7, 77:3, 79:8, 81:5, 93:16, 93:23, 99:20, 103:1
**beginning** [2] - 58:11, 82:10
**begins** [2] - 95:7, 95:17
**behavior** [3] - 92:14, 92:17, 99:10
**behind** [1] - 62:24
**below** [1] - 25:22
**best** [5] - 57:10, 63:11, 73:16, 90:15, 100:3
**better** [6] - 12:7, 22:3, 24:5, 57:9, 88:19, 90:2
**between** [6] - 8:22, 46:12, 55:9, 84:4, 85:15, 86:20
**beyond** [5] - 29:11, 76:6, 84:9, 96:4
**big** [1] - 34:11
**bigger** [1] - 6:7
**bill** [3] - 7:5, 19:15, 30:25
**bills** [122] - 5:12, 5:17, 6:1, 6:5, 6:13, 6:15, 6:19, 6:21, 7:3, 7:7,

7:13, 7:16, 7:18, 7:24, 8:2, 8:6, 8:13, 8:17, 8:19, 8:22, 8:23, 8:25, 9:4, 9:9, 9:10, 9:17, 9:19, 9:23, 10:1, 10:2, 10:6, 10:15, 10:18, 10:19, 10:21, 11:15, 11:20, 11:22, 11:24, 12:1, 13:2, 13:8, 13:21, 14:5, 15:4, 16:16, 17:18, 17:20, 17:23, 18:2, 18:4, 19:4, 20:1, 20:5, 20:25, 21:21, 22:4, 22:10, 22:11, 23:1, 23:6, 23:16, 23:17, 24:4, 24:9, 24:20, 25:2, 25:4, 25:6, 25:9, 25:13, 25:17, 25:18, 26:10, 26:11, 27:14, 27:19, 27:23, 29:20, 31:11, 31:13, 31:17, 31:21, 32:3, 32:14, 32:17, 32:18, 32:23, 33:11, 33:16, 33:18, 33:20, 33:21, 36:4, 36:23, 36:24, 37:19, 38:3, 38:4, 39:17, 39:20, 41:3, 41:7, 41:21, 42:6, 42:10, 42:20, 43:1, 45:9, 45:18, 46:23, 47:13, 47:16, 47:22, 48:1, 49:4, 49:16, 50:8, 71:8, 71:14
**bit** [8] - 36:7, 72:9, 72:16, 72:17, 72:22, 80:3, 93:17, 100:2
**blog** [1] - 77:16
**blogs** [1] - 76:21
**board** [1] - 84:3
**body** [3] - 37:9, 84:21, 87:3
**bone** [7] - 88:4, 88:15, 89:23, 90:22, 98:3
**bone-on-bone** [1] - 90:22
**books** [1] - 76:22
**bootstrap** [2] - 59:24, 65:19
**bounds** [1] - 16:23
**box** [2] - 69:9, 69:19
**break** [12] - 66:12, 72:6, 72:9, 72:22, 73:2, 78:10, 79:1, 79:18, 98:3, 103:5, 103:6
**breaking** [1] - 100:1
**breaks** [1] - 72:14
**brief** [1] - 15:23
**briefly** [1] - 82:20

**bring** [7] - 65:22, 67:4, 71:24, 79:19, 85:1, 89:6, 93:7
**bringing** [1] - 93:9
**brings** [1] - 50:1
**broke** [2] - 5:9, 87:21
**broken** [1] - 98:3
**brought** [3] - 5:5, 75:22, 85:13
**bumpers** [1] - 84:4
**burden** [2] - 96:2, 96:3
**Burlington** [1] - 15:24
**business** [1] - 38:2

**C**

**cab** [1] - 81:22
**calculate** [3] - 70:19, 70:21, 71:18
**calculator** [2] - 43:21, 43:22
**cameras** [1] - 73:18
**cannot** [6] - 36:25, 76:16, 76:17, 77:5, 98:16, 101:2
**car** [18] - 56:19, 58:5, 59:15, 60:12, 60:25, 61:2, 61:3, 61:10, 61:13, 61:14, 61:17, 63:4, 82:14, 83:15, 84:10, 86:1, 91:5, 97:22
**care** [4] - 53:21, 61:12, 61:18, 96:10
**careful** [1] - 35:8
**carefully** [3] - 8:4, 36:6, 86:25
**carelessness** [1] - 93:1
**cars** [42] - 55:20, 56:24, 57:3, 57:8, 59:9, 59:12, 59:16, 59:19, 59:21, 60:1, 60:8, 60:11, 60:24, 61:2, 61:3, 61:10, 61:20, 61:21, 62:9, 62:13, 62:14, 62:19, 62:20, 63:3, 63:6, 63:24, 64:8, 64:12, 64:24, 64:25, 81:21, 81:23, 81:25, 84:4, 85:23, 86:17, 86:18, 91:23, 97:12
**cartilage** [2] - 88:16
**case** [71] - 4:6, 7:19, 8:7, 9:5, 9:20, 10:2, 10:9, 15:15, 15:18, 18:13, 19:7, 21:2, 22:14, 26:20, 27:2, 29:21, 29:25, 30:21,

32:22, 34:17, 35:1, 43:15, 48:6, 49:13, 53:20, 55:8, 62:19, 65:7, 65:24, 66:7, 68:22, 69:23, 70:4, 75:6, 75:14, 75:20, 75:21, 76:1, 76:11, 76:14, 76:15, 76:16, 76:23, 77:1, 77:4, 77:5, 77:6, 77:7, 77:12, 77:13, 77:14, 78:8, 83:10, 83:22, 84:8, 85:13, 85:17, 85:18, 88:6, 90:24, 91:9, 91:12, 91:21, 92:11, 92:20, 92:21, 92:25, 100:7, 103:1
**case-in-chief** [3] - 35:1, 65:7, 65:24
**cases** [6] - 5:18, 19:6, 19:8, 26:19, 76:8, 76:9
**casual** [1] - 92:14
**caused** [6] - 68:10, 88:9, 92:2, 93:2, 95:22, 98:13
**causing** [1] - 85:20
**cell** [2] - 77:9, 77:15
**Cell** [1] - 73:18
**Center** [1] - 98:1
**Certain** [1] - 74:16
**certain** [4] - 28:10, 56:12, 61:16, 64:8
**certainly** [1] - 100:3
**certified** [1] - 82:12
**chance** [1] - 60:12
**change** [13] - 56:4, 56:11, 56:20, 58:4, 58:18, 58:19, 59:19, 59:21, 60:2, 60:12, 63:3, 65:3, 70:5
**changed** [22] - 56:5, 56:9, 56:12, 57:8, 59:13, 59:14, 59:16, 59:17, 60:11, 60:24, 61:1, 61:9, 61:11, 61:13, 61:14, 62:1, 62:21, 62:23, 63:3, 63:5, 92:3, 92:4
**charge** [1] - 7:2
**charged** [2] - 17:22, 91:18
**check** [2] - 53:25, 54:9
**chief** [3] - 35:1, 65:7, 65:24
**chiefly** [1] - 96:12
**chondral** [1] - 88:15
**Cindy** [1] - 80:25
**circle** [1] - 21:24
**Circuit** [2] - 16:2,

19:19
**circumstance** [2] - 17:9, 91:1
**circumstances** [2] - 21:9, 96:10
**circumstantial** [2] - 75:9, 75:11
**cite** [3] - 15:19, 57:20, 58:6
**cited** [1] - 15:23
**City** [1] - 98:1
**civil** [2] - 75:21, 76:9
**claim** [4] - 29:12, 34:17, 36:20, 37:15
**claimed** [1] - 29:23
**claiming** [1] - 96:12
**claims** [1] - 93:3
**Clark** [9] - 15:15, 15:18, 15:19, 15:24, 16:23, 17:8, 19:6, 29:25, 30:13
**class** [1] - 95:1
**classic** [2] - 62:19, 62:22
**clean** [1] - 21:16
**clear** [3] - 5:22, 14:3, 59:12
**clearances** [1] - 86:21
**clearly** [1] - 33:16
**clerk** [2] - 69:23, 80:25
**CLERK** [9] - 30:16, 30:18, 66:20, 67:2, 79:5, 80:10, 81:2, 100:11, 103:12
**client** [4] - 17:10, 61:22, 68:24, 81:15
**clients** [1] - 74:20
**climb** [9] - 83:1, 86:9, 94:3, 94:12, 94:22, 95:8, 96:23, 97:21, 97:23
**climber** [16] - 55:9, 55:10, 63:12, 67:7, 84:2, 84:7, 84:8, 84:18, 84:20, 94:17, 94:18, 94:25, 95:15, 96:13, 96:25, 97:2
**climbers** [3] - 55:20, 84:3
**climbing** [1] - 94:5
**close** [5] - 55:23, 80:17, 80:20, 95:15, 96:8
**close-up** [1] - 55:23
**closing** [2] - 66:5, 78:21
**coast** [1] - 86:20
**coffee** [1] - 79:19

**Cokes** [1] - 79:19
**Columbia** [1] - 89:17
**Columbia-Presbyterian** [1] - 89:17
**comfortable** [5] - 92:12, 92:13, 99:4, 99:6, 99:12
**coming** [2] - 21:23, 101:17
**commencing** [1] - 103:14
**communicate** [2] - 77:12, 77:14
**compensation** [1] - 8:19
**Compensation** [2] - 35:24, 36:3
**complete** [2] - 67:14, 73:8
**completed** [1] - 72:23
**completely** [3] - 22:2, 81:11, 92:5
**complex** [1] - 89:21
**complicated** [6] - 22:12, 24:8, 24:21, 26:5, 85:11, 89:3
**complication** [1] - 30:23
**component** [1] - 31:14
**components** [2] - 24:2, 24:19
**comprehensive** [1] - 26:13
**concern** [1] - 46:17
**concerned** [3] - 51:18, 89:10, 89:11
**conclude** [1] - 75:12
**condition** [4] - 88:2, 98:13, 98:19, 98:21
**conditions** [1] - 98:9
**conduct** [2] - 76:10, 76:14
**conductor** [6] - 81:25, 93:15, 93:20, 93:23, 97:19, 97:20
**confident** [1] - 99:14
**conform** [1] - 25:18
**confuse** [1] - 10:14
**confused** [2] - 53:10, 55:17
**confusing** [2] - 35:23, 68:16
**confusion** [1] - 71:20
**Congress** [1] - 85:14
**connected** [1] - 81:25
**conscientious** [2] - 67:22, 68:5
**consciousness** [1] - 68:13

**consequences** [1] - 92:17
**consider** [9] - 5:24, 8:12, 19:25, 20:5, 20:6, 36:4, 59:23, 75:14, 76:2
**consideration** [1] - 8:7
**considered** [2] - 74:17, 75:4
**consist** [2] - 74:12, 81:24
**contact** [1] - 94:15
**continue** [2] - 90:18, 90:25
**contract** [1] - 17:13
**contradict** [1] - 62:5
**contribution** [1] - 12:10
**control** [1] - 87:25
**conversely** [2] - 25:21, 33:12
**copies** [1] - 76:22
**corners** [1] - 76:12
**correct** [7] - 13:4, 18:16, 21:12, 23:14, 28:7, 70:19, 97:25
**corrected** [1] - 13:5
**costs** [2] - 11:8, 17:11
**counsel** [5] - 4:21, 6:17, 9:21, 27:13, 37:13, 38:21, 49:14, 67:8, 67:10, 70:23, 81:8, 91:14, 92:8, 100:19, 101:4
**Counsel** [1] - 61:24
**couple** [4] - 87:8, 87:22, 95:21, 99:1
**course** [2] - 10:12, 74:8
**COURT** [241] - 4:1, 4:7, 4:9, 4:15, 4:22, 4:24, 5:3, 5:6, 6:11, 6:22, 7:8, 7:13, 7:22, 8:15, 8:18, 9:14, 9:18, 10:12, 10:24, 11:10, 11:17, 11:24, 12:3, 12:9, 12:12, 12:14, 12:17, 12:20, 13:4, 13:11, 13:13, 13:19, 13:23, 14:3, 14:8, 14:11, 14:20, 14:23, 15:1, 15:4, 15:10, 15:13, 15:18, 15:25, 16:4, 16:11, 16:15, 16:21, 16:25, 17:2, 17:5, 17:16, 18:22, 19:11, 20:4, 20:10, 21:12, 21:17, 22:17, 22:21, 23:9, 23:19, 23:24, 24:15, 24:17,

25:10, 25:14, 26:4, 26:13, 26:18, 26:25, 27:7, 27:12, 27:18, 28:14, 29:24, 30:4, 30:12, 30:14, 30:16, 30:18, 30:19, 30:21, 32:25, 33:3, 33:6, 34:10, 35:4, 35:7, 35:11, 35:20, 36:1, 36:22, 37:13, 37:23, 38:1, 38:7, 38:12, 38:21, 38:23, 39:9, 39:16, 39:21, 40:3, 40:14, 40:16, 40:19, 40:22, 40:24, 41:1, 41:5, 41:14, 41:20, 41:23, 41:25, 42:15, 42:19, 42:22, 42:25, 43:4, 43:8, 43:11, 43:14, 43:22, 43:25, 44:4, 44:8, 44:11, 44:15, 44:20, 45:2, 45:7, 45:15, 45:17, 45:24, 46:3, 46:9, 46:18, 47:6, 48:14, 48:19, 48:24, 51:7, 51:9, 51:14, 51:25, 52:5, 52:13, 52:18, 52:21, 54:3, 54:6, 54:13, 54:15, 54:17, 54:22, 55:1, 55:5, 55:17, 55:25, 56:7, 56:14, 56:22, 57:5, 57:17, 57:25, 58:7, 58:15, 58:23, 59:11, 60:4, 60:9, 60:18, 60:21, 61:5, 61:8, 61:19, 61:23, 62:11, 62:16, 63:14, 63:18, 64:2, 64:5, 64:19, 65:10, 65:17, 66:12, 66:18, 66:20, 67:2, 67:3, 67:10, 67:13, 68:3, 69:7, 69:19, 69:21, 69:25, 70:2, 70:7, 70:9, 70:14, 70:18, 70:22, 71:4, 71:10, 71:24, 72:3, 79:5, 79:7, 79:16, 79:24, 80:2, 80:10, 80:11, 80:16, 80:21, 81:2, 81:4, 92:7, 99:17, 100:11, 100:13, 100:17, 100:22, 101:1, 101:3, 101:8, 101:11, 101:14, 101:19, 102:1, 102:3, 102:7, 102:12, 102:14, 102:21, 103:1, 103:4, 103:12
  **Court** [13] - 11:3, 19:6, 27:6, 73:9, 74:6,

