```
1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW JERSEY

3


4    STEVEN FODER,              :        Civil No.
                                         14-cv-3935-MCA
5                 Plaintiff,    :
                                         TRANSCRIPT OF
6            v.                 :        TRIAL PROCEEDINGS

7    PORT AUTHORITY TRANS HUDSON  :         VOLUME 5
     CORPORATION,
8                               :
                  Defendant.
9    -------------------------------x

10

                                         Newark, New Jersey
11                                       November 18, 2016

12


13


14
     BEFORE:
15
            THE HON. MADELINE COX ARLEO, U.S.D.J.
16

17

18                                  Reported by:
                                    CHARLES P. McGUIRE, C.C.R.
19                                  Official Court Reporter

20

21
            Pursuant to Section 753, Title 28, United States
22      Code, the following transcript is certified to be
        an accurate record as taken stenographically in
23      the above entitled proceedings.

24
                         s/CHARLES P. McGUIRE, C.C.R.
25
```

CHARLES P. McGUIRE, C.C.R.

1       APPEARANCES:

2           BARISH ROSENTHAL
            1717 Arch Street
3           Philadelphia, PA 19067
            BY: SAMUEL J. ROSENTHAL, ESQ., and
4               ANTHONY M. DiGIULIO, ESQ.
            Attorneys for Plaintiff
5
            NICHOLAS MINO, ESQUIRE
6           150 Greenwich Street
            New York, New York 10007
7           Attorney for Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury out)

2                THE COURT CLERK:  All rise.

3                THE COURT:  Good morning, everyone.

4                Okay.  Are we ready?

5                MR. ROSENTHAL:  Yes, Your Honor.

6                MR. MINO:  Yes.

7                THE COURT:  All right.  Good.

8                THE COURT CLERK:  All rise.

9            (The jury enters)

10               THE COURT:  Good morning, everyone.

11               THE JURY:  Good morning.

12               THE COURT:  Okay.  So you have your Hobby's lunch

13    order in, I take it?

14               Everyone can be seated.

15               It's the best place to eat in Newark, so I hope

16    you enjoy it, and I hope you ordered something that you

17    like.  All the food there is very good.

18               Okay.  So we're here for the final instructions.

19               Ladies and gentlemen:

20               Now that you have heard all of the evidence to be

21    received in this trial, I will now give you the final

22    instructions of the Court as to the law that is applicable

23    to this case and which will guide you in your decisions.

24               All of the instructions of law given to you by the

25    Court - those given to you at the beginning of the trial,

CHARLES P. McGUIRE, C.C.R.

683

1  those given to you during the trial, and these final

2  instructions - must guide and govern your deliberations.

3          It is your duty as jurors to follow the law as

4  stated in all of the instructions of the Court and to apply

5  those rules of law to the facts as you find them from the

6  evidence received during the trial.

7          Counsel may refer to some of the applicable rules

8  of law in their closing arguments to you.  If, however, any

9  difference appears to you between the law as stated by

10 counsel and that as stated by the Court, you, of course, are

11 to be governed by the instructions given to you by the

12 Court.

13         You are not to single out any one instruction

14 alone as stating the law, but must consider the instructions

15 as a whole in reaching your decisions.

16         You should not be concerned with the wisdom of any

17 rule of law stated by the Court.  Regardless of any opinion

18 you may have as to what the law ought to be, it would be a

19 violation of your sworn duty to base any part of your

20 verdict upon any view or opinion of the law other than that

21 given in these instructions of the Court, just as it would

22 be a violation of your sworn duty, as the judges of the

23 facts, to base your verdict upon anything but the evidence

24 received in this case.

25         In deciding the issues presented to you for

CHARLES P. McGUIRE, C.C.R.

1    decision in this trial, you must not be persuaded by bias,

2    prejudice, or sympathy for or against any of the parties to

3    this case, or by any public opinion.

4           Justice through trial by jury depends on the

5    willingness of each individual juror to seek the truth from

6    the same evidence presented to all of the jurors here in the

7    courtroom and to arrive at a verdict by applying the same

8    rules of law as now being given to each of you in these

9    instructions.

10          In a trial of this kind, the attorneys, the judge,

11   and you, the jury, have separate duties.  The primary

12   function of the attorneys is to present the evidence and to

13   argue their contentions; that is, what they contend the

14   evidence does or does not prove.

15          The Court has the responsibility of safeguarding

16   the rights of the parties and deciding the legal issues in

17   the case.  It is the function of the Court, as you have

18   observed, to preside over the trial and to see that it is

19   conducted in accordance with the established rules and

20   principles of law.  Furthermore, it is for the Court to make

21   decisions on questions of law that are presented from time

22   to time during and at the conclusion of the case.  Finally,

23   it is the Court's function to instruct you on the

24   substantive law that applies to this case.

25          If during the course of this trial I asked a

CHARLES P. McGUIRE, C.C.R.

1      question of a witness, it was solely for the purpose of

2      making clear whatever the testimony was from a witness or

3      perhaps clarifying a question for the witness' benefit.  You

4      are not to infer from the fact that I asked a question here

5      and there that I hold any opinion whatsoever regarding the

6      result of the trial; I do not.  Nor should you consider it

7      any more or less important because a question happened to be

8      asked by me rather than somebody else.

9              It is your function as jurors to determine the

10     facts, and this, of course, should be done solely from a

11     fair consideration of all the evidence in the case.  It is

12     your recollection of the evidence that you have heard that

13     controls your deliberations.  The evidence should be

14     considered and viewed by you as jurors in light of your own

15     observations and experience in the affairs of life; that is,

16     by using your own good common sense.  You are to perform

17     this duty without sympathy, bias, or prejudice.  Thus, as

18     judges of the facts, you, the jury, are to carefully and

19     impartially consider all the evidence, follow the law as I

20     state it to you, and reach a just verdict.  The Plaintiff

21     and the Defendant expect this of you, and they are entitled

22     to nothing less.

23             During the trial, counsel for the parties have

24     made arguments and statements before you.  Similarly,

25     counsel will make arguments during their closing arguments.

1    When attorneys do this, they are acting well within their

2    rights and indeed their obligations to represent their

3    clients.  Statements of counsel are for the purpose of

4    attempting to persuade you as to their view of what the

5    evidence has shown, or failed to show, and accordingly

6    should be regarded as arguments, but not as evidence.  No

7    statement, opinion, unanswered question, or argument by a

8    lawyer in this case is to be considered as evidence by you.

9    Again, the only evidence that you may consider is that which

10   you have seen and heard by way of the sworn testimony of

11   witnesses, documents and other exhibits that were received

12   into evidence and which you will be given an opportunity to

13   review during your deliberations.

14           I further instruct you that if during the course

15   of this trial, in opening statements, closing statements, or

16   at any time any of the attorneys here has put forth a

17   version of the facts that does not square with your own

18   recollection, you are to disregard counsel's version in

19   favor of your own recollection.  The attorneys function as

20   advocates representing their clients, the clients before

21   you, whether it's the Plaintiff, Steven Foder, or the

22   Defendant, the PATH.  Your decision in this case is to be

23   based solely on the evidence as you found it, assessed

24   against the principles of law governing the charges as I

25   instruct you.

1          You are to draw no inferences from any objections

2     made by counsel or from my rulings on those objections.  On

3     some occasions during the trial, I struck certain evidence

4     or remarks from the record and instructed you to disregard

5     them.  You must adhere to those instructions and disregard

6     any such item.  Just as you are not to draw any inferences

7     from or speculate about objections made by counsel to

8     testimony or exhibits offered by the other side, you should

9     not speculate as to why objections were not made in certain

10    instances or why an attorney may object to some items of

11    evidence but not to others that you might consider similar.

12    Pay no attention to that, even if you happen to observe it.

13    Your focus should be on the evidence that has been presented

14    for your consideration, not whether it came before you with

15    or without objection from any party.

16          From time to time, counsel and I conferred at the

17    sidebar of the Court in the corner of the courtroom.  These

18    conferences between the Court and counsel concern legal

19    questions upon which I have ruled.  All of these conferences

20    or arguments pertained solely to legal phases of the case

21    and do not concern your function as jurors.  More

22    particularly, you should not speculate on the matters that

23    we may have been discussing or allow that speculation to

24    intrude into your deliberations in any way.

25          There is nothing particularly different in the way

CHARLES P. McGUIRE, C.C.R.

1    that a juror should consider the evidence in a trial from

2    that in which any reasonable and careful person would treat

3    any very important question that must be resolved by

4    examining facts, opinions and evidence.  You are expected to

5    use your good sense in considering and evaluating the

6    evidence in this case for only those purposes for which it

7    has been received.

8          Keep constantly in mind that it would be a

9    violation of your sworn duty to base a verdict upon anything

10   other than the evidence received in the case and the

11   instructions of the Court.

12         The evidence in this case consists of the sworn

13   testimony of the witnesses, all exhibits received into

14   evidence, regardless of who produced them, and all the facts

15   which may have been agreed or stipulated.

16         Evidence should not be considered in bits and

17   pieces, as though each fact or circumstance stood apart from

18   others.  Rather, you should consider all of the evidence

19   presented, whether or not I have referred to it or whether

20   or not counsel has referred to it, and draw such inferences

21   as reason and common sense lead you to draw.

22         It makes no difference whether the evidence was

23   offered by the Plaintiff or by the Defendant.  It was all

24   evidence, and you should consider it to the extent that it

25   helps you decide the issues.  If I have made references to

1    the evidence in the course of these instructions that does

2    not coincide with your own, please disregard my references.

3    You are to determine the facts on the basis of all of the

4    evidence.

5         Certain things are not evidence and you may not

6    consider them in deciding the facts of the case.  I will

7    list them for you.

8         One, arguments and statements by lawyers are not

9    evidence.  The lawyers are not witnesses.  What they have

10   said in their opening statements, closing arguments, and at

11   any other time is intended to help you interpret the

12   evidence, but does not constitute evidence.  If the facts as

13   you remember them differ from the way a lawyer has stated

14   it, your memory of the facts controls.

15        Two, questions and objections by lawyers are not

16   evidence.  Attorneys have a duty to object when they believe

17   a question is improper under the Rules of Evidence.  You

18   should not be influenced by the objection or the Court's

19   ruling on it.

20        Three, testimony that has been excluded or

21   stricken or that I have instructed you to disregard is not

22   evidence and must not be considered.  In addition, if

23   testimony or exhibits have been received for a limited

24   purpose, you must follow the limiting instruction as I have

25   given you.

1          Four, anything you may have heard or seen when

2     court was not in session is not evidence.  You must decide

3     the case solely based on the evidence received at trial.

4          There are, generally speaking, two types of

5     evidence upon which you may find the truth as to the facts

6     of this case, "direct" evidence and "circumstantial."  One

7     type is direct evidence, such as recordings or the testimony

8     of eyewitnesses who testified as to what he or she has

9     heard, or what that person knows based on his or her

10     knowledge by virtue of that person's senses.  The other type

11     is circumstantial evidence, which is evidence that tends to

12     prove a disputed fact by proof of other facts.  Stated more

13     simply, circumstantial evidence describes evidence of

14     surrounding circumstances from which a jury might conclude

15     that an event has taken place.

16          Let me give you an example between direct and

17     circumstantial evidence.

18          For example, assume you are walking along a

19     sidewalk when you hear the squeal of tires on the roadway

20     behind you.  You turn around and notice fresh skid marks

21     behind a car which is stopped near you.  Even though you did

22     not see the car, you may properly conclude from the

23     surrounding circumstances, such as the squeal of the tires

24     and the skid marks, that the car has just skidded to a stop.

25          Circumstantial evidence is of no less value than

CHARLES P. McGUIRE, C.C.R.

1 direct evidence.  Thus, no greater degree of certainty is

2 required of circumstantial evidence as opposed to direct

3 evidence.  The law makes no distinction between direct and

4 circumstantial evidence.

5   In considering evidence, you are not limited to

6 the bald statements of witnesses or the bald appearance of a

7 particular exhibit.  On the contrary, you are permitted to

8 draw from the facts that you find to have been proved such

9 reasonable inferences as seem justified to you in light of

10 your own experience and common sense.  In other words, you

11 are to use your own good common sense in determining what

12 inferences, if any, are to be drawn from such facts as you,

13 the jurors, find to be proven.

14   What is an inference?  An inference is basically a

15 deduction or a conclusion that reason and common sense lead

16 you to draw from the evidence.

17   As I have noted, you are the sole judges of the

18 issues of fact.  You are likewise the sole judges of the

19 credibility, that is, the believability of all witnesses who

20 testified at the trial as well as the weight to be given to

21 the testimony of any witnesses you have heard.  It is not

22 for you to determine how much testimony -- I'm sorry.

23 Strike that.  It is for you to determine how much of the

24 testimony is believable and how much is not.  Where one

25 witness testified to a fact and another unequivocally denies

1    it, examine the testimony of both persons in the light of

2    all the circumstances under which the testimony was given.

3    Seek out the motive or motives which may have prompted the

4    witness to testify the way he or she did.  In other words,

5    ask yourself, "Did the witness have cause to lie?"

6         In your determination of whether the testimony of

7    any one or more witnesses who testified is credible in whole

8    or in part, you have the right to take into consideration

9    the circumstances under which he or she testified; the

10   relationship, if any, to a party; the intelligence, or lack

11   of intelligence of the witness; the demeanor of the witness

12   on the stand; the candor and sincerity or lack of it

13   indicated by the manner in which the testimony was given;

14   and the interest or lack of interest of a witness in the

15   outcome.  Consider, too, the knowledge or lack of knowledge

16   which a witness might have concerning the facts about which

17   he or she testifies.  Inconsistencies or discrepancies in

18   the testimony of a witness and between the testimony of

19   different witnesses may or may not cause the jury to

20   discredit any such testimony.  An innocent misrecollection,

21   like a failure to recollect, is not an uncommon experience.

22   In weighing the effect of a discrepancy, consider whether it

23   pertains to a matter of importance or a non-important

24   detail, or whether the discrepancy resulted from innocent

25   error or willful falsehood.

CHARLES P. McGUIRE, C.C.R.

1            You may also consider in evaluating the

2    credibility of any witness' testimony and the weight to be

3    given to it the extent to which his or her testimony is

4    contradicted or corroborated by other testimony or

5    documentary evidence.  You may, after such an appraisal of

6    testimony of a witness and in the exercise of your sound,

7    conscientious discretion, believe or disbelieve the

8    testimony of any witness either in whole or in part.

9            A witness may by discredited or impeached by

10   contradictory evidence; or by evidence that at some other

11   time, the witness has said or done something, or has failed

12   to do or say something, which is inconsistent with the

13   witness' present testimony.

14            If you believe any witness has been impeached and

15   thus discredited, it is your exclusive province to give the

16   testimony of that witness such credibility, if any, as you

17   think it deserves.

18            Your decision on the facts of this case should not

19   be determined by the number of witnesses testifying against

20   a party.  You should consider all the facts and

21   circumstances in evidence to determine which of the

22   witnesses to believe.

23            The testimony of a single witness which produces

24   in your mind a belief in the likelihood of the truth of any

25   fact is sufficient for the proof of that fact.

1          It is your exclusive function to determine the

2    persuasive value or weight that you will attribute to the

3    testimony of all witnesses whom you have heard testify.

4    Each of you is a judge in this case.  Collectively, you are

5    the sole judges of the facts.

6          The parties have stipulated that certain facts are

7    true, and those stipulations have been read to you during

8    this trial.  You must therefore treat these facts as having

9    been proven for the purposes of this case.

10         During the trial, certain testimony has been

11   presented to you by way of video deposition.  The deposition

12   consists of sworn, recorded answers to questions asked of

13   the witness in advance of the trial by attorneys for the

14   parties to the case.  The testimony of a witness who, for

15   some reason, is not present to testify from the witness

16   stand may be presented by a videotape.  Such testimony is

17   entitled to the same consideration and is to be judged as to

18   the credibility and weighed and otherwise considered by you,

19   insofar as possible, in the same way as if the witness had

20   been present and had testified from the witness stand.

21         Plaintiff Steven Foder has the burden of proving

22   his case by what is called the preponderance of the

23   evidence.  That means Mr. Foder has to prove to you, in

24   light of all the evidence, that what he claims is more

25   likely so than not so.  To say it differently:  If you were

1    to put the evidence favorable to Mr. Foder and the evidence

2    favorable to PATH on opposite sides of the scales, Mr. Foder

3    would have to make the scales tip somewhat on his side.  If

4    Mr. Foder fails to meet this burden, you must find for the

5    PATH on that issue.

6           On other issues, called defenses, PATH has the

7    burden of proving the elements of the defense by a

8    preponderance of the evidence.  I will instruct you on the

9    facts that will be necessary for you to find on this

10   defense.  A defense is proven if you find, after considering

11   all the evidence in the case, that the Defendant has

12   succeeded in proving that the required facts are more likely

13   so than not so.

14          In determining whether any fact has been proved by

15   a preponderance of the evidence in this case, you may,

16   unless otherwise instructed, consider the testimony of all

17   witnesses, regardless of who has called them, and all

18   exhibits in evidence, regardless of who may have produced

19   them.

20          When I say in these instructions that a party has

21   the burden of proof of any proposition, or when I use the

22   expression "if you find, or "if you decide," I mean you must

23   be persuaded, considering all the evidence in the case, that

24   the proposition is more probably true than not true.

25          Okay.  Let's talk about the claims in this

1    lawsuit.

2            Plaintiff Steven Foder's claim is based on the

3    Federal Employers' Liability Act, known as FELA.  This is a

4    Federal statute that requires railroads, such as Defendant

5    Port Authority Trans Hudson Corp., or the PATH, to exercise

6    reasonable care to provide a reasonably safe workplace for

7    its employees.

8            I will now briefly explain Mr. Foder's claim and

9    PATH's defenses to that claim.  I will then explain in more

10   detail certain legal terms that apply to their claims.

11           First, Mr. Foder's claim.  Mr. Foder claims that

12   while he was employed by PATH, he suffered an injury that

13   was caused by PATH's negligence.  Mr. Foder claims that PATH

14   should be required to pay damages because its negligence was

15   a cause of injury to Mr. Foder.  Mr. Foder has the burden of

16   proving this claim by a preponderance of the evidence.

17           Specifically, Mr. Foder claims here that the PATH

18   is at fault because PATH failed to provide Plaintiff with a

19   reasonably safe workplace, as PATH failed to provide a

20   reasonably safe climbing system to access the rail car.

21   Plaintiff also claims that PATH failed to provide a proper

22   non-slip surface on the portion of the anti-climber where

23   Plaintiff was required to place his foot when boarding

24   Defendant's rail car.  PATH denies Mr. Foder's claim.

25           PATH also asserts that Mr. Foder was negligent and

1      that this negligence was a cause of the claimed injury.  In

2      other words, PATH claims that, even if it is at fault,

3      Mr. Foder should share responsibility for his own injuries.

4      PATH has the burden of proving this claim by a preponderance

5      of the evidence.

6              Specifically, PATH claims here that Mr. Foder was

7      also at fault because Plaintiff failed to follow the

8      training provided by PATH with respect to how to properly

9      climb a train from track level; Plaintiff failed to use the

10     gloves provided to him to climb the train; Plaintiff failed

11     to place his foot securely on the anti-climber; Plaintiff

12     failed to properly secure his hands to the grab bar before

13     climbing onto the train, and Plaintiff failed to report an

14     unsafe condition with respect to the anti-climber or track

15     prior to his accident.  Mr. Foder denies PATH's claims.

16             If you determine that both Mr. Foder and PATH's

17     negligence were causes of Mr. Foder's injury or damage, then

18     you will be asked to compare the negligence of both and

19     determine what amount or percentage of fault is attributable

20     to Mr. Foder.

21             I will now explain certain terms I had mentioned

22     before in more detail.  First, negligence and reasonable

23     care.

24             I used the term "negligence."  You are instructed

25     that negligence is the failure to use reasonable care.

1      Reasonable care is the degree of care that a reasonably

2      prudent person would use under like circumstances.  The law

3      does not say how a reasonably prudent person should act;

4      that is for you to decide.  Negligence may be either doing

5      something that a reasonably careful person would not do

6      under like circumstances, or failing to do something that a

7      reasonable careful person would do under like circumstances.

8           The fact that an accident or injury may have

9      happened does not mean that it was caused by anyone's

10     negligence.  PATH is not required to guarantee Mr. Foder's

11     safety.  The extent of PATH's duty is to exercise reasonable

12     care under the circumstances to see that the workplace is

13     reasonably safe.

14          PATH's duty is measured by what is reasonably

15     foreseeable under the circumstances.  That depends on the

16     circumstances which are known or should be known and varies

17     in proportion to the harm that persons reasonably should

18     foresee.

19          A railroad may be found negligent under the FELA

20     if it fails to prescribe, promulgate, or enforce adequate

21     rules, procedures, and regulations for the safe operation of

22     its rail cars or if it fails to train or instruct its

23     employees on these rules, procedures, and regulations.

24          Even if the evidence reveals that the Defendant

25     complied with an applicable safety statute or regulation, it

699

1    is still liable for Plaintiff's injuries if, under the

2    circumstances, a reasonable person would have taken

3    additional precautions to prevent harm.

4            The Defendant, however, PATH, was not required to

5    furnish Plaintiff with the latest, best, or most perfect

6    rail cars, provided those in use are reasonably safe and

7    suitable.  You may not find Defendant liable merely because

8    there may be safer equipment or a safer method of performing

9    the work in question.

10           I also discussed PATH's assertion that Mr. Foder's

11   negligence has caused or contributed to his own injuries.

12   This is called contributory negligence.  Contributory

13   negligence is a careless act or omission of the Plaintiff

14   tending to add new dangers to conditions that the employer

15   negligently created or permitted to exist.  You should

16   consider this.  But you may not find contributory negligence

17   on the part of Mr. Foder simply because he acceded to the

18   request or direction of the responsible representatives of

19   his employer that he work at a dangerous job, or in a

20   dangerous place, or under unsafe conditions.  In other

21   words, you cannot find that Mr. Foder was contributorily

22   negligent just because he assumed the risk of his

23   employment.

24           Finally, the fact that Plaintiff's physical

25   condition prior to the accident may have made him

CHARLES P. McGUIRE, C.C.R.

1    susceptible to greater injury and loss than could have been

2    anticipated by the railroad does not in any way reduce his

3    recovery in the case.  A tortfeasor takes his victim as he

4    finds him and is liable for the full extent of the damages

5    sustained, even if they are greater than he could have

6    foreseen because that particular Plaintiff is susceptible to

7    the injury.  Thus a railroad whose actions exacerbate or

8    aggravate a pre-existing asymptomatic condition is

9    nonetheless liable for all of the Plaintiff's resulting

10   losses.

11        Second, causation.

12        I also used the term "cause" or "causation."  If

13   negligence is proved, Mr. Foder must also show that it was a

14   cause of the injury for which he seeks damages.  To be a

15   cause of the injury, the negligence must have played a part,

16   no matter how small, in bringing about the injury.

17   Negligence may not be -- may be a cause of injury even

18   though it operates in combination with another's act or with

19   some other cause, if the negligence played any part in

20   causing the injury.

21        Third, damages.

22        I used the term "damage."  The damage a party

23   suffers means the amount of money that will fairly

24   compensate him for any injury he sustained and is reasonably

25   certain to sustain in the future.

1          It is the duty of one who has been injured to use

2    reasonable diligence and means in caring for his injuries in

3    order to prevent their aggravation, to accomplish healing,

4    and to minimize his resulting damage.  Failure of the

5    injured party to make a reasonable effort to minimize

6    damages does not prevent all recovery, but does preclude

7    recovery for damages or losses which would have been avoided

8    had a reasonable effort to lessen damages been made.

9          In this case, you are instructed to only consider

10   two types of compensation:  One, the amount of money that

11   will compensate Mr. Foder for his pain and suffering, and,

12   two, the amount of money that will compensate him for his

13   lost overtime.

14         I will now explain pain and suffering and lost

15   overtime in more detail.

16         "Pain and suffering" means the physical pain and

17   suffering including any aggravation of a pre-existing

18   condition that Plaintiff has experienced and is reasonably

19   certain to experience in the future.  No evidence of the

20   dollar value of physical pain and suffering has been or

21   needs to be introduced.  There is no exact standard for

22   setting the damages to be awarded on account of pain and

23   suffering.  You are to determine an amount that will fairly

24   compensate the Plaintiff for the injury he has sustained.

25         "Lost overtime" means the amount of overtime that

1     Mr. Foder would have earned from July 23rd, 2011 to February

2     17th, 2012, then from October 28th, 2013 to April 4th --

3     April 7th, 2014, and, finally, from November 25th, 2014 to

4     April 17th, 2015 if he were not injured.

5              If you come to the point where you must calculate

6     these damages, you must only consider these two issues -

7     pain and suffering, as I've described it, and lost overtime

8     as I've described it.  Pain and suffering and lost overtime

9     are two unrelated values.  Your assessment of one should not

10    impact the assessment of the other.  It is also extremely

11    important that you only consider these two issues.  You are

12    specifically instructed not to consider regular wages or

13    medical bills.  They are not at issue in this case.  You

14    should put them out of your mind.

15             You must also not engage in any speculation,

16    guess, or conjecture, and you must not award any damages by

17    way of punishment or through sympathy.

18             Finally, do not make any reduction in the amount

19    of damages that you award based on any percentage of

20    negligence that you have determined.

21             Stipulations.

22             The parties have stipulated, or agreed, that when

23    Mr. Foder was injured, he was an employee of PATH performing

24    duties in the course of that employment, and that PATH was a

25    common carrier by railroad engaged in interstate commerce.

1           How You Will Answer the Verdict Sheet.

2           You will be given a verdict sheet where you will

3   write down your decision.  We give you one verdict sheet.

4   That sheet will have four questions to answer which will be

5   based on the information that I just explained to you.  I

6   will now explain these questions.

7           Question 1.

8           In Question 1, you must consider whether Mr. Foder

9   has proved by a preponderance of the evidence that, one,

10  PATH was negligent in one or more ways Mr. Foder claims;

11  and, two, PATH's negligence played any part in causing the

12  injury for which Mr. Foder seeks damages.

13          If Mr. Foder proves both elements, you must write

14  "Yes" and move on to the next question.

15          But if Mr. Foder does not prove both of those

16  elements, you must write "No" and turn in the verdict sheet.

17          Question 2.

18          In Question 2, you must consider whether PATH has

19  proven by a preponderance of the evidence that, one,

20  Mr. Foder was also negligent in any one or more of the ways

21  PATH claims; and, two, Mr. Foder's negligence played any

22  part in causing the injury for which he seeks damages.

23          If PATH proves both elements, you must write "Yes"

24  and move to the next question.  If PATH does not prove both

25  these elements, you must write "No" and move to the next

CHARLES P. McGUIRE, C.C.R.

1     question.

2              In Question 3, you will decide to what extent

3     Mr. Foder's injury was caused by his own negligence.  This

4     should be answered in terms of percentage per party,

5     totaling 100 percent.  You will only answer this question if

6     you find that PATH was negligent and that Mr. Foder was also

7     negligent.  In other words, you will only answer this

8     question if you answered "Yes" to Question 2.

9              In Question 4, the final question, you will

10    indicate the dollar amount of Mr. Foder's damage.  You will

11    write in that dollar amount, if any, of Mr. Foder's pain and

12    suffering in the blank line so indicated.  You will write in

13    the dollar amount, if any, of Mr. Foder's lost overtime in

14    the blank line so indicated.  Your answers for pain and

15    suffering must not take into consideration any possible

16    negligence by Mr. Foder.

17             Deliberating.

18             I have just described for you the various concepts

19    that you are going to have to address when deciding the

20    case.  You will next hear closing statements.  All the

21    instructions I just provided to you apply to this final part

22    of the trial.

23             To assist you in reaching a verdict, you will have

24    with you in the jury room a verdict form consisting of

25    questions calling for certain answers.  The verdict form

1    does not constitute evidence.  I will also give you a copy

2    of this charge.

3            To assist you in your deliberations, you will be

4    provided with all the exhibits.