74:8, 74:14, 75:3, 77:21, 78:3, 78:22, 78:24, 101:9
  **court** [2] - 72:10, 72:22
  **Court's** [1] - 74:23
  **courthouse** [1] - 99:24
  **courtroom** [7] - 73:15, 73:21, 75:5, 75:7, 76:13, 76:24, 79:20
  **courts** [1] - 9:15
  **create** [1] - 26:14
  **credibility** [1] - 75:19
  **credit** [2] - 48:16, 49:18
  **crew** [1] - 43:23
  **criminal** [1] - 76:8
  **cross** [2] - 78:18, 78:19
  **cross-examine** [2] - 78:18, 78:19
  **crossed** [1] - 69:24
  **cure** [1] - 36:1
  **cut** [5] - 14:15, 18:8, 18:9, 53:4, 89:22
  **cuts** [4] - 33:6, 36:10, 36:22, 53:24

# D

  **damage** [1] - 30:10
  **damages** [11] - 10:4, 18:20, 19:1, 24:3, 31:4, 31:14, 32:10, 47:9, 50:7, 85:21
  **damaging** [1] - 59:3
  **dangerous** [1] - 91:25
  **date** [4] - 24:10, 45:20, 95:20, 97:25
  **days** [5] - 72:12, 72:14, 87:12, 87:22, 99:1
  **deal** [5] - 11:22, 18:23, 65:25, 87:19, 102:14
  **dealing** [3] - 36:16, 55:3, 101:7
  **decide** [5] - 24:12, 31:15, 75:6, 75:16, 76:11
  **decided** [1] - 86:16
  **decides** [2] - 88:1, 95:11
  **decision** [17] - 55:15, 56:4, 56:8, 56:11, 56:20, 57:15, 57:17, 57:22, 58:1, 58:2, 58:3,

58:18, 58:25, 59:4, 59:18, 59:21, 60:11
  **defect** [1] - 89:23
  **Defendant** [16] - 10:25, 12:14, 12:19, 12:20, 12:21, 13:2, 13:3, 13:8, 17:16, 23:5, 30:24, 65:14, 65:15, 75:22, 75:23, 78:18
  **defense** [3] - 4:10, 18:6, 78:17
  **degrees** [2] - 91:4, 91:5
  **delay** [1] - 80:3
  **deliberate** [3] - 76:25, 77:3, 78:23
  **deliberating** [1] - 78:6
  **deliberative** [1] - 10:8
  **delivering** [1] - 91:24
  **demonstrate** [2] - 66:7, 97:17
  **demonstrated** [1] - 95:1
  **demonstratives** [1] - 79:9
  **Dennis** [1] - 100:24
  **deny** [1] - 98:16
  **denying** [1] - 71:21
  **department** [1] - 89:5
  **deposed** [1] - 62:8
  **deposition** [3] - 57:1, 58:8, 62:5
  **depth** [1] - 96:7
  **deputy** [1] - 73:15
  **deserve** [1] - 99:9
  **design** [3] - 57:9, 57:10, 82:14
  **detached** [1] - 88:17
  **detail** [1] - 83:20
  **determine** [1] - 47:25
  **determines** [1] - 47:24
  **determining** [2] - 75:19, 75:25
  **develop** [3] - 66:3, 98:9, 98:10
  **device** [2] - 76:22, 86:15
  **diamond** [6] - 84:10, 94:20, 94:23, 95:16, 96:24, 97:5
  **dictates** [1] - 72:18
  **dictionaries** [1] - 76:20
  **Diet** [1] - 79:19
  **difference** [2] - 46:12, 55:9
  **different** [10] - 17:18, 18:12, 19:12, 20:9, 22:13, 28:17, 56:22,

62:18, 63:1, 95:21
  **differently** [2] - 15:17, 24:24
  **DiGiulio** [16] - 4:3, 6:2, 6:6, 7:10, 7:15, 18:16, 19:5, 30:3, 30:5, 30:13, 30:20, 50:24, 51:3, 51:10, 53:2, 55:22
  **diminished** [1] - 15:16
  **dip** [1] - 19:10
  **dipping** [1] - 19:11
  **direct** [3] - 75:8, 75:9
  **disable** [1] - 90:23
  **disagree** [1] - 29:18
  **discretion** [1] - 22:2
  **discuss** [2] - 77:1, 77:5
  **discussing** [1] - 77:4
  **discussion** [1] - 55:4
  **disputed** [2] - 9:4, 9:5
  **disputes** [1] - 11:1
  **disregard** [1] - 75:4
  **disregarded** [1] - 75:6
  **disruptive** [1] - 73:24
  **dissecans** [3] - 98:5, 98:8, 98:12
  **doctor** [23] - 6:15, 7:4, 87:12, 87:15, 87:16, 87:23, 87:24, 87:25, 88:1, 88:11, 88:12, 88:18, 88:25, 89:1, 89:6, 89:8, 89:9, 89:11, 89:16, 102:2, 102:3, 102:4
  **doctors** [6] - 87:17, 87:18, 87:19, 88:7
  **documents** [1] - 74:12
  **dollar** [2] - 16:24
  **dollar-for-dollar** [1] - 16:24
  **dollars** [3] - 22:16, 33:20, 46:15
  **dominant** [1] - 83:12
  **done** [11] - 16:12, 35:14, 54:20, 57:12, 58:5, 79:3, 80:5, 92:15, 93:2, 94:8, 95:7
  **door** [8] - 34:22, 35:1, 35:8, 37:2, 38:13, 50:12, 83:14
  **doors** [1] - 94:2
  **doorway** [2] - 83:14, 84:12
  **double** [6] - 19:10, 19:11, 40:4, 48:20, 49:21, 54:9
  **doubt** [1] - 76:7

**down** [6] - 84:20, 84:23, 85:7, 93:16, 93:18, 93:20
  **Dr** [7] - 89:16, 89:19, 90:5, 90:7, 90:20
  **drill** [1] - 88:21
  **drink** [1] - 78:11
  **drinks** [1] - 79:19
  **dropped** [1] - 58:4
  **due** [1] - 96:16
  **duly** [1] - 72:1
  **during** [7] - 43:17, 54:25, 66:4, 73:23, 74:8, 76:13, 95:4
  **duty** [3] - 52:1, 74:3, 98:22
  **dying** [1] - 88:17

# E

  **early** [1] - 72:18
  **earned** [2] - 39:6, 41:19
  **easier** [2] - 21:24, 45:2
  **easy** [2] - 25:5, 27:15
  **edge** [5] - 55:23, 84:8, 94:24, 96:13, 96:25
  **edited** [1] - 102:23
  **effect** [1] - 57:18
  **eight** [5] - 28:9, 28:11, 69:9, 69:15, 69:19
  **either** [9] - 6:7, 6:24, 7:15, 34:2, 65:7, 83:1, 85:7, 87:16, 101:22
  **elbow** [2] - 87:9, 87:10
  **electronic** [1] - 76:22
  **electronically** [1] - 77:12
  **email** [1] - 77:15
  **embryonic** [1] - 89:25
  **empaneled** [1] - 72:1
  **emphasize** [1] - 76:17
  **employed** [1] - 35:13
  **employee** [5] - 52:2, 58:24, 60:19, 60:20, 62:8
  **employees** [1] - 94:11
  **employers** [1] - 85:16
  **empty** [1] - 93:7
  **encountered** [1] - 57:16
  **encourage** [1] - 62:24
  **end** [23] - 7:19, 9:12, 14:22, 14:23, 15:8, 16:22, 18:21, 42:12,

43:19, 46:3, 54:12, 73:25, 75:14, 75:20, 77:7, 78:7, 85:17, 95:9, 96:16, 97:8, 97:9, 97:14, 99:1
**ended** [1] - 97:5
**ends** [2] - 21:8, 55:20
**engineer** [10] - 81:19, 81:23, 82:9, 82:12, 83:19, 86:8, 93:7, 93:12, 94:7, 98:22
**engineers** [5] - 81:20, 82:15, 91:11, 94:12, 94:22
**engineers'** [1] - 95:1
**enjoy** [1] - 100:9
**enter** [2] - 94:1, 95:1
**enters** [1] - 81:3
**entire** [6] - 37:4, 51:1, 81:24, 84:20, 95:16
**entirely** [1] - 95:24
**entirety** [1] - 5:15
**entities** [1] - 76:15
**entitled** [38] - 8:17, 8:19, 8:20, 9:9, 11:7, 16:24, 20:23, 21:20, 23:14, 23:15, 24:11, 24:18, 24:19, 25:9, 28:2, 28:3, 31:5, 32:18, 34:3, 35:3, 35:4, 35:5, 38:13, 38:16, 39:4, 39:7, 39:9, 45:10, 45:12, 45:22, 47:9, 47:15, 47:16, 48:4, 49:2, 50:11, 85:21
**entity** [1] - 68:10
**entry** [1] - 103:7
**equals** [1] - 37:11
**equipment** [2] - 62:25, 81:21
**error** [2] - 26:3, 35:24
**essentially** [3] - 29:7, 85:4, 98:6
**estimate** [2] - 71:6, 72:24
**event** [1] - 61:16
**eventually** [2] - 38:10, 93:24
**evidence** [57] - 6:10, 7:4, 7:17, 9:3, 9:24, 18:17, 20:19, 25:19, 25:20, 25:25, 58:17, 59:6, 59:7, 60:5, 60:7, 60:9, 60:10, 60:19, 63:14, 63:19, 63:21, 64:6, 65:20, 65:22, 66:2, 68:11, 74:4, 74:11, 74:16, 74:19, 74:21, 75:1, 75:5, 75:7, 75:8, 75:9, 75:11,

75:15, 76:1, 76:4, 76:12, 78:5, 78:14, 78:16, 78:20, 78:22, 96:4, 96:19, 97:3, 97:11, 97:13, 97:16, 98:7, 98:11
**Evidence** [1] - 74:22
**evidential** [1] - 56:16
**exact** [2] - 40:13, 53:8
**exactly** [7] - 21:2, 23:18, 26:2, 27:2, 49:15, 63:21, 86:24
**examine** [2] - 78:18, 78:19
**examining** [1] - 15:21
**example** [3] - 16:7, 17:12, 37:9
**except** [1] - 9:8
**exception** [1] - 72:21
**excluded** [1] - 75:3
**excluding** [1] - 34:2
**exclusive** [1] - 71:4
**excuse** [1] - 69:14
**excuses** [1] - 69:8
**execute** [1] - 59:5
**executive** [2] - 58:24
**exercise** [2] - 69:15, 96:10
**exert** [3] - 17:21, 18:10, 23:10
**exhibit** [1] - 59:24
**exhibits** [4] - 74:13, 76:4, 79:8, 102:20
**exist** [3] - 39:17, 75:12, 92:1
**existing** [1] - 98:13
**exists** [1] - 18:14
**exits** [2] - 79:6, 100:12
**expect** [2] - 77:19, 101:11
**expected** [1] - 69:5
**expenses** [9] - 16:8, 24:14, 26:21, 26:22, 26:23, 30:7, 34:1, 70:13, 70:16
**experience** [1] - 73:12
**expert** [4] - 57:8, 86:8, 91:16, 101:17
**explain** [5] - 6:15, 9:22, 16:10, 50:19, 82:20
**explained** [2] - 93:17, 96:22
**express** [1] - 73:8
**extensive** [1] - 94:11
**extent** [2] - 7:19, 73:11
**extinguish** [1] - 18:4

**extinguished** [2] - 15:6, 39:18
**extinguishes** [1] - 22:11
**extra** [1] - 46:14
**extraordinary** [1] - 69:4
**eyewitness** [1] - 75:10

**F**

**F.2d** [1] - 16:3
**face** [4] - 9:14, 94:3, 94:5, 94:22
**Facebook** [1] - 77:16
**facilities** [1] - 86:19
**facility** [2] - 81:14, 82:17
**fact** [8] - 9:8, 18:19, 61:14, 62:23, 75:10, 75:25, 86:9, 86:10
**factor** [1] - 8:12
**facts** [7] - 74:3, 74:5, 74:11, 74:13, 75:11, 75:12
**failed** [1] - 59:5
**failure** [1] - 96:9
**fair** [14] - 10:14, 17:24, 19:23, 28:7, 33:7, 33:8, 33:23, 34:23, 36:21, 42:24, 42:25, 67:23, 68:17, 99:14
**fairest** [1] - 34:4
**fairly** [1] - 82:5
**fairness** [1] - 77:24
**faith** [2] - 64:22, 66:7
**faith-basis** [1] - 66:7
**fall** [9] - 92:23, 93:3, 93:4, 95:22, 97:23, 97:25, 98:10, 98:14, 99:10
**falling** [1] - 87:13
**falls** [1] - 95:18
**family** [2] - 77:8, 77:13
**far** [2] - 80:2, 103:6
**fashion** [1] - 56:12
**father** [1] - 87:5
**fault** [20] - 12:15, 12:18, 12:21, 18:11, 18:14, 24:2, 24:23, 32:10, 32:14, 32:20, 34:6, 42:10, 42:11, 44:21, 46:22, 48:5, 49:7, 49:8, 68:9
**favor** [1] - 11:13
**Federal** [1] - 78:24