5            Your deliberations will be chaired by a

6    foreperson.  You shall select your own foreperson as soon as

7    you get settled in the jury room.  I suggest that you take a

8    vote and select someone.  The foreperson shall preside over

9    your discussions, conduct any votes you choose to take on

10   the questions you are considering, and announce your verdict

11   in open court.  Exactly how you conduct your business in the

12   jury room is up to you.  I suggest that a show of hands, a

13   role call, or written ballot ships can be used.  If you do

14   use written ballot slips, however, please be sure to destroy

15   them before you leave the jury room, and do not bring them

16   out of the room under any circumstances.

17           Your verdict in this case will be announced at the

18   end of your deliberations and in open court.

19           As I mentioned a moment ago, the first duty you

20   will be asked to discharge in the jury room will be to

21   select from your number a person who will serve as the

22   foreperson of the jury.  How that person then proceeds to

23   discharge the function is entirely up to you.  For my

24   purposes, though, that is the person who should compose and

25   transmit any notes to the Court, and that is also the person

1    who should make the final entries on the verdict sheet.

2         The foreperson will be the person who will be

3    asked to hand up the verdict and report to the bench when

4    your verdict is returned.

5         Nothing said in these instructions and nothing in

6    any form of verdict prepared for your convenience is meant

7    to suggest in any way what your verdict should be.  What the

8    verdict shall be is your sole and exclusive duty and

9    responsibility.

10        Your verdict must be unanimous.  All members of

11   the deliberating jury must agree as to the verdict.  Any

12   verdict other than unanimous is not a legal verdict and will

13   not be accepted by the Court.

14        Following closing statements, you will retire to

15   the jury room to commence your deliberations and apply the

16   law as I have instructed to you to the facts as you find

17   them for the purposes of arriving at a fair and correct

18   verdict.  The verdict must represent the considered judgment

19   of each juror.

20        It is your duty as jurors to consult with one

21   another and to deliberate with a view to reaching an

22   agreement, if you can do so without violence to individual

23   judgment.  Each of you must decide the case for yourself,

24   but do so only after impartial consideration of the evidence

25   with your fellow jurors.  In the course of your

CHARLES P. McGUIRE, C.C.R.

1    deliberations, do not hesitate to re-examine your own views

2    and change your opinion if convinced it is erroneous; but do

3    not surrender your honest conviction as to the weight or

4    effect of evidence solely because of the opinion of your

5    fellow jurors, or for the mere purpose of returning a

6    verdict.

7            You are not partisans.  You are the judges -

8    judges of the fact.  Your sole interest is to ascertain the

9    truth from the evidence in this case.  You are to perform

10   your duty without bias or prejudice to any party.  The law

11   does not permit jurors to be governed by bias, sympathy,

12   prejudice or public opinion.  Both the Plaintiff and

13   Defendant expect that you will carefully and impartially

14   consider all of the evidence, follow the law as the Court

15   has stated it, and reach a fair and just verdict.

16           If during your deliberations you have a question

17   or feel that you need further assistance or instruction, or

18   wish part of the testimony read back, write your inquiry on

19   a sheet of paper and give it to the court officer stationed

20   at the jury room door, who, in turn, will give it to the

21   Court.  In the presence of the parties and counsel, the

22   Court will answer your inquiry.  It may take a while for us

23   to prepare a response, so don't stop deliberating and wait

24   for us to answer.  Move on to other matters if you can.  We

25   will resolve your question as soon as we can.  If testimony

CHARLES P. McGUIRE, C.C.R.

1    is read back to you, you may not give undue weight to the

2    testimony that is read back to you.

3              I instruct you that in writing notes to the Court,

4    please do not indicate how your votes are going, if at that

5    point you have taken any votes.  Except for announcing your

6    verdict, absolutely no one outside the jury is to be given

7    any idea of what your thoughts are on any part of the case.

8    When you start deliberating, do not talk to the jury

9    officer, or me, or anyone else but each other about the

10   case.  During your deliberations, you must not communicate

11   with or provide any information to anyone about the case.

12   You may not use any electronic devices or media, such as a

13   cell phone, smartphone, BlackBerry, iPhones, or any

14   computer, the internet, any internet service, any text

15   messaging, instant messaging, or any internet chat room,

16   blog, website, or social network such as Facebook, MySpace,

17   LinkedIn, or YouTube to communicate in any way, shape, or

18   form about this case or conduct research until I accept your

19   verdict.

20             During the course of a trial such as this, the

21   emotions of all concerned are on display.  This includes

22   witnesses and lawyers, as well as the Court.  It is part of

23   a real life drama.  Remember, each party's claims or

24   defenses are to be decided purely on the evidence presented

25   and not on your own perception of how counsel related to

1    each other, to the witnesses, or to the Court.  You are

2    engaged in a search for truth, and matters of advocacy -

3    adversarial interaction - are not relevant to the search.

4    Your only concern should be rendering a fair and impartial

5    verdict based solely on the evidence presented and the legal

6    instructions given.

7           Ladies and gentlemen:  Serving as a juror in a

8    case such as this is one of the most solemn duties that a

9    community can entrust to its citizens.  The responsibility

10   that rests upon you is a weighty one:  To be fair and

11   impartial jurors.

12          When you have reach a unanimous verdict, you

13   should advise the Deputy Marshal outside the door that you

14   have done so, and he will report that fact to the Court.

15   Again, do not indicate what the verdict is.  After you have

16   been ushered back to your seats in the jury box, I will

17   request that the foreperson rise, and ask, Have you reached

18   a verdict?  I presume the answer will be yes.  I will then

19   ask the foreperson to hand me the verdict form.  I will

20   review it, and then ask the foreperson to announce your

21   verdict to the courtroom.

22          Ladies and gentlemen, decide this case on the

23   facts and the inferences supported by the evidence and the

24   legal principles involved as I have just instructed you.  In

25   every respect, your judgment should be considered,

CHARLES P. McGUIRE, C.C.R.

1  deliberate, objective, deriving its force and validity from

2  the facts and inferences reasonably and logically supported

3  by the testimony and other evidence.

4  Now, ladies and gentlemen, I have concluded my

5  instructions.  You will next hear closing statements.  Then

6  you will begin your deliberations.

7  You may have noticed that whenever you left or

8  entered the courtroom, everyone stood.  We do that for a

9  very important reason, and that is to convey to each of you

10  that, together, you are the judges of this case.  By

11  standing, we accord you the respect to which you, as jurors,

12  are entitled.  I am confident that you will live up to our

13  expectations and deliberate with all the care that justice

14  requires and both parties deserve.

15  Counsel, I have come to the end of my charge.  If

16  you have any objections, kindly approach the sidebar and the

17  Court will hear you.

18  Anything?

19  MR. ROSENTHAL:  Can I see you at sidebar for a

20  moment, not on an objection, but --

21  THE COURT:  Okay.  Sure.

22  (The following takes place at sidebar)

23  MR. ROSENTHAL:  What is Your Honor's policy on

24  rebuttal?

25  THE COURT:  There is no rebuttal.

CHARLES P. McGUIRE, C.C.R.

1          MR. ROSENTHAL:  Okay.

2          THE COURT:  Thank you both for being so respectful

3     at sidebar.  I've had lawyers huff and puff and run away

4     while I was talking.  And I want to tell you all on the

5     record that you were a pleasure to have in my courtroom, and

6     I appreciate your respect to the Court, and to the jury, and

7     to Chuck.  Thank you.

8          MR. ROSENTHAL:  Thank you, Your Honor.

9          MR. MINO:  Thank you, Your Honor.

10         THE COURT:  Okay.

11     (The following takes place in open court)

12         THE COURT:  Mr. Mino?  You're first.

13         MR. MINO:  Sure.

14         Good morning, ladies and gentlemen of the jury.

15         Before I start, I want to thank you for your time

16    and your patience.  It's not always easy, I know that.  But

17    you guys doing what you do and sitting there and listening

18    to us allows me to do my job, and quite frankly the most fun

19    part of my job, trying the case.  So thank you very much.

20         Now, at the opening of my case, I told you that

21    this case was going to be about the carelessness and the

22    mistakes that are made when a person becomes too comfortable

23    in their routine, when they're doing something that they've

24    done a hundred times and they just don't pay attention the

25    way they should.

1          And now that you've heard the evidence in this

2     case, I think you've seen the carelessness that happened on

3     July 22nd, 2011.

4          Before we get into it, though, let's just discuss

5     exactly what the Plaintiff has to demonstrate in this case.

6          You just heard Judge Arleo say it's Mr. Foder that

7     bears the burden of proof in this case.  He must prove his

8     elements by a preponderance of the evidence - more likely

9     than not.  That's the scales that Judge Arleo just talked to

10    you about.

11         And what exactly does he need to prove?

12         He needs to prove by a preponderance of the

13    evidence that PATH failed to provide a reasonably safe

14    workplace and that that failure caused, in whole or in part,

15    his injuries.

16         And, ladies and gentlemen of the jury, I submit to

17    you that Plaintiff has failed to meet his burden.

18         Now, Plaintiff claims that PATH was negligent in

19    two ways:  One, that there wasn't anti-slip tape on the

20    anti-climber, and, two, because of the climb system

21    provided, the end step and the grab bars.

22         Now, Plaintiff is going to want you to immediately

23    start thinking about those questions, immediately think

24    about, did PATH do anything wrong.

25         However, I think there's a critical question that

713

1      you need to consider first.  That's, what exactly happened

2      on July 22nd, 2011?

3              Now, why would Plaintiff want you to just jump

4      right into, did PATH do anything wrong?

5              Because, ladies and gentlemen of the jury, the

6      truth of what actually happened on July 22nd, 2011 does not

7      demonstrate a failure of PATH, but a failure of Mr. Foder.

8              Now, let's think about the evidence of what

9      happened that day.  All right?

10             You were told -- you heard three different stories

11     - three different stories of what happened to Mr. Foder and

12     what caused him to fall.

13             Only one of them makes sense.  And I submit to

14     you, ladies and gentlemen of the jury, the best evidence of

15     what happened that day is what was said closest in time to

16     the accident.

17             Everyone knows memory doesn't get better over

18     time, it only gets worse.  That's why it's important that as

19     soon as something happens, or as close in time to it, we get

20     an accurate picture of it.

21             You heard Mr. Avril say that whenever a PATH

22     employee gets hurt, they have to fill out an accident report

23     as soon as they can.

24             And you heard about the accident report that

25     Mr. Foder filled out that day.

CHARLES P. McGUIRE, C.C.R.

1          It's right here:  Defendant's Exhibit A.  You will

2   have this back in that room when you deliberate.  You can

3   look at it and you can read what's written on it.  All

4   right?

5          This was filled out by Mr. Foder a few hours after

6   he fell, only a couple of hours.  Everything is fresh in his

7   mind at that point.  Okay?

8          And you heard the testimony.  He was asked on this

9   form, in his own handwriting, describe how the injury

10   occurred.

11          Does he say that his left foot slipped?

12          No.

13          Are the words "left foot" found on here at all?

14          No.

15          His description:  "As I was climbing onto the

16   train on S1 I put my right foot into the...footstep and

17   grabbed hold of the climbing rail."  And "As I lifted my

18   body up my right ankle slipped and rolled over on me.  I

19   tried to hold on but due to my hands being sweaty I couldn't

20   hold on."

21          Ladies and gentlemen of the jury, that

22   description, he never places his left foot on the

23   anti-climber.  A couple hours after the accident, he's

24   telling you he never places his left foot on the

25   anti-climber.

1           The cause of his accident is sweaty hands.

2           He then fills out the Unusual Occurrence Report.

3    Again, asked to describe the incident:  "As I was climbing

4    onto the train on S-1 I put my right foot into the right

5    footstep, grabbed hold of the R-1."  And "As I lifted my

6    body up my right ankle slipped and rolled."  And "I tried to

7    hold on but due to my hands being sweaty I slipped and

8    fell."

9           Again, cause of the fall is sweaty hands.

10          Now, Mr. Foder attempts to explain this by saying,

11   well, I was really in pain at the time, I just wanted to go

12   home, I wanted -- wanted things to be over quickly.

13          But this is where your common sense comes in.  How

14   much longer would it have taken to write the phrase, my left

15   foot slipped?  Thirty seconds?  Thirty seconds was going to

16   be the breaking point?

17          And look at this:  He goes over the amount of

18   space in the box.  It wasn't as if he wrote two or three

19   words.  He had the time to write out the entire thing, but

20   left out his left foot slipping.

21          Ladies and gentlemen of the jury, that's because

22   his left foot never slipped because he never placed it

23   there.  All right?

24          Does it make sense to you that when you're asked

25   to describe an accident a few hours later that you're going

CHARLES P. McGUIRE, C.C.R.

1      to leave out the literal moment you start -- start to slip?

2              That doesn't make sense at all.

3              And you know it doesn't make sense, because

4      Mr. Foder went up there and testified that whether or not

5      his hands are sweaty didn't come into play at all because,

6      if he was glued to the bar, it wouldn't have mattered

7      because his foot already slipped.

8              So if you want to believe that, then Mr. Foder,

9      when asked to describe the incident, wrote something that

10     did not apply.

11             Ladies and gentlemen of the jury, that doesn't

12     make any sense.

13             Hold Mr. Foder to the words that he wrote a few

14     hours after the accident.  All right?  Don't let him rewrite

15     these words.  This is what happened.

16             Mr. Foder could have put on the gloves that day,

17     but he didn't.  Gloves, again, aren't even mentioned.  He

18     says, my hands are sweaty and I fall.

19             Now, a few days after the accident, we get story

20     number two, and that story is not sweaty hands anymore.

21     We've gotten rid of the sweaty-hands thing.  This time, it's

22     grease on the shoes.  All right?

23             And we see this for the first time in the PATH

24     medical file.  There's a note from July 25th, 2011, the

25     first time Mr. Foder goes to see the PATH Medical

1    Department.  And in that note, it says that Mr. Foder said

2    that he thought that he slipped and fell because he had

3    grease on his shoes.

4            So this is story number two.  And he then tells

5    this again to the physical therapist on August 1st, 2011, so

6    about a week and a half, two weeks after his accident.

7            Now, you can't blame pain for this version of the

8    story, because, when he goes to PATH Medical, he says his

9    ankle's doing better, and when he goes to the rehabilitation

10   place, he says his ankle pain is one out of 10.  So we can't

11   blame pain for this one.

12           But we know that it's unlikely that Mr. Foder fell

13   on grease.  When he was up there, he couldn't specifically

14   identify where the grease was.  He eventually just said,

15   well, you know, it's -- or he eventually just gave a general

16   assumption of what he thought the area was probably like.

17   But there was no specifics.  Right?

18           And how else do we know there wasn't grease?

19   Because right after Mr. Foder fell, in fact, when he was

20   still on the ground and he was there, a PATH car inspector,

21   you heard from him, Dennis Velez, went to the train.  He

22   looked at the end step.  No grease, no oil, no water.

23           He looked at the anti-climber.  No grease, no oil,

24   no water.

25           This is all written in the memo to Mr. Avril,

1    Exhibit C.  You will also have this back there with you.

2              So now we come to the third story, right?  This is

3    the one that we heard up on the witness stand, right?

4              This time, this story is, well, I was walking very

5    carefully, made sure not to step on anything.  I get to the

6    train, I begin to climb as I was taught, I placed my foot

7    mostly on the diamond plate, and I slip and fall.  All

8    right?

9              Mr. Widas actually described his version as

10   perfect.  And it should be.  I mean, it's taken a long time

11   to craft and to be told.  Right?

12             But let's think about what else we heard.

13             When Mr. Foder described his accident, he said it

14   happened in a split second, he said less than two seconds

15   from when he starts to climb up until when he falls.

16             Yet he wants you to believe that he can

17   specifically remember where he placed his foot.  He can't

18   specifically remember the grease, he can't specifically

19   remember any oil, but he can specifically remember, he wants

20   you to believe, that he placed -- exactly where he placed

21   his foot, despite the accident taking a split second.

22             Now, ladies and gentlemen of the jury, we know

23   that this story also doesn't make sense.  And how are some

24   of the ways that we know this?

25             Well, did you ever hear from Mr. -- did Mr. Foder

1    ever say when he was up there that he complained about the

2    condition of the anti-climber or the climb system prior to

3    July 22nd, 2011?

4           No.

5           Did you ever hear Mr. Foder say that prior to July

6    22nd, 2011, he had any problems using that climb system or

7    climbing up a train?

8           No.

9           And what else did you hear?

10          You heard that car inspector Dennis Velez, right

11   after Plaintiff's accident, climbed up the train - not a

12   problem.

13          And perhaps, to me, one of the best pieces of

14   evidence, and you might have missed it because it was late

15   in the day and it didn't take very long, was Sandra Bou.

16          Sandra Bou was the conductor working with

17   Mr. Foder.  Right?  She went up right before him.

18          You saw her walk in here.  Sandra Bou at the time

19   of the accident was approximately 45 years old, and she's a

20   five-foot-one woman, and she could make it up there safely.

21          But Mr. Foder would have you believe that as a

22   24-year-old guy, six feet tall, it was unsafe for him.

23          But Sandra Bou could do it.

24          It simply doesn't hold up.

25          Now, I think it's pretty clear, ladies and

1    gentlemen of the jury, that the most likely story is, as I

2    said, the first one, the one that's written on Defendant's

3    Exhibit A and Exhibit B, and based on that, you can't find

4    PATH negligent, because the cause of the accident is sweaty

5    hands.

6            Now, PATH can do a lot of things, but PATH cannot

7    control the weather.  PATH can't make it less hot.  They

8    just simply can't.

9            Now, if you, though, choose to believe Mr. Foder's

10   third version of the accident, the one you heard up there,

11   Mr. Foder still caused or contributed to this accident.  And

12   it's at this point that you get to the questions that

13   Plaintiff wants you to consider:  Was PATH negligent because

14   of the anti-slip tape or was PATH negligent because of the

15   climb system?

16           And you just heard the jury instruction from

17   Judge Arleo about PATH failing to provide a reasonably safe

18   workplace.

19           In order to meet this burden, Mr. Foder relies on

20   his own testimony as well as that of George P. Widas, the

21   supposed expert that testified, right?

22           But think about all the testimony you heard,

23   ladies and gentlemen of the jury.

24           Mr. Foder, Mr. Widas, and no one else here said

25   that PATH train car 5678 did not comply with all applicable

CHARLES P. McGUIRE, C.C.R.

1    government regulations at the time of the accident.  In

2    fact, what you heard from everyone involved was that PATH

3    train car 5678 complied with all the regulations.  It was

4    exactly as it was required to be under the FRA.

5              You didn't hear one witness testify that there was

6    a requirement to put grip tape on the anti-climber.  You

7    didn't hear one witness say that the FRA required it.  Okay?

8              And let's talk about the FRA, the Federal Railroad

9    Administration.  This is the government agency that governs

10   PATH.

11             You heard time and time again about how the train

12   car complied with the FRA regulations, right?  And you can

13   see for yourselves, Defendant's Exhibit E, which goes back

14   with you, the daily inspections that PATH does to meet its

15   FRA requirements.  No problems with car 5678.

16             You also heard from railroad safety regulation

17   expert Augustine Ubaldi.  He said when he looked at the car,

18   nothing wrong with the end step, nothing wrong with the

19   anti-climber, nothing wrong with the grab bar.  All of it

20   met the applicable regulations.

21             So what does this mean?

22             This means that Mr. Foder is saying that PATH

23   should have gone above and beyond.  Right?

24             But, ladies and gentlemen of the jury, Judge Arleo

25   just instructed you this isn't the standard.  PATH doesn't

1    have to provide the best or the latest or the safest or the

2    most perfect train car.  Right?  They're only obligated to

3    provide a reasonably safe train car.

4            Now, there was the instruction that just because

5    PATH complied doesn't automatically mean they're not

6    negligent.  And that's true.  However, compliance is

7    evidence that PATH acted reasonably, and you should listen

8    to that evidence, right?

9            And the question isn't really whether -- or it's

10   not at all whether or not something can be made safer.

11   Almost anything can be made safer, right?  Me standing here

12   right now, it's probably safer if I just had a seat, but I

13   don't really think that I would be allowed to do that,

14   right?

15           So you don't look at whether or not something can

16   be made safer; you look at whether or not what was there was

17   safe.

18           And, ladies and gentlemen of the jury, I submit to

19   you that it was safe.  It met all the regulations that it

20   needed to.

21           And how else do we know that PATH acted

22   reasonably, that PATH provided a reasonably safe workplace?

23           Well, let's think about it.

24           When the cars first came in, you heard Mr. Wallace

25   testify about it.  The FRA came and looked at the cars.  The

1    Federal Railroad Administration, the thing that governs

2    PATH, comes and looks at the cars, found no problem with

3    that climb system, found no problem with that anti-climber.

4    They do daily inspections, every 24 hours, right, looking at

5    the train car:  Is there anything wrong with the end step,

6    is there anything wrong with the anti-climber, is there

7    anything wrong with the grab bar?  And they do inspections

8    every 92 days, the periodic inspections that Mr. Wallace

9    talked about, looking at the same stuff.  No inspection, the

10   92-day, the daily inspection, or the initial FRA inspection

11   where they were telling them if anything needed to be

12   changed, at no point was any of that a problem.

13            And then you heard about the training that

14   Mr. Foder received.  Mr. Avril talked about that

15   extensively.  Right?  They recognize that someone needs to

16   be taught how to climb up onto the train, right?

17            So what did we hear?

18            Mr. Avril said, well, at orientation, the very

19   first day, they are shown how to climb up onto that train.

20   The very first day.

21            And what did Mr. Avril say about it?  If you're

22   climbing up on the right side, your right foot in the end

23   step, you grab onto the grab bar with both hands, maintain

24   three points of contact, you pull yourself up, and you place

25   your left foot on the diamond plate.

1                    Now, he did say if you have like size 15 feet,

2        really big feet, maybe some of it might have to get on the

3        edge.

4                    Mr. Foder doesn't have size 15 feet.  Right?

5                    The instruction from Mr. Avril is put your foot

6        securely on the anti-climber on the diamond plate.

7                    And in addition to training them how to do it,

8        they provide them with gloves.

9                    These are the gloves.  They provide them with

10        these gloves.  You put them on, you tighten them, you're

11        ready to go, you're ready to climb up the train.

12                    Mr. Foder mentioned these conductor's gloves.  But

13        look at the difference.  You heard all the manual work

14        engineers need to do, all the things they need to do

15        compared to the conductors.  Mr. Avril said, if I gave these

16        gloves to engineers, they wouldn't last a day.

17                    So Mr. Foder, who doesn't even put on gloves when

18        he's climbing, seems to think that this, the glove that

19        isn't going to last a day, is better than this glove.

20                    It just simply doesn't hold up.

21                    Now, based on the inspections, based on the

22        training, based on the equipment provided, I think it's

23        clear that PATH acted reasonably in this scenario.

24                    And let's just talk for a second about the

25        testimony of Mr. Widas.

CHARLES P. McGUIRE, C.C.R.

1            Now, there was a lot of like nevers with

2    Mr. Widas, right:  He never worked on a railroad, never had

3    to perform the functions of a train engineer, never climbed

4    up that climb system that he dislikes so much, never saw

5    anyone climb up it, and never actually took any

6    slip-resistance measurements of the grab bar or the

7    anticlimber, right?

8            MR. ROSENTHAL:  Your Honor.

9            THE COURT:  Yes.

10            MR. ROSENTHAL:  Objection, Your Honor.

11            THE COURT:  On what basis?

12            MR. ROSENTHAL:  On the basis of, he's talking

13    about why -- Mr. Widas not measuring the slip resistance.

14            MR. MINO:  I will go back --

15            THE COURT:  Okay.

16            MR. ROSENTHAL:  And that was something that we --

17            MR. MINO:  I will go back and rephrase the way I

18    said it.

19            THE COURT:  Let's talk at sidebar for a second.

20            MR. MINO:  Sure.

21        (The following takes place at sidebar)

22            THE COURT:  Yes?

23            MR. ROSENTHAL:  Counsel mentioned that Mr. Widas

24    didn't do measurements on the slip resistance of the diamond

25    plate, and the reason he didn't do it was because they had

1    -- there was tape on there, and when asked the question of

2    why he didn't do the slip resistance, he said the conditions

3    had changed.

4            Now, I believe that counsel just opened the door

5    for me to get into --

6            THE COURT:  No, you can't get into anything

7    because it's not evidential.  That's the first thing.

8            I'll give a limiting instruction.

9            MR. MINO:  I said anti-climber, not diamond plate,

10   and that was wrong.  To me, I should have said diamond

11   plate, because that was a safety issue, and he could have

12   measured it.  However, if you are telling me to not mention

13   it at all --

14           THE COURT:  I'm going to instruct them to

15   disregard anything at the end -- right now, to disregard

16   anything having to do with measuring of the area, the

17   anti-climber area.

18           MR. MINO:  Okay.

19           MR. ROSENTHAL:  And also, I wanted to mention that

20   Mr. Ubaldi had talked about that the area was safe, and all

21   he -- Mr. Ubaldi was able to testify here was that it met

22   the FRA standards.  So I was going to wait until he was done

23   and place that objection to that statement on the record.

24           MR. MINO:  He testified that it didn't violate the

25   FRA.

CHARLES P. McGUIRE, C.C.R.

1              MR. ROSENTHAL:  Right, but not that it was safe.

2              MR. DiGIULIO:  You said that he inspected it and

3     it was safe.  That's the problem.

4              THE COURT:  So let me write these both down.

5              So we're going to instruct the jury to ignore the

6     statement that, one, Mr. --

7              What's your expert's name?

8              MR. MINO:  Ubaldi.

9              MR. ROSENTHAL:  Ubaldi.

10             MR. MINO:  U-b-a-l-d-i.

11             THE COURT:  -- testified that it was safe, and,

12    two, that Mr. --

13             What's your expert's name?

14             MR. ROSENTHAL:  Widas.

15             THE COURT:  -- Widas failed to measure the --

16             MR. ROSENTHAL:  Slip resistance.

17             MR. MINO:  Of the anti-climber.

18             THE COURT:  Move off it, okay?  Stick with the

19    evidence.  This is careful stuff.  We have to be real

20    careful here, okay?

21             All right.  So noted.  I'll tell the jury right

22    now.

23             Thank you.

24             MR. ROSENTHAL:  Thank you.

25

1          (The following takes place in open court)

2          THE COURT:  Okay.  Before I allow counsel to

3     continue, I'm going to give you two additional instructions:

4     To ignore counsel's statement that Mr. Ubaldi testified that

5     the work area was safe - you're to ignore that statement as

6     evidence in this case; and, two, that Mr. Widas failed to

7     measure the slip resistance of the anti-climber.

8          Those two statements made by defense counsel

9     should be ignored.  Okay?

10          And you can continue.

11          And they should be ignored and not submitted to

12     you as arguments based on relevant evidence in this case.

13          Continue.

14          MR. MINO:  Sure.

15          So, to kind of pick up where I left off, Mr. Widas

16     never works on a railroad, never performs the functions of a

17     train engineer, never climbed up the train, and never saw

18     anyone climb up the train, right?

19          But Plaintiff will still use him to argue that

20     PATH was negligent.

21          And let's think about what Mr. Widas actually is.

22     Right?  He's a safety consultant.  He's hired by people to

23     say how you can make things better, how you can make things

24     safer.  Right?  And of course, if the Plaintiff is going to

25     hire him, he's going to find something wrong, or otherwise,

1    why would he get paid, right?  And he's even said every time

2    he looked at PATH --

3                MR. ROSENTHAL:  Objection, Your Honor.

4                THE COURT:  Hold on.

5                What's your objection based on?

6                MR. ROSENTHAL:  On improper commenting on the

7    credibility of the witness.

8                THE COURT:  I'll overrule it.

9                You can continue.

10               MR. MINO:  Now, let's talk about what Mr. Widas

11   said about the grab bar and the end step.

12               He fully admitted that he wasn't testifying as to

13   whether or not it was within compliance of FRA regulations,

14   right?  He was using the FRA regulations in his mind to try

15   and help guide him.

16               And when asked, well, what would you really do

17   with the grab bar and the end step, well, he said, well, I

18   think I would move that grab bar over, but you've got to

19   bring it up and over.

20               So his first inclination is to make that grab bar

21   that he says is asymmetrical and really hard to grab, to

22   actually move it up higher.