**feet** [5] - 84:13, 84:14, 84:18, 87:2, 93:22
**fell** [4] - 81:17, 85:7, 92:22, 96:6
**fellow** [2] - 77:1, 77:4
**few** [8] - 8:25, 63:13, 63:20, 72:6, 76:10, 79:17, 79:18, 80:7
**fifty** [1] - 13:22
**fight** [1] - 26:8
**fighting** [1] - 19:12
**figure** [6] - 8:9, 28:24, 34:12, 47:3, 47:4, 52:13
**figured** [1] - 5:1
**filed** [1] - 75:24
**fill** [1] - 22:5
**final** [1] - 65:24
**fine** [7] - 4:18, 5:6, 23:22, 57:9, 70:6, 79:20, 80:23
**fingertips** [1] - 76:18
**finish** [6] - 11:2, 25:16, 37:2, 62:11, 64:5
**finished** [2] - 69:13, 82:10
**first** [13] - 31:10, 49:25, 51:21, 52:18, 52:21, 54:7, 56:23, 64:15, 85:3, 87:20, 89:12, 96:13, 102:23
**five** [10] - 14:1, 14:22, 16:20, 16:22, 30:14, 42:13, 44:13, 81:12, 82:11, 83:6
**fix** [1] - 25:14
**fixed** [1] - 9:6
**flexibility** [1] - 100:3
**focus** [2] - 99:10, 99:13
**foder** [1] - 93:20
**Foder** [69] - 4:5, 20:14, 20:16, 28:22, 35:2, 37:1, 39:14, 40:17, 51:7, 52:2, 55:10, 57:1, 58:8, 60:14, 60:16, 60:20, 62:4, 63:9, 63:20, 75:21, 78:3, 81:15, 81:19, 81:23, 82:2, 82:8, 82:15, 82:21, 83:3, 85:2, 86:13, 87:4, 87:15, 88:8, 88:11, 90:9, 91:17, 92:1, 92:21, 93:6, 93:11, 93:15, 93:22, 94:7, 95:2, 95:4, 95:6, 95:9, 95:17, 95:19, 95:21, 96:2, 96:6, 96:11, 96:22, 97:3, 97:20, 97:21, 97:22, 98:1,

98:10, 98:15, 99:6, 99:9, 101:15, 101:20, 101:23
**Foder's** [5] - 85:20, 92:25, 97:24, 98:13, 98:18
**folks** [1] - 57:11
**follow** [7] - 36:5, 47:6, 68:17, 74:6, 75:2, 77:3, 78:16
**followed** [1] - 97:3
**foot** [26] - 83:3, 83:4, 83:11, 83:24, 84:1, 84:11, 84:13, 84:14, 84:16, 84:20, 84:22, 84:23, 84:24, 85:1, 85:3, 85:6, 87:2, 89:18, 94:16, 94:23, 94:24, 95:9, 95:16, 96:24, 97:4
**forget** [1] - 85:16
**form** [1] - 78:5
**forth** [1] - 93:11
**forward** [4] - 27:21, 37:5, 73:4, 87:7
**four** [6] - 28:9, 28:11, 76:12, 80:5, 84:18, 87:2
**frame** [1] - 39:1
**frankly** [2] - 12:6, 36:17
**free** [3] - 51:20, 52:4, 52:19
**Friday** [2] - 72:25, 99:2
**friends** [2] - 77:8, 77:14
**front** [7] - 7:21, 18:18, 67:14, 67:16, 81:22, 94:12, 95:8
**full** [25] - 16:19, 20:17, 21:23, 28:8, 28:14, 28:19, 29:21, 40:9, 40:11, 40:17, 42:8, 42:9, 45:22, 47:8, 47:12, 48:8, 48:9, 49:18, 71:1, 71:6, 72:12, 98:22, 99:9
**full-time** [1] - 42:8
**fully** [5] - 11:1, 17:7, 38:8, 38:14, 38:15
**functional** [1] - 97:15
**functions** [1] - 27:21
**funky** [1] - 46:19

**G**

**game** [2] - 86:2, 96:15
**general** [4] - 46:2, 62:13, 68:20, 72:19
**generally** [2] - 95:19,

95:20

**genetically** [1] - 88:6
**gentlemen** [15] - 5:7, 29:24, 54:17, 67:4, 79:7, 81:5, 81:10, 82:13, 82:19, 84:3, 85:13, 91:21, 92:9, 92:24, 99:18
**given** [8] - 25:6, 47:17, 47:23, 71:12, 72:24, 95:4, 96:23, 97:4
**gloves** [6] - 91:9, 91:11, 91:15, 95:5, 95:10, 95:11
**goal** [1] - 99:23
**good-faith** [1] - 64:22
**goodbye** [1] - 49:9
**Google** [1] - 77:16
**governed** [1] - 85:18
**governing** [1] - 97:2
**Government** [1] - 54:1
**grab** [7] - 83:13, 85:5, 95:12, 96:16, 97:7, 97:8, 97:14
**grabbing** [1] - 84:16
**grabs** [1] - 95:11
**graft** [2] - 89:25
**grant** [1] - 25:18
**gratitude** [2] - 73:8, 73:9
**great** [4] - 4:1, 10:21, 89:7, 103:9
**Greisberg** [7] - 89:16, 89:19, 90:5, 90:7, 90:20
**grip** [7] - 58:10, 62:20, 63:12, 64:9, 66:10, 95:5, 97:2
**gross** [1] - 51:3, 51:4, 54:4
**ground** [2] - 85:9, 93:21
**group** [1] - 72:15
**grow** [1] - 90:1
**guess** [7] - 20:15, 21:13, 24:16, 38:22, 48:22, 53:10, 56:17
**guidance** [1] - 75:19
**guy** [4] - 19:10, 58:22, 58:23, 90:25
**guys** [5] - 51:2, 51:5, 57:5, 66:19, 80:7, 80:23, 100:13, 103:8, 103:9

## H

**half** [17] - 14:15, 14:22, 14:25, 15:5,

18:8, 18:9, 20:17, 20:21, 28:12, 28:19, 29:2, 29:6, 32:5, 33:19, 43:17, 81:12, 88:24
**hand** [2] - 8:11, 33:17
**handhold** [1] - 86:6
**handholds** [2] - 86:3, 86:4
**handle** [1] - 72:11
**handrail** [1] - 83:24
**hands** [3] - 83:25, 85:6, 95:11
**happenstance** [1] - 55:11
**happy** [1] - 54:8
**hard** [4] - 36:8, 76:22, 77:2, 82:22
**harm** [1] - 24:8
**harmful** [1] - 50:18
**hear** [31] - 16:25, 19:14, 26:18, 27:13, 36:24, 38:5, 38:8, 38:9, 38:10, 59:11, 60:21, 62:17, 75:5, 82:3, 85:23, 86:7, 86:23, 88:7, 90:16, 90:17, 91:16, 91:17, 94:6, 94:10, 94:14, 94:21, 94:25, 95:3, 98:17, 98:21, 101:14
**heard** [7] - 6:17, 9:21, 69:13, 76:6, 89:5, 93:5, 96:11
**hearing** [6] - 27:25, 56:23, 57:20, 83:16, 83:17, 83:18
**hears** [1] - 36:11
**hello** [1] - 67:3
**help** [2] - 78:16, 95:5
**helped** [1] - 91:20
**Herald** [2] - 91:7, 91:8
**Herald-Tribune** [2] - 91:7, 91:8
**hesitate** [1] - 73:14
**high** [2] - 8:23, 84:19
**higher** [1] - 52:16
**highly** [1] - 65:1
**himself** [3] - 95:2, 95:5, 95:17
**hired** [1] - 82:8
**history** [1] - 91:4
**hold** [2] - 73:24, 83:23
**holding** [2] - 83:25, 85:5
**Home** [1] - 91:7
**home** [3] - 73:5, 79:23, 91:6
**Honor** [32] - 4:3, 4:8, 4:11, 4:14, 4:19, 6:6,

8:14, 15:8, 18:16, 30:3, 51:18, 53:3, 54:14, 54:20, 55:2, 55:22, 56:18, 59:25, 65:6, 67:6, 67:12, 69:18, 69:22, 70:8, 71:23, 80:12, 80:13, 80:14, 81:9, 100:15, 101:6, 103:11
**hope** [3] - 78:8, 81:10, 99:25
**hopeful** [1] - 101:16
**hopefully** [7] - 72:5, 72:20, 72:25, 80:5, 88:19, 90:1, 99:2
**Hospital** [1] - 89:17
**hospital** [1] - 87:20
**hot** [1] - 95:10
**hottest** [1] - 91:3
**hourly** [2] - 34:14, 34:15
**hours** [1] - 35:14
**huge** [1] - 8:25
**humanly** [1] - 73:11
**hundred** [26] - 13:7, 13:10, 17:13, 17:17, 17:19, 17:20, 17:24, 21:16, 22:14, 22:15, 23:4, 23:13, 31:9, 31:20, 41:16, 42:6, 42:17, 42:19, 44:12, 44:17, 46:6, 46:13, 46:24, 47:4, 91:4
**hundreds** [2] - 92:15, 93:2, 94:9, 95:7
**hurt** [3] - 57:16, 87:9, 92:1
**husband** [1] - 13:11
**hypothetical** [4] - 11:19, 31:7, 32:1, 42:4
**hypothetically** [2] - 37:5, 42:20

## I

**idea** [4] - 81:20, 83:20, 84:5, 95:23
**identified** [1] - 96:21
**ignore** [1] - 74:24
**imagine** [2] - 11:11, 17:25
**immediately** [1] - 58:3
**impeach** [4] - 57:11, 65:20, 65:21, 65:22
**impeachment** [2] - 56:16, 65:19
**implemented** [1] - 60:15

**implementing** [1] - 59:22
**importance** [1] - 94:14
**important** [3] - 63:18, 77:2, 96:1
**imposed** [1] - 13:7
**improper** [2] - 65:2, 74:22
**in-depth** [1] - 96:7
**inattentive** [1] - 99:7
**inattentiveness** [2] - 92:14, 93:1
**inches** [1] - 83:6, 84:9, 94:20
**incident** [17] - 56:3, 56:21, 59:9, 63:23, 63:25, 64:1, 64:11, 81:13, 81:14, 82:5, 82:11, 82:16, 82:19, 87:5, 88:9, 90:10, 91:3
**inclined** [4] - 24:7, 67:21, 67:25, 68:18
**include** [6] - 8:5, 10:6, 42:23, 46:23, 46:24, 71:3
**includes** [2] - 76:19, 77:13
**including** [1] - 71:1
**income** [1] - 29:1
**independent** [3] - 18:14, 76:14, 76:17
**indicate** [1] - 74:9
**indicating** [1] - 74:10
**individuals** [1] - 76:15
**infer** [1] - 75:12
**influence** [4] - 9:25, 10:22, 37:20, 37:23
**influenced** [1] - 74:23
**inform** [1] - 77:19
**information** [4] - 75:13, 76:18, 76:23, 76:24
**injured** [4] - 35:15, 40:18, 68:8, 85:9
**injuries** [1] - 85:21, 87:8, 87:20, 93:3
**injury** [12] - 52:1, 52:3, 52:11, 68:10, 68:12, 75:24, 81:17, 85:10, 85:11, 92:2, 97:24
**inside** [1] - 82:17
**inspector** [1] - 97:22
**instead** [1] - 91:25
**instruct** [4] - 8:4, 10:4, 10:5, 36:3
**instructed** [5] - 20:5, 24:25, 75:1, 76:2, 94:23

**instruction** [4] - 18:24, 36:2, 75:2, 77:2
**instructions** [8] - 25:1, 36:6, 68:17, 73:19, 74:2, 77:20, 78:23, 96:8
**instructs** [1] - 74:15
**intended** [1] - 74:9
**intends** [1] - 78:15
**interchangeable** [1] - 98:6
**interesting** [3] - 52:5, 78:9, 86:23
**intern** [1] - 4:13
**Internet** [2] - 76:19, 77:10
**internet** [1] - 76:20
**interpret** [1] - 78:21
**introduce** [5] - 60:23, 65:11, 65:12, 68:21, 68:24
**introducing** [1] - 9:24
**invading** [1] - 80:18
**invite** [1] - 26:2
**IOD** [4] - 51:22, 51:23, 52:1, 52:11
**iPhone** [4] - 43:23, 76:21, 77:15
**iPhones** [1] - 77:10
**irrelevant** [2] - 19:7, 35:20
**issue** [34] - 5:10, 5:14, 6:8, 9:20, 9:21, 10:2, 19:7, 19:12, 19:19, 22:6, 22:8, 26:17, 27:25, 29:25, 34:8, 34:10, 36:16, 37:12, 37:18, 38:7, 51:25, 54:15, 54:21, 54:22, 55:2, 55:6, 55:7, 56:3, 56:17, 56:22, 66:11, 77:22, 88:16, 91:9
**issues** [6] - 5:8, 70:12, 90:15, 90:16, 100:17, 102:8
**item** [1] - 75:1
**itself** [1] - 88:17

## J

**jeopardizes** [1] - 77:24
**Jersey** [3] - 86:20, 91:4, 98:1
**job** [5] - 4:1, 90:14, 99:7, 100:13, 103:9
**jobs** [1] - 87:8
**joint** [1] - 70:4