23               Does that make any sense to you?

24               I think no.

25               And then with respect to the end step, you heard

1    the testimony from Mr. Ubaldi.  It's going to be very hard

2    to move that end step in, because you need to allow the

3    train -- he talked to you about the coupling device.  You

4    need to allow the train to be able to move around the

5    curves, and if you move that end step in, the coupler arm

6    won't be able to swing.

7          So this testimony about moving the grab bar or

8    moving the end step, ladies and gentlemen of the jury,

9    there's just no proof that any of that is actually feasible.

10   In fact, where Mr. Ubaldi ended -- or, strike that -- where

11   Mr. Widas ended up was, when asked, well, wouldn't that

12   moving it up higher make it more difficult, he said if it

13   were up to him, he'd just kind of scrap the whole design and

14   start from the beginning.

15         So let's go back to kind of where we started.

16         Did Plaintiff prove by a preponderance of the

17   evidence that PATH failed to provide a reasonably safe

18   workplace?  It's going to be your first question on the

19   verdict sheet.

20         And, ladies and gentlemen of the jury, I submit to

21   you that your answer there should be no.  And your answer

22   there should be no because, first, Mr. Foder fell, in his

23   own words, because his hands were sweaty, right?

24         And even if you believe that third version of the

25   story told by Mr. Foder, PATH acted reasonably at all times.

1    They inspect the trains, they teach Mr. Foder how to climb

2    up onto the train, they provide him with safety equipment.

3           As the jury instruction says, PATH is not a

4    guarantor of Mr. Foder's safety.  They do not guarantee at

5    all times he will be safe.  Mr. Widas himself testified that

6    Mr. Foder has to play a role in his own safety.  Mr. Wallace

7    testified that every PATH employee has to play a role in

8    their own safety.

9           Now, I submit to you, ladies and gentlemen of the

10   jury, that you shouldn't reach damages, because your answer

11   to the first question of whether or not PATH was negligent

12   should be no.

13          However, if you do reach damages, I think it's

14   important to discuss what should be included in these

15   damages.

16          And again, here, I want to remind you, this case

17   isn't about whether or not Mr. Foder fell, because he did

18   fall, or whether or not he had three surgeries, because he

19   did.  Right?  But as Judge Arleo instructed, your award, if

20   you choose to give one to Mr. Foder, should not be

21   influenced by sympathy.  Okay?  It should be a fair and

22   reasonable award, nothing else.  It should not come into

23   play whether or not you feel bad for Mr. Foder.

24          And pain and suffering only includes injuries that

25   can be related to the July 22nd, 2011 fall.

1          Now, you heard from two doctors in this case,

2      Dr. Greisberg, who testified for Plaintiff, and Dr. Dennis,

3      who testified for PATH.  But only one of those doctors saw

4      any MRI films prior to Plaintiff's first surgery.  Only one

5      doctor saw an image of what Mr. Foder's ankle looked like a

6      little over a month after the accident, and that was not

7      Dr. Greisberg.  That was Dr. Dennis.

8          And what did Dr. Dennis tell you?

9          The osteochondritis dissecans, or the

10     osteochondral lesion, as Dr. Greisberg puts it, pre-existed

11     Plaintiff's fall on July 22nd, 2011.  He gave you the

12     description of what osteochondritis dissecans means.  He

13     said dissecans is desert, it's a lack of blood, and he said

14     quite simply it couldn't have formed over that short a

15     period of time, over that 32-day period from when Mr. Foder

16     fell to when Mr. Foder had his MRI.

17         Now, Dr. Greisberg, despite not seeing the MRI,

18     comes to a different conclusion.

19         But think about here, think about which doctor had

20     more information as to what that ankle looked like before

21     the first surgery.

22         Now, because Mr. Foder had this condition before

23     July 22nd, 2011, it could not possibly have been caused by

24     the fall on July 22nd, 2011.

25         Now, you did hear in Judge Arleo's instruction

733

1        about aggravation of a pre-existing condition.

2                Well, ladies and gentlemen of the jury, based on

3        the testimony of Dr. Dennis, there's simply no way to

4        actually know whether or not this aggravated the condition,

5        because Dr. Dennis testified that the proper testing was not

6        done to differentiate whether or not that pain that

7        Mr. Foder was feeling in his right ankle after the injury

8        leading up to the first surgery, whether or not it was due

9        to the ankle sprain that he did suffer -- he admittedly

10       suffered a right ankle sprain -- whether it was due to that,

11       or the osteochondral lesion.  Right?  There's just no way to

12       determine what was causing that pain.

13               So here, Plaintiff is asking you to find in his

14       favor, to find that this pre-existing osteochondral

15       dissecans was aggravated.  But there is not the background

16       information to come to that point.

17               Now, Plaintiff also discusses some of the things

18       that he says he suffered as a result of this injury.  Right?

19       And this is, to me, where it's very important to remember

20       that sympathy should not be a factor.

21               Plaintiff talks about having to move back home.

22       Plaintiff talks about breaking up with his fiancee, and not

23       being able to play with his young daughter.

24               Now, ladies and gentlemen of the jury, these are

25       not happy things.  I fully admit these are sad things.

1              But these are things that are said to play on your

2       sympathy.  Okay?

3              Resist that urge.  All right?

4              And Mr. Foder also talked about the things he

5       couldn't do as a result of this injury, right?

6              You will have the medical records of

7       Dr. Greisberg, the doctor who did the second two surgeries

8       for Mr. Foder, the last orthopaedic doctor that Mr. Foder

9       saw, right?  You will not find anywhere in those records

10      Dr. Greisberg instructing Plaintiff, once he's ready, to not

11      run, to not be active.  In fact, Mr. Foder testified that

12      Dr. Greisberg told him to jog and use the elliptical

13      machine.

14             You will not find a note in those medical records

15      that tells Mr. Foder not to ride his motorcycle.  You will

16      not find anything in those medical records that tell

17      Mr. Foder not to play with his daughter, to push her on a

18      swing, to go run around on the playground with her, nothing

19      that tells Mr. Foder not to do the things that a good parent

20      such as Mr. Foder would want to do with his daughter.  Okay?

21             But what did the medical evidence actually show?

22             We talked about it.  A week or so after the

23      accident, when -- actually, more like two weeks after the

24      accident, when he goes to the first rehab visit, by August

25      1st, 2010, the pain in the right ankle is a one out of 10.

1     All right?  Six weeks after the first surgery, Mr. Foder

2     tells his doctor he's feeling pretty well.  By the time he

3     gets to Dr. Greisberg, he fills out an intake form and he

4     tells Dr. Greisberg he's exercising regularly.

5          And again, six weeks after the second surgery, he

6     says he's not really feeling much pain, and within a few

7     months of that second surgery, he's doing the jogging and

8     the elliptical that Dr. Greisberg suggested.

9          And after the third surgery, which both Dr. Dennis

10    and Dr. Greisberg agree involves less than the second

11    surgery, less than two weeks after that, Mr. Foder's feeling

12    pretty well and putting weight on that foot.  All right?

13         And with respect to this last surgery, you heard

14    Dr. Dennis say that Mr. Foder made a pretty good -- had a

15    pretty good result.  And you heard Dr. Greisberg talk about

16    the result as well.

17         And how else do we know that it's a pretty good

18    result?

19         Well, Mr. Foder hasn't seen Dr. Greisberg since

20    March of 2015.  That's more than a year and a half.  And

21    Plaintiff is back to work, full duty, as an engineer for

22    PATH.  Not an easy job physically, but he's back full duty.

23         Now, Plaintiff does claim that he's suffering from

24    some residual tendinitis in the ankle.

25         Now, one of the instructions Judge Arleo gave you

1    is about the mitigation of damages and how Mr. Foder has a

2    duty to not make his injury any worse by taking the proper

3    care to treat his injury.

4            Dr. Greisberg prescribed a foot orthotic for

5    Mr. Foder, and Dr. Greisberg said not wearing that foot

6    orthotic can make the tendinitis worse.

7            Well, what did Plaintiff say?

8            Plaintiff said he doesn't wear it around the house

9    all the time.  And Dr. Dennis also testified that Plaintiff

10   wasn't wearing it when he went to go see him.

11           So we know that Plaintiff not only doesn't wear it

12   around the house all the time, but he also doesn't always

13   wear it when he goes outside.

14           So like I said, where are we today with Plaintiff?

15   Hasn't seen an orthopaedic doctor in over a year and a half,

16   is back to full duty at PATH.  All right?

17           Now, Plaintiff is also asking for some lost

18   overtime here, saying that he would have made X amount of

19   dollars in overtime had he not been injured.

20           Well, you heard about overtime, right?  You heard

21   that it's not guaranteed.  You heard that it fluctuates.

22   And you also heard Mr. Foder say that there were times when

23   he was offered overtime and didn't work it.

24           So, ladies and gentlemen of the jury, I think when

25   you look back and consider the evidence and the testimony in

1    this case, I think it's relatively straightforward.  I think

2    you look at Defendant's Exhibit A and Defendant's Exhibit B

3    and see that Mr. Foder fell because his hands are sweaty.  I

4    think it's as simple as that.

5              Words have meaning, right?  Make these words

6    count.  These are his words, said hours after the accident.

7              But really, no matter what story you believe,

8    Mr. Foder was doing something on a job that he had done

9    hundreds of times, right?

10             But he wasn't paying attention.  He didn't pay

11   attention enough to put the gloves on, right?  Especially in

12   light of his hands being sweaty.  Doesn't pay attention

13   enough to put the gloves on.  Doesn't pay attention enough

14   to notice if there's grease on his shoe or on the

15   anti-climber or on the end step.  Right?  And he doesn't pay

16   attention enough to put his foot securely on the

17   anti-climber.

18             So based on this, ladies and gentlemen of the

19   jury, I submit to you that Mr. Foder has not met his burden,

20   and PATH was not negligent in this case.

21             Thank you.

22             THE COURT:  Thank you.

23             Okay.  It is now 11:45.  Why don't we take like a

24   10-minute break to use the bathrooms, and then we'll come

25   back and allow Plaintiff's counsel to sum up.  Okay?

1              Thank you.

2              THE COURT CLERK:  All rise.

3              THE COURT:  If you need 15, that's fine.  Ten to

4    15 minutes.

5         (The jury exits)

6              THE COURT:  Okay?  All right.  See you in 10 to

7    15.

8         (Recess taken)

9         (Jury out)

10             THE COURT CLERK:  All rise.

11             THE COURT:  Okay.

12             THE COURT CLERK:  All rise.

13        (The jury enters)

14             THE COURT:  Okay.  Ladies and gentlemen of the

15   jury, have a seat.

16             And now we will call upon Plaintiff's counsel to

17   give closing remarks.

18             MR. ROSENTHAL:  Thank you, Your Honor.

19             Is it afternoon or is it morning?

20             THE COURT:  It's afternoon somewhere and it's

21   morning somewhere, but it's 12:01 here, so I think we're

22   good either way.

23        (Laughter)

24             MR. ROSENTHAL:  Good afternoon, ladies and

25   gentlemen.

1              Let me begin by telling you what this case is not

2      about.

3              This case is not about FRA regulations.  We're not

4      claiming that there was any FRA regulation that Mr. -- or

5      Mr. Foder is not claiming through me that there's any FRA

6      regulation that was violated specifically relating to the

7      climb system or the grip tape.  We're not saying that

8      there's a violation of any FRA regulations that are

9      applicable to PATH.

10             What we are saying is that PATH did not provide a

11     reasonably safe place to work.  And I'm going to explain how

12     the evidence shakes out on that very issue.  I'm going to go

13     through each of the witnesses and explain how this case

14     actually plays out.

15             This, Exhibit 23A, which is in evidence, is the

16     front side of a PATH PA-5 car, very similar to the one --

17     actually, it is the one that Mr. Foder got injured on.

18     Again, it's not the same scenario - there was no steps there

19     at the time.  He was using the climb system that existed on

20     the car.

21             We heard, first of all, from Mr. Wallace.

22     Mr. Wallace tells us that prior to these cars ever getting

23     into service, the FRA met with PATH to talk about whether,

24     you know, are they in compliance with FRA regulations.

25     Again, remember, FRA regulations aren't the case here.

1     Mr. Wallace also tells us that there's part of

2  this that has nothing to do with FRA regulations - this,

3  which is the footstool on the right.  Nothing to do with the

4  FRA.  The FRA says nothing about that.

5     The climb system, again, having a climb system on

6  the back of the car - FRA doesn't deal with it at all.

7     That, ladies and gentlemen, is what this case is

8  about:  Whether, when you tell your employees to use a

9  particular method or system to gain access to a train,

10  whether you have to make it safe or not, and whether PATH

11  did that.  They knew that people were going to be getting on

12  and off the trains.  They knew it.  They put nonstick

13  material on this, right here, on the footstool.  That had

14  it.

15     July 22nd, 2011.  Mr. Foder was doing his job.

16  He's been working as an engineer for PATH for six months or

17  so, five months.  He is living with his girlfriend, their

18  new baby.  His life is beginning.  He's 24 years old.  This

19  is the beginning of his life.

20     It's a hot day.  He follows another worker on --

21  into this area.  The other worker, Ms. Bou, gets up on the

22  train.  Mr. Foder follows her.

23     Now, we heard something from just about every

24  witness about training that PATH uses to train people how to

25  get on trains, and what do we know from the testimony?

1              We know that Mr. Avril claims that he makes sure

2      that every engineer is able to get onto the train and that

3      he instructs them to use a certain method.  And what is the

4      method that he instructs?  Put your right foot into the foot

5      stirrup, grab ahold with your left hand the vertical portion

6      of the grab bar, your right hand on the horizontal portion

7      of the hand bar, and then with all the strength that you

8      can, you pull yourself up and place your right foot directly

9      -- or, I'm sorry, your left foot directly onto the diamond

10     plate.  That's what he says is the method that he's teaching

11     to every single engineer.

12             Then he sort of backs away a little bit:  Well, if

13     you have a big foot, it might be okay if you have part of it

14     on the diamond plate.

15             And, of course, the diamond plate that Mr. Foder

16     encountered that day looked like that (referring to Exhibit

17     P-24A).

18             Now, Mr. Foder testified that at the time of the

19     incident, having non-slip on the anti-climber existed, but

20     wasn't prevalent.  So some cars had it, some cars didn't.

21             But it's not something that he was entrusted with

22     inspecting, and in fact, it wasn't even something that

23     Mr. Velez inspected.  You see, when Mr. Velez later is going

24     to come and look at this piece, he's not looking to see

25     whether it has slip-resistant tape or not; he's just looking

1       to see if there's any bends or bangs or if it's falling off.

2       It's pretty much a visual inspection is what he testified

3       to.

4              Now, Mr. Foder and everybody else except for

5       Mr. Avril testifies that when they step onto the train,

6       they're stepping on the edge.  Mr. Velez stepped on the edge

7       when -- when he did the same thing that day, he stepped on

8       the edge.  He testified to that.

9              Mr. Wallace testifies that you have to, you have

10      to step on the edge as well as the diamond plate.  You have

11      to.  You can't do it without it, which is essentially what

12      Mr. Foder testifies to.  It's impossible, it's impossible

13      not to.

14             Now, the ultimate question, ladies and gentlemen,

15      that you're going to be asked is whether the whole system

16      with non-slip tape is or is not reasonably safe.  PATH wants

17      you to believe that they don't have any obligation to

18      provide for that because the FRA doesn't obligate it.  But

19      again, the FRA isn't what's at issue here.  FRA regulations

20      don't apply to this.  This is just about whether or not this

21      -- telling people to get on the train in that environment

22      from track level, climbing 49 inches with your left foot, is

23      safe if you don't have something nonskid.

24             And I'm going to explain a little bit later what

25      Mr. Widas's testimony was on that issue.

1          PATH acknowledges that they have a moral

2     obligation to provide a safe place.

3          Well, what does that mean, a moral obligation?

4          They have an obligation under the law to provide a

5     reasonably safe place to work, period.  Not a -- it's not

6     moral, not just moral - it's an obligation.  They have that.

7     The law as the Judge read it to you says it.

8          PATH's main defense is that Mr. Foder's climbing

9     up, and his right foot slips, and it has nothing to do with

10    the non-slip because he didn't write it in his initial

11    accident report, the accident report that he wrote out two

12    hours after he was hurt.  When he writes, I injured my ankle

13    when I was essentially climbing onto the train, he was in

14    pain, excruciating pain, as he testified, and he just wanted

15    to get out of there.  Of course, PATH doesn't let him go

16    home; they bring him from the hospital to PATH's

17    headquarters and make him fill out this report, two of them,

18    and he's writing the exact same thing in both of them.

19         Mr. Mino wants you to believe that this is two

20    different times telling the same thing.  He's telling the

21    same thing, it's at the same time he's filling out these

22    reports.

23         Interestingly, PATH's so concerned about Mr. Foder

24    that they let him under those circumstances drive himself

25    home with his left foot.

CHARLES P. McGUIRE, C.C.R.

1          So we have Ms. Bou, who gets on the train

2     immediately before Mr. Foder.  She's not using the right

3     method to climb up.  She has both her hands on the

4     horizontal.

5          As a matter of fact, nobody testifies that they

6     use the method that Mr. Avril claims everybody should be

7     using.  Not a single witness came in here to tell you that.

8          And, in fact, they never charged Mr. Foder with

9     violating a rule for failing to get on the train properly.

10    What they basically were trying to say is that he should

11    have put gloves on, okay?  He should have put his gloves on.

12    He should have known and put gloves on because -- and you

13    heard Mr. Avril testify to this -- it is a requirement of

14    the job, you have to wear gloves at all times.  That's --

15    that's it, period.  You have to wear gloves.  He wasn't

16    wearing gloves.  It's his fault.  That's what Mr. Avril

17    said.

18         And when he got on the stand, when Mr. Foder got

19    on the stand, Mr. Mino went after him:  So you're calling

20    Mr. Avril a liar.

21         Let's talk about the gloves for a moment.

22         Gloves.  Are they a requirement of the job?  You

23    heard people talk about PATH had a book of rules, this thick

24    book of rules.  It's not in evidence.  They didn't put it in

25    evidence.  Don't you think if there was a rule requiring him

CHARLES P. McGUIRE, C.C.R.

1      to wear gloves, that would have been -- he would have been

2      cross-examined on that, and you would be looking at that

3      rule to see that he was in violation of that?

4                Nothing.

5                The other thing I want you to understand about the

6      gloves, ladies and gentlemen, is, when the accident report

7      is filled out -- this is Defendant's Exhibit A.

8                Question number 15 -- that might be hard to read;

9      I'll have to -- can people see that?

10               "Was personal protective equipment required for

11     this job?"

12               This is their exhibit.

13               "Yes."

14               Identify it.

15               "Safety Shoes; Reflective Vest; Flashlight; other,

16     Escape Head," or that's what it looks like.

17               THE PLAINTIFF:   "Hood."

18               MR. ROSENTHAL:   There's something here for "Rubber

19     Gloves, Canvas Gloves, Other Type Gloves."

20               You don't see it circled, do you?

21               There was no requirement for gloves.   That's their

22     defense.   They concocted that.   Half of this is concocted to

23     try to make him look like he did something wrong.   And you

24     know what?   He didn't deserve it.

25               This isn't just what PATH did to Mr. Foder, ladies

1    and gentlemen.  That is what PATH's trying to do to you in

2    how you evaluate this case.

3              Let's talk about the grounds around where

4    Mr. Foder got hurt.

5              This is also in evidence.  To give you an idea,

6    this is Exhibit 5T.

7          (Plaintiff's Exhibit 5T was displayed.)

8              MR. ROSENTHAL:  And you can see some things in

9    here that probably shouldn't be there:  We have a hairbrush;

10   we got some sort of trash; there's more cigarette butts in

11   this photo than I don't think I've ever seen on a street

12   corner anywhere.

13             Mr. Foder tells us, this is the way it is all the

14   time.  This is the way it is.  There's debris, there's oil,

15   and there's grease.

16             Mr. Mino goes after Mr. Foder because he doesn't

17   know the exact spot for where the oil and grease were.

18             Why would he?  I mean, he's not inspecting for

19   that.  Either is Mr. Velez, for that matter.  They're not

20   inspecting for oil and grease.  It's not their jobs.  They

21   don't know exactly where it is.  They know it exists in that

22   area.  As Ms. Bou testified and as Mr. Foder testified with

23   regard to the grease, there's a greaser that goes by that

24   area all the time spreading grease.  She said it gets on

25   your shoes, it gets everywhere, and so did Mr. Foder.

CHARLES P. McGUIRE, C.C.R.

1            The question of whether or not there were other

2       things there and why he told the doctor or the PATH Medical

3       a week later that he thinks maybe he had grease on his foot,

4       he's trying to figure out what's going on:  There's grease

5       there.  Why did I slip?  He's trying to figure it out, why

6       he slipped.  Why did he slip?

7            Now, let's talk about safety, because that's

8       really the issue here is safety.

9            You only heard one witness testify about, what is

10      safety?  What is required?  We have steps all over the

11      place.  Here (indicating Exhibit P-23A), we have steps.

12      What do we need?  What makes safe steps, particularly if

13      we're going to tell people, this is where you've got to get

14      onto a train.  There's no other place to get on; got to get

15      on here.

16           Now, there's no question about it, ladies and

17      gentlemen, if they had this thing there with the handholds

18      here, no problem.  They don't.  And we're not saying that

19      they should have.

20           What we're saying is, in essence, that if you're

21      going to have -- that what makes steps and climbing systems

22      safe is, you need -- and I can't remember the exact words

23      that Mr. Widas used, but symmetrical was one of them, and

24      concentric, I believe, was the other one, which means that

25      you really need to be -- where the force is coming down, you

1 need to be almost at a perpendicular angle, because when

2 it's perpendicular, there's no slippage in any direction,

3 it's straight down, and that's just common sense.

4    When you're asked to pull yourself in a direction,

5 like this climb system does, you're violating the principles

6 that safe practice requires for concentric and symmetrical

7 climbing systems.  It becomes eccentric and asymmetrical.

8    Now, even with that being said, if the walking

9 surface up here that he's getting on had some sort of slip

10 resistance at that edge, we wouldn't be here.  That's what

11 Mr. Widas said as well.  If you're going to ask people to do

12 this, make the floor safe, like on some of the other trains.

13 Make it safe.  Why isn't it safe on this one?

14    If it had been, we wouldn't be here.  And what

15 happened to Mr. Foder afterwards, none of that would have

16 happened.

17    So, really, if he is in any way injured in the

18 process, PATH could have done something to -- should have

19 done something to make this whole system safe.  They did it

20 on the foot step.  They failed to do it here.  And you don't

21 need slip resistance like that.  It's concentric and

22 symmetric.  But it wasn't.  And you're asking people to use

23 it every day, and it's foreseeable, ladies and gentlemen,

24 that at some point there's going to be a problem, and it

25 might not happen every day.  But if it does happen, it's

1    because there's a problem with the system, not because

2    Mr. Foder wasn't paying attention.

3              Mr. Foder has done that job a lot.  Never happened

4    to him before.  Always used the same procedure.  He knows

5    where his foot was.

6              I heard Mr. Mino in his closing say, he can't even

7    tell you, you know, he can tell you where his foot was, but

8    he can't tell you what the -- you know, where the oil or

9    grease were.

10             He knows where his foot is because he does this

11   every day.  He knows where his foot is when he gets up

12   there.  He's only a -- he's six foot, and his foot's going

13   to be in the same place every time.  It's just the way it

14   is.

15             Ms. Bou's foot is going to be in a different place

16   because she's a lot smaller.

17             Everybody who does this is going to be affected by

18   the system differently.  It's just a matter of physics.  You

19   don't need the numbers to be able to tell that.  It's just

20   common sense.

21             So we know from Mr. Avril that he supposedly is

22   teaching everybody to use the same system, and we know that

23   we don't have one witness that actually is using the proper

24   system that he's teaching.  We know from Mr. Avril that,

25   supposedly, there is a requirement that everybody's supposed

 1      to wear gloves, and we know that that can't be true because

 2      they don't even list it on the accident report as required

 3      PPE, or personal protective equipment.

 4              So we know all that now.

 5              Mr. Foder falls at some point during this process

 6      of trying to get onto the train using this system without

 7      proper -- without the proper ingredients to make it safe.

 8      We know he injures his ankle, falls to the ground, and bangs

 9      his leg.  But whether he actually causes the damage to his

10      ankle here or here, we can't tell, and neither can

11      Dr. Greisberg.

12              Mr. Foder goes to the hospital that night.  He

13      goes to PATH Medical.  They sent him to Drs. Lombardi and

14      Patel.  They're treating him in the beginning for a sprain.

15      Now, he has a sprain.  There's no question, he's got a

16      sprain.  But there's something else going on, because,

17      normally, when you have a sprain, it goes away after a

18      certain period of time.  This didn't.  Normally, when you

19      have a sprain, you don't have the same pain that this man

20      had.

21              Now, I'm going to talk about the doctors that

22      ultimately do the surgery and Dr. Dennis.  I want you to

23      remember when I go through talking about them two important

24      facts.

25              Number one is, Dr. Greisberg, Dr. Lombardi,

751

1    Dr. Patel, Dr. Berberian, Dr. Greisberg, Dr. Whitley,

2    all these doctors either work for PATH or PATH referred

3    Mr. Foder to them.

4         Mr. Mino is poking holes in Dr. Greisberg's

5    opinion, but Dr. Greisberg was the doctor that they hired to

6    help him.

7         That doesn't make sense.

8         So what did they do?  They go out and they get

9    Dr. Dennis.  Dr. Dennis -- Dr. Greisberg testifies that the

10   first surgery he does is state of the art in 2013 - state of

11   the art.

12        Dr. Dennis hasn't done a surgery on anybody since

13   2000, or 2001, possibly.  He hasn't seen an ankle.  And he's

14   going to be complaining about the care that Mr. Foder got:

15   The first surgery, I don't think it was necessary.

16        Well, the doctors that PATH sent Mr. Foder to,

17   they certainly did, because they did the surgery, not just

18   once, not just twice, but three times, he had surgery.  The

19   doctors that PATH sent him to, three times, he had surgery.

20        What's the other side of that; that Mr. Foder

21   wanted to be out of work during that period of time so -- I

22   mean, I don't understand what the argument is with any of

23   that.  Everything was incidental?

24        Dr. Dennis in his opinions says, I believe that

25   this incident caused some sort of issue with regard to this

1       dissecans that he's talking about.

2               Now, I'm going to get to that also in a minute,

3       because Dr. Greisberg talks and explains what that is.

4       Dr. Greisberg tells us that there is a condition called

5       osteochondral dissecans, and some people have it when

6       they're young and adolescent, some people have a propensity

7       to have that issue.  Doesn't really matter.  You heard the

8       Judge talk about you take your Plaintiff as you find them.

9       If he had that propensity, that's on them.  That's not on

10      him.  If he happens to damage his ankle, causing some sort

11      of problem with his osteochondral cartilage, that's on them,

12      that's not on him.  That's not unrelated.

13              Even Dr. Dennis says it came from this incident.

14              The only thing that he says didn't possibly is the

15      first surgery, which he says, well, you know, look, they

16      shouldn't have done this first surgery.  But they did.  They

17      weren't working on the sprain, ladies and gentlemen.  They

18      were working on this.

19              And what did they do in that first surgery?  They

20      drilled into his bone.  He was off his feet.  He didn't

21      work.  He got paid for a short amount of time and then went

22      back to work.  And when, by the end of the time that he was

23      out for the first surgery, he lost his house, and he and his

24      girlfriend and his new child moved into the garage of his

25      parents' house.

1          Now, being a father is important to Mr. Foder, and

2     even Mr. Mino had to admit that, well, he's a good father.

3     Well, he is a good father.  He didn't grow up with a good

4     father himself.  He actually grew up without a father,

5     essentially.  His father was an alcoholic.  And so he wanted

6     to do everything for his daughter, be with her at all times.

7     And so when he's out, he's got a newborn baby, and he can't

8     even hold her and walk with her.

9          Now, I can't imagine what that is.  But somebody

10    under those circumstances, somebody who, all they want to

11    do, all they've ever wanted to do is be the father that they

12    never had, I'm going to do that.  And that's what he was

13    deprived of for that period of time.