**Journal** [4] - 81:13, 90:11, 93:13, 93:15
**Judge** [3] - 49:17, 85:16, 96:7
**judge** [2] - 68:18, 74:5
**July** [7] - 81:12, 85:2, 93:6, 94:8, 95:6, 96:13, 98:11
**jump** [1] - 20:12
**juror** [2] - 77:23, 99:4
**juror's** [1] - 77:20
**jurors** [10] - 36:5, 69:3, 69:18, 76:10, 76:11, 77:1, 77:4, 78:2, 99:7
**jury** [131] - 4:20, 5:1, 5:23, 6:25, 7:2, 7:9, 7:21, 8:3, 8:4, 8:8, 9:16, 9:19, 9:25, 10:4, 10:14, 10:17, 10:21, 11:4, 11:13, 11:25, 12:3, 12:23, 13:13, 14:4, 14:5, 16:13, 17:19, 17:22, 18:8, 18:18, 19:2, 19:14, 19:20, 19:24, 19:25, 20:4, 20:7, 20:25, 21:24, 22:22, 23:1, 23:4, 23:18, 24:4, 24:12, 24:13, 24:22, 25:3, 25:17, 25:21, 26:9, 27:10, 30:7, 31:1, 31:12, 31:15, 31:18, 32:11, 32:23, 33:9, 33:13, 33:22, 34:15, 34:20, 35:17, 35:19, 35:21, 35:23, 35:25, 36:1, 36:2, 36:9, 36:11, 36:24, 38:2, 38:3, 38:24, 39:15, 39:18, 40:4, 40:7, 41:4, 42:3, 47:10, 47:11, 47:13, 47:14, 47:17, 47:19, 47:22, 47:24, 48:25, 49:2, 49:18, 49:22, 50:16, 50:20, 54:18, 55:3, 55:8, 66:13, 67:5, 67:16, 67:18, 69:1, 69:17, 70:12, 70:24, 71:16, 71:18, 71:24, 72:1, 72:12, 79:5, 79:6, 80:9, 80:17, 81:2, 81:3, 92:10, 92:24, 99:18, 100:12, 102:22
**Jury** [1] - 72:2
**jury's** [4] - 7:24, 10:10, 24:25, 37:20
**justice** [1] - 68:7
**Justin** [1] - 89:16

**K**

**Kawasaki** [1] - 91:24
**keep** [3] - 66:18, 75:14, 78:6
**Ken** [1] - 100:24
**kind** [1] - 22:19
**kinds** [1] - 75:15
**knowledge** [4] - 60:18, 60:22, 60:24, 61:1

**L**

**lack** [2] - 58:10, 97:1
**ladder** [1] - 86:3
**ladies** [10] - 81:5, 81:10, 82:13, 82:18, 84:3, 85:13, 91:21, 92:9, 92:24, 99:18
**language** [10] - 5:20, 8:7, 22:1, 26:5, 26:6, 26:7, 26:16, 27:19, 33:25, 60:16
**last** [5] - 4:1, 29:17, 51:23, 69:5, 98:19
**latest** [1] - 73:1
**Laughter** [1] - 4:17
**law** [10] - 4:12, 8:16, 8:21, 18:24, 30:9, 74:6, 74:7, 80:25, 85:18, 85:19
**lawsuit** [3] - 75:22, 75:23, 75:24
**lawyer** [1] - 10:25
**lawyers** [9] - 31:16, 69:3, 72:24, 74:14, 74:18, 74:20, 76:15, 78:3, 81:1
**lax** [2] - 92:17, 99:10
**laying** [1] - 36:18
**least** [1] - 35:10
**leave** [4] - 13:23, 73:22, 99:24, 100:6
**leaves** [1] - 16:18
**Ledger** [1] - 91:8
**left** [13] - 5:9, 16:20, 23:18, 23:19, 49:11, 56:8, 83:4, 83:25, 84:1, 84:17, 87:2, 93:19, 95:14
**leg** [7] - 84:17, 84:19, 84:20, 85:9, 88:17, 88:21, 95:14
**legally** [1] - 52:10
**lesion** [4] - 88:2, 88:8, 88:14, 98:12
**lesions** [2] - 98:5,

98:8
**less** [3] - 46:8, 54:3, 94:19
**letting** [1] - 36:9
**level** [8] - 81:16, 82:16, 84:18, 86:21, 90:11, 93:16, 93:17, 93:23
**liability** [25] - 11:12, 13:7, 14:6, 15:16, 16:7, 16:17, 17:24, 21:22, 22:14, 23:5, 31:9, 31:20, 32:2, 32:4, 41:8, 42:5, 42:18, 43:18, 44:16, 44:18, 46:5, 46:7, 46:8, 50:1
**liable** [2] - 17:17, 45:4
**lien** [78] - 5:22, 6:10, 7:23, 11:5, 12:22, 13:14, 14:12, 15:2, 15:6, 16:19, 17:21, 18:3, 18:7, 18:9, 18:10, 18:14, 18:18, 18:20, 18:25, 19:1, 19:9, 19:13, 19:22, 20:24, 21:1, 21:2, 22:7, 22:11, 22:13, 22:24, 22:25, 23:10, 25:7, 25:9, 26:4, 26:9, 26:10, 26:15, 27:16, 27:21, 27:23, 28:22, 29:10, 30:6, 30:25, 31:22, 32:6, 32:15, 32:21, 34:7, 37:2, 39:18, 40:10, 40:23, 41:9, 42:24, 43:5, 43:6, 43:7, 43:8, 44:5, 44:11, 44:22, 48:7, 48:8, 48:15, 49:15, 49:16, 49:24, 50:2, 70:19, 70:21, 80:21
**liens** [6] - 5:25, 13:7, 20:13, 42:11, 49:13, 71:17
**life** [5] - 87:6, 90:19, 91:1, 92:3, 92:4
**lift** [3] - 84:17, 84:19
**light** [2] - 15:14, 70:23
**likely** [1] - 96:5
**limine** [1] - 15:23
**limines** [2] - 56:14, 57:7
**limited** [1] - 75:2
**line** [10] - 10:18, 12:24, 24:22, 26:9, 26:22, 31:18, 37:11, 37:14, 49:3, 57:25
**lines** [1] - 33:8, 37:21, 58:8

**lingering** [1] - 90:15
**LinkedIn** [1] - 77:16
**list** [1] - 74:17
**listen** [2] - 59:11, 86:25
**literally** [1] - 89:22
**live** [1] - 76:18
**locomotives** [1] - 81:22
**logical** [4] - 8:21, 50:3, 72:14, 99:25
**look** [10] - 24:24, 29:24, 30:15, 50:11, 57:2, 76:20, 87:21, 88:18, 91:15, 100:8
**looked** [8] - 5:18, 5:19, 30:21, 58:22, 58:23, 64:24, 64:25
**looking** [4] - 22:13, 39:7, 58:13, 88:12
**looks** [2] - 84:7, 86:1
**lost** [33] - 5:13, 6:5, 7:11, 8:6, 11:15, 20:15, 20:19, 24:20, 28:4, 28:21, 29:1, 29:7, 29:13, 29:23, 32:18, 34:1, 35:5, 37:10, 37:15, 37:17, 37:25, 41:7, 41:8, 41:17, 47:15, 48:12, 49:2, 49:16, 69:24, 70:12, 70:16, 70:25
**loud** [1] - 59:11
**loved** [1] - 77:8
**lunch** [1] - 54:19, 54:23, 103:5
**luncheon** [1] - 66:21

**M**

**maintaining** [1] - 94:15
**major** [1] - 92:2
**mandates** [1] - 96:21
**Manhattan** [1] - 89:17
**map** [1] - 59:6
**match** [1] - 21:2
**materials** [1] - 76:20
**math** [2] - 42:15, 45:7
**mathematically** [1] - 41:12
**matter** [14] - 31:1, 34:21, 41:5, 41:6, 41:15, 41:23, 41:24, 41:25, 42:3, 49:13, 50:4, 51:14, 73:10, 103:13
**matters** [2] - 75:13, 76:14

**Maxwell** [1] - 65:8
**mean** [18] - 6:2, 6:23, 13:20, 14:14, 17:5, 20:8, 24:17, 35:21, 36:2, 36:19, 39:4, 47:5, 48:22, 49:7, 60:21, 73:7, 93:18, 93:19
**meaning** [3] - 45:18, 82:4, 93:10
**means** [7] - 18:9, 76:13, 81:24, 88:15, 93:20, 96:5, 96:8
**measure** [4] - 56:1, 56:3, 59:15, 59:18
**measures** [1] - 56:15
**media** [1] - 77:18
**medical** [75] - 5:12, 5:17, 5:25, 6:4, 6:10, 6:13, 6:14, 6:19, 6:21, 7:13, 7:16, 7:18, 7:24, 8:2, 8:5, 8:13, 8:17, 8:19, 8:22, 8:23, 8:25, 9:4, 9:9, 9:10, 9:17, 9:19, 10:1, 10:2, 10:6, 10:11, 10:15, 10:17, 10:19, 10:21, 11:7, 11:15, 11:20, 11:22, 11:24, 11:25, 12:22, 13:2, 13:6, 13:8, 13:14, 13:21, 13:22, 14:5, 14:12, 14:25, 15:2, 15:4, 15:6, 16:8, 16:15, 16:16, 17:4, 17:5, 17:6, 17:11, 17:18, 17:20, 17:23, 18:2, 18:4, 18:13, 18:18, 19:4, 19:15, 20:1, 20:5, 20:25, 21:3, 21:8, 23:16, 23:17, 24:4, 24:9, 24:13, 24:20, 25:2, 25:4, 25:6, 25:9, 25:13, 25:16, 25:18, 26:10, 26:11, 26:21, 26:22, 26:23, 27:14, 27:18, 27:23, 29:20, 30:6, 30:7, 30:24, 31:11, 31:13, 31:17, 31:21, 32:3, 32:13, 32:17, 32:18, 32:23, 33:11, 33:16, 33:18, 33:20, 33:21, 34:1, 35:18, 36:4, 36:23, 36:24, 37:19, 38:3, 38:4, 39:17, 39:19, 41:3, 41:7, 41:9, 41:21, 42:6, 42:9, 42:19, 42:20, 43:1, 43:6, 45:9, 45:18, 46:23, 47:12,

47:16, 47:22, 47:25, 49:3, 49:14, 50:8, 70:13, 70:16, 71:6, 71:8, 71:14, 87:14, 89:5
**Medical** [2] - 89:4, 98:1
**medicals** [3] - 27:3, 35:20, 48:9
**meet** [2] - 4:8, 103:8
**members** [1] - 77:8
**memory** [1] - 63:11
**mention** [1] - 91:2
**mentioned** [3] - 77:18, 85:18, 98:2
**messaging** [1] - 77:15
**middle** [1] - 83:14
**might** [2] - 89:2, 92:14
**million** [1] - 33:20
**mind** [3] - 75:14, 76:9, 78:6
**minds** [1] - 89:13
**MINO** [135] - 4:11, 4:18, 6:20, 7:6, 11:23, 12:2, 12:6, 12:10, 12:13, 12:16, 13:10, 13:12, 15:8, 15:11, 15:14, 15:19, 16:1, 16:6, 16:12, 16:16, 16:22, 17:1, 20:12, 21:13, 22:15, 22:20, 23:8, 23:11, 23:22, 24:13, 24:16, 25:8, 25:12, 26:2, 26:12, 26:16, 27:2, 27:10, 27:17, 28:3, 28:10, 28:18, 29:1, 29:5, 29:9, 29:14, 29:17, 29:23, 33:5, 37:14, 37:25, 38:6, 38:22, 39:13, 40:1, 40:10, 40:15, 40:17, 40:20, 40:23, 40:25, 41:2, 41:6, 41:16, 41:22, 41:24, 42:14, 42:16, 42:21, 42:23, 43:3, 43:6, 43:9, 43:13, 43:15, 43:21, 44:3, 44:6, 44:24, 45:5, 45:21, 51:2, 51:4, 51:12, 51:20, 52:1, 52:6, 52:8, 52:17, 52:20, 53:8, 53:12, 53:18, 53:24, 54:5, 54:7, 54:16, 54:20, 54:24, 56:24, 58:6, 58:8, 62:4, 62:7, 62:12, 63:16, 63:25, 64:13, 64:18, 65:9, 66:9, 66:15, 69:22, 70:1,

70:6, 71:3, 71:9, 79:10, 79:13, 79:22, 80:1, 80:13, 92:9, 100:16, 100:19, 100:24, 101:2, 101:4, 101:9, 101:22, 102:6, 102:9, 102:13, 102:16, 103:3
**Mino** [5] - 4:12, 26:20, 31:24, 50:24, 89:6
**minor** [1] - 92:2
**minus** [7] - 43:11, 44:11, 44:12, 44:24, 46:9
**minute** [4] - 12:12, 20:11, 38:1, 38:13
**minutes** [6] - 29:25, 30:15, 54:19, 72:7, 79:17, 80:7
**minutes'** [1] - 79:18
**mislead** [1] - 40:4
**misleading** [2] - 94:19, 95:13
**missed** [2] - 87:12, 90:12
**misses** [2] - 88:22, 90:3
**mistake** [2] - 32:8, 99:5
**mistakes** [1] - 92:11
**mistrial** [1] - 77:24
**model** [1] - 24:25
**mold** [13] - 10:3, 11:3, 12:17, 12:24, 19:16, 19:17, 19:23, 25:5, 26:11, 31:19, 32:20, 51:14, 54:11
**molded** [3] - 21:11, 27:7, 27:8
**molding** [1] - 23:25
**moment** [2] - 21:4, 85:11
**Monday** [2] - 72:25, 99:3
**money** [14] - 7:11, 10:10, 11:6, 30:10, 33:10, 39:14, 41:21, 42:7, 44:8, 44:20, 50:20, 52:14, 52:15, 53:22
**monies** [1] - 52:12
**months** [6] - 28:16, 51:1, 82:11, 88:22, 90:4, 90:12
**morning** [8] - 4:11, 4:14, 5:12, 68:23, 70:11, 94:3, 102:23, 103:5
**most** [5] - 37:3, 51:6, 72:14
**motion** [4] - 15:23,