14         And then, because it was too cold in the garage,

15    they left.  And they left him there, and they moved an hour

16    away, and his relationship crumbled.

17         And he's still in his parents' garage.  He's

18    working.  He has the second surgery.

19         The second surgery, clearly more intensive than

20    anything that he had up until then.  They're literally

21    cutting into his bone and reattaching it so they can get to

22    the area where the problem is.  Dr. Greisberg tells us that

23    what he sees in there is a really large, over one centimeter

24    large defect or portion of bone.  It's not -- it's loose,

25    but it's a flap, and he says flaps are really bad, too.  It

CHARLES P. McGUIRE, C.C.R.

1   can be loose, which this one is, and this is really bad, and

2   I need to get in there, we need to clean this up and get rid

3   of it.  And he does.

4          And again, Mr. Foder is off his feet.  This time

5   he's on his own, for months.  Goes back to work.  There's a

6   lot of -- there was -- and again, I don't understand the

7   necessity of this, but there was a lot of medical records

8   from right after the incident, couple of weeks, couple of

9   months where he says his pain wasn't that bad.

10         Before the surgeries, his pain obviously got a lot

11  worse, because he had the first surgery.  If his pain wasn't

12  bad, he never would have had the first surgery.  So

13  obviously his pain got worse, and it got worse enough so

14  that he got the first surgery, and it got worse enough again

15  after he tried to go back to work after the second surgery,

16  it got worse enough so that he felt that excruciating pain

17  again and came back, and he felt the need for a third

18  surgery.

19         Three surgeries.  People don't get surgeries

20  unless they need the surgeries, and doctors don't tell

21  people they need surgery, certainly not Dr. Greisberg.

22  Dr. Greisberg, the doctor that they sent him to, is a

23  world-class doctor, a specialist in foot and ankles.  If I

24  had a problem, that's where I would go.

25         I give PATH credit for that:  They sent him to the

1    best doctor that they could have sent him to at

2    Columbia-Presbyterian Hospital.  Good for them.

3            But then they walk into this courtroom and try to

4    say that, you know, Dr. Greisberg, he didn't do everything

5    he should have done; he should have looked at that MRI, his

6    opinion really has no merit.

7            Dr. Greisberg knows what he's doing.  His opinion

8    has merit.  And what does Dr. Greisberg say, the doctor that

9    PATH hired, what does he say?  He says that this was a

10   traumatically introduced osteochondral defect, traumatically

11   induced.

12           From what, Doctor?

13           From that day that he fell off the train.

14           This incident -- this injury was caused by that

15   event.  There's no question about it.

16           What's the defense?

17           The defense is, he shouldn't be doing it.  He did

18   something unsafe.  It's his fault.

19           It's not always somebody's fault if they get hurt.

20   It's not always, somebody's not being safe, when they get

21   hurt, if the system doesn't -- if the system is something

22   like this and it's not proper to begin with.

23           So, ladies and gentlemen, you're asked to decide

24   certain questions, the first being whether or not PATH was

25   negligent, and whether that negligence played any role, even

1     the slightest.  This case is being brought under a very

2     special act of Congress called the Federal Employers'

3     Liability Act, as Judge Arleo told us.  That Act says that

4     if PATH's negligence plays any part in causing this

5     incident, if this had any role in causing the injury, PATH

6     is negligent -- PATH is liable, I should say.  Any role.

7     "This" being the back of the car that he was asked to climb,

8     the climb system without the proper slip resistance.

9            FRA regs don't matter.  And you're going to be

10    asked whether Mr. Foder was negligent because he wasn't

11    wearing gloves, because he wasn't being safe, because --

12    because he got hurt.

13           Mr. Foder's at this point given six years of his

14    life to PATH.  And this is where we are.

15           Now, what are the damages?

16           Seventeen months, he wasn't able to work overtime.

17    That's the first measure of damages.  Mr. Foder told you

18    that he was working one or two days a month overtime.  I had

19    him calculate what one day a month, what that loss would be,

20    and he calculated it out, netted it out after taxes, if he

21    missed one day a month, to $5,600.  If he missed two days,

22    it would be something like 10,000.  But that's the extent of

23    what his loss is from the overtime.

24           The other portion is a much more significant

25    portion:  Pain and suffering, for the pain, for all the pain

CHARLES P. McGUIRE, C.C.R.

1   and suffering he sustained as a result of this incident.

2   And you heard a lot of testimony about what that pain and

3   suffering entailed, from the pains that he had when he first

4   was injured, to the excruciating pains, as he described it,

5   to the pains that he had throughout the entire process.  He

6   told you about everything that he went through when he lost

7   his home, his family, and how he went back to work in pain.

8   They told him it was going to be a year.  He went back to

9   work in six months, and he continued to work until he

10  couldn't do it anymore, and then he needed surgery.  He went

11  back to Dr. Berberian, who said, you need surgery.  He said,

12  I don't want to get surgery.  I don't want to get another

13  surgery.

14           So PATH sent him to Dr. Greisberg.  He has a

15  second surgery.  Again, in pain.  The pain has not gone away

16  in six years.  Not once.  Not for a single day.

17           And what he's been left with, after the third

18  surgery, what did Dr. Greisberg tell us?  He's got arthritis

19  in there, bone on bone.  Not just a little arthritis; it's

20  bone on bone in his ankle.  This is never going to get any

21  better.  Arthritis doesn't get better.  His ankle today is

22  as good as it's ever going to be and it's only going to get

23  worse, and even Dr. Dennis has to knowledge that, and even

24  Dr. Dennis tells us that the arthritis is based on this

25  incident, and even Dr. Dennis tells us that all three

1    surgeries -- well, maybe not the first, but all three

2    surgeries resulted from this incident.  Dr. Dennis really

3    doesn't tell us anything of significance.

4         Mr. -- I can't remember his name, the expert for

5    the Defendant that we saw yesterday for 15 minutes.  He

6    doesn't tell us anything.  I don't think he gave us any

7    information of any relevance in this case, nothing, because

8    the case isn't about the violation of FRA rules.

9         Ladies and gentlemen, this is Steven Foder's one

10   and only opportunity to tell his story to a jury.  This is

11   it.  There will be no other juries.  There will be no other

12   testimony.  What you do today will be final.  What you do

13   today will be forever.  What you do today Mr. Foder is going

14   to have to live with for the rest of his life.

15        We all can leave here and move on in our lives,

16   forgetting about what goes on today, forgetting about this

17   past week, all of us.  Me, too.

18        But not Steven Foder.  He will go on for the rest

19   of his life in the condition that he was left in because of

20   this injury, because of what PATH allowed the condition to

21   be for him to climb that day.

22        Some cars had it, some didn't.

23        Why not this one?

24        Thank you.

25        THE COURT:  Anything further?

CHARLES P. McGUIRE, C.C.R.

1              MR. MINO:  No.

2              THE COURT:  Mr. Rosenthal, are you good?

3              MR. ROSENTHAL:  I'm good.  Thank you, Your Honor.

4              THE COURT:  Okay.  Thank you.

5              All right.  Ladies and gentlemen of the jury, this

6    is now your turn to deliberate.  It is always good timing

7    when it's right around lunchtime.  So Amy has taken care of

8    your lunch.

9              I am going to send you into the jury room.  We're

10   going to send in a copy of the written instructions that I

11   read to you so you can use that as a reference, as well as

12   the verdict sheet, and Amy will then bring in to you or have

13   the CSO, the Court Security Officer bring in the exhibits.

14   Okay?

15             So, with that, be mindful of the instructions that

16   I gave earlier.  Please take this seriously.

17             I can tell, and I want to thank you before you

18   deliberate for the great attention that you've all shown

19   during this trial.  All jurors are not created equal, and

20   this has been an extraordinarily attentive and respectful

21   jury, and for that, I am grateful.

22             So with that, I will send you into the jury room,

23   and please begin to deliberate in accordance with my

24   instructions.

25             Thank you.

1              Yes?

2              Okay.  We have to swear in the CSO, our Court

3      Security Officer, who will stand guard and protect the jury

4      during the deliberations.

5              THE COURT CLERK:  Raise your right hand, place

6      your left hand on the bible, please.

7      R O B E R T   L I P I N S K I, Court Security Officer, was

8      duly sworn.

9              THE COURT CLERK:  Please state your full name for

10     the record.

11             SCO LIPINSKI:  Robert Lipinski, L-i-p-i-n-s-k-i.

12             THE COURT CLERK:  All rise.

13         (The jury retired at 12:41 p.m.)

14             THE COURT:  All right.  Guys, does Amy have your

15     cell phones?

16             MR. ROSENTHAL:  I'm here.  I'm not going anywhere.

17             THE COURT:  Okay.  If you want to run to the men's

18     room or something --

19             MR. ROSENTHAL:  I can give her my cell phone

20     number.

21             THE COURT:  You don't have to.  If you're going to

22     stay here, that's fine, but if you want to get a bite to

23     eat, there's a coffee shop in the basement, you know, if

24     you're going to leave, like, the hallway or here, just leave

25     Amy your cell phone number.

CHARLES P. McGUIRE, C.C.R.

1              MR. ROSENTHAL:  Thank you, Your Honor.

2              MR. MINO:  Thank you, Your Honor.

3              THE COURT:  And if there are any questions, I'll

4      have her call you.

5           (Matter recessed)

6           (Jury out)

7              THE COURT CLERK:  All rise.

8              THE COURT:  All right.  Juror note one -- we've

9      got a note, Jury Communication Number 1.  Amy has given the

10     lawyers copies of the note, and I'll read it for the record.

11             It says:  "Is there an exhibit that can show us

12     where the train was located when the accident occurred?

13     Please specify the exhibit number."

14             Signed by the foreperson.

15             I will tell you what my immediate reaction is, is

16     that I don't think it would be appropriate to at this point

17     direct them to any one exhibit, because that would be

18     supplementing the record.

19             When the exhibits were entered, they were moved

20     into evidence in front of the jury.  If counsel didn't

21     explain any of them, it's up for them to discern what they

22     are.  It's not for me to tell them, oh, yes, Exhibit 6 is

23     where it might have been, or close to where it was, because

24     then I would be commenting on evidence beyond the record.

25             So I don't think I can answer this question, other

CHARLES P. McGUIRE, C.C.R.

 1      than to tell them that they need to rely on their own

 2      recollection of what the witnesses said about the exhibits

 3      when they were entered into evidence.

 4              What do you --

 5              MR. MINO:  I agree with that.  I think -- and even

 6      using the photographs, there was never a specific

 7      identification of, this photo is where the train was, or

 8      anything like that.

 9              THE COURT:  Right.  I mean, sometimes in court you

10      have a witness with a series of exhibits, and you say,

11      What's Exhibit 1?  And they say, Oh, this is what it looked

12      like before Hurricane Sandy hit.  This was my house.  What's

13      Exhibit 2?  This was the morning after the hurricane.

14      What's Exhibit 3?  Six months later.  And the witness will

15      describe it so you could then read back that portion of the

16      record to the witness.

17              I don't remember with any kind of specificity

18      about the pictures.

19              I think there were -- how many pictures were

20      entered into evidence?

21              MR. ROSENTHAL:  Probably about 45.

22              THE COURT:  Forty-five, and are they all of

23      trains, or --

24              MR. ROSENTHAL:  No, there's probably about -- my

25      guess is about 30 are of S track and that about 15 are of

763

1   the car -- the train at a different location.

2                THE COURT:  And they were all your exhibits,

3   Mr. Rosenthal?

4                MR. ROSENTHAL:  Yes.  Yes.

5                THE COURT:  Okay.  And when you entered them --

6   the one that was blown up on the easel we used a lot.  I

7   don't recall you really talking -- you moved them in, and I

8   don't think there was a lot of discussion about them.

9                MR. ROSENTHAL:  I think at one point I talked

10  about the one being at -- not in the location it was at the

11  time.

12               MR. MINO:  The blowup.

13               MR. ROSENTHAL:  The blowup.

14               MR. MINO:  Yes, that was it, but there was no

15  discussion as to the ones that show S track, track area,

16  where, like which -- Mr. Foder or no one else testified,

17  This is where the train was that day.

18               THE COURT:  Right.  But I don't think I can say

19  that.

20               MR. MINO:  Right, I don't either.  I think that's

21  why you shouldn't, because there wasn't testimony to that.

22               THE COURT:  Okay.  So let's prepare a response.

23               We can do it on this note, or I can call them back

24  in and tell them orally.

25               MR. ROSENTHAL:  Why don't you do it on the note?

CHARLES P. McGUIRE, C.C.R.

764

1          THE COURT:  So let's formulate an answer:

2          The Court can only answer your question by

3  referring you to the exhibits and the testimony, if any --

4  the exhibits themselves, and the testimony, if any, of

5  witnesses about a particular exhibit.

6          MR. ROSENTHAL:  I mean, I think it's also fairly

7  clear that the incident happened on S track.

8          THE COURT:  I can't say that, though, because

9  that's not the question.

10          MR. ROSENTHAL:  Okay.

11          THE COURT:  "Is there an exhibit that can show us

12  where the train was located when the accident occurred?"

13          MR. ROSENTHAL:  Okay.

14          THE COURT:  I was going to propose:  The Court can

15  only answer your question by referring you to the exhibits

16  themselves and the testimony, if any, of witnesses about a

17  particular exhibit.

18          MR. ROSENTHAL:  Well, the accident report does

19  reference where it happened.

20          MR. MINO:  Yes, but there's no testimony tying the

21  accident report to the photos.  Where within the photos?

22          MR. ROSENTHAL:  It's not about the photos.

23          THE COURT:  It doesn't say about photos, it says

24  "exhibit."

25          MR. MINO:  Oh, "exhibit."  Then, yes, you can

1      say --

2                  MR. ROSENTHAL:  It's in Exhibit -- I think it's A?

3                  MR. MINO:  A is the accident report, yes.

4                  THE COURT:  The exhibits, including the accident

5      report?

6                  MR. ROSENTHAL:  Oh, and Velez's memo, Exhibit --

7                  What is Velez's memo?

8                  MR. MINO:  His memo to Avril?  It's C.

9                  THE COURT:  My sense from this note is, they don't

10     want --

11                 MR. MINO:  Yes, They want a picture.

12                 THE COURT:  They want a picture, my sense is, but

13     that's what they ask.

14                 MR. MINO:  Right.

15                 THE COURT:  Including the accident report, which

16     is -- what's the number of that one?

17                 MR. MINO:  Defendant's Exhibit A.

18                 THE COURT:  Defendant A.  And anything else?

19                 MR. MINO:  I think B does as well, the Unusual

20     Occurrence mentions S track?

21                 MR. ROSENTHAL:  B and C.

22                 MR. MINO:  A, B, and C.

23                 C is the memo from Lupia to Avril.

24                 THE COURT:  My sense is, I'm not sure if I'm

25     comfortable referring them to a particular exhibit, one over

1    the other.

2                MR. ROSENTHAL:  Okay.

3                THE COURT:  I think the better answer is, The

4    Court can only answer your question by directing you to each

5    exhibit --

6                MR. ROSENTHAL:  And your recollection of the

7    testimony.

8                THE COURT:  -- and your recollection of the

9    testimony for each exhibit.

10               MR. ROSENTHAL:  Or the testimony, testimony.

11               THE COURT:  Of the testimony, if any, about a

12   particular exhibit.

13               MR. ROSENTHAL:  Okay.

14               THE COURT:  "The Court can only answer your

15   question by directing you to each exhibit and your

16   recollection of the testimony, if any, about a particular

17   exhibit."

18               Does that work?

19               MR. ROSENTHAL:  That's fine.

20               MR. MINO:  Yes.

21               THE COURT:  Okay.

22               So I'm going to have someone with neat handwriting

23   -- which would be Amy --

24          (Laughter)

25               THE COURT:  We don't have a typewriter, do we?

1           THE COURT CLERK:  No.

2           MR. ROSENTHAL:  Do they still make typewriters?

3           THE COURT:  I have one --

4       (Laughter)

5           THE COURT:  -- but it's home.

6           "The Court can only answer your question -- " --

7           I have an I.B.M. Selectric.

8           -- " -- directing you to each exhibit..."

9           Okay.  I'll read it back again.  I'll have Amy

10      write it out, and then you can look at it before I send it

11      back.

12          "The Court can only answer your question by

13      directing you to each exhibit and your recollection of the

14      testimony, if any, about a particular exhibit."

15          MR. MINO:  Yes.  That's fine.

16          MR. ROSENTHAL:  Yes, that's fine.

17          THE COURT:  Okay.

18           Amy will write it, show it to me, then show it to

19      you, and then send it in to the jury.  Okay?

20          Thank you.

21      (Matter recessed)

22      (Jury out)

23          THE COURT CLERK:  All rise.

24          THE COURT:  Okay, everyone.  At 2:55 p.m., I

25      received Jury Communication Number 2 that states that "The

1    jury has come to a unanimous verdict."  Okay?

2           So we're going to call the jury in.  I will ask

3    them to pass me up the note, and then we'll read the

4    questions together, and if you want me to poll the jury,

5    just ask me, and we'll poll the jury.

6           THE COURT CLERK:  All rise.

7       (The jury returned to the courtroom at 3:10 p.m.)

8           THE COURT:  I understand that the jury has reached

9    a unanimous verdict

10          THE FOREPERSON:  Yes, we have.

11          THE COURT:  Okay.  Could the foreman kindly pass

12   the verdict sheet up to me, and I'll look at it and I will

13   give it back to you, and then Amy will read the questions

14   and you can read the answers.

15          Okay.  I'm going to ask the foreperson to also

16   sign and date the verdict when I give it back to you, okay?

17          THE FOREPERSON:  Okay.

18       (The verdict was returned to foreperson.)

19          THE COURT CLERK:  Just sign here, and just date

20   it.  Okay.  And then you just hold on to that.

21          THE COURT:  Okay.  If the foreperson can rise.

22          Amy is going to read the questions, starting with

23   Question 1.

24          THE COURT CLERK:  "Question Number 1:  Do you find

25   that Defendant PATH was negligent and that Defendant PATH's

1    negligence caused or contributed, in whole or in part, to

2    Plaintiff Steven Foder's injuries?"

3              THE FOREPERSON:  The answer is no.

4              THE COURT:  Okay.  Thank you.

5              Anything further?

6              MR. ROSENTHAL:  Poll the jury, please?

7              THE COURT:  Okay.  I'm going to ask each of the

8    jurors the question, Is that your verdict, and was that

9    verdict unanimous?

10             THE COURT:  Juror Number 2.

11             JUROR NO. 2:  Yes.

12             THE COURT:  Juror Number 3.

13             JUROR NO. 3:  Yes.

14             THE COURT:  Juror Number 4.

15             JUROR NO. 4:  Yes.

16             THE COURT:  Juror Number 5.

17             JUROR NO. 5:  Yes.

18             THE COURT:  Juror Number 6.

19             JUROR NO. 6:  Yes.

20             THE COURT:  Juror Number 7.

21             JUROR NO. 7:  Yes.

22             THE COURT:  Juror Number 8.

23             JUROR NO. 8:  Yes.

24             THE COURT:  Okay.  Thank you.  The jury is now

25   officially discharged.

CHARLES P. McGUIRE, C.C.R.

1          Thank you for your service to the Court.  Thank

2     you for your patience.  Thank you for taking time out of

3     your busy schedules to serve the Court.

4          If you will return to the jury room, Amy will give

5     you your phones, and then she also has for you a certificate

6     of appreciation on behalf of the Federal Courts for your

7     jury service.  Okay?

8          Have a great weekend, and come back anytime if you

9     ever want to watch a trial here in Newark.  You did an

10    outstanding job by your attentiveness and your care, and we

11    appreciate it, and thank you for your service to our Federal

12    Court.  Thank you.

13         Okay.

14         THE COURT CLERK:  All rise.

15    (The jury was discharged and left the courtroom.)

16         THE COURT:  Okay.  Thank you, everyone.

17    (Matter concluded)

18

19

20

21

22

23

24

25

771

1                                      **INDEX**

2

                                                                **Page**:

3

         **CHARGE OF THE COURT:**                                682

4

5        **CLOSING ARGUMENTS**:

6        **MR. MINO:**                                           711

7

         **MR. ROSENTHAL:**                                      738

8

9

10

         **JURY QUESTION:**                                      761

11

12

13

14       **VERDICT:**                                            768

15

16

17

18

19

20

21

22

23

24

25

                          CHARLES P. McGUIRE, C.C.R.

## $

**$5,600** [1] - 756:21

## 1

**1** [6] - 703:7, 703:8, 761:9, 762:11, 768:23, 768:24
**10** [3] - 717:10, 734:25, 738:6
**10,000** [1] - 756:22
**10-minute** [1] - 737:24
**100** [1] - 704:5
**11:45** [1] - 737:23
**12:01** [1] - 738:21
**12:41** [1] - 760:13
**15** [8] - 724:1, 724:4, 738:3, 738:4, 738:7, 745:8, 758:5, 762:25
**17th** [2] - 702:2, 702:4
**1st** [2] - 717:5, 734:25

## 2

**2** [7] - 703:17, 703:18, 704:8, 762:13, 767:25, 769:10, 769:11
**2000** [1] - 751:13
**2001** [1] - 751:13
**2010** [1] - 734:25
**2011** [13] - 702:1, 712:3, 713:2, 713:6, 716:24, 717:5, 719:3, 719:6, 731:25, 732:11, 732:23, 732:24, 740:15
**2012** [1] - 702:2
**2013** [2] - 702:2, 751:10
**2014** [2] - 702:3
**2015** [2] - 702:4, 735:20
**22nd** [10] - 712:3, 713:2, 713:6, 719:3, 719:6, 731:25, 732:11, 732:23, 732:24, 740:15
**23A** [1] - 739:15
**23rd** [1] - 702:1
**24** [2] - 723:4, 740:18
**24-year-old** [1] - 719:22
**25th** [2] - 702:3, 716:24
**28th** [1] - 702:2
**2:55** [1] - 767:24

## 3

**3** [4] - 704:2, 762:14, 769:12, 769:13
**30** [1] - 762:25
**32-day** [1] - 732:15
**3:10** [1] - 768:7

## 4

**4** [3] - 704:9, 769:14, 769:15
**45** [2] - 719:19, 762:21
**49** [1] - 742:22
**4th** [1] - 702:2

## 5

**5** [2] - 769:16, 769:17
**5678** [3] - 720:25, 721:3, 721:15
**5T** [2] - 746:6, 746:7

## 6

**6** [3] - 761:22, 769:18, 769:19

## 7

**7** [2] - 769:20, 769:21
**7th** [1] - 702:3

## 8

**8** [2] - 769:22, 769:23

## 9

**92** [1] - 723:8
**92-day** [1] - 723:10

## A

**able** [7] - 726:21, 730:4, 730:6, 733:23, 741:2, 749:19, 756:16
**absolutely** [1] - 708:6
**acceded** [1] - 699:17
**accept** [1] - 708:18
**accepted** [1] - 706:13
**access** [2] - 696:20, 740:9

**accident** [35] - 697:15, 698:8, 699:25, 713:16, 713:22, 713:24, 714:23, 715:1, 715:25, 716:14, 716:19, 717:6, 718:13, 718:21, 719:11, 719:19, 720:4, 720:10, 720:11, 721:1, 732:6, 734:23, 734:24, 737:6, 743:11, 745:6, 750:2, 761:12, 764:12, 764:18, 764:21, 765:3, 765:4, 765:15
**accomplish** [1] - 701:3
**accord** [1] - 710:11
**accordance** [2] - 684:19, 759:23
**accordingly** [1] - 686:5
**account** [1] - 701:22
**accurate** [1] - 713:20
**acknowledges** [1] - 743:1
**Act** [3] - 696:3, 756:3
**act** [4] - 698:3, 699:13, 700:18, 756:2
**acted** [4] - 722:7, 722:21, 724:23, 730:25
**acting** [1] - 686:1
**actions** [1] - 700:7
**active** [1] - 734:11
**add** [1] - 699:14
**addition** [2] - 689:22, 724:7
**additional** [2] - 699:3, 728:3
**address** [1] - 704:19
**adequate** [1] - 698:20
**adhere** [1] - 687:5
**Administration** [2] - 721:9, 723:1
**admit** [2] - 733:25, 753:2
**admitted** [1] - 729:12
**admittedly** [1] - 733:9
**adolescent** [1] - 752:6
**advance** [1] - 694:13
**adversarial** [1] - 709:3
**advise** [1] - 709:13
**advocacy** [1] - 709:2
**advocates** [1] - 686:20
**affairs** [1] - 685:15
**affected** [1] - 749:17
**afternoon** [3] - 738:19, 738:20, 738:24
**afterwards** [1] -

748:15
**agency** [1] - 721:9
**aggravate** [1] - 700:8
**aggravated** [2] - 733:4, 733:15
**aggravation** [3] - 701:3, 701:17, 733:1
**ago** [1] - 705:19
**agree** [3] - 706:11, 735:10, 762:5
**agreed** [2] - 688:15, 702:22
**agreement** [1] - 706:22
**ahold** [1] - 741:5
**alcoholic** [1] - 753:5
**allow** [5] - 687:23, 728:2, 730:2, 730:4, 737:25
**allowed** [2] - 722:13, 758:20
**allows** [1] - 711:18
**almost** [2] - 722:11, 748:1
**alone** [1] - 683:14
**amount** [3] - 697:19, 700:23, 701:10, 701:12, 701:23, 701:25, 702:18, 704:10, 704:11, 704:13, 715:17, 736:18, 752:21
**Amy** [1] - 759:7, 759:12, 760:14, 760:25, 761:9, 766:23, 767:9, 767:18, 768:13, 770:4
**amy** [1] - 768:22
**angle** [1] - 748:1
**ankle** [17] - 714:18, 715:6, 717:10, 732:5, 732:20, 733:7, 733:9, 733:10, 734:25, 735:24, 743:12, 750:8, 750:10, 751:13, 752:10, 757:20, 757:21
**ankle's** [1] - 717:9
**ankles** [1] - 754:23
**announce** [2] - 705:10, 709:20
**announced** [1] - 705:17
**announcing** [1] - 708:5
**another's** [1] - 700:18
**Answer** [1] - 703:1
**answer** [19] - 703:4, 704:5, 704:7, 707:22, 707:24, 709:19, 730:21, 731:10, 761:25, 764:1, 764:2, 764:15, 766:3, 766:4, 766:14, 767:6, 767:12, 769:3

**answered** [2] - 704:4, 704:8
**answers** [4] - 694:12, 704:14, 704:25, 768:14
**anti** [22] - 696:22, 697:11, 697:14, 712:19, 712:20, 714:23, 714:25, 717:23, 719:22, 720:14, 721:6, 721:19, 723:3, 723:6, 724:6, 726:9, 726:17, 727:17, 728:7, 737:15, 737:17, 741:19
**anti-climber** [20] - 696:22, 697:11, 697:14, 712:20, 714:23, 714:25, 717:23, 719:2, 721:6, 721:19, 723:3, 723:6, 724:6, 726:9, 726:17, 727:17, 728:7, 737:15, 737:17, 741:19
**anti-slip** [2] - 712:19, 720:14
**anticipated** [1] - 700:2
**anticlimber** [1] - 725:7
**anytime** [1] - 770:8
**apart** [1] - 688:17
**appearance** [1] - 691:6
**applicable** [5] - 683:7, 698:25, 720:25, 721:20, 739:9
**applies** [1] - 684:24
**apply** [6] - 683:4, 696:10, 704:21, 706:15, 716:10, 742:20
**applying** [1] - 684:7
**appraisal** [1] - 693:5
**appreciate** [2] - 711:6, 770:11
**appreciation** [1] - 770:6
**approach** [1] - 710:16
**appropriate** [1] - 761:16
**April** [3] - 702:2, 702:3, 702:4
**area** [10] - 717:16, 726:16, 726:17, 726:20, 728:5, 740:21, 746:22, 746:24, 753:22, 763:15
**argue** [2] - 684:13, 728:19
**argument** [2] - 686:7, 751:22
**arguments** [9] - 683:8, 685:24, 685:25, 686:6, 687:20, 689:8, 689:10, 728:12