25:15, 25:18, 25:24
**move** [2] - 80:15, 97:14
**moving** [2] - 87:6, 100:1
**MR** [299] - 4:3, 4:4, 4:11, 4:14, 4:18, 4:19, 4:23, 4:25, 5:4, 6:6, 6:20, 7:6, 7:10, 7:15, 8:14, 8:16, 9:8, 9:16, 10:9, 10:23, 11:7, 11:16, 11:23, 12:2, 12:6, 12:10, 12:13, 12:16, 12:19, 13:1, 13:10, 13:12, 13:17, 13:22, 13:25, 14:7, 14:10, 14:13, 14:21, 14:24, 15:3, 15:8, 15:11, 15:14, 15:19, 16:1, 16:6, 16:12, 16:16, 16:22, 17:1, 17:3, 17:8, 18:16, 19:5, 20:2, 20:8, 20:12, 21:3, 21:13, 22:15, 22:20, 23:8, 23:11, 23:22, 24:13, 24:16, 25:8, 25:12, 26:2, 26:12, 26:16, 26:19, 27:1, 27:2, 27:5, 27:8, 27:10, 27:17, 28:3, 28:6, 28:10, 28:11, 28:16, 28:18, 28:24, 29:1, 29:4, 29:5, 29:7, 29:9, 29:11, 29:14, 29:15, 29:17, 29:21, 29:23, 30:3, 30:5, 30:13, 30:20, 32:22, 33:1, 33:5, 34:8, 35:3, 35:5, 35:9, 35:17, 35:21, 36:12, 37:8, 37:14, 37:25, 38:6, 38:11, 38:18, 38:22, 39:3, 39:12, 39:13, 39:15, 39:19, 40:1, 40:10, 40:15, 40:17, 40:20, 40:23, 40:25, 41:2, 41:6, 41:16, 41:22, 41:24, 42:12, 42:14, 42:16, 42:17, 42:21, 42:23, 43:3, 43:6, 43:9, 43:12, 43:13, 43:15, 43:18, 43:21, 43:24, 44:2, 44:3, 44:6, 44:7, 44:10, 44:13, 44:17, 44:23, 44:24, 44:25, 45:5, 45:6, 45:14, 45:16, 45:21, 45:22, 46:1, 46:6, 46:11, 47:1, 48:12, 48:17, 48:22, 50:24, 51:2, 51:3, 51:4, 51:8, 51:10, 51:12,

51:17, 51:20, 52:1, 52:6, 52:7, 52:8, 52:17, 52:20, 53:1, 53:2, 53:6, 53:8, 53:11, 53:12, 53:13, 53:18, 53:22, 53:24, 54:5, 54:7, 54:14, 54:16, 54:20, 54:24, 55:2, 55:7, 55:19, 55:22, 56:2, 56:10, 56:17, 56:24, 57:14, 57:23, 58:5, 58:6, 58:8, 58:21, 59:8, 59:25, 60:7, 60:17, 60:20, 61:1, 61:7, 61:12, 61:22, 62:4, 62:6, 62:7, 62:10, 62:12, 63:9, 63:16, 63:17, 63:23, 63:25, 64:1, 64:3, 64:11, 64:13, 64:15, 64:18, 65:6, 65:9, 65:15, 66:9, 66:15, 67:6, 67:12, 68:2, 69:6, 69:18, 69:20, 69:22, 70:1, 70:6, 70:8, 70:10, 70:15, 70:20, 71:3, 71:9, 71:23, 79:10, 79:12, 79:13, 79:14, 79:22, 80:1, 80:12, 80:13, 80:14, 80:20, 81:9, 92:9, 100:15, 100:16, 100:19, 100:24, 101:2, 101:4, 101:6, 101:9, 101:13, 101:16, 101:20, 101:22, 101:24, 102:2, 102:5, 102:6, 102:9, 102:13, 102:16, 102:19, 102:25, 103:3, 103:11
**MRI** [2] - 88:1, 88:13
**multiple** [1] - 82:4
**MUs** [1] - 82:4
**must** [8] - 33:19, 74:6, 74:16, 75:5, 76:11, 76:13, 77:11, 84:14
**MySpace** [1] - 77:16

# N

**named** [2] - 65:7, 89:16
**names** [3] - 67:13, 67:15, 100:22
**narrow** [5] - 5:14, 19:12, 47:20, 58:16
**near** [1] - 84:12
**Nebraska** [1] - 16:3
**necessary** [23] - 6:13, 6:16, 6:18, 6:23, 6:25,

7:1, 7:3, 7:5, 7:7, 7:9, 8:2, 9:7, 9:22, 11:3, 17:7, 21:18, 22:6, 22:7, 23:7, 25:3, 27:24, 31:3, 31:16
**need** [18] - 30:10, 35:11, 35:19, 39:1, 43:21, 59:5, 60:10, 72:9, 73:14, 73:16, 79:16, 89:12, 89:20, 95:11, 102:8, 102:12, 102:23
**needed** [1] - 86:10
**needs** [4] - 9:16, 47:3, 63:8, 100:4
**negligence** [4] - 62:2, 63:3, 85:19, 96:8
**negligent** [7] - 15:5, 17:10, 85:19, 96:3, 96:7, 96:12, 97:17
**net** [2] - 54:4, 54:6
**never** [13] - 39:16, 40:18, 41:18, 49:17, 58:19, 59:1, 61:9, 85:2, 86:13, 86:14, 87:11, 91:18, 97:4
**new** [2] - 82:5, 95:25
**New** [3] - 86:20, 91:4
**Newark** [2] - 91:8, 94:3
**next** [4] - 62:13, 83:13, 93:21, 101:20
**nice** [1] - 80:23
**Nicholas** [1] - 4:12
**night** [4] - 72:10, 72:22, 87:20, 103:9
**night's** [1] - 100:9
**ninety** [2] - 45:2, 45:5
**nobody** [1] - 90:23
**none** [1] - 62:20
**northern** [1] - 15:24
**noted** [1] - 70:22
**noteworthy** [1] - 78:9
**Nothing** [1] - 74:8
**nothing** [5] - 9:1, 21:10, 28:13, 41:15, 47:19
**noticed** [2] - 63:23, 65:3
**November** [1] - 103:13
**number** [9] - 15:9, 15:10, 27:24, 27:25, 40:13, 51:3, 91:17, 91:18, 91:19
**numbers** [2] - 51:2, 51:5
**numerous** [2] - 63:24, 64:12
**nutshell** [1] - 92:25

# O

o'clock [1] - 66:13
object [1] - 70:11
objection [9] - 67:9, 67:10, 67:11, 70:14, 70:18, 70:20, 71:11, 74:23, 74:24
objections [6] - 67:22, 68:5, 69:12, 74:19, 74:21, 102:7
obligation [2] - 72:23, 74:20
obtain [1] - 76:22
occasions [1] - 28:17
occurred [5] - 81:13, 82:6, 82:11, 82:17, 87:5
offer [1] - 60:19
offered [2] - 74:21, 78:16
offering [1] - 62:18
office [1] - 102:17
offset [5] - 9:7, 9:9, 14:11, 22:25, 30:25
old [5] - 56:9, 73:19, 87:4, 90:14, 90:21
once [2] - 36:10, 84:22
one [42] - 11:1, 12:24, 27:24, 30:3, 31:18, 34:16, 36:4, 36:15, 39:21, 42:13, 42:17, 42:19, 42:23, 43:23, 44:13, 44:14, 44:18, 44:21, 58:9, 61:16, 62:7, 62:16, 65:10, 66:13, 66:16, 69:5, 79:10, 79:23, 83:1, 83:24, 84:11, 84:16, 85:18, 85:25, 86:5, 88:7, 90:19, 91:2, 91:17, 93:18, 97:16, 101:24
one-sixty-five [1] - 44:13
one-ten [1] - 42:23
ones [2] - 64:20, 77:8
open [12] - 34:22, 34:25, 35:1, 35:8, 38:13, 50:12, 57:12, 57:14, 60:5, 64:21, 66:1, 78:6
Opening [1] - 59:6
opening [12] - 37:1, 54:25, 63:19, 66:6, 72:6, 72:7, 78:12, 78:14, 79:2, 79:11, 81:6, 81:7
openings [2] - 66:8,

80:5
operate [3] - 81:21, 81:23
operates [2] - 26:9, 86:19
opinion [2] - 89:14, 89:15
opinions [1] - 78:5
opportunity [1] - 98:24
oral [1] - 8:1
order [4] - 26:17, 42:24, 65:25, 100:17
originally [1] - 89:2
orthopaedic [2] - 87:19, 87:23
Osteo [1] - 88:15
osteochondral [7] - 88:2, 88:8, 88:14, 98:5, 98:8, 98:12
osteochondritis [2] - 98:5, 98:7
otherwise [4] - 24:3, 25:20, 48:19, 76:2
OUR [1] - 4:4
ourselves [1] - 50:5
outline [1] - 78:15
outnumbered [1] - 4:15
outside [5] - 20:6, 20:25, 41:3, 75:5, 76:24
outstanding [3] - 5:10, 7:16, 10:7
overruled [1] - 74:25
overtime [41] - 20:19, 24:12, 28:4, 28:8, 28:12, 28:21, 29:13, 29:23, 34:2, 34:13, 34:17, 34:18, 34:20, 34:24, 35:2, 35:6, 35:12, 35:14, 35:16, 36:7, 36:8, 36:9, 36:16, 36:21, 37:11, 37:12, 37:15, 37:25, 38:17, 41:7, 41:18, 47:21, 50:10, 50:11, 69:24, 70:2, 71:1, 71:3, 71:4
own [5] - 9:17, 57:1, 80:22, 92:25, 93:1

# P

PA-5 [3] - 82:4, 82:13
page [4] - 57:1, 57:25, 58:6, 58:8
paid [83] - 6:21, 7:18, 8:17, 8:18, 8:20, 9:23, 11:1, 13:3, 13:21, 16:8, 17:7, 19:8, 19:10,

20:14, 20:16, 20:17, 20:21, 24:10, 28:19, 29:3, 29:4, 29:6, 32:23, 33:1, 33:16, 33:21, 34:2, 34:16, 34:21, 36:10, 36:11, 36:12, 36:13, 37:1, 37:3, 37:6, 37:7, 38:8, 38:9, 38:14, 38:15, 38:25, 40:1, 40:5, 40:6, 40:11, 40:22, 41:18, 41:21, 42:1, 42:10, 43:17, 45:20, 46:20, 48:1, 48:8, 48:9, 48:10, 48:15, 48:20, 48:21, 49:16, 49:17, 49:18, 49:20, 49:22, 50:12, 50:16, 51:18, 51:19, 52:14, 52:16, 53:9, 53:13, 54:1, 54:2, 54:3, 54:5
pain [55] - 5:16, 8:5, 8:22, 8:25, 9:1, 10:5, 10:20, 10:22, 11:4, 12:24, 13:17, 13:19, 14:24, 16:13, 18:1, 19:3, 20:3, 21:7, 24:1, 24:20, 25:4, 26:10, 31:8, 31:12, 31:18, 32:19, 33:10, 33:19, 33:22, 37:20, 37:21, 38:4, 41:6, 41:17, 42:4, 42:14, 42:17, 43:1, 43:16, 44:4, 45:8, 47:14, 47:24, 49:5, 67:22, 68:6, 68:12, 68:14, 70:2, 87:22, 87:24, 88:11, 88:23, 89:1, 90:6
painstakingly [1] - 7:5
panel [1] - 67:18
paralegal [1] - 4:4
Paralegal [1] - 4:23
paramount [1] - 100:4
part [18] - 8:6, 8:9, 10:7, 11:12, 18:20, 23:20, 31:2, 52:17, 52:18, 52:21, 60:2, 62:1, 63:2, 65:24, 66:7, 85:20, 85:22, 88:16
particular [1] - 86:17
particularly [1] - 86:5
parties [13] - 5:13, 5:21, 24:8, 24:9, 25:1, 26:14, 26:22, 33:25, 37:9, 69:2, 71:12, 78:20, 99:15
parting [1] - 100:6

party [5] - 5:22, 18:12, 18:13, 78:15, 103:7
pass [1] - 69:16
passengers [2] - 93:8, 93:10
past [1] - 20:13
PATH [99] - 4:12, 7:6, 7:17, 11:1, 12:7, 14:17, 15:4, 15:16, 16:12, 18:3, 20:12, 20:17, 21:8, 21:13, 23:5, 23:13, 23:15, 23:17, 28:8, 28:13, 28:18, 28:21, 28:24, 29:9, 29:18, 31:20, 32:22, 33:24, 37:16, 38:14, 40:20, 40:21, 40:23, 41:2, 43:16, 43:19, 45:3, 45:4, 45:6, 48:1, 52:2, 52:3, 53:23, 56:4, 57:11, 58:24, 59:3, 59:21, 60:19, 60:20, 62:8, 62:14, 62:20, 63:12, 70:6, 81:14, 82:4, 82:5, 82:9, 83:18, 85:19, 85:24, 86:16, 86:17, 86:19, 86:24, 87:11, 87:14, 87:16, 87:22, 88:7, 89:4, 89:5, 89:6, 89:8, 89:15, 91:10, 91:23, 93:6, 93:14, 94:2, 94:10, 94:14, 94:16, 94:21, 96:3, 96:6, 96:12, 96:21, 97:12, 97:15, 97:17, 98:16, 98:22, 99:9, 100:20
PATH's [4] - 47:3, 87:16, 87:18
Pawlikowski [1] - 4:13
PAWLIKOWSKI [1] - 4:14
pay [28] - 14:18, 17:14, 17:17, 18:21, 20:17, 20:22, 22:9, 28:12, 28:19, 29:2, 29:6, 37:4, 39:5, 39:24, 40:9, 43:17, 47:3, 48:2, 50:14, 50:18, 50:21, 52:9, 52:21, 68:10, 99:8, 99:13
paycheck [2] - 52:3, 53:20, 53:25
paychecks [1] - 54:11
paying [6] - 9:17, 38:16, 38:18, 46:14, 46:15, 48:17
pays [1] - 28:8