**Arleo** [7] - 712:6, 712:9, 720:17, 721:24, 731:19, 735:25, 756:3
**Arleo's** [1] - 732:25
**arm** [1] - 730:5
**arrive** [1] - 684:7
**arriving** [1] - 706:17
**art** [2] - 751:10, 751:11
**arthritis** [4] - 757:18, 757:19, 757:21, 757:24
**ascertain** [1] - 707:8
**assertion** [1] - 699:10
**asserts** [1] - 696:25
**assessed** [1] - 686:23
**assessment** [2] - 702:9, 702:10
**assist** [2] - 704:23, 705:3
**assistance** [1] - 707:17
**assume** [1] - 690:18
**assumed** [1] - 699:22
**assumption** [1] - 717:16
**asymmetrical** [2] - 729:21, 748:7
**asymptomatic** [1] - 700:8
**attempting** [1] - 686:4
**attempts** [1] - 715:10
**attention** [9] - 687:12, 711:24, 737:10, 737:11, 737:12, 737:13, 737:16, 749:2, 759:18
**attentive** [1] - 759:20
**attentiveness** [1] - 770:10
**attorney** [1] - 687:10
**attorneys** [7] - 684:10, 684:12, 686:1, 686:16, 686:19, 689:16, 694:13
**attributable** [1] - 697:19
**attribute** [1] - 694:2
**August** [2] - 717:5, 734:24
**Augustine** [1] - 721:17
**Authority** [1] - 696:5
**automatically** [1] - 722:5
**avoided** [1] - 701:7
**Avril** [17] - 713:21, 717:25, 723:14, 723:18, 723:21, 724:5, 724:15, 741:1, 742:5, 744:6, 744:13, 744:16, 744:20, 749:21, 749:24, 765:8,

765:23
**award** [4] - 702:16, 702:19, 731:19, 731:22
**awarded** [1] - 701:22

## B

**baby** [2] - 740:18, 753:7
**background** [1] - 733:15
**backs** [1] - 741:12
**bad** [5] - 731:23, 753:25, 754:1, 754:9, 754:12
**bald** [2] - 691:6
**ballot** [2] - 705:13, 705:14
**bangs** [2] - 742:1, 750:8
**bar** [13] - 697:12, 716:6, 721:19, 723:7, 723:23, 725:6, 729:11, 729:17, 729:18, 729:20, 730:7, 741:6, 741:7
**bars** [1] - 712:21
**base** [3] - 683:19, 683:23, 688:9
**based** [16] - 686:23, 690:3, 690:9, 696:2, 702:19, 703:5, 709:5, 720:3, 724:21, 724:22, 728:12, 729:5, 733:2, 737:18, 757:24
**basement** [1] - 760:23
**basis** [3] - 689:3, 725:11, 725:12
**bathrooms** [1] - 737:24
**bears** [1] - 712:7
**becomes** [2] - 711:22, 748:7
**begin** [5] - 710:6, 718:6, 739:1, 755:22, 759:23
**beginning** [4] - 730:14, 740:18, 740:19, 750:14
**behalf** [1] - 770:6
**behind** [2] - 690:20, 690:21
**belief** [1] - 693:24
**believability** [1] - 691:19
**believable** [1] - 691:24
**bench** [1] - 706:3
**bends** [1] - 742:1

**benefit** [1] - 685:3
**Berberian** [2] - 751:1, 757:11
**best** [5] - 699:5, 713:14, 719:13, 722:1, 755:1
**better** [7] - 713:17, 717:9, 724:19, 728:23, 757:21, 766:3
**between** [5] - 683:9, 687:18, 690:16, 691:3, 692:18
**beyond** [2] - 721:23, 761:24
**bias** [4] - 684:1, 685:17, 707:10, 707:11
**bible** [1] - 760:6
**big** [2] - 724:2, 741:13
**bills** [1] - 702:13
**bit** [2] - 741:12, 742:24
**bite** [1] - 760:22
**bits** [1] - 688:16
**BlackBerry** [1] - 708:13
**blame** [2] - 717:7, 717:11
**blank** [2] - 704:12, 704:14
**blog** [1] - 708:16
**blood** [1] - 732:13
**blown** [1] - 763:6
**blowup** [2] - 763:12, 763:13
**boarding** [1] - 696:23
**body** [2] - 714:18, 715:6
**bone** [7] - 752:20, 753:21, 753:24, 757:19, 757:20
**book** [2] - 744:23, 744:24
**Bou** [7] - 719:15, 719:16, 719:18, 719:23, 740:21, 744:1, 746:22
**Bou's** [1] - 749:15
**box** [2] - 709:16, 715:18
**break** [1] - 737:24
**breaking** [2] - 715:16, 733:22
**briefly** [1] - 696:8
**bring** [5] - 705:15, 729:19, 743:16, 759:12, 759:13
**bringing** [1] - 700:16
**brought** [1] - 756:1
**burden** [10] - 694:21, 695:4, 695:7, 695:21, 696:15, 697:4, 712:7,

712:17, 720:19, 737:19
**business** [1] - 705:11
**busy** [1] - 770:3
**butts** [1] - 746:10

## C

**calculate** [2] - 702:5, 756:19
**calculated** [1] - 756:20
**candor** [1] - 692:12
**cannot** [2] - 699:21, 720:6
**Canvas** [1] - 745:19
**car** [20] - 690:21, 690:22, 690:24, 696:20, 696:24, 717:20, 719:10, 720:25, 721:3, 721:12, 721:15, 721:17, 722:2, 722:3, 723:5, 739:16, 739:20, 740:6, 756:7, 763:1
**care** [1] - 696:6, 697:23, 697:25, 698:1, 698:12, 710:13, 736:3, 751:14, 759:7, 770:10
**careful** [5] - 688:2, 698:5, 698:7, 727:19, 727:20
**carefully** [3] - 685:18, 707:13, 718:5
**careless** [1] - 699:13
**carelessness** [2] - 711:21, 712:2
**caring** [1] - 701:2
**carrier** [1] - 702:25
**cars** [9] - 698:22, 699:6, 722:24, 722:25, 723:2, 739:22, 741:20, 758:22
**cartilage** [1] - 752:11
**case** [58] - 683:24, 684:3, 684:17, 684:22, 684:24, 685:11, 686:8, 686:22, 687:20, 688:6, 688:10, 688:12, 689:6, 690:3, 690:6, 693:18, 694:4, 694:9, 694:14, 694:22, 695:11, 695:15, 695:23, 700:3, 701:9, 702:13, 704:20, 705:17, 706:23, 707:9, 708:7, 708:10, 708:11, 708:18, 709:8, 709:22, 710:10, 711:19, 711:20, 711:21, 712:2, 712:5, 712:7, 728:6, 728:12, 731:16, 732:1, 737:1, 737:20,

712:17, 720:19, 737:19
**business** [1] - 705:11
**busy** [1] - 770:3
**butts** [1] - 746:10

739:1, 739:3, 739:13, 739:25, 740:7, 746:2, 756:1, 758:7, 758:8
**causation** [2] - 700:11, 700:12
**caused** [11] - 696:13, 698:9, 699:11, 704:3, 712:14, 713:12, 720:11, 732:23, 751:25, 755:14, 769:1
**causes** [2] - 697:17, 750:9
**causing** [2] - 700:20, 703:11, 703:22, 733:12, 752:10, 756:4, 756:5
**cell** [4] - 708:13, 760:15, 760:19, 760:25
**centimeter** [1] - 753:23
**certain** [13] - 687:3, 687:9, 689:5, 694:6, 694:10, 696:10, 697:21, 700:25, 701:19, 704:25, 741:3, 750:18, 755:24
**certainly** [2] - 751:17, 754:21
**certainty** [1] - 691:1
**certificate** [1] - 770:5
**chaired** [1] - 705:5
**change** [1] - 707:2
**changed** [2] - 723:12, 726:3
**charge** [2] - 705:2, 710:15
**charged** [1] - 744:8
**charges** [1] - 686:24
**chat** [1] - 708:15
**child** [1] - 752:24
**choose** [2] - 705:9, 720:9, 731:20
**Chuck** [1] - 711:7
**cigarette** [1] - 746:10
**circled** [1] - 745:20
**circumstance** [1] - 688:17
**circumstances** [15] - 690:14, 690:23, 692:2, 692:9, 693:21, 698:2, 698:6, 698:7, 698:12, 698:15, 698:16, 699:2, 705:16, 743:24, 753:10
**circumstantial** [7] - 690:6, 690:11, 690:13, 690:17, 690:25, 691:2, 691:4
**citizens** [1] - 709:9
**claim** [8] - 696:2, 696:8, 696:9, 696:11, 696:16, 696:24, 697:4, 735:23

774

**claimed** [1] - 697:1
**claiming** [2] - 739:4, 739:5
**claims** [16] - 694:24, 695:25, 696:10, 696:11, 696:13, 696:17, 696:21, 697:2, 697:6, 697:15, 703:10, 703:21, 708:23, 712:18, 741:1, 744:6
**clarifying** [1] - 685:3
**class** [1] - 754:23
**clean** [1] - 754:2
**clear** [4] - 685:2, 719:25, 724:23, 764:7
**clearly** [1] - 753:19
**CLERK** [13] - 738:2, 738:10, 738:12, 760:5, 760:9, 760:12, 761:7, 767:1, 767:23, 768:6, 768:19, 768:24, 770:14
**clients** [3] - 686:3, 686:20
**climb** [25] - 697:9, 697:10, 712:20, 718:6, 718:15, 719:2, 719:6, 720:15, 723:3, 723:16, 723:19, 724:11, 725:4, 725:5, 728:18, 731:1, 739:7, 739:19, 740:5, 744:3, 748:5, 756:7, 756:8, 758:21
**climbed** [3] - 719:11, 725:3, 728:17
**climber** [20] - 696:22, 697:11, 697:14, 712:20, 714:23, 714:25, 717:23, 719:2, 721:6, 721:19, 723:3, 723:6, 724:6, 726:9, 726:17, 727:17, 728:7, 737:15, 737:17, 741:19
**climbing** [13] - 696:20, 697:13, 714:15, 714:17, 715:3, 719:7, 723:22, 724:18, 742:22, 743:8, 743:13, 747:21, 748:7
**close** [2] - 713:19, 761:23
**closest** [1] - 713:15
**closing** [9] - 683:8, 685:25, 686:15, 689:10, 704:20, 706:14, 710:5, 738:17, 749:6
**coffee** [1] - 760:23
**coincide** [1] - 689:2
**cold** [1] - 753:14
**collectively** [1] - 694:4
**Columbia** [1] - 755:2

**Columbia-Presbyterian** [1] - 755:2
**combination** [1] - 700:18
**comfortable** [2] - 711:22, 765:25
**coming** [1] - 747:25
**commence** [1] - 706:15
**commenting** [2] - 729:6, 761:24
**commerce** [1] - 702:25
**common** [9] - 685:16, 688:21, 691:10, 691:11, 691:15, 702:25, 715:13, 748:3, 749:20
**communicate** [2] - 708:10, 708:17
**Communication** [2] - 761:9, 767:25
**community** [1] - 709:9
**compare** [1] - 697:18
**compared** [1] - 724:15
**compensate** [4] - 700:24, 701:11, 701:12, 701:24
**compensation** [1] - 701:10
**complained** [1] - 719:1
**complaining** [1] - 751:14
**compliance** [3] - 722:6, 729:13, 739:24
**complied** [4] - 698:25, 721:3, 721:12, 722:5
**comply** [1] - 720:25
**compose** [1] - 705:24
**computer** [1] - 708:14
**concentric** [3] - 747:24, 748:6, 748:21
**concepts** [1] - 704:18
**concern** [3] - 687:18, 687:21, 709:4
**concerned** [3] - 683:16, 708:21, 743:23
**concerning** [1] - 692:16
**conclude** [2] - 690:14, 690:22
**concluded** [2] - 710:4, 770:17
**conclusion** [3] - 684:22, 691:15, 732:18
**concocted** [1] - 745:22

**condition** [11] - 697:14, 699:25, 700:8, 701:18, 719:2, 732:22, 733:1, 733:4, 752:4, 758:19, 758:20
**conditions** [3] - 699:14, 699:20, 726:2
**conduct** [3] - 705:9, 705:11, 708:18
**conducted** [1] - 684:19
**conductor** [1] - 719:16
**conductor's** [1] - 724:12
**conductors** [1] - 724:15
**conferences** [2] - 687:18, 687:19
**conferred** [1] - 687:16
**confident** [1] - 710:12
**Congress** [1] - 756:2
**conjecture** [1] - 702:16
**conscientious** [1] - 693:7
**consider** [25] - 683:14, 685:6, 685:19, 686:9, 687:11, 688:1, 688:18, 688:24, 689:6, 692:15, 692:22, 693:1, 693:20, 695:16, 699:16, 701:9, 702:6, 702:11, 702:12, 703:8, 703:18, 707:14, 713:1, 720:13, 736:25
**consideration** [6] - 685:11, 687:14, 692:8, 694:17, 704:15, 706:24
**considered** [7] - 685:14, 686:8, 688:16, 689:22, 694:18, 706:18, 709:25
**considering** [5] - 688:5, 691:5, 695:10, 695:23, 705:10
**consisting** [1] - 704:24
**consists** [2] - 688:12, 694:12
**constantly** [1] - 688:8
**constitute** [2] - 689:12, 705:1
**consult** [1] - 706:20
**consultant** [1] - 728:22
**contact** [1] - 723:24
**contend** [1] - 684:13
**contentions** [1] -

684:13
**continue** [4] - 728:3, 728:10, 728:13, 729:9
**continued** [1] - 757:9
**contradicted** [1] - 693:4
**contradictory** [1] - 693:10
**contrary** [1] - 691:7
**contributed** [3] - 699:11, 720:11, 769:1
**contributorily** [1] - 699:21
**contributory** [3] - 699:12, 699:16
**control** [1] - 720:7
**controls** [2] - 685:13, 689:14
**convenience** [1] - 706:6
**convey** [1] - 710:9
**conviction** [1] - 707:3
**convinced** [1] - 707:2
**copies** [1] - 761:10
**copy** [2] - 705:1, 759:10
**corner** [2] - 687:17, 746:12
**Corp** [1] - 696:5
**correct** [1] - 706:17
**corroborated** [1] - 693:4
**counsel** [20] - 683:7, 683:10, 685:23, 685:25, 686:3, 687:2, 687:7, 687:16, 687:18, 688:20, 707:21, 708:25, 710:15, 725:23, 726:4, 728:2, 728:8, 737:25, 738:16, 761:20
**counsel's** [2] - 686:18, 728:4
**count** [1] - 737:6
**couple** [4] - 714:6, 714:23, 754:8
**coupler** [1] - 730:5
**coupling** [1] - 730:3
**course** [11] - 683:10, 684:25, 685:10, 686:14, 689:1, 702:24, 706:25, 708:20, 728:24, 741:15, 743:15
**court** [8] - 690:2, 705:11, 705:18, 707:19, 711:11, 728:1, 760:7, 762:9
**Court** [33] - 683:4, 683:10, 683:12, 683:17, 683:21, 684:15, 684:17, 684:20, 687:17, 687:18,

688:11, 705:25, 706:13, 707:14, 707:21, 707:22, 708:3, 708:22, 709:1, 709:14, 710:17, 711:6, 759:13, 760:2, 764:2, 764:14, 764:4, 766:14, 767:6, 767:12, 770:1, 770:3, 770:12
**COURT** [87] - 710:21, 710:25, 711:2, 711:10, 711:12, 725:9, 725:21, 725:15, 725:19, 725:22, 726:6, 726:14, 727:4, 727:11, 727:15, 727:18, 728:2, 729:4, 729:8, 737:22, 738:2, 738:3, 738:6, 738:10, 738:11, 738:12, 738:14, 738:20, 758:25, 759:2, 759:4, 760:5, 760:9, 760:12, 760:14, 760:17, 760:21, 761:3, 761:7, 761:8, 762:9, 762:22, 763:2, 763:5, 763:18, 763:22, 764:1, 764:8, 764:11, 764:14, 764:23, 765:4, 765:9, 765:12, 765:15, 765:18, 765:24, 766:3, 766:8, 766:11, 766:14, 766:21, 766:25, 767:1, 767:3, 767:5, 767:17, 767:23, 767:24, 768:6, 768:8, 768:11, 768:19, 768:21, 768:24, 769:4, 769:7, 769:10, 769:12, 769:14, 769:16, 769:18, 769:20, 769:22, 769:24, 770:14, 770:16
**Court's** [2] - 684:23, 689:18
**courtroom** [8] - 684:7, 687:17, 709:21, 710:8, 711:5, 755:3, 768:7, 770:15
**Courts** [1] - 770:6
**craft** [1] - 718:11
**created** [2] - 699:15, 759:19
**credibility** [5] - 691:19, 693:2, 693:16, 694:18, 729:7
**credible** [1] - 692:7
**credit** [1] - 754:25
**critical** [1] - 712:25
**cross** [1] - 675:18
**cross-examined** [1] - 745:2
**crumbled** [1] - 753:16
**CSO** [2] - 759:13, 760:2

**curves** [1] - 730:5
**cutting** [1] - 753:21

# D

**daily** [3] - 721:14, 723:4, 723:10
**damage** [7] - 697:17, 700:22, 701:4, 704:10, 750:9, 752:10
**damages** [19] - 696:14, 700:4, 700:14, 700:21, 701:6, 701:7, 701:8, 701:22, 702:6, 702:16, 702:19, 703:12, 703:22, 731:10, 731:13, 731:15, 736:1, 756:15, 756:17
**dangerous** [2] - 699:19, 699:20
**dangers** [1] - 699:14
**date** [2] - 768:16, 768:19
**daughter** [4] - 733:23, 734:17, 734:20, 753:6
**days** [4] - 716:19, 723:8, 756:18, 756:21
**deal** [1] - 740:6
**debris** [1] - 746:14
**decide** [8] - 688:25, 690:2, 695:22, 698:4, 704:2, 706:23, 709:22, 755:23
**decided** [1] - 708:24
**deciding** [4] - 683:25, 684:16, 689:6, 704:19
**decision** [4] - 684:1, 686:22, 693:18, 703:3
**decisions** [2] - 683:15, 684:21
**deduction** [1] - 691:15
**defect** [2] - 753:24, 755:10
**Defendant** [13] - 685:21, 686:22, 688:23, 695:11, 696:4, 698:24, 699:4, 699:7, 707:13, 758:5, 765:18, 768:25
**Defendant's** [8] - 696:24, 714:1, 720:2, 721:13, 737:2, 745:7, 765:17
**defense** [8] - 695:7, 695:10, 728:8, 743:8, 745:22, 755:16, 755:17
**defenses** [3] - 695:6, 696:9, 708:24
**degree** [2] - 691:1,

698:1
**deliberate** [7] - 706:21, 710:1, 710:13, 714:2, 759:6, 759:18, 759:23
**deliberating** [4] - 704:17, 706:11, 707:23, 708:8
**deliberations** [13] - 683:2, 685:13, 686:13, 687:24, 705:3, 705:5, 705:18, 706:15, 707:1, 707:16, 708:10, 710:6, 760:4
**demeanor** [1] - 692:11
**demonstrate** [2] - 712:5, 713:7
**denies** [3] - 691:25, 696:24, 697:15
**Dennis** [20] - 717:21, 719:10, 732:2, 732:7, 732:8, 733:3, 733:5, 735:9, 735:14, 736:9, 750:22, 751:9, 751:12, 751:24, 752:13, 757:23, 757:24, 757:25, 758:2
**Department** [1] - 717:1
**deposition** [2] - 694:11
**deprived** [1] - 753:13
**Deputy** [1] - 709:13
**deriving** [1] - 710:1
**describe** [5] - 714:9, 715:3, 715:25, 716:9, 762:15
**described** [6] - 702:7, 702:8, 704:18, 718:9, 718:13, 757:4
**describes** [1] - 690:13
**description** [3] - 714:15, 714:22, 732:12
**desert** [1] - 732:13
**deserve** [2] - 710:14, 745:24
**deserves** [1] - 693:17
**design** [1] - 730:13
**despite** [2] - 718:21, 732:17
**destroy** [1] - 705:14
**detail** [4] - 692:24, 696:10, 697:22, 701:15
**determination** [1] - 692:6
**determine** [10] - 685:9, 689:3, 691:22, 691:23, 693:21, 694:1, 697:16, 697:19, 701:23,

733:12
**determined** [2] - 693:19, 702:20
**determining** [2] - 691:11, 695:14
**device** [1] - 730:3
**devices** [1] - 708:12
**diamond** [10] - 718:7, 723:25, 724:6, 725:24, 726:9, 726:10, 741:9, 741:14, 741:15, 742:10
**differ** [1] - 689:13
**difference** [3] - 683:9, 688:22, 724:13
**different** [8] - 687:25, 692:19, 713:10, 713:11, 732:18, 743:20, 749:15, 763:1
**differentiate** [1] - 733:6
**differently** [2] - 694:25, 749:18
**difficult** [1] - 730:12
**DiGIULIO** [1] - 727:2
**diligence** [1] - 701:2
**direct** [7] - 690:6, 690:7, 690:16, 691:1, 691:2, 691:3, 761:17
**directing** [1] - 766:4, 766:15, 767:8, 767:13
**direction** [3] - 699:18, 748:2, 748:4
**directly** [2] - 741:8, 741:9
**disbelieve** [1] - 693:7
**discern** [1] - 761:21
**discharge** [2] - 705:20, 705:23
**discharged** [1] - 769:25, 770:15
**discredit** [1] - 692:20
**discredited** [2] - 693:9, 693:15
**discrepancies** [1] - 692:17
**discrepancy** [2] - 692:22, 692:24
**discretion** [1] - 693:7
**discuss** [2] - 712:4, 731:14
**discussed** [1] - 699:10
**discusses** [1] - 733:17
**discussing** [1] - 687:23
**discussion** [2] - 763:8, 763:15
**discussions** [1] - 705:9

**dislikes** [1] - 725:4
**display** [1] - 708:21
**displayed** [1] - 746:7
**disputed** [1] - 690:12
**disregard** [7] - 686:18, 687:4, 687:5, 689:2, 689:21, 726:15
**dissecans** [6] - 732:9, 732:12, 732:13, 733:15, 752:1, 752:5
**distinction** [1] - 691:3
**Doctor** [1] - 755:12
**doctor** [12] - 732:5, 732:19, 734:7, 734:8, 735:2, 736:15, 747:2, 751:5, 754:22, 754:23, 755:1, 755:8
**doctors** [7] - 732:1, 732:3, 750:21, 751:2, 751:16, 751:19, 754:20
**documentary** [1] - 693:5
**documents** [1] - 686:11
**dollar** [4] - 701:20, 704:10, 704:11, 704:13
**dollars** [1] - 736:19
**done** [13] - 685:10, 693:11, 709:14, 711:24, 726:22, 733:6, 737:8, 748:18, 748:19, 749:3, 751:12, 752:16, 755:5
**door** [3] - 707:20, 709:13, 726:4
**down** [4] - 703:3, 727:4, 747:25, 748:9
**Dr** [54] - 732:2, 732:7, 732:8, 732:10, 732:17, 733:3, 733:5, 734:7, 734:10, 734:12, 735:3, 735:4, 735:8, 735:9, 735:10, 735:14, 735:15, 735:19, 736:4, 736:5, 736:9, 750:11, 750:22, 750:25, 751:1, 751:4, 751:5, 751:9, 751:12, 751:24, 752:3, 752:4, 752:13, 753:22, 754:21, 754:22, 755:4, 755:7, 755:8, 757:11, 757:14, 757:18, 757:23, 757:24, 757:25, 758:2
**drama** [1] - 708:23
**draw** [6] - 687:1, 687:6, 688:20, 688:21, 691:8, 691:16
**drawn** [1] - 691:12
**drilled** [1] - 752:20
**drive** [1] - 743:24
**Drs** [1] - 750:13

**due** [4] - 714:19, 715:7, 733:8, 733:10
**duly** [1] - 760:8
**during** [18] - 683:1, 683:6, 684:22, 684:25, 685:23, 685:25, 686:13, 686:14, 687:3, 694:7, 694:10, 707:16, 708:10, 708:20, 750:5, 751:21, 759:19, 760:4
**duties** [3] - 684:11, 702:24, 709:8
**duty** [17] - 683:3, 683:19, 683:22, 685:17, 688:9, 689:16, 698:11, 698:14, 701:1, 705:19, 706:8, 706:20, 707:10, 735:21, 735:22, 736:2, 736:16

# E

**earned** [1] - 702:1
**easel** [1] - 763:6
**easy** [2] - 711:16, 735:22
**eat** [1] - 760:23
**eccentric** [1] - 748:7
**edge** [6] - 724:3, 742:6, 742:8, 742:10, 748:10
**effect** [2] - 692:22, 707:4
**effort** [2] - 701:5, 701:8
**either** [6] - 693:8, 698:4, 738:22, 746:19, 751:2, 763:20
**electronic** [1] - 708:12
**elements** [6] - 695:7, 703:13, 703:16, 703:23, 703:25, 712:8
**elliptical** [2] - 734:12, 735:8
**emotions** [1] - 708:21
**employed** [1] - 696:12
**employee** [2] - 702:23, 713:22, 731:7
**employees** [3] - 696:7, 698:23, 740:8
**employer** [2] - 699:14, 699:19
**Employers'** [2] - 696:3, 756:2
**employment** [2] - 699:23, 702:24
**encountered** [1] -

741:16
**end** [16] - 705:18, 710:15, 712:21, 717:22, 721:18, 723:5, 723:22, 726:15, 729:11, 729:17, 729:25, 730:2, 730:5, 730:8, 737:15, 752:22
**ended** [2] - 730:10, 730:11
**enforce** [1] - 698:20
**engage** [1] - 702:15
**engaged** [2] - 702:25, 709:2
**engineer** [6] - 725:3, 728:17, 735:21, 740:16, 741:2, 741:11
**engineers** [2] - 724:14, 724:16
**entailed** [1] - 757:3
**entered** [5] - 710:8, 761:19, 762:3, 762:20, 763:5
**enters** [1] - 738:13
**entire** [2] - 715:19, 757:5
**entirely** [1] - 705:23
**entitled** [3] - 685:21, 694:17, 710:12
**entries** [1] - 706:1
**entrust** [1] - 709:9
**entrusted** [1] - 741:21
**environment** [1] - 742:21
**equal** [1] - 759:19
**equipment** [5] - 699:8, 724:22, 731:2, 745:10, 750:3
**erroneous** [1] - 707:2
**error** [1] - 692:25
**Escape** [1] - 745:16
**especially** [1] - 737:11
**essence** [1] - 747:20
**essentially** [3] - 742:11, 743:13, 753:5
**established** [1] - 684:19
**evaluate** [1] - 746:2
**evaluating** [2] - 688:5, 693:1
**event** [2] - 690:15, 755:15
**eventually** [2] - 717:14, 717:15
**everywhere** [1] - 746:25
**Evidence** [1] - 689:17
**evidence** [104] - 683:6, 683:23, 684:6, 684:12, 684:14, 685:11,

685:12, 685:13, 685:19, 686:5, 686:6, 686:8, 686:9, 686:12, 686:23, 687:3, 687:11, 687:13, 688:1, 688:4, 688:6, 688:10, 688:12, 688:14, 688:16, 688:18, 688:22, 688:24, 689:1, 689:4, 689:5, 689:9, 689:12, 689:16, 689:22, 690:2, 690:3, 690:5, 690:6, 690:7, 690:11, 690:13, 690:17, 690:25, 691:1, 691:2, 691:3, 691:4, 691:5, 691:16, 693:5, 693:10, 693:21, 694:23, 694:24, 695:1, 695:8, 695:11, 695:15, 695:18, 695:23, 696:16, 697:5, 698:24, 701:19, 703:9, 703:19, 705:1, 706:24, 707:4, 707:9, 707:14, 708:24, 709:5, 709:23, 710:3, 712:1, 712:8, 712:13, 713:8, 713:14, 719:14, 722:7, 722:8, 727:19, 728:6, 728:12, 730:17, 734:21, 736:25, 739:12, 739:15, 744:24, 744:25, 746:5, 761:20, 761:24, 762:3, 762:20
**evidential** [1] - 726:7
**exacerbate** [1] - 700:7
**exact** [4] - 701:21, 743:18, 746:17, 747:22
**exactly** [7] - 705:11, 712:5, 712:11, 713:1, 718:20, 721:4, 746:21
**examine** [2] - 692:1, 707:1
**examined** [1] - 745:2
**examining** [1] - 688:4
**example** [2] - 690:16, 690:18
**except** [2] - 708:5, 742:4
**excluded** [1] - 689:20
**exclusive** [3] - 693:15, 694:1, 706:8
**excruciating** [3] - 743:14, 754:16, 757:4
**exercise** [3] - 693:6, 696:5, 698:11
**exercising** [1] - 735:4
**Exhibit** [20] - 714:1, 718:1, 720:3, 721:13, 737:2, 739:15, 741:16, 745:7, 746:6, 746:7, 747:11, 761:22, 762:11,