Pazsik [2] - 4:5, 4:19
people [12] - 8:23, 8:24, 58:21, 62:24, 69:8, 80:18, 81:21, 83:17, 86:24, 86:25, 88:6, 91:13
people's [1] - 89:13
percent [78] - 12:14, 12:18, 12:21, 13:1, 13:3, 13:5, 13:7, 13:21, 13:22, 14:2, 14:9, 15:6, 15:7, 17:10, 17:11, 17:13, 17:14, 17:16, 17:17, 17:19, 17:21, 17:24, 21:8, 22:14, 23:5, 23:13, 23:17, 31:9, 32:13, 32:17, 36:13, 36:15, 38:25, 39:5, 39:23, 39:24, 41:16, 42:5, 42:18, 42:19, 43:18, 44:14, 44:15, 44:17, 44:18, 44:21, 44:25, 45:1, 45:3, 45:4, 45:12, 45:13, 46:5, 46:6, 46:7, 46:11, 46:13, 46:14, 46:16, 46:18, 46:19, 46:21, 46:23, 46:24, 47:2, 47:4, 48:6, 49:7, 49:8, 53:1, 53:2, 53:6, 53:16
percentage [1] - 48:5
percentages [1] - 21:21
perfect [1] - 101:8
perfectly [1] - 79:20
permitted [2] - 6:9, 18:22
person [5] - 68:14, 69:9, 75:22, 92:12, 92:14
personal [5] - 69:4, 69:8, 75:24, 80:19, 80:22
perspective [1] - 82:22
pertains [1] - 6:4
perverse [2] - 86:2, 96:15
phone [2] - 73:25, 77:15
phones [3] - 73:18, 76:19, 77:9
photo [4] - 66:9, 79:10, 79:12, 94:18
photograph [7] - 62:12, 67:7, 82:17, 82:18, 82:23, 83:8, 83:9
photographs [2] - 54:24, 83:7

**physical** [2] - 87:23, 102:18
**PI** [1] - 48:6
**pick** [2] - 93:10, 93:14
**picked** [1] - 32:8
**picture** [4] - 34:12, 55:18, 55:19, 66:3
**place** [4] - 84:1, 84:12, 95:16, 96:24
**placement** [1] - 97:2
**places** [1] - 95:9
**placing** [1] - 94:16
**Plaintiff** [30] - 4:6, 8:16, 11:14, 12:4, 12:19, 12:22, 12:25, 14:9, 18:2, 18:15, 18:17, 21:20, 24:10, 26:18, 27:20, 29:12, 31:3, 31:4, 31:22, 32:6, 32:13, 34:2, 34:17, 37:11, 67:20, 68:12, 75:21, 78:17, 78:19, 96:2
**plaintiff** [1] - 18:25
**PLAINTIFF** [4] - 4:8, 51:21, 52:10, 64:17
**Plaintiff's** [5] - 12:18, 37:10, 81:8, 100:19, 101:4
**Plaintiffs** [1] - 25:11
**plan** [2] - 100:14, 102:16
**plate** [6] - 84:10, 94:20, 94:23, 95:16, 96:24, 97:6
**platform** [2] - 93:18, 94:1
**plays** [1] - 85:20
**pleasant** [1] - 73:13
**pleasure** [1] - 4:8
**plus** [10] - 14:1, 41:18, 43:11, 43:16, 43:20, 43:24, 44:2, 44:3, 44:4
**pocketbooks** [1] - 73:22
**pockets** [1] - 73:22
**podium** [1] - 80:15
**point** [15] - 6:7, 19:5, 19:24, 21:19, 26:1, 44:22, 57:18, 63:21, 65:11, 65:12, 73:7, 84:23, 85:7, 96:1, 100:1
**points** [1] - 94:15
**policy** [1] - 62:24
**pool** [1] - 71:25
**Port** [2] - 50:19, 75:22, 78:4
**portion** [6] - 5:16, 6:4, 38:25, 55:23, 94:19,

95:4
**position** [4] - 26:8, 36:19, 38:20, 62:18
**possibility** [1] - 66:2
**possible** [7] - 26:3, 57:10, 73:4, 73:11, 73:13, 73:17, 97:13
**practical** [3] - 31:1, 34:21, 95:4
**practice** [1] - 87:25
**pre** [3] - 56:21, 56:24, 98:13
**pre-existing** [1] - 98:13
**preemptories** [1] - 69:15
**prejudicial** [2] - 33:17, 59:3
**prejudicing** [1] - 38:2
**preliminary** [2] - 5:8, 74:1
**preparation** [1] - 51:5
**preponderance** [2] - 76:1, 96:4
**Presbyterian** [1] - 89:17
**presence** [4] - 20:7, 20:25, 41:3, 98:4
**present** [3] - 78:17, 78:18, 78:21
**presented** [4] - 67:7, 74:4, 75:7, 76:12
**pretrial** [1] - 65:25
**prevent** [1] - 68:13
**printout** [2] - 51:11, 51:12
**problem** [6] - 11:8, 13:3, 62:12, 88:6, 88:13, 101:7
**problematic** [1] - 27:21
**problems** [1] - 90:4
**process** [5] - 10:8, 71:20, 77:25, 85:8, 94:5
**produce** [1] - 57:21
**produced** [1] - 76:5
**professional** [2] - 83:18, 86:7
**program** [1] - 60:2
**prohibited** [1] - 73:21
**promise** [1] - 73:11
**promptly** [1] - 99:22
**proof** [5] - 75:9, 75:11, 76:6, 76:7, 96:2
**proper** [2] - 47:23, 94:12
**properly** [4] - 94:16, 96:23, 96:24, 97:23
**property** [2] - 61:2, 82:6

**proportion** [4] - 11:14, 24:1, 46:22, 50:1
**proportionate** [1] - 21:21
**propose** [4] - 9:18, 26:6, 26:7, 26:16
**proposed** [1] - 15:12
**proposing** [1] - 26:6
**proposition** [3] - 16:5, 16:6, 68:8
**protected** [2] - 22:24, 23:21, 27:20
**prove** [3] - 18:19, 78:16, 96:3
**proved** [1] - 75:25
**provide** [1] - 51:10
**provider** [1] - 18:13
**pull** [6] - 15:20, 16:2, 84:22, 84:23, 95:14, 95:17
**pulling** [2] - 20:2, 20:4
**pulls** [1] - 95:5
**purpose** [7] - 8:3, 9:3, 9:24, 10:20, 75:2, 86:17, 86:18
**purposes** [3] - 53:15, 56:16, 102:4
**put** [40] - 6:9, 6:14, 6:15, 7:4, 7:9, 7:17, 7:21, 8:3, 10:18, 10:19, 17:18, 18:17, 18:19, 19:1, 19:19, 23:16, 27:3, 27:6, 30:11, 35:24, 49:2, 49:3, 54:25, 57:18, 58:17, 69:9, 76:9, 77:21, 83:3, 83:11, 84:11, 84:16, 86:12, 89:25, 94:23, 94:24, 95:10, 96:21, 98:4
**puts** [1] - 25:3
**putting** [6] - 9:3, 27:4, 36:17, 37:19, 47:21, 79:11

**Q**

**QUESTION** [1] - 58:10
**questions** [10] - 67:4, 67:19, 67:21, 67:24, 68:20, 69:10, 69:11, 69:13, 74:18, 77:21
**quickly** [1] - 100:1
**quite** [2] - 12:6, 17:15
**quote** [1] - 30:8
**quote-unquote** [1] - 30:8

**R**

**rail** [7] - 80:21, 83:5, 83:6, 83:13, 83:23, 85:5, 85:8
**railroad** [3] - 19:8, 81:19, 81:20
**Railroad** [1] - 15:24
**rails** [1] - 93:21
**rate** [2] - 34:14, 34:15
**rather** [3] - 32:16, 65:21, 101:20
**ray** [1] - 87:21, 98:2
**re** [1] - 103:7
**re-entry** [1] - 103:7
**read** [4] - 68:3, 68:22, 102:9, 102:17
**reading** [1] - 14:14
**real** [1] - 24:8
**realizes** [1] - 64:7
**really** [14] - 22:9, 23:12, 23:14, 23:24, 32:16, 33:7, 33:23, 34:4, 38:19, 61:15, 86:10, 92:3, 95:23
**reason** [3] - 19:6, 25:23, 59:25, 68:13, 69:4, 71:21, 85:24, 95:20
**reasonable** [28] - 6:13, 6:16, 6:18, 6:23, 6:25, 7:1, 7:3, 7:5, 7:7, 7:8, 8:2, 9:6, 9:22, 11:2, 17:6, 17:24, 19:23, 21:18, 22:5, 22:7, 23:6, 25:2, 27:23, 31:3, 31:15, 76:7, 96:10, 99:24
**reasonableness** [1] - 71:15
**reasons** [1] - 70:22
**rebut** [1] - 65:14
**rebuttal** [6] - 65:7, 65:11, 65:13, 65:23, 66:2
**receive** [2] - 29:5, 52:3
**received** [9] - 20:23, 28:23, 35:13, 40:18, 53:20, 54:10, 74:13, 75:1, 76:4
**recess** [3] - 30:17, 66:21, 80:8
**record** [9] - 22:3, 24:6, 55:4, 67:7, 68:3, 68:4, 70:10, 74:13, 91:3
**recover** [2] - 17:11, 85:21
**recovery** [3] - 40:4,

48:20, 49:21
**reduced** [1] - 50:1
**refer** [1] - 87:18
**reference** [1] - 76:20
**referred** [3] - 87:16, 87:17, 88:8
**refers** [1] - 5:20
**reflect** [3] - 20:22, 31:4, 34:1
**regard** [1] - 28:6
**regardless** [2] - 76:3, 76:4
**regular** [17] - 20:15, 20:22, 28:4, 34:22, 36:10, 38:16, 38:24, 42:2, 42:8, 42:9, 48:5, 50:13, 50:16, 71:5, 71:7, 71:13, 86:3
**regulation** [3] - 96:20, 97:1, 97:11
**regulations** [1] - 97:9
**reject** [1] - 75:18
**relating** [1] - 61:17
**relationship** [3] - 8:21, 85:15, 87:6
**relatively** [2] - 98:18, 98:20
**release** [1] - 99:19
**relevance** [4] - 9:5, 10:24, 19:2, 71:18
**relevant** [5] - 10:3, 18:23, 33:4, 56:15, 83:10
**rely** [1] - 58:20
**remedial** [10] - 56:1, 56:3, 56:15, 57:4, 59:15, 59:18, 62:14, 62:17, 62:19, 62:22
**remember** [2] - 29:22, 97:19
**repair** [6] - 57:4, 62:15, 62:17, 62:19, 62:22, 63:6
**represent** [1] - 20:16
**represents** [2] - 53:8, 54:10
**request** [1] - 71:21
**requested** [1] - 17:12
**require** [2] - 31:13, 77:25
**requirement** [1] - 96:20
**rerun** [2] - 51:2, 51:5
**research** [4] - 76:14, 76:17, 76:19, 100:7
**resolution** [1] - 30:19
**resolve** [1] - 30:1
**resolved** [1] - 102:8
**respect** [3] - 6:18, 96:18, 97:7

**respects** [1] - 92:4
**response** [1] - 62:22
**responsibility** [1] -
15:7
**responsible** [5] -
9:17, 14:15, 14:17,
17:14, 22:10
**rest** [5] - 72:11, 78:1,
90:19, 91:1, 94:20
**restrict** [1] - 80:16
**restrictions** [1] -
77:23
**result** [5] - 68:12,
77:25, 87:13, 99:14
**resulted** [1] - 93:4
**retire** [3] - 76:25,
77:3, 78:23
**retrofitted** [1] - 56:25
**return** [1] - 79:2
**returned** [2] - 77:6,
98:21
**review** [1] - 56:18
**rewarding** [1] - 73:12
**rid** [1] - 69:7
**rise** [9] - 30:16, 30:18,
66:20, 67:2, 79:5,
80:10, 81:2, 100:11,
103:12
**risk** [11] - 9:14, 25:10,
30:6, 30:8, 30:9, 33:9,
33:13, 35:23, 36:19,
36:20, 80:22
**road** [1] - 59:6
**role** [1] - 99:6
**rolled** [1] - 85:7
**rolling** [1] - 85:8
**room** [2] - 73:10,
100:5
**ROSENTHAL** [148] -
4:4, 4:19, 4:23, 4:25,
5:4, 8:14, 8:16, 9:8,
9:16, 10:9, 10:23, 11:7,
11:16, 12:19, 13:1,
13:17, 13:22, 13:25,
14:7, 14:10, 14:13,
14:21, 14:24, 15:3,
17:3, 17:8, 20:2, 20:8,
21:3, 26:19, 27:1, 27:5,
27:8, 28:6, 28:11,
28:16, 28:24, 29:4,
29:7, 29:11, 29:15,
29:21, 32:22, 33:1,
34:8, 35:3, 35:5, 35:9,
35:17, 35:21, 36:12,
37:8, 38:11, 38:18,
39:3, 39:12, 39:15,
39:19, 42:12, 42:17,
43:12, 43:18, 43:24,
44:2, 44:7, 44:10,
44:13, 44:17, 44:23,