762:13, 762:14, 765:2, 765:6, 765:17
**exhibit** [18] - 691:7, 745:12, 761:11, 761:13, 761:17, 764:5, 764:11, 764:17, 764:24, 764:25, 765:25, 766:5, 766:9, 766:12, 766:15, 766:17, 767:13, 767:14
**exhibit..** [1] - 767:8
**exhibits** [15] - 686:11, 687:8, 688:13, 689:23, 695:18, 705:4, 759:13, 761:19, 762:2, 762:10, 763:2, 764:3, 764:4, 764:15, 765:4
**exist** [1] - 699:15
**existed** [3] - 732:10, 739:19, 741:19
**existing** [4] - 700:8, 701:17, 733:1, 733:14
**exists** [1] - 746:21
**exits** [1] - 738:5
**expect** [2] - 685:21, 707:13
**expectations** [1] - 710:13
**expected** [1] - 688:4
**experience** [4] - 685:15, 691:10, 692:21, 701:19
**experienced** [1] - 701:18
**expert** [3] - 720:21, 721:17, 758:4
**expert's** [2] - 727:7, 727:13
**explain** [10] - 696:8, 696:9, 697:21, 701:14, 703:6, 715:10, 739:11, 739:13, 742:24, 761:21
**explained** [1] - 703:5
**explains** [1] - 752:3
**expression** [1] - 695:22
**extensively** [1] - 723:15
**extent** [6] - 688:24, 693:3, 698:11, 700:4, 704:2, 756:22
**extraordinarily** [1] - 759:20
**extremely** [1] - 702:10
**eyewitnesses** [1] - 690:8

**F**

**Facebook** [1] - 708:16
**fact** [19] - 685:4, 688:17, 690:12, 691:18, 691:25, 693:25, 695:14, 698:8, 699:24, 707:8, 709:14, 717:19, 721:2, 730:10, 734:11, 741:22, 744:5, 744:8
**factor** [1] - 733:20
**facts** [27] - 683:5, 683:23, 685:10, 685:18, 686:17, 688:4, 688:14, 689:3, 689:6, 689:12, 689:14, 690:5, 690:12, 691:8, 691:12, 692:16, 693:18, 693:20, 694:5, 694:6, 694:8, 695:9, 695:12, 706:16, 709:23, 710:2, 750:24
**failed** [16] - 686:5, 693:11, 696:18, 696:19, 696:21, 697:7, 697:9, 697:10, 697:12, 697:13, 712:13, 712:17, 727:15, 728:6, 730:17, 748:20
**failing** [3] - 698:6, 720:17, 744:9
**fails** [3] - 695:4, 698:20, 698:22
**failure** [6] - 692:21, 697:25, 701:4, 712:14, 713:7
**fair** [6] - 685:11, 706:17, 707:15, 709:4, 709:10, 731:21
**fairly** [3] - 700:23, 701:23, 764:6
**fall** [8] - 713:12, 715:9, 716:18, 718:7, 731:18, 731:25, 732:11, 732:24
**falling** [1] - 742:1
**falls** [3] - 718:15, 750:5, 750:8
**falsehood** [1] - 692:25
**family** [1] - 757:7
**father** [7] - 753:1, 753:2, 753:3, 753:4, 753:5, 753:11
**fault** [7] - 696:18, 697:2, 697:7, 697:19, 744:16, 755:18, 755:19
**favor** [2] - 686:19, 733:14
**favorable** [2] - 695:1,

695:2
**feasible** [1] - 730:9
**February** [1] - 702:1
**Federal** [7] - 696:3, 696:4, 721:8, 723:1, 756:2, 770:6, 770:11
**feet** [6] - 719:22, 724:1, 724:2, 724:4, 752:20, 754:4
**FELA** [2] - 696:3, 698:19
**fell** [10] - 714:6, 715:8, 717:2, 717:12, 717:19, 730:22, 731:17, 732:16, 737:3, 755:13
**fellow** [2] - 706:25, 707:5
**felt** [2] - 754:16, 754:17
**few** [5] - 714:5, 715:25, 716:13, 716:19, 735:6
**fiancee** [1] - 733:22
**figure** [2] - 747:4, 747:5
**file** [1] - 716:24
**fill** [2] - 713:22, 743:17
**filled** [3] - 713:25, 714:5, 745:7
**filling** [1] - 743:21
**fills** [2] - 715:2, 735:3
**films** [1] - 732:4
**final** [5] - 683:1, 704:9, 704:21, 706:1, 758:12
**finally** [4] - 684:22, 699:24, 702:3, 702:18
**fine** [3] - 738:3, 760:22, 766:19, 767:15, 767:16
**first** [35] - 696:11, 697:22, 705:19, 711:12, 713:1, 716:23, 716:25, 720:2, 722:24, 723:19, 723:20, 726:7, 729:20, 730:18, 730:22, 731:11, 732:4, 732:21, 733:8, 734:24, 735:1, 739:21, 751:10, 751:15, 752:15, 752:16, 752:19, 752:23, 754:11, 754:12, 754:14, 755:24, 756:17, 757:3, 758:1
**five** [3] - 719:20, 740:17, 762:22
**five-foot-one** [1] - 719:20
**flap** [1] - 753:25
**flaps** [1] - 753:25

**Flashlight** [1] - 745:15
  **floor** [1] - 748:12
  **fluctuates** [1] - 736:21
  **focus** [1] - 687:13
  **Foder** [120] - 686:21, 694:21, 694:23, 695:1, 695:2, 695:4, 696:11, 696:13, 696:15, 696:17, 696:25, 697:3, 697:6, 697:15, 697:16, 697:20, 699:17, 699:21, 700:13, 701:11, 702:1, 702:23, 703:8, 703:10, 703:12, 703:13, 703:15, 703:20, 704:6, 704:16, 712:6, 713:7, 713:11, 713:25, 714:5, 715:10, 716:4, 716:8, 716:13, 716:16, 716:25, 717:1, 717:12, 717:19, 718:13, 718:25, 719:5, 719:17, 719:21, 720:11, 720:19, 720:24, 721:22, 723:14, 724:4, 724:12, 724:17, 730:22, 730:25, 731:1, 731:6, 731:17, 731:20, 731:23, 732:15, 732:16, 732:22, 733:7, 734:4, 734:8, 734:11, 734:15, 734:17, 734:19, 734:20, 735:1, 735:14, 735:19, 736:1, 736:5, 736:22, 737:3, 737:8, 737:19, 739:5, 739:17, 740:15, 740:22, 741:15, 741:18, 742:4, 742:12, 743:23, 744:2, 744:8, 744:18, 745:25, 746:4, 746:13, 746:16, 746:22, 746:25, 748:15, 749:2, 749:3, 750:5, 750:12, 751:3, 751:14, 751:16, 751:20, 753:1, 754:4, 756:10, 756:17, 758:13, 758:18, 763:16
  **Foder's** [20] - 696:2, 696:8, 696:11, 696:24, 697:17, 698:10, 699:10, 703:21, 704:3, 704:10, 704:11, 704:13, 720:9, 731:4, 732:5, 735:11, 743:8, 756:13, 758:9, 769:2
  **follow** [5] - 683:3, 685:19, 689:24, 697:7, 707:14
  **following** [5] - 706:14, 710:22, 711:11, 725:21, 728:1

**follows** [2] - 740:20, 740:22
  **foot** [40] - 696:23, 697:11, 714:11, 714:13, 714:16, 714:22, 714:24, 715:4, 715:15, 715:20, 715:22, 716:7, 718:6, 718:17, 718:21, 719:20, 723:22, 723:25, 724:5, 735:12, 736:4, 736:5, 737:16, 741:4, 741:8, 741:9, 741:13, 742:22, 743:9, 743:25, 747:3, 748:20, 749:5, 749:7, 749:10, 749:11, 749:12, 749:15, 754:23
  **foot's** [1] - 749:12
  **footstep** [1] - 715:5
  **footstool** [2] - 740:3, 740:13
  **force** [2] - 710:1, 747:25
  **foreman** [1] - 768:11
  **foreperson** [12] - 705:6, 705:8, 705:22, 706:2, 709:17, 709:19, 709:20, 761:14, 768:15, 768:18, 768:21
  **FOREPERSON** [3] - 768:10, 768:17, 769:3
  **foresee** [1] - 698:18
  **foreseeable** [2] - 698:15, 748:23
  **foreseen** [1] - 700:6
  **forever** [1] - 758:13
  **forgetting** [2] - 758:16
  **form** [7] - 704:24, 704:25, 706:6, 708:18, 709:19, 714:9, 735:3
  **formed** [1] - 732:14
  **formulate** [1] - 764:1
  **forth** [1] - 686:16
  **forty** [1] - 762:22
  **forty-five** [1] - 762:22
  **four** [2] - 690:1, 703:4
  **FRA** [27] - 721:4, 721:7, 721:8, 721:12, 721:15, 722:25, 723:10, 726:22, 726:25, 729:13, 729:14, 739:3, 739:4, 739:5, 739:8, 739:23, 739:24, 739:25, 740:2, 740:4, 740:6, 742:18, 742:19, 756:9, 758:8
  **frankly** [1] - 711:18
  **fresh** [2] - 690:20, 714:6
  **front** [2] - 739:16, 761:20

**full** [5] - 700:4, 735:21, 735:22, 736:16, 760:9
  **fully** [2] - 729:12, 733:25
  **fun** [1] - 711:18
  **function** [8] - 684:12, 684:17, 684:23, 685:9, 686:19, 687:21, 694:1, 705:23
  **functions** [2] - 725:3, 728:16
  **furnish** [1] - 699:5
  **furthermore** [1] - 684:20
  **future** [2] - 700:25, 701:19

**G**

**gain** [1] - 740:9
  **garage** [3] - 752:24, 753:14, 753:17
  **general** [1] - 717:15
  **generally** [1] - 690:4
  **gentlemen** [34] - 709:7, 709:22, 710:4, 711:14, 712:16, 713:5, 713:14, 714:21, 715:21, 716:11, 718:22, 720:1, 720:23, 721:24, 722:18, 730:8, 730:20, 731:9, 733:2, 733:24, 736:24, 737:18, 738:14, 738:25, 740:7, 742:14, 745:6, 746:1, 747:17, 748:23, 752:17, 755:23, 758:9, 759:5
  **George** [1] - 720:20
  **girlfriend** [2] - 740:17, 752:24
  **given** [15] - 683:1, 683:11, 683:21, 684:8, 686:12, 689:25, 691:20, 692:2, 692:13, 693:3, 703:2, 708:6, 709:6, 756:13, 761:9
  **glove** [2] - 724:18, 724:19
  **Gloves** [3] - 745:19
  **gloves** [24] - 697:10, 716:16, 716:17, 724:8, 724:9, 724:10, 724:12, 724:16, 724:17, 737:11, 737:13, 744:11, 744:12, 744:14, 744:15, 744:16, 744:21, 744:22, 745:1, 745:6, 745:21, 750:1, 756:11

**glued** [1] - 716:6
  **govern** [1] - 683:2
  **governed** [2] - 683:11, 707:11
  **governing** [1] - 686:24
  **government** [2] - 721:1, 721:9
  **governs** [2] - 721:9, 723:1
  **grab** [15] - 697:12, 712:21, 721:19, 723:7, 723:23, 725:6, 729:11, 729:17, 729:18, 729:20, 729:21, 730:7, 741:5, 741:6
  **grabbed** [2] - 714:17, 715:5
  **grateful** [1] - 759:21
  **grease** [17] - 716:22, 717:3, 717:13, 717:14, 717:18, 717:22, 717:23, 718:18, 737:14, 746:15, 746:17, 746:20, 746:23, 746:24, 747:3, 747:4, 749:9
  **greaser** [1] - 746:23
  **great** [2] - 759:18, 770:8
  **greater** [3] - 691:1, 700:1, 700:5
  **Greisberg** [30] - 732:2, 732:7, 732:10, 732:17, 734:7, 734:10, 734:12, 735:3, 735:4, 735:8, 735:10, 735:15, 735:19, 736:4, 736:5, 750:11, 750:25, 751:1, 751:5, 751:9, 752:3, 752:4, 753:22, 754:21, 754:22, 755:4, 755:7, 755:8, 757:14, 757:18
  **Greisberg's** [1] - 751:4
  **grew** [1] - 753:4
  **grip** [2] - 721:6, 739:7
  **ground** [2] - 717:20, 750:8
  **grounds** [1] - 746:3
  **grow** [1] - 753:3
  **guarantee** [2] - 698:10, 731:4
  **guaranteed** [1] - 736:21
  **guarantor** [1] - 731:4
  **guard** [1] - 760:3
  **guess** [2] - 702:16, 762:25
  **guide** [2] - 683:2, 729:15

**guy** [1] - 719:22
  **guys** [2] - 711:17, 760:14

**H**

**hairbrush** [1] - 746:9
  **half** [4] - 717:6, 735:20, 736:15, 745:22
  **hallway** [1] - 760:24
  **hand** [7] - 706:3, 709:19, 741:5, 741:6, 741:7, 760:5, 760:6
  **handholds** [1] - 747:17
  **hands** [16] - 697:12, 705:12, 714:19, 715:1, 715:7, 715:9, 716:5, 716:18, 716:20, 720:5, 723:23, 730:23, 737:3, 737:12, 744:3
  **handwriting** [2] - 714:9, 766:22
  **happy** [1] - 733:25
  **hard** [3] - 729:21, 730:1, 745:8
  **harm** [2] - 698:17, 699:3
  **Head** [1] - 745:16
  **headquarters** [1] - 743:17
  **healing** [1] - 701:3
  **hear** [11] - 690:19, 704:20, 710:5, 710:17, 718:25, 719:5, 719:9, 721:5, 721:7, 723:17, 732:25
  **heard** [41] - 685:12, 686:10, 690:1, 690:9, 691:21, 694:3, 712:1, 712:6, 713:10, 713:21, 712:4, 714:8, 717:21, 718:3, 718:12, 719:10, 720:10, 720:16, 720:22, 721:2, 721:11, 721:16, 722:24, 723:13, 724:13, 729:25, 732:1, 735:13, 735:15, 736:20, 736:21, 736:22, 739:24, 740:23, 744:13, 744:23, 747:9, 749:6, 752:7, 757:2
  **help** [3] - 689:11, 729:15, 751:6
  **helps** [1] - 688:25
  **hesitate** [1] - 707:1
  **higher** [2] - 729:22, 730:12
  **himself** [3] - 731:5, 743:24, 753:4

hire [1] - 728:25
hired [3] - 728:22, 751:5, 755:9
hit [1] - 762:12
hold [12] - 685:5, 714:17, 714:19, 714:20, 715:5, 715:7, 716:13, 719:24, 724:20, 729:4, 753:8, 768:20
holes [1] - 751:4
home [6] - 715:12, 733:21, 743:16, 743:25, 757:7, 767:5
honest [1] - 707:3
Honor [9] - 711:8, 711:9, 725:8, 725:10, 729:3, 738:18, 759:3, 761:1, 761:2
Honor's [1] - 710:23
hood [1] - 745:17
horizontal [2] - 741:6, 744:4
hospital [3] - 743:16, 750:12, 755:2
hot [2] - 720:7, 740:20
hour [1] - 753:15
hours [8] - 714:5, 714:6, 714:23, 715:25, 716:14, 723:4, 737:6, 743:12
house [5] - 736:8, 736:12, 752:23, 752:25, 762:12
Hudson [1] - 696:5
huff [1] - 711:3
hundred [1] - 711:24
hundreds [1] - 737:9
Hurricane [1] - 762:12
hurricane [1] - 762:13
hurt [6] - 713:22, 743:12, 746:4, 755:19, 755:21, 756:12

I

I.B.M [1] - 767:7
idea [2] - 708:7, 766:8
identification [1] - 762:7
identify [2] - 717:14, 745:14
ignore [3] - 727:5, 728:4, 728:5
ignored [2] - 728:9, 728:11
image [1] - 732:5
imagine [1] - 753:9

immediate [1] - 761:15
immediately [3] - 712:22, 712:23, 744:2
impact [1] - 702:10
impartial [3] - 706:24, 709:4, 709:11
impartially [2] - 685:19, 707:13
impeached [2] - 693:9, 693:14
importance [1] - 692:23
important [10] - 685:7, 688:3, 692:23, 702:11, 710:9, 713:18, 731:14, 733:19, 750:23, 753:1
impossible [2] - 742:12
improper [2] - 689:17, 729:6
inches [1] - 742:22
incident [12] - 715:3, 716:9, 741:19, 751:25, 752:13, 754:8, 755:14, 756:5, 757:1, 757:25, 758:2, 764:7
incidental [1] - 751:23
inclination [1] - 729:20
included [1] - 731:14
includes [2] - 708:21, 731:24
including [3] - 701:17, 765:4, 765:15
inconsistencies [1] - 692:17
inconsistent [1] - 693:12
indeed [1] - 686:2
indicate [3] - 704:10, 708:4, 709:15
indicated [3] - 692:13, 704:12, 704:14
indicating [1] - 747:11
individual [2] - 684:5, 706:22
induced [1] - 755:11
infer [1] - 685:4
inference [2] - 691:14
inferences [7] - 687:1, 687:6, 688:20, 691:9, 691:12, 709:23, 710:2
influenced [2] - 689:18, 731:21
information [5] -

703:5, 708:11, 732:20, 733:16, 758:7
ingredients [1] - 750:7
initial [2] - 723:10, 743:10
injured [9] - 701:1, 701:5, 702:4, 702:23, 736:19, 739:17, 743:12, 748:17, 757:4
injures [1] - 750:8
injuries [7] - 697:3, 699:1, 699:11, 701:2, 712:15, 731:24, 769:2
injury [26] - 696:12, 696:15, 697:1, 697:17, 698:8, 700:1, 700:7, 700:14, 700:15, 700:16, 700:17, 700:20, 700:24, 701:24, 703:12, 703:22, 704:3, 714:9, 733:7, 733:18, 734:5, 736:2, 736:3, 755:14, 756:5, 758:20
innocent [1] - 692:20, 692:24
inquiry [2] - 707:18, 707:22
insofar [1] - 694:19
inspect [1] - 731:1
inspected [2] - 727:2, 741:23
inspecting [3] - 741:22, 746:18, 746:20
inspection [4] - 723:9, 723:10, 742:2
inspections [5] - 721:14, 723:4, 723:7, 723:8, 724:21
inspector [2] - 717:20, 719:10
instances [1] - 687:10
instant [1] - 708:15
instruct [8] - 684:23, 686:14, 686:25, 695:8, 698:22, 708:3, 726:14, 727:5
instructed [10] - 687:4, 689:21, 695:16, 697:24, 701:9, 702:12, 706:16, 709:24, 721:25, 731:19
instructing [1] - 734:10
instruction [9] - 683:13, 689:24, 707:17, 720:16, 722:4, 724:5, 726:8, 731:3, 732:25
instructions [19] -

683:2, 683:4, 683:11, 683:14, 683:21, 684:9, 687:5, 688:11, 689:11, 695:20, 704:21, 706:5, 709:6, 710:5, 728:3, 735:25, 759:10, 759:15, 759:24
instructs [2] - 741:3, 741:4
intake [1] - 735:3
intelligence [2] - 692:10, 692:11
intended [1] - 689:11
intensive [1] - 753:19
interaction [1] - 709:3
interest [3] - 692:14, 707:8
interestingly [1] - 743:23
internet [3] - 708:14, 708:15
interpret [1] - 689:11
interstate [1] - 702:25
introduced [2] - 701:21, 755:10
intrude [1] - 687:24
involved [2] - 709:24, 721:2
involves [1] - 735:10
iPhones [1] - 708:13
issue [9] - 695:5, 702:13, 726:11, 739:12, 742:19, 742:25, 747:8, 751:25, 752:7
issues [7] - 683:25, 684:16, 688:25, 691:18, 695:6, 702:6, 702:11
item [1] - 687:6
items [1] - 687:10

J

job [11] - 699:19, 711:18, 711:19, 735:22, 737:8, 740:15, 744:14, 744:22, 745:11, 749:3, 770:10
jobs [1] - 746:20
jog [1] - 734:12
jogging [1] - 735:7
judge [2] - 684:10, 694:4
Judge [10] - 712:6, 712:9, 720:17, 721:24, 731:19, 732:25, 735:25, 743:7, 752:8, 756:3
judged [1] - 694:17
judges [8] - 683:22, 685:18, 691:17, 691:18,

694:5, 707:7, 707:8, 710:10
judgment [3] - 706:18, 706:23, 709:25
July [12] - 702:1, 712:3, 713:2, 713:6, 716:24, 719:3, 719:5, 731:25, 732:11, 732:23, 732:24, 740:15
jump [1] - 713:3
juries [1] - 758:11
Juror [7] - 769:10, 769:12, 769:14, 769:16, 769:18, 769:20, 769:22
juror [5] - 684:5, 688:1, 706:19, 709:7, 761:8
JUROR [13] - 769:11, 769:13, 769:15, 769:17, 769:19, 769:21, 769:23
jurors [14] - 683:3, 684:6, 685:9, 685:14, 687:21, 691:13, 706:20, 706:25, 707:5, 707:11, 709:11, 710:11, 759:19, 769:8
Jury [2] - 761:9, 767:25
jury [67] - 684:4, 684:11, 685:18, 690:14, 692:19, 704:24, 705:7, 705:12, 705:15, 705:20, 705:22, 706:11, 706:15, 707:20, 708:6, 708:8, 709:16, 711:6, 711:14, 712:16, 713:5, 713:14, 714:21, 715:21, 716:11, 717:22, 720:1, 720:16, 720:23, 721:24, 722:18, 727:5, 727:21, 730:8, 730:20, 731:3, 731:10, 733:2, 733:24, 736:24, 737:19, 738:5, 738:9, 738:13, 738:15, 758:10, 759:5, 759:9, 759:21, 759:22, 760:3, 760:13, 761:6, 761:20, 767:19, 767:22, 768:1, 768:2, 768:4, 768:5, 768:7, 768:8, 769:6, 769:24, 770:4, 770:7, 770:15
justice [2] - 684:4, 710:13
justified [1] - 691:9

K

keep [1] - 688:8
kind [5] - 684:10, 728:15, 730:13, 730:15,

762:17
**kindly** [2] - 710:16,
768:11
**knowledge** [4] -
690:10, 692:15, 757:23
**known** [4] - 696:3,
698:16, 744:12
**knows** [6] - 690:9,
713:17, 749:4, 749:10,
749:11, 755:7

## L

**L-i-p-i-n-s-k-i** [1] -
760:11
**lack** [5] - 692:10,
692:12, 692:14, 692:15,
732:13
**ladies** [34] - 709:7,
709:22, 710:4, 711:14,
712:16, 713:5, 713:14,
714:21, 715:21, 716:11,
718:22, 719:25, 720:23,
721:24, 722:18, 730:8,
730:20, 731:9, 733:2,
733:24, 736:24, 737:18,
738:14, 738:24, 740:7,
742:14, 745:6, 745:25,
747:16, 748:23, 752:17,
755:23, 758:9, 759:5
**large** [2] - 753:23,
753:24
**last** [4] - 724:16,
724:19, 734:8, 735:13
**late** [1] - 719:14
**latest** [2] - 699:5,
722:1
**Laughter** [2] - 766:24,
767:4
**laughter** [1] - 738:23
**law** [21] - 683:3,
683:5, 683:8, 683:9,
683:14, 683:17, 683:18,
683:20, 684:8, 684:20,
684:21, 684:24, 685:19,
686:24, 691:3, 698:2,
706:16, 707:10, 707:14,
743:4, 743:7
**lawsuit** [1] - 696:1
**lawyer** [2] - 686:8,
689:13
**lawyers** [6] - 689:8,
689:9, 689:15, 708:22,
711:3, 761:10
**lead** [2] - 688:21,
691:15
**leading** [1] - 733:8
**leave** [5] - 705:15,
716:1, 758:15, 760:24

**left** [21] - 710:7,
714:11, 714:13, 714:22,
714:24, 715:14, 715:20,
715:22, 723:25, 728:15,
741:5, 741:9, 742:22,
743:25, 753:15, 757:17,
758:19, 760:6, 770:15
**leg** [1] - 750:9
**legal** [7] - 684:16,
687:18, 687:20, 696:10,
706:12, 709:5, 709:24
**lesion** [2] - 732:10,
733:11
**less** [7] - 685:7,
685:22, 690:25, 718:14,
720:7, 735:10, 735:11
**lessen** [1] - 701:8
**level** [2] - 697:9,
742:22
**Liability** [2] - 696:3,
756:3
**liable** [5] - 699:1,
699:7, 700:4, 700:9,
756:6
**liar** [1] - 744:20
**lie** [1] - 692:5
**life** [7] - 685:15,
708:23, 740:18, 740:19,
756:14, 758:14, 758:19
**lifted** [2] - 714:17,
715:5
**light** [5] - 685:14,
691:9, 692:1, 694:24,
737:12
**likelihood** [1] -
693:24
**likely** [4] - 694:25,
695:12, 712:8, 720:11
**likewise** [1] - 691:18
**limited** [1] - 689:23,
691:5
**limiting** [1] - 689:24,
726:8
**line** [2] - 704:12,
704:14
**LinkedIn** [1] - 708:17
**LIPINSKI** [1] - 760:11
**Lipinski** [1] - 760:11
**list** [2] - 689:7, 750:2
**listen** [1] - 722:7
**listening** [1] - 711:17
**literal** [1] - 716:1
**literally** [1] - 753:20
**live** [2] - 710:12,
758:14
**lives** [1] - 758:15
**living** [1] - 740:17
**located** [1] - 761:12,
764:12
**location** [1] - 763:1,

763:10
**logically** [1] - 710:2
**Lombardi** [2] -
750:13, 750:25
**look** [12] - 714:3,
715:17, 722:15, 722:16,
724:13, 736:25, 737:2,
741:24, 745:23, 752:15,
767:10, 768:12
**looked** [10] - 717:22,
717:23, 721:17, 722:25,
729:2, 732:5, 732:20,
741:16, 755:5, 762:11
**looking** [2] - 723:4,
723:9, 741:24, 741:25,
745:2
**looks** [2] - 723:2,
745:16
**loose** [2] - 753:24,
754:1
**loss** [3] - 700:1,
756:19, 756:23
**losses** [2] - 700:10,
701:7
**lost** [9] - 701:13,
701:14, 701:25, 702:7,
702:8, 704:13, 736:17,
752:23, 757:6
**lunch** [1] - 759:8
**lunchtime** [1] - 759:7
**Lupia** [1] - 765:23

## M

**machine** [1] - 734:13
**main** [1] - 743:8
**maintain** [1] - 723:23
**man** [1] - 750:19
**manner** [1] - 692:13
**manual** [1] - 724:13
**March** [1] - 735:20
**marks** [2] - 690:20,
690:24
**Marshal** [1] - 709:13
**material** [1] - 740:13
**matter** [11] - 692:23,
700:16, 737:7, 744:5,
746:19, 749:18, 752:7,
756:9, 761:5, 767:21,
770:17
**mattered** [1] - 716:6
**matters** [3] - 687:22,
707:24, 709:2
**mean** [10] - 695:22,
698:9, 718:10, 721:21,
722:5, 743:3, 746:18,
751:22, 762:9, 764:6
**meaning** [1] - 737:5
**means** [8] - 694:23,