44:25, 45:6, 45:14,
45:16, 45:22, 46:1,
46:6, 46:11, 47:1,
48:12, 48:17, 48:22,
51:8, 51:17, 52:7, 53:1,
53:6, 53:11, 53:13,
53:22, 54:14, 55:2,
55:7, 55:19, 56:2,
56:10, 56:17, 57:14,
57:23, 58:5, 58:21,
59:8, 59:25, 60:7,
60:17, 60:20, 61:1,
61:7, 61:12, 61:22,
62:6, 62:10, 63:9,
63:17, 63:23, 64:1,
64:3, 64:11, 64:15,
65:6, 65:15, 67:6,
67:12, 68:2, 69:6,
69:18, 69:20, 70:8,
70:10, 70:15, 70:20,
71:23, 79:12, 79:14,
80:12, 80:14, 80:20,
81:9, 100:15, 101:6,
101:13, 101:16, 101:20,
101:24, 102:2, 102:5,
102:19, 102:25, 103:11
**Rosenthal** [22] -
10:16, 11:10, 17:2,
22:8, 38:24, 45:24,
49:1, 51:16, 55:5,
58:16, 61:9, 71:11,
79:16, 92:7, 93:5,
93:17, 95:8, 95:13,
96:11, 97:8, 97:25, 98:2
**Rosenthal's** [2] -
21:19, 31:7
**rough** [2] - 53:14,
71:6
**roughly** [3] - 40:24,
71:1, 71:7
**round** [1] - 69:16
**routine** [1] - 92:12
**rule** [4] - 91:18,
91:19, 96:19, 97:1
**Rules** [1] - 74:22
**ruling** [1] - 74:23
**rulings** [1] - 70:11
**run** [3] - 33:8, 33:12,
36:18, 37:18
**running** [1] - 35:22

**S**

**safe** [4] - 62:23, 86:5,
86:11, 86:22
**safely** [4] - 73:5,
85:25, 86:21, 97:21
**safer** [1] - 62:25
**safety** [3] - 62:20,

86:15, 91:22
**salary** [1] - 42:8
**satisfaction** [1] - 95:3
**satisfactory** [2] -
69:17, 70:4
**satisfied** [2] - 20:7,
71:19
**satisfy** [2] - 22:9,
42:11
**saw** [4] - 63:22,
87:15, 87:16, 91:5
**scenario** [18] - 12:7,
12:15, 13:6, 13:14,
14:4, 14:14, 15:11,
15:17, 16:8, 17:25,
20:24, 21:5, 21:15,
35:25, 42:12, 47:23,
48:23, 61:25
**scenarios** [1] - 47:8
**schedule** [6] - 72:4,
72:18, 73:3, 80:4,
101:7, 101:19
**schedules** [1] - 72:15
**search** [1] - 76:20
**seat** [1] - 5:7
**seated** [1] - 69:15
**second** [13] - 7:14,
16:2, 52:8, 52:11,
52:22, 53:16, 53:23,
62:16, 85:3, 88:12,
89:14, 89:15, 92:19
**secure** [1] - 84:23
**see** [25] - 5:24, 15:1,
16:11, 44:8, 47:1, 47:2,
48:22, 53:25, 58:10,
62:14, 66:18, 66:19,
75:4, 82:22, 83:7, 83:8,
84:6, 86:12, 87:18,
87:23, 88:13, 88:20,
89:16, 100:10, 103:10
**seeing** [1] - 89:18
**seem** [2] - 19:12,
87:24
**sees** [1] - 89:19
**selection** [1] - 4:20
**send** [3] - 54:23,
79:23, 87:23
**sends** [2] - 87:25,
89:15
**sense** [4] - 17:15,
23:21, 24:3, 72:13
**serious** [2] - 81:17,
87:6
**serve** [2] - 69:5, 73:10
**service** [4] - 49:10,
78:25, 93:8, 93:9
**serving** [1] - 78:2
**session** [1] - 72:11
**set** [6] - 5:13, 5:15,
15:22, 37:8, 83:9, 84:11

**setoff** [25] - 5:10,
5:24, 5:25, 6:8, 7:23,
8:3, 9:12, 9:23, 10:10,
15:15, 16:6, 16:24,
17:12, 21:9, 23:14,
23:15, 38:19, 39:4,
39:16, 40:6, 41:9, 47:3,
47:4, 54:21
**seven** [1] - 87:12
**several** [1] - 84:9
**shall** [1] - 75:4
**sheet** [15] - 10:18,
11:9, 26:21, 27:9,
29:19, 36:18, 37:9,
37:19, 37:21, 38:2,
49:12, 67:15, 69:10,
70:15, 70:17
**shoot** [1] - 99:21
**short** [2] - 78:10,
81:15
**show** [18] - 55:3,
55:7, 55:25, 57:5,
58:17, 59:5, 61:10,
64:22, 91:15, 96:19,
97:3, 97:11, 97:13,
97:17, 98:4, 98:7,
98:11, 102:21
**showed** [3] - 66:10,
79:10, 98:2
**shows** [3] - 56:6,
68:11, 100:8
**sick** [3] - 51:24, 52:9,
64:14
**side** [4] - 54:1, 78:12,
83:1, 94:1
**sidebar** [1] - 69:13
**sides** [1] - 82:25
**sign** [1] - 67:15
**sign-in** [1] - 67:15
**silence** [1] - 73:23
**similar** [1] - 77:17
**simple** [4] - 50:3,
86:15, 89:20
**simplicity** [2] - 11:21,
53:15
**sincerity** [1] - 73:8
**single** [2] - 87:15,
94:7
**Siri** [1] - 76:21
**sit** [1] - 84:15
**sites** [1] - 76:21
**sitting** [2] - 4:21, 5:4
**situation** [4] - 18:17,
36:17, 89:3, 91:25
**six** [5] - 58:9, 82:11,
83:6, 88:22, 90:3
**sixty** [2] - 42:13,
44:13
**sixty-five** [1] - 42:13
**sleep** [1] - 100:9

**slid** [2] - 85:4
**slightest** [2] - 85:20,
85:22
**slightly** [1] - 94:19
**slip** [4] - 86:12, 96:14,
96:18, 96:21
**slipped** [1] - 81:17
**smart** [1] - 50:10
**smartphones** [2] -
73:18, 77:10
**so-and-so** [1] - 69:1
**social** [1] - 77:17
**solely** [2] - 75:6,
76:11
**someone** [4] - 53:24,
59:20, 68:8, 68:9
**sometimes** [3] - 6:14,
94:7, 99:11
**soon** [2] - 66:19,
72:18
**sooner** [1] - 32:8
**sorry** [8] - 12:20,
13:4, 16:16, 52:17,
71:4, 80:3, 87:10
**sort** [3] - 84:4, 86:12,
96:14
**sorts** [1] - 86:8
**sources** [1] - 76:24
**space** [2] - 80:19,
80:23
**special** [1] - 85:14
**specifically** [4] - 10:5,
19:25, 77:18, 94:11
**spend** [1] - 99:1
**split** [6] - 14:21, 15:5,
16:7, 18:7, 32:2, 85:5
**Square** [4] - 81:13,
90:11, 93:13, 93:15
**stage** [2] - 44:20,
45:12
**stand** [2] - 13:5,
92:22
**standard** [2] - 76:7,
96:20
**standards** [1] - 86:4
**stands** [2] - 16:4,
68:8
**Star** [1] - 91:8
**Star-Ledger** [1] - 91:8
**start** [7] - 72:13,
72:16, 72:20, 77:25,
78:6, 93:9, 99:21
**started** [4] - 65:3,
82:6, 82:8, 82:12
**starting** [1] - 22:3
**state** [2] - 63:6, 68:25
**statement** [5] - 59:6,
68:22, 69:23, 70:4,
78:13, 78:14
**statements** [5] - 72:6,

72:7, 79:2, 81:6, 81:7
**Statements** [1] - 74:18

**Station** [1] - 81:13

**station** [2] - 93:10, 93:14

**statute** [2] - 5:19, 5:20

**stay** [6] - 16:23, 56:9, 99:23, 100:1, 103:7, 103:8

**steel** [3] - 84:9, 85:4, 86:11

**step** [10] - 82:24, 83:4, 83:11, 84:24, 85:6, 95:9, 96:16, 97:8, 97:9, 97:14

**steps** [3] - 23:19, 83:9, 86:5

**Steven** [10] - 4:5, 58:8, 75:21, 81:15, 81:19, 87:4, 87:15, 89:10, 90:9, 91:5

**stick** [1] - 68:19

**sticks** [1] - 83:6

**still** [17] - 17:3, 18:7, 18:9, 23:15, 25:9, 32:3, 55:16, 61:9, 73:19, 84:24, 88:23, 88:25, 90:4, 90:6, 90:15, 97:14, 102:10

**stipulate** [27] - 6:18, 6:20, 6:22, 7:3, 7:7, 11:2, 20:13, 20:14, 20:18, 20:20, 21:25, 23:11, 24:9, 26:23, 28:4, 28:18, 28:20, 28:21, 28:25, 34:14, 36:14, 37:10, 40:20, 40:21, 74:14

**stipulated** [9] - 6:12, 25:1, 37:3, 38:15, 45:9, 47:11, 49:4, 71:19

**stipulates** [1] - 23:6

**stipulating** [5] - 22:6, 28:1, 31:14, 33:24, 50:6

**stipulation** [42] - 8:1, 10:12, 10:17, 11:12, 21:17, 21:18, 22:4, 22:5, 22:12, 22:17, 22:18, 22:22, 22:25, 23:8, 23:13, 23:20, 23:23, 23:24, 24:6, 24:7, 25:16, 27:12, 30:1, 31:2, 31:11, 31:12, 32:9, 33:24, 34:15, 35:18, 37:17, 47:19, 50:6, 50:14, 50:15, 50:17, 52:14, 52:15, 70:23, 71:15,

71:16

**stirrup** [1] - 83:24

**stones** [1] - 83:5

**stop** [6] - 12:12, 38:1, 62:16, 65:10

**story** [2] - 20:9, 25:22

**straight** [7] - 46:18, 46:20, 50:25, 51:3, 51:4, 84:9, 95:23

**strength** [2] - 84:21, 87:3

**stresses** [2] - 94:14, 94:16

**strictest** [1] - 76:7

**struck** [1] - 85:8

**struggling** [1] - 33:7

**stuff** [3] - 54:1, 54:21, 59:16

**subsequent** [16] - 56:1, 56:2, 56:15, 56:18, 57:4, 57:6, 59:15, 59:17, 61:18, 62:14, 62:17, 62:19, 62:22, 63:6, 64:18, 64:19

**subsequently** [1] - 61:11

**substantial** [1] - 68:14

**substantive** [1] - 65:20

**subsumed** [3] - 67:23, 67:24, 68:17

**subtract** [4] - 16:19, 21:1, 31:22, 32:5

**successful** [2] - 90:13, 98:20

**suffered** [2] - 33:25, 68:12

**suffering** [50] - 5:17, 8:5, 8:22, 8:24, 8:25, 9:2, 10:5, 10:20, 10:22, 11:5, 12:24, 13:17, 13:19, 14:24, 16:13, 18:1, 19:3, 20:3, 21:7, 24:1, 24:20, 25:4, 26:10, 31:8, 31:12, 31:19, 32:20, 33:10, 33:19, 33:23, 37:20, 37:22, 38:4, 41:7, 41:17, 42:4, 42:14, 42:17, 43:1, 43:16, 44:4, 45:8, 47:14, 47:24, 49:5, 67:23, 68:6, 68:15, 70:2

**suffices** [1] - 96:9

**suggest** [1] - 19:2

**suggesting** [2] - 26:25, 42:2

**sum** [1] - 68:14

**summarize** [1] - 78:21

**supervisors** [1] - 95:3

**support** [1] - 60:6

**supposed** [7] - 66:15, 81:16, 83:12, 83:23, 84:1, 84:19, 94:24

**surgeries** [7] - 51:22, 52:12, 90:9, 92:3, 98:16, 98:19

**surgery** [17] - 87:9, 88:18, 88:21, 89:4, 89:11, 89:12, 89:14, 89:18, 89:20, 89:21, 90:3, 90:8, 90:13, 98:18, 98:20

**surroundings** [1] - 92:13

**sustained** [1] - 74:24

**Sweat** [1] - 91:6

**swing** [1] - 95:14

**sworn** [2] - 62:5, 72:1

**system** [2] - 68:7, 86:10

**T**

**table** [2] - 4:21, 11:21

**takeaway** [1] - 36:5

**takeout** [1] - 9:12

**talks** [2] - 34:16, 97:8

**talus** [2] - 88:3, 88:4

**tape** [14] - 58:10, 60:1, 62:20, 63:12, 64:9, 66:10, 67:8, 86:12, 96:14, 96:18, 96:21, 97:2, 102:2, 102:3

**taught** [2] - 86:24, 91:13

**tax** [5] - 51:20, 52:3, 52:19, 52:24, 53:21

**tax-free** [1] - 52:19

**taxed** [1] - 52:12

**taxes** [8] - 51:19, 52:4, 52:14, 52:16, 52:21, 53:13, 53:16, 54:8

**team** [1] - 4:9

**technically** [1] - 31:10

**technology** [2] - 77:11, 77:17

**television** [1] - 100:8

**temperature** [1] - 91:6

**ten** [1] - 42:23

**term** [1] - 76:6

**terms** [2] - 42:2, 98:6

**terrible** [1] - 81:11

**testified** [1] - 62:8

**testifies** [2] - 61:16, 62:4

**testify** [2] - 61:5, 62:7

**testimony** [14] - 27:11, 57:6, 57:21, 58:21, 58:24, 59:3, 59:20, 59:24, 74:12, 75:10, 75:18, 76:2, 86:23, 98:17

**Testimony** [1] - 75:3

**text** [1] - 77:15

**Thanksgiving** [2] - 73:1, 103:7

**THE** [245] - 4:1, 4:7, 4:8, 4:9, 4:15, 4:22, 4:24, 5:3, 5:6, 6:11, 6:22, 7:8, 7:13, 7:22, 8:15, 8:18, 9:14, 9:18, 10:12, 10:24, 11:10, 11:17, 11:24, 12:3, 12:9, 12:12, 12:14, 12:17, 12:20, 13:4, 13:11, 13:13, 13:19, 13:23, 14:3, 14:8, 14:11, 14:20, 14:23, 15:1, 15:4, 15:10, 15:13, 15:18, 15:25, 16:4, 16:11, 16:15, 16:21, 16:25, 17:2, 17:5, 17:16, 18:22, 19:11, 20:4, 20:10, 21:12, 21:17, 22:17, 22:21, 23:9, 23:19, 23:24, 24:15, 24:17, 25:10, 25:14, 26:4, 26:13, 26:18, 26:25, 27:7, 27:12, 27:18, 28:14, 29:24, 30:4, 30:12, 30:14, 30:16, 30:18, 30:19, 30:21, 32:25, 33:3, 33:6, 34:10, 35:4, 35:7, 35:11, 35:20, 36:1, 36:22, 37:13, 37:23, 38:1, 38:7, 38:12, 38:21, 38:23, 39:9, 39:16, 39:21, 40:3, 40:14, 40:16, 40:19, 40:22, 40:24, 41:1, 41:5, 41:14, 41:20, 41:23, 41:25, 42:15, 42:19, 42:22, 42:25, 43:4, 43:8, 43:11, 43:14, 43:22, 43:25, 44:4, 44:8, 44:11, 44:15, 44:20, 45:2, 45:7, 45:15, 45:17, 45:24, 46:3, 46:9,