**meant** [1] - 706:6
**measure** [3] - 727:15,
728:7, 756:17
**measured** [2] -
698:14, 726:12
**measurements** [2] -
725:6, 725:24
**measuring** [2] -
725:13, 726:16
**media** [1] - 708:12
**medical** [7] - 702:13,
716:24, 734:6, 734:14,
734:16, 734:21, 754:7
**Medical** [4] - 716:25,
717:8, 747:2, 750:13
**meet** [4] - 695:4,
712:17, 720:19, 721:14
**members** [1] - 706:10
**memo** [5] - 717:25,
765:6, 765:7, 765:8,
765:23
**memory** [2] - 689:14,
713:17
**men's** [1] - 760:17
**mention** [2] - 726:12,
726:19
**mentioned** [5] -
697:21, 705:19, 716:17,
724:12, 725:23
**mentions** [1] - 765:20
**mere** [1] - 707:5
**merely** [1] - 699:7
**merit** [2] - 755:6,
755:8
**messaging** [2] -
708:15
**met** [5] - 721:20,
722:19, 726:21, 737:19,
739:23
**method** [7] - 699:8,
740:9, 741:3, 741:4,
741:10, 744:3, 744:6
**might** [9] - 687:11,
690:14, 692:16, 719:14,
724:2, 741:13, 745:8,
748:25, 761:23
**mind** [5] - 688:8,
693:24, 702:14, 714:7,
729:14
**mindful** [1] - 759:15
**minimize** [2] - 701:4,
701:5
**MINO** [30] - 711:9,
711:13, 725:14, 725:17,
725:20, 726:9, 726:18,
726:24, 727:8, 727:10,
727:17, 728:14, 729:10,

759:1, 761:2, 762:5,
763:12, 763:14, 763:20,
764:20, 764:25, 765:3,
765:8, 765:11, 765:14,
765:17, 765:19, 765:22,
766:20, 767:15
**Mino** [7] - 711:12,
743:19, 744:19, 746:16,
749:6, 751:4, 753:2
**minute** [1] - 752:2
**minutes** [2] - 738:4,
758:5
**misrecollection** [1] -
692:20
**missed** [3] - 719:14,
756:21
**mistakes** [1] - 711:22
**mitigation** [1] - 736:1
**moment** [4] - 705:19,
710:20, 716:1, 744:21
**money** [3] - 700:23,
701:10, 701:12
**month** [4] - 732:6,
756:18, 756:19, 756:21
**months** [8] - 735:7,
740:16, 740:17, 754:5,
754:9, 756:16, 757:9,
762:14
**moral** [4] - 743:1,
743:3, 743:6
**morning** [4] - 711:14,
738:19, 738:21, 762:13
**most** [5] - 699:5,
709:8, 711:18, 720:1,
722:2
**mostly** [1] - 718:7
**motive** [1] - 692:3
**motives** [1] - 692:3
**motorcycle** [1] -
734:15
**move** [12] - 703:14,
703:24, 703:25, 707:24,
727:18, 729:18, 729:22,
730:2, 730:4, 730:5,
733:21, 758:15
**moved** [4] - 752:24,
753:15, 761:19, 763:7
**moving** [3] - 730:7,
730:8, 730:12
**MR** [78] - 710:19,
710:23, 711:1, 711:8,
711:9, 711:13, 725:8,
725:10, 725:12, 725:14,
725:16, 725:17, 725:20,
725:23, 726:9, 726:18,
726:19, 726:24, 727:1,
727:2, 727:8, 727:9,
727:10, 727:14, 727:17,
728:14, 729:3, 729:6, 729:10,

738:18, 738:24, 745:18,
746:8, 759:1, 759:3,
760:16, 760:19, 761:1,
761:2, 762:5, 762:21,
762:24, 763:4, 763:9,
763:12, 763:13, 763:14,
763:20, 763:25, 764:6,
764:10, 764:13, 764:18,
764:20, 764:22, 764:25,
765:2, 765:3, 765:6,
765:8, 765:11, 765:14,
765:17, 765:19, 765:21,
765:22, 766:2, 766:6,
766:10, 766:13, 766:19,
766:20, 767:2, 767:15,
767:16, 769:6

**MRI** [4] - 732:4,
732:16, 732:17, 755:5

**must** [30] - 683:2,
683:14, 684:1, 687:5,
688:3, 689:22, 689:24,
690:2, 694:8, 695:4,
695:22, 700:13, 700:15,
702:5, 702:6, 702:15,
702:16, 703:8, 703:13,
703:16, 703:18, 703:23,
703:25, 704:15, 706:10,
706:11, 706:18, 706:23,
708:10, 712:7

**MySpace** [1] - 708:16

## N

**name** [4] - 727:7,
727:13, 758:4, 760:9
**near** [1] - 690:21
**neat** [1] - 766:22
**necessary** [2] -
695:9, 751:15
**necessity** [1] - 754:7
**need** [21] - 707:17,
712:11, 713:1, 724:14,
730:2, 730:4, 738:3,
747:12, 747:22, 747:25,
748:1, 748:21, 749:19,
754:2, 754:17, 754:20,
754:21, 757:11, 762:1
**needed** [3] - 722:20,
723:11, 757:10
**needs** [3] - 701:21,
712:12, 723:15
**negligence** [26] -
696:13, 696:14, 697:1,
697:17, 697:18, 697:22,
697:24, 697:25, 698:4,
698:10, 699:11, 699:12,
699:13, 699:16, 700:13,
700:15, 700:17, 700:19,
702:20, 703:11, 703:21,
704:3, 704:16, 755:25,

756:4, 769:1
**negligent** [19] -
696:25, 698:19, 699:22,
703:10, 703:20, 704:6,
704:7, 712:18, 720:4,
720:13, 720:14, 722:6,
728:20, 731:11, 737:20,
755:25, 756:6, 756:10,
768:25
**negligently** [1] -
699:15
**netted** [1] - 756:20
**network** [1] - 708:16
**never** [19] - 714:22,
714:24, 715:22, 725:2,
725:3, 725:4, 725:5,
728:16, 728:17, 744:8,
749:3, 753:12, 754:12,
757:20, 762:6
**nevers** [1] - 725:1
**new** [3] - 699:14,
740:18, 752:24
**Newark** [1] - 770:9
**newborn** [1] - 753:7
**next** [5] - 703:14,
703:24, 703:25, 704:20,
710:5
**night** [1] - 750:12
**NO** [7] - 769:11,
769:13, 769:15, 769:17,
769:19, 769:21, 769:23
**nobody** [1] - 744:5
**non** [5] - 692:23,
696:22, 741:19, 742:16,
743:10
**non-important** [1] -
692:23
**non-slip** [4] - 696:22,
741:19, 742:16, 743:10
**none** [1] - 748:15
**nonetheless** [1] -
700:9
**nonskid** [1] - 742:23
**nonstick** [1] - 740:12
**normally** [2] - 750:17,
750:18
**note** [10] - 716:24,
717:1, 734:14, 761:8,
761:9, 761:10, 763:23,
763:25, 765:9, 768:3
**noted** [2] - 691:17,
727:21
**notes** [2] - 705:25,
708:3
**nothing** [15] - 685:22,
687:25, 706:5, 721:18,
721:19, 731:22, 734:18,
740:2, 740:3, 740:4,
743:9, 745:4, 758:7
**notice** [2] - 690:20,

737:14
**noticed** [1] - 710:7
**November** [1] - 702:3
**number** [9] - 693:19,
705:21, 716:20, 717:4,
745:8, 760:20, 760:25,
761:13, 765:16
**Number** [11] - 750:25,
761:9, 767:25, 768:24,
769:10, 769:12, 769:14,
769:16, 769:18, 769:20,
769:22
**numbers** [1] - 749:19

## O

**object** [2] - 687:10,
689:16
**objection** [7] -
687:15, 689:18, 710:20,
725:10, 726:23, 729:3,
729:5
**objections** [6] -
687:1, 687:2, 687:7,
687:9, 689:15, 710:16
**objective** [1] - 710:1
**obligate** [1] - 742:18
**obligated** [1] - 722:2
**obligation** [5] -
742:17, 743:2, 743:3,
743:4, 743:6
**obligations** [1] -
686:2
**observations** [1] -
685:15
**observe** [1] - 687:12
**observed** [1] - 684:18
**obviously** [2] -
754:10, 754:13
**occasions** [1] - 687:3
**occurred** [3] - 714:10,
761:12, 764:12
**Occurrence** [2] -
715:2, 765:20
**October** [1] - 702:2
**offered** [3] - 687:8,
688:23, 736:23
**Officer** [1] - 759:13,
760:3, 760:7
**officer** [2] - 707:19,
708:9
**officially** [1] - 769:25
**oil** [7] - 717:22,
717:23, 718:19, 746:14,
746:17, 746:20, 749:8
**old** [2] - 719:19,
740:18
**omission** [1] - 699:13
**once** [3] - 734:10,

751:18, 757:16
**one** [60] - 683:13,
689:8, 690:6, 691:24,
692:7, 701:1, 701:10,
702:9, 703:3, 703:9,
703:10, 703:19, 703:20,
706:20, 708:6, 709:8,
709:10, 712:19, 713:13,
717:10, 717:11, 718:3,
719:13, 719:20, 720:2,
720:10, 720:24, 721:5,
721:7, 727:6, 731:20,
732:3, 732:4, 734:25,
735:25, 739:16, 739:17,
747:9, 747:23, 747:24,
748:13, 749:23, 750:25,
753:23, 754:1, 756:18,
756:19, 756:21, 758:9,
758:23, 761:8, 761:17,
763:6, 763:9, 763:10,
763:16, 765:16, 765:25,
767:3
**ones** [1] - 763:15
**open** [4] - 705:11,
705:18, 711:11, 728:1
**opened** [1] - 726:4
**opening** [3] - 686:15,
689:10, 711:20
**operates** [1] - 700:18
**operation** [1] - 698:21
**opinion** [11] - 683:17,
683:20, 684:3, 685:5,
686:7, 707:2, 707:4,
707:12, 751:5, 755:6,
755:7
**opinions** [2] - 688:4,
751:24
**opportunity** [2] -
686:12, 758:10
**opposed** [1] - 691:2
**opposite** [1] - 695:2
**orally** [1] - 763:24
**order** [2] - 701:3,
720:19
**orientation** [1] -
723:18
**orthopaedic** [2] -
734:8, 736:15
**orthotic** [2] - 736:4,
736:6
**osteochondral** [6] -
732:10, 733:11, 733:14,
752:5, 752:11, 755:10
**osteochondritis** [2] -
732:9, 732:12
**otherwise** [3] -
694:18, 695:16, 728:25
**ought** [1] - 683:18
**outcome** [1] - 692:15
**outside** [3] - 708:6,

709:13, 736:13
**outstanding** [1] -
770:10
**overrule** [1] - 729:8
**overtime** [14] -
701:13, 701:15, 701:25,
702:7, 702:8, 704:13,
736:18, 736:19, 736:20,
736:23, 756:16, 756:18,
756:23
**own** [20] - 685:14,
685:16, 686:17, 686:19,
689:2, 691:10, 691:11,
697:3, 699:11, 704:3,
705:6, 707:1, 708:25,
714:9, 720:20, 730:23,
731:6, 731:8, 754:5,
762:1

## P

**P-23A** [1] - 747:11
**P-24A)** [1] - 741:17
**p.m** [2] - 760:13,
767:24, 768:7
**PA-5** [1] - 739:16
**paid** [2] - 729:1,
752:21
**pain** [34] - 701:11,
701:14, 701:16, 701:20,
701:22, 702:7, 702:8,
704:11, 704:14, 715:11,
717:7, 717:10, 717:11,
731:24, 733:6, 733:12,
734:25, 735:6, 743:14,
750:19, 754:9, 754:10,
754:11, 754:13, 754:16,
756:25, 757:2, 757:7,
757:15
**pains** [3] - 757:3,
757:4, 757:5
**paper** [1] - 707:19
**parent** [1] - 734:19
**parents'** [2] - 752:25,
753:17
**part** [18] - 683:19,
692:8, 693:8, 699:17,
700:15, 700:19, 703:11,
703:22, 704:21, 707:18,
708:7, 708:22, 711:19,
712:14, 740:1, 741:13,
756:4, 769:1
**particular** [9] - 691:7,
700:6, 740:9, 764:5,
764:17, 765:25, 766:12,
766:16, 767:14
**particularly** [3] -
687:22, 687:25, 747:12
**parties** [8] - 684:2,

781

684:16, 685:23, 694:6,
694:14, 702:22, 707:21,
710:14
  **partisans** [1] - 707:7
  **party** [8] - 687:15,
692:10, 693:20, 695:20,
700:22, 701:5, 704:4,
707:10
  **party's** [1] - 708:23
  **pass** [2] - 768:3,
768:11
  **past** [1] - 758:17
  **Patel** [2] - 750:14,
751:1
  **PATH** [95] - 686:22,
695:2, 695:5, 695:6,
696:5, 696:12, 696:13,
696:17, 696:18, 696:19,
696:21, 696:24, 696:25,
697:2, 697:4, 697:6,
697:8, 698:10, 699:4,
702:23, 702:24, 703:10,
703:18, 703:21, 703:23,
703:24, 704:6, 712:13,
712:18, 712:24, 713:4,
713:7, 713:21, 716:23,
716:25, 717:8, 717:20,
720:4, 720:6, 720:7,
720:13, 720:14, 720:17,
720:25, 721:2, 721:10,
721:14, 721:22, 721:25,
722:5, 722:7, 722:21,
722:22, 723:2, 724:23,
728:20, 729:2, 730:17,
730:25, 731:3, 731:7,
731:11, 732:3, 735:22,
736:16, 737:20, 739:9,
739:10, 739:16, 739:23,
740:10, 740:16, 740:24,
742:16, 743:1, 743:15,
744:23, 745:25, 747:2,
748:18, 750:13, 751:2,
751:16, 751:19, 754:25,
755:9, 755:24, 756:5,
756:6, 756:14, 757:14,
758:20, 768:25
  **PATH's** [14] - 696:9,
696:13, 697:15, 697:16,
698:11, 698:14, 699:10,
703:11, 743:8, 743:16,
743:23, 746:1, 756:4,
768:25
  **patience** [2] - 711:16,
770:2
  **pay** [7] - 687:12,
696:14, 711:24, 737:10,
737:12, 737:13, 737:15
  **paying** [2] - 737:10,
749:2
  **people** [13] - 728:22,

740:11, 740:24, 742:21,
744:23, 745:9, 747:13,
748:11, 748:22, 752:5,
752:6, 754:19, 754:21
  **per** [1] - 704:4
  **percent** [1] - 704:5
  **percentage** [3] -
697:19, 702:19, 704:4
  **perception** [1] -
708:25
  **perfect** [3] - 699:5,
718:10, 722:2
  **perform** [3] - 685:16,
707:9, 725:3
  **performing** [2] -
699:8, 702:23
  **performs** [1] - 728:16
  **perhaps** [2] - 685:3,
719:13
  **period** [7] - 732:15,
743:5, 744:15, 750:18,
751:21, 753:13
  **periodic** [1] - 723:8
  **permit** [1] - 707:11
  **permitted** [2] - 691:7,
699:15
  **perpendicular** [2] -
748:1, 748:2
  **person** [13] - 688:2,
690:9, 698:2, 698:3,
698:5, 698:7, 699:2,
705:21, 705:22, 705:24,
705:25, 706:2, 711:22
  **person's** [1] - 690:10
  **personal** [2] - 745:10,
750:3
  **persons** [2] - 692:1,
698:17
  **persuade** [1] - 686:4
  **persuaded** [2] -
684:1, 695:23
  **persuasive** [1] -
694:2
  **pertained** [1] - 687:20
  **pertains** [1] - 692:23
  **phases** [1] - 687:20
  **phone** [3] - 708:13,
760:19, 760:25
  **phones** [2] - 760:15,
770:5
  **photo** [2] - 746:11,
762:7
  **photographs** [1] -
762:6
  **photos** [4] - 764:21,
764:22, 764:23
  **phrase** [1] - 715:14
  **physical** [4] - 699:24,
701:16, 701:20, 717:5
  **physically** [1] -

735:22
  **physics** [1] - 749:18
  **pick** [1] - 728:15
  **picture** [3] - 713:20,
765:11, 765:12
  **pictures** [2] - 762:18,
762:19
  **piece** [1] - 741:24
  **pieces** [2] - 688:17,
719:13
  **place** [20] - 690:15,
696:23, 697:11, 699:20,
710:22, 711:11, 717:10,
723:24, 725:21, 726:23,
728:1, 739:11, 741:8,
743:2, 743:5, 747:11,
747:14, 749:13, 749:15,
760:5
  **placed** [5] - 715:22,
718:6, 718:17, 718:20
  **places** [2] - 714:22,
714:24
  **Plaintiff** [44] - 685:20,
686:21, 688:23, 694:21,
696:2, 696:18, 696:21,
696:23, 697:7, 697:9,
697:10, 697:11, 697:13,
699:5, 699:13, 700:6,
701:18, 701:24, 707:12,
712:5, 712:17, 712:18,
712:22, 713:3, 720:13,
728:19, 728:24, 730:16,
732:2, 733:13, 733:17,
733:21, 733:22, 734:10,
735:21, 735:23, 736:7,
736:8, 736:9, 736:11,
736:14, 736:17, 752:8,
769:2
  **PLAINTIFF** [1] -
745:17
  **Plaintiff's** [9] - 699:1,
699:24, 700:9, 719:11,
732:4, 732:11, 737:25,
738:16, 746:7
  **plate** [10] - 718:7,
723:25, 724:6, 725:25,
726:9, 726:11, 741:10,
741:14, 741:15, 742:10
  **play** [7] - 716:5,
731:6, 731:7, 731:23,
733:23, 734:1, 734:17
  **played** [5] - 700:15,
700:19, 703:11, 703:21,
755:25
  **playground** [1] -
734:18
  **plays** [2] - 739:14,
756:4
  **pleasure** [1] - 711:5
  **point** [12] - 702:5,

708:5, 714:7, 715:16,
720:12, 723:12, 733:16,
748:24, 750:5, 756:13,
761:16, 763:9
  **points** [1] - 723:24
  **poking** [1] - 751:4
  **policy** [1] - 710:23
  **poll** [3] - 768:4, 768:5,
769:6
  **Port** [1] - 696:5
  **portion** [7] - 696:22,
741:5, 741:6, 753:24,
756:24, 756:25, 762:15
  **possible** [2] - 694:19,
704:15
  **possibly** [3] - 732:23,
751:13, 752:14
  **PPE** [1] - 750:3
  **practice** [1] - 748:6
  **pre** [5] - 700:8,
701:17, 732:10, 733:1,
733:14
  **pre-existed** [1] -
732:10
  **pre-existing** [4] -
700:8, 701:17, 733:1,
733:14
  **precautions** [1] -
699:3
  **preclude** [1] - 701:6
  **prejudice** [4] - 684:2,
685:17, 707:10, 707:12
  **prepare** [2] - 707:23,
763:22
  **prepared** [1] - 706:6
  **preponderance** [10] -
694:22, 695:8, 695:15,
696:16, 697:4, 703:9,
703:19, 712:8, 712:12,
730:16
  **Presbyterian** [1] -
755:2
  **prescribe** [1] - 698:20
  **prescribed** [1] - 736:4
  **presence** [1] - 707:21
  **present** [4] - 684:12,
693:13, 694:15, 694:20
  **presented** [9] -
683:25, 684:6, 684:21,
687:13, 688:19, 694:11,
694:16, 708:24, 709:5
  **preside** [2] - 684:18,
705:8
  **presume** [1] - 709:18
  **pretty** [7] - 719:25,
735:2, 735:12, 735:14,
735:15, 735:17, 742:2
  **prevalent** [1] - 741:20
  **prevent** [3] - 699:3,
701:3, 701:6

  **primary** [1] - 684:11
  **principles** [4] -
684:20, 686:24, 709:24,
748:5
  **problem** [11] -
719:12, 723:2, 723:3,
723:12, 727:3, 747:18,
748:24, 749:1, 752:11,
753:22, 754:24
  **problems** [2] - 719:6,
721:15
  **procedure** [1] - 749:4
  **procedures** [2] -
698:21, 698:23
  **proceeds** [1] - 705:22
  **process** [3] - 748:18,
750:5, 757:5
  **produced** [2] -
688:14, 695:18
  **produces** [1] - 693:23
  **prompted** [1] - 692:3
  **promulgate** [1] -
698:20
  **proof** [5] - 690:12,
693:25, 695:21, 712:7,
730:9
  **propensity** [1] -
752:6, 752:9
  **proper** [8] - 696:21,
733:5, 736:2, 749:23,
750:7, 755:22, 756:8
  **properly** [4] - 690:22,
697:8, 697:12, 744:9
  **proportion** [1] -
698:17
  **propose** [1] - 764:14
  **proposition** [2] -
695:21, 695:24
  **protect** [1] - 760:3
  **protective** [2] -
745:10, 750:3
  **prove** [9] - 684:14,
690:12, 694:23, 703:15,
703:24, 712:7, 712:11,
712:12, 730:16
  **proved** [4] - 691:8,
695:14, 700:13, 703:9
  **proven** [4] - 691:13,
694:9, 695:10, 703:19
  **proves** [2] - 703:13,
703:23
  **provide** [17] - 696:6,
696:18, 696:19, 696:21,
708:11, 712:13, 720:17,
722:1, 722:3, 724:8,
724:9, 730:17, 731:2,
739:10, 742:18, 743:2,
743:4
  **provided** [8] - 697:8,
697:10, 699:6, 704:21,

705:4, 712:21, 722:22, 724:22

**province** [1] - 693:15
**proving** [1] - 694:21, 695:7, 695:12, 696:16, 697:4
**prudent** [2] - 698:2, 698:3
**public** [2] - 684:3, 707:12
**puff** [1] - 711:3
**pull** [3] - 723:24, 741:8, 748:4
**punishment** [1] - 702:17
**purely** [1] - 708:24
**purpose** [4] - 685:1, 686:3, 689:24, 707:5
**purposes** [4] - 688:6, 694:9, 705:24, 706:17
**push** [1] - 734:17
**put** [19] - 686:16, 695:1, 702:14, 714:16, 715:4, 716:16, 721:6, 724:5, 724:10, 724:17, 737:11, 737:13, 737:16, 740:12, 741:4, 744:11, 744:12, 744:24
**puts** [1] - 732:10
**putting** [1] - 735:12

## Q

**questions** [15] - 684:21, 687:19, 689:15, 694:12, 703:4, 703:6, 704:25, 705:10, 712:23, 720:12, 755:24, 761:3, 768:4, 768:13, 768:22
**quickly** [1] - 715:12
**quite** [2] - 711:18, 732:14

## R

**R-1** [1] - 715:5
**rail** [5] - 696:20, 696:24, 698:22, 699:6, 714:17
**Railroad** [2] - 721:8, 723:1
**railroad** [8] - 699:19, 700:2, 700:7, 702:25, 721:16, 725:2, 728:16
**railroads** [1] - 696:4
**raise** [1] - 760:5
**rather** [2] - 685:8, 688:18
**re** [1] - 707:1

**re-examine** [1] - 707:1
**reach** [5] - 685:20, 707:15, 709:12, 731:10, 731:13
**reached** [2] - 709:17, 768:8
**reaching** [3] - 683:15, 704:23, 706:21
**reaction** [1] - 761:15
**read** [15] - 694:7, 707:18, 708:1, 708:2, 714:3, 743:7, 745:8, 759:11, 761:10, 762:15, 767:9, 768:3, 768:13, 768:14, 768:22
**ready** [3] - 724:11, 734:10
**real** [2] - 708:23, 727:19
**really** [18] - 715:11, 722:9, 722:13, 724:2, 729:16, 729:21, 735:6, 737:7, 747:8, 747:25, 748:17, 752:7, 753:23, 753:25, 754:1, 755:6, 758:2, 763:7
**reason** [5] - 688:21, 691:15, 694:15, 710:9, 725:25
**reasonable** [13] - 688:2, 691:9, 696:6, 697:22, 697:25, 698:1, 698:7, 698:11, 699:2, 701:2, 701:5, 701:8, 731:22
**reasonably** [25] - 696:6, 696:19, 696:20, 698:1, 698:3, 698:5, 698:13, 698:14, 698:17, 699:6, 700:24, 701:18, 710:2, 712:13, 720:17, 722:3, 722:7, 722:22, 724:23, 730:17, 730:25, 739:11, 742:16, 743:5
**reattaching** [1] - 753:21
**rebuttal** [2] - 710:24, 710:25
**received** [10] - 683:6, 683:24, 686:11, 688:7, 688:10, 688:13, 689:23, 690:3, 723:14, 767:25
**recess** [1] - 738:8
**recessed** [2] - 761:5, 767:21
**recognize** [1] - 723:15
**recollect** [1] - 692:21
**recollection** [8] -

685:12, 686:18, 686:19, 762:2, 766:6, 766:8, 766:16, 767:13
**record** [8] - 687:4, 711:5, 726:23, 760:10, 760:11, 761:18, 761:24, 762:16
**recorded** [1] - 694:12
**recordings** [1] - 690:7
**records** [5] - 734:6, 734:9, 734:14, 734:16, 754:7
**recovery** [3] - 700:3, 701:6, 701:7
**reduce** [1] - 700:2
**reduction** [1] - 702:18
**refer** [1] - 683:7
**reference** [2] - 759:11, 764:19
**references** [2] - 688:25, 689:2
**referred** [3] - 688:19, 688:20, 751:2
**referring** [4] - 741:16, 764:3, 764:15, 765:25
**Reflective** [1] - 745:15
**regard** [2] - 746:23, 751:25
**regarded** [1] - 686:6
**regarding** [1] - 685:5
**regardless** [4] - 683:17, 688:14, 695:17, 695:18
**regs** [1] - 756:9
**regular** [1] - 702:12
**regularly** [1] - 735:4
**regulation** [4] - 698:25, 721:16, 739:4, 739:6
**regulations** [15] - 698:21, 698:23, 721:1, 721:3, 721:12, 721:20, 722:19, 729:13, 729:14, 739:3, 739:8, 739:24, 739:25, 740:2, 742:19
**rehab** [1] - 734:24
**rehabilitation** [1] - 717:9
**related** [2] - 708:25, 731:25
**relating** [1] - 739:6
**relationship** [2] - 692:10, 753:16
**relatively** [1] - 737:1
**relevance** [1] - 758:7
**relevant** [2] - 709:3, 728:12
**relies** [1] - 720:19

**rely** [1] - 762:1
**remarks** [2] - 687:4, 738:17
**remember** [12] - 689:13, 708:23, 718:17, 718:18, 718:19, 733:19, 739:25, 747:22, 750:23, 758:4, 762:17
**remind** [1] - 731:16
**rendering** [1] - 709:4
**rephrase** [1] - 725:17
**Report** [1] - 715:2
**report** [15] - 697:13, 706:3, 709:14, 713:22, 713:24, 743:11, 743:17, 745:6, 750:2, 764:18, 764:21, 765:3, 765:5, 765:15
**reports** [1] - 743:22
**represent** [2] - 686:2, 706:18
**representatives** [1] - 699:18
**representing** [1] - 686:20
**request** [2] - 699:18, 709:17
**required** [11] - 691:2, 695:12, 696:14, 696:23, 698:10, 699:4, 721:4, 721:7, 745:10, 747:10, 750:2
**requirement** [5] - 721:6, 744:13, 744:22, 745:21, 749:25
**requirements** [1] - 721:15
**requires** [3] - 696:4, 710:14, 748:6
**requiring** [1] - 744:25
**research** [1] - 708:18
**residual** [1] - 735:24
**resist** [1] - 734:3
**resistance** [9] - 725:6, 725:13, 725:24, 726:2, 727:16, 728:7, 748:10, 748:21, 756:8
**resistant** [1] - 741:25
**resolve** [1] - 707:25
**resolved** [1] - 688:3
**respect** [7] - 697:8, 697:14, 709:25, 710:11, 711:6, 729:25, 735:13
**respectful** [2] - 711:2, 759:20
**response** [2] - 707:23, 763:22
**responsibility** [4] - 684:15, 697:3, 706:9, 709:9