46:18, 47:6, 48:14, 48:19, 48:24, 51:7, 51:9, 51:14, 51:21, 51:25, 52:5, 52:10, 52:13, 52:18, 52:21, 54:3, 54:6, 54:13, 54:15, 54:17, 54:22, 55:1, 55:5, 55:7, 55:25, 56:7, 56:14, 56:22, 57:5, 57:17, 57:25, 58:7, 58:15, 58:23, 59:11, 60:4, 60:9, 60:18, 60:21, 61:5, 61:8, 61:19, 61:23, 62:11, 62:16, 63:14, 63:18, 64:2, 64:5, 64:17, 64:19, 65:10, 65:17, 66:12, 66:18, 66:20, 67:2, 67:3, 67:10, 67:13, 68:3, 69:7, 69:19, 69:21, 69:25, 70:2, 70:7, 70:9, 70:14, 70:18, 70:22, 71:4, 71:10, 71:24, 72:3, 79:5, 79:7, 79:16, 79:24, 80:2, 80:10, 80:11, 80:16, 80:21, 81:2, 81:4, 92:7, 99:17, 100:11, 100:13, 100:17, 100:22, 101:1, 101:3, 101:8, 101:11, 101:14, 101:19, 102:1, 102:3, 102:7, 102:12, 102:14, 102:21, 103:1, 103:4, 103:12

**themselves** [1] - 68:21

**theoretical** [1] - 22:25

**theoretically** [4] - 7:1, 7:25, 22:23, 39:17

**theory** [4] - 59:4, 59:16, 66:3, 95:16

**therapy** [1] - 87:24

**they've** [6] - 25:6, 38:25, 40:6, 40:7, 43:16, 48:9

**thinking** [1] - 21:23

**third** [12] - 5:22, 18:12, 18:13, 52:8, 52:12, 52:22, 53:16, 53:23, 90:7, 90:13, 90:20, 98:18

**third-party** [1] - 18:13

**thirds** [1] - 53:7

**thousand** [3] - 22:15, 46:14, 46:15

**three** [19] - 24:19, 28:17, 44:12, 52:7, 52:19, 53:5, 53:14,

66:15, 68:11, 69:16,
90:9, 90:10, 91:19,
92:3, 94:15, 98:15,
98:19, 100:20

**throw** [1] - 8:9

**Thursday** [2] - 5:9,
51:6

**tied** [1] - 80:15

**today** [6] - 72:6,
79:23, 79:24, 80:3,
81:14, 95:21

**Tom** [1] - 4:4

**tomorrow** [11] - 72:7,
72:11, 72:21, 80:4,
80:6, 99:20, 100:10,
100:14, 101:18, 103:6,
103:10

**Tomorrow** [1] - 72:9

**tonight** [1] - 100:8

**tools** [2] - 77:10,
77:12

**top** [4] - 36:16, 55:23,
94:19, 95:15

**Tosha** [1] - 65:8

**total** [6] - 14:2, 18:10,
44:1, 48:3, 48:4, 70:25

**totally** [1] - 46:22

**touched** [1] - 97:5

**touching** [1] - 65:18

**track** [11] - 81:16,
82:16, 83:4, 83:5,
86:21, 90:11, 93:16,
93:17, 93:18, 93:19,
93:23

**train** [35] - 58:11,
58:13, 81:16, 81:21,
81:24, 82:13, 82:21,
82:25, 83:2, 83:15,
84:4, 84:25, 86:1,
90:11, 93:7, 93:8,
93:14, 93:16, 93:21,
93:24, 93:25, 94:2,
94:4, 94:6, 94:13,
94:15, 94:22, 95:8,
97:15, 97:20, 97:21,
97:23

**trained** [3] - 82:15,
82:21, 83:3

**training** [6] - 82:9,
82:10, 87:1, 94:11,
96:23, 97:4

**trains** [5] - 63:12,
82:1, 82:4, 82:16, 94:21

**transcript** [3] - 102:9,
102:17, 102:19

**travel** [1] - 72:17

**treat** [1] - 74:25

**trial** [12] - 4:21, 29:18,
58:18, 59:7, 66:4, 69:5,
73:23, 74:9, 76:13,

77:24, 96:9, 102:4

**trial's** [1] - 39:7

**Tribune** [2] - 91:7,
91:8

**trickier** [1] - 36:7

**triple** [1] - 54:9

**true** [6] - 6:19, 7:18,
62:10, 93:5, 98:3, 98:15

**try** [4] - 72:14, 73:12,
76:23

**trying** [4] - 10:13,
47:7, 90:10, 90:14

**Tuesday** [3] - 73:1,
99:3, 103:13

**tunnels** [1] - 86:20

**turn** [3] - 68:25,
73:21, 81:7

**twisted** [1] - 87:11

**twister** [1] - 86:2,
96:16

**Twitter** [1] - 77:16

**two** [21] - 20:18,
22:12, 24:2, 27:25,
37:21, 44:20, 44:23,
45:12, 51:22, 51:23,
53:7, 55:12, 55:19,
62:13, 62:14, 75:8,
79:13, 91:18, 93:19,
94:19, 96:12

**two-thirds** [1] - 53:7

**type** [2] - 85:11, 92:17

**types** [2] - 55:12, 75:8

**U**

**ultimately** [1] - 90:12

**uncertainty** [1] -
26:14

**under** [18] - 8:16,
12:7, 12:15, 13:5,
15:11, 15:17, 16:7,
21:5, 21:9, 21:15,
47:23, 50:17, 74:22,
85:14, 85:19, 87:24,
88:5, 96:10

**underneath** [1] - 83:5

**underwent** [1] - 98:15

**undisputed** [2] - 50:7

**unfair** [3] - 78:1, 78:2,
78:3

**unfortunately** [1] -
8:24

**units** [1] - 82:4

**unjust** [1] - 25:25

**unless** [9] - 18:22,
27:19, 56:16, 59:20,
63:20, 64:3, 64:22,
65:13, 76:1

**Unless** [1] - 64:6

**unnecessary** [1] -
92:5

**unpaid** [2] - 13:24,
14:12

**unquote** [1] - 30:8

**up** [58] - 4:20, 5:5,
9:12, 13:15, 14:4,
14:22, 14:23, 15:8,
15:20, 16:2, 16:22,
19:18, 21:8, 27:3, 27:4,
27:19, 32:8, 36:25,
42:13, 43:17, 43:19,
46:3, 46:4, 46:16,
54:25, 55:23, 61:15,
69:8, 75:16, 79:11,
81:24, 83:1, 83:6, 84:9,
84:11, 84:14, 84:16,
84:23, 85:1, 85:3, 87:2,
93:10, 93:14, 94:3,
94:5, 94:7, 94:12,
94:22, 95:5, 95:8,
95:14, 95:15, 95:17,
96:23, 97:5, 97:21,
97:23

**updated** [1] - 51:6

**upper** [1] - 84:21

**V**

**vague** [2] - 59:2,
59:16

**Velez** [1] - 100:24

**venire** [1] - 68:21

**verdict** [67] - 5:14,
5:15, 5:16, 6:1, 6:4, 8:3,
9:10, 9:11, 9:12, 10:3,
11:4, 11:8, 12:3, 12:17,
12:23, 12:24, 13:15,
19:16, 19:18, 19:22,
19:24, 21:6, 21:7,
21:10, 23:9, 23:25,
24:23, 25:5, 25:15,
25:19, 25:25, 26:8,
26:11, 26:15, 26:21,
27:9, 27:20, 29:19,
31:1, 31:17, 31:19,
32:19, 36:18, 37:9,
37:19, 37:21, 37:24,
39:18, 40:7, 41:3, 46:4,
46:19, 47:10, 48:6,
48:25, 49:6, 49:11,
49:19, 51:14, 70:15,
70:16, 70:24, 71:17,
74:10, 77:6

**versions** [1] - 95:22

**versus** [2] - 46:13,
47:4

**video** [4] - 89:18,
102:10, 102:18, 102:22

**view** [1] - 22:9

**violates** [1] - 77:23

**violating** [1] - 91:19

**violation** [1] - 77:20

**W**

**wage** [9] - 6:10, 7:11,
20:13, 20:15, 21:2,
40:23, 41:9, 43:7, 43:8

**wages** [83] - 5:13,
6:1, 6:5, 8:6, 11:15,
11:21, 15:22, 16:14,
19:15, 19:21, 20:1,
20:6, 20:9, 20:10,
20:11, 20:13, 20:20,
20:23, 20:24, 21:20,
24:10, 24:11, 24:21,
27:3, 27:4, 28:1, 28:2,
28:4, 28:6, 28:8, 28:14,
28:20, 29:7, 32:18,
33:2, 34:2, 34:8, 34:22,
35:10, 35:11, 35:18,
36:10, 36:13, 37:1,
37:10, 37:17, 38:14,
38:24, 38:25, 39:2,
39:22, 39:23, 40:9,
41:8, 42:3, 42:9, 42:22,
43:2, 45:10, 45:20,
46:24, 47:12, 47:15,
47:21, 48:10, 48:12,
49:2, 49:3, 49:16, 50:8,
50:13, 50:17, 50:18,
50:21, 70:12, 70:16,
70:25, 71:5, 71:7, 71:13

**wait** [2] - 16:15, 69:14

**walk** [2] - 41:11,
41:17

**walked** [1] - 97:19

**walking** [4] - 21:16,
93:16, 93:21, 93:23

**walks** [4] - 13:10,
13:11, 22:15, 45:21

**wall** [1] - 86:2

**Wallace** [1] - 100:25

**wants** [1] - 38:23

**wash** [1] - 33:22

**watch** [1] - 100:8

**ways** [8] - 6:24, 12:9,
22:13, 33:7, 36:10,
36:22, 37:6, 96:12

**wear** [1] - 91:11

**web** [1] - 76:21

**Wednesday** [3] -
51:5, 102:25, 103:2

**week** [6] - 4:2, 35:14,
69:5, 72:4, 72:12, 72:24

**weeks** [3] - 28:9,
28:11

**weeks'** [1] - 28:11

**weight** [1] - 25:19

**welcome** [4] - 4:7,
78:24, 81:4, 103:7

**whole** [6] - 6:1, 25:22,
43:23, 68:20, 77:25,
86:9

**Widas** [1] - 101:22

**wide** [1] - 94:20

**willing** [9] - 6:20,
20:12, 28:18, 28:20,
28:21, 28:25, 36:14,
40:20, 40:21

**willingness** [1] -
73:10

**wind** [1] - 13:15

**winds** [2] - 46:3, 46:4

**witness** [9] - 58:1,
60:10, 60:14, 63:8,
63:20, 64:10, 65:1,
65:7, 65:13

**witness'** [1] - 75:18

**witnesses** [22] -
61:16, 64:23, 65:23,
66:4, 66:15, 68:25,
69:1, 69:3, 72:8, 73:4,
74:12, 75:16, 75:17,
75:19, 76:3, 78:17,
78:19, 79:22, 83:17,
100:18, 100:20, 101:12

**witnesses'** [1] - 72:15

**word** [1] - 88:15

**wording** [1] - 23:12

**words** [10] - 9:24,
11:19, 18:23, 23:3,
27:13, 31:6, 52:18,
76:10, 96:15, 100:6

**workers** [1] - 85:15

**Workers** [2] - 35:23,
36:2

**works** [9] - 22:13,
26:5, 29:19, 41:10,
43:25, 81:25, 83:19,
88:24, 101:19

**world** [2] - 8:24,
76:18

**worth** [2] - 13:8,
25:12

**wrist** [2] - 87:10

**writing** [1] - 77:21

**written** [1] - 8:1

**Y**

**year** [5] - 86:15,
87:10, 88:24, 91:23

**years** [5] - 36:5,
81:12, 87:4, 90:10,
90:21

**York** [1] - 86:20

**yourself** [2] - 84:22, 95:14
  **yourselves** [1] - 68:24
  **YouTube** [1] - 77:17

## Z

**zero** [2] - 9:13, 41:13