**responsible** [1] - 699:18
**rest** [2] - 758:14, 758:18
**rests** [1] - 709:10
**result** [7] - 685:6, 733:18, 734:5, 735:15, 735:16, 735:18, 757:1
**resulted** [2] - 692:24, 758:2
**resulting** [2] - 700:9, 701:4
**retire** [1] - 706:14
**retired** [1] - 760:13
**return** [1] - 770:4
**returned** [3] - 706:4, 766:7, 768:18
**returning** [1] - 707:5
**reveals** [1] - 698:24
**review** [2] - 686:13, 709:20
**rewrite** [1] - 716:14
**rid** [2] - 716:21, 754:2
**ride** [1] - 734:15
**rights** [2] - 684:16, 686:2
**rise** [10] - 709:17, 738:2, 738:10, 738:12, 760:12, 761:7, 767:23, 768:6, 768:21, 770:14
**risk** [1] - 699:22
**roadway** [1] - 690:19
**Robert** [1] - 760:11
**role** [6] - 705:13, 731:6, 731:7, 755:25, 756:5, 756:6
**rolled** [2] - 714:18, 715:6
**room** [14] - 704:24, 705:7, 705:12, 705:15, 705:16, 705:20, 706:15, 707:20, 708:15, 714:2, 759:9, 759:22, 760:18, 770:4
**Rosenthal** [2] - 759:2, 763:3
**ROSENTHAL** [47] - 710:19, 710:23, 711:1, 711:8, 725:8, 725:10, 725:12, 725:16, 725:23, 726:19, 727:1, 727:9, 727:14, 727:16, 727:24, 729:3, 729:6, 738:18, 738:24, 745:18, 746:8, 759:3, 760:16, 760:19, 761:1, 762:21, 762:24, 763:4, 763:9, 763:13, 763:25, 764:6, 764:10, 764:13, 764:18, 764:22, 765:2, 765:6, 765:21,

783

766:2, 766:6, 766:10,
766:13, 766:19, 767:2,
767:16, 769:6
  **routine** [1] - 711:23
  **Rubber** [1] - 745:18
  **rule** [3] - 683:17,
744:9, 744:25, 745:3
  **ruled** [1] - 687:19
  **Rules** [1] - 689:17
  **rules** [9] - 683:5,
683:7, 684:8, 684:19,
698:21, 698:23, 744:23,
744:24, 758:8
  **ruling** [1] - 689:19
  **rulings** [1] - 687:2
  **run** [4] - 711:3,
734:11, 734:18, 760:17

## S

  **S-1** [1] - 715:4
  **S1** [1] - 714:16
  **sad** [1] - 733:25
  **safe** [35] - 696:6,
696:19, 696:20, 698:13,
698:21, 699:6, 712:13,
720:17, 722:3, 722:17,
722:19, 722:22, 726:20,
727:1, 727:3, 727:11,
728:5, 730:17, 731:5,
739:11, 740:10, 742:16,
742:23, 743:2, 743:5,
747:12, 747:22, 748:6,
748:12, 748:13, 748:19,
750:7, 755:20, 756:11
  **safeguarding** [1] -
684:15
  **safely** [1] - 719:20
  **safer** [7] - 699:8,
722:10, 722:11, 722:12,
722:16, 728:24
  **safest** [1] - 722:1
  **safety** [13] - 698:11,
698:25, 721:16, 726:11,
728:22, 731:2, 731:4,
731:6, 731:8, 745:15,
747:7, 747:8, 747:10
  **Sandra** [4] - 719:15,
719:16, 719:18, 719:23
  **Sandy** [1] - 762:12
  **saw** [7] - 719:18,
725:4, 728:17, 732:3,
732:5, 734:9, 758:5
  **scales** [3] - 695:2,
695:3, 712:9
  **scenario** [2] - 724:23,
739:18
    **schedules** [1] - 770:3
    **SCO** [1] - 760:11

  **scrap** [1] - 730:13
  **search** [2] - 709:2,
709:3
  **seat** [2] - 722:12,
738:15
  **seats** [1] - 709:16
  **second** [13] - 700:11,
718:14, 718:21, 724:24,
725:19, 734:7, 735:5,
735:7, 735:10, 753:18,
753:19, 754:15, 757:15
  **seconds** [2] - 715:15,
718:14
  **secure** [1] - 697:12
  **securely** [3] - 697:11,
724:6, 737:16
  **Security** [2] - 759:13,
760:3, 760:7
  **see** [17] - 684:18,
690:22, 698:12, 710:19,
716:23, 716:25, 721:13,
736:10, 737:3, 738:6,
741:23, 741:24, 742:1,
745:3, 745:9, 745:20,
746:8
  **seeing** [1] - 732:17
  **seek** [2] - 684:5,
692:3
  **seeks** [3] - 700:14,
703:12, 703:22
  **seem** [1] - 691:9
  **sees** [1] - 753:23
  **select** [3] - 705:6,
705:8, 705:21
  **Selectric** [1] - 767:7
  **send** [5] - 759:9,
759:10, 759:22, 767:10,
767:19
  **sense** [20] - 685:16,
688:5, 688:21, 691:10,
691:11, 691:15, 713:13,
715:13, 715:24, 716:2,
716:3, 716:12, 718:23,
729:23, 748:3, 749:20,
751:7, 765:9, 765:12,
765:24
  **senses** [1] - 690:10
  **sent** [7] - 750:13,
751:16, 751:19, 754:22,
754:25, 755:1, 757:14
  **separate** [1] - 684:11
  **series** [1] - 762:10
  **seriously** [1] - 759:16
  **serve** [2] - 705:21,
770:3
  **service** [5] - 708:14,
739:23, 770:1, 770:7,
770:11
  **serving** [1] - 709:7
  **session** [1] - 690:2

  **setting** [1] - 701:22
  **settled** [1] - 705:7
  **seventeen** [1] -
756:16
  **shakes** [1] - 739:12
  **shall** [3] - 705:6,
705:8, 706:8
  **shape** [1] - 708:17
  **share** [1] - 697:3
  **Sheet** [1] - 703:1
  **sheet** [9] - 703:2,
703:3, 703:4, 703:16,
706:1, 707:19, 730:19,
759:12, 768:12
  **ships** [1] - 705:13
  **shoe** [1] - 737:14
  **Shoes** [1] - 745:15
  **shoes** [3] - 716:22,
717:3, 746:25
  **shop** [1] - 760:23
  **short** [2] - 732:14,
752:21
  **show** [9] - 686:5,
700:13, 705:12, 734:21,
761:11, 763:15, 764:11,
767:18
  **shown** [3] - 686:5,
723:19, 769:18
  **side** [5] - 687:8,
695:3, 723:22, 739:16,
751:20
  **sidebar** [2] - 687:17,
710:16, 710:19, 710:22,
711:3, 725:19, 725:21
  **sides** [1] - 695:2
  **sidewalk** [1] - 690:19
  **sign** [2] - 768:16,
768:19
  **signed** [1] - 761:14
  **significance** [1] -
758:3
  **significant** [1] -
756:24
  **similar** [2] - 687:11,
739:16
  **similarly** [1] - 685:24
  **simple** [1] - 737:4
  **simply** [7] - 690:13,
699:17, 719:24, 720:8,
724:20, 732:14, 733:3
  **sincerity** [1] - 692:12
  **single** [5] - 683:13,
693:23, 741:11, 744:7,
757:16
  **sitting** [1] - 711:17
  **six** [9] - 719:22,
735:1, 735:5, 740:16,
749:12, 756:13, 757:9,
757:16, 762:14
    **size** [2] - 724:1, 724:4

  **skid** [2] - 690:20,
690:24
  **skidded** [1] - 690:24
  **slightest** [1] - 756:1
  **slip** [20] - 696:22,
712:19, 716:1, 718:7,
720:14, 725:6, 725:13,
725:24, 726:2, 727:16,
728:7, 741:19, 741:25,
742:16, 743:10, 747:5,
747:6, 748:9, 748:21,
756:8
  **slip-resistance** [1] -
725:6
  **slip-resistant** [1] -
741:25
    **slippage** [1] - 748:2
    **slipped** [9] - 714:11,
714:18, 715:6, 715:7,
715:15, 715:22, 716:7,
717:2, 747:6
    **slipping** [1] - 715:20
    **slips** [2] - 705:14,
743:9
    **small** [1] - 700:16
    **smaller** [1] - 749:16
    **smartphone** [1] -
708:13
    **social** [1] - 708:16
    **sole** [5] - 691:17,
691:18, 694:5, 706:8,
707:8
    **solely** [1] - 685:1,
685:10, 686:23, 687:20,
690:3, 707:4, 709:5
    **solemn** [1] - 709:8
    **someone** [3] - 705:8,
723:15, 766:22
    **sometimes** [1] -
762:9
    **somewhat** [1] - 695:3
    **somewhere** [2] -
738:20, 738:21
    **soon** [2] - 705:6,
707:25, 713:19, 713:23
    **sorry** [2] - 691:22,
741:9
    **sort** [5] - 741:12,
746:10, 748:9, 751:25,
752:10
    **sound** [1] - 693:6
    **space** [1] - 715:18
    **speaking** [1] - 690:4
    **special** [1] - 756:2
    **specialist** [1] - 754:23
    **specific** [1] - 762:6
    **specifically** [9] -
696:17, 697:6, 702:12,
717:13, 718:17, 718:18,
718:19, 739:6

  **specificity** [1] -
762:17
  **specifics** [1] - 717:17
  **specify** [1] - 761:13
  **speculate** [2] - 687:7,
687:9, 687:22
  **speculation** [2] -
687:23, 702:15
  **split** [2] - 718:14,
718:21
  **spot** [1] - 746:17
  **sprain** [8] - 733:9,
733:10, 750:14, 750:15,
750:16, 750:17, 750:19,
752:17
    **spreading** [1] -
746:24
    **square** [1] - 686:17
    **squeal** [2] - 690:19,
690:23
    **stand** [7] - 692:12,
694:16, 694:20, 718:3,
744:18, 744:19, 760:3
    **standard** [2] - 701:21,
721:25
    **standards** [1] -
726:22
    **standing** [2] - 710:11,
722:11
    **start** [6] - 708:8,
711:15, 712:23, 716:1,
730:14
    **started** [1] - 730:15
    **starting** [1] - 768:22
    **starts** [1] - 718:15
    **state** [4] - 685:20,
751:10, 760:9
    **statement** [5] - 686:7,
726:23, 727:6, 728:4,
728:5
    **statements** [11] -
685:24, 686:3, 686:15,
689:8, 689:10, 691:6,
704:20, 706:14, 710:5,
728:8
    **states** [1] - 767:25
    **stating** [1] - 683:14
    **stationed** [1] - 707:19
    **statute** [2] - 696:4,
698:25
    **stay** [1] - 760:22
    **step** [16] - 712:21,
717:22, 718:5, 721:18,
723:5, 723:23, 729:11,
729:17, 729:25, 730:2,
732:8, 730:8, 737:15,
742:5, 742:10, 748:20
    **stepped** [2] - 742:6,
742:7
    **stepping** [1] - 742:6

**steps** [5] - 739:18, 747:10, 747:11, 747:12, 747:21
**Steven** [6] - 686:21, 694:21, 696:2, 758:9, 758:18, 769:2
**stick** [1] - 727:18
**still** [6] - 699:1, 717:20, 720:11, 728:19, 753:17, 767:2
**stipulated** [3] - 688:15, 694:6, 702:22
**stipulations** [2] - 694:7, 702:21
**stirrup** [1] - 741:5
**stood** [2] - 688:17, 710:8
**stop** [2] - 690:24, 707:23
**stopped** [1] - 690:21
**stories** [2] - 713:10, 713:11
**story** [11] - 716:19, 716:20, 717:4, 717:8, 718:2, 718:4, 718:23, 720:1, 730:25, 737:7, 758:10
**straight** [1] - 748:3
**straightforward** [1] - 737:1
**street** [1] - 746:11
**strength** [1] - 741:7
**stricken** [1] - 689:21
**strike** [2] - 691:23, 730:10
**struck** [1] - 687:3
**stuff** [2] - 723:9, 727:19
**submit** [6] - 712:16, 713:13, 722:18, 730:20, 731:9, 737:19
**submitted** [1] - 728:11
**substantive** [1] - 684:24
**succeeded** [1] - 695:12
**suffer** [1] - 733:9
**suffered** [3] - 696:12, 733:10, 733:18
**suffering** [15] - 701:11, 701:14, 701:16, 701:17, 701:20, 701:23, 702:7, 702:8, 704:12, 704:15, 731:24, 735:23, 756:25, 757:1, 757:3
**suffers** [1] - 700:23
**sufficient** [1] - 693:25
**suggest** [3] - 705:7, 705:12, 706:7

**suggested** [1] - 735:8
**suitable** [1] - 699:7
**sum** [1] - 737:25
**supplementing** [1] - 761:18
**supported** [2] - 709:23, 710:2
**supposed** [2] - 720:21, 749:25
**supposedly** [2] - 749:21, 749:25
**surface** [2] - 696:22, 748:9
**surgeries** [8] - 731:18, 734:7, 754:10, 754:19, 754:20, 758:1, 758:2
**surgery** [34] - 732:4, 732:21, 733:8, 735:1, 735:5, 735:7, 735:9, 735:11, 735:13, 750:22, 751:10, 751:12, 751:15, 751:17, 751:18, 751:19, 752:15, 752:16, 752:19, 752:23, 753:18, 753:19, 754:11, 754:12, 754:14, 754:15, 754:18, 754:21, 757:10, 757:11, 757:12, 757:13, 757:15, 757:18
**surrender** [1] - 707:3
**surrounding** [2] - 690:14, 690:23
**susceptible** [2] - 700:1, 700:6
**sustain** [1] - 700:25
**sustained** [4] - 700:5, 700:24, 701:24, 757:1
**swear** [1] - 760:2
**sweaty** [12] - 714:19, 715:1, 715:7, 715:9, 716:5, 716:18, 716:20, 716:21, 720:4, 730:23, 737:3, 737:12
**sweaty-hands** [1] - 716:21
**swing** [2] - 730:6, 734:18
**sworn** [7] - 683:19, 683:22, 686:10, 688:9, 688:12, 694:12, 760:8
**symmetric** [1] - 748:22
**symmetrical** [2] - 747:23, 748:6
**sympathy** [7] - 684:2, 685:17, 702:17, 707:11, 731:21, 733:20, 734:2
**system** [23] - 696:20, 712:20, 719:2, 719:6, 720:15, 723:3, 725:4,

739:7, 739:19, 740:5, 740:9, 742:15, 748:5, 748:19, 749:1, 749:18, 749:22, 749:24, 750:6, 755:21, 756:8
**systems** [2] - 747:21, 748:7

# T

**talks** [3] - 733:21, 733:22, 752:3
**tall** [1] - 719:22
**tape** [7] - 712:19, 720:14, 721:6, 726:1, 739:7, 741:25, 742:16
**taught** [2] - 718:6, 723:16
**taxes** [1] - 756:20
**teach** [1] - 731:1
**teaching** [3] - 741:10, 749:22, 749:24
**ten** [1] - 738:3
**tending** [1] - 699:14
**tendinitis** [2] - 735:24, 736:6
**tends** [1] - 690:11
**term** [3] - 697:24, 700:12, 700:22
**terms** [3] - 696:10, 697:21, 704:4
**testified** [25] - 690:8, 691:20, 691:25, 692:7, 692:9, 694:20, 716:4, 720:21, 726:24, 727:11, 728:4, 731:5, 731:7, 732:2, 732:3, 733:5, 734:11, 736:9, 741:18, 742:2, 742:8, 743:14, 746:22, 763:16
**testifies** [6] - 692:17, 742:5, 742:9, 742:12, 744:5, 751:9
**testify** [8] - 692:4, 694:3, 694:15, 721:5, 722:25, 726:21, 744:13, 747:9
**testifying** [2] - 693:19, 729:12
**testimony** [58] - 685:2, 686:10, 687:8, 688:13, 689:20, 689:23, 690:7, 691:21, 691:22, 692:4, 692:1, 692:2, 692:6, 692:13, 692:18, 692:20, 693:2, 693:3, 693:4, 693:6, 693:8, 693:13, 693:16, 693:23, 694:3, 694:10, 694:14,

694:16, 695:16, 707:18, 707:25, 708:2, 710:3, 714:8, 720:20, 720:22, 724:25, 730:1, 730:7, 733:3, 736:25, 740:25, 742:25, 757:2, 758:12, 763:21, 764:3, 764:4, 764:16, 764:20, 766:7, 766:9, 766:10, 766:11, 766:16, 767:14
**testing** [1] - 733:5
**text** [1] - 708:14
**THE** [91] - 710:21, 710:25, 711:2, 711:10, 711:12, 725:9, 725:11, 725:15, 725:19, 725:22, 726:6, 726:14, 727:4, 727:11, 727:15, 727:18, 728:2, 729:4, 729:8, 737:22, 738:2, 738:3, 738:6, 738:10, 738:11, 738:12, 738:14, 738:20, 745:17, 758:25, 759:2, 759:4, 760:5, 760:9, 760:12, 760:14, 760:17, 760:21, 761:3, 761:7, 761:8, 762:9, 762:22, 763:2, 763:5, 763:18, 763:22, 764:1, 764:8, 764:11, 764:14, 764:23, 765:4, 765:9, 765:12, 765:15, 765:18, 765:24, 766:3, 766:8, 766:11, 766:14, 766:21, 766:25, 767:1, 767:3, 767:5, 767:17, 767:23, 767:24, 768:6, 768:8, 768:10, 768:11, 768:17, 768:19, 768:21, 768:24, 769:3, 769:4, 769:7, 769:10, 769:12, 769:14, 769:16, 769:18, 769:20, 769:22, 769:24, 770:14, 770:16
**the...footstep** [1] - 714:16
**themselves** [2] - 764:4, 764:16
**therapist** [1] - 717:5
**therefore** [1] - 694:8
**they've** [2] - 711:23, 753:11
**thick** [1] - 744:23
**thinking** [1] - 712:23
**thinks** [1] - 747:3
**third** [7] - 701:24, 718:2, 720:10, 730:24, 735:9, 754:17, 757:17
**thirty** [1] - 715:15
**thoughts** [1] - 708:7
**Three** [1] - 754:19

**three** [10] - 689:20, 713:10, 713:11, 715:18, 723:24, 731:18, 751:18, 751:19, 757:25, 758:1
**throughout** [1] - 757:5
**tighten** [1] - 724:10
**timing** [1] - 759:6
**tip** [1] - 695:3
**tires** [2] - 690:19, 690:23
**today** [6] - 736:14, 757:21, 758:12, 758:13, 758:16
**together** [2] - 710:10, 768:4
**took** [1] - 725:5
**tortfeasor** [1] - 700:3
**totaling** [1] - 704:5
**track** [8] - 697:9, 697:14, 742:22, 762:25, 763:15, 764:7, 765:20
**train** [42] - 693:9, 697:10, 697:13, 698:22, 714:16, 715:4, 717:21, 718:6, 719:7, 719:11, 720:25, 721:3, 721:11, 722:2, 722:3, 723:5, 723:16, 723:19, 724:11, 725:3, 728:17, 728:18, 730:3, 730:4, 731:2, 740:9, 740:22, 740:24, 741:2, 742:5, 742:21, 743:13, 744:1, 744:9, 747:14, 750:6, 755:13, 761:12, 762:7, 763:1, 763:17, 764:12
**training** [5] - 697:8, 723:13, 724:7, 724:22, 740:24
**trains** [5] - 731:1, 740:12, 740:25, 748:12, 762:23
**Trans** [1] - 696:5
**transmit** [1] - 705:25
**trash** [1] - 746:10
**traumatically** [2] - 755:10
**treat** [3] - 688:2, 694:8, 736:3
**treating** [1] - 750:14
**trial** [21] - 683:1, 683:6, 684:1, 684:4, 684:10, 684:18, 684:25, 685:6, 685:23, 686:15, 687:3, 688:1, 690:3, 691:20, 694:8, 694:10, 694:13, 704:22, 708:20, 759:19, 770:9
**tried** [3] - 714:19,

785

715:6, 754:15
**true** [5] - 694:7,
695:24, 722:6, 750:1
**truth** [6] - 684:5,
690:5, 693:24, 707:9,
709:2, 713:6
**try** [3] - 729:14,
745:23, 755:3
**trying** [6] - 711:19,
744:10, 746:1, 747:4,
747:5, 750:6
**turn** [4] - 690:20,
703:16, 707:20, 759:6
**twice** [1] - 751:18
**two** [30] - 689:15,
690:4, 701:10, 701:12,
702:6, 702:9, 702:11,
703:11, 703:21, 712:19,
712:20, 715:18, 716:20,
717:4, 717:6, 718:14,
727:12, 728:3, 728:6,
728:8, 732:1, 734:7,
734:23, 735:11, 743:11,
743:17, 743:19, 750:23,
756:18, 756:21
**tying** [1] - 764:20
**Type** [1] - 745:19
**type** [2] - 690:7,
690:10
**types** [2] - 690:4,
701:10
**typewriter** [1] -
766:25
**typewriters** [1] -
767:2

---

**U**

**U-b-a-l-d-i** [1] -
727:10
**Ubaldi** [8] - 721:17,
726:20, 726:21, 727:8,
727:9, 728:4, 730:1,
730:10
**ultimate** [1] - 742:14
**ultimately** [1] -
750:22
**unanimous** [6] -
706:10, 706:12, 709:12,
768:1, 768:9, 769:9
**unanswered** [1] -
686:7
**uncommon** [1] -
692:21
**under** [17] - 689:17,
692:2, 692:9, 698:2,
698:6, 698:7, 698:12,
698:15, 698:19, 699:1,
699:20, 705:16, 721:4,

743:4, 743:24, 753:10,
756:1
**undue** [1] - 708:1
**unequivocally** [1] -
691:25
**unless** [2] - 695:16,
754:20
**unlikely** [1] - 717:12
**unrelated** [2] - 702:9,
752:12
**unsafe** [4] - 697:14,
699:20, 719:22, 755:18
**Unusual** [2] - 715:2,
765:19
**up** [51] - 705:12,
705:23, 706:3, 710:12,
714:18, 715:6, 716:4,
717:13, 718:3, 718:15,
719:1, 719:7, 719:11,
719:17, 719:20, 719:24,
720:10, 723:16, 723:19,
723:22, 723:24, 724:11,
724:20, 725:4, 725:5,
728:15, 728:17, 728:18,
729:19, 729:22, 730:11,
730:12, 730:13, 731:2,
733:8, 733:22, 737:25,
740:21, 741:8, 743:9,
744:3, 748:9, 749:11,
753:3, 753:4, 753:20,
754:2, 761:21, 763:6,
768:3, 768:12
**urge** [1] - 734:3
**uses** [1] - 740:24
**ushered** [1] - 709:16

---

**V**

**validity** [1] - 710:1
**value** [3] - 690:25,
694:2, 701:20
**values** [1] - 702:9
**varies** [1] - 698:16
**various** [1] - 704:18
**Velez** [6] - 717:21,
719:10, 741:23, 742:6,
746:19
**Velez's** [2] - 765:6,
765:7
**verdict** [44] - 683:20,
683:23, 684:7, 685:20,
688:9, 703:2, 703:3,
703:16, 704:23, 704:24,
704:25, 705:10, 705:17,
706:1, 706:3, 706:4,
706:6, 706:7, 706:8,
706:10, 706:11, 706:12,
706:18, 707:6, 707:15,
708:6, 708:19, 709:5,

709:12, 709:15, 709:18,
709:19, 709:21, 730:19,
759:12, 768:1, 768:9,
768:12, 768:16, 768:18,
769:8, 769:9
**Verdict** [1] - 703:1
**version** [6] - 686:17,
686:18, 717:7, 718:9,
720:10, 730:24
**vertical** [1] - 741:5
**Vest** [1] - 745:15
**victim** [1] - 700:3
**video** [1] - 694:11
**videotape** [1] -
694:16
**view** [3] - 683:20,
686:4, 706:21
**viewed** [1] - 685:14
**views** [1] - 707:1
**violate** [1] - 726:24
**violated** [1] - 739:6
**violating** [2] - 744:9,
748:5
**violation** [6] - 683:19,
683:22, 688:9, 739:8,
745:3, 758:8
**violence** [1] - 706:22
**virtue** [1] - 690:10
**visit** [1] - 734:24
**visual** [1] - 742:2
**vote** [1] - 705:8
**votes** [3] - 705:9,
708:4, 708:5

---

**W**

**wages** [1] - 702:12
**wait** [2] - 707:23,
726:22
**walk** [3] - 719:18,
753:8, 755:3
**walking** [3] - 690:18,
718:4, 748:8
**Wallace** [7] - 722:24,
723:8, 731:6, 739:21,
739:22, 740:1, 742:9
**wants** [5] - 718:16,
718:19, 720:13, 742:16,
743:19
**watch** [1] - 770:9
**water** [2] - 717:22,
717:24
**ways** [4] - 703:10,
703:20, 712:19, 718:24
**wear** [7] - 736:8,
736:11, 736:13, 744:14,
744:15, 745:1, 750:1
**wearing** [4] - 736:5,
736:10, 744:16, 756:11

weather [1] - 720:7
**website** [1] - 708:16
**week** [4] - 717:6,
734:22, 747:3, 758:17
**weekend** [1] - 770:8
**weeks** [6] - 717:6,
734:23, 735:1, 735:5,
735:11, 754:8
**weighed** [1] - 694:18
**weighing** [1] - 692:22
**weight** [6] - 691:20,
693:2, 694:2, 707:3,
708:1, 735:12
**weighty** [1] - 709:10
**whatsoever** [1] -
685:5
**Whitley** [1] - 751:1
**whole** [5] - 683:15,
692:7, 693:8, 712:14,
730:13, 742:15, 748:19,
769:1
**Widas** [17] - 718:9,
720:20, 720:24, 724:25,
725:2, 725:13, 725:23,
727:14, 727:15, 728:6,
728:15, 728:21, 729:10,
730:11, 731:5, 747:23,
748:11
**Widas's** [1] - 742:25
**willful** [1] - 692:25
**willingness** [1] -
684:5
**wisdom** [1] - 683:16
**wish** [1] - 707:18
**witness** [33] - 685:1,
685:2, 691:25, 692:4,
692:5, 692:11, 692:14,
692:16, 692:18, 693:6,
693:8, 693:9, 693:11,
693:14, 693:16, 693:23,
694:13, 694:14, 694:15,
694:19, 694:20, 718:3,
721:5, 721:7, 729:7,
740:24, 744:7, 747:9,
749:23, 762:10, 762:14,
762:16
**witness'** [3] - 685:3,
693:2, 693:13
**witnesses** [18] -
686:11, 688:13, 689:9,
691:6, 691:19, 691:21,
692:7, 692:19, 693:19,
693:22, 694:3, 695:17,
708:22, 709:1, 739:13,
762:2, 764:5, 764:16
**woman** [1] - 719:20
**words** [14] - 691:10,
692:4, 697:2, 699:21,
704:7, 714:13, 715:19,
716:13, 716:15, 730:23,

737:5, 737:6, 747:22
**worker** [2] - 740:20,
740:21
**workplace** [7] -
696:6, 696:19, 698:12,
712:14, 720:18, 722:22,
730:18
**works** [1] - 728:16
**world** [1] - 754:23
**world-class** [1] -
754:23
**worse** [9] - 713:18,
736:2, 736:6, 754:11,
754:13, 754:14, 754:16,
757:23
**write** [14] - 703:3,
703:13, 703:16, 703:23,
703:25, 704:11, 704:12,
707:18, 715:14, 715:19,
727:4, 743:10, 767:10,
767:18
**writes** [1] - 743:12
**writing** [2] - 708:3,
743:18
**written** [6] - 705:13,
705:14, 714:3, 717:25,
720:2, 759:10
**wrote** [4] - 715:18,
716:9, 716:13, 743:11

---

**Y**

**year** [3] - 735:20,
736:15, 757:8
**years** [4] - 719:19,
740:18, 756:13, 757:16
**yesterday** [1] - 758:5
**young** [2] - 733:23,
752:6
**yourself** [5] - 692:5,
706:23, 723:24, 741:8,
748:4
**yourselves** [1] -
721:13
**YouTube** [1] - 708:17